i1n2saiC kjc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                 New York, N.Y.

 4              v.                             17 Cr. 722(VSB)

 5   SAYFULLO HABIBULLAEVIC SAIPOV,

 6              Defendant.

 7   ------------------------------x
                                              January 23, 2018
 8                                            12:15 p.m.

 9
     Before:
10
                        HON. VERNON S. BRODERICK,
11
                                              District Judge
12

13                          APPEARANCES

14   GEOFFREY S. BERMAN
          Interim United States Attorney for
15        the Southern District of New York
     BY:  AMANDA L. HOULE
16        Assistant United States Attorney

17
     FEDERAL DEFENDERS OF NEW YORK
18        Attorneys for Defendant
     BY: DAVID E. PATTON
19       JENNIFER L. BROWN

20   DAVID STERN
          Attorney for Defendant
21

22   ALSO PRESENT:

23   YANA AGOUREEV, Russian Interpreter

24   SANJAR BABADJANOV, Uzbek Interpreter

25   MICHAEL DE LUCA, Paralegal, USAO
```

i1n2saiC kjc

```
 1              (Case called)
 2              MS. HOULE:  Good afternoon, your Honor.  Amanda Houle
 3      for the government.  With me at counsel's table is Michael
 4      DeLuca, a paralegal from our office.
 5              THE COURT:  Good afternoon.
 6              MR. PATTON:  Good afternoon, your Honor.  David
 7      Patton, Jennifer Brown, and David Stern, on behalf of
 8      Mr. Saipov.  Apparently we are still waiting for the Uzbek
 9      interpreter.
10              THE COURT:  Oh, okay.  All right.  So why don't -- you
11      may be seated.  Sorry about that.  Let me make sure, am I
12      correct that we have a Russian interpreter?  Is that right?
13              MR. PATTON:  That's correct, your Honor, but it would
14      be --
15              THE COURT:  I have no problem with waiting for the
16      Uzbek interpreter, but let me just be sure, Mr. Saipov, can you
17      hear the interpreter?
18              THE DEFENDANT (In English):  Yes.
19              THE COURT:  Hold on two seconds.
20              So we will wait until we get the Uzbek interpreter
21      because I don't want to have a situation where Mr. Saipov
22      doesn't understand exactly what's going on here.  All right?
23      So I apologize for the delay, but we will get started shortly,
24      as soon as the interpreter arrives.  Okay?
25              MR. PATTON:  Thank you.
```

i1n2saiC kjc

1           THE COURT:  Thank you very much.

2           (Recess)

3           THE COURT:  Mr. Saipov, can you hear and understand

4    the interpreter?

5           THE DEFENDANT (In English):  Yes.

6           THE COURT:  All right.  So we are here for a status

7    conference.

8           I have several letters from the parties, including a

9    December 15 letter from the defense.  I issued a court order on

10   January 5.  The government made a motion for reconsideration

11   with regard to that order of endorsement on January 5; the

12   defense opposition to the motion for reconsideration.

13          I issued an order on January 8 that, among other

14   things, indicated that I would take those issues up today here

15   in court, in other words, the motion for reconsideration.

16          The government submitted a letter in further support

17   of its motion for reconsideration on January 22.

18          I have received two status update letters, one from

19   the government dated January 16 and one from the defense dated

20   January 17.

21          In addition, certain of the letters -- yes.

22          THE INTERPRETER:  Please be slower.

23          THE COURT:  Slower?  Okay.  Sorry about that.

24          Certain of the letters, although portions of the

25   letters were redacted, so I received unredacted versions of the

i1n2saiC kjc

1  redacted letters, which were filed on the docket.

2          Are there any materials or letters or correspondence

3  that I have omitted that I should have in connection with

4  today's conference?

5          From the government?

6          MS. HOULE:  No, your Honor.

7          THE COURT:  From the defense?

8          MR. PATTON:  No, your Honor.

9          THE COURT:  So the way I would like to proceed is, I

10  would initially like to deal with the issue of the

11  reconsideration.  I would then like to deal with the issue of

12  the motion schedule.  And then, lastly, I would deal with the

13  issue relating to a trial date.  Then at the end, I would open

14  up the discussion for any other matters that the parties

15  believe it is appropriate for me to take up at this time.

16          So, first, with regard to the motion for

17  reconsideration, in connection with that, I do have several

18  questions and points.  I guess what I will do is the following,

19  because I don't believe that either side has struck the balance

20  that I think is appropriate here.  You know, the initial

21  request by the defense was to preclude the government from

22  having access to the visitor log.  I thought that that was --

23  well, that didn't, in my mind, strike the correct balance.  The

24  government's response, in essence, said, and I am paraphrasing

25  here, that they can and should have access to the visitor --

5

i1n2saiC kjc

unfettered access to the visitor log.

I think that my reading of the law is something less than both positions for the following reasons, and then I will open it up for discussion.  I will have several questions and open it up for discussion.

First, with regard to the -- I already had made an earlier decision with regard to the defense request, and I set up a process by which there would be *in camera* review of the individuals on the visitor log who are being proposed by the -- that the government not have access to.  That obviously was the subject for the motion for reconsideration.

With regard to the reconsideration, there are a couple of things.  It may be that the visitor log itself and the potential experts, whether they are testifying, might be testifying, or consultative experts, that that mere fact may not be privileged, but it certainly, I think, implicates the work product doctrine.

It is clear to me that I have the authority and, in fact, based upon my reading of the CJA Act, in fact, under Title 18 United States Code 3006A(e)(1) defense counsel -- and I will read it, "Upon request, counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an *ex parte* application.  Upon finding, after appropriate inquiry in an *ex parte* proceeding, that the services are

i1n2saiC kjc

1    necessary and that the person is financially unable to obtain

2    them, the court or the United States magistrate judge, if the

3    services are required in connection with the matter over which

4    he has jurisdiction, shall authorize counsel to obtain the

5    services."

6            So there have been several cases that have discussed

7    that issue in the context of the CJA Act.  I see no reason why

8    the application of the logic behind the *ex parte* basis for that

9    request shouldn't be applied here.  So in *United States v.*

10   *Marshall*, 423 F.2d 1315, 1318, the Fifth Circuit held "that the

11   manifest purpose of requiring that an inquiry be *ex parte* is to

12   ensure that the defendant will not have to make premature

13   disclosure of his case.  Even though the rights established by

14   Section 3006A(e) are clearly procedural and appellant could

15   have waived the services provided therein by not timely moving

16   under subsection (e), we cannot countenance use of any other

17   than *ex parte* determination if a motion does in fact come under

18   that statute.  In most instances, the hearing should be held in

19   the absence of the prosecution."

20           The Tenth Circuit agreed with that logic in *United*

21   *States v. Sutton*, 464 F.2d 552, where the district court had

22   failed to hold an *ex parte* hearing for authorization to hire an

23   investigator and the court reversed the defendant's conviction

24   on that basis.

25           So there is a basis, albeit not a privacy interest,

i1n2saiC kjc

1    necessarily, and perhaps not directly a direct privilege claim,

2    there is a basis, in my view, for the defendant's request that

3    the government not have access at this stage to the names of

4    the experts.

5           Having said that, I also recognize the government's

6    interest in connection with whether it is an ongoing

7    investigation or national security interest with regard to this

8    case.

9           In light of that, I am going to make -- I make the

10   following -- well, let me ask one question.  Who is going to be

11   dealing with this issue on behalf of the defense?

12          MS. BROWN:  I am, your Honor.

13          THE COURT:  In connection with -- I don't remember

14   which letter, but there was an indication that the visitors to

15   Mr. Saipov have to be, is it approved by the Bureau of Prisons?

16   If you could explain the process that the BOP -- that you, the

17   defense goes through with the BOP.

18          MS. BROWN:  Yes, your Honor.

19          We have to give advance notice through the legal

20   department, Adam Johnson, of any visitor that we want to have

21   visit with Mr. Saipov.  They have to approve or deny the visit,

22   and they send a letter to the front desk so that no one can

23   enter without having been expressly approved by legal.

24          THE COURT:  Okay.  And typically is that a same-day

25   request or does it take a week or two for that to be processed?

i1n2saiC kjc

1          MS. BROWN:  In advance, your Honor.  Not same day.  It

2     may be several days, but in advance.

3          THE COURT:  Okay.  Thank you.

4          This is my proposal, and then I will hear from the

5     parties, because it does appear, I think, again, that there

6     is -- at least the defense threw out or, I will say, proposed

7     the issue of having wall counsel or, for lack of a better term

8     or a wall team review that.  The government, in response,

9     indicated that although it still believed that there was no

10    basis to preclude it from having access to that, I think I have

11    indicated that my ruling is that I believe there is a basis for

12    that.  But the government also indicated, I think, that that,

13    as an alternative, that would be something that could work.

14         So let me make the following proposal, which is, based

15    upon what I heard today, that the government establish a wall

16    team.  Whatever the composition is, obviously I will leave that

17    up to the government.  Obviously that team is not to --

18    consistent within the case law, should not have any part in the

19    prosecution itself, and their sole responsibility with regard

20    to this case would be to review names.

21         At this point I'm going to suggest something that's

22    slightly different than I think where the parties are.  I think

23    when the defense makes the request to the Bureau of Prisons to

24    the legal department, that those requests -- and I don't know,

25    as a practical matter, how this would occur but, again, I will

i1n2saiC kjc

leave that to the parties -- that those requests in or about

the same time would be communicated to the assistant in charge

of the wall team.

The wall team would then do whatever diligence they

believe is appropriate to vet that individual, for lack of a

better term.

Once the determination is made -- and obviously they

should do so as expeditiously as possible, and hopefully so

that that will dovetail with the amount of time that --

typically the turn around time that it takes.  But whatever

time it takes, the wall team will do that.

The individual will not be permitted to visit until

such time as either the wall team -- the assistant, whoever the

assistant is, contacts the legal department and indicates that

there isn't an issue with the particular visitor who has asked

to visit.  Obviously that should not -- who that individual is

shouldn't be disclosed to the trial team.

If there is an objection, those objections -- the

objections should come to me with a detailed explanation as to

what the objection is with regard to the particular visitor.  I

will review it and make a determination.  I am assuming that

the objection will be such or could be such that that objection

can be, if it involves national security interests and the

government believes it is appropriate, can be made under seal.

However, to the extent that any portion of the government's

i1n2saiC kjc

| | |
|---|---|
| 1 | objection can be, in other words, the objection can be |
| 2 | redacted, it should be done in that fashion.  But obviously the |
| 3 | wall assistant should let the defense know that there is an |
| 4 | objection that is going to be filed. |
| 5 | And obviously I would attempt to make my decision as |
| 6 | expeditiously as possible so that the case can move forward. |
| 7 | So that is my suggestion of a resolution of the |
| 8 | matter.  So just to be clear, that would mean I would be |
| 9 | granting in part, I guess, and denying in part the government's |
| 10 | motion for reconsideration. |
| 11 | So I have reconsidered my decision, in part, just to |
| 12 | be clear, I think that my involvement should come later in the |
| 13 | process.  I obviously don't have access to the resources that |
| 14 | the government has to make an assessment of whether there is an |
| 15 | issue with regard to a particular visitor, so that's why I have |
| 16 | set it up in the way that I have. |
| 17 | So let me hear from the government.  Does that |
| 18 | proposal make sense? |
| 19 | MS. HOULE:  Thank you, your Honor. |
| 20 | With regard to your Honor's position regarding 3006, I |
| 21 | think, in the government's view, that is distinguishable in |
| 22 | that an application under 3006 would include information that |
| 23 | is not included in the visitor log that would expose defense |
| 24 | strategies, such as, why the expert is required, the details of |
| 25 | the expert's expected testimony, and the extent to which the |

i1n2saiC kjc

1    defense intends to use that expert at trial.

2              Nonetheless, we understand your Honor's reasoning, we

3    appreciate your consideration of this, and we think that the

4    wall team is the most appropriate avenue to ensure that law

5    enforcement are able to review the log in its entirety.

6              Just one question, your Honor, about this approach.

7    To the extent that the prosecution case team sought access to

8    the log for purposes of this trial, would your Honor permit the

9    case team to review a redacted version of the log at that

10   point?

11             THE COURT:  Oh, yes.  I'm sorry.  So the portion of my

12   order with regard to the redaction of the log would remain.  So

13   if there was a determination that there was an objection that

14   the defense was submitting someone, yes, the answer is yes.

15   Sorry.

16             MS. HOULE:  Thank you, your Honor.

17             THE COURT:  I apologize.  I should have made clear

18   that part of the process I was suggesting was so that the

19   government could have access to the portions of the log that I

20   believe that there really is an objection to by the defense.

21   In other words, that under normal circumstances, the government

22   would have -- would be able to have access to a visitor log.

23             MS. HOULE:  Understood.  Thank you.

24             THE COURT:  All right?

25             From the defense.

i1n2saiC kjc

1              MS. BROWN:  Your Honor, our preference was the balance

2       that you had struck on your initial decision, because the

3       further away from the prosecution, the less risk there is of

4       them learning about what we think is protected by the Sixth

5       Amendment defense strategy.

6              THE COURT:  Let me just be clear about that.  First of

7       all, I think that, as I mentioned, I am not -- I don't have

8       access to the information that the government has.  Second, the

9       government establishes the wall team, and I am assuming that

10      they are going to abide by the process and procedures that are

11      appropriate in connection with that.  If that is violated in

12      some way, that's a separate issue, and that's something I would

13      need to deal with at that time.

14             I understand the government's position that they

15      believe that 3006A is something different, but just to make a

16      finer point of it, you know, there could be situations where,

17      because the government, as I understand it, the intention would

18      be and the reason to get the log would be to actually

19      scrutinize the individuals on that log.  Were the defense to

20      have an expert, let's say, either the defense had not made a

21      decision about whether to retain an expert to testify, but was

22      retaining an expert, let's say, for purposes of consultation,

23      and the particular area of consultation that the expert is

24      being retained at is a pretty narrow band.  The disclosure of

25      that information, although, yes, the actual request made by

i1n2saiC kjc

1    defense in 3006 is more detailed than would be on the log, the

2    issue would be, as the prosecution then would be in a position,

3    through its own research, to make a determination what the, in

4    essence, the substance of what that expert is being retained to

5    do.

6              Now, the legal question about whether that crosses a

7    line is something that I don't need to opine on at this time.

8    So I understand what the defense's position is, but I think, in

9    order to strike the balance, in particular in light of the fact

10   that I don't have access to the information and therefore would

11   not be in a position to do this, I think that establishing the

12   wall counsel is the appropriate thing to do in this case.

13             MS. BROWN:  So I understand that balance, your Honor.

14   The advance notice requirement is very problematic.  So right

15   now the procedure, your Honor, Mr. Saipov is housed in

16   10 South, which is the most secure area of the facility.  And

17   as things stand now, we are required to give advance notice to

18   the legal team that is in charge of security in that area.  So

19   the vetting that goes on to make sure that folks that come into

20   that area is of course diligent.  And so this idea that, as

21   things stand now, we -- as long as it is approved by the BOP,

22   who is in charge of the safety of the inmates, as long as they

23   say it is okay for an expert to come in, the expert could come

24   in.  The idea that now we are going to have to wait a certain

25   amount of time and that they could actually veto one of our

i1n2saiC kjc

1    experts coming in is problematic, your Honor.  There has been

2    no indication -- now, I don't know what was sent to the court

3    *ex parte*, but there has been absolutely no explanation that the

4    BOP cannot satisfactorily perform that safety --

5              THE COURT:  Okay.  Well, let me ask this.  Do you know

6    whether the BOP has access to the national security information

7    that would be necessary to vet individuals in this case?

8              MS. BROWN:  I have not asked that question, your

9    Honor.

10             THE COURT:  Does the government know whether the BOP

11   individuals, the people who typically make these decisions,

12   have access to such information?

13             MS. HOULE:  They don't, your Honor.  For the reasons

14   set out in the government's submission to this court, in this

15   case in particular, it is necessary for law enforcement, the

16   F.B.I., to review the visitor log.

17             THE COURT:  Okay.  So in light of that, I understand

18   the defense's position, but it seems to me that, yes, I agree,

19   in a normal case, where there might not be national security

20   implications or even -- I guess I would say even the need to

21   have knowledge, that typically would be something that is

22   covered by SIPA, that's something that the BOP officials don't

23   have.  And therefore, although I think in a normal circumstance

24   they would be equipped to make that determination, in this

25   circumstance I believe that the necessary step is that wall

i1n2saiC kjc

1    counsel be provided.

2            Obviously, if this process leads to extensive delays,

3    then I will hear from the parties and try and do something to

4    streamline the process, but I think that the suggested process,

5    I think, is something that will -- and also, just to be clear,

6    the initial way it had been structured would have been when --

7    I think this strikes a balance that I think is necessary in

8    this case.

9            MS. BROWN:  Understood, your Honor.

10           We do have one particular visit scheduled already of

11   someone that's already been approved, and so I'm concerned,

12   because experts are difficult to schedule, and so I don't want

13   that visit to be delayed.  This is someone that's been approved

14   and already visited.  So I don't want this change of procedure

15   to impact that scheduling which has been difficult.

16           THE COURT:  I guess what I will say is this:  To the

17   extent that there have been visitors who have already visited,

18   the wall team can have access to the log.  My suggestion would

19   be that they look at the log as it stands and make a

20   determination about whether or not -- I understand that there

21   may be -- that someone has already visited, but there -- and

22   I'm not saying there is going to be any problem, but that they

23   would review the log as it currently stands, and if there is an

24   objection to anyone, that that objection be made known to me

25   and that the prosecution let the defense know that there is

i1n2saiC kjc

1    going to be objection.  And that should be coming obviously

2    from the wall assistant and the wall team, and the prosecution

3    should not be involved in that discussion.

4         MS. HOULE:  Yes.  Thank you, your Honor.

5         THE COURT:  All right.

6         Is there anything else on the issue of the motion for

7    reconsideration?

8         MS. BROWN:  The only thing I would ask is if you would

9    consider setting some outer limit.  I understand that you want

10   it to be done expeditiously, but a directive from the court

11   that, you know, any review will -- the expectation that it will

12   be done in X number of days, so it doesn't overly burden our

13   scheduling.

14        THE COURT:  Again, what I would do is leave it to the

15   parties in that sense, because since I don't know who the

16   individual experts are, when they would necessarily intend to

17   visit, it may be under certain circumstances that there is a

18   certain amount of lead time that's fine because the expert

19   isn't available for several weeks.  There may be circumstances,

20   though, where there is a narrow window.  So I will leave it

21   to -- and the government, once the wall team is established,

22   obviously you should communicate, the wall team should

23   communicate with the defense so you know who these folks are,

24   so that when you do begin the process of providing the names to

25   the Bureau of Prisons, that you know who to contact to see

i1n2saiC kjc

 1    where they stand in terms of their vetting process.  Okay?  All

 2    right.

 3              Now with regard to scheduling of the motion schedules,

 4    I see the microphone shifting over, so I take it, Mr. Patton,

 5    you are going to be handling that.

 6              My question is the following:  With regard to the -- I

 7    recognize the two different proposals, one being 30 days from

 8    the date that the Department of Justice makes a determination

 9    about whether or not the government intends to seek the death

10    penalty, as opposed to October 1, which is keyed off of the

11    outside date that the government has provided of September 1

12    for making -- for that decision to be made.

13              Let me ask this with regard to the -- are there any

14    motions, Mr. Patton, that you envision at this time, based upon

15    the discovery that has been obtained, that are not directly

16    related to the decision of whether the government seeks the

17    death penalty?

18              MR. PATTON:  There are, your Honor, but I don't know

19    that they would end up being filed if the decision by the

20    government were "no seek."

21              THE COURT:  You are anticipating what my next question

22    was going to be, and that was whether or not there could be a

23    staging of motions.  But I understand that there may be reasons

24    why you want to hold in abeyance the filing of all of the

25    motions until such time the determination is made.

i1n2saiC kjc

1              So this is what we are going to do with regard to the

2      motions.  We are going to -- I'm going to set October 1 as a

3      date for the motions.  However, that date is subject to

4      potentially change if in fact the government, the Department of

5      Justice has made a decision with regard to the death penalty in

6      advance of the September 1 date.  So I would put the onus on

7      the parties that, once that decision has been reached, if it is

8      in advance of September 1, for the parties to meet and confer

9      about a motion schedule.  In other words, and it depends

10     upon -- obviously, if it is August 30 that the decision is

11     made, that I view as different than if it is, you know, in June

12     or July.  And I guess what I am saying is that I would revisit

13     the scheduling of the motion and I would want to hear from the

14     parties how much -- in light of the fact that the decision has

15     been made, whether or not we can advance that October 1 date.

16             I understand that it is conceivable that, depending

17     upon when that happens, there may be the individual lawyers who

18     may be responsible for particular motions may be otherwise

19     engaged.  But the purpose for my ruling is to allow flexibility

20     so that if we can advance that date of October 1, we would do

21     that.

22             And then the proposed schedule thereafter obviously,

23     you know, I don't have a problem with 30/30 -- basically 30

24     days, 30 days, and then two weeks on reply; however, if there

25     is an earlier decision, I will leave it up to the parties to

i1n2saiC kjc

1  present to me a proposed schedule that accelerates that date.

2  Obviously if, because of counsel's obligations on either side,

3  the October date still would make most sense, then we will just

4  stick with that date.

5        Let me hear from the parties with regard to that

6  proposal.  From the government?

7              MS. HOULE:  Understood, your Honor.  Thank you.

8              THE COURT:  All right.  From the defense.

9              MR. PATTON:  Understood, your Honor.

10        I will say that, even now, if we got an earlier

11  decision over the summer, I would anticipate that we would be

12  coming back to the court asking for additional time.  The

13  motions that we anticipate, if there is a decision to seek, are

14  voluminous.

15              THE COURT:  I understand.  And I understand this is

16  not a static process, it is dynamic, and decisions are being

17  made with regard to that issue.

18        So the third issue is the trial date.  I know the

19  government has proposed a trial date of April 2019 or somewhere

20  in that range.  The defense has mentioned a date of September

21  2019 as a trial date.  But I think I need some additional

22  information, and this goes a little bit to where things stand

23  in terms of discovery.

24        As I understand from the government's letter, the

25  discovery has been substantially made.  Are there materials

i1n2saiC kjc

1   that the government is currently aware of that it still needs

2   to turn over to the defense?

3           MS. HOULE:  No, your Honor.

4           THE COURT:  Are there materials that, and again this

5   may be covered by my prior question, but are there materials

6   that the government has not yet received that the government

7   anticipates receiving that will need to be turned over to the

8   defense?

9           MS. HOULE:  No, your Honor.

10          And if I may, your Honor, just on the point of

11  discovery, the defense made reference in one of their

12  submissions to the discovery being more than a terabyte.  The

13  discovery in this case is not extraordinarily voluminous.  That

14  terabyte consists mainly of videos and photographs of the

15  attack as well as the contents of the defendant's phone.

16          THE COURT:  Let me ask this with regard to the

17  discovery that has been produced.  Do you have a sense of how

18  much of that discovery will require the preparation of the

19  transcripts?  In other words, where there are foreign language

20  materials that have been provided, and do you have a sense of

21  what the timing will be with regard to the government's

22  preparation of those materials.

23          MS. HOULE:  Thank you, your Honor.

24          The government is in the process of preparing

25  translations of the materials, particularly on the defendant's

i1n2saiC kjc

phone.  To the extent that the defense is willing to enter into

a standard stipulation that those transcriptions will not be

used for litigation purposes, the government can produce those

on a rolling basis once they become available.  We expect that

they will begin to become available within the next two weeks.

THE COURT:  Okay.  Then obviously the parties should

meet and confer with regard to the -- again, if it is the

standard agreement that the parties typically enter into and

obviously start making those available.

Do you have a sense, though -- I understand that on a

rolling basis they could -- you could start producing in two

weeks.  Do you have a sense of when that process might be

completed?

MS. HOULE:  The substantial volume of those

transcriptions, your Honor, or translations would be available

within the next three weeks; and as the government continues to

identify materials that should be translated thereafter, it

will quickly have them translated and provided to defense.

THE COURT:  All right.  That is helpful.

The next question I have is, I would like to get a

sense, on the basis of an outside date, how long the parties

anticipate the case would be?  This is not something I am

obviously going -- that is set in stone, that I am going to

hold the parties to, but I think for purposes of (a) my setting

aside the time for the trial, but (b) so that counsel can make

i1n2saiC kjc

1    decisions concerning their own calendars, I would like to get a

2    sense of what the parties -- and as part of that, have the

3    parties actually discussed the issue related to how long a

4    trial might be?

5            Go ahead.

6            MS. HOULE:  We have discussed it at a general level,

7    your Honor, with the defense.  I think that the defense takes a

8    different view as to how long they anticipate jury selection in

9    this case will take.  But as to the government's proof at

10   trial, if we were in a situation where the government was

11   seeking the death penalty, the government anticipates that its

12   case on the guilt phase would be, conservatively, approximately

13   three weeks and that the penalty phase would take approximately

14   the same amount of time.

15           THE COURT:  Okay.

16           MR. PATTON:  Your Honor, may I be heard briefly on

17   that.

18           THE COURT:  I was thinking about asking how long you

19   think, but I understand that it is -- that is a long way off.

20   I was just thinking in my own mind, and I would just add a

21   certain amount of time to that.

22           So go ahead, Mr. Patton.

23           MR. PATTON:  I just think that it is entirely likely

24   that those estimates are on the short end, just given my own

25   limited personal experience trying capital cases.  But I know

i1n2saiC kjc

1   from talking to Mr. Stern, who has tried more, and from our

2   consultations with the Federal Death Penalty Resource Council,

3   the fastest that jury selection happens where there is a need

4   for an awful lot of individual *voir dire* on the issue of the

5   death penalty, the fastest it seems to ever happen is a month.

6          I know the last trial that Mr. Stern tried, it took

7   two months.

8          THE COURT:  And just so I have, and I apologize for

9   interrupting, but does that include a process of initially

10  screening the jurors through some process, such as a

11  questionnaire and, in other words, getting -- whittling down

12  the pool of folks and even having the parties review them for

13  cause initially?

14         MR. PATTON:  I think we will almost certainly propose

15  a questionnaire.  I think the government in the past has been

16  amenable to that and it is often used.  But even with a

17  questionnaire, there tends to be an awful lot of follow-up

18  because the questions and the answers are not always terribly

19  black and white.

20         THE COURT:  I understand.  I guess my question,

21  though, went to the statistics that you were providing with

22  regard to the one month -- in other words, I want to get a

23  sense of whether I am comparing apples to apples.  In other

24  words, if that includes as part of the process, the

25  questionnaire process, that the shortest time that folks have

i1n2saiC kjc

1    been -- have seen has been approximately a month.

2            MR. PATTON:  Mr. Stern is communicating that he has

3    never done a capital trial without a questionnaire.  So the

4    timing that we are providing the court is with a questionnaire.

5            THE COURT:  Okay.

6            MR. PATTON:  And in terms of the merits versus penalty

7    phase of the trial, I don't have any specific reason to think

8    that the government's estimate of three weeks on the merits

9    phase is wrong.  I would think that that is an aggressive

10   schedule for a variety of reasons, but I don't have any

11   particular reason to push back on the three weeks.  I do think

12   that the penalty phase could well last longer than that.  The

13   government typically in a penalty phase will put on a

14   significant case and the defense, unlike many merits phases,

15   will itself put on a significant case.  And so I think that the

16   court should anticipate a longer period of time than three

17   weeks for any penalty phase.

18           THE COURT:  All right.

19           MS. HOULE:  Your Honor, as noted in the government's

20   letter, jury selection could begin before April of 2019, and

21   the government has also conferred with the capital case

22   committee about the variety of time spans that have been used

23   for jury selection.  There are instances where it was less than

24   one month.  In a case that we think is an apt comparator, which

25   is the prosecution of Dylann Roof in South Carolina, which was

i1n2saiC kjc

 1    also a single defendant, single incident case, jury selection

 2    took approximately two weeks.

 3            THE COURT:  Okay.  But does that include the process

 4    of -- were there questionnaires in that case?

 5            MS. HOULE:  I believe so, your Honor.

 6            THE COURT:  Does that include -- the two weeks include

 7    that process?  In other words, because I think -- and, again, I

 8    don't know the exact process, but participating in cases, not

 9    death penalty cases, where questionnaires have been used, they

10    go out to a whole host as part of a panel, you get them back,

11    the parties are given a certain amount of time, and then they

12    compare notes as to whom should be -- which potential jurors

13    should be dismissed for cause, and then we would proceed

14    with -- so what I am trying to figure out is whether those two

15    weeks includes that or not.  Do you know?

16            MS. HOULE:  I don't know specifically, your Honor,

17    about the timing of sending out the jury questionnaires in that

18    case.  Even if we were to assume that this was going to take

19    four weeks, the government has proposed that we start the

20    questionnaire process in March so that we can proceed to trial

21    in April.

22            THE COURT:  I don't have a problem with -- I guess

23    from my perspective I am including all of that as part of jury

24    selection.

25            MS. HOULE:  Understood.

i1n2saiC kjc

1          THE COURT:  So I think that -- again, I don't know,

2     but I am thinking in terms of allotting time, the jury

3     selection through to the end of trial and, again, this is

4     outside dates, if you are saying three weeks and three weeks,

5     and I understand the defense's position that it is going to

6     likely take longer, I think we are talking about setting aside

7     somewhere in the order of three months to four months to be on

8     the safe side.  Again, I am just saying -- what I am saying to

9     the parties is that that seems to me to be something that the

10    parties should at least in their own calendars try and leave

11    that time period free for the purposes of the case.  I'm not

12    saying -- and I have to think about it.  I typically do not

13    set -- I know some of my colleagues set trial dates at initial

14    appearances.  I typically do not do that.  I wait until I get

15    more information from the parties before I set a date.

16         But let me hear, is there anything else from the

17    government?

18         MS. HOULE:  Just on that point, your Honor, even

19    accepting sort of the defense's view that this could extend

20    beyond four months, including jury selection, the government

21    thinks that setting the April trial date would still be

22    appropriate here.  While it is possible that starting in April

23    could start to run into the end of summer holidays, under the

24    defense's request, trial would begin in September and so at any

25    point in the year, your Honor, you set a date, if you are going

i1n2saiC kjc

1    four months out, you are going to run into some sort of

2    holiday.  We don't think that's avoidable here.

3          THE COURT:  My experience has been in the trials I

4    have had that there is no particular date that is going to

5    work.  Obviously I think either the September date or the April

6    date, my assumption is that there are going to be vacation

7    schedules, holiday schedules, and other things that would --

8    where there would be -- where there would be issues, and we

9    would deal with that in terms of the amount of jurors that we

10   get.  So I don't think -- and I saw the argument in defense's

11   paper with regard to the summer.  I think there are other

12   issues that will be more of a dispositive factor concerning

13   whether jurors are going to be able to sit or not on the case.

14   So I don't view that as a particularly -- that's not a

15   particularly weighty consideration on my part.

16          MS. HOULE:  Understood, your Honor.

17          The schedule that the government put forward was an

18   attempt to address the defense's request for additional time to

19   prepare mitigation, their request to hold the motion schedule

20   in abeyance until the capital case process is complete; and

21   under the current schedule, this would enable -- an April trial

22   date would allow for at least five months for trial preparation

23   after the motions are briefed.  We think that that is fair to

24   the defendant.  We think that that accommodates many of the

25   issues that the defense has raised.

i1n2saiC kjc

1            And as set out in the letter, we think that there are

2    other important equities at play here.  When there is an attack

3    such as this one, where eight people are murdered and others

4    are critically and permanently injured, those victims and their

5    families and the public deserve a speedy trial.  These victims

6    are looking for how this process is going to play out, what it

7    looks like, and how they fit into it.  Having a certain trial

8    date will enable them to prepare for that and enable the

9    government to efficiently ensure that they can be present at

10   trial, which will require coordination with foreign

11   governments.

12           THE COURT:  Let me ask you this:  When you say

13   coordination with foreign governments, are you anticipating the

14   need to involve the State Department in obtaining visas for

15   individuals to come to the country either to testify in the

16   case?  Is that what --

17           MS. HOULE:  We will need to work through the State

18   Department, we will need to submit MLATs to foreign entities to

19   ensure that all of the sort of boxes are checked on their end,

20   to permit citizens to come to the United States and testify

21   here.

22           THE COURT:  How much time typically, do you have a

23   sense of how much time that typically requires?  What I am

24   trying to do, just so that you know, is decide whether or

25   not -- because I'm not sure I have entirely enough information

i1n2saiC kjc

1    to make the decision now as to when the trial will be, but what

2    I am trying to gauge is how much time you would need.  Because,

3    obviously, if the decision is made in May, the date that you

4    proposed would be 11 months away.  Would that be sufficient

5    amount of time for the government to do what it needs to do to

6    make sure that -- and I am not saying that I am going to do

7    this, and I'm not saying that I would wait until then to make a

8    ruling as to a trial date, but would that amount of time be

9    sufficient?

10             MS. HOULE:  Yes, your Honor.

11             THE COURT:  Mr. Patton.

12             MR. PATTON:  Your Honor, I agree with the court's view

13   that, no matter when we set a trial date, ultimately there will

14   be scheduling issues.  I do think that the summer tends to be

15   the worst possible time.

16             But leaving that aside, our main reason for not

17   setting a trial date now or at the very least setting one

18   further out than when the government is proposing is because we

19   just need more time than that.  The average, again, going back

20   to the statistics compiled by the Federal Death Penalty

21   Resource Council, the average time, since 2004, for all capital

22   trials around the country, from indictment to trial, has been

23   36.5 months, so just a little over three years.

24             We are, I think, being quite reasonable and proposing

25   a schedule in good faith that is far more aggressive in a case

i1n2saiC kjc

1   that is far more complicated than the typical capital case.  To

2   put on a capital mitigation case in a penalty phase where the

3   vast majority of the defendant's life is literally halfway

4   around the world poses extraordinary logistical challenges for

5   us in preparing.

6           THE COURT:  Let me ask a similar question to the

7   government.  Assuming that the schedule -- again, I understand

8   with regard to the death penalty -- proceeds as the parties

9   anticipate, in other words, that the defense makes their

10  mitigation submission to the Department of Justice in May, that

11  a decision is rendered at the latest by September 1 of 2018, is

12  the time frame from September 1 to April a sufficient amount of

13  time to --

14          MR. PATTON:  No, your Honor.

15          THE COURT:  What would be?  Assuming the September

16  decision.

17          MR. PATTON:  An April trial date would be half the

18  average time of a capital case to trial from indictment in a

19  case that's certainly far more complex than the average trial.

20          The government talked about a two-week *voir dire* in

21  Dylann Roof.  Well, Mr. Roof was largely representing himself.

22  I don't think that that is a terribly apt comparison for our

23  situation here.  Eighteen months is just simply not enough time

24  for us to do all of the things that we are talking about doing

25  here.  Everything we do in this case, given Mr. Saipov's

i1n2saiC kjc

1    location in 10 South, given the hoops that we need to jump

2    through for expert visitation, given all of the difficulties in

3    meeting with family, it's not like we just take a drive or a

4    quick trip to meet with an enormously extended family or to

5    gather records or to have the cooperation of government

6    agencies the way that we are going to need in Uzbekistan.

7    Those things are tremendously time consuming.  Even on an

8    aggressive motion schedule like the one we have proposed, we

9    are not going to have decisions on those motions surely at the

10   very earliest until the end of this calendar year, and that's

11   not including *in limine* motions, which themselves, I think,

12   could be quite complicated, given some of the issues that we

13   foresee in this case.

14          So this trial will be dramatically different,

15   depending on the government's decision to seek.  It could be

16   dramatically different depending if the government does seek,

17   depending on the outcome of the motions.  I just think that

18   spring 2019 trial date is not remotely realistic.

19          THE COURT:  As I mentioned, I think, at least in my

20   view, and again some of my colleagues differ, and I understand

21   the need to have -- both sides to have advance knowledge of

22   when the trial is going to be so that witnesses for whatever

23   parts of the case can be contacted and adequately prepared.  I,

24   however, at this stage don't think I have a sufficient amount

25   of information to make a determination about whether April is

1   the appropriate date or September is the appropriate date or

2   some time in between.

3           So what I am going to propose is the following:  I am

4   going to ask that the parties provide me with a status update

5   of the case every two months, and I will issue an order

6   indicating what specific dates those updates should happen.

7   Those updates, as a general matter, should include, for

8   example, the status of the preparation and distribution of the

9   transcripts that have been -- the foreign language transcripts

10  that have been translated, any additional discovery that the

11  government anticipates providing, whether or not there has been

12  any change in the scheduling with regard to the death penalty

13  consideration by the Department of Justice, so that I have a

14  better sense between now and the next -- the first letter I

15  receive, the first letter, whether or not we are proceeding at

16  the pace that the parties anticipated proceeding, so that I

17  could have a better sense of whether -- what date makes the

18  most sense.  It is obviously we are talking -- the parties

19  agree that that date at the earliest is April of 2019, so we

20  are still talking a fair amount of time away.

21          Just to be clear, it is not my intention -- I plan on

22  providing adequate time to allow the parties to do what they

23  need to do to adequately prepare for this trial.  Obviously, if

24  I am going to -- if I decide, after receiving the first status

25  update, or even the second, that I want to set a trial date, I

i1n2saiC kjc

1    will have the parties in and we will talk about it in more

2    detail at that point concerning what date in my mind I think

3    makes the most sense, after I see where things stand from the

4    parties' standpoint.

5           So you are not going to get a trial date today I guess

6    is the short answer, but I am not ruling out making that

7    determination after I see whether or not the parties are

8    actually able to meet the dates that they set forth.

9           Yes.

10          MS. HOULE:  Thank you, your Honor.

11          If I may respond to one point defense counsel made, to

12   the extent that it shapes your Honor's view of this

13   conversation.

14          In terms of the statistic regarding an average of 36

15   months between I believe it was indictment and trial, many of

16   those cases are very different from this case and involve

17   multidefendant cases, crimes that are committed over years of

18   time.

19          This is a different scenario here.  Defense counsel

20   has already used as an example, I believe, the prosecution of

21   the individual who committed the Boston bombing in 2013.  That

22   case proceeded to trial approximately 21 months after the

23   offense was committed.

24          So we would like your Honor to keep those time frames

25   in mind when setting a schedule here.

i1n2saiC kjc

1          THE COURT:  Well, what I would suggest is this:  In

2     that first status letter, the parties should talk to one

3     another, and the government should basically make a list of the

4     cases that they believe are appropriate comparators, the

5     defense should make a similar list, and you should talk about

6     that, and then provide me in that letter with the cases that

7     you believe are the appropriate comparators to give me more of

8     a sense of how much time typically it would take.  I think that

9     would provide me with the additional information that would be

10    helpful, quite frankly, to setting a trial date that makes

11    sense, understanding that no case is exactly the same, but

12    assuming that the parties, there is an overlap, and I imagine

13    there will be, an overlap between the cases that the defense

14    and the government believe are appropriate comparators -- I am

15    not saying it will be 100 percent -- that would be a useful, to

16    me, a useful thing to have.

17          MS. HOULE:  Understood, your Honor.

18          THE COURT:  Okay.

19          MR. PATTON:  Yes, your Honor.

20          THE COURT:  That takes us through the three matters

21    that the parties had raised that we should discuss.

22          Let me ask, are there any issues that the parties

23    believe that we should take up at this time from the

24    government?

25          MS. HOULE:  Unless the defense has any other issues,

i1n2saiC kjc

 1    the government moves for the exclusion of time.

 2              THE COURT:  Okay.

 3              MR. PATTON:  No objection, your Honor.

 4              THE COURT:  All right.  So I will -- Ms. Williams, two

 5    months from today, what's that first date?

 6              THE DEPUTY CLERK:  Should be March 23, Judge.

 7              THE COURT:  I will say this, I will make an

 8    observation.  Mr. Patton, you have indicated that this is a

 9    complex case.  Do you think it is sufficiently complex under

10    the Speedy Trial Act to qualify as such?

11              MR. PATTON:  I do, your Honor.

12              THE COURT:  And does the government agree to that with

13    regard to exclusion of time?

14              MS. HOULE:  Yes, your Honor.

15              THE COURT:  So what I will do is, March 23 I expect to

16    get the first letter from the parties.  I am going to exclude

17    the time until March 30 from the time within which Mr. Saipov

18    would have to go to trial.  I find that the exclusion of time,

19    both on the basis that this is a complex case, that the parties

20    acknowledge, so that it is appropriate to exclude the time, but

21    also I find that the time is necessary to allow the parties to

22    consider -- the government to continue to produce discovery,

23    and for the defense to review that discovery and continue to

24    make -- do their investigation with regard to the case.  I find

25    that that exclusion is appropriate and outweighs the interest

i1n2saiC kjc

1      of the public and Mr. Saipov in a speedy trial.  So the

2      exclusion will be until 3/30.

3                  Is there anything else from the defense?

4                  MR. PATTON:  No, your Honor.

5                  THE COURT:  From the government?

6                  MS. HOULE:  No, thank you, your Honor.

7                  THE COURT:  All right.  Thank you very much for coming

8      in.  We stand adjourned.

9                                   oOo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25