UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,     :     17 Cr. 722 (VSB)

            -v-           :

SAYFULLO HABIBULLAEVIC SAIPOV, :

               Defendant.   :

-----------------------------------------------------X

DAVID E. PATTON
Federal Defender of New York, Inc.
Attorney for Defendant
SAYFULLO HABIBULLAEVIC SAIPOV

52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8738

Jennifer L. Brown, Esq.
   Attorney-in-Charge

TO:   Geoffrey S. Berman, ESQ.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007

Attn:  **Andrew Beaty/ Amanda Houle**
       **Matthew Laroche**
       Assistant United States Attorney
       Southern District of New York

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT .......................................................................................................................... 4

   A.  The Court may grant Mr. Saipov's Motion regardless of whether he has exhausted any
       administrative remedies ................................................................................................ 4

   B.  The Court should vacate Mr. Saipov's SAMs because they fail to comply with the
       requirements of 28 C.F.R. § 501.3. ............................................................................. 8

        i.  The SAMs restrictions on Mr. Saipov are not authorized by 28 C.F.R. § 501.3(a)
           because the government has not established, by clear and convincing evidence,
           that Mr. Saipov's third-party communications pose a substantial risk to public
           safety ............................................................................................................... 8

        ii.  The SAMs restrictions on Mr. Saipov's counsel, defense team, and attorney-
           client communications are baseless and do not conform to 28 C.F.R. § 501.3 ... 15

   C.  Mr. Saipov's SAMs are unconstitutional ................................................................... 18

CONCLUSION ....................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Owhali v. Ashcroft,*
279 F. Supp. 2d 13 (D.D.C. 2003) .................................................................................. 6

*Bell v. Wolfish,*
441 U.S. 520 (1979) ........................................................................................................ 19

*Booth v. Churner,*
532 U.S. 731 (2001) .......................................................................................................... 5

*Gardner v. Florida,*
430 U.S. 349 (1977) .................................................................................................. 13, 15

*Haller v. Robbins,*
409 F.2d 857 (1st Cir. 1969) .......................................................................................... 13

*Joint Anti-Fascist Refugee Committee v. McGrath,*
341 U.S. 123 (1951) ........................................................................................................ 14

*Lockett v. Ohio,*
438 U.S. 586 (1978) .................................................................................................. 20, 21

*Porter v. Nussle,*
534 U.S. 516 (2002) .......................................................................................................... 5

*Skipper v. South Carolina,*
476 U.S. 1 (1986) ...................................................................................................... 15, 19

*Stringer v. Black,*
503 U.S. 222 (1992) ........................................................................................................ 19

*Turner v. Safley,*
482 U.S. 78 (1987) .......................................................................................................... 20

*United States v. Abu Ali,*
396 F. Supp. 2d 703 (E.D. Va. 2005) ............................................................................ 6, 7

*United States v. Al-Marri,*
239 F. Supp. 2d 366 (S.D.N.Y. 2002) .............................................................................. 8

*United States v. Catalan-Roman,*
329 F. Supp. 2d 240 (D.P.R. 2004) ................................................................. 5, 6, 15, 19

*United States v. Cronic,*
466 U.S. 648 (1984) ........................................................................................................ 14

*United States v. Cureton,*
719 F. App'x 190 (4th Cir. 2018) .................................................................................... 7

*United States v. El-Hage,*
213 F.3d 74 (2d Cir. 2000) ....................................................................................... 13, 21

*United States v. Hashmi,*
621 F. Supp. 2d 76 (S.D.N.Y. 2008) ................................................................... 4, 5, 6, 7

*United States v. Kassir,*
04 CR. 356, 2008 WL 2695307 (S.D.N.Y. July 8, 2008) .............................................. 21

*United States v. Khan,*
540 F. Supp. 2d 344 (E.D.N.Y. 2007) .......................................................................... 7, 8

*United States v. Lopez,*
327 F. Supp. 2d 138 (D.P.R. 2004) ................................................................... 4, 6, 19, 22

*United States v. Mohamed*,
  103 F. Supp. 3d 281 (E.D.N.Y. 2015) ................................................................ 8
*United States v. Reid*,
  214 F. Supp. 2d 84 (D. Mass. 2002) ......................................................... 11, 17
*United States v. Savage*,
  2010 WL 4236867 (E.D. Pa. Oct. 21, 2010) ............................................ 4, 6, 7, 8
*United States v. Troya*,
  2008 WL 2537145 (S.D. Fla. June 24, 2008) ..................................................... 8
*Wood v. Georgia*,
  450 U.S. 261 (1981) ...................................................................................... 20
*Woodford v. Ngo*,
  548 U.S. 81 (2006) ......................................................................................... 5
*Woodson v. North Carolina*,
  428 U.S. 280 (1976) ...................................................................................... 14
*Yousef v. Reno*,
  254 F.3d 1214 (10th Cir. 2001) ....................................................................... 6

**Statutes**

28 U.S.C. § 2241 ............................................................................................. 7
42 U.S.C. § 1197(e) ........................................................................................ 4

**Regulations**

28 C.F.R. § 501.3 ................................................................................... Passim
28 C.F.R. § 542.14 ........................................................................................ 7
National Security; Prevention of Acts of Violence and Terrorism,
  66 FR 55062-01 .......................................................................................... 18
Scope of Rules: National Security; Prevention of Acts of Violence and Terrorism,
  62 FR 33730-01 ............................................................................................ 9

**Other Authorities**

U.S. Const. amend. V ............................................................................. Passim
U.S. Const. amend. VI .................................................................. 1, 4, 16, 19, 24
U.S. Const. amend. VIII .......................................................... 2, 4, 13, 14, 21, 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,      :  17 Cr. 722 (VSB)

          -v-               :

SAYFULLO HABIBULLAEVIC SAIPOV, :

               Defendant.   :

-----------------------------------------------------X

**DEFENDANT SAYFULLO HABIBULLAEVIC SAIPOV'S REPLY
MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO VACATE
SPECIAL ADMINISTRATIVE MEASURES**

**I.      Introduction**

The Court should vacate the Special Administrative Measures ("SAMs") imposed on Mr. Saipov after he had demonstrated five months of incident-free custody.  These special conditions do not satisfy the requirements of 28 C.F.R. § 501.3 and violate Mr. Saipov's constitutional rights.

Mr. Saipov's SAMs subject him to an extreme form of solitary confinement. They also give the government significant control over how Mr. Saipov and his defense team may interact with one another, speak with prospective witnesses, prepare for trial, and do what is constitutionally required of them in preparing for a potential capital sentencing proceeding.  The government claims these onerous restrictions are justified by the circumstances of Mr. Saipov's offense, but has failed to identify concrete circumstances creating a "substantial risk" Mr. Saipov may manipulate third parties or defense counsel into killing others or facilitating new acts of terrorism.  *See generally* 28 C.F.R. § 501.3(a) and (d).  Accordingly, since Mr. Saipov's SAMs are not rationally related to the interests 28 C.F.R. § 501.3 was designed to address, the SAMs: exceed regulatory authority; punish Mr. Saipov in violation of his Fifth Amendment due process rights; unconstitutionally burden his Sixth Amendment rights to a meaningful defense and the effective

assistance of counsel; and violate his Eighth Amendment right to prepare for a trial at which the government may seek the death penalty.

In its response, the government claims Mr. Saipov's motion falls under the Prison Litigation Reform Act ("PLRA") and that he must exhaust administrative remedies before seeking relief in court.  Government Response (ECF No. 68, hereinafter "Response") at 14.[1]  But Mr. Saipov's motion is not an independent "action" or "proceeding" covered by the PLRA; therefore, the Court has jurisdiction to grant Mr. Saipov relief regardless of whether he first raised these claims directly with the BOP.

Next, the government argues the SAMs comply with 28 C.F.R. § 501.3 and are constitutional because there is sufficient evidence of a substantial risk Mr. Saipov's third-party communications will result in death or serious injury.  Its position boils down to a single point: Mr. Saipov's communications with anyone are necessarily dangerous because ISIS inspired Mr. Saipov to murder others.  Response at 18.  Basically, the government submits that Mr. Saipov's SAMs are justified and "reasonably related to the legitimate national security interests" (Response at 25) animating 28 C.F.R. § 501.3 because he is a terrorist and SAMs "promote a valid public interest in preventing additional terrorist acts."  *Id.* at 2.

But 28 C.F.R. § 501.3 does not automatically apply to any inmate accused or convicted of being a terrorist (as the government's response suggests), and Mr. Saipov's SAMs are not justified simply because the government claims his actions were ISIS-inspired.  Rather, SAMs are a case-by-case, prisoner-specific administrative solution for managing inmates with a demonstrated reach and capacity to transform third-party communications into weapons capable of causing death or serious injury.  In meeting this challenge, the government must provide concrete, non-speculative

---

[1]    Page numbers refer to those found at the top of the ECF-filed versions of the government's response and Mr. Saipov's initial memorandum.

evidence as to how Mr. Saipov's contact with others inherently jeopardizes public safety.  But as discussed herein and in Mr. Saipov's initial memorandum, the government has failed to do so.  *See* Memorandum (ECF No. 56) at 21.

Notably, the government suggests the attorney-client provisions of the SAMs are valid despite its failure to offer any evidence that Mr. Saipov's communications with defense counsel and their agents present a substantial risk of death or serious injury to others.  The government maintains it is entitled to "ensure that members of the defense team do not inadvertently pass on forbidden messages from Saipov to third parties" without independently proving that Mr. Saipov's attorney-client communications are dangerous.  Response at 24.  But without such proof, the attorney-client provisions are arbitrary and not tailored to Mr. Saipov's circumstances.  This renders them unconstitutional and beyond the regulatory authority of 28 C.F.R. § 501.3.

The government's emphasis on the circumstances of Mr. Saipov's charges to defend the SAMs is ultimately unavailing because it does not address the real issue: whether specific and particularized circumstances actually exist that could have legitimately led the Attorney General to conclude Mr. Saipov's communications with third parties—including defense counsel—inherently threaten the public.  *See* 28 C.F.R. § 501.3(a) and (d).  Essentially, the government endeavors to convince the Court Mr. Saipov remains a threat to public safety despite (1) his incident-free detention in the Metropolitan Correctional Center's most restrictive unit and (2) a dearth of specific, articulable facts supporting a finding that there is truly a substantial risk Mr. Saipov's *words* will create more terrorism, even encompassing his communications with defense counsel.

Given the deficiencies in the government's position, the Court is left with only one, plausible conclusion: Mr. Saipov's SAMs are factually disconnected from the administrative public-safety issues 28 C.F.R. § 501.3 was designed to address, and amount to pre-trial punishment incapable of passing regulatory or constitutional muster.  Mr. Saipov's circumstances do not justify

restrictions on his interactions with defense counsel, immediate family members, and other third parties necessary to preparing a defense, especially because this is a capital case. The terms of 28 C.F.R. § 501.3 and Mr. Saipov's Fifth, Sixth, and Eighth Amendment rights compel the Court to vacate the SAMs.

## II.        Argument

### A. The Court may grant Mr. Saipov's Motion regardless of whether he has exhausted any administrative remedies.

The government first urges the Court to dismiss Mr. Saipov's motion outright because he has not satisfied the PLRA and exhausted the BOP's available administrative remedies. Response at 14. But Mr. Saipov is a defendant in a criminal prosecution brought by the *government*, and his challenge to confinement conditions that interfere with his constitutional rights as a pre-trial detainee is not an "action" under the PLRA that requires exhaustion of administrative remedies. *United States v. Hashmi*, 621 F. Supp. 2d 76, 84-86 (S.D.N.Y. 2008) (federal pre-trial detainee can move directly in district court for relief from SAMs; defendant's motion challenging SAMs was not an "action" under the PLRA's section requiring exhaustion of administrative remedies prior to bringing an action in district court). *See also United States v. Savage*, No. 07-550-03, 2010 WL 4236867, at *3-7 (E.D. Pa. Oct. 21, 2010) (same); *United States v. Lopez*, 327 F. Supp. 2d 138, 140-42 (D.P.R. 2004) (rejecting notion that a capital defendant must exhaust administrative remedies under the PLRA before seeking relief in district court from his placement in solitary confinement).

The PLRA provides that "[n]o *action* shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1197(e) (emphasis added). The Supreme Court has held that the PLRA's exhaustion

4

requirement implicates "all inmate *suits* about prison life" and does not have a "'futility exception.'"  *United States v. Catalan-Roman*, 329 F. Supp. 2d 240, 250 (D.P.R. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 531 (2002) (explaining that PLRA covers all varieties of prisoners' suits without holding that it applied to pre-trial detainees) (emphasis added) and *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) (no futility exception to compliance with the PLRA)).

But the notion that a SAMs challenge is subject to the PLRA's exhaustion requirement "overlooks a crucial fact in this matter": a defendant's motion challenging his conditions as a pre-trial detainee "is not a separate action or civil suit…."  *Catalan-Roman*, 329 F. Supp. 2d at 250 (rejecting government's position that PLRA controlled defendants' challenge to their pre-trial confinement conditions because "[t]his is not a separate action or civil suit brought by the defendants.  Defendants filed their motion in the pending criminal action …; they did not file an action or suit.  *Consequently the PLRA is inapplicable to the matter at hand.*") (emphasis added). Instead, a pre-trial detainee's challenge to his confinement conditions invokes a court's "proper role as a judicial check on the constitutional limitations of the executive branch's, or in this case more specifically, the prison system's use of power."  *Catalan-Roman*, 329 F. Supp. 2d at 242.  As Judge Preska explained in *Hashmi*, "[t]he PLRA was passed in the wake of a 'sharp rise in prisoner litigation in federal courts'" (621 F. Supp. 2d at 84 (quoting *Woodford v. Ngo*, 548 U.S. 81, 84 (2006))), and its exhaustion requirement was added to "'reduce the quantity and improve the quality of prisoner suits'" (*id.* (quoting *Porter*, 534 U.S. at 524)).

In contrast, these interests are not present when a pre-trial detainee challenges government conduct related to his prosecution.  Indeed, Mr. Saipov's motion is "a written or oral application requesting a court to make a specified ruling or order" (*Black's Law Dictionary* 1031 (7th Ed. 1999)), and is not the type of distinct, independent "'civil or criminal judicial proceeding'" the PLRA was designed to regulate.  *Hashmi*, 621 F. Supp. 2d at 85 (quoting *Black's Law Dictionary*

5

28 (7th Ed. 1999); *accord Lopez*, 327 F. Supp. 2d at 141 n.1)).  Accordingly, the PLRA's

exhaustion requirement does not apply here and cannot be invoked to dismiss Mr. Saipov's motion.

*See Lopez*, 327 F. Supp. 2d at 141 n.1, 142 ("Thus, we find that Defendant's motion [challenging

his pre-trial placement in administrative segregation] falls outside of the intended coverage of the

PRLA [sic] as well as its plain language.").[2]

The government's argument to the contrary "is misplaced."  *Catalan-Roman*, 329 F. Supp.

2d at 242.  In its response, the government cited several decisions that invoked the PLRA's

exhaustion requirement in the context of a SAMs challenge.  *See* Response at 16-17.  At least three

of these cases—*United States v. Abu Ali*, 396 F. Supp. 2d 703 (E.D. Va. 2005), *Yousef v. Reno*, 254

F.3d 1214 (10th Cir. 2001), and *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13 (D.D.C. 2003)—are

readily distinguishable and, therefore, inapposite here.

First, *Yousef* and *Al-Owhali* are unavailing; both involved *post-conviction* "civil actions

initiated by inmates for the sole purpose of challenging SAMs," which placed them squarely within

the PLRA's ambit.  *Savage*, 2010 WL 4236867 at *5.  Thus, since these cases "were not criminal

actions in which the defendant filed a motion seeking relief from SAMs," their holdings are

---

[2]      Determining that this motion falls outside of the PLRA's scope is appropriate and firmly
reconcilable with Congress's intent behind the PLRA, as

> Congress's clear purpose in enacting the PLRA, as the Supreme Court has
> recognized, was to reduce the quantity of lawsuits related to prison conditions.  The
> initiation of a new lawsuit is certainly a more costly process than an application for
> a specific ruling or order brought to a court in the context of an already-pending
> action.  A new lawsuit required, *inter alia*, the assignment of a Judge; the
> effectuation of service on the Government; a formal answer from the Defendant; the
> briefing of a motion to dismiss or for summary judgment, etc.  This is a costly
> process.  A motion by a pretrial detainee, on the other hand, is relatively
> inexpensive.  Thus, *it would certainly not be absurd for Congress to have intended
> that a motion be treated differently from the initiation of an 'action.'*

*Hashmi*, 621 F. Supp. 2d at 85 (emphasis added).

inapplicable to Mr. Saipov's motion.  *Id.*

Second, although *Abu Ali* concerned a pre-trial SAMs challenge, its holding that exhaustion was required is unpersuasive because the court presumed—without any analysis—that the PLRA covered motions by pre-trial detainees.  *Abu Ali*, 396 F. Supp. 2d at 705 (applying PLRA's exhaustion requirement without considering whether the statute's use of the term "action" extended to a pre-trial detainee's motion).  As the court in *Savage* observed, a "survey of the case law reveals that every court that has considered the issue has found that a motion to remove SAMs that is filed pre-trial in a defendant's criminal case is not an 'action' to which the PLRA applies."  2010 WL 4236867 at *6; *but see United States v. Khan*, 540 F. Supp. 2d 344, 349-50 (E.D.N.Y. 2007) (rejecting defendant's claim that he is exempt from the exhaustion requirement because it does not apply to pre-trial detainees challenging detention in a criminal proceeding).[3]  Additionally, the court in *Abu Ali* "reached the constitutional question nevertheless," effectively gutting its holding that it lacked the authority to decide the motion.  *Hashmi*, 621 F. Supp. 2d at 85-86 (deciding that it had subject matter jurisdiction over the SAMs challenge despite the decision in *Abu Ali*).

---

[3]      The government also cited an unpublished decision from the Fourth Circuit, *United States v. Cureton*, 719 F. App'x 190 (4th Cir. 2018), for the proposition that the PLRA applies to a pre-trial detainee's SAMs challenge.  Response at 16.  But this is not quite accurate.  In *Cureton*, the defendant sought to vacate the SAMs imposed on him pre-trial *after* he pleaded guilty and one day before his sentencing hearing.  *See* Motion for Modification of Conditions of Confinement at 1-2, *United States v. Cureton*, No. 3:14-cr-00229-MOC (W.D.N.C. Apr. 24, 2017), ECF No. 571.  In a written opinion, the district court rejected the defendant's SAMs challenge and noted that any challenge to a post-sentence SAMs designation likely required exhaustion of administrative remedies under 28 C.F.R. § 542.14, *et seq.*, followed by the filing of a habeas motion under 28 U.S.C. § 2241.  Order Denying Motion to Change Confinement Conditions at 2, *United States v. Cureton*, No. 3:14-cr-00229-MOC (W.D.N.C. May 5, 2017), ECF No. 577.  Notably, the court nevertheless held that it could not "conclude that the SAM has been improperly or vindictively placed" because "[c]learly, this defendant orchestrated the murders of others while being detained pending trial."  *Id.*  Given this context, the Fourth Circuit's determination that it lacked jurisdiction to consider the merits of the defendant's SAMs challenge is irrelevant here, as Mr. Saipov challenges his SAMs in a true pre-trial, and not post-plea, posture.

Thus, this Court should "agree with the weight of authority that a capital defendant's motion to remove SAMs, brought as part of his underlying criminal case, is not an 'action' to which the PLRA's exhaustion requirement applies[,]" notwithstanding the few outlying cases cited by the government.[4]  *Savage*, 2010 WL 4236867 at *6.  There simply "is nothing in either the language of the PLRA or its legislative history to suggest that Congress intended to strip district courts of the ability to effectively manage their criminal cases," and the Court should not constrain itself.  *Id.* at *7; *United States v. Mohamed*, 103 F. Supp. 3d 281, 286-87 (E.D.N.Y. 2015) ("A motion filed by a pre-trial detainee in a criminal case, unlike a civil case or criminal appeal initiated by a prisoner, is not an 'action' for PLRA purposes.").

### B.   The Court should vacate Mr. Saipov's SAMs because they fail to comply with the requirements of 28 C.F.R. § 501.3.

The government has not sufficiently demonstrated—as it must—that there are circumstances creating a realistic "substantial risk" that Mr. Saipov's third-party communications will endanger the public.  Nor has the government averred *any* information suggesting that Mr. Saipov's communications with counsel could turn his defense team into unwitting tools of terror.  As such, the SAMs do not conform to the strictures of 28 C.F.R. § 501.3 and should be vacated.

#### i.   The SAMs restrictions on Mr. Saipov are not authorized by 28 C.F.R. § 501.3(a) because the government has not established, by clear and convincing evidence, that Mr. Saipov's third-party communications pose a substantial risk to public safety.

Although 28 C.F.R. § 501.3(a) is silent as to how much proof the government must possess

---

[4]      *See* Response at 16 (citing *Khan*, 540 F. Supp. 2d at 349-50; *United States v. Troya*, No. 06-80171-Cr, 2008 WL 2537145, at *4-5 (S.D. Fla. June 24, 2008) (relying on *Abu Ali* to hold that "because Defendant has not exhausted his administrative remedies his constitutional challenges to the SAM restrictions are not ripe for consideration"; the *Troya* court did not discuss the question of whether motions are properly considered "actions" under the PLRA); and *United States v. Al-Marri*, 239 F. Supp. 2d 366, 366 n.1, 367-68 (S.D.N.Y. 2002) (relying on *Porter* to find PLRA's exhaustion requirement applicable to a pre-trial SAMs challenge while acknowledging, in a footnote, that "*Porter* does not explicitly say that the PRLA [sic] applies to pre-trial detainees…")).

before finding that an inmate's third-party contacts pose a "substantial risk" of causing others death or serious injury, the BOP's announcement of the "final rule" in the Federal Register does suggest a standard of proof.  In emphasizing that SAMs are only applicable to "those inmates for whom there is an identified concern … that the inmate's communications with other persons could serve as an instrumentality for acts of violence and terrorism," the BOP likened the government's burden to a "clear and convincing evidence" standard.  Scope of Rules: National Security; Prevention of Acts of Violence and Terrorism, 62 FR 33730-01, 1997 WL 334553, at *33730-31 (June 20, 1997) (finding the "substantial risk" requirement "consistent with the commenter who suggests, 'At a minimum, the standards for restrictive inmate privileges such as those described in the regulation should be that there is *clear and convincing evidence* of a substantial risk to death or serious bodily injury.'") (emphasis added).

Consequently, the SAMs may survive Mr. Saipov's challenge only if the government proves it is "highly probable or reasonably certain" Mr. Saipov's third-party communications will endanger the public.  *See Black's Law Dictionary* 636 (9th ed. 2009) (clear and convincing evidence is "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain.").  The government has not met this burden.

The government argues "[t]here is overwhelming evidence to support the Attorney General's conclusion that the SAMs are necessary … to avoid the 'substantial risk' that Saipov's communications and contact with others could lead to death or serious bodily injury of persons." Response at 18.  But only a fraction of its "evidence" is related to Mr. Saipov's third-party contacts, and only peripherally.  Instead, the government's argument turns on the allegations contained in the indictment—*i.e.*, that SAMs are justified because Mr. Saipov was inspired by ISIS to commit acts of violence.  These allegations are insufficient because they do not demonstrate Mr. Saipov's capacity to manipulate his family, friends, or others into killing or injuring people, or

9

suggest he has ever conspired with or recruited anyone to commit violent acts.[5]  The allegation that

Mr. Saipov was inspired by ISIS does not itself justify SAMs.

> **1.  The government has not demonstrated how the facts of Mr. Saipov's offense—without more—create a substantial risk that his *words* will cause others to die or suffer serious physical injury.**

In defending its claim that "Saipov undoubtedly presents a physical threat to others," the

government repeated the circumstances of Mr. Saipov's actions on October 31, 2017, and

emphasized his perceived lack of remorse based on his alleged post-arrest statements and in-court

speech on June 22, 2018.  Response at 19.  But there are at least two problems with this reasoning.

First, the notion that SAMs are necessary to protect "other inmates, prison staff, visitors, or

the public at large" from Mr. Saipov (Response at 19) is belied by Mr. Saipov's pre-SAMs

placement in "normal" administrative segregation.  Before the SAMs, Mr. Saipov's custody was

without incident; he did not fight or create conflict with other inmates, prison staff or visitors, nor

did he make any threats against the public.  And while the government need not wait for something

to happen before invoking 28 C.F.R. § 501.3, this incident-free, pre-SAMs period is persuasive

circumstantial evidence the SAMs are an exaggerated response to any potential risk Mr. Saipov's

communications present.

Second, even if the government is correct that Mr. Saipov believes "he was justified in his

brutal and indiscriminate acts of violence" (Response at 19), his motivation does not inherently

bear on whether his *communications* with others, including defense counsel, threaten public safety.

---

[5]     Indeed, New York Governor Andrew Cuomo's statement on November 1, 2017, describing Mr. Saipov as a "lone wolf"—"All the evidence we have is that he was a quote unquote lone-wolf model"—undercuts the government's position that the circumstances of Mr. Saipov's allegations justify significant restrictions on his third-party contacts.  Barbara Demick, *New York attack suspect's family was 'very mysterious,' neighbor says*, LA Times (Nov. 1, 2017) *available at*: http://www.latimes.com/nation/la-na-new-york-sayfullo-saipov-profile-20171101-htmlstory.html.

Mr. Saipov's post-offense comments fall well short of establishing that SAMs are necessary because they do not reveal anything incriminating about the reach of Mr. Saipov's third-party contacts or his capacity to transform them into terrorist co-conspirators.

Taken to its logical conclusion, the government's position that SAMs are justified because Mr. Saipov was inspired by ISIS implies SAMs are *per se* warranted in every foreign terrorism-related prosecution (or at least every ISIS-related case) regardless of whether the defendant actually demonstrates a capacity to abuse, manipulate, or exploit third-party contacts.  But SAMs were not designed to automatically apply to a class of prisoners or a category of offenses; rather, they must be based on, and tailored to, a defendant's particular circumstances.  *See United States v. Reid*, 214 F. Supp. 2d 84, 87 (D. Mass. 2002).  And in this case, the particulars of the government's allegations do not show Mr. Saipov coordinated, conspired, or worked with ISIS agents, operatives, or sympathizers to commit murder.  Nor do they suggest Mr. Saipov will exploit attorney-client communications to facilitate terrorism.  *See infra*, II(B)(ii).

Thus, even taken as true, the government's allegations are insufficient to trigger SAMs because they do not reveal anything about Mr. Saipov's third-party contacts and necessarily fail to create a "substantial risk that [his] communications or contacts with persons could result in death or serious bodily injury…."  28 C.F.R. § 501.3(a).

> **2. The government's allegations tangentially related to Mr. Saipov's contacts and communications—particularly those allegations contained in the government's improper *ex parte* filing—also do not justify near-absolute restrictions on his third-party contacts.**

Nevertheless, to the extent the government's response offers information peripherally related to Mr. Saipov's communications, it still does not justify SAMs.

In contesting that Mr. Saipov's interaction with ISIS has always been one-way and limited to his personal consumption of ISIS propaganda, the government points to a single, benign

statement Mr. Saipov allegedly made when introducing himself to others in an encrypted chat group titled, "Darul Khilafa" ("House of the Caliphate"): "Peace be upon you, hi everybody, this is my second number, what's up?  What are you doing?  Please send messages to my second number as well, ha-ha-ha-ha-ha-ha, hey."  Response at 9, 19.  But this just demonstrates that Mr. Saipov joined a group chat that facilitated his consumption of ISIS propaganda; it is not proof that Mr. Saipov communicated regularly with anyone from the group, nor has the government alleged Mr. Saipov used the group to befriend or scheme with any actual ISIS operatives or agents.  At best, this statement shows Mr. Saipov's interest in learning more about ISIS, which is not evidence of his intent or capacity to conspire with others to achieve ISIS's goals.[6]

The government's opposition also relies on information purportedly contained in an *ex parte* filing with the Court (ECF No. 67)—*i.e.*, an internal memorandum from the Acting Assistant Attorney General and Deputy Attorney General to the Attorney General concerning Mr. Saipov. Response at 11 n.2, 22 n.6.  According to the government, this internal memorandum presents information from a cooperating witness that "Saipov has had contact with ISIS supporters and

---

[6]     The government also argues Mr. Saipov's communications are dangerous because ISIS allegedly referred to Mr. Saipov as a "soldier of the caliphate" in one of its online newsletters ("al-Naba") on November 3, 2017.  Response at 20.  But this is a red herring.  Even assuming ISIS— and not an impostor—made this statement (a flawed assumption without any authenticating evidence), it does not prove Mr. Saipov has any actual connections to terrorists, which is the real issue here.  Indeed, the al-Naba posting "provided no evidence" ISIS had any knowledge of Mr. Saipov's actions beforehand, never suggested ISIS accepted "direct responsibility" for Mr. Saipov's behavior, and did not acknowledge Mr. Saipov by name.  Nicole Chavez and Hamdi Alkashali, *ISIS calls New York terror attack suspect a 'soldier of the caliphate'*, CNN (Nov. 3, 2017), *available at*: https://www.cnn.com/2017/11/03/us/new-york-terror-attack/index.html.  And since ISIS has a recent track record of taking credit for crimes it did not commit, facilitate, or know about in advance, the al-Naba quote has little, if any, relevance to this case, let alone Mr. Saipov's motion.  *See generally* Joshua Keating, *ISIS Is Not Known for Falsely Taking Credit for Attacks— Until Recently*, Slate (Oct. 2, 2017), *available at*: http://www.slate.com/blogs/the_slatest/2017/10/02/isis_s_claims_of_responsibility_are_getting_m ore_dubious.html (discussing how ISIS falsely took credit for the October 2017 mass shooting in Las Vegas, a June 2017 incident at a casino in Manila, Philippines, and a September 2017 bogus bomb scare aboard a British Airways flight in France).

other extremists." Response at 22 n.6. However, the Court should not rely on this memorandum to decide Mr. Saipov's motion.

First, although the *ex parte* nature of the filing unfairly thwarts the defense's ability to meaningfully contest the usefulness of the memorandum (*see infra*), its qualitative value is so suspect that the memorandum is not a basis for denying Mr. Saipov's motion.

Even if the cooperating witness's information is credible and reveals Mr. Saipov actually "had contact with ISIS supporters and other extremists"—points Mr. Saipov does not concede— this information does not satisfactorily resolve the critical issue triggered by 28 C.F.R. § 501.3(a)—*i.e.*, whether additional, administrative pre-trial detention restrictions on Mr. Saipov are necessary to prevent him from coordinating with unconfined potential co-conspirators to facilitate new terrorist acts. *See, e.g.*, *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (finding pre-trial SAMs served a regulatory purpose of preventing the defendant from "facilitating additional terrorist acts" because the government presented "ample evidence of the defendant's extensive terrorist connections."). Mr. Saipov's nondescript and vague "contact with ISIS supporters and other extremists" presents a speculative, abstract basis for imposing SAMs, falling far short of "ample evidence of [his] extensive terrorist connections." *Id.* Consequently, the Court should not rely on the one-sided memorandum to decide Mr. Saipov's motion against him because it does not prove by clear and convincing evidence that his third-party contacts are actually dangerous.

Second, the government's reliance on an *ex parte* argument to resolve a contested motion is improper and unconstitutional, particularly in the context of a capital case.

"[I]t is a dangerous procedure" when a criminal defendant's "principal adversary is given private access to the ear of the court." *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969). Such secret proceedings in a capital case violate Due Process, the right to counsel, and the Eighth Amendment's guarantee of reliability. U.S. Const. amends. V, VI, VIII; *see also, e.g.*, *Gardner v.*

*Florida*, 430 U.S. 349 (1977) (petitioner denied due process when his death sentence was imposed in part based on information he had no opportunity to explain or deny).  Indeed, in his concurring opinion in *Joint Anti-Fascist Refugee Committee v. McGrath*, Justice Frankfurter famously observed that "the right to be heard" before being forced to suffer a serious loss "is a principle basic to our society," specifically, to its democratic commitment to "fairness."  341 U.S. 123, 168, 170 (1951) (Frankfurter, J., concurring).  "Fairness of procedure," which is the essence of due process (*id.* at 161), at least requires that Mr. Saipov—a person "in jeopardy of serious loss"— receive "notice of the case against him and opportunity to meet it."  *Id.* at 171-72.

The government's *ex parte* argument also infringes Mr. Saipov's right to effective assistance of counsel, which, as the Constitution assures, "requires that a defendant be represented at every critical stage of his trial."  *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984).

Further, the concern raised by *ex parte* communications is heightened in the context of a capital case, and adds a third constitutional dimension: the Eighth Amendment's guarantee of reliability.  While there may be exceptional circumstances in which *ex parte* government submissions on a contested motion might be permissible with sufficient justification, it is difficult to imagine that such could be the case where a man's life is at stake.  As the Supreme Court explained in *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976):

> Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

Subjecting Mr. Saipov's SAMs to a heightened-reliability requirement—as this Court must because this is a death-eligible case—militates against consideration of the government's secret memorandum.  The SAMs strike at the heart of Mr. Saipov's ability to exercise his due process right to develop and "present any evidence that tends to shed light on [his] character," particularly

14

his "disposition to make a well-behaved and peaceful adjustment to prison life …[,] an aspect of his character that is by its nature relevant to the sentencing determination." *Catalan-Roman*, 329 F. Supp. 2d at 254 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986)) (internal quotation marks omitted). They also implicate Mr. Saipov's ability to rebut aggravating factors the government could offer at a penalty phase, namely future dangerousness.

By design, the SAMs imply Mr. Saipov presents a future danger and that he lacks the ability to positively adjust to prison life. Therefore, if the Court upholds the SAMs based on an *ex parte* filing, it would improperly curtail Mr. Saipov's ability to explain or deny the government's future dangerousness showing at sentencing, which would necessarily increase the likelihood of a death sentence in violation of due process. *See Skipper*, 476 U.S. at 5 n.1 ("Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty," due process requires that "a defendant not be sentenced to death 'on the basis of information which he had no opportunity to explain or deny.'") (quoting *Gardner*, 430 U.S. at 362).

The government has not proven by clear and convincing evidence that Mr. Saipov's contacts or communications pose a substantial risk of death or injury to others.[7]

> ### ii. The SAMs restrictions on Mr. Saipov's counsel, defense team, and attorney-client communications are baseless and do not conform to 28 C.F.R. § 501.3.

The government maintains that the attorney-client provisions of Mr. Saipov's SAMs

---

[7]    Besides the *ex parte* filing, the government also referenced letters ostensibly exchanged between two convicted terrorists previously housed in Mr. Saipov's unit—Sajmir Alimehmeti and Ahmad Khan Rahimi—to prove that, "if given the opportunity, [Mr. Saipov] will communicate with others regarding his attack and ISIS's violent ideology…." Response at 20. In the letters, a person referred to as "Abu Jannah" (literally "father of paradise") is said to still desire martyrdom ("He still wants his Shahada [sic]"). *Id.* The government claims "Abu Jannah" is Mr. Saipov and that the letters prove he interacted with Alimehmeti and Rahimi. But the government has not authenticated the letters, established how it confirmed Mr. Saipov's alleged nickname, or presented evidence independently confirming Mr. Saipov spoke to either Alimehmeti or Rahimi. The letters appear to be no more than vague inmate gossip that do not help the government meet its burden.

"clearly fall within § 501.3(a)'s regulatory authority."  Response at 25.  Conspicuously missing from the government's argument, however, is *any* evidence suggesting—or even creating the possibility—that Mr. Saipov will dupe defense counsel or members of the defense team into inadvertently sharing coded messages with unconfined terrorists.  The government cannot be permitted to regulate defense counsel's representation of Mr. Saipov and infringe on the attorney-client relationship based on mere speculation.  Further, since the language of § 501.3(a) and its purpose make no mention of attorney-client communications, the attorney-client provisions of Mr. Saipov's SAMs exceed regulatory authority.

The government states that "[t]he only restriction on the defense is that [Mr. Saipov's] attorneys may disseminate [his] communications to third parties 'for the sole purpose of preparing the inmate's defense.'"  This is wrong.  The SAMs attorney-client provisions (Paragraph 2) present a detailed list of restrictions that regulate how the defense team may operate and work with Mr. Saipov.  These include restrictions on who from the defense team may share Mr. Saipov's communications for the purposes of preparing his defense (¶2(d)); a pre-condition that each member of Mr. Saipov's defense team sign a SAMs affirmation before visiting with Mr. Saipov (¶2(a)); and limitations on who may share documents or materials pertinent to the defense with Mr. Saipov (¶2(h)).  These restrictions are onerous and have had a chilling effect on the defense team.  They also compromise the defense team's relationship with Mr. Saipov and potential mitigation witnesses, particularly immediate family members.  The SAMs compel defense counsel and their agents to question *every* decision concerning fact investigations, which slowly erodes Mr. Saipov's Sixth Amendment right to a meaningful defense and effective, conflict-free representation.  *See infra*, II(C).

Worse, the government imposed these restraints without citing to a single circumstance unique to Mr. Saipov indicating their necessity.  Instead, it relies on dicta from other decisions

addressing abstract concerns about inmates speaking in code or sharing coded messages. *See* Response at 24-25. But "SAMs are prisoner-specific; that is, each prisoner upon who SAMs are imposed has a set of SAMs issued for him, and him alone, based on the circumstances of his case." *Reid*, 214 F. Supp. 2d at 87. Consequently, whether other courts have upheld SAMs-related attorney-client provisions (*see* Response at 25) is irrelevant unless the government can show how those defendants' circumstances resemble Mr. Saipov's. The government has not done so, nor has it provided any basis to believe that absent SAMs, the defense team cannot represent Mr. Saipov responsibly without presenting a risk to national security.

Critically, the government's response misconstrues Mr. Saipov's argument about the attorney-client provisions. Response at 24. As discussed above, the portion of Mr. Saipov's SAMs regulating his defense team's operations exceed regulatory authority because they were imposed absent any evidence that Mr. Saipov's communications with counsel are dangerous. But there is also another reason why the attorney-client provisions are improper: the government's SAMs only invoke 28 C.F.R. § 501.3(a), which is not the proper regulatory mechanism for policing a SAMs prisoner's attorney-client communications. Rather, as the history and text of § 501.3 reveals, a separate finding concerning Mr. Saipov's attorney-client communications under § 501.3(d) is a prerequisite to regulating and, if necessary, monitoring Mr. Saipov's contact with his defense team. *See* Memorandum at 14.

The government claims § 501.3(d) is inapplicable here because the SAMs do not authorize monitoring of Mr. Saipov's attorney-client communications. Response at 24. But this argument misses the mark. The government correctly observes that, on its face, § 501.3(d) appears to only address when the monitoring of attorney-client communications is appropriate, and that no such monitoring is occurring here. Response at 24. However, the government ignores that § 501.3(a) is silent about attorney-client communications, and instead strictly addresses the threat posed by the

17

defendant's non-legal communications with third parties; it is plainly inapplicable to attorney-client communications.

In contrast, 28 C.F.R. § 501.3(d) was modified in October 2001 in order to address the discrete risk posed by attorney-client relations "that are in furtherance of the client's ongoing or contemplated illegal acts." Scope of Rules: National Security; Prevention of Acts of Violence and Terrorism, 66 FR 55062-01, 2001 WL 1334043, at *55064 (Oct. 31, 2001) (internal citations omitted). This includes situations where "the attorney is unaware that his professional service is being sought in furtherance of an improper purpose … and the attorney takes no action to assist the client." *Id.* (internal citations omitted). *See also* Memorandum at 14-15.

Against this backdrop, administrative measures regulating protected attorney-client communications are inextricably intertwined with the regulation for monitoring such contacts (§ 501.3(d)), and are unrelated to a separate regulatory provision concerning a defendant's communications with all other third parties (§ 501.3(a)). Without first imposing administrative restrictions on how an attorney may interact with his client, it is unclear how the Attorney General could even make a "specific determination" that monitoring attorney-client communications is "reasonably necessary in order to deter future acts of violence or terrorism[.]" Scope of Rules: National Security; Prevention of Acts of Violence and Terrorism, 2001 WL 1334043, at *55064. Thus, without any concrete, non-speculative suspicions that the defense team may communicate with Mr. Saipov to commit acts of violence, or that Mr. Saipov will seek to transform his representatives into unwitting tools of terror, the attorney-client provisions exceed the regulatory authority of 28 C.F.R. § 501.3—subsections (a) and/or (d).

### C.  Mr. Saipov's SAMs are unconstitutional.

Since the SAMs are untethered to the regulatory, public-safety goals 28 C.F.R. § 501.3 is meant to address (*see supra*), they violate Mr. Saipov's constitutional rights.

The SAMs are not rationally related to a non-speculative threat posed by Mr. Saipov's third-party contacts; instead, they were imposed despite a dearth of information illustrating why—after months of incident-free, non-SAMs custody—they were necessary to prevent terrorism and maintain institutional security.  This compels only one conclusion: the SAMs were meant to punish Mr. Saipov pre-trial in violation his due process rights.  *See Bell v. Wolfish*, 441 U.S. 520, 520-21 (1979) ("[I]f a condition or restriction is arbitrary or purposeless, a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.").  *See also* Memorandum at 24-25.

Mr. Saipov also has a due process right to argue, at a prospective capital sentencing hearing, how his "past behavior in prison" bears positively on his character.  *Skipper*, 476 U.S. at 7. But the SAMs gut Mr. Saipov's ability to cultivate a record that illustrates his "disposition to make a well-behaved and peaceful adjustment to life in prison…" (*id.*) and effectively guarantee that a jury will find Mr. Saipov remains a future danger (or, at the very least, that his actions in jail do not reflect positively on his character).  *See* Memorandum at 25-26.  By arbitrarily precluding Mr. Saipov from developing *Skipper* mitigation, the SAMs deprive Mr. Saipov of due process.  *See, e.g.*, *Catalan-Roman*, 329 F. Supp. 2d at 254-55 (automatic placement of pre-trial defendants charged with capital offenses in administrative detention "effectively eliminates the ability of the defendants to establish mitigating evidence relative to their character and adjustment to life in prison."); *Lopez*, 327 F. Supp. 2d at 144 (placement in administrative segregation "limits the amount and kind of mitigating evidence that a capital defendant might bring in the penalty phase"; when imposed arbitrarily, it "place[s] a 'thumb [on] the death's side of the scale.'") (quoting *Stringer v. Black*, 503 U.S. 222, 235 (1992)).

Further, the attorney-client provisions of the SAMs violate Mr. Saipov's Sixth Amendment right to a meaningful defense and the effective assistance of counsel because they micromanage

how defense counsel may delegate tasks to its agents and force individual members of the defense

team to constantly evaluate whether their actions will subject them to criminal liability.

Memorandum at 27-31.  The "chilling effect" Mr. Saipov's representatives face is real, as all are

hyper aware that the SAMs criminalize practices—like sharing information gleaned from third

parties with Mr. Saipov—that would otherwise be a routine feature of their representation.  And

while defense counsel does not (yet) claim they are incapable of adequately representing Mr.

Saipov because of the SAMs, it is undeniable that the SAMs force the defense team to weigh its

interests against Mr. Saipov's, eroding his "right to representation that is free from conflicts of

interest."  *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

Since the government has not offered a credible connection between Mr. Saipov's attorney-

client communications and the risks 28 C.F.R. § 501.3 was created to address, none of the attorney-

client provisions are rationally related to the government's interest in safeguarding the public or

maintaining institutional security; at the very least, the provisions are an exaggerated response to

those concerns.  The constraints on the defense team are unconstitutional.  *See generally Turner v.

Safley*, 482 U.S. 78, 87, 89-91 (1987) (four-factor test to determine constitutionality of pre-trial

confinement conditions; first factor is whether there is a valid, rational connection between the

regulation and the legitimate governmental interest underlying it).

Relatedly, Mr. Saipov's SAMs arbitrarily burden the defense team's ability to investigate

and develop, "*as a mitigating factor*, any aspect of [Mr. Saipov's] character or record and any of

the circumstances of the offense" that could serve "as a basis for a sentence less than death."

*Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original) (it is unconstitutional to preclude

the sentencer from considering any aspect of a defendant's character or record, or the

circumstances of the offense, that he proffers against a death sentence).  An "individualized

decision is essential in capital cases[,]" and the SAMs thwart "the type of individualized

consideration of mitigating factors … required by the Eighth and Fourteenth Amendments in capital cases." *Id.* at 605, 606.

The government's arguments to the contrary are unavailing. Preliminarily, the cases the government claims rejected constitutional challenges to SAMs "[i]n similar circumstances" are not actually similar to Mr. Saipov's circumstances. *See* Response at 25-26. For example, in *El-Hage*, the Second Circuit upheld SAMs because the government had introduced "ample evidence of the defendant's extensive terrorist connections." 213 F.3d at 81. The government has made no such showing here. Further, in *El-Hage*, the court noted that the "alternative" to the defendant's "current confinement conditions appears to be his confinement as part of the general prison population." *Id.* at 82. Here, if the Court were to vacate Mr. Saipov's SAMs, he would revert to his pre-SAMs placement in "normal" solitary confinement. *See* Response at 10 (noting that Mr. Saipov was placed in routine administrative detention following his arrest due to internal BOP classification procedures).

Similarly, in *United States v. Kassir*, No. S2 04 CR. 356 (JFK), 2008 WL 2695307, at *3 (S.D.N.Y. July 8, 2008), the court's decision to uphold SAMs was informed, at least in part, by the defendant's self-proclaimed "jihad training in Afghanistan." Mr. Saipov has no such specialized training, much less any bona fide, non-hypothetical connections to overseas terrorists.

More significantly, the government's response to Mr. Saipov's due process claims is a mere restatement of its conclusion that SAMs are justified by the circumstances of Mr. Saipov's offense. Response at 28. Essentially, the government claims Mr. Saipov's conditions are not arbitrary because they were imposed under 28 C.F.R. § 501.3. But since the conditions do not conform to the regulation (*see supra*), they are indeed arbitrary and unable to withstand constitutional scrutiny.

The government's dismissal of *Lopez* (and *Catalan-Roman*) to Mr. Saipov's situation is also unpersuasive. Response at 28. In both *Lopez* and *Catalan-Roman*, the district court

21

determined it was a due process violation to place death-certified defendants in administrative

detention simply because they were charged with capital offenses.  *See supra*; Memorandum at 25-

26.  The government claims these cases are inapposite because "[t]he SAMs were not imposed

reflexively or because Saipov faces death-eligible charges; rather, they are imposed based upon a

specific and well-supported finding by the Attorney General that Saipov's contacts and

communications with third parties pose a substantial risk to others."  Response at 29.

But this is a circular argument that erroneously presumes the Attorney General actually had

sufficient evidence to satisfy the standard set forth in 28 C.F.R. § 501.3(a).  Instead, like the

violative policy at issue in *Lopez* and *Catalan-Roman*, which automatically assumed capital

defendants are "inherently more prone to disrupt the orderly running of the institution" (*Lopez*, 327

F. Supp. 2d at 143), the government imposed SAMs because it reflexively assumed Mr. Saipov

is inherently more prone to manipulate third-party contacts due to his status as an accused terrorist,

and not because of any specific, articulable concerns stemming from his past conduct, behavior in

prison, or established third-party contacts showing that his words are dangerous.  *See also id.*

(presumption that capital defendants are inherently more "ignores the fact that Defendant resided in

the general population for over ten (10) months without causing [] disruption…").

The government's response concerning the constitutionality of the attorney-client

provisions also suffers from a similar, glaring omission: there is no information indicating that such

measures are reasonably necessary to prevent the defense team from sharing communications to or

from Mr. Saipov in a manner that jeopardizes public safety.  As the government acknowledges, Mr.

Saipov's defense team has "many years' experience" with protective orders and representing

defendants in high-profile and sensitive cases.  Response at 30.  Their judgment regarding how to

interact with Mr. Saipov, interview potential witnesses, and share information with others in

preparing a defense is uncontested, and should be immune from government input *absent a*

*compelling, specific, and non-speculative reason*.  Without one, the attorney-client provisions are arbitrary and unconstitutional.

The government's suggestion that defense counsel seek "clarification" of the attorney-client provisions before taking any action (Response at 31) is not a solution.  To the contrary, it is a *per se* infringement on the attorney-client relationship that puts Mr. Saipov's counsel in an untenable position: either act in a manner that could violate the SAMs and result in criminal liability, or seek the government's clarification and risk revealing defense strategies and potential fact witnesses.

Accordingly, the Court should vacate the attorney-client provisions.  At the very least, the following specific modifications should be made:

| SAMs Measure | Proposed Defense Modification |
| --- | --- |
| ¶2(d): Only attorneys (as defined in ¶2(a)) may disseminate contents of Mr. Saipov's communications to third parties for the sole purpose of preparing Mr. Saipov's defense. | Modify condition to permit pre-cleared attorneys' agents—*i.e.*, paralegals, investigators, and mitigation specialists—to: (a) share Mr. Saipov's statements with third parties for the sole purpose of preparing his defense and (b) share third parties' statements with Mr. Saipov for the sole purpose of preparing his defense.<br><br>Whether an action qualifies as one undertaken for the sole purpose of the defense is within the discretion of the attorneys representing Mr. Saipov and not subject to government oversight. |
| ¶2(i): Attorneys may not "send, communicate, distribute, or divulge Mr. Saipov's mail (legal or otherwise), or any portion of its contents, to third parties, except when disclosure of the contents is necessary for the sole purpose of providing necessary legal services related to the inmate's defense—and not for any other reason." | Modify to permit any member of Mr. Saipov's defense team to divulge the contents of mail to or from Mr. Saipov to third parties for the sole purpose of preparing his defense.<br><br>Whether an action qualifies as one undertaken for the sole purpose of the defense is within the discretion of the attorneys representing Mr. Saipov. |

## III.        Conclusion

The so-called "array of factors" cited by the government in support of the SAMs (Response at 3-4) proves nothing about Mr. Saipov's third-party contacts or communications, including those with counsel.  Instead, the government's argument essentially treats SAMs as a routine aspect of

foreign terrorism prosecutions, and insinuates that SAMs are necessary here to prevent future acts of terrorism simply because Mr. Saipov was allegedly inspired by ISIS.  This position is in direct conflict with 28 C.F.R. § 501.3, its public-policy roots, and Mr. Saipov's constitutional rights.  The SAMs bear no relationship to any regulatory public-safety goals, and therefore exceed regulatory authority, deprive Mr. Saipov of due process, and violate his Sixth and Eighth Amendment rights.

 Dated: New York, New York
        July 18, 2018

                                    Respectfully submitted,


                                    /s/ Jennifer Brown
                                    Jennifer Brown
                                    Annalisa Mirón
                                    David Patton
                                    Federal Defenders of New York
                                    Tel.: (212) 417-8700

                                    David Ruhnke
                                    Tel.: (212) 608-7949