UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | S1 17 Cr. 722 (VSB) |
| -v.- | |
| SAYFULLO HABIBULLAEVIC SAIPOV, | |
| Defendant. | |

**THE GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO THE DEFENDANT'S MOTION TO PRECLUDE
THE GOVERNMENT FROM SEEKING THE DEATH PENALTY**

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
*Attorney for the United States of America*

Andrew D. Beaty
Amanda Houle
Matthew Laroche
*Assistant United States Attorneys*
        *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................3

    A.    The Federal Death Penalty Act of 1994.......................................................3

    B.    Internal Policies in the Justice Manual.........................................................3

    C.    Status of the Capital Case Protocol Concerning Saipov .............................5

DISCUSSION ........................................................................................................5

I.     THERE IS NO BASIS TO INTERFERE WITH THE ATTORNEY
      GENERAL'S PROSECUTORIAL DISCRETION IN THIS CASE ......................5

    A.    The Attorney General's Decision Whether to Seek the Death Penalty Is
        Presumptively Unreviewable ......................................................................5

    B.    There is No Statutory or Constitutional Basis Supporting Judicial
        Review of the Capital Case Process in This Case........................................7

        1.    The Federal Death Penalty Act and Justice Manual
            Do Not Confer Rights on Saipov That are Enforceable
            Against the Government ..................................................................8

        2.    Saipov's Conclusory Assertions About the Violation of His
            Constitutional Rights Have No Basis in the Law or Facts................10

    C.    The Court Cannot and Should Not Appoint an Independent Prosecutor ...14

CONCLUSION......................................................................................................16

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Sayfullo Habibullaevic Saipov's motion, dated September 6, 2018, to preclude the Government from seeking the death penalty or, in the alternative, for the appointment of an independent prosecutor to determine whether the Government should seek the death penalty (the "Motion"). In his Motion, Saipov claims that the Attorney General cannot fairly and independently determine whether to seek the death penalty because the President of the United States publicly stated that the death penalty should be sought in this case and, with respect to unrelated cases, has purportedly criticized the Attorney General.[1]

The Attorney General's decision whether to seek the death penalty is a quintessential exercise of prosecutorial discretion—a "core executive constitutional function." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). The basic principles of prosecutorial discretion are well settled and dispositive of Saipov's Motion. Where, as here, there is no evidence that the Attorney General exercised his discretion based on a discriminatory factor, the Attorney General's decision-making process is judicially unreviewable. *See McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987).

In fact, in nearly identical circumstances—when in 1995 the President and Attorney General publicly commented during the investigation of the Oklahoma City bombing that the perpetrator of the crime should receive the death penalty—a district court denied a request to strike the Attorney General's decision to seek the death penalty. *See Nichols v. Reno*, 931 F. Supp. 748, 751-52 (D. Colo. 1996). *Nichols* is in line with numerous other cases in this and other Circuits

---

[1]     On September 27, 2018, the Attorney General directed the Government to seek the death penalty in this case. The following day, the Government filed its notice of intent to seek the death penalty.

that have declined to intervene in the capital case process because it is a matter of prosecutorial discretion that is "presumptively unreviewable." *Id.*; *see infra* at 10 and 12-13 (collecting cases).

Saipov fails to identify any of this case law, claiming "there is no case law directly addressing" this situation. (Mot. at 6).  Instead, he argues that there is a "risk" the Attorney General might exercise his prosecutorial discretion "arbitrarily" and "unreliably."  This self-serving allegation is not based on fact or evidence, but on a series of speculative leaps:  The Attorney General *might* be concerned about losing his job (although there is no evidence he is); the Attorney General *might* be influenced by the President's public statements about Saipov (although there is no evidence he is); and, therefore, the Attorney General *might* give the President's statements unconstitutional weight in deciding whether to seek the death penalty (although there is no evidence he will).  Saipov's argument strains credulity.

In reality, the Attorney General and his subordinates reviewed this case in accordance with the Federal Death Penalty Act and the internal procedures outlined in the Justice Manual ("JM") for determining whether to seek the death penalty.[2]  After fully complying with the law and Justice Manual, the Attorney General appropriately exercised his discretion in determining that the circumstances of this case—which involve a terrorist attack that caused extensive death and human suffering—justify the ultimate sanction available.  For these reasons and those set forth below, Saipov's Motion should be denied.

---

[2]     The Justice Manual, which was previously known as the U.S. Attorneys' Manual or USAM, contains publicly available U.S. Department of Justice ("DOJ") policies and procedures. JM § 1-1.100.

## BACKGROUND

### A.      The Federal Death Penalty Act of 1994

In 1994, Congress enacted the Federal Death Penalty Act ("Act"), 18 U.S.C. §§ 3591-3598. The Act established procedures for imposition of the death penalty for federal capital offenses if, after a hearing under the Act, "it is determined that imposition of the sentence of death is justified." *Id.* § 3591(a).

Congress was careful to include in the Act the substantive and procedural protections required by the Constitution, as well as various additional protections to ensure that the federal death penalty would not be imposed arbitrarily or unfairly. The Act sets forth these requirements in detail. *See, e.g.*, *id.* §§ 3592 (mitigating and aggravating factors to be considered in determining whether a sentence of death is justified), 3593 (special hearing to determine whether a sentence of death is justified), 3595 (review of a sentence of death).

Notably, the Act contains no restrictions on the Government's traditional prosecutorial discretion to seek the death penalty against persons charged with violating a federal capital offense. To the contrary, the Act provides that the death penalty should be sought whenever "the attorney for the government believes that the circumstances of the offense are such that the sentence of death is justified under [the Act]." *Id.* § 3593(a).

### B.      Internal Policies in the Justice Manual

The Justice Manual includes, among other things, a set of internal policies and guidelines for federal prosecutors to follow in cases in which death is a possible penalty. JM § 9-10.010-.200 (the "Capital Case Protocol"). The purpose of these internal guidelines is to assist the Attorney General and those working under him in exercising the Government's prosecutorial discretion fairly and consistently throughout the country. *Id.* § 9-10.030. The Capital Case Protocol makes

3

clear that in every case, the decision whether to seek the death penalty "must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws.  Arbitrary or impermissible factors—such as a defendant's race, ethnicity, or religion—will not inform any stage of the decision-making process."  *Id.*  The Attorney General makes the final decision whether to seek the death penalty. *Id.* § 9-10.050.

Under the Capital Case Protocol, in any case in which death is a possible punishment, the U.S. Attorney must make a recommendation to an internal committee of DOJ officials (the "Capital Review Committee").  *Id.* § 9-10.080.  Before doing so, the U.S. Attorney should give defense counsel a reasonable opportunity to present mitigating factors for the U.S. Attorney's consideration in making that recommendation.  *Id.*  The Capital Case Protocol further provides that defense counsel should also be afforded a reasonable opportunity to present to the Capital Review Committee, either orally or in writing, reasons why the death penalty should not be sought. *Id.* § 9-10.130.

After considering the submitted materials, the Capital Review Committee makes its recommendation to the Attorney General, who then makes the final prosecutorial decision whether the Government will seek the death penalty.  *Id.* § 9-10.130.  The Protocol states that the Capital Review Committee, the U.S. Attorney, and the Attorney General may consider "any legitimate law enforcement or prosecutorial reason that weighs for or against seeking the death penalty."  *Id.* § 9-10.140.  These factors include, among others, whether the available, admissible evidence is legally sufficient to obtain a capital conviction and death sentence at trial and to sustain them on appeal; whether the aggravating factors applicable to the case sufficiently outweigh any applicable

4

mitigating factors to justify a sentence of death; or, in the absence of any mitigating factors, whether the aggravating factors alone are sufficient to justify a sentence of death.  *Id.*

    **C.**    **Status of the Capital Case Protocol Concerning Saipov**

The Government has fully complied with the Capital Case Protocol in this case.  Shortly following Saipov's indictment, the U.S. Attorney's Office invited defense counsel to submit a mitigation submission pursuant to the Capital Case Protocol.  (*See, e.g.*, Dkt. Nos. 23, 37).  On May 18, 2018, defense counsel submitted its mitigation submission to the U.S. Attorney's Office, and on June 4, defense counsel made an in-person mitigation presentation to the U.S. Attorney himself and other prosecutors.  Following the meeting with defense counsel, the U.S. Attorney's Office sent its submission, along with Saipov's mitigation submission, to the Capital Review Committee.  On July 23, 2018, defense counsel made an in-person mitigation presentation to the Capital Review Committee, which then made its recommendation to the Attorney General concerning whether to seek the death penalty.  After considering all of the relevant materials and recommendations, including those of the U.S. Attorney's Office, the Capital Review Committee, and defense counsel, on September 27, 2018, the Attorney General directed the Government to seek the death penalty.

**DISCUSSION**

**I.**    **THERE IS NO BASIS TO INTERFERE WITH THE ATTORNEY GENERAL'S PROSECUTORIAL DISCRETION IN THIS CASE**

    **A.**    **The Attorney General's Decision Whether to Seek the Death Penalty Is Presumptively Unreviewable**

It is well settled that the decision whether to seek the death penalty is ultimately made by the Attorney General.  *See* JM § 9-10.050; *United States v. Fell*, 531 F.3d 197, 217 n.11 (2d Cir.

2008).  The Attorney General has broad discretion in this regard, and a presumption of regularity supports his prosecutorial decisions.  *Armstrong*, 517 U.S. at 464.

The exercise of the Attorney General's prosecutorial discretion is not ordinarily subject to judicial review.  In this regard, the Supreme Court has long recognized the principle that decisions by the Executive Branch "whether or not to prosecute, or what charge to file or bring . . . generally rest[] entirely in [the prosecutor's] discretion."  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *Armstrong*, 517 U.S. at 464; *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000) ("[I]t is the prosecutor, not the court, who is vested with authority to decide whether to prosecute or to forgo prosecution."); *In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997) ("[T]he exercise of prosecutorial discretion, at the very core of the executive function, has long been held presumptively unreviewable.").

In *Wayte v. United States*, 470 U.S. 598 (1985), the Court explained the reasons for this basic constitutional principle.  First, prosecutorial decision-making requires weighing many factors—such as the strength of the case, the prosecution's deterrence value, and the Government's enforcement priorities—that are "not readily susceptible to the kind of analysis the courts are competent to undertake."  *Id.* at 607.  Second, judicial examination of the basis for prosecutorial decision-making would "delay[] the criminal proceeding, threaten[] to chill enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy."  *Id.*

Third, judicial interference in the Executive's prosecutorial decision-making would violate separation-of-powers principles.  *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (stating that the exercise of prosecutorial discretion "has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care

that the Laws be faithfully executed'" (quoting U.S. Const., Art. II, § 3)); *United States v. Robertson*, 45 F.3d 1423, 1437-38 (10th Cir. 1995) (separation-of-powers principles prevent the judiciary from "second-guessing" prosecutor's exercise of charging discretion, which "is nearly absolute"); *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) ("It follows, as an incident to constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecution.").

For these reasons, "a prosecutor need not explain his decisions [including the decision to seek the death penalty] unless the criminal defendant presents a *prima facie* case of unconstitutional conduct with respect to his case." *McCleskey*, 481 U.S. at 296-97 n.18; *see also id.* at 296 ("[P]olicy considerations behind a prosecutor's traditionally wide discretion suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties.") (internal quotation mark and footnote omitted); *Wayte*, 470 U.S. at 608 ("[A]lthough prosecutorial discretion is broad, it is not unfettered.  Selectivity in the enforcement of criminal cases is subject to constitutional constraints." (internal quotation marks omitted)); *United States v. Stanley*, 928 F.2d 575, 580-81 (2d Cir. 1991).  Because of the importance of prosecutorial discretion, the Supreme Court demands "exceptionally clear proof before we would infer that the discretion has been abused." *McCleskey*, 481 U.S. at 297.

## B.   There Is No Statutory or Constitutional Basis Supporting Judicial Review of the Capital Case Process in This Case

Saipov has submitted no evidence—in fact, he does not even allege—that the Attorney General based his decision whether to seek the death penalty on a constitutionally suspect factor. (Nor would Saipov have grounds for such a claim.)  Saipov's Motion should be denied on this basis alone. *See United States v. Frank*, 8 F. Supp. 2d 253, 283 (S.D.N.Y. 1998) ("In the absence

of any evidence to the contrary, the Court must presume that the prosecution was undertaken in good faith.").  Nevertheless, Saipov claims that there is a statutory and a constitutional basis for the Court to intervene in the Attorney General's decision-making process.  These arguments are without merit.

### 1. The Federal Death Penalty Act and Justice Manual Do Not Confer Rights on Saipov That Are Enforceable Against the Government

Saipov first claims that the Attorney General cannot have complied with the Act because he might have been influenced by the President's public statements.  (Mot. at 4-6).  This argument fails because neither the Act nor the Capital Case Protocol create procedural or substantive rights that are enforceable against the Government with respect to the Attorney General's decision-making process.

First, the Act speaks to the process by which courts and juries determine whether to sentence a defendant to death, not to the process by which the Government decides whether to seek the death penalty.  While the filing of a notice of intent to seek the death penalty by an "attorney for the government" triggers the judicial process described in the Act, nothing in the Act prescribes any procedures or places any restraints on how the "attorney for the government" exercises his discretion in determining whether to file capital charges or seek the death penalty.  *See* 18 U.S.C. § 3593(a).  Under similar circumstances, the court in *Nichols* described the limited reach of the Act:

> The only legislative guidance [for § 3593(a)] is that [the attorney for the government] shall consider whether the "circumstances of the offense" justifies a sentence of death.  There is no other direction.  Thus, absent the [Capital Case] Protocol, [the attorney for the government] had the statutory authority to file the notice as soon as he believed that there was sufficient evidence to show that the explosion on April 19, 1995, was caused by an intentional bombing.

8

*Nichols*, 931 F. Supp. at 752.   Thus, the Act in no way intrudes on traditional concepts of prosecutorial discretion.

Saipov also is not entitled to judicial review based on the Capital Case Protocol.  The Capital Case Protocol does not create a judicial or an administrative proceeding at which prospective capital defendants possess legally enforceable rights.  In fact, the Justice Manual makes clear that its provisions constitute "internal DOJ guidance."  JM § 1-1.200.  The Justice Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.  Nor are any limitations placed [by the Justice Manual] on otherwise lawful litigative prerogatives of DOJ."  *Id.*

Against this background, the Supreme Court, the Second Circuit, and every other Court of Appeals to consider the matter have held consistently that the internal prosecutorial policies and procedures in the Justice Manual or in similar internal policy statements do not limit the Government's prosecutorial discretion, do not create substantive or procedural rights, and may not be enforced against the Government.  *See, e.g.*, *Sullivan v. United States*, 348 U.S. 170, 172-73 (1954) (DOJ internal policy concerning tax violations); *United States v. Canori*, 737 F.3d 181, 185 (2d Cir. 2013) (DOJ internal policy concerning certain marijuana prosecutions); *United States v. Piervinanzi*, 23 F.3d 670, 682-83 (2d Cir. 1993) (DOJ Guidelines for prosecutions under money laundering statute); *United States v. Ivie*, 700 F.2d 51, 64 (2d Cir. 1983) (DOJ guidelines for RICO prosecutions); *United States v. Myers*, 692 F.2d 823, 845-46 (2d Cir. 1982) (DOJ guidelines regarding undercover investigations).

Saipov has cited no authority, and the Government is aware of none, in which a court has reviewed the process by which the Attorney General decided whether to seek the death penalty under the Act or the Capital Case Protocol.  Rather, every court to consider the issue has squarely

held that the Capital Case Protocol does not create enforceable procedural or substantive rights. *See, e.g.*, *United States v. Williams*, 181 F. Supp. 2d 267, 299 (S.D.N.Y. 2001) ("The vast majority of courts to consider this question have held that the Protocol does not create any such legally enforceable rights, and that, therefore, they lack the power to order the Government to abide by it." (collecting cases)); *United States v. Lopez-Matias*, 522 F.3d 150, 155 (1st Cir. 2008) (reversing district court order striking notice of intent to seek the death penalty based on alleged violation of Capital Case Protocol); *United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001) ("We agree with those courts which have concluded that the Capital Case Protocol is unenforceable by individuals."); *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000); *Nichols v. Reno*, 124 F.3d 1376, 1376 (10th Cir. 1997) (defendant has no "protectable interest" in enforcement of Capital Case Protocol); *Walker v. Reno*, 925 F. Supp. 124, 127 (N.D.N.Y. 1995); *United States v. Savage*, 2011 WL 6747479, at *2 (E.D. Pa. 2011); *United States v. Shakir*, 113 F. Supp. 2d 1182, 1191 (M.D. Tenn. 2000).  As a result, Saipov's argument fails.

### 2. Saipov's Conclusory Assertions About the Violation of His Constitutional Rights Have No Basis in the Law or Facts

Saipov next argues that based on the President's statements, "a decision by the Attorney General to seek death . . . would pose a constitutionally unacceptable risk of arbitrariness and unreliability." (Mot. at 7).  This argument also is without merit.

Even in death penalty cases, the Supreme Court has reinforced "the capacity of prosecutorial discretion to provide individualized justice." *McCleskey*, 481 U.S. at 311-12; *Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (holding that the Eighth Amendment is not violated by prosecutors' unfettered discretion to determine which death-eligible defendants will be capitally prosecuted and which will not be).  As a result, a challenge to the Government's ability to pursue capital punishment must fail in the absence of "exceptionally clear proof" that the Government

10

acted with a discriminatory purpose.  *McCleskey*, 481 U.S. at 296; *see also Gregg*, 428 U.S. at 225 (White, *J*., concurring) ("Absent facts to the contrary it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts.").

Here, Saipov has submitted no evidence suggesting that the Attorney General acted arbitrarily in determining whether to seek the death penalty.  Instead, he relies on conclusory assertions that there is a *risk* the Attorney General *might* act inappropriately because the President has made public statements about this and other cases.  (Mot. at 7).  It is unremarkable that the President possesses strong views concerning the attack at issue in this case, which constituted one of the most horrific acts of terrorism in this country since September 11, 2001.  The view that the nature of this offense—a terrorist attack inspired by ISIS that left eight people dead and many others seriously injured—justifies seeking the death penalty represents only a permissible "general zealousness in the enforcement process."[3]  *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 250 (1980); *see also United States v. Goodwin*, 457 U.S. 368, 373 (1982) (stating that because "the imposition of punishment is the very purpose of virtually all criminal proceedings," the mere existence of a punitive motivation is not an adequate basis of distinguishing proper governmental conduct from impermissible actions).  In any event, Saipov submits no evidence that the Attorney General

---

[3]      It is also not impermissible as a matter of law for the Attorney General to consider the President's views of a case in assessing whether the death penalty is appropriate.  *See, e.g.*, *Armstrong*, 517 U.S. at 465 ("[The Attorney General and United States Attorneys] are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const., Art II, § 3)); *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) ("The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceedings and in the prosecution of offenses, be faithfully executed.").

blindly relied on the President's views to make an arbitrary or unreliable decision concerning the death penalty.

Moreover, the Government disagrees with Saipov's characterization of the President's tweets as reflecting a direction to act based on "raw political considerations, even if they are unrelated to the facts and circumstances of the crime." (Mot. at 6). But even if they did, the Attorney General has made clear that "the actions of the Department of Justice will not be improperly influenced by political considerations." Sarah Isgur Flores, Official Department of Justice Twitter Account, Twitter Post (Aug. 23, 2018), *available at* https://twitter.com/SarahFloresDOJ/status/1032674568849244160. In the absence of any actual evidence that the Attorney General based his decision on a constitutionally suspect factor (and there is none), the Court must presume that the Government will act in good faith. *See Bordenkircher*, 434 U.S. at 364 ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

In similar circumstances, courts in this and other circuits regularly deny requests to intervene in the capital case process. *United States v. Kee*, 2000 WL 863119, at *4 (S.D.N.Y. 2000) ("Absent a preliminary showing of arbitrary action, the Court must assume that the Attorney General's decision was made in good faith."); *Frank*, 8 F. Supp. 2d at 283 (denying defendant's motion to review materials considered by Government in capital case process where there was "absolutely no evidence that the Government has acted with an improper motive, or otherwise arbitrarily"); *Savage*, 2011 WL 6747479, at *2; *United States v. Cooper*, 91 F. Supp. 2d 90, 115 (D.D.C. 2000) (discovery not appropriate where no evidence of discriminatory purpose, even where Attorney General overrode U.S. Attorney's recommendation against seeking death penalty).

Saipov is simply wrong that there is no guiding case law and that this is "the first time in the history of the federal death penalty where the President of the United States" publicly expressed support for seeking the death penalty.  (Mot. at 6).  In the immediate aftermath of the Oklahoma City bombing in 1995, both the President and the Attorney General publicly stated that the perpetrator of the crime—who had not yet been identified—should receive the death penalty. Specifically, on April 19, 1995, the day of the bombing, then-President William J. Clinton held a press conference during which he called the perpetrators "evil cowards" and stated that "justice will be swift, certain, and severe."  After the President's remarks, then-Attorney General Janet Reno stated during the press conference that "we will seek [the death penalty]."  *See Terror in Oklahoma City: Official Response; Statements by the President and Attorney General*, N.Y. Times (Apr. 20, 1995), *available at* https://www.nytimes.com/1995/04/20/us/terror-oklahoma-city-official-response-statements-president-attorney-general.html.   Several days later, during an interview, President Clinton reiterated in no uncertain terms that the Government would seek the death penalty:  "I certainly believe that they should be executed. . . . If this is not a crime for which capital punishment is called, I don't know what is."  *See* Transcript of Interview on CBS's *60 Minutes* (Apr. 23, 1995), available at http://www.presidency.ucsb.edu/ws/index.php?pid=51266. The *Nichols* court nevertheless denied the defendant's motion to strike the Government's notice to seek the death penalty on the ground that the Attorney General's decision was "presumptively unreviewable."  931 F. Supp. at 751-52, *aff'd*, 124 F.3d 1376, 1378 (10th Cir. 1997) ("adopt[ing]" the reasoning of the district court).  The reasoning in *Nichols* applies equally here.

At bottom, Saipov's speculative and unsupported allegations of arbitrary and unreliable conduct do not come close to meeting the "exceptionally clear proof" standard of showing that the Attorney General abused his discretion.  *Cf. McCleskey*, 481 U.S. at 311-12 (holding that the

Baldus study, an extensive study examining over 2,000 murder cases in Georgia, was "clearly insufficient to support an inference that any of the decisionmakers . . . acted with discriminatory purpose"). Because there is no evidence that the Attorney General acted with an improper motive, or otherwise arbitrarily, Saipov's Motion fails.[4]

### C.      The Court Cannot and Should Not Appoint a Special Prosecutor

Saipov asks the Court to exercise its "inherent authority" to appoint an "independent" prosecutor to determine whether the Government should seek the death penalty. (Mot. at 8). For the reasons set forth above, Saipov's requested remedy violates separation-of-powers principles and is wholly unsupported by the record in this case.

There also is no basis for the Court to appoint an independent prosecutor. The only authorities on which Saipov relies are those dealing with criminal contempt proceedings—charges that are initiated by a court itself and which the Supreme Court has recognized are different in kind from criminal prosecutions initiated by the Executive. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793-96 (1987) ("[I]t is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt. . . . The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a

---

[4]      The fact that the Attorney General appropriately exercised his discretion to *seek* the death penalty without interference from the Court does not mean that Saipov is without ample judicially enforced protections. Saipov has an array of constitutional and statutory protections to avoid an arbitrary or unjustified *imposition* of the death penalty. The Due Process and Equal Protection Clauses of the Constitution, for example, preclude the Government from deciding to seek the death penalty based on invidious factors like the race or national origin of the defendant or victims. *United States v. Pitera*, 795 F. Supp. 546, 568 (E.D.N.Y. 1992) (citing *Bordenkircher*, 434 U.S. at 364, and *Stanley*, 928 F.2d at 580-81). In addition, the Act contains numerous procedural and substantive protections (some constitutionally mandated) to protect capital defendants against arbitrary imposition of the death penalty. *See, e.g.*, 18 U.S.C. §§ 3591-3598.

means to vindicate its own authority without complete dependence on other Branches."); *accord Morrison v. Olson*, 487 U.S. 654, 681 & n.20 (1988).

To the contrary, Courts of Appeals have recognized that "[t]he judiciary's alleged 'inherent power' to appoint special prosecutors clashes with Article II, section 3 of the United States Constitution." *United States v. Davis*, 285 F.3d 378, 383 (5th Cir. 2002). And where that inherent power clashes, "a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the [Executive or the grand jury itself] unless there is a clear basis in fact and law for doing so." *In re Wood*, 833 F.2d 113, 115 (8th Cir. 1987) (internal quotation marks omitted); *see also In re Application for Appointment of Independent Counsel*, 596 F. Supp. 1465, 1470-72 (E.D.N.Y. 1984) (concluding that the constitutional separation of powers between the executive and the judicial branches, as well as the broad discretion traditionally vested in the prosecutor, prohibited the court from interfering with the prosecutorial function), *vacated on other grounds, sub nom. In re Appointment of Independent Counsel*, 766 F.2d 70 (2d Cir. 1985).[5]

Saipov has cited no precedent, and the Government is aware of none, in which a court has intervened in the exercise of the Executive's prosecutorial discretion in such a way. On the entirely speculative arguments that Saipov advances here, to do so would be a gross violation of the Court's constitutionally mandated role and of separation-of-powers principles. *See In re Grand Jury Subpoena of Rochon*, 873 F.2d 170, 176 (7th Cir. 1989) (disqualification of the Attorney General is a "drastic remedy" that should be undertaken only when "absolutely necessary"). Thus, the Court should not "examine the availability of alternative prosecution teams nor second-guess the

---

[5]     In addition, courts in this Circuit have concluded that they may not direct the Attorney General to appoint a special prosecutor pursuant to DOJ guidelines because that is an inherently discretionary act not subject to a court's *mandamus* authority. *See United States v. Sessa*, 2011 WL 256330, at *60 (E.D.N.Y. 2011), *aff'd*, 711 F.3d 316 (2d Cir. 2013).

Government's reasons for proceeding as it did." *United States v. Troutman*, 814 F.2d 1428, 1438 (10th Cir. 1987) (rejecting a request similar to Saipov's).

Nor is an independent prosecutor required, as Saipov argues, to ensure the "appearance of impartiality." (Mot. at 8). The Supreme Court has made clear that the "rigid requirements" of judicial impartiality "are not applicable to those acting in a prosecutorial . . . capacity." *Jerrico, Inc.*, 446 U.S. at 248. The reason that "[p]rosecutors need not be entirely neutral and detached" is grounded in the adversary system that necessarily expects and permits them "to be zealous in their enforcement of the law." *Id.*; *see Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) ("True disinterest on the issue of such a defendant's guilt is the domain of the judge and the jury— not the prosecutor.").

## CONCLUSION

For the reasons stated above, the Motion should be denied.

Dated: New York, New York
       September 28, 2018

                                        Respectfully Submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York


                                        By:  _____/s/_____
                                             Andrew D. Beaty
                                             Amanda Houle
                                             Matthew Laroche
                                             Assistant United States Attorneys
                                             Tel.: (212) 637-2420

Cc:     Defense Counsel (via ECF)

16