UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,                :        17 Cr. 722 (VSB)

              -v-                                    :

SAYFULLO HABIBULLAEVIC SAIPOV,           :

               Defendant.      :

-------------------------------------------------------X

DAVID E. PATTON
Federal Defender of New York, Inc.
Attorney for Defendant
SAYFULLO HABIBULLAEVIC SAIPOV

52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8750

Jennifer L. Brown, Esq.
   Attorney-in-Charge

To:    Geoffrey S. Berman
      United States Attorney
      Southern District of New
      York One St. Andrew's Plaza
      New York, New York 10007

Attn:  Andrew Beaty/Amanda Houle/Matthew Laroche
      Assistant United States Attorneys
      Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,           :           17 Cr. 722 (VSB)

                       -v-                          :

SAYFULLO HABIBULLAEVIC SAIPOV,      :

                              Defendant.    :

--------------------------------------------------------X

## MOTION TO SUPPRESS STATEMENTS

Sayfullo Habibullaevic Saipov, through counsel, respectfully seeks suppression of any

statements he made to law enforcement at Bellevue Hospital while recuperating from a gunshot

wound.  The Court should suppress Mr. Saipov's statements because:

(1) They were involuntary (see Mincey v. Arizona, 437 U.S. 385 (1978));

(2) Agents did not issue the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966); and

(3) Even if Miranda warnings were issued, the "totality of the circumstances surrounding the

interrogation" do not demonstrate Mr. Saipov waived his rights with a full awareness of what he was

abandoning and the consequences of such a decision (Fare v. Michael C., 442 U.S. 707, 725 (1979)).

Dated: December 14, 2018                    Respectfully Submitted,
       New York, NY


                                            /s/ Jennifer Brown
                                            Jennifer Brown
                                            David Patton
                                            Sylvie Levine
                                            Annalisa Mirón
                                            Federal Defenders of New York, Inc.
                                            (212) 417-8700

                                            David Stern
                                            Rothman, Schneider, Soloway & Stern, LLP
                                            (212) 571-5500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA,                :          17 Cr. 722 (VSB)

                            -v-                        :

SAYFULLO HABIBULLAEVIC SAIPOV,           :

                            Defendant.      :

----------------------------------------------------------X

DAVID E. PATTON
Federal Defender of New York, Inc.
Attorney for Defendant
SAYFULLO HABIBULLAEVIC SAIPOV

52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8750

Jennifer L. Brown, Esq.
   Attorney-in-Charge

To:     Geoffrey S. Berman
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007

Attn:  Andrew Beaty/Amanda Houle/Matthew Laroche
        Assistant United States Attorneys
        Southern District of New York

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................................iii

SUMMARY OF ARGUMENT ..........................................................................................................1

STATEMENT OF FACTS..................................................................................................................4

    A.    Paramedics take Mr. Saipov to Bellevue Hospital after he is shot in the groin and arrested......4

    B.    Mr. Saipov is anesthetized for emergency surgery. ...........................................................5

    C.    While recuperating from his operation, Mr. Saipov remained intubated and unconscious, and on fentanyl and propofol drips. .......................................................................................5

    D.    FBI agents interrogated Mr. Saipov until 6:00 or 7:00 a.m. on November 1, 2017. ...................6

ARGUMENT.......................................................................................................................................8

    I.    Mr. Saipov's statements were involuntary. ...................................................................8

    II.    The government has failed to prove the agents timely Mirandized Mr. Saipov. .....................13

    III.    Even if Mr. Saipov's confession was voluntary, and agents issued timely Miranda warnings, his statements are still inadmissible because Mr. Saipov's Miranda waiver was not knowing, intelligent, or voluntary...............................................................................................15

CONCLUSION ................................................................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Berghuis v. Thompkins,
   560 U.S. 370 (2010).................................................................................................15

Colorado v. Connelly,
   479 U.S. 157 (1986)..................................................................................................9

Crane v. Kentucky,
   476 U.S. 683 (1986)..................................................................................................9

Dickerson v. United States,
   530 U.S. 428 (2000)..................................................................................................8

Duckworth v. Eagan,
   492 U.S. 195 (1989)................................................................................................16

Fare v. Michael C.,
   442 U.S. 707 (1979)..........................................................................................Passim

Harris v. New York,
   401 U.S. 222 (1971)..................................................................................................8

Jackson v. Denno,
   378 U.S. 368 (1964)..................................................................................................8

Lego v. Twomey,
   404 U.S. 477 (1972)..................................................................................................9

Mincey v. Arizona,
   437 U.S. 385 (1978)..........................................................................................Passim

Miranda v. Arizona,
   384 U.S. 436 (1966)..........................................................................................Passim

Moran v. Burbine,
   475 U.S. 412 (1986)................................................................................................15

New Jersey v. Portash,
   440 U.S. 450 (1979)..................................................................................................8

New York v. Quarles,
   467 U.S. 649 (1984)..........................................................................................Passim

Schneckloth v. Bustamonte,
   412 U.S. 218 (1973)..............................................................................................2, 7

Sims v. Georgia,
   385 U.S. 538 (1967)..................................................................................................8

United States v. Anderson,
   929 F.2d 96 (2d Cir. 1991).................................................................................Passim

United States v. DeSantis,
   870 F.3d 536 (9th Cir. 1989)...................................................................................14

United States v. Heredia-Fernandez,
   756 F.2d 1412 (9th Cir. 1985)..................................................................................15

United States v. Jaswal,
   47 F.3d 539 (2d Cir. 1995)..................................................................................3, 15

United States v. Kaba,
   999 F.2d 47 (2d Cir. 1993)........................................................................................8

United States v. Pena,
   961 F.2d 333 (2d Cir. 1992) ............................................................................. 8, 13
United States v. Plugh,
   648 F.3d 118 (2d Cir. 2011) ................................................................................. 15
United States v. Santiago,
   720 F. Supp. 2d 245 (W.D.N.Y. 2010) ............................................................... 15
United States v. Taylor,
   745 F.3d 15 (2d Cir. 2014) ............................................................................ Passim

**Statutes**

18 U.S.C. § 3501(a) ................................................................................................... 8
18 U.S.C. § 3501(b) ............................................................................................ 9, 12
18 U.S.C. § 3501(c) ................................................................................................. 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA,                :          17 Cr. 722 (VSB)

             -v-                :

SAYFULLO HABIBULLAEVIC SAIPOV,   :

           Defendant.   :

----------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS

## SUMMARY OF ARGUMENT

The Court should suppress the statements Mr. Saipov made to two FBI agents during an all-night-long interrogation while he recuperated from gunshot wounds in a post-surgery, intensive care unit.  Because the agents interrogated Mr. Saipov while he was still under the effect of powerful opioid and benzodiazepine sedatives, Mr. Saipov's statements were not voluntary.  But even if they were, the statements should still be suppressed because the government has not met its burden to prove Mr. Saipov was Mirandized before the interrogation began or that any waiver of his Miranda rights was knowing or voluntary.

Mr. Saipov was apprehended on the afternoon of October 31, 2017, after a police officer shot him in the groin.  He was taken to Bellevue Hospital, anesthetized, and wheeled into the operating room.  After two surgeons probed, cleaned, and stitched Mr. Saipov's gunshot wounds, he remained intubated and heavily sedated in two intensive care units for the next five hours.  Mr. Saipov received doses of powerful opioid painkillers and benzodiazepine sedatives right up until his breathing tube was removed at 11:20 p.m.  Twenty-eight minutes later, two FBI agents began an interrogation that lasted all night long.

The government has not produced a recording or contemporaneous memorialization of the interrogation; just an FBI FD-302, which revolves around three times: 11:48 p.m., 12:29 a.m., and 5:40 a.m.  Per the agents' narrative, they started interrogating Mr. Saipov without <u>Miranda</u> warnings at 11:48 p.m. to address their concerns about potential ongoing threats to public safety.  At 12:29 a.m., the agents claim their concerns were allayed, and that they verbally warned Mr. Saipov of his <u>Miranda</u> rights.  They also claim that Mr. Saipov—an Uzbek national with elementary English-language skills and minimal prior interaction with law enforcement—verbally waived his rights without asking any questions or seeking any clarifications.

The agents' questioning continued until they took a break at 5:40 a.m., November 1, 2017.  The interrogation recommenced shortly thereafter, but the agents do not note when it formally ended.  Instead, according to another FD-302, Mr. Saipov was taken to 26 Federal Plaza at 2:09 p.m.  An "advice of rights" form was appended to this FD-302, which Mr. Saipov purportedly signed.  According to the document, Mr. Saipov was advised of his rights at 1:35 p.m.

The government compelled an involuntary statement from Mr. Saipov and therefore cannot use it at trial for any reason.  <u>Mincey v. Arizona</u>, 437 U.S. 385, 398 (1978) ("<u>any</u> criminal trial use against a defendant of his <u>involuntary</u> statement is a denial of due process of law") (emphasis in original) (citations omitted).  Agents interrogated Mr. Saipov minutes after he regained consciousness from an operation; he was bedridden, recovering from a gunshot wound in a post-surgery, painkiller-induced daze, "'drugged [and] otherwise lack[ing] capacity for conscious choice.'"  <u>United States v. Taylor</u>, 745 F.3d 15, 24 (2d Cir. 2014) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 224 (1973)).  Because Mr. Saipov "confessed while in a stupor, his will was overborne, his statements were not voluntarily made, and they should [be] suppressed."  <u>Taylor</u>, 745 F.3d at 27.

But even assuming the government can prove Mr. Saipov's statements were voluntary, his statements are still inadmissible because he was not advised of his <u>Miranda</u> rights before the

interrogation began.  Miranda v. Arizona, 384 U.S. 436, 444 (1966) ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the [Fifth Amendment] privilege against self-incrimination.").  Although the agents claim to have Mirandized Mr. Saipov 40 minutes into the interrogation, this is belied by (1) the "advice of rights" form Mr. Saipov signed more than 12 hours later, and (2) the agents' failure to contemporaneously document or record the supposed warning.

Alternatively, assuming arguendo the agents did issue Miranda warnings at some point during the interrogation, the government cannot show Mr. Saipov's waiver was knowing or voluntary.  United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam) ("To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right.").  Indeed, the government took no steps to confirm that Mr. Saipov—a non-native and non-fluent English speaker who was raised in a politically-repressed country[1] without a Bill of Rights—appreciated the significance and absolute nature of his right against self-incrimination and to consult an attorney, free of charge, before answering any questions.  Nor did the government establish that Mr. Saipov appreciated the implications of speaking to FBI agents without an attorney or understood that he had the power to end the interrogation at any time.  Because the government has not demonstrated Mr. Saipov made a "deliberate choice free from intimidation, coercion, or deception" and possessed a "full awareness of the nature of the right being abandoned and the

---

[1] See, e.g., Human Rights Watch, "Until the Very End": Politically Motivated Imprisonment in Uzbekistan, (Sept. 25, 2014), available at: https://www.hrw.org/report/2014/09/25/until-very-end/politically-motivated-imprisonment-uzbekistan# ("Political repression, including the arrest, torture, and imprisonment of actual or perceived government opponents, has been a constant feature of life in Uzbekistan since Islam Karimov first became the Communist Party secretary of the Uzbek Soviet Socialist Republic in 1989 and following independence when he became the country's president.").

consequences of abandoning it," the government cannot use Mr. Saipov's statements against him.

Taylor, 745 F.3d at 23.

## STATEMENT OF FACTS

### A. Paramedics take Mr. Saipov to Bellevue Hospital after he is shot in the groin and arrested.

At approximately 3:15 p.m. on October 31, 2017, emergency medical technicians (EMTs) found Mr. Saipov lying in the street and in the custody of the New York Police Department. See Affidavit from Karen Wetther, RN, LNC at 1 (attached as Exhibit A).[2] Mr. Saipov was bleeding profusely from an apparent gunshot wound to his left buttock. Id. at 1-2. As the EMTs loaded Mr. Saipov onto an ambulance, they tried assessing his pupils, but were unable to do so because Mr. Saipov was uncooperative and otherwise refused to speak. Id. at 2. Escorted by the NYPD, Mr. Saipov and the EMTs headed for Bellevue Hospital and arrived at 3:55 p.m. Id. Mr. Saipov was in handcuffs and has remained in custody. Id.

Upon arriving at Bellevue, Mr. Saipov was admitted to the Trauma Unit and was evaluated by Dr. Nelly Parisot. Ex. A at 2. Mr. Saipov was awake and followed some commands, but did not say anything. Id. Dr. Parisot confirmed Mr. Saipov had gunshot wounds to his left groin and buttock, and a nurse started Mr. Saipov on a fentanyl drip (see infra) at 4:30 p.m. Id. Mr. Saipov was admitted to the operating room shortly thereafter. Id.

---

[2] Ms. Wetther is a registered nurse and legal nurse consultant retained by defense counsel to review and interpret Mr. Saipov's medical records from October 31 and November 1, 2017. The medical records Ms. Wetther reviewed are attached to Exhibit A for the Court's benefit. Defense counsel attempted numerous times to speak with a few of the Bellevue physicians, nurses, and physician assistants who attended to Mr. Saipov on October 31 and November 1, 2017. However, Catherine Gursky, RN, Esq., Associate Executive Director of Risk Management at Bellevue Hospital, informed defense counsel that health-care providers are unwilling to speak about Mr. Saipov's case "unless they have to." See June 21, 2018, Email from Catherine Gursky (attached as Exhibit B). Defense counsel understands this to mean they require a subpoena, which further heightens the need for an evidentiary hearing on this motion.

**B.    Mr. Saipov is anesthetized for emergency surgery.**

Attending Surgeon Dr. Marko Bukur and Surgery Resident Dr. Donnele Daley operated on Mr. Saipov.  Ex. A at 2.  Dr. Bukur noted that a bullet entered Mr. Saipov's left groin and exited via his "left gluteal region."  Id.  Although Mr. Saipov's femoral artery and vain were intact, Dr. Bukur observed damage to the soft tissue and frontal muscles of Mr. Saipov's upper thigh.  Id.  Mr. Saipov was then intubated and given a general anesthetic, which rendered him unconscious.  Id.

During surgery, Mr. Saipov was sedated by a concoction of sedatives and opioid painkillers, including fentanyl, propofol, and versed.  Ex. A at 2.  Fentanyl is a potent synthetic opioid drug that is used to treat severe pain and as an anesthetic.  Id. at 3.  As a pain reliever, fentanyl is approximately 100 times as potent as morphine and 50 times more potent than heroin.  Id.  When administered intravenously, fentanyl has an elimination half-life of two to four hours, which means it takes approximately 11 to 22 hours to completely leave a person's system.  Id.  Side effects of fentanyl include confusion, anxiety, dizziness, headache, nervousness, abnormal thinking, agitation, somnolence, and mental clouding.  Id.

Unlike fentanyl, propofol is not a pain medication; rather, it is a potent sedative used primarily for general anesthesia and to sedate patients on ventilators.  Ex. A at 3.  Propofol is aptly referred to as "Milk of Amnesia" as it decreases a person's cognition and can cause memory loss.  Id.  Similarly, versed is a benzodiazepine sedative used in a variety of medical settings.  Versed can cause extreme drowsiness, confusion, dizziness, and forgetfulness.  Id.

Mr. Saipov came out of surgery around 5:08 p.m., and he was transferred to the Post-Anesthesia Recovery Unit ("PACU") at 5:48 p.m. still intubated and unconscious.  Ex. A at 3.

**C.  While recuperating from his operation, Mr. Saipov remained intubated and unconscious, and on fentanyl and propofol drips.**

After his operation, Mr. Saipov recovered in the PACU and the Medical Intensive Care Unit ("MICU").  Ex. A at 3.   Because he remained intubated, Mr. Saipov was kept heavily sedated and was

administered doses of fentanyl and propofol at regular intervals.  Id.  Between 6:00 and 11:00 p.m., Mr. Saipov received 50mcg/kg/min of propofol.  Id.  From 6:00 p.m. to 7:00 p.m., he also received 50mcg/hr of fentanyl.  At 7:00 p.m., his fentanyl dosage was doubled to 100 mcg/hr and it stayed at that strength for the next four hours.  Id.

At 11:16 p.m., Nurse Carlos Garcia stopped Mr. Saipov's propofol and fentanyl drips and prepared to extubate Mr. Saipov.  Ex. A at 4.  Mr. Saipov's breathing tube was removed four minutes later.  Id.  At 11:48 p.m., just 28 minutes after Mr. Saipov began to breathe on his own for the first time since the general anesthetic was administered, FBI Agents Joanna Maroudas and Richard Paugh began interrogating him.  See Maroudas and Paugh FD-302 at 1 (attached as Exhibit C).

### D.  FBI agents interrogated Mr. Saipov until 6:00 or 7:00 a.m. on November 1, 2017.

Maroudas and Paugh admit they did not advise Mr. Saipov of his Miranda rights before the interrogation began; rather, between 11:48 p.m. and 12:29 a.m., they claim a "Quarles interview[3] was conducted to address the ongoing concern for public safety."  Ex. C at 1-2.  Once the agents were satisfied Mr. Saipov "did not have any additional plans to cause [an] imminent threat or danger to the public," Mr. Saipov was "verbally advised [] of his Miranda rights," which he "verbally waived."  Id.

Maroudas and Paugh interrogated Mr. Saipov all night long (Ex. C at 2-7), and he received medical attention throughout the interrogation.  Various nurses and physician assistants ran blood tests, changed his dressings, and, at 3:41 a.m., gave Mr. Saipov two grams of magnesium sulfate and 15 millimoles of potassium phosphate, both of which are known to cause confusion, dizziness, and weakness.  Ex. A at 4.

At 5:40 a.m., the agents asked Mr. Saipov to waive his speedy presentment rights.  Id. at 7.  But Mr. Saipov "did not understand everything" and asked the agents to repeat themselves.  Id.  Maroudas

---

[3] Referring to the public-safety exception to Miranda first recognized in New York v. Quarles, 467 U.S. 649 (1984).

then read the "Waiver of Speedy Presentment" document "at a slower pace, explaining each paragraph with additional details." Id.  At that point, the agents wrote, Mr. Saipov "wanted to waive his speedy initial appearance before a United States Magistrate Judge or other judicial officer [and] agreed to continue the interview." Id.  Two additional law enforcement officers (FBI Agent Brett Yellen and Task Force Officer Peter Schrammel) were apparently present for this part of the interrogation.  Id. Maroudas and Paugh continued to question Mr. Saipov after 5:40 a.m.,[4] but stopped sometime before Mr. Saipov signed an "advice of rights" form at 1:35 p.m. (attached as Exhibit D).  Mr. Saipov was transported to 26 Federal Plaza at 2:09 p.m.  See Tyree FBI FD-302 (attached as Exhibit E).

Although it is impossible to know from the face of their FD-302 what specific questions Maroudas and Paugh asked, it is clear they interrogated Mr. Saipov about matters and contacts that overlap with surreptitious FBI surveillance of Mr. Saipov's communications. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  We are still waiting for more information from the government about the nature and basis of the wiretaps, and expects that this November 2018 revelation may lead to additional Rule 16 discovery and Rule 12 motion practice, particularly because there is a colorable basis to believe the agents derived their questions from information the FBI

---

[4] At some point after 5:40 a.m., Maroudas and Paugh claim Mr. Saipov consented to a search of his cell phones, and YouTube and e-mail accounts.  But as discussed in Mr. Saipov's motion to suppress the fruits of the government's search warrants, any consent Mr. Saipov gave was just as involuntary as his confession because he could not have summoned the will to make a conscious decision "representing a choice of alternatives."  Schneckloth v. Bustamonte, 412 U.S. 218, 224, 229 (1973) (traditional definition of voluntariness applies to consent searches such that courts must take account "of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents" to weed out those obtained through "duress or coercion, express or implied").

obtained through this monitoring.  In the meantime, defense counsel mentions the surveillance now because it bears on the original source(s) of the information contained in Maroudas and Paugh's FD-302 and whether Mr. Saipov voluntarily disclosed this information to the government.

## ARGUMENT

**I.      Mr. Saipov's statements were involuntary.**

The Due Process and Self-Incrimination Clauses of the Fifth Amendment require "that a confession be voluntary to be admitted into evidence."  Dickerson v. United States, 530 U.S. 428, 433 (2000.  As opposed to statements taken in violation of Miranda v. Arizona, which are admissible for impeachment if their "trustworthiness … satisfies legal standards" (Harris v. New York, 401 U.S. 222, 224 (1971)), "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law, 'even though there is ample evidence aside from the confession to support the conviction.'"  Mincey, 437 U.S. at 398 (emphasis in original) (quoting Jackson v. Denno, 378 U.S. 368, 376 (1964)).  See also New Jersey v. Portash, 440 U.S. 450, 459 (1979) ("[A] defendant's compelled statements, as opposed to statements taken in violation of Miranda, may not be put to any testimonial use whatever against him in a criminal trial.").

A defendant challenging the voluntariness of a confession has a due process right to "a fair hearing and a reliable determination on the issue of voluntariness."  Denno, 378 U.S. at 377; Sims v. Georgia, 385 U.S. 538, 543-44 (1967).  Thus, in federal cases, "before a confession may be received in evidence, 'the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness.'"  United States v. Kaba, 999 F.2d 47, 50 (2d Cir. 1993) (quoting 18 U.S.C. § 3501(a)).  And as long as a defendant demonstrates a "sufficiently definite, specific, detailed and nonconjectural" issue of fact pertaining to voluntariness, an evidentiary hearing is required.  United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992).

The government must prove voluntariness by a preponderance of the evidence.  Lego v. Twomey, 404 U.S. 477, 489 (1972).  "'A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given.'"  United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014) (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)).  The voluntariness inquiry probes "the physical and psychological environment that yielded the confession" (Crane v. Kentucky, 476 U.S. 683, 688-89 (1986))—i.e., "'the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials.'"  Taylor, 745 F.3d at 23-24 (quoting Anderson, 929 F.2d at 99); see also, e.g., 18 U.S.C. § 3501(b) (providing that district courts, in deciding voluntariness, shall consider "all the circumstances," including "time elapsing between arrest and arraignment," and whether defendant "knew the nature of the offense … of which he was suspected," was advised of Miranda rights, or was represented by counsel).  "An individual's mental state should [also] be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual."  Taylor, 745 F.3d at 24 (citing Colorado v. Connelly, 479 U.S. 157, 164-65 (1986)).

Mincey v. Arizona and United States v. Taylor are illustrative.  In Mincey, the Supreme Court ruled that statements made by a defendant who was hospitalized for a gunshot wound were involuntary and should have been suppressed.  437 U.S. at 401-02.  Although the defendant "had received some treatment" before police questioned him, "his condition at the time of [the] interrogation was still sufficiently serious that he was in the intensive care unit."  Id. at 398.  He "complained to [police] that the pain in his leg was 'unbearable'" and "[h]e was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation."  Id.  And "while [he] was being questioned [the defendant] was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus."  Id. at 399.  "He was, in short, 'at the complete mercy' of [the police], unable to escape or resist the thrust of [their] interrogation."

Id.  Taken together, these circumstances supported only one conclusion: the defendant's statements were "the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness," who was "weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, [such that] his will was simply overborne."  Id. at 401-02.

In Taylor, 745 F.3d at 20-25, the defendant ingested a large amount of Xanax[5] shortly before he was arrested and interrogated by the police, which he argued rendered his confession involuntary. The Second Circuit agreed.

At the suppression hearing, the interrogating officers testified that the defendant displayed varying degrees of lucidity during the two- to three-hour interrogation.  When he was "awake and speaking," the defendant was "coherent and fluid," and at one point alert enough to sign an "advice of rights form" waiving his Miranda rights.  Id. at 20-21.  But at other times, the defendant's "body was somewhat shutting down," and he had to be "refocused" whenever he started "dozing off."  Id.

In rejecting the defendant's claim, the district court found that the defendant was "sufficiently lucid during the questioning [because] his waiver of Miranda rights was knowing and voluntary." Taylor, 745 F.3d at 22 (citations omitted).  The court emphasized "that it did not equate nodding off intermittently with total psychotic episodes of hallucination and other extreme circumstances that might throw greater doubt on the defendant's ability to voluntarily and knowingly waive his rights." Id. (citations omitted).

Without disturbing the district court's factual findings, the Second Circuit disagreed with its judgment, and held that the defendant's "statement was made when he was unable to summon the will to make a knowing and voluntary decision" despite a valid Miranda waiver.  Taylor, 745 F.3d at 24.

---

[5] Xanax is a benzodiazepine sedative that is used to treat anxiety, but frequently abused.  See John Henning Schumann, Benzodiazepines: America's 'Other Prescription Drug Problem', NPR (Apr. 26, 2018), available at: https://www.npr.org/sections/health-shots/2018/04/26/602213172/benzodiazepines-america-s-other-prescription-drug-problem.

The defendant may have been "coherent <u>at times</u>" during the interview, including when he signed the "advice of rights form." <u>Id.</u> at 25 (emphasis in original).  But just because the defendant voluntarily waived his <u>Miranda</u> rights did not change the fact that he was also "in and out of consciousness while giving his statement, and in a trance or a stupor most of the time when not actually asleep." <u>Id.</u>  And while these interrogation conditions did "not appear to have been abusive … the officers' persistent questioning took undue advantage of [the defendant's] diminished mental state, and ultimately overbore his will." <u>Id.</u>  As the Second Circuit explained, "there is little difference in effect between sleep deprivation as a technique and the relentless questioning of a person who is obviously unable to focus or stay awake for some other reason." <u>Id.</u>

Here, Mr. Saipov's answers to the agents' relentless questioning were not the product of his free and rational choice.  Mr. Saipov emerged from surgery intubated and comatose, recuperating from a debilitating gunshot wound to the groin.  Mr. Saipov was on a constant drip of propofol and fentanyl—potent substances that are known to cause confusion, dizziness, and weakness—administered at regular intervals right up until his breathing tube was removed at 11:20 p.m.  Barely 30 minutes later, at 11:48 p.m., two FBI agents began interrogating Mr. Saipov and continued well into the night.  Throughout the interrogation, Mr. Saipov was kept in the intensive care unit.  He received additional medical treatment, including infusions of magnesium sulfate and potassium phosphate at 3:41 a.m.—substances that are also known to cause confusion, dizziness, and weakness.  The agents took advantage of Mr. Saipov's diminished physical and mental condition to coerce a statement; drugged, "weakened by pain and shock" and "isolated from family, friends, and legal counsel," Mr. Saipov could not muster the strength to rebuff the agents' advances and his "will was simply overborne." <u>Mincey</u>, 437 U.S. at 401-02.

Indeed, although not identical to <u>Mincey</u> or <u>Taylor</u>, Mr. Saipov's interrogation presents circumstances that compel a finding of involuntariness.  Like Mincey, Mr. Saipov "was being

questioned [while] he was lying on his back on a hospital bed, encumbered by tubes [and] needles …

'at the complete mercy' of [the agents], unable to escape or resist the thrust of [their] interrogation."

Mincey, 437 U.S. at 399.  And like Taylor, Mr. Saipov was under the influence of substances—i.e., a

potent opioid and benzodiazepine cocktail—that undermined his ability to focus and rely on his

faculties to resist the agents' persistent questioning.  See Taylor, 745 F.3d at 25 (explaining that "the

decisive issue is whether the will was 'overborne' by the police, so that the defendant is not using such

faculties as he has.").  Chained to a hospital bed, drugged, and breathing on his own for the first time

in hours, Mr. Saipov lacked the capacity to do anything but capitulate to the agents' will, even assuming

he validly waived his Miranda rights (which he did not, see infra).

Four of the five § 3501(b) factors favor Mr. Saipov, too.  The "time elapsing between arrest

and arraignment," § 3501(b)(1), was about 26 hours—from 3:15 p.m. on October 31 to 6:10 p.m.[6] on

November 1—more than four times the six-hour safe harbor provided by 18 U.S.C. § 3501(c).

Although the agents wrote they advised Mr. Saipov of his Miranda rights at 12:29 a.m. after a 40-

minute Quarles interview, this claim is contradicted by the "advice of rights" form Mr. Saipov

ostensibly signed at 1:35 p.m. on November 1, some 13 hours later (see infra).  No evidence

corroborates the agents' barebones assertion that Mr. Saipov—who requires the assistance of an

Uzbek interpreter in his interactions with the Court and defense counsel—"knew that he was not

required to make any statement and that any such statement could be used against him." § 3501(b)(3).

Nor is there sufficient evidence that the agents meaningfully advised Mr. Saipov "of his right to the

assistance of counsel" (§ 3501(b)(4)), and he was "without the assistance of counsel when questioned"

(§ 3501(b)(5)).  Mr. Saipov's statements should be suppressed.

At a minimum, the circumstances surrounding Mr. Saipov's interrogation as reflected by his

medical records are sufficiently "specific, detailed, and nonconjectural" to establish a factual dispute

---

[6] See Initial Appearance, ECF No. 4.

regarding his mental state during the interrogation.  Pena, 961 F.2d at 339 (an evidentiary hearing on a motion to suppress "ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.") (citations omitted).  Accordingly, the Court cannot deem his confession voluntary without first establishing a factual record at a hearing.

## II.      The government has failed to prove the agents timely Mirandized Mr. Saipov.

The government's discovery creates competing inferences as to whether Mr. Saipov was Mirandized before any portion of his confession, a fundamental "prerequisite[] to the admissibility of any statement made by a defendant."  Miranda, 384 U.S. at 476.

According to their FD-302, Maroudas and Paugh Mirandized Mr. Saipov 40 minutes into the interrogation.  But there is no corroborating evidence of this warning; all that exists is a bald assertion in their FD-302 that Maroudas "verbally advised" Mr. Saipov of his Miranda rights and the he "verbally waived."  The document contains nothing about the substance of the alleged warning or even the words Mr. Saipov supposedly spoke, or whether he hesitated, asked any clarifying questions, or was shown a written explanation of the rights the agents wanted him to waive.

On the other hand, the government's discovery contains an FBI "advice of rights" form that Mr. Saipov apparently signed at 1:35 p.m. on November 1, 2017—minutes before his discharge from Bellevue but well after the interrogation ended.  See Exhs. D & E.  The form described Mr. Saipov's Miranda rights and prompted him to confirm that "[a]t this time, I am willing to answer questions without a lawyer present."  Ex. D.  It is a far more detailed and probative account of a Miranda warning than that offered by the FD-302.  Cf. Taylor, 745 F.3d at 23 ("In general, a suspect who reads, acknowledges, and signs an "advice of rights" form before making a statement has knowingly and voluntarily waived Miranda rights.").  Because the form suggests Mr. Saipov was only meaningfully apprised of his Miranda rights after the interrogation had ended, his statements are inadmissible.

Notably, even if the agents Mirandized Mr. Saipov, they admit to interrogating him for 40 minutes before doing so.  Accordingly, for Mr. Saipov's statements to be admissible, the government must also prove that its Quarles interrogation was proper.[7]

In New York v. Quarles, 467 U.S. 649 (1984), the Supreme Court addressed the admissibility of a rape suspect's response to a police officer's question, posed before Miranda warnings were given, concerning the location of a missing gun.  The suspect, who was wearing an empty holster when arrested, told police where to find the weapon.  The Supreme Court held that the statement was admissible despite the officer's failure to issue Miranda warnings because "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 657.  But the Supreme Court emphasized the narrowness of its exception to the Miranda rule, noting that the officer "asked only the question necessary to locate the missing gun" before advising the suspect of his rights.  Id. at 659.  Then, after securing the loaded revolver and giving the warnings, the officer continued with "investigatory questions" about the weapon.  Id.

In this case, Maroudas and Paugh's FD-302 sheds no light on what they spoke with Mr. Saipov about for 40 minutes.  There is no evidence that their questions were limited in scope to the issue of imminent threats to public safety; to the contrary, Mr. Saipov's purported answers to the agents' questions, namely that he was inspired by a video of ISIS leader Abu-Bakr al-Baghdadi, suggest that they asked investigatory questions that were not confined to what was necessary to rule out an imminent danger to public safety.  Ex. C at 1.  If the government cannot prove that its agents did not

---

[7] Whether the Quarles portion of the interrogation was proper has no bearing on the voluntariness analysis, as Quarles cannot be invoked to admit otherwise involuntary statements.  United States v. DeSantis, 870 F.2d 536, 540 (9th Cir. 1989).  Cf. New York v. Quarles, 467 U.S. 649, 654 (1984) (case involved "no claim that respondent's statements were actually compelled by police conduct which overcame his will to resist").

exceed the narrow Quarles exception to Miranda, Mr. Saipov's statements can be suppressed on that basis as well.

### III. Even if Mr. Saipov's confession was voluntary, and agents issued timely Miranda warnings, his statements are still inadmissible because Mr. Saipov's Miranda waiver was not knowing, intelligent, or voluntary.

Assuming arguendo Mr. Saipov voluntarily confessed and was also timely advised of his Miranda rights, his statements are still inadmissible because the government cannot meet its "heavy burden" to show that Mr. Saipov "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475.

"The accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived Miranda rights when making the statement." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (citations omitted). "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." Jaswal, 47 F.3d at 542. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).

When determining whether the totality of the circumstances reveals an uncoerced choice, courts should consider the defendant's background and experience, and account for the defendant's age, intelligence, education, ability to speak English and experience with the criminal justice system. United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011); see also United States v. Santiago, 720 F. Supp. 2d 245, 252 (W.D.N.Y. 2010) ("A language barrier is certainly a factor to consider when determining the validity of a waiver.") (citing United States v. Heredia-Fernandez, 756 F.2d 1412, 1415 (9th Cir. 1985)). This means courts "review the warnings not for whether they adhered to a certain

form, but for their substance." United States v. Anderson, 929 F.2d 96, 98 (2d Cir. 1991)

(citing Duckworth v. Eagan, 492 U.S. 195, 202 (1989)). Essentially, the Court must ascertain if Mr.

Saipov's Miranda rights were "brought home to him in an intelligible fashion." Id.

Michael C. illustrates what a voluntary and knowing Miranda waiver looks like. There, a 16 ½-year-old boy sought to suppress his statements to police while they interrogated him about a murder. The Supreme Court's assessment of his Miranda waiver started with the transcript of the interrogation, which "reveal[ed] that the police officers … took care to ensure that [the defendant] understood his rights." Michael C., 442 U.S. at 726. "They fully explained to [the defendant] that he was being questioned in connection with a murder," "informed him of all the rights delineated in Miranda, and ascertained that [he] understood those rights." Id. The transcript also did not suggest the defendant "failed to understand what the officers told him." Id.

Just as importantly, the defendant's background was consistent with a knowing and intelligent waiver; he had "considerable experience with the police," racked up "several arrests," spent time in a youth camp, and "had been on probation for several years" before the interrogation. Michael C. 442 U.S. at 726. "There [was] no indication he was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be" and the defendant was not overborne "by improper interrogation tactics or lengthy questioning…." Id. at 726-27.

The facts presented here bear no resemblance to those in Michael C. The FBI did not record Mr. Saipov's interrogation, which means the Court cannot inspect a transcript to assess the substance of his purported waiver like the Supreme Court did in Michael C. Nor does Maroudas and Paugh's FD-302 include details about their exchange with Mr. Saipov, as it does with the speedy-presentment waiver. See supra II(D); Ex. C at 7 (explaining that Mr. Saipov "did not understand" his speedy-presentment rights and asked to have them "read [to him] again," at which point the agents did so "at a slower pace" and explained "each paragraph with additional details"). Instead, the Court is left with

16

only FBI Agent Maroudas's barebones conclusion that Mr. Saipov "verbally waived" his rights.  Ex. C at 2.  This is not enough to sustain the government's burden of proving Mr. Saipov intelligently understood the implications of <u>Miranda</u> and voluntarily chose to answer questions nonetheless.

Mr. Saipov's waiver was involuntary because his will was overborne (<u>see</u> <u>supra</u> III(A)) and it was unknowing because the agents did not take "care to ensure [Mr. Saipov] understood his rights" (<u>Michael C.</u>, 442 U.S. at 726) or explain <u>Miranda</u> in a manner that would have "brought [it] home to him in an intelligible fashion" (<u>Anderson</u>, 929 F.2d at 98).  Indeed, unlike the defendant in <u>Michael C.</u>—a native English speaker whose numerous, extensive encounters with the criminal justice system helped confirm the validity of his waiver—Mr. Saipov was hampered by a language barrier and an unfamiliarity with the rights he was being asked to waive.  Mr. Saipov was raised in Uzbekistan, a politically-repressed country without comparable, absolute constitutional rights to remain silent and be questioned alongside counsel.  He also requires an interpreter for all court appearances and interactions with counsel, and has had few prior interactions with law enforcement; before October 31, 2017, Mr. Saipov was arrested for a traffic violation, but was never interrogated by police.

Mr. Saipov was a complete novice who required at least as much of a careful explanation of his rights as that issued by the officers n <u>Michael C.</u>  Yet, as their FD-302 suggests, Maroudas and Paugh improperly treated their verbal warning as "a preliminary ritual" and not as a fundamental prerequisite to the admissibility of Mr. Saipov's confession.  <u>See</u> <u>Miranda</u>, 384 U.S. at 476 ("The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.").  Because the interrogating agents' FD-302 forecloses a substantive assessment of their exchange with Mr. Saipov, the government cannot prove Mr. Saipov executed a valid waiver without an evidentiary hearing.

**CONCLUSION**

The government obtained Mr. Saipov's statements in violation of his due process rights and

Fifth Amendment privilege against self-incrimination; accordingly, the Court should suppress them.

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,       :        DECLARATION

-v-             :        17 Cr. 722 (VSB)

SAYFULLO HABIBULLAEVIC SAIPOV,  :

Defendant.    :

-------------------------------------------------------X

I, Karen Wetther, hereby declare under the penalties of perjury, pursuant to 28 U.S.C. §
1746, that:

1.      I am a Registered Nurse and Legal Nurse Consultant who was retained by the
Federal Defenders of New York, Inc., to review medical records associated with Sayfullo
Habibullaevic Saipov's encounter with police and hospitalization at Bellevue Hospital on October
31, 2017, through November 1, 2017.

2.      The statements made herein are based on a review of documents obtained by Mr.
Saipov's defense counsel as well as documents the United States provided to defense counsel in
discovery, which were subsequently made available to me. Attached to this declaration are the actual
medical records that informed my review in the order in which they appear.

3.      I have also attached an up-to-date curriculum vitae. See Curriculum Vitae. I was a
practicing clinical nurse for nine-and-one-half years before becoming a legal nurse consultant in
1983. Since then, I have been working as a legal nurse consultant and helped create the Legal Nurse
Consultant Certificate Program at University of California—San Diego. I was an instructor in that
program for 14 years.

4.      At approximately 3:15 p.m. on October 31, 2017, emergency medical technicians
(EMTs) attended to Mr. Saipov, who had just been shot in the groin and was bleeding profusely

1

from his left buttock. See Attachment A at 1 and 4. The EMTs noted a penetrating wound to Mr. Saipov's left buttock and attempted to assess his pupils, but were unable to do so because Mr. Saipov would not cooperate and otherwise refused to speak. Id. at 4.

5.      Mr. Saipov was placed on oxygen via a non-rebreather mask and intravenous access was obtained at the inner aspect of his left elbow. Attachment A at 4. The EMTs began an intravenous normal saline infusion and were escorted to Bellevue Hospital by the New York Police Department. Id.

6.      Bellevue's Trauma Unit records show that Mr. Saipov arrived to the hospital at 3:55 p.m. in handcuffs. See Attachment B at 1. Dr. Nelly Parisot evaluated Mr. Saipov and observed gunshot wounds to Mr. Saipov's left groin and left gluteal region. Id. Dr. Parisot also noted Mr. Saipov was awake and alert, but not forthcoming with information or responding to questioning. Id. at 4. At 4:30 p.m., Registered Nurse Melisa Serrano started Mr. Saipov on a 50mcg dose of Fentanyl and he was taken to the operating room shortly thereafter. See Attachment C.

7.      Attending Surgeon Dr. Marko Bukur and Surgery Resident Dr. Donnele Daley were responsible for Mr. Saipov's operation. See Attachment D. Dr. Daley noted that the bullet appeared to enter through Mr. Saipov's left groin and exit through his left gluteal region, which accounted for the two wounds. Id. at 2.

8.      Dr. Daley observed obvious damage to the soft tissue and anterior (frontal) muscles of Mr. Saipov's upper thigh. Attachment D at 2. The femoral artery and vein were identified and there was no evidence of injury to those vessels. Id.

9.      According to Dr. Daley, Mr. Saipov was intubated without difficulty and a general anesthetic was administered, which rendered him completely unconscious. Attachment D at 2. During the procedure, Mr. Saipov was kept sedated by an assortment of sedatives and opioid painkillers, including Fentanyl, Propofol, and Versed. See Attachment E.

2

10.     Through my research and continuing education, including information I have gleaned from secondary sources, I am familiar with Fentanyl, Propofol, and Versed. Fentanyl is a synthetic opioid painkiller that is approximately 100 times more potent than Morphine and 50 times more potent than Heroin. When administered intravenously, Fentanyl has an elimination half-life of two to four hours, which means it takes approximately 11 to 22 hours to completely leave a person's system. Fentanyl can produce many side effects, including confusion, anxiety, dizziness, headache, nervousness, abnormal thinking, agitation, somnolence, and mental clouding.

11.     Propofol is not a pain medication; rather, it is a potent sedative used primarily for general anesthetic purposes and to sedate patients on ventilators. Propofol decreases a person's cognition and can cause memory loss. Due to its milky appearance, it is sometimes referred to as "Milk of Amnesia," a play on "Milk of Magnesia."

12.     Versed is a benzodiazepine sedative that is used in a variety of medical settings. Its side effects can include drowsiness, confusion, dizziness, and forgetfulness.

13.     Mr. Saipov's surgery ended at 5:08 p.m. and he was transferred to the Post-Anesthesia Recovery Unit (PACU) at 5:48 p.m. See Attachment F at 4. Mr. Saipov remained intubated and sedated to the point of a medically induced coma. See Attachment G at 1. At around 7:30 p.m., Mr. Saipov was relocated to the Medical Intensive Care Unit (MICU). See Attachment H.

14.     Because Mr. Saipov remained intubated while he recovered in the PACU and MICU, he was kept heavily sedated and was administered doses of Fentanyl and Propofol at regular intervals. Attachment G. From 6:00 p.m. to 11:00 p.m., Mr. Saipov received 50mcg/kg/min of Propofol. Id at 1. From 6:00 p.m. to 7:00 p.m., he also received 50mcg/hr of Fentanyl. Id. At 7:00 p.m., his Fentanyl was doubled to 100 mcg/hr and it stayed at that strength until 11:00 p.m. Id. at 1-2.

3

15.    At 11:16 p.m., Nurse Carlos Garcia prepared Mr. Saipov for extubation, discontinuing the Propofol and Fentanyl drips for the first time since Mr. Saipov's surgery. Attachment G at 2.

16.    Mr. Saipov was extubated at 11:20 p.m. and received around-the-clock medical attention and care throughout the night. See Attachment I and G. At 3:41 a.m., November 1, 2017, Registered Physician Assistant Dana Chalker ordered a two gram infusion of Magnesium Sulfate to run over two hours, and a 15 millimole infusion of Potassium Phosphate. Attachment G at 3. Both of these substances have dizziness, confusion, and weakness as side effects.

17.    Mr. Saipov was discharged to police custody on the afternoon of November 1, 2017. See Attachment J.

Dated: December 14, 2018
       Gilmanton, New Hampshire


_____ , RN, LNC
Karen Wetther, RN, LNC

4

# CURRICULUM VITAE

**KAREN L. WETTHER, B.S.N., R.N.**
Legal Nurse Consultant
528 Meadow Pond Rd. · Gilmanton, NH 03237-5136
(619) 219-0211
karen4mlr@earthlink.net

## EDUCATION

1971        Bachelor of Science in Nursing       Biola College, La Mirada, California

Primary training facility for this 5-year nursing program was L.A. County/USC Medical Center, with rotations to Shriner's Hospital for Children, Kaiser Hospital-Bellflower, Metropolitan State Hospital (psychiatric), Rancho Los Amigos Rehabilitation Hospital, and various Los Angeles County Public Health and Mental Health agencies.

## LICENSURE

1971 to present      Licensed as a Registered Nurse by the California Board of Registered Nursing.  Licensed in Illinois from 1971 to 1980.

## PROFESSIONAL WORK EXPERIENCE

1987 to present      Owner and President, **Medical Legal Resources**, San Diego, California from 1987 to 2011.  From 2011 to present, while in New Hampshire, operate the business under my own name rather than a fictitious name. Clients have included, but not limited to, Bacalski, Ottoson & Dubé (San Diego); Schoville & Arnell (San Diego); Sidley Austin, LLP (Chicago and Los Angeles offices); Shook Hardy & Bacon (Irvine, CA office); Palmieri Tyler Wiener Wilhelm & Waldron (Irvine, CA); Wingert Grebing Brubaker & Ryan (San Diego); Strauss & Asher (San Diego); Aminpour & Associates (San Diego); Law Offices of Thor Emblem (Escondido, CA); St. Paul Insurance Company; and Golden Eagle Insurance Company.  Worked as a consultant on the Erin Brockovich case.  Also provided training workshops nationwide for nurses pursuing the legal nurse consulting specialty from 1987 to 1994.

1993 to 2009      Program Coordinator and faculty member, **University of California at San Diego, Extension Studies Division,** *Legal Nurse Consultant Certificate Program.* Selected an Advisory Committee and developed the course curriculum in 1993.  Also developed internship phase of the program; placed students in law firms, healthcare risk management departments, and the San Diego County District Attorney's Office. Currently developing online program.

2006 to 2018      Adjunct instructor at **University of California at San Diego, Extension Studies Division,** for the Case Management Certificate Program.  Course taught:  *Legal Responsibilities of the Case Manager.*

| | |
|---|---|
| 1993 | Adjunct faculty, **University of California at San Diego, Extension Studies Division.** (Course: Medical Terminology) |
| 1987 | Adjunct faculty member, **National University,** San Diego, California. (Course: Legal Nurse Consulting.) |
| 1983 to1989 | Legal Nurse Consultant (in-house), **Law Offices of Wingert Grebing Anello & Brubaker,** San Diego, California. |
| 1979 to 1980 | Clinical Nurse II, **University of California at San Diego (UCSD) Medical Center,** San Diego, California.  Clinical staff nurse/Relief Charge Nurse (night shift), Newborn Nursery. |
| 1977 to 1979 | Discharge Planning Nurse (one of two for the 250-bed acute care facility), **Central DuPage Hospital,** Winfield, Illinois (Chicago suburb). |
| 1974 to 1977 | Clinical Staff Nurse, Medical-Surgical Unit (56-bed unit, predominantly orthopedic patients), **Central DuPage Hospital,** Winfield, Illinois. |
| 1973 to 1974 | School/Dormitory Nurse, elementary school health teacher, and dormparent for thirteen high school girls, **Morrison Academy,** Taichung, Taiwan, Republic of China. |
| 1971 to 1973 | Clinical Staff Nurse, Pediatric Outpatient Clinic, **University of Illinois Medical Center,** Chicago, Illinois. |

SPECIALIZED COURSES AND CERTIFICATIONS

| | |
|---|---|
| 1973-1974 | Pediatric Nurse Practitioner course, **University of Illinois Medical Center,** Chicago, Illinois.  Registered with the American Academy of Pediatrics as a Pediatric Nurse Practitioner upon completion. |
| 1980 | Nursing Child Assessment Satellite Training (NCAST) program certification, **University of Washington** School of Nursing, Seattle, Washington. |
| 1982 | *Current Concepts in Child Health* course, **San Diego State University.** (earned two graduate credits) |
| 1984 | Certified by the Arthritis Foundation to teach the *Arthritis Self-Help Course,* an 8-week/16-hour course for patients with arthritis. |
| 1985 | *Legal Aspects of Nursing* course, **Western Schools,** San Diego, California. |
| 1987 | Small Business Management Certificate Program, **National University,** San Diego, California. |
| 1990 | Trained as a *Risk Prevention Skills* instructor by **Tennenhouse Professional Publications.** Instructor: Daniel Tennenhouse, M.D., J.D. |

| | |
|---|---|
| 1993 | Trained as a Patient Educator for the *arthroPRO* program at the **University of Texas Southwestern Medical Center** in Dallas, Texas, to train primary care physicians how to perform thorough musculoskeletal examinations of the hands and wrists. *arthroPRO* program was funded by Searle Laboratories. |
| 1994 | Trained by Searle Laboratories in Washington D.C. to teach primary care physicians to perform knee exams through the Patient Partner Program. |
| 1995 | Trained by Searle Laboratories as a Patient Partner in their *Total Patient Management in Arthritis* program. |

## PROFESSIONAL MEMBERSHIPS

- American Association of Legal Nurse Consultants (1989 to 2010)
  A founding member of this non-profit national organization, formed in 1989. Served on the Board of Directors as Director-at-Large and Chairperson of the Chapter Liaison Committee from 1990 to 1992.

- American Association of Legal Nurse Consultants, San Diego Chapter (1987-2011)
  Charter member and served on the Board of Directors in 1993, 2001 (Director-at-Large and Education Committee Chair) and 2008 and 2009 (Director-at Large and Chair of Mentorship Program Committee and Philanthropy Committee), and served on the Nominating Committee in 2005.

## HONORS AND AWARDS

| | |
|---|---|
| 1987 | Received an award for best workshop, Eighth Western Regional Conference of the Arthritis Health Professions Association, San Diego, California. |
| 1989 to 1993 | Listed in Marquis . . . |

  - Who's Who in American Nursing
  - Who's Who among Young American Professionals
  - Who's Who in the West
  - Who's Who in California
  - Who's Who of American Women

| | |
|---|---|
| April 20, 2001 | ***Recognition of Service Award*** from the American Association of Legal Nurse Consultants (AALNC) for "*significant contributions to the specialty, unwavering support for the goals and vision of AALNC and for mentorship and leadership.*" |

## COMMUNITY INVOLVEMENT

| | |
|---|---|
| 1980 to 1982 | Arthritis Foundation, San Diego Chapter – Arthritis Self-Help Course instructor and volunteer for the San Diego Chargers/Arthritis Foundation Annual Golf Tournaments (1980-1986) and the Victoria Principal Tennis Classic (1986). |

| 1980 to 1982 | California Teratogen Registry, UCSD Medical Center – hotline counselor. |
|---|---|
| 1986 to 1994 | Make-A-Wish Foundation, San Diego Chapter – Liaison Representative for Children's Hospital, San Diego, and a member of the Wish-Granting and Wish-Assist Committees. |
| 2005 to present | Soldiers' Angels – registered member of national non-profit organization that supports the U.S. troops and veterans in all branches of military service. Adopts troops and supports them while deployed; participates in local chapter meetings, events and fundraisers; and is a member of the Wounded TLC Team that takes home-cooked meals to wounded troops on Med-Hold at the San Diego Naval Regional Medical Center and Camp Pendleton's Wounded Warrior Barracks on a monthly basis. |
| 2008 to present | Volunteer with the Enhanced Intensive Outpatient Program at Camp Pendleton, CA, which treats U.S. Marines with Post-Traumatic Stress Disorder and substance abuse issues. |

**PUBLICATIONS**

**Books/Chapters**

Wetther, KL.  *A Good Sign,* in How I Became a Nurse Entrepreneur: Tales from 50 Nurses in Business.  National Nurses in Business Association, 1991.

Wetther, KL (2001).  The Nuts & Bolts of Legal Nurse Consulting (a 293-page independent study course).  San Diego, CA: Medical Legal Resources (first edition published in 1994).

Wetther KL (1998).  *Literature Research,* in Bogart JB (ed.), Legal Nurse Consulting: Principles and Practice.  CRC Press.  (This book is the Core Curriculum for the certification offered by the American Association of Legal Nurse Consultants.)

Wetther KL, Cregan MA   (2003).   *Literature Research,* in Iyer PW (ed.), Legal Nurse Consulting: Principles and Practice (Second Edition). CRC Press.

Wetther, KL (1998).  *Independent/Defense Medical Examinations,* in Bogart JB (ed.), Legal Nurse Consulting: Principles and Practice.   CRC Press, 1998.   (This book is the Core Curriculum for the certification offered by the American Association of Legal Nurse Consultants.)

Wetther KL, Buchanan LE (2003).  *Defense Medical Examinations,* in Iyer PW (ed.), Legal Nurse Consulting: Principles and Practice (Second Edition).  CRC Press.

Wetther KL.  Multiple Injury Cases: How to help your client achieve maximum recovery.  San Diego, CA: (in progress.  Anticipated date of publication: Summer, 2010).

**Professional Journals**

*Medical Legal Nurse Consultant.*  The Nursing Spectrum, Illinois Edition, September 1989, p. 21.

*Medical Legal Nurse Consulting: In-house or In-home Consultant?*  Nurse Entrepreneur's Exchange (newsletter of the National Nurses in Business Association), May/June 1990, Vol. VI, No. 5.

*The Key to Personal Injury Cases is Often in the Medical Records.*  Medical Career Opportunities, MJR Publications, October 1, 1990, p. 10.

*The Expanding Role of the Legal Nurse Consultant.*  DFW Nursing, August 1992, p. 2-.

*Forensic Responsibilities of the Legal Nurse Consultant.*  Journal of Psychosocial Nursing and Mental Health Services, November 1993.

*Creating Resumes Appropriate for the Legal Field.*  Journal of Legal Nurse Consulting, July 1997 and October 1997 issues (2-part article).

*Multiple Injury Case Analysis.*  Legal Nurse Consultant Resource, December 2005.



Columnist/reporter for national Publications Committee of the American Association of Legal Nurse Consultants (AALNC) from 1991 to 1994.  Filled the same position for the AALNC San Diego Chapter from 1991 to 1995.

Peer reviewer for the national AALNC journal *Network* from 1993 to 1995.

## PRESENTATIONS

| | |
|---|---|
| 1987 to 1998 | *Medical Legal Issues and Opportunities for Nurses of the '90s.*  Workshop offered several times per year across the U.S.  Also offered at National University in San Diego, California in 1987. |
| 1987 to 1998 | *The Art of Summarizing Medical Records from a Legal Perspective.*  Workshop offered several times per year across the U.S.  Also offered at National University in San Diego, California in 1987. |
| 09/26/87 | *Legalities of Documentation.*  Presented at TRAUMA CONCEPTS, a conference for trauma personnel co-sponsored by Children's Hospital and Sharp Memorial Hospital, San Diego, California. |
| 10/22/87 | *Medicolegal Issues in Office Practice.*  Presented to physicians, nurses and nurse practitioners on staff at the Student Health Service, San Diego State University, as part of their Continuing Medical Education Lecture Series. |

| 11/06/87 | *Four Keys to Avoiding Legal Pitfalls in Direct Patient Care.*  Presented at the plenary session at the Eighth Western Regional Conference of the Arthritis Health Professions Association in San Diego, California. |
|---|---|
| 05/23/88 | *Four Keys to Avoiding Legal Pitfalls in Direct Patient Care.*  Presented as a concurrent session at the national conference of the Arthritis Health Professions Association in Houston, Texas. |
| 04/89 | *Working as a Medical-Legal Consultant.*  Presented at a conference co-sponsored by the Emory University Woodruff School of Nursing and the Nurses in Business Organization in Atlanta, Georgia.  Also served as a panelist of nurse entrepreneurs. |
| 06/19/89 | *The Art of Summarizing Medical Records.*  Presented to attorneys and law clerks at the Law Offices of Chapin, Brewer and Winet in San Diego, California. |
| 07/27/89 | *Summarizing Medical Records from a Legal Perspective.*  Presented to law clerks employed by the Law Offices of Wingert, Grebing, Anello and Brubaker in San Diego, California.  The videotape of the presentation has been part of the orientation program for newly-hired law clerks and paralegals from 1989 to the present. |
| 08/25/89 | *Working as a Medical-Legal Consultant.*  Presented at a nursing seminar in Rancho Santa Fe, California, sponsored by the Moor Learning Institute. |
| 10/07/89 | *Four Keys to Avoiding Legal Pitfalls in Direct Patient Care.*  Presented at the California Chapter of the American Physical Therapy Association Annual Conference in San Diego, California. |
| 08/29/90 | *Making a Successful Transition from Employee to Entrepreneur.*  Presented to legal nurse consultants at the Peak Performers Conference sponsored by Medical Legal Resources in Vail, Colorado. |
| 08/29/90 | *Conquering Chiropractic Records.*  Presented at the Peak Performers Conference sponsored by Medical Legal Resources in Vail, Colorado. |
| 08/30/90 | *Conditions Commonly Encountered in Personal Injury Cases.*  Presented at the Peak Performers Conference sponsored by Medical Legal Resources in Vail, Colorado. |
| 10/02/90 | *Minimize Your Chances of Being Sued.*  Presented at the Second Annual Conference of ADVANCES IN CRITICAL CARE sponsored by the Nursing Education Institute in Las Vegas, Nevada. |
| 10/02/90 | *The Nurse as a Witness.*  Presented at the Second Annual Conference of ADVANCES IN CRITICAL CARE sponsored by the Nursing Education Institute in Las Vegas, Nevada. |
| 10/09/90 | *Medical Legal Issues for Nurses of the '90s.* Presented at a nursing seminar sponsored by ProMedLegal in Wichita, Kansas. |

| | |
|---|---|
| 10/29-31/90 | *Risk Prevention Skills.*  A risk management program developed by Daniel Tennenhouse, M.D., J.D., of Tennenhouse Professional Publications, presented to medical office personnel in Portland, Salem and Eugene, Oregon.  (Dr. Tennenhouse concurrently presented the program to physicians from those practices.)  Sponsored by Northwest Physicians Mutual Insurance Company (a physician-owned professional liability company). |
| 11/06/90 | *Medical Legal Issues for Nurses of the '90s.*  Presented to the nursing staff of Charter Hospital in Hawaiian Gardens, California. |
| 04/27/91 | *Marketing Your Services as a Legal Nurse Consultant.*  Presented at the Second Annual Conference of the American Association of Legal Nurse Consultants in Atlanta, Georgia. |
| 05/18/91 | *Medical-Legal Consulting.*  Presented at the National Nurses in Business Association annual conference in Anaheim, California. |
| 07/09/91 | *Sharpen Your Summarizing Skills.*  Co-presenter with Sandra McNeel, M.A. at the Second Annual Peak Performers Conference sponsored by Medical Legal Resources in Santa Barbara, California. |
| 07/10/91 | *Marketing: Generating the Opportunity to Work.*  Presented at the Second Annual Peak Performers Conference in Santa Barbara, California. |
| 09/30/91 | *Liability, Lawyers and Litigation: Reducing Your Legal Exposure in the Critical Care Setting.*  A 7-hour pre-conference at the Third Annual Critical Care Challenges Conference in Las Vegas, Nevada, sponsored by the Nursing Education Institute. |
| 10/01/91 | *Minimize Your Chances of Being Sued.*  Presented at the ADVANCES IN CRITICAL CARE Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada. |
| 10/01/91 | *The Nurse as a Witness.*  Presented at the ADVANCES IN CRITICAL CARE Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada. |
| 02/11/92 | *The Legal Nurse Consultant: Professional Conduct.*  Co-presenter at the San Diego Chapter of the American Association of Legal Nurse Consultants. |
| 03/23/92 | *Career Opportunities and Growth: The Nurse Entrepreneur.*  Panelist for a program sponsored by the Zeta Mu Chapter of Sigma Theta Tau, International, San Diego, California. |
| 10/29/92 | *Using Your Expertise in the Legal Field.*  Presented at the Fourth Annual Critical Care and Emergency Care Nursing Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada. |
| 10/29/92 | *The Silicone Breast Implant Controversy: Scientific Basis for Concern or Political Hype?*  Presented at the Fourth Annual Critical Care and Emergency |

Care Nursing Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada.

10/06/93    *Lawyers, Liability and Litigation: Reducing Your Legal Exposure.*  Presented at the Fifth Annual Critical Care and Emergency Care Nursing Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada.

10/06/93    *The Nurse as a Witness in the Legal Arena.*  Presented at the Fifth Annual Critical Care and Emergency Care Nursing Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada.

10/25/93    *Locating and Qualifying Expert Witnesses.*  Co-presenter at the Peak Performers Conference sponsored by Medical Legal Resources in San Diego, California.

11/93       *Speaking Medically: Learning a New Language.*  A 2-unit course in medical terminology offered through the University of California, San Diego, Extension Studies Division.

01/94       *Speaking Medically: Learning a New Language.*  (same as above)

07/94       *Speaking Medically: Learning a New Language.*  (same as above)

09/08/94    *Career Directions in Legal Nurse Consulting.*  Presented at the University of California, San Diego, Extension Studies Division.

09/27/94    *Justice For All? The Nurse on the Witness Stand.*  Presented at the Sixth Annual Critical Care and Emergency Care Nursing Conference, sponsored by the Nursing Education Institute in Las Vegas, Nevada.

09/27/94    *Nursing Grand Rounds: Viewing an Incident From a Legal Perspective.*  Presented at the Sixth Annual Critical Care and Emergency Care Nursing Conference, sponsored by the Nursing Education Institute in Las Vegas, Nevada.

10/95       *Legal Implications of Computerized Charting.*  Co-presenter at the Seventh Annual Critical Care and Emergency Care Nursing Conference, sponsored by the Nursing Education Institute in Las Vegas, Nevada.

09/96       *Report Writing.*  Brief presentation and a panelist at the Third Annual Conference for Legal Nurse Consultants co-sponsored by the Los Angeles and Orange County, California, chapters of the American Association of Legal Nurse Consultants.

10/22/96    *Legal Nurse Consultants: Nancy Drew's Medical Counterparts.*  Presented at the Eighth Annual Critical Care, Emergency Care and Nursing Management Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada.

10/23/96    *A Look at Legal Issues in the Age of Managed Care.*  Presented at the Eighth Annual Critical Care, Emergency Care and Nursing Management Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada.

| | |
|---|---|
| 09/16/97 | *Legal Nurse Consultants: Their Role in the Criminal Setting.*  Presented at the Ninth Annual Critical Care, Emergency Care and Nursing Management Conference sponsored by the Nursing Education Institute in Las Vegas, Nevada. |
| 10/09/97 | *The Write Stuff: Polishing Your Reports.*  Co-presenter with Sandie McNeel, M.A., at the Peak Performers Conference sponsored by Medical Legal Resources in Vail, Colorado. |
| 06/22/2000 | *Maximizing Your Research: What Makes a Good Source?*  Sole presenter for a 90-minute presentation for a national telephone seminar sponsored by the American Association of Legal Nurse Consultants. |
| 11/10/2000 | *Marketing Your Services as a Legal Nurse Consultant.*  The American Association of Legal Nurse Consultants – San Diego Chapter dinner meeting. |
| 02/21/2001 | *Defense Medical Exams: the LNC's Role and Responsibility.*  Presenter and panel moderator, American Association of Legal Nurse Consultants – San Diego Chapter dinner meeting. |
| 06/11/2002 | *The Legal Nurse Consultant's Role at Defense Medical Examinations.*  Guest presenter for the course *Advanced Applications for Legal Nurse Consulting,* University of Rochester School of Nursing, Rochester, New York. |
| 06/11/2002 | *Research Techniques for the Legal Nurse Consultant.*  Guest presenter for the course *Advanced Applications for Legal Nurse Consulting,* University of Rochester School of Nursing, Rochester, New York. |
| 09/24/2005 | *Multiple Injury Cases: how to help your attorney clients achieve maximum recovery.*  Co-presenter with Darrell N. Erwin, Esq. at a seminar sponsored by the American Association of Legal Nurse Consultants, San Diego Chapter, in San Diego, California. |
| 02/25/2006 | *Multiple Injury Cases:  how to help your attorney clients achieve maximum recovery.*  Co-presenter with Darrell N. Erwin, Esq. and Michael Balingit, Esq. of Erwin & Balingit, LLP (San Diego, California) at a luncheon meeting for the Sacramento and Bay Area Chapters of the American Association of Legal Nurse Consultants in Sacramento, California. |
| 10/05/2006 | *Ethics and Standards of Care for Nurse Case Managers from a Medical and Legal Perspective.*  Panelist at an annual conference sponsored by the Rehabilitation Nurse Coordinators' Network, San Diego, California. |
| 11/04/2006 | *Legal Responsibilities for Nurse Case Managers.*  Instructor for an 8-hour class in the Nurse Case Management Certificate Program offered by University of California at San Diego, Extension Studies Program. |
| 11/09/2006 | *Business 101 for Legal Nurse Consultants.* Panelist.  Program sponsored by the American Association of Legal Nurse Consultants, San Diego Chapter. |

| 09/11/2007 | *A Shot in the Arm: What a nurse can do for your personal injury case.*  Panelist (Personal topic: *Medical Record Review, Summaries and Chronologies*).   Bar Association of North County, Vista, California. |
| 11/22/2007 | Same presentation as directly above, presented to Consumer Attorneys of San Diego. |

# ATTACHMENT A – redacted

# ATTACHMENT B – redacted

# ATTACHMENT C – redacted

# ATTACHMENT D – redacted

# ATTACHMENT E – redacted

# ATTACHMENT F – redacted

# ATTACHMENT G – redacted

# ATTACHMENT H – redacted

# ATTACHMENT I – redacted

# ATTACHMENT J – redacted

# EXHIBIT B

**Andrew Dalack**

| | |
|---|---|
| **From:** | Gursky, Catherine ███████████████████ |
| **Sent:** | Thursday, June 21, 2018 7:55 PM |
| **To:** | Andrew Dalack |
| **Cc:** | Anna Finkel; ████████████ |
| **Subject:** | RE: touching base |

Unfortunately, it has been extremely busy and I have not been able to discuss your needs with the providers. Im afraid the providers will not be comfortable talking to you unless they have to. We educate the providers to stay strickly in the objective medical lane and not lean to one side or the other (prosecution or defense)
I know you are trying to get some factual info but the providers see it as helping the defense.
I apologize for the lack of help in this case.
Regards,
cathy
**Catherine A. Gursky, R.N., Esq.**
**Associate Executive Director**
**Risk Management**
Bellevue Hospital Center
460 First Avenue – H Bldg. Mezz 22
New York, NY 10016

███████████████████████████

NYC
**HEALTH+**
Live Your Healthiest Life. **HOSPITALS**

**Confidential QA Material Prepared in Accordance with NY Education Law 6527(3) and NY Public Health Law 2805 (m).**

This communication, including any attachments, contains confidential and or legally privileged information, and is intended solely for the entity or individual to whom it is addressed. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete/purge this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying or storage of this message or any attachments is strictly prohibited.

# EXHIBIT C – redacted

# EXHIBIT D

| FD-395<br>Revised<br>11-05-2002 | FEDERAL BUREAU OF INVESTIGATION<br>**ADVICE OF RIGHTS** |
|---|---|

## LOCATION

Place: Bellevue Hospital, NY, NY    Date: 11/1/2017    Time: 01:35pm

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

## CONSENT

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed: _____

## WITNESS

Witness: _____

Witness: _____

Time: 1:35 PM

FD-395 (Revised 11-05-2002)         Page 1 of 1         FEDERAL BUREAU OF INVESTIGATION

000035

# EXHIBIT E – redacted