UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,            :        17 Cr. 722 (VSB)

-v-                                  :

SAYFULLO HABIBULLAEVIC SAIPOV,       :

Defendant.                           :

-------------------------------------------------------X


DAVID E. PATTON
Federal Defender of New York, Inc.
Attorney for Defendant
SAYFULLO HABIBULLAEVIC SAIPOV
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8750

Jennifer L. Brown, Esq.
    Attorney-in-Charge


TO:    Geoffrey S. Berman
       United States Attorney
       Southern District of New
       York One St. Andrew's Plaza
       New York, New York 10007

Attn:  Andrew Beaty/ Amanda Houle Matthew Laroche
       Assistant United States Attorney
       Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,              :        17 Cr. 722 (VSB)

-v-                                    :

SAYFULLO HABIBULLAEVIC SAIPOV,         :

Defendant.                             :

-------------------------------------------------------X

## MOTION TO DISMISS AND/OR STRIKE GOVERNMENT'S NOTICE OF INTENT TO SEEK DEATH PENALTY BECAUSE 18 U.S.C. § 3596(a) FAILS TO PROVIDE COURTS IN NON-DEATH-PENALTY STATES, LIKE NEW YORK, GUIDANCE FOR CHOOSING THE MANNER OR PROCEDURE OF EXECUTION AND CANNOT BE CONSTITUTIONALLY IMPLEMENTED

Sayfullo Habibullaevic Saipov, through counsel, respectfully moves this Court for an order dismissing and/or striking the government's Notice of Intent to Seek the Death Penalty (ECF No. 80). The government's attempt to put Mr. Saipov to death should be barred on constitutional grounds because of defects in the Federal Death Penalty Act ("FDPA") and the procedures governing implementation of a death sentence imposed in New York, a non-death-penalty state, under 18 U.S.C. § 3596(a) (specifying that "[i]f the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death").

First, when a death sentence is imposed in a non-death-penalty state, the FDPA contains no standards or criteria to guide courts in selecting the state where the execution will occur and whose laws will govern the implementation of the defendant's death sentence.

Second, the government has failed to establish adequate procedures to ensure that an execution will in fact conform to the law of the host state and the Eighth Amendment. The

macabre spectacle of botched executions in states like Oklahoma[1] and Arizona[2] underscore the importance of fixing standards for the implementation of a death sentence.

Accordingly, and as described in greater detail in the accompanying Memorandum, Mr. Saipov respectfully requests this Court dismiss and/or strike the Notice of Intent to Seek the Death Penalty.

Dated:  December 14, 2018          Respectfully Submitted,
        New York, NY


                                   /s/ Jennifer Brown
                                   Jennifer Brown
                                   David Patton
                                   Sylvie Levine
                                   Annalisa Mirón
                                   Federal Defenders of New York, Inc.
                                   (212) 417-8700

                                   David Stern
                                   Rothman, Schneider, Soloway & Stern, LLP
                                   (212) 571-5500

---

[1] Katie Fretland, Oklahoma execution: Clayton Lockett writhes on gurney in botched procedure, The Guardian (Apr. 30, 2014), available at: https://www.theguardian.com/world/2014/apr/30/oklahoma-execution-botched-clayton-lockett.

[2] Tom Dart, Arizona inmate Joseph Wood was injected 15 times with execution drugs, The Guardian (Aug. 2, 2014), available at: https://www.theguardian.com/world/2014/aug/02/arizona-inmate-injected-15-times-execution-drugs-joseph-wood.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

UNITED STATES OF AMERICA,      :     17 Cr. 722 (VSB)

-v-        :

SAYFULLO HABIBULLAEVIC SAIPOV,   :

Defendant.        :

---------------------------------------------------------X

 

DAVID E. PATTON
Federal Defender of New York, Inc.
Attorney for Defendant
SAYFULLO HABIBULLAEVIC SAIPOV
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8750

Jennifer L. Brown, Esq.
   Attorney-in-Charge

TO:   Geoffrey S. Berman
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007

Attn:  Andrew Beaty/ Amanda Houle Matthew Laroche
      Assistant United States Attorney
      Southern District of New York

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ...............................................................................................................1

BACKGROUND ...............................................................................................................3

    A.   1937-1986: Congress Turns to State Law .......................................................3

    B.   1993: The Department of Justice Regulations ................................................4

    C.   The Federal Death Penalty Act of 1994: Returning to State Law..................6

    D.   The Department of Justice's Unhappiness with 18 U.S.C. § 3596 ................7

    E.   State Law Concerning Executions....................................................................7

    F.   Federal Executions Since the Reinstitution of Capital Punishment ...............9

ARGUMENT.....................................................................................................................10

I.   Vesting Courts With Unbridled Discretion to Determine the Method of a Defendant's Execution Denies Due Process and Violates the Eighth Amendment........................................................10

    A.   In a capital case, the Constitution requires that uniform and objective standards be applied in killing a human being. ...........................................................................................................10

    B.   In cases brought in states without the death penalty, the FDPA gives the sentencing court unguided discretion to choose the death-penalty state whose law will govern the execution............13

II.   The Department of Justice Has Failed to Establish Adequate Procedures to Ensure Compliance with the Sentencing Court's Choice of State Law under Section 3596.................................14

CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

Baze v. Rees,
550 U.S. 35 (2008) (2008)...................................................................................8

BMW of N. Am., Inc. v. Gore,
517 U.S. 559 (1996)............................................................................................12

Cooey v. Kasich,
801 F. Supp. 2d 623 (S.D. Ohio 2011)...............................................................8

Furman v. Georgia,
408 U.S. 238 (1972)..............................................................................................9

Gesicki v. Oswald,
336 F. Supp. 371 (S.D.N.Y. 1971)....................................................................11

Giaccio v. Pennsylvania,
382 U.S. 399 (1966)....................................................................................Passim

Gregg v. Georgia,
428 U.S. 153 (1976).......................................................................................2, 10

Lockett v. Evans,
356 P.3d 58 (Ok. 2014).......................................................................................8

Mattison v. Dallas Carrier Corp.,
947 F.2d 95 (4th Cir. 1991)...........................................................................3, 13

Pacific Mutual Life Insurance Co. v. Haslip,
499 U.S. 1 (1991)................................................................................................12

Philip Morris v. Williams,
549 U.S. 346 (2007)..............................................................................................3

State Farm Mut. Auto. Ins. Co. v. Campbell,
538 U.S. 408 (2003)............................................................................................12

State in re Hunter,
387 So. 2d 1086 (La. 1980).................................................................................11

State v. Perique,
439 So. 2d 1060 (La. 1983) ................................................................................11

United States v. Flores,
63 F.3d 1342 (5th Cir. 1995)................................................................................9

United States v. Hammer,
121 F. Supp. 2d 794 (M.D. Pa. 2000)..............................................................2, 7

United States v. Jones,
132 F.3d 232 (5th Cir. 1998) ..........................................................................9, 10

**Statutes**

18 U.S.C. § 542 (1934)..........................................................................................3

18 U.S.C. § 3566 (Supp. IV 1948).........................................................................4

18 U.S.C. § 3596..........................................................................................Passim

18 U.S.C. § 3597(a)............................................................................................6, 7

21 U.S.C. § 848(e)-(r) (1988)................................................................................4

Pub. L. No. 98-473..................................................................................................4

Pub. L. No. 100-690, § 7001(a), 102 Stat. 4181, 4387.........................................4

**Regulations**

28 C.F.R. §§ 26.1-26.5.................................................................................................................... 3, 4, 5

Implementation of Death Sentences in Federal Cases,
58 Fed. Reg. 4,898, 4901–02 (Jan. 19, 1993) ...................................................................................4

**Other Authorities**

George Kannar, <u>Federalizing Death</u>, 44 Buff. L. Rev. 325, 331 (1996)......................................................2, 4

Juris. Stmt., No. 47, <u>Giaccio v. Pennsylvania</u>,
1965 WL 130038 (U.S. Jan. 15, 1965) .........................................................................................11

Brief Of Sixteen Professors Of Pharmacology As Amici Curiae In Support Of Neither Party, <u>Glossip v. Gross</u>, 576 U.S. ___ (Mar. 16, 2015) ...........................................................................................1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,  :  17 Cr. 722 (VSB)

-v-           :

SAYFULLO HABIBULLAEVIC SAIPOV, :

Defendant.       :

------------------------------------------------------------X

**MEMORANDUM IN SUPPORT OF SAYFULLO SAIPOV'S MOTION TO DECLARE
THE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL FOR FAILURE TO
GUIDE COURTS' DISCRETION IN CHOOSING THE MANNER AND LOCATION OF
EXECUTION FOR  A DEFENDANT SENTENCED TO DEATH IN A NON-DEATH-
PENALTY STATE**

**INTRODUCTION**

   The government's attempt to put Mr. Saipov to death should be barred on constitutional

grounds because the Federal Death Penalty Act ("FDPA") offers no standards or safeguards to ensure

that the execution of a defendant sentenced to death in New York, a state that does not have the death

penalty, satisfies due process and Eighth Amendment strictures.  The shocking spectacles in 2014 of

botched executions in Oklahoma and Arizona highlight the significance of problems relating to the

method of execution.  See Brief Of Sixteen Professors Of Pharmacology As Amici Curiae In Support

Of Neither Party, Glossip v. Gross, 576 U.S. __ (Mar. 16, 2015) (No. 14-7955).[1]

   First, when a death sentence is imposed in a state that does not have the death penalty, the

Federal Death Penalty Act ("FDPA") contains no standards or criteria to guide the court in selecting,

from among the 30 states that still have the death penalty, the one where the execution will occur and

whose laws will govern implementation of the defendant's death sentence.  When Congress enacted

---

[1] Available at:
http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/BriefsV5/14-
7955_amicus_neither_pharm.authcheckdam.pdf

the FDPA in 1994, it effectively restored a provision that it had first enacted in 1937—when due process protections were much more rudimentary—and had repealed in 1984.  For capital prosecutions in states without the death penalty, the FDPA left it to the court to choose a state that does have that penalty, as the state whose laws will govern the defendant's execution.  See 18 U.S.C. § 3596(a).  But because § 3596(a) does not set forth specific factors for a court to consider in designating a state for the implementation of a death sentence, Congress failed to bring the restored scheme into compliance with modern principles of due process and the Eighth Amendment.  Indeed, among "[t]he states that still have death penalty statutes," they are "not uniform in the implementation of death sentences, including the method of execution and the time of execution."  United States v. Hammer, 121 F. Supp. 2d 794, 799 (M.D. Pa. 2000).  And while "[i]t would be preferable to have uniformity in the implementation of federal death sentences … uniformity is contrary to the process which Congress devised."  Id.; see also George Kannar, Federalizing Death, 44 Buff. L. Rev. 325, 331 (1996) ("How the court is to select the alternate state … is not suggested, much less specified.").

Such unfettered discretion does not comply with modern conceptions of due process and the Eighth Amendment.  As the Supreme Court has emphasized:

> [T]he penalty of death is different in kind from any other punishment imposed under our system of criminal justice.  Because of the uniqueness of the death penalty, … it [cannot] be imposed under sentencing procedures that create[] a substantial risk that it would be inflicted in an arbitrary and capricious manner.

Gregg v. Georgia, 428 U.S. 153, 188 (1976) (emphasis added).  And if a jury's discretion to impose a death sentence must "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action," id. at 189, then so should a court's discretion to specify a time, place, and manner of execution.[2]

---

[2] Indeed, the Supreme Court has established that subjecting a criminal defendant to a judge or jury's unlimited discretion is unconstitutional even when only money is at stake.  For example, in Giaccio v. Pennsylvania, 382 U.S. 399 (1966), the Court struck down a Pennsylvania statute that subjected misdemeanor defendants to juries' unguided discretion in awarding costs.  "[O]ne of the basic

Second, the federal government has failed to establish adequate procedures to ensure that, after the sentencing court chooses another state whose law will govern the defendant's execution, the execution will in fact conform to the law of that state.  Instead, the Department of Justice has left unchanged regulations (28 C.F.R. §§ 26.1-26.5) promulgated two years before the FDPA—when there was no obligation at all to follow state law in implementing a federal death sentence.  Given the Department's failure to adopt and implement procedures ensuring that death sentences under the FDPA conform to the law of the state chosen by the court, Mr. Saipov, if sentenced to death, faces the prospect of a standard-less execution.  This is intolerable under the Eighth Amendment.

## BACKGROUND

Until 1937, with respect to federal offenses punishable by death, federal law provided that, "The manner of inflicting the punishment of death shall be by hanging."  Act of Mar. 4, 1909, ch. 321, § 323, 35 Stat. 1151 (codified as amended at 18 U.S.C. § 542 (1934)).

### A.  1937-1986: Congress Turns to State Law

In 1937, Congress replaced the provision for hanging with one directing attention to state law. Act of June 19, 1937, ch. 367, 50 Stat. 304.  The 1937 law provided that, "The manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State in which the sentence is imposed."  It further provided that, "If the laws of the State within which the sentence is imposed make no provision for the infliction of the penalty of death, then the court shall designate some other

---

purposes of the Due Process Clause," the Court explained, "has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land.  Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce."  <u>Id.</u> at 403.  The Court held that the statute was unconstitutional "because of vagueness and the absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory imposition of costs." <u>Id.</u> at 402.  Analogously, unchanneled discretion in awarding punitive damages is a denial of due process.  <u>See, e.g.</u>, <u>Philip Morris v. Williams</u>, 549 U.S. 346, 353 (2007); <u>Mattison v. Dallas Carrier Corp.</u>, 947 F.2d 95, 101 (4th Cir. 1991) ("The first principle of due process embraces a rule of law which contains standards that can be known in advance, conformed to, and applied rationally.").

State in which such sentence shall be executed in the manner prescribed by the laws thereof." The court's designation thus dictated not only the state in which the execution would take place but also which state's law would govern the execution. When the Federal Criminal Code was recodified in 1948, the 1937 law was preserved without substantive change.  Act of June 25, 1948, ch. 645, 62 Stat. 837 (codified as amended at 18 U.S.C. § 3566 (Supp. IV 1948)).

### B.  1993: The Department of Justice Regulations

The provisions of the 1937 law remained in effect until they were repealed by the Sentencing Reform Act of 1984, effective November 1, 1986. Pub. L. No. 98-473, Tit. II, ch. II § 212(a)(2), 98 Stat. 1987.  The 1984 legislation did not include any new provisions addressing how federal executions were to be carried out.

The failure to enact any new law governing the method of execution created difficulty when Congress enacted the Anti-Drug Abuse Act of 1988.[3]  In that Act, "Congress hastily established a new federal death penalty for drug 'king-pins' implicated in drug-related murders."  Kannar, supra, 44 Buff. L. Rev. at 326.  In its haste, however, Congress "neglected to include … anything at all about the actual, time, place, method, and manner for carrying out federal death sentences." Id.  "The Congress delegated all that boring, non-symbolic work, in a manner so broad as to raise its own questions as to constitutionality, to someone else, to develop the real-world details through regulations, or Executive orders—or whatever." Id. at 326 n.11.

On the last day before President Clinton succeeded President Bush in office, the Department of Justice promulgated regulations in an attempt to fix the problem created by Congress's oversight. Implementation of Death Sentences in Federal Cases, 58 Fed. Reg. 4,898, 4901–02 (Jan. 19, 1993) (promulgating 28 C.F.R. §§ 26.1-26.5).  The regulations, which remain unchanged to this day, "apply whenever a sentencing hearing conducted in United States District Court has resulted in a

---

[3] Continuing Criminal Enterprise Act, Pub. L. No. 100-690, § 7001(a), 102 Stat. 4181, 4387 (codified at 21 U.S.C. § 848(e)-(r) (1988)).

recommendation or determination that a criminal defendant be sentenced to death for commission of an offense described in any federal statute."  28 C.F.R. § 26.1.

The regulations make no reference to state law.  Instead, they require government attorneys to file a proposed judgment and order providing that the death sentence shall be executed "by a United States Marshal designated by the Director of the United States Marshals Service [hereinafter 'a designated Marshal'] … by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death," and "on a date and time designated by the Director of the Federal Bureau of Prisons [hereinafter 'BOP']," and that "[t]he prisoner under sentence of death shall be committed to the custody of the Attorney General or his authorized representative for appropriate detention pending execution of the sentence." § 26.2(a)(1)-(4).

The regulations also contain directives to be followed unless the court orders otherwise.  The "substance or substances" to be used in the lethal injection are "to be determined by the Director of [BOP]." § 26.3(a)(4).  The execution is to take place at a federal penal or correctional institution designated by the Director of BOP.  § 26.3(a)(2).  The sentence is to be executed by a designated Marshal, "assisted by additional personnel selected by the Marshal and the Warden of the designated institution and acting at the direction of the Marshal." § 26.3(a)(3).

The regulations not only lack any sort of provision for identifying factors or standards for the BOP Director to consult in determining which substance or substances to use in the lethal injection(s), but, incredibly, they also fail to provide any procedure for judicial review of the Director's determination.  Indicative of the Department's policy priorities, however, the regulations do provide that "[i]f the date designated for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of [the BOP] when the stay is lifted." § 26.3(a)(1). Despite the constitutional basis of the President's power to grant clemency, the Department also

specified that, "Unless the President interposes, the United States Marshal shall not stay execution of the sentence on the basis that the prisoner has filed a petition for executive clemency." § 26.2(b).

### C. The Federal Death Penalty Act of 1994: Returning to State Law

When Congress enacted the FDPA in 1994, it chose to restore the old approach, enacted into law in 1937 and in effect until 1986, of carrying out executions in accordance with state law. When a defendant is sentenced to death under the Act, he "shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence." 18 U.S.C. § 3596(a). Thereafter, "the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." Id. And (as was true under the 1937 legislation) "[i]f the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in that latter State in the manner prescribed by such law." Id. Further, the Marshal is permitted, but not required, to use state or local facilities or personnel: "A United States marshal charged with supervising the implementation of a sentence of death may use appropriate State or local facilities for the purpose, may use the services of an appropriate State or local official or of a person such an official employs for the purpose, and shall pay the costs thereof in an amount approved by the Attorney General." 18 U.S.C. § 3597(a).

Thus, under the FDPA when a death sentence is imposed in a case brought in a state that does not have the death penalty, the court selects a death-penalty state (i) that will be the place of execution and (2) whose laws will govern the manner of execution.

### D.  The Department of Justice's Unhappiness with 18 U.S.C. § 3596

Soon after the FDPA became law, the Department of Justice made clear its unhappiness with Congress's decision that state law should again control the carrying out of federal death sentences. In 1995, a year after the FDPA was enacted, the Department supported legislation to establish a uniform national system for putting federal prisoners to death.  In its own words, the Department sought to "amend[]" the FDPA by "remov[ing] the current death penalty procedures which provide that State methods of execution are to be used in Federal executions."[4]  Although the FDPA in theory facilitated use of state methods of execution in federal executions by allowing Marshals to use state or local facilities or personnel, see 18 U.S.C. § 3597(a), the Department recognized the practical obstacles to any such arrangement.  "When the issue has come up during informal discussions with State officials," the Department told Congress, "the view of those officials has been that they are not interested in having any involvement with Federal executions."[5]

The proposed amendments to the FDPA were not enacted (see Hammer, 121 F. Supp. 2d at 799-800) and the Department has left the matter there.  It has not modified its 1993 regulations, which were issued when there was no obligation to follow state law, nor has it established procedures to ensure compliance with the state law chosen by the sentencing court to govern an execution.

### E.  State Law Concerning Executions

"The states that still have death penalty statutes are not uniform in the implementation of death sentences, including the method of execution…." Hammer, 121 F. Supp. 2d at 799.  All states that have the death penalty authorize lethal injection as the primary method, but in many states, it is not the only authorized method of execution.[6]  Nine states authorize electrocution (but all have lethal

---

[4] Hearing Before the Subcomm. on Crime of H. Judiciary Comm., 104th Cong., 1st Sess. 149 (1995) (letter from Assistant Attorney General Andrew Fois to Rep. Bill McCollum).
[5] Id. at 150.
[6] See Death Penalty Information Center, Methods of Execution, available at: https://deathpenaltyinfo.org/methods-execution

injection as the primary method); six states authorize the gas chamber; and three states authorize

hanging (with lethal injection as the primary method).  In Mississippi, Oklahoma and Utah, execution

by firing squad is also an option.

How lethal injection occurs varies widely, and legal challenges and other problems have led to

frequent changes in procedures and, in some states, to lengthy Eighth Amendment litigation.  To what

extent the method of execution is governed by state law, and to what extent it is left to the discretion

of state officials, is often unclear.  For example, in 2011 a federal judge in Ohio noted that although a

state correctional official had previously testified that the state's written execution protocol "carries the

force of administrative law," the current warden of the Southern Ohio Correctional Facility "tells this

Court that the written protocol is merely a set of guidelines."  Cooey v. Kasich, 801 F. Supp. 2d 623,

624, 643 (S.D. Ohio 2011) ("It is the policy of the State of Ohio that the State follows its written

execution protocol, except when it does not.  This is nonsense.").

Sodium thiopental was used in the lethal injection procedure approved by the Supreme Court

in 2008[7] and for a period was used in many states.  In January 2011, however, the only domestic

manufacturer of sodium thiopental stopped producing it.  In late 2011, the European Union

announced strict regulations on the export of sodium thiopental to countries that authorize the death

penalty.  Press Release, European Commission, Commission Extends Control over Goods Which

Could Be Used for Capital Punishment or Torture (Dec. 20, 2011).[8]  This has caused great uncertainty

regarding lethal injections, as states have scrambled to find a substitute—and often have fought tooth

and nail to keep information about the substitute a secret.  See, e.g., Lockett v. Evans, 356 P.3d 58

(Ok. 2014) (state statute provides that "identity of all persons who participate in or administer the

execution process and persons who supply the drugs … shall be confidential").  A substantial number

of states have obtained drugs for lethal injection from compounding pharmacies (frequently,

---

[7] See Baze v. Rees, 550 U.S. 35 (2008).
[8] Available at: http://europa.eu/rapid/press-release_IP-11-1578_en.htm

unidentified compounding pharmacies using unidentified drugs).  See Jeffrey E. Stern, The Cruel and Unusual Execution of Clayton Lockett, The Atlantic (June 2015).[9]  This has led to grisly examples of botched executions in places like Oklahoma and Arizona.  Jeffrey Stern, a journalist for The Atlantic, provided an account of one such example:

> Lockett lurched up against the restraints. While the witnesses looked on, he started writhing as if trying to free himself, to get up off the gurney. He struggled violently, twisting his whole body…. [Lockett's] lawyer, began to cry.  Lockett got his whole head up off the gurney, as far as the restraints would let him go. He kept trying to speak but couldn't form the words, and he rolled his head back and forth … [t]he doctor thought Lockett might be starting to seize. But he still felt uncertain of his role, and hesitated to intervene. Finally Lockett managed to speak: "Man."

Arizona's 2014 execution of Joseph R. Wood III, which lasted two hours, was similarly horrifying.  Some observers reported that Mr. Wood was gasping and snorting while he slowly died, and the late Senator John McCain described Mr. Wood's execution as "torture."  Burgess Everett, John McCain: Arizona Execution 'Torture', Politico (July 24, 2014).[10]

### F.  Federal Executions Since the Reinstitution of Capital Punishment

Since 1976, when capital punishment resumed in this country after Furman v. Georgia, 408 U.S. 238 (1972), there has never been an execution for a crime committed in a state that has abolished the death penalty.  Timothy McVeigh was convicted under the FDPA after bombing the Alfred P. Murrah Federal Building in Oklahoma City and executed on June 11, 2001.  Juan Raul Garza was convicted under the Anti-Drug Abuse Act of 1988 on the basis of three killings in Texas in 1990-91 in furtherance of a continuing criminal enterprise and executed on June 19, 2001. United States v. Flores, 63 F.3d 1342, 1350-51 (5th Cir. 1995).  Louis Jones, Jr. was convicted under the FDPA on the basis of the kidnapping resulting in death of his ex-wife from the Goodfellow Air Force Base in San Angelo,

---

[9] Available at: https://www.theatlantic.com/magazine/archive/2015/06/execution-clayton-lockett/392069/
[10] Available at: https://www.politico.com/story/2014/07/john-mccain-arizona-execution-109350

Texas.  United States v. Jones, 132 F.3d 232, 237 (5th Cir. 1998), aff'd, 527 U.S. 373, 375-76 (1999). He

was executed on March 18, 2003.  Mr. McVeigh, Mr. Garza, and Mr. Jones were all executed at the

federal prison in Terre Haute, Indiana.

## ARGUMENT

I.     **Vesting Courts With Unbridled Discretion to Determine the Method of a
        Defendant's Execution Denies Due Process and Violates the Eighth Amendment.**

Even assuming that the FDPA otherwise satisfies constitutional standards, it suffers from a

critical constitutional defect as applied to a case such as this, which has been brought in a state that

does not have the death penalty.  For such cases, the FDPA contains no standard or criteria to guide

the court in choosing the state where the execution will take place and whose laws will control the

method of execution.  The Court is free to choose, for any reason or no reason, any of the 30 states

that authorize the death penalty.  Such absolute, unfocused discretion is not compatible with the Due

Process Clause or with the Eighth Amendment.

### A.  In a capital case, the Constitution requires that uniform and objective standards be applied in killing a human being.

It is a fundamental tenet of Eighth Amendment jurisprudence that "where discretion is

afforded a sentencing body on a matter so grave as the determination of whether a human life should

be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of

wholly arbitrary and capricious action."  Gregg, 428 U.S. at 189.

The same process is due even in the non-capital context.  Giaccio v. Pennsylvania, 382 U.S.

399 (1966), involved an award of $230.95 in costs, assessed by a jury against a defendant indicted on

misdemeanor charges of wantonly pointing or discharging a firearm at another person but acquitted at

trial.  In challenging the award before the Supreme Court, the defendant argued, inter alia, "We might

concede, arguendo, that situations can be conceived in which it would not be unfair to require

acquitted defendants to pay costs.  But these situations must be precisely defined; the elements of this

punitive liability must be adequately spelled out."  Juris. Stmt., No. 47, <u>Giaccio v. Pennsylvania</u>, 1965 WL 130038, at *15-16 (U.S. Jan. 15, 1965).  The Supreme Court agreed.

Stressing that the statute "contain[ed] no standards at all," <u>Giaccio v. Pennsylvania</u>, 382 U.S. 399, 403 (1966), the Court held that it was "invalid under the Due Process Clause because of vagueness and the absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory imposition[] of costs." <u>Id.</u> at 402.  A basic goal of the constitutional guarantee of due process "has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land," the Court observed. <u>Id.</u> at 403.  "Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce." <u>Id.</u>

The principle stated in <u>Giaccio</u> has broad application.  In <u>State in re Hunter</u>, 387 So. 2d 1086 (La. 1980),[11] the Supreme Court of Louisiana dealt with the absolute discretion of a juvenile court judge to transfer to adult court any 15-year-old whom there was probable cause to believe had committed a major violent felony.  "The statute no longer contains any standards that the juvenile judge must apply to individual cases to determine which fifteen year olds accused of the designated crimes should be transferred or which ones should remain in the juvenile court system." <u>Id.</u> at 1087. Citing <u>Giaccio</u>, the court held that the law "fails to meet the requirements of due process because of vagueness caused by its failure to set forth standards to enable juveniles to protect themselves against arbitrary and discriminatory forfeiture of the special rights and immunities of juvenile court jurisdiction." <u>Id.</u> at 1088.

Similarly, a three-judge panel in this District struck down, on vagueness grounds, a statute permitting juveniles to be sentenced as adults under the moniker "Wayward Minor" only if it found them "morally depraved" or "in danger of becoming morally depraved." <u>Gesicki v. Oswald</u>, 336 F.

---

[11] Superseded by Statute/Rule as Stated in <u>State v. Perique</u>, 439 So. 2d 1060 (La. 1983).

Supp. 371, 374 (S.D.N.Y. 1971).  In attempting to show that the statute was neither "criminal [n]or penal," and therefore not subject to the vagueness test applicable to criminal statutes, New York claimed that designating a juvenile a "Wayward Minor" did not denominate him a criminal and was not deemed a conviction.  Id. at 377.  But the court rejected this argument, writing, "Both liberty and property are specifically protected by the Fourteenth Amendment against any state deprivation which does not meet the standards of due process, and this protection is not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute."  Id. at 377 n.8 (quoting Giaccio, 382 U.S. at 402).

Unfettered discretion is also incompatible with due process even when only quasi-criminal sanctions are at stake.  In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1 (1991), the Supreme Court highlighted the constitutional significant of providing guidance to a jury asked to assess punitive damages (a "'quasi-criminal'" sanction):

> One must concede that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities.  We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.  We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus.

Id. at 18 (emphasis added) (citations omitted).

More recently, the Court has emphasized "the need to avoid an arbitrary determination of an award's amount."  Phillip Morris v. Williams, 549 U.S. 346, 352 (2007).  "[U]nless a State insists upon proper standards that will cabin the jury's discretionary authority," the Court has explained, "its punitive damages system … may threaten 'arbitrary punishments,' i.e., punishments that reflect not an 'application of law' but 'a decisionmaker's caprice,'…."  Id. (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 418 (2003), and BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 587 (1996)).  Lower court decisions confirm that unguided discretion to assess punitive damages is

unconstitutional.  In <u>Mattison v. Dallas Carrier Corp.</u>, 947 F.2d 95 (4th Cir. 1991), the Fourth Circuit examined how punitive damages were then assessed under South Carolina law.  "The amount of penalty [was] committed to the discretion of the jury."  <u>Id.</u> at 100.  The jury was told only that it should consider the goals of punishment and deterrence and the defendant's ability to pay.  <u>See id.</u> at 100-01. The Fourth Circuit reversed the award of punitive damages.  "The first principle of due process," the court declared, "embraces a rule of law which contains standards that can be known in advance, conformed to, and applied rationally."  <u>Id.</u> at 101 (emphasis added).

How much, if anything, to award in costs in a criminal case, whether a criminal case against a juvenile will proceed in adult court or juvenile court, whether to instruct the jury on voluntary manslaughter, and how much to award in punitive damages—due process forbids leaving any of these matters to the unbridled discretion of a judge or jury.  It is apparent then that in a death-penalty case, the Constitution requires objective and uniform standards affecting how to execute a human being.

**B.  In cases brought in states without the death penalty, the FDPA gives the sentencing court unguided discretion to choose the death-penalty state whose law will govern the execution.**

Because the FDPA confers unbridled discretion on sentencing judges to choose the state whose laws will govern an execution, in capital cases brought in states without the death penalty, it denies due process and violates the Eighth Amendment.  In such cases, the FDPA leaves it to the sentencing court to choose, from among all the other states that do have the death penalty, the state— and therefore the manner— of execution.  Yet the FDPA provides no standards or criteria to guide the court's choice.  Currently, courts have unfettered discretion to choose among the 30 states that authorize the death penalty.  And a court's choice has important consequences.

The tension between § 3596 and due process is palpable.  Where sanctions in criminal cases are at stake, laws must "carr[y] an understandable meaning with legal standards that courts must enforce." <u>Giaccio</u>, 382 U.S. at 403.  Section 3596 contains no such standards, since it requires a court, which sits

in a state that does not have the death penalty, to choose among the 30 states that do have that penalty and that have a variety of different procedures—and different track records—with respect to how to put a prisoner to death.  Even if the Government's bid for the death penalty in this case were otherwise constitutionally proper, the unconstitutionality of § 3596, as applied, would alone foreclose the death penalty in this case.  If federal law is to provide for the death penalty in states that do not authorize that penalty, the Due Process Clause and the Eighth Amendment require that Congress enact standards or criteria to guide selection of the state and manner of execution.

## II.     The Department of Justice Has Failed to Establish Adequate Procedures to Ensure Compliance with the Sentencing Court's Choice of State Law under Section 3596.

The death notice also should be stricken because DOJ apparently has failed to establish procedures to ensure compliance with the state law chosen by the sentencing court pursuant to § 3596. This creates an impermissibly high risk of a botched execution, contrary to due process and the Eighth Amendment.  The 1993 DOJ regulations were issued before the enactment of the FDPA, when there was no obligation to follow state law.  More than 21 years have passed since the issuance of those regulations.  Yet, despite Congress's mandate that federal prisoners be executed in the manner provided by state law, DOJ has never modified its regulations to establish procedures designed to ensure compliance with state law.  To our knowledge, the DOJ has likewise failed to take other steps to adopt and implement procedures in a form other than regulations.

The record of botched executions in recent years shows that executions have often gone awry even when state officials are carrying out executions under the laws of their own states.  Surely, written procedures are required to guide federal officials in carrying out executions under laws with which they may have no experience.  Improvisation and ad hoc judgments are not enough given the enormous potential for mental and physical suffering when something goes wrong during an execution. Although in theory federal officials might involve state officials, DOJ has itself informed Congress that, "When the issue has come up during informal discussions with State officials, the view of those

14

officials has been that they are not interested in having any involvement with Federal executions." See p. 7, supra.  Frequently, there may not even be any publicly available information about what procedures state officials actually follow, in light of the secrecy now surrounding lethal injection procedures in many states.  See, e.g., Mark Alesia, What Indiana officials want to keep secret about executions, Indy Star (May 16, 2018, 3:27 p.m.).[12]

## CONCLUSION

The FDPA's failure to provide any guidance whatsoever to courts, like this one, that must select a death-penalty state to carry out Mr. Saipov's execution if he is sentenced to death violates the Fifth and Eighth Amendments.

---

[12] Available at: https://www.indystar.com/story/news/2018/05/16/capital-punishment-death-penalty-executions-secrecy/610775002/