```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA                                    :
                                                            :
                                                            :    17-CR-722 (VSB)
                    -against-                               :
                                                            :    OPINION & ORDER
                                                            :
SAYFULLO HABIBULLAEVIC SAIPOV,                              :
                                                            :
                    Defendant.                              :
------------------------------------------------------------X
```

<u>VERNON S. BRODERICK</u>, United States District Judge:

Defendant Sayfullo Habibullaevic Saipov has been charged in a twenty-eight count indictment with, among other offenses, eight counts of murder in aid of racketeering and eighteen counts of attempted murder, arising out of an attack in New York City on October 31, 2017, in which Defendant Saipov—purportedly acting on behalf of the Islamic State of Iraq and al-Sham ("ISIS")—is alleged to have driven a flatbed truck onto a cycling and pedestrian pathway on the west side of lower Manhattan, killing eight civilians and injuring at least eighteen others. (Doc. 61.) Many of the charges against Saipov carry a possible sentence of death.

Currently before me is Defendant Saipov's motion to preclude the Government from seeking the death penalty as a result of statements made by President Donald J. Trump, in which the President encouraged the United States Attorney General to seek the death penalty in Saipov's case, or in the alternative, for the appointment of an independent prosecutor to decide whether to authorize the death penalty.[1] (Doc. 75.) For the reasons that follow, Saipov's motion is DENIED.

---

[1] On September 28, 2018—the same date it filed its opposition to the instant motion—the Government filed its Notice of Intent to Seek the Death Penalty, (Doc. 80). As a result, Saipov no longer appears to advocate for the appointment of an independent prosecutor. Saipov instead argues that "unless the government can establish that its

I.      **Background and Procedural History**

On June 19, 2018, the Government returned a superseding indictment against Defendant Saipov, arising out of the October 31, 2017 truck attack. (Doc. 61.) The superseding indictment charges Saipov with eight counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); eight counts of assault with a dangerous weapon and attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3); ten additional counts of attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); one count of providing material support to a designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; and one count of violence and destruction of a motor vehicle resulting in death, in violation of 18 U.S.C. §§ 33(a) and 34. (Doc. 61.) The murder in aid of racketeering charges, as well as the charge for violence and destruction of a motor vehicle resulting in death, carry a possible sentence of death. *See* 18 U.S.C. §§ 34, 1959(a)(1).

On November 1, 2017, the day after Saipov was taken into custody, the President posted the following statement to his Twitter account: "NYC terrorist was happy as he asked to hang ISIS flag in his hospital room. He killed 8 people, badly injured 12. SHOULD GET DEATH PENALTY!" (Saipov Br. 2.)[2] The following day, the President stated—again in relation to Saipov—"Should move fast. DEATH PENALTY!" (*Id.*) Since that time, the President has

---

death notice was not affected by President Trump's uninformed and intemperate directive to execute Mr. Saipov, it may not pursue a death sentence in a manner that complies with the Federal Death Penalty Act . . . or the Constitution. Without such assurances, which can only be obtained through a hearing, the Court should strike the notice." (Saipov Reply 1.) "Saipov Reply" refers to Defendant Sayfullo Habibullaevic Saipov's Reply Motion and Memorandum of Law to Vacate or Dismiss the Government's Notice of Intent to Seek the Death Penalty, filed October 9, 2018, (Doc. 89).

[2] "Saipov Br." refers to Defendant's Motion to Preclude Government from Seeking the Death Penalty, or, in the Alternative, for the Appointment of an Independent Prosecutor to Decide Whether a Capital Prosecution Should Be Authorized, filed September 6, 2018, (Doc. 75).

made other comments about Saipov using Twitter, referring to Saipov in one instance as a "degenerate animal." (*Id.* at 3.)[3]

Because Saipov has been charged with offenses for which death is a possible penalty, the "Capital Case Protocol"—a series of policies and guidelines outlined in the Justice Manual ("JM"),[4] which apply to all federal cases in which a defendant is, or could be, charged with a death-eligible offense alleged to have been committed after March 6, 2006—dictated the process by which the Government determined whether to seek the death penalty. *See* JM §§ 9-10.010–10.200. First, the United States Attorney's Office for the Southern District of New York invited Saipov's counsel to offer a mitigation submission. (*See* Gov't Br. 5; JM § 9-10.080 (requiring that defense counsel receive a reasonable opportunity to present to the U.S. Attorney information "which may bear on the decision whether to seek the death penalty").)[5] The defense made its submission on May 18, 2018, and subsequently made an in-person mitigation presentation to the Southern District U.S. Attorney and other federal prosecutors. (Gov't Br. 5.) Following the meeting with defense counsel, the Capital Case Protocol required the Southern District U.S. Attorney's Office to send both its submission and Saipov's submission to the Attorney General's Review Committee on Capital Cases (the "Capital Review Committee" or the "Committee"), an internal committee of Department of Justice ("DOJ") officials. (*See id.*; JM § 9-10.080 (instructing the U.S. Attorney to make a recommendation to the Committee regarding whether to

---

[3] Saipov also challenges more recent statements by the President, in which he criticized the Attorney General's decision to prosecute two Republican Congressmen in cases unrelated to Defendant Saipov's. (*See* Saipov Br. 3 (quoting September 3, 2018 Twitter post by President Trump).)

[4] "The JM was previously known as the United States Attorneys' Manual (USAM). It was comprehensively revised and renamed in 2018." U.S. Dep't of Justice, Justice Manual, https://www.justice.gov/jm/justice-manual (last visited Feb. 11, 2019).

[5] "Gov't Br." refers to the Government's Memorandum in Opposition to the Defendant's Motion to Preclude the Government from Seeking the Death Penalty, filed September 28, 2018, (Doc. 83).

3

seek the death penalty).) On July 23, 2018, defense counsel made another in-person mitigation presentation directly to the Capital Review Committee. (*See* Gov't Br. 5; JM § 9-10.130 (guaranteeing defense counsel a reasonable opportunity to "present evidence and argument in mitigation" to the Committee).) The Committee then made its recommendation to then-Attorney General Jefferson Sessions III,[6] (*see* Gov't Br. 5; JM § 9-10.130), and on September 27, 2018, the Attorney General, after considering the relevant materials and recommendations, directed the Government to seek the death penalty, (*see* Gov't Br. 5; JM § 9-10.140 (requiring the Attorney General to consider whether the applicable aggravating factors that are supported by "substantial, admissible, and reliable evidence" "sufficiently outweigh the applicable mitigating factors to justify a sentence of death")).

On September 6, 2018, Defendant Saipov filed the instant motion to preclude the Government from seeking the death penalty. (Doc. 75.) The Government filed its opposition to Saipov's motion, (Doc. 83), and its Notice of Intent to Seek the Death Penalty, pursuant to 18 U.S.C. § 3593(a), (Doc. 80), on September 28, 2018. Saipov filed a reply in further support of his motion on October 9, 2018. (Doc. 89.) Finally, Protect Democracy Project, Inc. ("Protect Democracy") sought and received leave to file an amicus brief in support of neither party. (Doc. 78-2.)[7]

---

[6] In November 2018, Sessions resigned as Attorney General, at the President's request. *See* Letter from Attorney Gen. Jefferson B. Sessions III to President Donald J. Trump (Nov. 7, 2018), *available at* https://www.cnn.com/2018/11/07/politics/sessions-resignation-letter/index.html.

[7] Protect Democracy's brief criticizes the President's "meddling in the criminal justice process," but "takes no position on the underlying merits of this case." (Doc. 78-2, at 2.) In fact, Protect Democracy notes that "the Department of Justice may well be acting independently and outside the cloud of any White House interference in this matter. Indeed . . . Protect Democracy hopes and expects that to be the case." (*Id.* at 3.) Because I find no indication that the Attorney General's charging decisions were improperly motivated by the President's remarks or that the Attorney General's prosecutorial independence was otherwise compromised, I decline Protect Democracy's invitation to further scrutinize the President's statements relating to Defendant Saipov.

## II. Discussion

### A. *Applicable Law*

The decision to seek the death penalty in federal cases is reserved to the United States Attorney General, who "retain[s] broad discretion" in his prosecutorial decision-making. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks omitted); *see also* JM § 9-10.050. "[P]olicy considerations behind a prosecutor's traditionally wide discretion suggest the impropriety of [courts] requiring prosecutors to defend their decisions to seek death penalties." *McCleskey v. Kemp*, 481 U.S. 279, 296 (1987) (internal quotation marks omitted); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."). "Because discretion is essential to the criminal justice process, [courts] demand exceptionally clear proof before [they] would infer that the discretion has been abused." *McClesky*, 481 U.S. at 297.

Therefore, "in the absence of clear evidence to the contrary," separation-of-powers principles require courts to presume that the Executive has "properly discharged [his] official duties." *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)). "Absent a preliminary showing of arbitrary action, the Court must assume that the Attorney General's decision [to seek the death penalty] was made in good faith." *United States v. Kee*, No. S1 98 CR 778(DLC), 2000 WL 863119, at *4 (S.D.N.Y. June 27, 2000) (denying motion to dismiss Government's notice of intent to seek death penalty).

B. *Application*

Defendant Saipov has not provided "exceptionally clear proof" that the Attorney General abused his discretion in directing the Government to seek the death penalty in the instant case. *See McClesky*, 481 U.S. at 297. As an initial matter, the Government appears to have followed the procedures set forth in the Capital Case Protocol.[8] In accordance with the Protocol, Saipov's counsel submitted written materials and made an in-person mitigation presentation to the U.S. Attorney before the U.S. Attorney's Office made its recommendation to the Capital Review Committee. *See* JM § 9-10.080. Saipov's counsel also presented mitigating factors directly to the Capital Review Committee before the Committee submitted its recommendation for the Attorney General's review. *See id.* § 9-10.130. Although "[t]he decision-making process preliminary to the Attorney General's final decision is confidential," the Capital Case Protocol requires that "Reviewers [of a decision regarding whether to seek the death penalty] are to resolve ambiguity as to the presence or strength of aggravating or mitigating factors in favor of the defendant." *Id*. §§ 9-10.050, 9-10.140. In other words, as one court stated, before filing a notice of intent to seek the death penalty, "Government officials are instructed to consider any mitigating factor reasonably raised by the evidence in the light most favorable to the defendant and to satisfy themselves that there is sufficient admissible evidence of aggravating factors to both obtain a death sentence and to sustain it on appeal." *United States v. Frank*, 8 F. Supp. 2d 253, 284 (S.D.N.Y. 1998.) Defendant Saipov does not assert that he was prevented from

---

[8] I note that even if the Government did not follow every dictate of the Capital Case Protocol to the letter, numerous courts have concluded that the Capital Case Protocol "does not create any [] legally enforceable rights, and that, therefore, [death-eligible defendants] lack the power to order the Government to abide by it." *United States v. Williams*, 181 F. Supp. 2d 267, 299 (S.D.N.Y. 2001); *see also Nichols v. Reno*, 931 F. Supp. 748, 751–52 (D. Colo. 1996) ("The [Justice] Manual expressly disclaims any intention to create any judicially enforceable substantive or procedural rights in any party in any civil or criminal matter."), *aff'd*, 124 F.3d 1376 (10th Cir. 1997). I agree that the Capital Case Protocol does not create procedural or substantive rights enforceable by Saipov. However, the fact that the Government appears to have fully complied with the Protocol constitutes evidence that the Attorney General's death penalty decision was not arbitrary or infected by improper influence.

presenting mitigation evidence at any point in the DOJ's decision-making process.

Moreover, although "[t]he overriding goal of the [death penalty] review process is to allow proper individualized consideration of the appropriate factors relevant to each case," JM § 9-10.030, the Attorney General's decision to seek the death penalty here does not appear inconsistent with other cases in which the death penalty has been sought. Saipov is accused of committing indiscriminate acts of extreme violence in the name of a Foreign Terrorist Organization, resulting in eight fatalities and many more injuries. (*See* Doc. 61.) In support of its decision to seek the death penalty, the Government cited numerous statutory aggravating factors, including death during commission of another crime, (18 U.S.C. § 3592(c)(1)); grave risk of death to additional persons, (§ 3592(c)(5)); heinous, cruel, and depraved manner of committing the offense, (§ 3592(c)(6)); substantial planning and premeditation, (§ 3592(c)(9)); and multiple killings, (§ 3592(c)(16)). Prior Attorneys General have also sought the death penalty where similar aggravating factors were present. *See, e.g.*, *United States v. Tsarnaev*, No. 13 Cr. 10200 (GAO) (D. Mass. Jan. 30, 2014), ECF No. 167 (Government's notice of intent to seek death penalty against defendant who killed three in Boston Marathon bombing, citing same statutory aggravating factors set forth in Saipov's notice, as well as the existence of a vulnerable victim (*see* § 3592(c)(11)); *United States v. Roof*, No. 15 Cr. 472 (RMG) (D.S.C. May 24, 2016), ECF No. 164 (Government's notice of intent to seek death penalty against defendant who fatally shot nine parishioners in South Carolina church, citing substantial planning and premeditation, multiple killings, and vulnerable victim as statutory aggravating factors).

Saipov offers only the conclusory allegation that because of the President's public statements advocating for the imposition of the death penalty—statements that were perhaps ill-advised given the pendency of this case—the Attorney General's decision to seek that penalty

must have been motivated more by "President Trump's emotions and partisan desire[s] . . . than [by] Sessions's informed judgment." (Saipov Reply 4.) This assertion is pure speculation made without a scintilla of direct factual support, and without more, it is insufficient to warrant interference by this Court with the Attorney General's presumptive authority to make charging decisions.

The case of *Nichols v. Reno*, 931 F. Supp. 748 (D. Colo. 1996), *aff'd*, 124 F.3d 1376 (10th Cir. 1997)—in which the U.S. District Court for the District of Colorado rejected both statutory and constitutional challenges to then-Attorney General Janet Reno's decision to seek the death penalty against Terry Nichols for his role in the 1995 Oklahoma City bombing—is particularly instructive. Before any suspects were named or arrested in connection with the Oklahoma City attack, Attorney General Reno publicly announced an intention to seek the death penalty; President Clinton also announced his support for the death penalty early in the Government's investigation. *Id.* at 752. Nichols challenged the Government's death penalty notice, alleging that in deciding to pursue the death penalty, the Attorney General failed to follow the applicable DOJ procedures, which require individualized consideration of the defendant and the crime. *Id.* at 751. The district court rejected Nichols's arguments in their entirety, emphasizing that the Attorney General's exercise of charging discretion is "presumptively unreviewable." *Id.* The court further determined that the procedures set forth in the Capital Case Protocol had been followed, and that "the charge of bias based solely on the public statements of the President and the Attorney General in the immediate aftermath of the explosion [wa]s legally insufficient to support a constitutional challenge to the [Death] Notice." *Id.* at 752–53.

Like Nichols, Saipov has presented no evidence that the Government failed to fully comply with the Capital Case Protocol here. Moreover—and in contrast to Nichols—Saipov does not contend that the Attorney General himself made any improper public comments relating to Saipov's alleged crimes or the appropriate punishment for those crimes. Any allegations of bias or impropriety on the part of Attorney General Sessions are based wholly on the President's unilateral comments and conduct. While those comments are arguably more inflammatory than President Clinton's statements relating to Nichols,[9] Saipov has offered no evidence that the President's remarks impacted the Attorney General's decision-making process in any way. To the contrary, Attorney General Sessions has categorically renounced other provocative remarks made by the President, stating, "While I am Attorney General, the actions of the Department of Justice will not be improperly influenced by political considerations." Sarah Isgur Flores (@SarahFloresDOJ), Twitter (Aug. 23, 2018, 10:02 a.m.), https://twitter.com/SarahFloresDOJ/status/1032674568849244160 (statement issued by DOJ Director of Public Affairs on behalf of Attorney General Sessions).

The statutes and case law Saipov cites in an attempt to buttress his argument are equally unavailing. Saipov contends, for instance, that in electing to seek the death penalty, the Attorney General failed to comply with the Federal Death Penalty Act (the "FDPA"), 18 U.S.C. §§ 3591–3598, which provides various substantive and procedural protections for capital defendants. However, the FDPA primarily governs the process by which courts and juries determine whether to impose a sentence of death at trial, rather than the process by which the Government decides

---

[9] Discussing the Oklahoma City bombing four days after the incident, President Clinton commented, "I certainly believe that [the perpetrators] should be executed. . . . If this is not a crime for which capital punishment is called, I don't know what is." Interview by Steve Kroft, *60 Minutes*, with President William J. Clinton (Apr. 23, 1995), *available at* http://www.presidency.ucsb.edu/ws/index.php?pid=51266.

9

to *seek* the death penalty. *See, e.g.*, 18 U.S.C. § 3592 (requiring that the factfinder be presented with any mitigating factors); § 3593 (requiring a separate hearing following a guilty verdict to determine whether a sentence of death is justified); § 3595 (providing for review of a death sentence by the United States Court of Appeals). In fact, "[t]he only legislative guidance [the FDPA offers to the Attorney General in determining which punishment to seek] is that he shall consider whether the 'circumstances of the offense' justif[y] a sentence of death. There is no other direction." *Nichols*, 931 F. Supp. at 752 (quoting 18 U.S.C. § 3593(a)). Similarly, the cases cited by Saipov—including *Zant v. Stephens*, 462 U.S. 862 (1983); *Woodson v. North Carolina*, 428 U.S. 280 (1976); and *Ford v. Wainwright*, 477 U.S. 399 (1986)—do not consider the Attorney General's exercise of prosecutorial discretion; rather, each addresses the heightened "need for reliability" in ultimately sentencing a defendant to death. *See Zant*, 462 U.S. at 884–85.

There is no dispute that Saipov has and will continue to have a wide range of statutory and constitutional protections available to him, particularly if his trial ultimately proceeds to the penalty phase. However, "[a]bsent a preliminary showing of arbitrary action," I must assume that the Attorney General's decision to seek the death penalty at trial "was made in good faith." *Kee*, 2000 WL 863119, at *4; *see also Frank*, 8 F. Supp. 2d at 283 (denying request to preclude Government from seeking death penalty where defendant "adduced absolutely no evidence suggesting that the Government abused its discretion" and instead relied on "conclusory allegations" of impropriety). Defendant Saipov's unsupported allegation that the Attorney General's decision to pursue the death penalty must have been influenced by remarks made by

10

the President on a social media platform nearly a year earlier is insufficient to rebut the presumption of regularity that attaches to the Attorney General's charging decisions.[10]

Finally, I decline Saipov's request that I appoint an independent prosecutor to determine whether the Government should seek the death penalty. As an initial matter, Saipov fails to address the proposed appointment of an independent prosecutor in his reply papers and therefore appears to have abandoned that request. This is unsurprising as the request was essentially mooted by the Government's subsequent filing of its Notice of Intent to Seek the Death Penalty. (Doc. 80.) In any event, even if the decision to pursue the death penalty had not already been made, where, as here, there is no indication that the Attorney General discharged his duties improperly, there is no basis to interfere with the Executive's exercise of prosecutorial discretion by the unprecedented appointment of an independent prosecutor. *Cf. In re Wood*, 833 F.2d 113, 115 (8th Cir. 1987) (holding that "a court may not exercise its supervisory power in a way which encroaches on the prerogatives of the executive . . . unless there is a clear basis in fact and law for doing so." (internal quotation marks omitted)).

---

[10] Saipov cites events unrelated to his case—including, for instance, the Attorney General's termination of Acting FBI Director Andrew McCabe in March 2018—to support his contention that the DOJ "heed[s] President Trump's tweets." (Saipov Reply 5–6.) I decline to analyze the merits of Saipov's allegations regarding these incidents, which bear no relation to the "core executive constitutional function" of determining which charges to bring, and which penalties to seek, in a particular case. *See Armstrong*, 517 U.S. at 465.

### III. **Conclusion**

For the foregoing reasons, Defendant Saipov's motion to preclude the Government from seeking the death penalty, (Doc. 75), is DENIED. I will address Saipov's remaining challenges to the Government's Notice of Intent to Seek the Death Penalty, (*see* Docs. 97, 99, 103), once those motions are fully briefed in March 2019.

SO ORDERED.

Dated: February 14, 2019
      New York, New York

Vernon S. Broderick
United States District Judge