# Exhibit S

I6MHSaiC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          17 Cr. 722 (VSB)

SAYFULLO HABIBULLAEVIC SAIPOV,

                                               Conference
              Defendant.

------------------------------x

                                       New York, N.Y.
                                     June 22, 2018
                                     3:30 p.m.

Before:

                    HON. VERNON S. BRODERICK,

                                     District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
AMANDA L. HOULE
ANDREW BEATY
MATTHEW LaROCHE
     Assistant United States Attorneys

DAVID E. PATTON
     Federal Defenders of New York, Inc.
     Attorney for the Defendant
DAVID E. PATTON
JENNIFER BROWN

ALSO PRESENT:   LISA KOROLOGOS, USAO Wall Team
                 ELIZABETH HANFT, USAO Wall Team
                 NODIRA ISAMIDDINOVA, Interpreter (Uzbek)
                 MICHAEL DeLUCA, Paralegal USAO

I6MHSaiC

1        (Case called)

2        MS. HOULE:  Good afternoon.  Amanda Houle, Andrew

3   Beaty, and Matthew LaRoche, for the government.  With us at

4   counsel's table is our paralegal, Michael Deluca.  I'd also

5   like to note for your Honor that the AUSAs from the wall team,

6   Ms. Korologos and Ms. Hanft, are also in the courtroom today.

7        THE COURT:  All right.  Thank you.

8        MR. PATTON:  Good afternoon.  David Patton, from the

9   Federal Defenders.  And at counsel table are Jennifer Brown and

10  David Stern, on behalf of the Mr. Saipov, who's present in

11  following the proceedings with an Uzbek interpreter.

12       THE COURT:  Thank you.

13       The only thing I ask is that whoever is going to

14  speak, you just please remember to pull the microphone close to

15  you just because this courtroom, unless you do so, it's going

16  to be very difficult for the court reporter to hear everything

17  that's going on.

18       Let me ask, Mr. Saipov, can you hear and understand

19  the interpreter?

20       THE DEFENDANT:  (In English) Yes.

21       THE COURT:  If at any point in time you have

22  difficulty hearing the interpreter or you want time to speak to

23  your attorneys, just raise your hand, and we'll try and fix the

24  headset or I'll allow you some time to speak with your

25  attorneys.  OK?

I6MHSaiC

1          THE DEFENDANT:  (In English) OK.

2          THE COURT:  All right.  The first order of business is

3     to arraign Mr. Saipov on the superseding indictment which was

4     returned earlier this week.

5          Mr. Patton, has your client seen and a copy of the

6     superseding information and has it either been translated or

7     read to him?

8          MR. PATTON:  Yes, your Honor.  I reviewed the

9     superseding indictment with Mr. Saipov with the assistance of

10    an Uzbek interpreter.  He waives its public reading and wishes

11    to enter a plea of not guilty.

12         THE COURT:  All right.  So the record will reflect

13    that Mr. Saipov will enter a plea of not guilty.

14         All right.  The next order of business, and just so

15    that the parties know, I intend to first go through

16    discovery-related issues and motion-related issues and then to

17    discuss the issue related to -- the narrower issue related to

18    the special administrative measures, although it could blur

19    into some broader discussion of the SAMs, as well as the motion

20    that is currently being briefed.  And then I plan on discussing

21    trial dates, potential trial dates.

22         First, with regard to the parties' application

23    concerning the SAMs motion, I have granted the application to

24    extend the time, and so that should hit the docket later on

25    today, at the latest Monday.  So I note with regard to when the

 1  briefing would be due.

 2          So let me ask this with regard to the discovery

 3  issues:  I noted that there was going to be production, I think

 4  today, of some additional transcripts, and the like.  So let me

 5  ask the government, have those items been produced, and if they

 6  haven't, what the timing of that would be?  And then, second,

 7  what, if any, additional discovery has yet to be produced?

 8          MS. HOULE:  Thank you, your Honor.

 9          Those additional translations were produced last

10  night.  There are no pending translations at this time, and

11  there is no pending Rule 16 discovery.

12          THE COURT:  Just to confirm, because there was a

13  question I had the last time, and I assume it's still the same,

14  that currently there are no CIPA-related materials that we're

15  going to have to deal with here?

16          MS. HOULE:  Yes, your Honor.  As we indicated at the

17  last conference, we certainly don't anticipate any substantial

18  CIPA motion practice here.

19          THE COURT:  OK.

20          MS. HOULE:  The government is continuing to review

21  whether or not there will be any motions made.

22          THE COURT:  The only thing I ask is that -- well,

23  actually, I think what makes sense is perhaps we revisit the

24  issue once we discuss trial dates.  To the extent there is

25  going to be that kind of motion practice, I'd like to get a

I6MHSaiC

1    sense of when that would happen.

2           All right.  Let's now move to the issue related to the

3    SAMs, the narrow request by the government which relates to

4    being able to monitor family visits should they occur in the

5    future.  My prior ruling related to purely the visitor log and

6    that the visitor log should be reviewed by a wall team and any

7    redactions, and the like, be done in that fashion.

8           However, as I understand it, since the institution of

9    the special administrative measures with regard to Mr. Saipov,

10   the government has made an application, I think, one, with

11   regard to the list itself, that with regard to that, that they,

12   the government, the prosecution team, should be allowed to see

13   the nonlegal individuals on that list.

14          Let me just ask, I just want to clarify one point with

15   regard to that, and I think I know the answer.  We were talking

16   about legal versus nonlegal in my prior order.  Is it the

17   government's contemplation that the experts -- and, again, I

18   know that the current SAMs doesn't provide that experts can

19   visit -- but that experts are included as part of that, the

20   legal review?

21          MR. BEATY:  Yes, your Honor.  The experts, defense

22   investigators, paralegals, and counsel for the defendant are

23   all covered under the legal side of that distinction.

24          THE COURT:  OK.

25          MR. BEATY:  I believe there's been a modification to

I6MHSaiC

1    the SAMs explicitly to allow experts to visit him --

2              THE COURT:  OK.

3              MR. BEATY:  I'm not part of the wall team, so I'm only

4    aware that a modification has been made, but I believe it

5    includes the specific experts who have been approved to see

6    him.

7              THE COURT:  I see.  I'm looking around for a member of

8    the wall team.  Ms. Korologos, could you step up for a moment?

9              MS. KOROLOGOS:  Sure.

10             THE COURT:  The only thing I want to ask, although I

11   recognize that there may be a reason why the prosecution team

12   doesn't have a copy of the current SAMs related to Mr. Saipov,

13   could I make a request, could you provide me with a copy of the

14   current SAMs?

15             MS. KOROLOGOS:  Yes, your Honor, I have both redacted

16   and nonredacted versions of the SAMs, and then there's been two

17   modifications.

18             THE COURT:  OK.

19             MS. KOROLOGOS:  In the redacted versions, the names of

20   the defense legal visitors have been redacted.

21             THE COURT:  OK.  All right.

22             MS. KOROLOGOS:  I have those with me in court if that

23   would help.

24             THE COURT:  It actually would.  If you could hand up a

25   copy, that would be great.

I6MHSaiC

1          MS. KOROLOGOS:  Do you want the unredacted version?

2          THE COURT:  Unredacted version, yes, please.  Thank

3   you.  Actually, if you have copies of both, I'll take both just

4   to make sure I have those.

5          MS. BROWN:  Your Honor, I don't think we have a copy

6   of the document that she's about to hand up.

7          THE COURT:  Do you have extra copies for -- well, I

8   assume -- let me just ask.  I think I understood you to

9   indicate that the redactions relate to the names of basically

10  what would be consistent with my order, that the prosecution

11  team not be made aware of the names of the experts, and the

12  like.

13         Are those the redactions?  I guess what I'm asking is

14  can the defense have an unredacted copy?

15         MS. KOROLOGOS:  Yes.

16         THE COURT:  So if you could provide a copy of each of

17  those to the defense, that would be great, if you have them.

18         MS. KOROLOGOS:  Today I have one redacted and one

19  unredacted.  Since the defense counsel know the names of their

20  witnesses, I propose I give the Court the unredacted version.

21         THE COURT:  That's fine.  I think what makes sense is

22  that, and this is another issue, what makes sense,

23  Ms. Korologos, if you could make sure that the transmittal at

24  least of the unredacted -- you don't have to put, obviously,

25  the unredacted on the docket.  I just want a record that you've

I6MHSaiC

1    sent it; that the defense has received it.  So it should be

2    something that actually -- and you could do that by cover

3    letter saying enclosed is a copy of it, a redacted version

4    which has been put on the docket since we have -- the SAMs is

5    already part of the document anyway.

6              MS. KOROLOGOS:  OK.

7              THE COURT:  All right.  This was another issue that I

8    wanted to raise related to submissions that are made, in

9    particular submissions that are made under seal and/or

10   redacted.  Prior to any redactions being submitted, you should

11   make a request to me for that, and I just want to make sure

12   that we have -- I think initially the SAMs were communicated to

13   me, but there was no -- initially, they were filed, I think,

14   under seal, to be filed under seal, but I don't believe that

15   that ever actually happened.  I just want to make sure that

16   when something is going to be -- when an application is made

17   that something be filed under seal and I grant the application,

18   that the documents are, in fact, filed under seal.

19             Secondly, with regard to the indictment, the

20   superseding indictment, I received a copy of it.  It was an

21   attachment to a letter.  The superseding indictment had been

22   redacted, and so I had not -- well, it had been redacted.

23   However, on the public docket there's also an unredacted

24   version that I think was filed probably by the clerk's office

25   once the superseding indictment was processed.

1          So I guess my question is for the government.  (a) I

2     hadn't received a request to file it, any portions of it, for

3     it to be redacted, but (b) is that a request that the

4     government would make at this time?

5          MS. HOULE:  No, your Honor.

6          THE COURT:  All right.  That's fine.

7          The principal reason that I just mention this is that,

8     at the end of the day, I want to have a complete record of what

9     is received and what is filed under seal, and that goes for

10     both counsel, all counsel, just so that we make sure that the

11     docket has everything, even if it's something that's filed

12     under seal.

13          Yes, Ms. Korologos.

14          MS. KOROLOGOS:  May I pass up the two unredacted

15     versions to the Court, and I'll drop off these at counsel

16     table?

17          THE COURT:  OK.  Thank you.  All right.

18          So I do have some questions, I think, with regard to

19     the current application that the government, the prosecution

20     team, be allowed to monitor family visits.  First let me ask

21     the defense, with regard to family communications, am I correct

22     that prior to the imposition of the SAMs, would telephone

23     communications between Mr. Saipov and his family members, would

24     those have been recorded by the Bureau of Prisons?

25          MS. BROWN:  Yes, your Honor.

I6MHSaiC

1          THE COURT:  Are you aware of any cases, whether it's

2    case law or precedent, for those calls not being recorded in

3    death penalty cases where SAMs has not been imposed?

4          MS. BROWN:  I'm not sure I heard your question, not

5    being record -- because there's a difference between

6    contemporaneous monitoring and recording, and we're focused on

7    the contemporaneous monitoring as opposed to the recording.

8          THE COURT:  Well, I understand that there's a timing

9    difference, but the government -- as I understand, the crux of

10   the argument is that there would be a disclosure, or potential

11   disclosure, of defense strategy based upon communications with

12   Mr. Saipov and his family members principally related to

13   penalty phase-related matters and mitigation-related matters.

14         So my question goes to the issue of -- while I

15   understand it's a timing difference, the government would still

16   be able to gain access to the recording.  So what I was trying

17   to figure out is whether or not there's precedent in cases

18   where SAMs has not been imposed, where the defense has sought

19   and obtained the ability to not have family calls recorded by

20   the Bureau of Prisons.

21         MS. BROWN:  I'm not aware of any situation where there

22   was no recording of family calls.

23         THE COURT:  All right.  Similarly, I don't know what

24   arrangements the family visits would have occurred with

25   Mr. Saipov and family members.  So let me ask, because

I6MHSaiC

1   typically, as I understand it, the attorney visits are private,

2   in other words, they are done in a room where it's the attorney

3   and the client; and that other visits, nonlegal visits, are

4   done in a room where, although there won't be necessarily a

5   Bureau of Prisons person actively listening in, they are

6   present.

7           I guess my question relates to what was the process or

8   do you know what the process would have been without the SAMs

9   for Mr. Saipov?

10          MS. BROWN:  Your Honor, so the process, given where

11  Mr. Saipov is being housed at the MCC, the physical space for

12  the social visit, family visit is actually the same physical

13  space as where the attorney-client visit is, which is to say,

14  it is a private room with doors closed, and it's noncontact.

15          THE COURT:  So my subsequent question relates not

16  specifically to Mr. Saipov's situation, but to death penalty

17  cases more generally, and specific death penalty cases where

18  SAMs has not been imposed.

19          Are there cases where it's a death penalty case, no

20  SAMs imposed, where the visits with family members are in

21  private?  In other words, I understand Mr. Saipov's situation,

22  and it may be other death penalty cases are similar, in other

23  words, that the family visits would be in private because of

24  the other restrictions, but are you aware of a death penalty

25  case where SAMs has not been imposed where the visiting isn't

I6MHSaiC

1    the normal visiting for -- where the visiting room is with

2    other people?

3              MS. BROWN:  Just a minute.

4              (Counsel conferred)

5              MS. BROWN:  I think the difficulties that we're having

6    is the issue of whether it's private or not.  So where

7    Mr. Saipov is housed, it's the closed room --

8              THE COURT:  Yes.

9              MS. BROWN:  -- and physically private.  But even in an

10   area where several visits are happening at once, they are

11   private in the sense that the individuals are speaking to each

12   other in person.  They could whisper.  There's no one able to

13   hear what they say if they modulate their behavior.  So, in

14   general, social visits are private in both capital and

15   noncapital when SAMs is not an issue.

16             THE COURT:  But in any capital cases where there have

17   been no SAMs, has the defense requested that those visits, in

18   essence, be treated as legal visits?

19             MS. BROWN:  I don't think there's a need to is what

20   we're saying because they can maintain the privacy of their

21   communications by not speaking loudly.

22             THE COURT:  All right.  Thank you.

23             Now, these questions aren't specifically -- well, I

24   think, actually, I've gotten an answer with regard to the

25   government's position with regard to experts, and I'll take a

I6MHSaiC

1    look at the modification of the SAMs, because I think that's

2    relevant, obviously, to the motion that has been filed.

3          Let me ask the government just to articulate exactly

4    what the limited application is that they're currently seeking

5    from me.

6          MR. BEATY:  Yes, your Honor.  We're just asking the

7    Court to clarify that its order with respect to the wall team

8    is only limited to approving legal visitors into the MCC.  That

9    was the scope of the Court's original order, but we were

10   subsequently informed that defense took the position that we

11   should not have access to the defendant's nonlegal

12   communications; that the case team should not be permitted to

13   monitor them, either the phone conversations or the in-person

14   conversations.  We're just asking the Court to clarify the

15   scope of its original order and to allow the case team and the

16   FBI agents who are part of the case team to monitor and have

17   access to those calls and meetings.

18         THE COURT:  All right.  In part, because I think my

19   ruling may be different depending on (a) the briefing that is

20   currently ongoing, I know there's a challenge by the defense to

21   the imposition of SAMs as a general matter.  However, based on

22   the discussion here, there may be, at least in my mind, a

23   difference between calls which are monitored by the Bureau of

24   Prisons in the normal course and, as I understand it, would be

25   monitored of a family member in a death penalty case regardless

I6MHSaiC

1   of whether or not the penalty phase was at issue, in other

2   words.

3        So what I propose is the following:  In the period

4   between now and the time that the briefing is completed, I'm

5   going to maintain that the wall team should conduct any review

6   or monitoring during that time period until such time I can

7   rule on the entire motion that's being made by the parties

8   because, again, there may be certain distinctions that I'm

9   going to make in connection with that ruling.

10        In addition, I'll note that right now I've gotten only

11   the defense motion, and I haven't received the government's

12   response.

13        So that, again, is my preliminary ruling, in other

14   words, with the understanding that I'm going to revisit it.

15        Yes.

16        MR. BEATY:  Yes, your Honor, if I may, I would just

17   point out that I think this issue is separate from the SAMs

18   issue in many ways, because as the Court noted, the calls that

19   the defendant makes are recorded in the normal course.  And

20   right now, for example, the one call that has been made, we

21   have not, the case team has not, gotten access to that due to

22   the defense's position that it can only go to the wall team.

23   That's not affected by the SAMs.  That's only affected by the

24   defense's position that the defendant's communications with his

25   immediate family members are somehow covered by the Sixth

I6MHSaiC

1    Amendment.

2         THE COURT:  OK.  Let me hear from the defense with

3    regard to just the calls.

4         MS. BROWN:  Your Honor, with regard to just the calls,

5    to be clear, we have no objection to them being recorded.  What

6    we do have an objection to is, as he accurately states, the

7    case team having access to that recording at this time.  It's

8    the timing aspect that we think affects the Sixth Amendment

9    rights and particularly in the context of the mitigation

10   preparation in a capital case.

11        THE COURT:  But as I understand it, just to clarify,

12   as I understand it, you're unaware of similar applications

13   being made?

14        MS. BROWN:  So, your Honor, this is a somewhat unique

15   case in that Mr. Saipov's only access to his family right now

16   is via telephone, to his mother, his father, his sisters, and

17   that is because the United States government has prevented them

18   from getting visas to enter the country.  So his use of the

19   telephone to communicate with his family is, in fact, his only

20   possible visitation with his family because of actions of the

21   U.S. government.  So it is, in our view, analogous to an

22   in-person visit because it's the only thing available because

23   of actions that were taken by the government.

24        THE COURT:  All right.  I'm going to maintain my

25   ruling, again, until I get the full briefing from the parties,

1    that the wall team should conduct the monitoring both of calls

2    and any in-person visits with the family members.

3              MR. BEATY:  Your Honor, if I could just respond to the

4    point about the visas and just to clarify for the Court.  That

5    was not something that the U.S. Attorney's Office had anything

6    to do with.

7              THE COURT:  I understand.  It's the State Department,

8    and I understand.  But let me -- why don't you make your

9    record.  Go ahead.

10             MR. BEATY:  Thank you, your Honor.

11             At the defense's request, we looked into why the

12   defendant's mother's visa was revoked.  The State Department

13   was contacted, and we were informed that her visa, which she

14   already had, was automatically revoked on November 2 after the

15   attack.  That revocation was without prejudice to any future

16   application, and we obviously have taken no position with

17   respect to whether a visa should be granted and play no role in

18   that process.

19             THE COURT:  Is that true -- I know you mentioned

20   Mr. Saipov's mother -- but true with regard to any other family

21   members that may have -- although they didn't necessarily have

22   a visa on the date in October of 2017, is it true with any

23   applications that may have been made since then?

24             MR. BEATY:  We're not specifically aware of any other

25   applications.

1          THE COURT:  OK.

2          MR. BEATY:  The defendant's mother was the person we

3   were asked to look into, which we did.

4          THE COURT:  All right.  As I said, I'm going to

5   maintain my ruling that, for the time being, the wall team will

6   monitor any calls with family members.

7          Let me ask, is that clear, or is there anything that

8   the parties, any questions the parties have at this time?

9          MR. BEATY:  No, your Honor.

10         THE COURT:  I should say, obviously, once I get the

11  briefing -- and I think it's due to be completed by July 23 --

12  I'll take a look at that and decide whether oral argument is

13  necessary.  I think it's likely I'll have some questions about

14  the submissions, and so what I may do, to the extent I do, I

15  will try, if I can, to give the parties at least some

16  indication of what my questions might be so that when we come

17  back for oral argument, you'll be able to specifically address,

18  at a minimum, the questions I have, just for efficiency

19  purposes.

20         Is there anything else with regard to the SAMs issue

21  that I need to deal with, or does that take care of it?

22         MR. BEATY:  Not from the government.

23         THE COURT:  All right.  From the defense?

24         MR. PATTON:  No, your Honor.

25         THE COURT:  Let's move on to the issue of trial dates.

I6MHSaiC

1    Before I get there, because I think this informs the discussion

2    related to trial dates, as I understand it, the current posture

3    of the consideration about whether or not the government's

4    going to seek the death penalty is that the process here in

5    this district has occurred and that the United States

6    Attorney's Office has submitted their paperwork along with the

7    defense submission to the Department of Justice in Washington

8    to the capital case review committee and that a meeting has

9    been scheduled with the defense at some point in July, near the

10   end of July.

11           Is that accurate?

12           MS. HOULE:  Yes, your Honor.  The meeting is scheduled

13   for July 23.

14           THE COURT:  Do you know -- and again, this isn't

15   something that necessarily will be etched in stone -- but do

16   you know whether there is -- once that meeting has occurred,

17   barring any requests by the panel in Washington for additional

18   information from the defense and any back-and-forth that may

19   occur, is there a timeline as to when a decision might be made

20   by the Attorney General?

21           MS. HOULE:  Yes, your Honor.  We continue to expect

22   that a decision will be made by the Attorney General by

23   September.

24           THE COURT:  All right.  I know that previously the

25   parties had indicated -- the government had indicated that a

I6MHSaiC

1    trial date, I think it was in the spring, or something like

2    that, of 2019.  And the defense took the position that no trial

3    date should be set, but that spring was too soon and had

4    mentioned the fall of 2019.

5          Let me hear first from the government and then the

6    defense, because I think, in the defense's letter to me,

7    they've indicated that it's still premature to set a trial

8    date, but let me hear from the government.

9          MS. HOULE:  Thank you, your Honor.

10          The government continues to believe that an April

11    trial date is appropriate here.  If I may, your Honor, I'd like

12    to spend a few minutes addressing some of the arguments made in

13    the defense's recent letters regarding a trial date.

14          THE COURT:  Yes.

15          MS. HOULE:  Turning first, your Honor, to the public

16    at large and the victims in this case.  Their interest in a

17    prompt and a firm trial date cannot be overstated here.  When

18    an attack like this occurs where eight people are murdered and

19    dozens more are injured, the public deserves a speedy trial,

20    and the surviving victims deserve to know when that trial is

21    going to be.  Indeed, the victims here are anxious to know when

22    that trial is going to be.

23          The defense has repeatedly responded to the

24    government's request for a trial date by stating that there

25    should be no trial set and that the most efficient way for this

I6MHSaiC

1    case to be resolved is by a guilty plea with a sentence of life

2    imprisonment.

3            First, your Honor can, of course, set a trial date

4    without any prejudice to the defendant pleading guilty at any

5    time between now and that trial date.  But more importantly,

6    your Honor, we think that that is an argument that's

7    appropriately made through the capital case process, and that

8    the question for this Court is just when can this case proceed

9    to trial?  And we think that all of the circumstances present

10   here demonstrate that an April trial date is the most efficient

11   way to proceed, that it's feasible, and that it's appropriate

12   here.

13           At our January conference, your Honor noted that you

14   would consider, in evaluating that April trial date, whether

15   the parties had kept in line with the time expectations that we

16   presented at that conference, and we have.  Discovery in this

17   case was produced in January.  The government has met all of

18   its deadlines in providing translations to defense counsel.  To

19   the extent that any other materials are submitted for

20   translation, we will produce those promptly to the defense.

21   The capital case process is proceeding efficiently and along

22   the same time frame that we indicated to your Honor back in

23   January.

24           As we just noted, there's a meeting scheduled for

25   July, and we anticipate resolution of that process by

I6MHSaiC

1    September.  An April date would permit significant time for the

2    defense to engage in any mitigation investigation.  They have

3    already had eight months to engage in that investigation.  An

4    April trial date would permit ten more months to engage in that

5    investigation.

6          As we said, your Honor, this case is, of course,

7    significant and important, but it also is a single-defendant

8    case relating principally to a single incident.  And the

9    defense's suggestion that a case involving a single defendant

10   and a single incident cannot proceed to trial for years is

11   unprecedented.  The cases cited by the defense in their letters

12   in this district, with the exception of the *Muhammad* case that

13   proceeded before Judge Sand, are all distinguishable in

14   material respects, and I'd like to just review a few of those

15   for your Honor now.

16         First, those cases involved anywhere from four to 14

17   defendants, sometimes with multiple defendants facing the death

18   penalty.  The conduct in those cases was alleged to have taken

19   place over substantially longer periods of time than what is

20   alleged here.  In the *Barnes* case, for example, the conduct

21   alleged spanned 11 years.

22         THE COURT:  Let me just ask, would you be able to

23   break down in those cases -- I apologize for interrupting --

24   but in those cases, how many of the defendants were foreign

25   nationals where the materials that might be sought by the

I6MHSaiC

1    defense with regard to mitigation are or could be or most

2    likely or many of them are located overseas.

3           MS. HOULE:  Well, we think, your Honor, the most apt

4    comparison in relation to that question is the *Muhammad* case

5    that proceeded before Judge Sand.  There, the mitigation

6    materials were located abroad.  That related to an embassy

7    bombing that took place internationally.  So the conduct

8    alleged also took place abroad.  And in that case, the

9    defendant, and there are two defendants, were facing the death

10   penalty, and that case proceeded to trial 15 months after those

11   defendants were arrested.

12          We noted as well in the *Tsarnaev* case from

13   Massachusetts where there were also mitigation materials

14   located abroad, that case proceeded to trial 21 months after

15   the defendant was arrested.

16          THE COURT:  Go ahead.

17          MS. HOULE:  As I noted, your Honor, in the cases

18   highlighted by the defense, the conduct alleged in those cases,

19   some of it was alleged to have taken place over seven years, 11

20   years.  We don't think that those are apt comparators to the

21   case here.

22          Moreover, in the majority of those cases, your Honor,

23   there was a delay of anywhere from two to four years between

24   the time when the case was charged and a decision was made

25   about whether or not the government would seek the death

penalty.  The only exception to that in the cases highlighted
by the defense is the *Quinones* case before Judge Rakoff.  And
as your Honor is aware, there were delays in that case because
the issue of whether or not the government could proceed on its
intention to seek the death penalty was then litigated for over
a year in the district court and then in the Second Circuit.

But at bottom here, your Honor, the circumstance of
having two to four years of time lapse before the government
makes a decision on whether or not to seek the death penalty is
not anticipated here.  As we said, we anticipate a resolution
of this process by September.

I'd note as well, your Honor, in each of the cases
cited by the defense, there was motion practice before the
capital case process was resolved, which led to then one or two
rounds of additional motion practice after resolution of the
capital case process.  Here, the government has agreed with
defense to refrain from motion practice for the eight months
already that this case has been pending for the specific reason
that we hope to proceed efficiently and expeditiously towards
trial once the capital case process is resolved.

We've highlighted for your Honor, again, the *Tsarnaev*
case in Massachusetts, the *Roof* case in South Carolina, the
*Mohammed* case in this district as the comparators that we think
are most appropriate for the reasons set out in our letters,
including that those cases largely related to single-incident

1   allegations.  And for *Tsarnaev* and *Roof*, it was a single

2   defendant.

3         But we think, sort of putting aside the comparisons,

4   your Honor, the facts here and the circumstances of this case

5   and the manner in which this case has been proceeding

6   efficiently show that an April trial date is appropriate here.

7   We've met all the deadlines that your Honor has set and all the

8   expectations that we've set in terms of production of

9   materials.  We have tried to be responsive to any requests from

10  the defense.  And, again, the allegations here relate to a

11  single incident and a single defendant.  We think all of that

12  governs toward an April trial date being appropriate here.

13        THE COURT:  OK.  Thank you.

14        Mr. Patton or who?  Mr. Patton.

15        MR. PATTON:  Your Honor, I'll just say, to begin with,

16  the government's remarks that the capital process and setting

17  of a trial date are two separate matters, I just think is not

18  quite accurate.  I continue to suggest to the Court that

19  setting a trial date before we have an answer on whether or not

20  the government is seeking the death penalty is premature

21  because so much of how this case will be handled depends on

22  that decision.

23        THE COURT:  But I guess what I don't understand,

24  Mr. Patton, is why is the mere fact that I set a trial date,

25  how does that impact -- again, assuming that I don't set it in

I6MHSaiC

a time period that's shorter than any of the parties have even

posited -- how does that impact what you and your colleagues

are doing with regard to the consideration of the death penalty

or with regard to preparing for trial?

          MR. PATTON:  Because our request to the Court would be

to hold off on setting a trial date until resolution of

pretrial motions, and those motions depend almost entirely on

the government's decision whether or not to seek.  There are

going to be significant challenges that I suppose I would

describe as broader challenges to the federal death penalty.

Case law has evolved over time.  We think there are a lot of

issues that are not foreclosed even though they may have been

raised long ago, and there are issues specific to this case

with respect to the death penalty.

          We'd like an opportunity to flesh those out before

scheduling the trial because the briefing of those motions and

I think the Court is going to require some time to weigh those

motions and to make those decisions, I assume it will probably

also involve some argument, until we have resolution of those,

it's hard for us to know how to focus our trial preparation and

just how time-consuming that preparation is going to be.

          We've obviously tried our best to keep the Court

informed about all that is involved in putting together a

mitigation case in the event that the death penalty is sought.

As your Honor noted, there is a distinguishing factor here

1    between this case and many others, which is not just that

2    there's overseas investigation, but where that overseas

3    investigation is specifically in a very difficult location,

4    both just to get to logistically and also to navigate once

5    we're there.  Even domestically mitigation investigation is

6    far-flung because of Mr. Saipov's various locations.

7           So there's an awful lot to be done in this case.  We

8    don't think that there is prejudice in holding off until we

9    resolve the pretrial motions phase, when we'll have a much

10   better idea of the length and scope of a trial, if there is to

11   be any trial at all.

12          THE COURT:  I recognize that, but for purposes of

13   several fold, number one, notifying potential witnesses of what

14   time period they should block out.  And, in particular, my

15   concern would be, quite frankly, with regard to the experts

16   because, at least in my experience -- and I'm not talking about

17   death penalty cases, but just experts in general -- their

18   calendars fill up fairly quickly.  And were I to wait until I

19   resolved the pretrial motions, I fear what that would do is it

20   would push out -- because I suspect there would be issues with

21   regard to the calendars of the experts and perhaps even counsel

22   here with regard to their calendars filling up because they've

23   got trials that have been scheduled in other matters, which

24   would push this case even further out.

25          So I understand what you're saying.  It just seems to

1  me that with an appropriate date that gives sufficient time, I

2  hope, for the parties to take care of what they need to take

3  care of, for me to make the rulings -- again, obviously, if the

4  government chooses not to seek the death penalty, I can easily

5  modify that schedule.

6          Let me just make one thing clear, because there's been

7  back and forth, there have been letters that have indicated

8  what may or may not happen if the government does not seek the

9  death penalty.  The decision about whether or not to go to

10  trial is going to be made by Mr. Saipov, and it's Mr. Saipov's

11  decision.  And it's not a decision -- and I understand counsel

12  may be in communications with the government, but it's not a

13  decision that necessarily has to be made at this juncture, and

14  I'm not in any way requiring that any such decision be made.

15  So regardless of whether or not the government seeks the death

16  penalty or doesn't, Mr. Saipov would still be entitled to go to

17  trial.

18          Now, any date I set, if the government chooses not to

19  seek the death penalty, I may actually accelerate.  In other

20  words, it will be a shorter time frame than what I'm thinking

21  about, but I just wanted to be clear on that issue.  The

22  decision is Mr. Saipov's, and the fact that the parties may

23  have exchanged materials is irrelevant to my consideration

24  about when Mr. Saipov has to make that decision about pleading

25  guilty.

I6MHSaiC

1          I'm sorry, Mr. Patton, I interrupted you.  I fully

2     intend -- well, let me ask you, do you have anything further

3     with regard to the trial date issue?

4               MR. PATTON:  Just two things.

5               THE COURT:  Yes.

6               MR. PATTON:  There is significant discovery in this

7     case.  We have continued to receive it.  I think, just in the

8     past week or two, on the order of 1,500 pages translations.

9     I'm sure the government is working in good faith to get us what

10    they have and what they think they're going to produce, but

11    there are always, as we all know, additional discovery that

12    come down the pike.  So we have a lot of discovery.  It's

13    entirely possible, even though at this time the government

14    thinks it's made its production, they thought they had made

15    their production the last time when we met, by and large, and

16    yet we've continued to receive a significant amount.  I'm not

17    casting blame.  I'm just suggesting there's a fair amount of

18    volume.

19         It's entirely possible we'll continue to get

20    significant volume in this case.  Our own investigation

21    involves a lot of material that is not in English, that is not

22    easily translated all the time.  It depends on what language it

23    is.  But we're dealing with a lot of different languages.  So I

24    would just say that there is an additional factor in terms of

25    volume of discovery.

1          In terms of blocking -- having sufficient time to

2     block out for experts, for anyone who needs to schedule time

3     surrounding the trial, I'm certainly not suggesting that we

4     would come to you after the motions briefing and ask for a

5     quick trial date.  I think for all the reasons that we need

6     time to prepare, there would still be plenty of notice.

7     Assuming motions got resolved in the next six to nine months,

8     somewhere on that order, there would still be plenty of time to

9     set a trial date out in the future, but with a much better idea

10    of what will be required at trial.

11          THE COURT:  All right.  Thank you.

12          Yes, Ms. Houle.

13          MS. HOULE:  Just a few points, your Honor.  With

14    regard to your Honor's point about the scheduling of experts,

15    the government agrees and appreciates that point.  I would just

16    note as well that many of the witnesses who are the surviving

17    victims of this attack are located outside the United States,

18    and so we believe that they as well need sufficient notice to

19    make sure that they can be available to travel to the United

20    States and spend sufficient time here for trial.

21          Your Honor, in regard to the comments made regarding

22    the translations that were recently produced, I just want to

23    clarify a bit the comment about 1,500 pages.  I'm not saying

24    that that's inaccurate, but to be clear, the translations are

25    produced in a format that's essentially a chart.  And so there

1    are several columns, and it is not sort of 1,500 pages of dense

2    text.  And the government has provided these translations in an

3    effort to be helpful to the defense and to ensure that we can

4    proceed quickly to trial, and so we would hate to have that

5    fact prejudice us in seeking a trial date.

6              THE COURT:  OK.  No, let me just state, if there's

7    material the government believes that it conceivably could use

8    that requires translation, doing those translations sooner

9    rather than later, obviously, makes sense.  So I'm not faulting

10   anyone for that.  And I do understand that does take time for

11   those materials to be translated, and there may be materials,

12   quite frankly, that the defense is going to translate that the

13   government has no interest in for one reason or another.

14             But having said that, I do think it does make sense to

15   set a trial date.  And while, Mr. Patton, I appreciate that

16   there will be time once I decide the various motions to set it

17   down, my fear is that when we get to that juncture and I ask

18   counsel -- and, obviously, what we're going to have is a

19   conflict with many different schedules.  Even in a normal case

20   where I'm just -- with or without experts, it takes time to

21   actually figure out where people's schedules are, so I want to

22   give everyone a date certain.  And I'm probably the last one,

23   but I also like to, quite frankly, put it in my calendar

24   because, obviously, as a criminal matter, this takes precedence

25   over any other matter that I would have.

1           So I plan on starting jury selection -- and we could

2   talk about this, what this means -- but October 7 of 2019.  So

3   it is not as soon as the government has requested, but it is in

4   the range of what the defense has requested.  And I think it

5   builds in sufficient time for whatever motion practice to occur

6   and for decisions to be made and for the parties to notify the

7   respective experts, in particular, but witnesses in general of

8   when that would be.

9           Now, I do think it's premature to discuss sort of

10  exactly what jury selection would look like, but I'm going to

11  notify, or have my deputy notify, the jury department that

12  we're looking to try and start the trial on Monday, October 7,

13  OK?

14          I think, Mr. Saipov, you first speak with your lawyer

15  and then --

16          THE DEFENDANT:  (In English) OK.

17          THE COURT:  Because if you have questions, speak with

18  your lawyer, then they can relay the questions to me, OK?

19          THE DEFENDANT:  (In English) All right.

20          (Counsel conferred with defendant)

21          THE COURT:  Mr. Patton, if you do need some additional

22  time, just let me know, and we can just take a brief break.

23          Why don't we do that.  It's about 4:20 right now.  Why

24  don't we come back in ten minutes.  I'd like to give you the

25  opportunity to speak with your client.  So we'll come back at

I6MHSaiC

1      4:30, OK?  We stand adjourned for now.

2                  (Recess)

3                  THE COURT:  Mr. Patton.

4                  MR. PATTON:  Your Honor, Mr. Saipov would like to very

5      briefly address the Court.

6                  THE COURT:  All right.  Utilizing the services of the

7      interpreter?

8                  MR. PATTON:  Yes, your Honor.

9                  THE COURT:  OK.  Go ahead, Mr. Saipov.

10                 THE DEFENDANT:  (In English) Are you on this?

11                 (Through the interpreter) First of all, I would like

12     to start speaking by addressing to the creator of the heavens

13     and earth and all the living animals and souls between them.

14     Then, of course, I would like to say to be grateful to the

15     Prophet Muhammad before I speak.

16                 So I have sat here and listened to the court and I've

17     participated in other courts before, and I say upon Allah, I

18     have to say that I didn't hear any meaning in these

19     conversations.  And the reason is because I didn't -- there

20     isn't a judgment of Allah here because Allah knows what -- how

21     these -- his creations should behave and what they should do.

22     That's what Allah knows.

23                 So the judgments that are made by them here, they're

24     not important for me because they don't know -- these are the

25     judgments of the living things, and they are not Allah's

1    judgments, and they're making them of their weak minds.  These

2    are judgments they're coming to.

3            MS. HOULE:  Your Honor, may I just briefly?

4            THE COURT:  Yes.

5            MS. HOULE:  If you could just advise the defendant

6    before he proceeds further that any statements he makes can be

7    used against him.

8            THE COURT:  Sure.  So, Mr. Saipov, and I'm sure your

9    attorneys have indicated this, you have no obligation to say

10   anything here.  And, in fact, you have a right to remain

11   silent.  You have a right to say nothing.  However, when you do

12   speak, however, regardless of how you may view these

13   proceedings, when you do speak, anything you say can be used by

14   the government, if it should choose to do so, in its case

15   against you.

16           THE DEFENDANT:  I understand.  I understand you, but

17   I'm not worried about this at all.

18           THE COURT:  OK.  All right.

19           THE DEFENDANT:  So thereafter in the Quran, Allah said

20   that you can be in fear to everybody else, but be faithful to

21   me.  This is written in the *ayat*.  And this is the weak minds.

22           So what is someone that can tell you?  The *taghut* is

23   this that says that these are the laws that are made up to --

24   to force upon other people.  So I would like to be brief, and

25   so the Islamic State, in order to impose *sharia* on earth, is

1  leading a war.  So the Islamic State is not fighting for land

2  like some say, or like some say for oil.  They have one

3  purpose, and they're fighting to impose *sharia* on earth.

4          MR. BEATY:  Excuse me, your Honor, if I may?

5          THE COURT:  Yes.

6          MR. BEATY:  We're here discussing a trial date.  This

7  is not an appropriate forum for a defendant --

8          THE COURT:  I'll allow the defendant to finish.  My

9  understanding from the body language is that he just has a

10  little bit more, and then we'll finish with the conference.

11          MR. BEATY:  OK.  Your Honor, I will just note that the

12  SAMs imposed limitations on the defendant's ability to

13  communicate with the media, in particular to limit his ability

14  to discuss terrorist propaganda.  Given the direction that his

15  comments are going, I just wanted to bring that to the Court's

16  attention and indicate our concern.

17          THE COURT:  I understand that.  Well, I understand

18  that.

19          Go ahead.

20          THE DEFENDANT:  Today I will speak briefly, if I am to

21  continue.  And at the end of my statement, I will thank Allah

22  and I will thank the Prophet, and then I will say more

23  statements in the future court.

24          And I wanted to express my gratitude to the judge

25  here.  I don't admit -- I don't accept this as my judge because

1    this is -- I know the judge as *taghut*.  I express my gratitude

2    to you for letting me speak.

3              THE COURT:  Thank you, Mr. Saipov.

4              Just to be clear on something, Mr. Saipov, I did give

5    you an opportunity to speak today.  I did not know what you

6    were going to say.  Obviously, your statements, as I indicated,

7    were your own and made voluntarily, but I'll emphasize again,

8    number one, that -- I'm sorry.

9              I'll go back.  I gave you an opportunity to speak

10   today, in part, because I was unaware of exactly what you

11   wanted to say, and I've allowed you to complete your statement

12   today.  And I've indicated to you you're under no obligation to

13   say anything.  Even if you made a statement today, you're under

14   no obligation to make any statements in the future.  But to be

15   clear, in the future your lawyers are here to provide you legal

16   representation, and you can talk through them, and they can

17   communicate with me the matters that they deem appropriate and

18   related to this case.

19              There will be a time, if you choose to do so, when you

20   will be entitled to take the witness stand in your own defense,

21   and I'm not saying you have to at all, but where you'll have an

22   opportunity to do that if you choose to do so.  After

23   communicating with your lawyers, you'll be entitled to do that.

24   But it's unlikely I'm going to give you any opportunities in

25   the future to make statements that aren't specifically related

I6MHSaiC

1    to the case and unless they're through your attorneys, OK?

2              All right.  So we've got a trial date of October 7th.

3    Is there anything else that we need to deal with today?

4              MS. HOULE:  Your Honor, at the last conference your

5    Honor indicated that you would set a motion schedule for

6    October 1, assuming that the capital case process was resolved

7    in September.  We just wanted to confirm that the October 1

8    motion deadline stands?

9              THE COURT:  It would, but I guess the question is,

10   although I have an understanding of some of the motions that

11   might be made, I don't, obviously, know the extent of all the

12   motions.  So I'll leave it to the parties to meet and confer

13   about that, and if there's a logical sequencing of how those

14   motions should proceed, I'd leave it to the parties to come up

15   with that.  Obviously, any discussion you have is preliminary,

16   and it would not preclude the defense from making any

17   additional motion should they believe they are appropriate.

18             Yes, Mr. Patton.

19             MR. PATTON:  Your Honor, as a general matter, and I'm

20   happy to take up the Court's suggestion that we talk about this

21   with the government, but I would ask, or perhaps I'll say we

22   will ask, I think, for 60 days from the time that we get

23   notice.  So if we receive early -- if we were to receive notice

24   in early September, that would be perhaps early November.  Part

25   of the motions practice will depend on what the factors are

1   that the Department of Justice cites in its authorization.

2           THE COURT:  Look, I think that allowing 60 days for

3   the defense to prepare the motions after the government -- and,

4   again, to the extent the government does seek the death

5   penalty, I'll allow the 60 days from the date of that decision

6   for the motions to be made, yes.

7           MS. HOULE:  Understood.  Thank you, your Honor.

8           THE COURT:  All right.  OK.  Anything else?

9           MS. HOULE:  Your Honor, unless the defense has

10  anything else to raise, we'll just turn to the exclusion of

11  time.

12          THE COURT:  Yes.  So I'll exclude the time between now

13  and the trial date, which is October 7 of 2019, from the time

14  within which trial would have to begin in this case, and I find

15  that that exclusion of time outweighs the interest of the

16  public and Mr. Saipov in a speedy trial.  That time is being

17  excluded to allow time for the capital process to complete,

18  allow the defense to consider what motions should be made, and

19  the motions to be made and for trial preparation.  OK.

20          MS. HOULE:  Thank you, your Honor.  If you could just

21  inquire as to whether the defense objects to the exclusion of

22  time.

23          MR. PATTON:  We do not object, Judge.

24          THE COURT:  All right.

25          MS. HOULE:  Thank you, your Honor.

I6MHSaiC

1              THE COURT:  Anything else?

2              MR. PATTON:  No, your Honor.

3              MS. HOULE:  No, your Honor.

4              THE COURT:  All right.  Thank you very much.  We'll

5    stand adjourned.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25