UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                           :

UNITED STATES OF AMERICA      :
                           :

                           :

       -against-           :

                           :

SAYFULLO HABIBULLAEVIC SAIPOV,  :

                           :

        Defendant.       :

                           :

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___7/11/2019___

17-CR-722 (VSB)

**OPINION & ORDER**

**VERNON S. BRODERICK, United States District Judge:**

       Defendant Sayfullo Habibullaevic Saipov is charged in a twenty-eight count superseding indictment, filed on June 19, 2018 ("Indictment"). The Indictment charges Saipov with, among other offenses, murder and attempted murder in aid of racketeering and provision of material support to a designated foreign terrorist organization, arising out of an attack in New York City on October 31, 2017. During that attack, Saipov—purportedly acting on behalf of the Islamic State of Iraq and al-Sham ("ISIS")—allegedly drove a flatbed truck onto a cycling and pedestrian pathway on the west side of lower Manhattan, resulting in eight fatalities and many more individuals injured. (Doc. 61.) Currently before me is Saipov's motion to suppress all evidence obtained from searches of his two cellular phones, which law enforcement recovered from the truck Saipov allegedly used to carry out the attack. (Doc. 92.) Because I find that the challenged search warrant was both supported by probable cause and sufficiently particularized, Saipov's motion to suppress is DENIED.

# I.  Factual Background and Procedural History

Hours after the October 31, 2017 attack, the Government submitted a search warrant application for two cellular phones (the "Cell Phones" or the "Subject Devices") recovered from the flatbed rental truck used in the attack.  (Saipov Br. Ex. A.)[1]  In support of its application, the Government submitted an affidavit by Special Agent Amber Tyree ("Tyree Affidavit" or "Tyree Aff.")[2] of the Federal Bureau of Investigation ("FBI"), who has investigated terrorism offenses on behalf of the FBI since 2009.  (Tyree Aff. ¶ 1.)  As a Special Agent working in the field of counterterrorism, Tyree is responsible for investigating acts of terrorism and related offenses, including the provision of material support to terrorists and to designated foreign terrorist organizations ("FTOs"), and the commission of acts of terrorism transcending national boundaries.  (*Id.*)

## A.    *The Tyree Affidavit*

The Tyree Affidavit sets forth facts related to the attack to establish probable cause for the search warrant.  According to the Tyree Affidavit, at approximately 3:00 p.m. on October 31, 2017, a flatbed rental truck traveled from New Jersey to New York City over the George Washington Bridge.  (Tyree Aff. ¶ 8(a).)  The truck proceeded southbound on the West Side Highway and, in the vicinity of Houston Street, drove onto a cycling and pedestrian pathway where it proceeded several blocks further south, striking numerous people who were walking along the pathway.  (*Id.* ¶ 8(b).)  Once the truck came to a stop in the vicinity of West Street and Chambers Street, an individual subsequently identified as Defendant Saipov got out of the

---

[1] "Saipov Br." refers to Defendant Sayfullo Saipov's Motion to Suppress Evidence, filed December 14, 2018.  (Doc. 92.)

[2] "Tyree Affidavit" refers to the Agent Affidavit in Support of Application for Search Warrant, signed by Special Agent Amber Tyree on October 31, 2017.  (Doc. 92-1.)

vehicle, carrying two objects in his hands that appeared to be firearms (but which were later determined to be a pellet gun and a paintball gun). (*Id.* ¶¶ 8(b)–(d).) Saipov shouted the phrase, "Allahu Akbar," an Arabic phrase that translates to "God is Great." (*Id.* ¶ 8(c).) He was immediately shot by a law enforcement officer and taken into police custody. (*Id.* ¶ 8(d).)

When officers searched the rental truck and the surrounding area, they recovered two cellular phones from the floor of the truck, near the driver's seat. (*Id.*) Both Cell Phones possessed "smartphone" capabilities, including the capacity to access websites, as well as email and social media accounts. (*Id.* ¶ 5.) One of the two Cell Phones was ringing at the time it was recovered. (*Id.* ¶ 8(d).) Outside the vehicle, officers recovered a document containing Arabic text that translates, "No God but God and Muhammad is his Prophet," and "Islamic Supplication. It will endure." (*Id.* ¶¶ 8(d), 9.) Special Agent Tyree explained that, based on her "training and experience," this language is commonly used to refer to ISIS. (*Id.* ¶ 9.)

The Tyree Affidavit also provides information regarding ISIS's recruitment and promotional tactics, including its use of propaganda to inspire followers to commit acts of violence—in particular, attacks using vehicles as weapons to "maximize the 'kill count' and terror." (*Id.* ¶ 12.) The Tyree Affidavit includes further observations—based on Special Agent Tyree's training and experience—linking the Cell Phones to Saipov's attack. (*Id.* ¶¶ 12–15.) For example, "the behavior displayed by Saipov during this attack is consistent with someone who may have been motivated or inspired by social media postings or through direct contact with others on social media to commit acts of violence for the purpose of committing a terrorist attack on behalf of ISIS." (*Id.* ¶ 13.) Special Agent Tyree also noted that "those committing or attempting to commit the Subject Offenses often use cellular telephones such as the Subject Devices," and opined that the Cell Phones likely contained information relating to the Subject

Offenses,[3] including, among other things, contact information of co-conspirators, voicemail messages and other communications from co-conspirators, and digital photographs and videos distributed by ISIS. (*Id.* ¶¶ 14–15.)

### B. *The Search Warrant*

At 10:05 p.m. on October 31, 2017, Magistrate Judge Barbara C. Moses issued a search warrant (the "Search Warrant" or "Warrant") authorizing the seizure and search of Saipov's Cell Phones. (Saipov Br. Ex. B, at 000061.) The Warrant lists the statutory provisions that Saipov is alleged to have violated, (*id.*), and Attachment A to the Warrant identifies with particularity the two Cell Phones to be searched, along with parameters for reviewing electronically stored information ("ESI") recovered from those devices. (*Id.* at 000063–65.) More specifically, the Warrant authorizes law enforcement personnel to search the Cell Phones for "evidence, fruits, and instrumentalities" of the alleged offenses by reviewing eleven specified categories of information:

1. The phone number associated with the Subject Devices, as well as call log information of phone numbers of incoming and outgoing, and missed or unanswered calls to and from the Subject Devices;

2. Address books and contact lists stored on the Subject Devices or its memory card(s);

3. Voicemail messages, opened or unopened, related to the Subject Offenses;

---

[3] The Tyree Affidavit and Attachment A to the Search Warrant define "Subject Offenses" as violations of

Title 18, United States Code, Sections 2339A (providing, attempting to provide, and conspiring to provide material support to terrorists); 2239B (providing, attempting to provide, and conspiring to provide material support to a designated foreign terrorist organization); 2332b (acts of terrorism transcending national boundaries); and 33 (destruction of motor vehicle with intent to endanger safety of person).

(Tyree Aff. ¶ 6; Saipov Br. Ex. B, at 000063.) The Bates numbers used to identify the pages of Saipov Br. Ex. B appear in the bottom righthand corner of each page of the exhibit.

4. Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Devices;

5. Evidence concerning the identity and/or location of the individual(s) involved in the commission of the Subject Offenses;

6. Evidence of communications among, or concerning, participants in or witnesses to the commission of the Subject Offenses;

7. Contact information of co-conspirators and witnesses to the commission of the Subject Offenses, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts;

8. Text, data, "chats," MMS ("Multimedia Messaging Service") messages, SMS ("Short Message Service") messages, FaceTime messages, and e-mail messages, any attachments to those messages, such as digital photographs and videos, and any associated information, such as the phone number or e-mail address from which the message was sent, pertaining to the Subject Offenses;

9. Digital photographs and videos related to the commission of the Subject Offenses;

10. Browsing history, websites visited, and internet searches conducted on the Subject Devices; and

11. Any Global Positioning Satellite ("GPS") entries, Internet Protocol connections, and location entries to include Cell Tower and WiFi entries.

(*Id.*)  The Warrant also specifies techniques that law enforcement might use to determine which files contain evidence of the Subject Offenses, including "conducting a file-by-file review by 'opening' or reading the first few 'pages' of such files in order to determine their precise contents," and performing "electronic keyword searches."  (*Id.* at 000065.)  While the Warrant instructs law enforcement agents to "make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant," the Warrant provides that, "[d]epending on the circumstances, . . . law enforcement may need to conduct a complete review of all the ESI from the Subject Device to locate all data responsive to the warrant."  (*Id.*)

The FBI's subsequent search of Saipov's Cell Phones uncovered evidence that Saipov viewed and stored thousands of images of ISIS propaganda on the Cell Phones, including calls to commit attacks in the United States using cars and trucks as weapons. (*See* Gov't Opp'n 35.)[4]

## II.    Procedural History

Saipov filed the instant motion seeking to suppress all evidence obtained from his Cell Phones on December 14, 2018. (Doc. 92.) The Government filed its opposition, (Doc. 121), along with supporting declarations, (Docs. 122–23), on February 15, 2019.[5] Saipov filed his reply on March 8, 2019. (Doc. 133.)

## III.    Discussion

Saipov challenges the validity of the Search Warrant on the grounds that the Warrant was not support by probable cause and that the Search Warrant amounts to a general warrant which lacks the requisite particularity. In opposition, the Government argues that the Search Warrant complies with the Fourth Amendment or, in the alternative, that even if the Search Warrant were deficient, the good faith exception would preclude suppression. I address these arguments in turn below.

### A.    *Probable Cause*

With regard to Saipov's argument that the Search Warrant was not supported by probable cause, I find that the warrant application and accompanying affidavit set forth sufficient

---

[4] "Gov't Opp'n" refers to the Government's Omnibus Response to the Defendant's Motions dated December 14, 2018, filed February 15, 2019. (Doc. 121.)

[5] The Government's opposition responds to several motions filed by Saipov on the same date, including a motion to suppress Saipov's post-arrest statements and various challenges to the Government's notice of intent to seek the death penalty. (*See* Docs. 97, 99, 101, 103.) The parties have agreed that Saipov's motion to suppress his post-arrest statements cannot be resolved without an evidentiary hearing, which will be scheduled after the parties have fully briefed Saipov's related Motion to Compel Notice and Discovery of Government Surveillance. (*See* Doc. 178.) I will issue a decision relating to Saipov's death penalty challenges in the coming months.

information suggesting that Saipov's Cell Phones likely contained evidence of a crime to justify the issuance of the Warrant.

## 1. Applicable Law

The Fourth Amendment guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether probable cause exists to support the issuance of a warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The experience of the law enforcement agents involved in preparing the warrant application is particularly relevant to the analysis, as "experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004); *see also United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("A number of cases have ruled that an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application."). Ultimately, the probable cause determination is a "flexible common-sense" inquiry based on the totality of the circumstances. *Texas v. Brown*, 460 U.S. 730, 742 (1983).

In reviewing a magistrate judge's probable cause determination, reviewing courts must give "great deference" to the magistrate's findings. *Gates*, 462 U.S. at 236 (internal quotation marks omitted); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely

determined by the preference to be accorded to warrants."). "[S]o long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

### 2. Application

Saipov asserts that the warrant application depends entirely on a "faulty syllogism" relating to the ubiquitous nature of cellphone usage—"that Mr. Saipov is engaged in crime so, like individuals engaged in any other kind of activity, he must have used his phones to engage in that activity." (Saipov Br. 9 (internal quotation marks omitted).) Saipov's assertion is overly simplistic, ignores many of the facts set forth in the Tyree Affidavit, and does not view the supporting evidence as a whole. In any event, Saipov's acknowledgement that "everyone uses phones for everything," (*id.*), does provide some support for the common-sense inference that, given the importance of cellular phones in daily life, Saipov may well have used his Cell Phones to collect and save important information, including information related to his criminal acts. However, the integration of cell phones into the lives of their users is just one of many factors which, taken together, establish a "fair probability" that Saipov's Cell Phones contained evidence of his crimes. The Government points to numerous additional facts and circumstances surrounding Saipov's alleged offenses and arrest that suggest that evidence of criminal activity— here, activity specifically related to terrorism—would be found on the Cell Phones. First, the Cell Phones were apparently among the few items found inside the rental truck that Saipov used to carry out his attack—an incredibly violent act that resulted in eight deaths and numerous injuries. (Tyree Aff. ¶ 8(d).) The logical inference, then, is that Saipov decided to keep the Cell Phones close to him while he committed the charged crimes. One of the phones was also ringing

at the time it was recovered by law enforcement mere minutes after the attack, (*id.*), supporting the reasonable inference and possibility that a co-conspirator may have been trying to reach Saipov in connection with the crimes he had just committed.

In addition, and more importantly, the Tyree Affidavit identifies material evidence uncovered at the scene of the attack linking Saipov to ISIS, a designated FTO that routinely transmits propaganda to its supporters over social media and the Internet. (*See id.* ¶¶ 7, 12.) First, as Saipov got out of the rental truck holding two objects that resembled firearms, he was heard shouting "Allahu Akbar." (*Id.* ¶ 8(c)–(d).) Second, a few feet away from the truck, law enforcement officers recovered a document containing Arabic text that translates as "Islamic Supplication. It will endure," a phrase commonly associated with ISIS. (*Id.* ¶¶ 8(d), 9.) In addition, Saipov's mode of attack—using a motor vehicle as a weapon to attack a crowded pedestrian thoroughfare—is consistent with the instructions that ISIS has provided for carrying out acts of terrorism. (*Id.* ¶ 12.)

Given that Saipov's attack bore many of the hallmarks of an ISIS attack, Special Agent Tyree's observations based on her counterterrorism training and experience are particularly probative. *See Gaskin*, 364 F.3d at 456–57 (noting that courts are entitled to give weight to the experience of law enforcement officers in evaluating whether a warrant application is supported by probable cause). As of October 2017, Special Agent Tyree had eight years of experience working for the FBI in the field of counterterrorism, including investigating offenses involving the provision of material support to terrorists and designated FTOs. (Tyree Aff. ¶ 1.) The Tyree Affidavit includes several statements regarding ISIS's indoctrination tactics and its use of social media to spread propaganda. Tyree noted, for instance, that Saipov's behavior during the attack appeared to be "consistent with someone who may have been motivated or inspired by social

media postings or through direct contact with others on social media to commit acts of violence for the purpose of committing a terrorist attack on behalf of ISIS." (*Id.* ¶ 13.) She also commented that, based on her "training and experience," individuals who commit the same offenses with which Saipov is charged often "store records relating to their illegal activity and to any persons involved with them in that activity on electronic devices such as the Subject Devices." (*Id.* ¶ 15.) She further elaborated on the categories of relevant records likely to be found on Saipov's Cell Phones, including "logs of online 'chats' with co-conspirators"; "contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts"; and "records of transactions in furtherance of the Subject Offenses (including, for instance, . . . truck rental information)." (*Id.*)

Considering all of the information set forth in the Tyree Affidavit—including, in particular, Special Agent Tyree's observations based on her extensive counterterrorism training and experience—I find that there was ample justification to support Magistrate Judge Moses's probable cause determination.

## B.  *Particularity*

Saipov next argues that the Search Warrant lacked particularity because it failed to sufficiently cabin the categories of ESI to be seized and searched and did not contain a temporal limitation. Once again, I disagree.

### 1.  Applicable Law

The Fourth Amendment requires, among other things, that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009) ("A warrant . . . can be unconstitutionally infirm in two conceptually distinct but related ways: either by seeking

specific material as to which no probable cause exists, or by giving so vague a description of the material sought as to impose no meaningful boundaries.").  The particularity requirement "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized."  *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990); *see also United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) ("Particularity concerns frequently arise in circumstances where the description in the warrant of the place to be searched is so vague that it fails reasonably to alert executing officers to the limits of their search authority[.]").  "To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements."  *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017).  The warrant must:  (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to designated crimes."  *Id.* (internal quotation marks omitted).

The level of specificity required by the Fourth Amendment depends on many factors, *United States v. Jacobson*, 4 F. Supp. 3d 515, 522 (E.D.N.Y. 2014), and courts do not demand "a perfect description of the data to be searched and seized," *Ulbricht*, 858 F.3d at 100.  Indeed, "[s]earch warrants covering digital data may contain some ambiguity."  *Id.* (internal quotation marks omitted); *see also United States v. Galpin*, 720 F.3d 436, 336 (2d Cir. 2013) ("[C]ourts may tolerate some ambiguity in the warrant so long as law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to uncover, and have insured that all those facts were included in the warrant." (internal quotation marks omitted)).  In other words, "a search warrant does not necessarily lack particularity simply because it is broad."  *Ulbricht*, 858 F.3d at 100.  The particularity requirement is satisfied if the warrant enables the executing officer

to ascertain and identify with reasonable certainty those items that the magistrate judge has authorized him or her to seize. *See United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992).

## 2. Application

I find that the Search Warrant—which identified the Subject Offenses, the places to be searched, and the items to be seized—was sufficiently particularized. *See Ulbricht*, 858 F.3d at 101 (observing that "the warrant plainly satisfie[d] the basic elements of the particularity requirement" where it "list[ed] the charged crimes, describe[d] the place to be searched, and designate[d] the information to be seized in connection with the specified offenses").

In his opening brief, Saipov asserted that the Search Warrant did not define the "Subject Offenses." (Saipov. Br. 12.) However, after the Government identified in its opposition where those definitions appear in the Warrant, Saipov conceded in his reply papers that the Warrant does in fact identify each of the statutory provisions that Saipov is accused of violating. (*See* Reply Br. 9 n.3;[6] Saipov Br. Ex. B, at 000061 (referencing "violation(s)" of "Title 18, United States Code, Sections 2339A, 2339B, 2332b, and 33"), 000063 (authorizing law enforcement personnel to search the Cell Phones "for the following evidence, fruits, and instrumentalities of violations [of] Title 18, United States Code, Sections 2339A (providing material support to terrorists); 2339B (providing material support to designated foreign terrorist organization); 2332(b) (acts of terrorism transcending national boundaries); and 33 (destruction of motor vehicle with intent to endanger safety of person)").)[7] The Search Warrant also identifies the property to be searched as Saipov's two Cell Phones. (Saipov Br. Ex. B, at 000063.)

---

[6] "Reply Br." refers to Mr. Saipov's Reply to the Government's Omnibus Opposition to his December 14, 2018 Motions, filed March 8, 2019. (Doc. 133.)

[7] Not only does the Search Warrant clearly define the Subject Offenses, but many of the decisions on which Saipov relies in support of his other challenges to the Warrant's particularity involve search warrants that did not identify the crimes under investigation, thereby making those decisions inapplicable to warrants—like the warrant at issue here—that clearly identify the offenses for which the Government claims there is probable cause. *See, e.g.*, *In re*

Saipov next contends that the Search Warrant is overbroad because certain of the categories of information to be searched—which are set forth in Attachment A to the Warrant, (*Id.* at 000063–65)—are listed without any limitation. (Saipov Br. 12.) For instance, the Warrant permits the Government to review incoming and outgoing call logs, contact lists, and browsing history, without specifying that that information must pertain to the Subject Offenses. (Saipov Br. Ex. B, at 000064.) As an initial matter, Saipov ignores the descriptive paragraph that precedes the listed categories of ESI and can be read to limit the scope of the Government's review to information within those categories that relates to the Subject Offenses. (*Id.* at 000063.) However, even if Saipov is correct that certain of the enumerated categories of ESI do not include a specific reference to the charged crimes, Judge McMahon rejected a virtually identical argument that such phrasing rendered a search warrant insufficiently particularized in *United States v. Alston*, No. 15 CR. 435 (CM), 2016 WL 2609521 (S.D.N.Y. Apr. 29, 2016). Analyzing a similarly worded warrant, Judge McMahon explained that "[w]hile it certainly would have been clearer had each and every paragraph included a reference to the target offense, a warrant need not necessarily survive a hyper-technical sentence diagraming and comply with the best practices of *Strunk & White* to satisfy the particularity requirement." *Id.* at *4 (internal quotation marks omitted). Indeed, a logical reading of the Warrant in its entirety leads to the conclusion that it limits the search to information related to the Subject Offenses.

The Second Circuit also recently rejected a particularity challenge to a warrant describing the information to be seized from two cellular phones as "any and all" evidence relating to

---

*650 Fifth Ave. & Related Props.*, 830 F.3d 66, 100 (2d Cir. 2016) (noting that the "warrant should have listed the alleged offenses, but did not"); *Galpin*, 720 F.3d at 447 ("[I]nsofar as the warrant generally authorized officers to search [defendant]'s physical property and electronic equipment for evidence of violations of 'NYS Penal Law and or Federal Statutes,' the warrant violated the Fourth Amendment's particularity requirement."); *United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010) (finding that "the search warrant itself did not incorporate any supporting documents, or set forth the nature of the suspected criminal activity").

(1) telephone numbers; (2) caller identification information; (3) call log information; (4) recently

called numbers; (5) address information; (6) voicemails, text messages, emails, and photographs;

and (7) the content of "apps." *United States v. Romain*, 678 F. App'x 23, 26 (2d Cir. 2017)

(summary order). The Search Warrant here is more particularized than the warrant upheld in

*Romain*, which failed to define the relevant offenses at all. *See id.* at 25–26 (acknowledging that

the warrant itself did not "detail[] the relevant criminal offenses being investigated" but finding

that the omission did not require suppression, particularly in light of the fact that this information

was included in the accompanying affidavit). Moreover, it is evident that the categories of

information to be searched here are related to the offenses with which Saipov has been charged,

including providing material support to ISIS. As Special Agent Tyree explained in her affidavit,

ISIS followers may be "motivated or inspired" to commit acts of violence by "social media

postings or through direct contact with others on social media." (Tyree Aff. ¶ 13.) This

observation establishes that a review of Saipov's browser history, as well as his text and email

messages—among other information—would likely reveal evidence of the Subject Offenses.

This connection between the information to be searched and the underlying crimes distinguishes

the instant case from *United States v. Galpin*, in which the Second Circuit concluded that a

search warrant was overbroad where "nothing in the current record explain[ed] how the vast

majority of th[e] items [to be seized] could possibly reveal evidence" of the alleged child

pornography offenses. 720 F.3d at 450.

  In his reply brief, Saipov clarifies that his objection extends beyond the enumerated

categories of ESI to the fact that the Search Warrant contemplates that the entire contents of the

Cell Phones may be subject to search, allegedly rendering it a general warrant. (*See* Reply Br. 9;

Saipov Br. Ex. B, at 000065 (recognizing that "law enforcement may need to conduct a complete

review of all the ESI from the Subject Device to locate all data responsive to the warrant").)

Such an approach to searching electronic devices is unremarkable, and Saipov's criticisms "run[]

contrary to overwhelming authority permitting just such a procedure." *Alston*, 2016 WL

2609521, at *6 (rejecting argument that because "the extraction report . . . took all the

information off the [cellular] phone," it "amount[ed] to a general exploratory search").  As the

Second Circuit has explained, "the creation of mirror images [of electronic devices] for offsite

review is constitutionally permissible in most instances." *United States v. Ganias*, 755 F.3d 125,

135 (2d Cir. 2014); *see also In re Warrant for All Content & Other Info. Associated with the

Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc.*, 33 F.

Supp. 3d 386, 393 (S.D.N.Y. 2014), *as amended* (Aug. 7, 2014) ("We view it as well-established

that a search warrant can properly permit the Government to obtain access to electronic

information for purposes of a search even where the probable cause showing does not apply to

the entirety of the electronic information that is disclosed to the Government.").  As discussed in

further detail below, *see infra* Part III.C.2, I find that the Government acted in good faith in

executing the Warrant and reasonably determined that creating a mirror image of the Cell Phones

was the only feasible method of identifying responsive ESI.  Thus, I conclude that the fact that

the Search Warrant allows for the possibility that the entire contents of the Cell Phones might be

reviewed does not render the Warrant overbroad.

Finally, Saipov challenges the fact that the Search Warrant does not contain a temporal

limitation.  However, even the authorities on which Saipov relies acknowledge that the inclusion

of a date range is not a "universal requirement[]" for a valid warrant, *United States v. Wey*, 256

F. Supp. 3d 355, 381 (S.D.N.Y. 2017), but rather a limitation that should be included "when

possible," *United States v. Levy*, No. S5 11 Cr. 62(PAC), 2013 WL 664712, at *11 n.7 (S.D.N.Y.

Feb. 25, 2013), *aff'd*, 803 F.3d 120 (2d Cir. 2015). I find that the Government has satisfactorily demonstrated that the inclusion of a temporal limitation was not possible here. First, the Search Warrant was issued in the midst of a national security emergency, mere hours after a deadly terrorist attack ostensibly intended to cause mass casualties. It was unknown at that time whether the attack was an isolated incident or whether other attacks might be imminent. The Second Circuit has observed that where, as here, the Government is "under emergency pressures," a more "broadly worded warrant" is acceptable. *U.S. v. Bianco*, 998 F.2d 1112, 1115 (2d Cir. 1993), *abrogated on other grounds by Groh v. Ramirez*, 540 U.S. 551 (2004). In addition, the circumstances surrounding Saipov's offense render the inclusion of a date range impractical as it was entirely unclear at the time how long Saipov had been planning the attack or when he had become radicalized. Indeed, Saipov offers no suggestion of a date range that would have been appropriate under the circumstances and any attempt to identify one at the time the Search Warrant was issued would have been pure guesswork. In light of the "circumstance-specific considerations" present here, *Wey*, 256 F. Supp. 3d at 381, I find that the absence of a temporal limitation does not render the Search Warrant invalid.

Based on the foregoing, I find that the Search Warrant was sufficiently particularized to permit the Government to "ascertain and identify with reasonable certainty" those items that Magistrate Judge Moses had authorized the Government to search. *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992).

## C.   *Good Faith*

In the alternative, the Government argues that even if the Search Warrant were invalid, suppression would not be appropriate because the FBI's reliance on the Warrant was objectively reasonable.  I agree.

### 1.  Applicable Law

"The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies."  *Herring v. United States*, 555 U.S. 135, 140 (2009).  The Supreme Court has explained that application of the exclusionary rule has always been its "last resort," not its "first impulse."  *Id.*  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Id.* at 144.

Under the good faith exception, the exclusionary rule does not apply to "evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid."  *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).  "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant."  *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (internal quotation marks omitted).  "In assessing whether it has carried that burden," courts must be "mindful that, in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection."  *Id.*; *see also Leon*, 468 U.S. at 922 ("Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has

acted in good faith in conducting the search." (internal quotation marks omitted)).  As the

Second Circuit has explained:

> It was against this presumption of reasonableness that the Supreme Court identified
> four circumstances where an exception to the exclusionary rule would not apply:
> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing
> magistrate wholly abandoned his or her judicial role; (3) where the application is
> so lacking in indicia of probable cause as to render reliance upon it unreasonable;
> and (4) where the warrant is so facially deficient that reliance upon it is
> unreasonable.

*Clark*, 638 F.3d at 100 (citing *Leon*, 468 U.S. at 923) (internal quotation marks omitted).  The

critical question is "whether a reasonably well trained officer would have known that the search

was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 922 n.23.

## 2.  Application

Even if I were to determine that the Search Warrant were deficient in some respect, the

good faith exception would preclude suppression as none of the four factors set forth in *Leon* is

present here.

Saipov does not allege that Magistrate Judge Moses "abandoned her judicial role";

however, he does contend that she was "knowingly misled" by the Government because the

warrant application represented that law enforcement would make "reasonable efforts to restrict

their search to data falling within the categories of evidence specified in the warrant" but the

Government instead copied the entire contents of the Cell Phones.  (Reply Br. 12; Tyree Aff.

¶ 20.)  Here again, Saipov ignores the specific language of the Warrant issued by Magistrate

Judge Moses, which expressly contemplates the possibility that "law enforcement may need to

conduct a complete review of all the ESI from the Subject Device to locate all data responsive to

the warrant." (Saipov Br. Ex. B, at 000065.)  Furthermore, the Government has satisfactorily

demonstrated that law enforcement reasonably determined that there was no workable alternative

to creating a mirror image of Saipov's Cell Phones. While Saipov suggests that the Government might have limited its ESI review to keyword searches, (Saipov Br. 15), the Government points out that (1) many of the relevant files were captured as screenshots, which are not susceptible to keyword searches; and (2) those files that could have been searched by keyword featured text in several different languages with different alphabets, and often utilized inconsistent and unpredictable phonetic spelling. (Gov't Opp'n 57–58.) Moreover, the Search Warrant does not restrict the Government to keyword searches but instead specifically recognizes that "[k]eyword searches alone are typically inadequate to detect all information subject to seizure." (Saipov Br. Ex. B, at 000065.) The practice of imaging the entire contents of a cellular phone that is the subject of a search warrant is common, was reasonable under the circumstances presented here, and provides no basis for believing that Magistrate Judge Moses was misled in reviewing and approving the warrant application.[8]

Nor can it be said that the Search Warrant and accompanying affidavit were so lacking in indicia of probable cause as to render reliance upon the Warrant unreasonable.[9] For the reasons stated above, Magistrate Judge Moses's determination that Saipov's Cell Phones likely contained evidence of his crimes was supported by numerous factors, including evidence linking Saipov's attack to ISIS and Special Agent Tyree's explanation—based on her many years of counterterrorism experience—that ISIS often uses internet propaganda to inspire its members and social media applications to connect them with one another. *See supra* Part III.A.2. Finally,

---

[8] Because (1) the Search Warrant expressly contemplates the possibility that law enforcement might need to review the entire contents of Saipov's Cell Phones, (*see* Saipov Br. Ex. B, at 000065), and (2) I find that law enforcement's decision to create a mirror image of the Cell Phones was reasonable under the circumstances, Saipov's argument that the "all-encompassing" seizure and search of the Cell Phones exceeded the scope of the Warrant necessarily fails. (*See* Saipov Br. 14–15.)

[9] Although I was required to assess the facial validity of the Search Warrant independently of the unattached Tyree Affidavit, unincorporated affidavits are "still relevant to [a court's] determination of whether the officers acted in good faith." *See Rosa*, 626 F.3d at 64.

the Search Warrant cannot be described as so facially deficient that reliance upon it was unreasonable. Courts have held that "a warrant is facially defective when it omits or misstates information specifically required to be contained therein, i.e., the place to be searched, and the persons or things to be seized." *Clark*, 638 F.3d at 102 (internal quotation marks omitted). As noted above, *see supra* Part III.B.2, all of that information was included in the instant warrant.

Thus, I find that there is nothing in the Search Warrant itself or in the circumstances surrounding its issuance that would lead law enforcement agents to believe that it was anything other than a legitimate warrant issued by a neutral magistrate. *Cf. Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in objective good faith." (internal quotation marks omitted)). Therefore, I conclude that even if the Warrant were deficient in some respect—which it is not—the good faith exception would preclude suppression.

### D. *Inevitable Discovery*

Finally, the Government argues that the evidence collected from Saipov's Cell Phones should not be suppressed for the independent reason that the inevitable discovery doctrine applies. *See Nix v. Williams*, 467 U.S. 431, 444 (1984) (holding that illegally obtained evidence need not be suppressed where the Government establishes "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means"). According to the Government, hours after his arrest, Saipov voluntarily participated in a Mirandized interview with law enforcement, during which he consented to a search of his Cell Phones. (Gov't Opp'n 53.) Because I conclude that the Search Warrant is valid, I need not reach the question of Saipov's consent, the resolution of which the Government has conceded

requires an evidentiary hearing. (*See id.* at 11 n.7 (acknowledging that the "Consent to Search" form does not list Saipov's Cell Phones and describing the anticipated testimony by law enforcement agents that would confirm Saipov consented to the search).)

## IV.   Conclusion

For the foregoing reasons, Defendant Saipov's motion seeking suppression of all evidence obtained pursuant to the Search Warrant, or, in the alternative, seeking an evidentiary hearing,[10] is DENIED.

The Clerk of Court is respectfully directed to close the open motion at Docket Entry 92.

SO ORDERED.

Dated: July 11, 2019
        New York, New York

Vernon S. Broderick
United States District Judge

---

[10] Saipov requests an evidentiary hearing to establish the procedures law enforcement followed in searching his Cell Phones. (Saipov Br. 15.) A hearing, however, is unnecessary: the Government has conceded that law enforcement copied the entire contents of Saipov's Cell Phones to facilitate their search and I find that this approach was reasonable under the circumstances. Accordingly, there are no disputed issues of material fact to be resolved at a hearing. *See United States v. Washington*, No. 12 Cr. 146(JPO), 2012 WL 5438909, at *8 (S.D.N.Y. Nov. 7, 2012) ("In the Second Circuit, a defendant is entitled to an evidentiary hearing on a motion to suppress only if the defendant establishes a contested issue of material fact." (internal quotation marks omitted)).