```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
UNITED STATES OF AMERICA                                   :
                                                           :
              -against-                                    :     S1 17-CR-722 (VSB)
                                                           :
SAYFULLO HABIBULLAEVIC SAIPOV,                             :     OPINION & ORDER
                                                           :
              Defendant.                                   :
                                                           :
-----------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/9/2019

VERNON S. BRODERICK, United States District Judge:

Defendant Sayfullo Habibullaevic Saipov is charged in a twenty-eight count superseding indictment, filed on June 19, 2018 ("Indictment"). The Indictment charges Saipov with, among other offenses, murder and attempted murder in aid of racketeering and provision of material support to a designated foreign terrorist organization, arising out of an attack in New York City on October 31, 2017 (the "October 31, 2017 attack"). During that attack, Saipov—purportedly acting on behalf of the Islamic State of Iraq and al-Sham—allegedly drove a flatbed truck onto a cycling and pedestrian pathway on the west side of lower Manhattan, resulting in eight fatalities and injuring numerous others. (Doc. 61, ¶ 15.)

Currently before me is Saipov's motion seeking my assistance in facilitating his immediate family's travel to the United States in order to offer live, in-person testimony at trial—either by reviewing and reversing the United States Department of State's ("State Department") recent denial of his relatives' visa applications or by ordering that Saipov's relatives be paroled into the United States without visas. Because I find that the consular officer's decision denying Saipov's relatives' visa applications is immune from judicial review, and because I lack the authority to order that his relatives be paroled into the United States,

Saipov's motion seeking my review of the State Department's visa denials or an Order directing the United States Department of Homeland Security ("DHS") to parole his relatives into the United States is DENIED.  However, I will direct the United States Attorney's Office for the Southern District of New York (referred to herein as "the Government" or "the Prosecution Team") to submit applications to DHS seeking parole on behalf of Saipov's relatives.

## I. Background

Saipov challenges the State Department's denial of nonimmigrant visa applications submitted by his immediate family members—his father, mother, and two sisters (collectively, "Saipov's Relatives")—following the October 31, 2017 attack.  Saipov's Relatives have a long history of applying for visas to enter the United States, dating back to at least 2003.  Although Saipov attempts to ignore this history, it is relevant to the disposition of the instant motion.

In May 2003, Saipov's father entered the United States pursuant to a nonimmigrant visa.  (Gov't Opp'n 4.)[1]  Although that visa expired in November 2003, he remained in the United States until August 2008.  (*Id.*)  In March 2012, Saipov's father, mother, and one of his sisters submitted nonimmigrant visa applications, all of which were denied by the State Department.  At that time, Saipov's father was barred from entering the United States as a result of his violation of his previous visa.  (*Id.* (citing 8 U.S.C. § 1182(a)(9)(B)(i)(II) (specifying that any alien who was unlawfully present in the U.S. for one year or more may not seek readmission within ten years of his or her departure or removal from the U.S.)).)  Saipov's mother's and sister's applications were denied on the basis that they had failed to establish nonimmigrant intent.  (*Id.* (citing 8 U.S.C. § 1184(b)).)  Between May 2012 and June 2017, the State Department denied

---

[1] "Gov't Opp'n" refers to the Government's Opposition to the Defendant's Motion to Compel the Issuance of Visas and Paroles, filed June 3, 2019.  (Doc. 182.)

four subsequent visa applications by Saipov's mother, and two subsequent applications by Saipov's sister. (*Id.*)

At the time of the October 31, 2017 attack, however, Saipov's mother had obtained a nonimmigrant visa, which was scheduled to expire on June 11, 2018. (*Id.* at 4–5.) The State Department revoked that visa on or about November 2, 2017. (*Id.* at 5.) In April 2018, Saipov's mother and his two sisters submitted applications for nonimmigrant visas; the State Department denied those applications based on their failure to establish nonimmigrant intent, explaining that they "did not prove that [they] ha[d] ties that would force [them] to return to [their] country after [their] trip to the United States." (*Id.*; *id.* Ex. A.) In November 2018, all four of Saipov's Relatives submitted new applications for nonimmigrant visas. (*Id.* at 5.) Those applications were denied, once again based on failure to establish nonimmigrant intent. (*See id.* Ex. B.)

On January 18, 2019, Saipov notified the Government that his family members' visa applications had been denied. (*Id.* at 5.) On February 13, 2019, the Government notified Saipov that it had "conveyed to the Department of State the relevance of these witnesses to a potential penalty phase in this trial" but explained that the Government was "not able to intervene further to assist in obtaining visas." (*Id*. at 6.)

During a March 12, 2019 conference, the defense brought the issue of Saipov's Relatives' inability to obtain visas to enter the United States to my attention. (*See* Doc. 145.) In an Order dated March 14, 2019, I directed the parties to brief Saipov's request that I intervene with respect to the State Department's denial of Saipov's Relatives' visa applications. (Doc. 140.) Saipov filed his motion, with supporting exhibits, on May 13, 2019. (Doc. 181.) On June 3, 2019, the Government submitted its opposition, with exhibits. (Doc. 182.) Saipov filed his reply on June 10, 2019. (Doc. 184.)

## II.     Discussion

In an effort to secure his family's in-person appearance and testimony at trial, Saipov first argues that the State Department's denial of his relatives' visa applications is reviewable and should be reversed because the applications were denied in bad faith.  Alternatively, Saipov asserts that I should issue an Order directing DHS to parole his relatives into the United States for purposes of providing testimony during trial, or—at a minimum—that I should direct the Prosecution Team to submit an application for parole to DHS.  The Government responds that I lack the authority either to review the State Department's denial of the visa applications or to order parole of Saipov's Relatives.  The Government further contends that it would be premature to order the Government to seek paroles from DHS.

As discussed below, the Government is correct that I do not have the ability to order parole or to reverse the denial of Saipov's Relatives' visa applications under the circumstances presented here.  However, since this is a capital case and both parties agree that Saipov's immediate family members will be important mitigation witnesses in any penalty phase, I conclude that an Order directing the Prosecution Team to file parole applications on behalf of Saipov's Relatives is appropriate.

### A.  *Right to Present In-Person Trial Testimony*

Saipov's assertion that the Government has "block[ed] Saipov's family members from appearing as mitigating witnesses," (Saipov Reply 9),[2] is inaccurate and mischaracterizes the Government's position.  The Government does not contest Saipov's right to offer penalty-phase testimony from his relatives, (Gov't Opp'n 7); however, that does not necessarily equate with the

---

[2] "Saipov Reply" refers to the Reply Memorandum in Support of Motion to Enforce Defendant's Fifth, Sixth, and Eighth Amendment Rights to Present the Live Testimony of Essential Witnesses at the Penalty Phase of His Capital Prosecution, filed June 10, 2019.  (Doc. 184.)

4

right to offer live, in-person testimony.  The Government has stated its willingness to "work in good faith to accommodate Saipov's preference that such testimony be offered in person," (*id.*), but correctly points out that Saipov has no constitutional right to present evidence through live, in-person testimony only.  *See, e.g.*, *United States v. Paracha*, No. 03 CR. 1197(SHS), 2006 WL 12768, at *12–13 (S.D.N.Y. Jan. 3, 2006) (concluding, in terrorism case where Government refused to produce two defense witnesses, that "[b]ecause . . . the substance of [the unavailable witnesses'] exculpatory evidence c[ould] be presented through means other than the witnesses' live testimony, [defendant's] Fifth and Sixth Amendment rights [could] be protected" (internal quotation marks omitted)); *cf. Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (explaining that a criminal defendant's Sixth Amendment "right to present relevant testimony is not without limitation" (internal quotation marks omitted)).  Saipov implicitly acknowledges this fact by arguing that, "[i]n general, live testimony is *preferred*."  (Saipov Br. 16 (emphasis added) (citing *DiRienzo v. Phillips Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002); *United States v. Int'l Bus. Machines Corp.*, 90 F.R.D. 377, 381 (S.D.N.Y. 1981) ("There is a strong preference for live testimony . . . .")).)[3]

      Contrary to Saipov's assertions, the case law on which he relies does not establish a constitutional right to present live, in-person testimony.  Both *United States v. Ginsberg*, 758 F.2d 823 (2d Cir. 1985), and *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), addressed the inability of defense witnesses who had been deported to testify at trial; in both cases, the courts determined there had been no constitutional violation.  In *Ginsberg*, the Second Circuit found that there was no constitutional violation where the defendant was permitted to offer the

---

[3] "Saipov Br." refers to the Memorandum in Support of Motion to Enforce Defendant's Fifth, Sixth, and Eighth Amendment Rights to Present the Live Testimony of Essential Witnesses at the Penalty Phase of His Capital Prosecution, filed May 13, 2019.  (Doc. 181.)

unavailable witnesses' prior grand jury testimony at trial. 758 F.2d at 831. In *Valenzuela-Bernal*, the Supreme Court reversed the Ninth Circuit's determination that the Government's deportation of two potential defense witnesses prior to trial violated the defendant's Fifth Amendment right to due process and Sixth Amendment right to compulsory process to obtain witnesses in his favor. 458 U.S. at 860. Not only did the Supreme Court find no constitutional violation in *Valenzuela-Bernal* but, crucially, it appears to have done so where there was no alternative to in-person testimony. *See id.* at 870 (explaining that defendant "simply had no access to the witnesses who were deported after he was criminally charged"). By contrast, the Government has offered to explore alternative options for obtaining Saipov's Relatives' testimony, including depositions pursuant to Fed. R. Crim. P. 15 or testimony by closed-circuit television ("CCTV"). (*See* Gov't Opp'n 13–23.) Although *Valenzuela-Bernal* and *Ginsberg* establish that a defendant is entitled to present testimony from certain witnesses where the defendant (1) makes a "plausible showing that the testimony . . . would have been material and favorable to his defense," and (2) demonstrates that "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact," *Ginsberg*, 758 F.2d at 831 (quoting *Valenzuela-Bernal*, 458 U.S. at 874), they do not hold or indicate that a defendant who satisfies this standard has a constitutionally guaranteed right to offer that testimony in person.

Indeed, there are widely recognized and legally sanctioned alternatives to live, in-person testimony. Federal Rule of Criminal Procedure 15 provides that, in "exceptional circumstances," a "prospective witness [may] be deposed in order to preserve testimony for trial." Fed. R. Crim. P. 15(a)(1). In addition, "[u]pon a finding of exceptional circumstances, . . . a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999). These alternatives have

6

recently been utilized in other capital cases.  For example, in *United States v. Tsarnaev*—a capital prosecution relating to the 2013 Boston Marathon bombing—a relative of the defendant, who was described as a "critical" defense witness and who was unable to secure permission to enter the United States, testified during the penalty phase of the trial via CCTV from the United States Embassy in Kazakhstan.  *See* No. 13 Cr. 10200, ECF Nos. 1312, 1393 (D. Mass.).  Similarly, in *United States v. Massaoui*—the capital prosecution of an individual involved in the September 11, 2001 terrorist attacks—the Fourth Circuit instructed the trial court to utilize written summaries from three enemy combatant witnesses in U.S. military custody in lieu of live testimony.  382 F.3d 453, 479–80 (4th Cir. 2004).  Thus, I find that Saipov has failed to establish that the alternatives to live, in-person testimony which the Government has suggested would infringe upon his constitutional rights.

### B.  *Judicial Review of Denial of Visa Applications*

I next analyze whether the State Department's denial of Saipov's Relatives' visa applications may be reviewed and reversed.  Saipov acknowledges that, as a general matter, "a consular officer's decision to deny a visa is immune from judicial review" under the "doctrine of consular nonreviewability."  (Saipov Br. 31 (quoting *Am. Acad. of Religion v. Napolitano* ("*AAR*"), 573 F.3d 115, 123 (2d Cir. 2009)); *see also Xian Yong Zeng v. Pompeo*, 740 F. App'x 9, 10 (2d Cir. 2018) (summary order) ("The doctrine of consular nonreviewability generally bars courts from reviewing a consular officer's denial of a visa.").)  In *Kleindienst v. Mandel*, 408 U.S. 753 (1972), the Supreme Court identified a "narrow exception" to this doctrine, relating to claims by United States citizens alleging violations of their First Amendment association rights based on the denial of visas to foreign nationals.  *See Xian Yong Zeng*, 740 F. App'x at 10 (referencing the "narrow exception" to the doctrine of consular nonreviewability "where a

7

plaintiff alleges that the denial of a visa to a visa applicant violated the plaintiff's First Amendment right to have the applicant present his views in this Country"); *see also AAR*, 573 F.3d at 125 ("[W]here a plaintiff, with standing to do so, asserts a First Amendment claim to have a visa applicant present views in this country, we should apply *Mandel* to a consular officer's denial of a visa.")[4]  Under those circumstances, courts inquire only as to whether the Executive branch has exercised its power to exclude aliens "on the basis of a facially legitimate and bona fide reason." *Mandel*, 408 U.S. at 770.  If it has, "the courts will n[ot] look behind the exercise of that discretion." *Id.*; *see also Lleshi v. Kerry*, 127 F. Supp. 3d 196, 200 (S.D.N.Y. 2015) ("Even where this strictly limited exception applies, the Government need only provide a facially legitimate and bona fide reason for its decision." (internal quotation marks omitted)). "This standard will be satisfied where a consular officer relies on a statutory ground of inadmissibility, unless the plaintiff affirmatively proffers 'a well supported allegation of bad faith.'" *Xian Yong Zeng*, 740 F. App'x at 11 (quoting *AAR*, 573 F.3d at 137).

I find that the denial of Saipov's Relatives' visa applications "presents a straightforward application of the consular non-reviewability doctrine," and "does not implicate the limited exception to the doctrine identified by the Supreme Court in *Mandel* and further expounded by the Second Circuit in [*AAR*]." *Lleshi*, 127 F. Supp. 3d at 200–01.  As an initial matter, Saipov is not a United States citizen.  *See AAR*, 573 F.3d at 121 (interpreting *Mandel* to have "recognized that United States citizens could invoke federal court jurisdiction to challenge a visa denial on

---

[4] As the Second Circuit recently explained, it "ha[s] not decided whether th[e] narrow exception [set forth in *Mandel*] to the consular nonreviewability doctrine applies to constitutional challenges other than First Amendment challenges." *Xian Yong Zeng*, 740 F. App'x at *11 (citing *Kerry v. Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring) (construing *Mandel* to apply where a plaintiff alleges that the denial of a visa "burdens a citizen's own constitutional rights" and applying *Mandel* to a due process claim)).  In *Din*, however, the plurality concluded—without discussing the *Mandel* test—that a U.S. citizen's due process rights were not violated by the Government's denial of her alien spouse's visa application.  *See* 135 S. Ct. at 2131–38 (plurality op.).  I therefore find that *Din* does not mandate the application of the *Mandel* analysis here and, in any event, I find that under *Mandel*, Saipov's challenge also fails.  *See infra.*

the ground that the denial may have violated *their*" constitutional rights); *see also Lleshi*, 127 F. Supp. 3d at 201. More importantly, as discussed above, *see supra* Part II.A, Saipov has not established that the denial of his relatives' visa applications violates his constitutional rights. *See Lleshi*, 127 F. Supp. 3d at 201 (finding *Mandel* did not apply where plaintiffs "failed to identify a valid constitutional claim upon which to predicate any challenge to the consular officer's decision").

Even if Saipov's challenge fell within the narrow confines of the *Mandel* exception, his challenge would still fail because the State Department has proffered a "facially legitimate and bona fide reason" for the denial of his relatives' visa applications. *Mandel*, 408 U.S. at 770. The State Department denied Saipov's Relatives' 2018 visa applications on the ground that they failed to establish nonimmigrant intent pursuant to 8 U.S.C. § 1184(b). *See* 8 U.S.C. § 1184(b) ("Every alien . . . shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, . . . that he is entitled to a nonimmigrant status under section 1101(a)(15)[.]"). An alien is entitled to "nonimmigrant status" where he establishes that he has "a residence in a foreign country which he has no intention of abandoning and [that he] is visiting the United States temporarily for business or temporarily for pleasure." *Id.* § 1101(a)(15)(B). Failure to establish nonimmigrant intent is a recognized ground for denial of a visa application under the Immigration and Nationality Act, *see id.* § 1184(b), and the State Department's explanation for its denial of Saipov's Relatives' visa applications is therefore sufficient to satisfy *Mandel*. *See AAR*, 573 F.3d at 137 ("[W]e have to take literally the statement in *Mandel* that courts may not 'look behind' exclusion decisions [such as a] consular officer's decision that a statutory ground of inadmissibility applies to the visa applicant, at least

in the absence of a well supported allegation of bad faith . . . ." (quoting *Mandel*, 408 U.S. at 770)).

Saipov's claim that the State Department denied Saipov's Relatives' visa applications in bad faith is without merit. In his opening brief, Saipov neglected to mention that the State Department denied visa applications by Saipov's father, mother, and sister on several occasions prior to the October 31, 2017 attack—and on the very same basis that the Department denied their 2018 applications.[5] Saipov also did not mention that his father had overstayed a previously issued nonimmigrant visa by nearly five years. These facts do not support an inference of bad faith with respect to the State Department's 2018 determinations. Rather, they support a finding that the State Department was operating well within its authority when it denied Saipov's Relatives' visa applications. Finally, although the State Department revoked Saipov's mother's visa shortly after the October 31, 2017 attack,[6] that attack—and the resulting criminal charges against Saipov—presented a significant change of circumstances, from which consular officers could reasonably conclude that Saipov's mother might no longer possess nonimmigrant intent. As the Government points out, "a consular officer could [] conclude in good faith that immediate relatives of a man facing a potentially lengthy sentence based on serious criminal charges face much stronger incentives to remain in the United States indefinitely so that they could be close to

---

[5] The Government also presents a thorough analysis of the exhibits to Saipov's motion, which Saipov argues establish his family members' nonimmigrant intent. (*See* Gov't Opp'n 29–30 (addressing a "Summary Appraisal Certificate" for a residential property, a fifteen-year-old driver's license, and a three-year-old vehicle registration).) I am persuaded by the Government's argument that these documents do not clearly establish that Saipov's family had no intention of abandoning their residence in Uzbekistan. *See* 8 U.S.C. § 1101(a)(15)(B). However, I will not undertake a detailed review of the documents since Saipov has failed to establish bad faith with regard to the State Department's determinations so as to justify looking behind those decisions.

[6] A consular officer may revoke a nonimmigrant visa at any time, in his or her discretion. *See* 8 U.S.C. § 1201(i) ("After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa . . . . There shall be no means of judicial review . . . of a revocation[.]").

him while he is incarcerated."  (Gov't Opp'n 31–32.)  I therefore find that Saipov has failed to put forth a "well supported allegation of bad faith" that would justify "looking behind" the State Department's decision to deny his relatives' visa applications.  *See AAR*, 573 F.3d at 137.

### C. *Applications for Parole*

In the alternative, Saipov requests that I order the parole of his relatives into the United States or direct the Prosecution Team to seek parole for Saipov's Relatives.  Pursuant to 8 U.S.C. § 1182(d)(5)(A),

> The Attorney General may, . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, . . . and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled . . . .

Congress has transferred this authority from the Attorney General to the Secretary of DHS.  *See Matter of Arrabally*, 25 I. & N. Dec. 771, 777 n.5 (BIA 2012).  The categories of individuals potentially eligible for parole include those "[a]liens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States." 8 C.F.R. § 212.5(b)(4).  In order for parole to be granted, DHS must find that the applicant "present[s] neither a security risk nor a risk of absconding."  *Id.* § 212.5(b).

I do not have the authority to order Saipov's Relatives paroled into the United States as the power to parole lies exclusively with the Secretary of DHS.  *See* 8 U.S.C. § 1182(d)(5)(A); *Ofosu v. McElroy*, 98 F.3d 694, 700 (2d Cir. 1996) ("[P]arole is a matter of the [Secretary of DHS's] discretion . . . .").  Moreover, DHS's determination related to parole is not subject to judicial review.  *Ricketts v. Simonse*, No. 16 Civ. 6662 (LGS), 2016 WL 7335675, at *4 (S.D.N.Y. Dec. 16, 2016) ("[P]arole is a discretionary decision made within the Department of Homeland Security without [] review by an immigration judge or federal court.").  However,

courts have ordered prosecutors to seek parole on behalf of prospective defense witnesses. *See, e.g.*, *United States v. Filippi*, 918 F.2d 244, 246 (1st Cir. 1990) (observing that the district court "ordered the United States Attorney 'to request a Special Public Interest Parole for [a potential defense witness] and to assist in bringing this material witness to the country to testify at trial'"); *United States v. Muhtorov*, No. 12 Cr. 33, ECF No. 1429 (D. Colo. June 9, 2017) (directing prosecutors to "prepare and present, on an expedited basis, an application to obtain 'significant public benefit' parole" for two Uzbek citizens who defendant intended to call at trial).

Accordingly, I will direct the Prosecution Team to submit applications to DHS seeking to parole Saipov's Relatives into the United States to facilitate their live, in-person testimony at trial. However, the Government need not seek parole for Saipov's Relatives on three occasions prior to trial, as Saipov requests. (*See* Saipov Br. 39.) Rather, the Government should seek to parole Saipov's Relatives into the United States sufficiently in advance of a potential penalty phase to enable them to prepare with defense counsel prior to testifying. The parties shall meet and confer regarding the substance of these parole applications; however, because the Government is more familiar with the relevant facts—including, for instance, any security risks that paroling Saipov's Relatives into the country might pose—the Government shall make the final determination as to the information to include in the applications.[7] Although the Government suggests that an Order directing that the Government seek to parole Saipov's Relatives into the country "implicit[ly]" suggests that I have determined "that the requested

---

[7] In its opposition, the Government asserts that it will not be in a position to pursue parole applications on behalf of Saipov's Relatives until it reviews Saipov's non-legal communications with his immediate family, which will inform the Government's assessment of whether paroling Saipov's Relatives into the United States poses any security risks. (Gov't Opp'n 7.) On June 11, 2019—after the Government submitted its opposition in connection with the instant motion—I granted the Prosecution Team's May 24, 2019 application to review prior and future non-legal communications between Saipov and his immediate family members, (*see* Doc. 185); thus, the Government should now have the information it needs to inform its preparation of the parole applications.

paroles are appropriate," (Gov't Opp'n 36), I make no such finding and my direction should not be construed as such. I understand that the ultimate determination as to the appropriateness of parole will be made by DHS, as it is in every case in which a parole application is submitted. However, given that this is a capital case and that the Government has acknowledged that Saipov's Relatives are important mitigation witnesses, I find it appropriate to require that parole applications be submitted to the Secretary of DHS for his consideration, regardless of their ultimate success. Because there is no set time table for the processing of parole applications, it is important that the application process begin well in advance of trial.[8]

      Given the risk that the Secretary of DHS may, in his discretion, deny the parole applications, and the fact that DHS's parole determinations are not subject to judicial review, the defense—to the extent it has not already done so—must immediately begin exploring alternative arrangements for obtaining testimony from Saipov's Relatives, in the event they are unable to enter the United States. The Government has offered to help facilitate depositions pursuant to Federal Rule of Criminal Procedure 15, (*see* Gov't Opp'n 20), and the parties should also explore the possibility of testimony by CCTV. Finally, Saipov notes in his brief that "[o]ther family members with important trial testimony to present intend to apply for visas as well." (Saipov Br. 39.) In light of the potential obstacles that the defense may face in securing visas for those individuals, the defense is advised to begin that visa application process as soon as possible, and to also begin exploring alternative arrangements for obtaining testimony from those individuals. There will be no further adjournments of the April 13, 2020 trial date on the ground

---

[8] In *Filippi*, for instance, defense counsel ultimately "agreed to proceed at trial without [the witness for whom the court had ordered the Government to file a parole application] rather than subject his client to a six week delay in proceedings." 918 F.2d at 246. In light of the charges in this case and the potential security concerns at play, the preparation and consideration of parole applications for Saipov's Relatives could take far longer than the six weeks apparently predicted in *Filippi*.

that Saipov has been unable to secure the in-person appearance of potential witnesses, or because of delay in seeking alternative means to obtain such testimony. In other words, the defense should avoid putting all of its eggs in the in-person testimony basket.

### III.     Conclusion

For the foregoing reasons, it is hereby

ORDERED that Saipov's request that I reverse the denial of Saipov's Relatives' visa applications or, alternatively, that I order his family members paroled into the United States is DENIED.

IT IS FURTHER ORDERED that the Prosecution Team shall submit applications to DHS to parole Saipov's Relatives into the United States to facilitate their presentation of in-person testimony at trial. Prior to the submission of those applications, the parties shall meet and confer regarding the substance of the applications and the proposed terms of parole, if those applications are granted.

IT IS FURTHER ORDERED that the parties shall meet and confer regarding the possibility of conducting Rule 15 depositions of Saipov's Relatives and/or facilitating their testimony by CCTV. The parties shall investigate what limitations, if any, the Uzbek government might place on such alternatives and shall further investigate the possibility of Saipov's Relatives offering testimony from another country.

Dated:  September 9, 2019
        New York, New York

*Vernon Broderick*
Vernon S. Broderick
United States District Judge