# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

November 18, 2019

**By ECF**
Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
United States Courthouse
40 Centre Street
New York, NY 10007

Re:   **United States v. Sayfullo Saipov**
       **(S1) 17 Cr. 0722 (VSB)**

Dear Judge Broderick,

In advance of the conference scheduled for today we write to advise the Court about our ongoing conversations with the government regarding jury selection.  In addition, because capital jury selection differs so significantly from non-capital jury selection, we outline the applicable case law and research that governs our proposed procedures.

I.    **Jury Selection Procedures**

We have asked the government to consider the following proposed procedures.  They are consistent with procedures ordered by district judges in other federal capital cases, including a recent one involving learned counsel in this case, David Ruhnke.  *See*, *e.g.*, *United States v. Con-Ui*, 13 Cr. 123, Dkt. No. 913 (M.D. Pa. Sept. 2, 2016) (jury selection procedures ordered on *joint* motion of the parties).  The *Con-Ui* order is attached for the Court's review.  *See* Exhibit A.

1

Once our conversations with the government are complete, and after the parties have consulted with the Jury Clerk, the parties will submit a proposed order to the Court, with any outstanding disputes noted, for its review.

First, we suggest the Court issue a hardship questionnaire to prospective jurors that would be sent out by the Jury Clerk in advance of the existing juror questionnaire schedule.  A short questionnaire that asks the venire about economic hardship; difficulty with the English language; a physical or medical condition that interferes with memory or concentration; and conflicting personal or professional scheduling obligations would help ensure that those who are summoned to court to fill out the full juror questionnaire are actually viable jurors.  After receiving and reviewing the hardship questionnaire responses, the parties could agree to the excusal of some jurors on the basis of their stated hardship; anyone for whom there is no agreement will remain in the pool.  Subject to the views of the Jury Clerk, the parties generally agree that proceeding to the juror questionnaire-stage with 500-700 eligible jurors is appropriate.

Second, we propose that the eligible jurors be summoned to the courthouse to fill out the juror questionnaires during the week of March 2, as previously ordered by the Court.  See Dkt. No. 173.  We propose that potential jurors be summoned in groups (of approximately 100 people, subject to the discretion of the Jury Clerk) that will be called for each morning and each afternoon session (i.e., 200 people per day).  Upon arrival, each group will be introduced to the parties and receive preliminary instructions.  Then the potential jurors will complete the questionnaires under the supervision of court personnel.  After the questionnaires are completed, the parties and the Court will review hard and electronic copies of the completed questionnaires (with the logistics of copying and scanning to be determined after consultation with the Jury Clerk).  After reviewing the questionnaires, the parties will confer and on March 30, the parties

will propose a list of jurors to be excused on consent. Anyone for whom there is no agreement will remain in the pool. During the week of April 6, as previously ordered, the parties will appear for a conference at which the Court will rule on those excusals and finalize the venire.

Third, on the first date of trial, April 13, and each day thereafter until a requisite number of jurors are qualified, we propose that 10-20 jurors be summoned per day (to be adjusted as the selection process proceeds and the Court and parties ascertain how much time is necessary). Each day, the summoned jurors will receive an overview of the process and applicable legal concepts. The group will be excused to a waiting area and individual *voir dire* will commence.

Fourth, we submit that when each individual juror enters the courtroom, one attorney from the government and one attorney from the defense take turns questioning the juror. The sides will alternate turns asking the first question. This procedure will be repeated for each juror.

Fifth, once at least 70 jurors have been qualified and accepted by the parties, we ask that the Court allow two business days for the parties to review the qualified panel. On the third day, the parties will exercise peremptory challenges and the jury of 12 and 6 alternates will be selected.

A formal proposed jury selection Order will be submitted to the Court, with specific dates and more specific procedures, following the parties' consultation with each other and with the Jury Clerk.

## II.      Legal Principles Regarding Jury Selection

The proposed selection procedures detailed above are supported by governing case law and research regarding capital jury selection. They are intended to create an efficient process that will afford the Court and parties the opportunity to do what is constitutionally required: select "an impartial jury" that is "not [] tilted in favor of capital punishment." *Witherspoon v.*

*Illinois*, 391 U.S. 510, 521 (1968).  Because capital jury selection is so distinctive and the need

for individual and attorney-conducted *voir dire* so heightened, we submit this outline for the

Court's review.

### A.      Death-qualification

#### 1.      Heightened need for thorough *voir dire* in capital cases

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire*

to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (relying on

*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *Dennis v. United States*, 339 U.S.

162, 171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950)).  Specifically, the

Sixth Amendment entitles a defendant to "inquiry discerning those jurors who, even prior to the

State's case in chief, had predetermined the terminating issue of his trial, that being whether to

impose the death penalty." *Morgan*, 504 U.S. at 736.  Thus, a searching *voir dire* is necessary for

both the government and the defendant to gather the information needed to exercise juror

challenges—peremptory and cause—in a fair, intelligent and informed manner.  The more the

parties know about the potential jurors, the less likely they are to fall back on prejudice and

stereotypes in the exercise of peremptory challenges in violation of the Constitution.  *See, e.g.*,

*Georgia v. McCollum*, 505 U.S. 42 (1992) (defense challenges subject to equal protection

scrutiny); *Batson v. Kentucky*, 476 U.S. 79 (1986) (prosecution challenges subject to equal

protection scrutiny).

A thorough *voir dire* also provides the court with sufficient information to rule accurately

on the requested removal of a juror.  *See Morgan*, 504 U.S. at 729-730 (quoting *Rosales-Lopez*,

451 U.S. at 188 ("Without an adequate *voir dire* the trial judge's responsibility to remove

prospective jurors who will not be able impartially to follow the court's instructions and evaluate

4

the evidence cannot be fulfilled.")).  In a capital case, questioning of potential jurors as to

whether they would automatically or nearly always vote for the death penalty on the facts of the

case, or whether a potential juror could consider and give effect to the relevant mitigating factors

in the case, is not only suitable, but constitutionally required if a capital defendant is to receive a

*voir dire* adequate to protect the right to a trial before an impartial tribunal.  *See Morgan,* 504

U.S. at 729-34.

       2.   <u>Jurors opposed to capital punishment</u>

The Supreme Court has long recognized that the Sixth Amendment protects a capital

defendant from being placed on trial before a "tribunal organized to return a verdict of death."

*Witherspoon*, 391 U.S. at 521.  In *Witherspoon*, the Court held that prosecution cause-challenges

based on a prospective juror's reservations or scruples regarding capital punishment should be

granted only under circumstances where jurors made it "unmistakably clear" that "they would

automatically vote against the imposition of capital punishment without regard to any evidence

that might be developed at the trial of the case before them…."  *Id.* at 522 n.21.  The Court

explained:

> [A] sentence of death cannot be carried out if the jury that imposed
> or recommended it was chosen by excluding veniremen for cause
> simply because they voiced general objections to the death penalty
> or expressed conscientious or religious scruples against its
> infliction.  No defendant can constitutionally be put to death at the
> hands of a tribunal so selected.

*Witherspoon*, 391 U.S. at 522-23.  While the Court has tinkered with language, it has never

retreated from the basic premise that "[a juror] who opposes the death penalty, no less than one

who favors it, can make the discretionary judgment entrusted to him by the State and can thus

obey the oath he takes as a juror."  *Witherspoon*, 391 U.S. at 519.  This principle was reiterated

when the Court noted that, under its cases, even "those who firmly believe that the death penalty

is unjust may nevertheless serve as jurors in capital cases…." *Lockhart v. McCree*, 476 U.S.

162, 176 (1986).

Twelve years after *Witherspoon*, the Court decided *Adams v. Texas*, 448 U.S. 38 (1980).[1]

Applying *Witherspoon*'s principles, the Court held that jurors could be excluded from service in

a capital case on prosecution challenges-for-cause only if the juror's views on capital punishment

"would prevent or substantially impair the performance of his duties as a juror in accordance

with his instructions and his oath." *Adams*, 448 U.S. at 45.  The Court held in *Adams* that it

would be (and was in that case) a violation of the Constitution to exclude jurors "who stated that

they would be 'affected' by the possibility of the death penalty, but who apparently meant only

that the potentially lethal consequences of their decision would invest their deliberations with

greater seriousness and gravity or would involve them emotionally." *Id.* at 49.  The *Adams*

Court also held that it would be a constitutional violation to exclude jurors who were "unable

positively to state whether or not their deliberations would in any way be 'affected'" by the

prospect of the death penalty. *Id.* at 50.  The Court explained further:

> [I]t is clear beyond peradventure that *Witherspoon* is not a ground
> for challenging any prospective juror.  It is rather a limitation on
> the State's power to exclude: if prospective jurors are barred from
> jury service because of their views about capital punishment on
> any broader basis than inability to follow the law or abide by their
> oaths, the death sentence cannot be carried out.

*Id.* at 47-48.

Five years after *Adams*, in *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court

summarized its prior rulings and, echoing the language from *Adams*, concluded that a trial court

---

[1]  In the years between *Witherspoon* and *Adams*, the Supreme Court both struck down capital punishment, *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam) and permitted its return, *Gregg v. Georgia*, 428 U.S. 153 (1976).

should not excuse a juror for cause on the basis of the juror's views on the death penalty unless those views were so deeply entrenched that they "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Witt*, 469 U.S. at 420 (quoting *Adams*, 448 U.S. at 45); *see also United States v. Chanthadara*, 230 F.3d 1237, 1270-73 (10th Cir. 2002) (reversing, on *Witherspoon* and *Witt* grounds, a sentence of death in a federal case because the district judge erroneously excluded a juror for cause).[2]  Since *Adams* and *Witt*, the Supreme Court has consistently held that a juror's views in opposition to capital punishment—even strong views—do not disqualify him or her from serving on a capital case.  As summarized in *Lockhart v. McCree*:

> [T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*Lockhart*, 476 U.S. at 176.

In *Uttecht v. Brown*, 551 U.S. 1 (2007), the Supreme Court re-affirmed those views and stated:

> Capital defendants have the right to be sentenced by an impartial jury.  The State may not infringe this right by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties.

*Uttecht*, 551 U.S. at 22.

3.  Jurors who favor capital punishment.

The "substantial impairment" gate swings both ways.  In addition to holding that the

---

[2]  It remains settled law that the erroneous exclusion of even a single juror because of his or her opposition to the death penalty is never harmless error and reversal of any ensuing sentence of death is always mandatory.  *See, e.g.*, *Grey v. Mississippi*, 481 U.S. 648 (1987); *Chanthadara*, 230 F.3d at 1268.

prosecution may challenge for cause prospective jurors who are "substantially impaired" in their ability to consider imposing a death sentence, the Supreme Court has held that the defense may likewise challenge for cause any juror whose *pro* death penalty views also render the juror impaired in his or her ability to consider a life sentence.  *Morgan*, 504 U.S. at 729.  In *Morgan*, the Court noted it was proper—indeed constitutionally necessary—to remove, on a cause challenge, "[a]ny juror to whom mitigating factors are . . . irrelevant."  *Id.* at 739.

**B.    The case law supports Mr. Saipov's proposal for thorough *voir dire*, including inquiry regarding mitigation impairment, case-specific questioning, individual questioning, and attorney-conducted *voir dire***

In this case, prospective jurors must be questioned regarding the circumstances of the offense and the aggravating factors alleged by the government.  The ultimate question is whether a juror will be able to consider mitigating factors or, indeed, consider any other sentence but death, for a case involving the murder of 8 people, the injuring and attempted murder of many others, and allegations that such acts were committed to join a foreign terrorist organization.

1.    <u>In cases involving highly prejudicial aggravating circumstances, the Court must identify "mitigation-impaired" jurors who will not consider and give meaningful effect to mitigation.</u>

The ability of each individual juror to consider and give effect to mitigating evidence is required by the Constitution.  To be competent to serve—and to ensure the constitutional validity of any death sentence that results—"sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."  *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007).  Not only must each juror possess the capacity to consider mitigating evidence, the Sixth Amendment entitles a defendant to a *voir dire* that uncovers those who cannot.  *See*

*Morgan,* 504 U.S. at 730.  Accordingly, among the many important *voir dire* tasks will be to

discern which potential jurors are "mitigation-impaired," meaning that under the facts and

circumstances of the case, they would be unable to fully consider and give effect to evidence in

mitigation in general or to classes of evidence in mitigation.

The Eighth Amendment also requires jurors in a capital case to be able to consider and

give meaningful effect to evidence in mitigation.

> Once this low threshold for relevance [of mitigating evidence] is
> met, the 'Eighth Amendment requires that the jury be able to
> consider and give effect to' a capital defendant's mitigating
> evidence.

*Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde v. California,* 494 U.S. 370, 377-

378, which *cites Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104

(1982); *Penry I*, 492 U.S. 302 (1989)) (quoting *Payne v. Tennessee,* 501 U.S. 808, 822 (1991)

("We have held that a State cannot preclude the sentencer from considering 'any relevant

mitigating evidence' that the defendant proffers in support of a sentence less than death. . . .

[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may

introduce concerning his own circumstances" (alterations in original) (quoting *Eddings, supra*, at

114)).

In fact, the law has long been explicit that, in capital cases, the sentencer may not refuse

to consider any evidence in mitigation, or be precluded from giving it whatever effect it may

merit.  *Penry v. Lynaugh,* 492 U.S. 302, 318-319 (1989) ("*Penry I*") (*abrogated on other*

*grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)); *Eddings v. Oklahoma*, 455 U.S. 104, 113-

115 (1982); *see also*, *McKoy v. North Carolina*, 494 U.S. 433, 435 (1990) (ruling state's

"unanimity requirement violates the Constitution by preventing the sentence from considering all

mitigation evidence").  In *Eddings*, the Court held explicitly that, "Just as the State may not by

9

statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings*, 455 U.S. at 113-14 (emphasis in original).  The Court noted that, whereas those who impose the sentence in a capital case "may determine the weight to be given relevant mitigating evidence, [] they may not give it *no weight* by excluding such evidence from their consideration." *Id.* at 114-15 (emphasis added).  Therefore, prospective jurors who would ignore mitigation evidence are not qualified to serve.

In short, "a sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances." *Penry I*, 492 U.S. at 319 (quoting *Johnson v. Texas*, 509 U.S. 350, 381 (1993) (emphasis in original)).

In *Penry I*, *supra*, the Court spoke in uncommonly strong terms:

> Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant.  If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.; *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).  Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence.  *Hitchcock v. Dugger*, [481 U.S. 393 (1987)].  Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence.  *Woodson* [*v. North Carolina*, 428 U.S. 280, 304-5 (1976)].  'Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime.'  *California v. Brown, supra, at 545* (O'Connor, J., concurring) (emphasis in original).

492 U.S. at 319.

The means to uncovering those jurors who may not be able to give full consideration and effect to mitigating factors, is a searching *voir dire*.  The District Court in *Fell* recognized these principles and applied them:

> [T]he FDPA requires jurors to make an individual finding
> regarding each mitigating factor proposed by the defense.  Thus, it
> is important for the court to ensure that every prospective juror is
> able to fairly and impartially consider the categories of mitigating
> evidence that the defendant would introduce at a penalty phase."

*United States v. Fell*, 372 F. Supp. 2d 786, 789 (D. Vt. June 9, 2005) (in a written decision by the District Court regarding a defense challenge for cause of a particular juror).

2.    Case-specific questions

In this case, the defense must question jurors to determine whether they could consider a punishment other than death for a person who, as alleged, intentionally killed 8 people, grievously wounded and attempted to kill many more, and did so in an effort to join a foreign terrorist organization.

The Constitution prohibits statutes that mandate death sentences when particular facts exist.  *See, e.g., Sumner v. Shuma*, 483 U.S. 66 (1987).  Just as a legislature may not mandate death for inmates who kill while imprisoned (the situation presented in *Sumner*), neither may a juror's pre-judgment of a capital case involving allegations of multiple murders or terrorism be allowed to accomplish the same result.  Thus, the Eighth Amendment requires the Court to determine whether jurors can follow the law as set forth in *Sumner*, *i.e.* prospective jurors must be questioned on the salient facts of this case and their ability to consider mitigating factors in a meaningful way in the face of the aggravating circumstances of the case.

Use of case-specific questions is common practice in death penalty cases.

> If properly formed, case-specific questions help identify various
> forms of juror bias.  For example, a juror might be excused for

11

> cause if he or she could not fairly consider the death penalty where
> the victim was involved in drug crimes.  See *United States v.*
> *Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995).  Similarly, a juror
> might be excused for cause if he or she would refuse to consider
> any mitigating evidence in a case involving the death of a child.
> See [*United States v.*] *Johnson*, [366 F. Supp. 2d 822,] 847-48
> [(N.D. Iowa 2005)].  Other jurors may have biases regarding
> particular forms of mitigating evidence.  For example, some jurors
> may be unable to fairly consider any mitigating evidence relating
> to the defendant's background or upbringing. [Footnote omitted.]
> Such jurors must be excused for cause as the Supreme Court has
> emphasized that the sentencer may not refuse to consider evidence
> relating to the defendant's background or upbringing.  See *Lockett*
> *v. Ohio*, 438 U.S. 586, 604-05 (1978).

*United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. May 25, 2005) (in a written decision by

the District Court holding defense counsel would be permitted to ask prospective jurors case-

specific questions with the primary purpose of achieving impartiality).  Another district court

explained the importance of case-specific questioning based on the court's experience:

> [T]his court's own experience with jury selection in the . . . federal
> death-penalty case against Dustin Honken, *United States v.*
> *Honken*, No. CR 01–3047–MWB (N.D. Iowa) . . . suggests the
> insufficiency of purely "abstract" questions to determine the ability
> of jurors to perform their duties.  In *Honken*, there were numerous
> examples of the phenomenon of jurors who agreed that they could
> "fairly consider" both life and death sentences in the abstract, but
> quickly acknowledged that they could only consider one penalty in
> a case involving certain facts.  For example, in *Honken*, several
> potential jurors readily agreed that they could "fairly consider"
> both life and death sentences in the case if they found the
> defendant guilty.  However, several of those same potential jurors
> stated that they were either doubtful that they could consider, or
> stated expressly that they could not consider, a life sentence if they
> found the defendant guilty of the murder of children.  These
> responses highlight the ineffectiveness of purely "abstract"
> questions to probe, in these cases, whether or not a juror would be
> able to fulfill his or her duty to give fair consideration to both life
> and death sentences no matter what the facts are.

*United States v. Johnson*, 366 F. Supp. 2d 822, 847-8 (N.D. Iowa 2005).

12

In other words, general questioning does not suffice.  Consider, for example, a juror who answers "yes" when asked "could you weigh all of the aggravating and mitigating evidence and return a sentence of life imprisonment, depending on the evidence?"  That answer could encompass the following wide range of possibilities: the juror might mean that he could only support a life sentence if evidence of guilt was not conclusive; or the killing was accidental or an act of self-defense; or the defendant was legally insane; or only one victim was killed; or the killing was not committed after substantial planning and premeditation; or the defendant did not intentionally injure or risk the lives of other people.  The "yes" answer to the general question is therefore inadequate to assess that juror's fitness to serve because it might well mean that the juror would only consider a life sentence under circumstances that are irrelevant to the case at hand.  This risk is not theoretical.  Based upon interviews with actual capital jurors, one scholar concluded that jurors who say that the appropriate punishment would "depend on the circumstances" are "thinking of 'circumstances' that would make the act or incident a killing in self-defense, an accident, an act in the 'heat of passion,' a product of insanity; that is, they are thinking of circumstances that would make the crime not a murder at all, let alone a capital murder."  John Blume et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209, 1244-45 (Summer 2001).

Thus, when jurors are questioned about their willingness to consider both life in prison and the death penalty, they must be informed of the specific context in which this decision would need to be made.  They must truly be able to consider a life sentence in such a context even after finding the defendant guilty beyond a reasonable doubt and rejecting any affirmative defenses (such as mistake, accident, insanity, or self-defense); even after finding beyond a reasonable doubt that the defendant killed intentionally and with premeditation; and even after finding

beyond a reasonable doubt that the defendant's specific murder was aggravated in the ways the Government has alleged.

There is a substantial body of research regarding the behavior of juries in capital cases. Those findings reveal disturbing problems:

> The research provides very strong evidence of three primary findings derived from seven specific problems.  First, the process of death qualification at voir dire produces juries which are biased in favor of imposing the death penalty.  This occurs both because jurors who are opposed to the death penalty are excluded and because the voir dire discussion itself creates an expectation in the minds of many jurors that the outcome of the case is likely to be the death penalty.  Second, in the course of the trial, a majority of jurors make up their minds about the death penalty *before* completing the conviction phase.  In many cases, the later balancing of aggravating and mitigating factors which *Gregg* relied upon to distinguish defendants who truly deserve death from those who do not does not actually take place.  Finally, jurors demonstrated a consistent inability to understand and apply the courts' instructions concerning the two phases of the trial, the different burdens of proof for aggravating and mitigating factors, and the other protections intended to guide the jury's discretion.

*United States v. Fell*, 224 F. Supp. 3d 327, 335-36 (D. Vt. Dec. 13, 2016) (conclusions after hearing expert testimony and reviewing research).  The court in *Fell* also stressed the constitutional implications of these problems:

> In considering testimony about the level of inherent bias generated by the process of jury selection, the court finds that the social science studies conducted since 1980 have converged on a common conclusion that the process by which jurors are selected does not measure up to the standards of objectivity required by *Gregg*.  The exclusion of many people opposed to the death penalty on religious or moral grounds and the implicit process of persuasion at voir dire that death is the likely outcome create jury populations which stack the deck against defendants.  This suspicion originally expressed by Justice Stewart has been shown to be true.  The most telling evidence is the absence of contrary research results.  The studies brought to the court's attention supported the position of the defense that jury selection since

14

> *Gregg* is not the solution to inherent jury bias but rather a
> substantial part of the problem.

*Id.* at 338.

As the research summarized in *Fell* demonstrates, juries in actual death penalty cases

often believe erroneously, that once an aggravating factor has been found, death is mandatory.

*See, e.g.,* U. Bentele and W.J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming;*

*Aggravation Requires Death; and Mitigation is No Excuse*, 66 BROOKLYN L. REV. 1011, 1031-41

(Summer 2001).[3]  Indeed, statistically valid surveys of capital-case jurors show that a substantial

number of jurors who served on capital cases *automatically* vote for death if the defendant is

found guilty of murder.  S*ee, e.g.,* W. S. Geimer & J. Amsterdam, *Why Jurors Vote Life or*

*Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 AM. J. CRIM. L. 1, 46

(Fall/Winter 1987/1988) ("In sum, there were a significant number of jurors sitting on the death

recommendation cases who held the view that the death penalty was mandatory or presumed for

first degree murder"); S. P. Garvey, *Aggravation and Mitigation in Capital Cases: What do*

*Jurors Think?*,  98 COLUMBIA L. REV. 1538 (Oct. 1998) ("[M]any jurors wrongly think they

must return a death sentence if they find the defendant's crime was especially heinous, or the

defendant is especially likely to present a risk of future danger"); T. Eisenberg, et al., *Jury*

*Responsibility in Capital Sentencing: An Empirical Study*, 44 BUFF. L. REV. 339, 360 (1996)

("Nearly one-third of the jurors were under the mistaken impression that the law required a death

sentence if they found heinousness or dangerousness, a result replicated in the multi-state study

of the interview data"); W. J. Bowers, et al., *Foreclosing Impartiality in Capital Sentencing:*

---

[3]  This article draws, in part, on the findings of the Capital Jury Project, a study funded by the
National Science Foundation of decision-making by actual jurors in actual capital cases. As noted
in the article, the data analyzed was based on interviews of 1,155 capital jurors from 340 trials in
14 states.  *Id.* at 1017.

*Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 CORNELL L. REV. 1476, 1524 (Sept. 1998) ("[S]ome jurors also associated specific aggravating characteristics of the crime, especially the killing . . . of more than one victim, with the presumption that death was the appropriate punishment"); T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 12 (Nov. 1993) ("The data suggest[s] that the sentencing phase of a capital trial commences with a substantial bias in favor of death. This is not itself an indictment of the death trial phase. But the tilt towards death suggests that a defendant with a confused jury may receive a death sentence by default, without having a chance to benefit from the legal standards deigned to give him a chance for life.").

In this case, at a penalty phase, the jury will also almost certainly hear heartbreaking evidence from the surviving loved ones of the deceased victims, injured victims and their loved ones, and others who were traumatized and permanently impacted by an act of terrorism committed in the physical vicinity of the 9/11 attacks. Thus, as the research demonstrates, given the aggravating nature of the instant charged crimes, there is a significant likelihood that a number of prospective jurors will enter their service biased or substantially impaired to consideration of a life sentence. Therefore, a particularly careful, case-specific *voir dire* is required.

3.    Individual questioning and attorney-conducted *voir dire*

Federal judges have overwhelmingly chosen to conduct individual, private questioning of potential jurors in capital trials; indeed, they do so in 87 percent of capital cases. *See* Declaration Regarding Jury Selection Practices by Kevin McNally, Feb. 15, 2019 ("McNally Declaration"), ¶

10.[4]  Individual questioning further promotes juror disclosure during *voir dire* and enhances the

ability of the parties and Court to assess bias.  Judge Gregory Mize, of the Superior Court of the

District of Columbia, vividly described this problem after conducting an experiment in his own

courtroom.  *See* Judge Gregory E. Mize, *On Better Jury Selection: Spotting UFO Jurors Before*

*They Enter the Jury Room*, 36 COURT REV. 10 (Spring 1999).[5]  In non-capital cases, Judge Mize

asked questions of jurors together during general *voir dire*, followed by private individual

questioning; he found that jurors who had remained silent when asked general questions

regarding guns, drugs, and the credibility of police officers, later revealed information that led to

them being struck for cause.  *Id.* at 12-13.  Judge Mize found that over the course of thirty trials,

an average of 16 people per 59-person panel remained silent during group questioning and that

an average of about three of them revealed, during private individual questioning, information

that resulted in a strike for cause by consensus of the parties.  *Id.* at 15.  As a result of this

experiment, Judge Mize concluded: "I found the individual voir dire of all citizens to be an

indispensable way of ferreting out otherwise unknown juror qualities."  *Id.* at 12.

　　　　Another problem of group-*voir dire* is conformity.  Research demonstrates that

individuals who are exposed to the views of others and are required to state their own views

before a group tend to conform their views to those of the majority.  *See, e.g.*, D. Suggs and B.D.

Sales, *Juror Self Disclosure in the Voir Dire: A Social Science Analysis*, 56 IND. L. J. 245, 259-

---

[4] Available at
https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/public/project_declarations/jury_selection
/voir_dire_procedures_2-15-19.pdf.

[5] Available at http://aja.ncsc.dni.us/publications/courtrv/cr36-1/CR36-1Mize.pdf.

60 (Winter 1981)[6] ("Both the group and the individual-within-a-group styles of questioning are grossly inadequate for producing honest self-disclosure because they engender conformity of responses.").  Questioning jurors individually will also prevent the spread of prejudicial information.  *See*, *e.g.*, *United States v. Rosado*, 728 F.2d 89, 94 (2d Cir. 1984) ("At the request of the defense, [the District Court] questioned members of the venire individually, thereby insulating prospective jurors from publicity to which others may have been exposed."); *U.S. v. Hosseini*, 679 F.3d 544, 555 (7th Cir. 2012) ("Individual voir dire of all prospective jurors may be called for in limited circumstances—for example, where extensive pretrial publicity increases the likelihood that jurors have formed preconceived notions about a case.").

Attorney-conducted *voir dire* is also important in assuring a fair jury in a capital case.  In federal capital trials across the country, attorney questioning during jury selection has been allowed in 82 percent of cases.  *See* McNally Declaration, *supra*, ¶ 5.  We ask the Court to follow the procedure employed by Judge Weinstein in *United States v. Taveras*:

> The general practice in this district is for the judge to ask all the questions or to supplement those posed in a written questionnaire. In a capital case it is particularly desirable to ensure that counsel for both parties have the opportunity to plumb the venireperson's views on capital punishment, their understanding of mitigating and aggravating factors, and other issues . . .
>
> Individual voir dire will be conducted in the jury room with the defendant present. Each side will be permitted 30 minutes to question each prospective juror.  Defendant will begin with each juror, and will have the right to reserve five minutes of his time to follow the government's questioning.  Additional time will be granted when the court deems it necessary.

---

[6] Available at
https://www.repository.law.indiana.edu/cgi/viewcontent.cgi?article=3535&context=ilj.

*Taveras*, 436 F. Supp. 2d 493, 504 (E.D.N.Y. 2006) (affirmed in part, vacated in part on other grounds), *United States v. Pepin*, 514 F.3d 193 (2d Cir. 2008).

Allowing counsel to question jurors is more effective for assessing bias because jurors are more likely to be honest about their views when questioned by attorneys rather than judges. Studies indicate that people are more willing to disclose information to those whom they perceive as having similar status to themselves than to those of higher status. *See Suggs and Sales*, *supra*, at 254 ("A large status differential between the interactants will most likely reduce perceived similarity and, in turn, the degree of self-disclosure.").  Highly-esteemed figures, such as judges, encourage potential jurors' tendency to offer the "socially desirable" response. *See* Neil Vidmar, *When All of Us Are Victims: Juror Prejudice and "Terrorist" Trials*, 78 CHI.-KENT L. REV. 1143, n. 88 (2003) ("Research findings suggest that judge-conducted voir dire is less likely to produce full disclosure in jurors than lawyer-conducted voir dire.") (internal citations omitted).

The Supreme Court has explicitly contemplated attorney questioning as a means of effectuating constitutional norms in capital cases: "As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality."  *Witt*, 469 U.S. at 423.  *See also United States v. Ible*, 630 F.2d 389, 395 (5th Cir. 1980) ("[V]oir dire may have little meaning if it is not conducted at least in part by counsel. . . . [I]t is the parties, rather than the court, who have a full grasp of the nuances and the strength and weaknesses of the case.").

Attorney participation in *voir dire* is efficient, too.  Allowing counsel to ask relevant questions of jurors is more expedient than requiring counsel for both parties to propose specific

questions, in advance, concerning each potential juror; to make specific requests throughout jury selection for follow-up questions of individual jurors; to make objections, for each individual juror questioned, regarding questions not asked; and to file motions throughout the process. Finally, allowing attorney-conducted questioning reduces post-trial speculation about what additional probing might have revealed about possible juror bias.

## Conclusion

For all of these reasons, Mr. Saipov urges the Court to adopt the general procedures outlined above, once they are formally submitted for the Court's approval, following consultations with the Government and the Jury Clerk.

Respectfully submitted,

_____/s/_____
David Patton
Counsel for Sayfullo Saipov

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :

       vs.              :    No.  3:CR-13-123

JESSIE CON-UI         :    Judge A. Richard Caputo

    Defendant      :

## ORDER

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

The Court has ordered that trial would commence in this case beginning April 24, 2017. The parties have jointly submitted a proposed order for jury selection procedures in which the parties agreed to a comprehensive set of procedures and deadlines for the jury selection process.

AND NOW, on the ___2nd___ of September, 2016, **IT IS HEREBY ORDERED THAT:**

1.    The Court will mail hardship questionnaires to a venire of approximately 750 persons on or about January 9, 2017. The venire persons are directed to return the questionnaires no later than February 6, 2017.

2.    Upon review of responses to the hardship questionnaires, the Court may excuse any potential juror it finds to be exempt or ineligible to serve based upon local rules.

3.    The remaining jurors will be summoned to appear in panels for completion of the special questionnaire the week of March 6, 2017. The size of the

1

panels to be summoned will be determined by the Court. Panels will be summoned for morning and afternoon sessions, and will complete the questionnaires under the supervision of court personnel.

4.     The Court will make completed special questionnaires electronically available to the parties for review the week of March 13, 2017.

5.     The parties must confer and file with the Court no later than March 31, 2017, a list of stipulated strikes for cause. The Court will excuse all members of the venire appearing on this stipulated list.

6.     The Jury Division shall create a list of remaining prospective jurors by name and number and the order in which they will be called. The jurors will be called in numerical order starting with the lowest number. The Clerk will provide this list to the parties by close of business on Friday, April 14, 2017.

7.     On the date the trial is scheduled to commence, April 24, 2017, 12 jurors will be summoned per day until a requisite number of jurors are qualified. This number may be adjusted up or down at the Court's discretion as jury selection proceeds and the Court sees how much time is necessary to complete individual voir dire.

8.     The 12 summoned jurors per day will be brought together into the courtroom where the Court will provide an overview of the process and general applicable legal concepts, including the possibility of the death sentence during the penalty phase. Thereafter, the Court will conduct general voir dire on issues for which individual voir dire is thought not to be necessary, including hardships, pretrial publicity, bias, prior contact with the defendant, attorneys, witnesses, etc.

Following this general voir dire, the prospective jurors will be excused to the jury room and cause challenges will be argued. Individual voir dire will then commence for the remaining prospective jurors.

9.       When an individual juror returns to the courtroom, one attorney from either the government or the defense will take turns questioning that juror, alternating which side begins the questioning. Cause challenges will be argued after the completion of individual voir dire for each prospective juror. The procedure is then repeated for those prospective jurors who remain. Each prospective juror not excused for cause would remain at the call of the Court for possible jury service.

10.      Once at least 70 jurors have been qualified and accepted by the parties, individual voir dire shall cease. The court will allow the parties two business days to review the qualified panel at which time the parties will exercise peremptory challenges and the petit jury will be selected. The parties will alternate going first in choosing whether to strike or pass each juror. If a party passes an opportunity to strike a juror, that challenge will be deemed to have been exhausted. The parties may strike a juror in any part of the qualified pool, not just as to the 12 seated in the jury box. Each party may exercise a maximum of 20 peremptory strikes. Consecutive passes will mean the jury is acceptable no matter how many strikes remain. Once a jury of 12 is selected, the parties will continue the process to select six alternative jurors. When selecting alternative jurors, each party may exercise three peremptory strikes utilizing the process set forth with regard to selecting the main panel. Peremptory strikes not used in picking the main panel may not carry over to be used

3

in selecting the alternate jurors. Once six alternate jurors are selected, any remaining prospective jurors will be excused.

Judge A. Richard Caputo
United States District Court
Middle District of Pennsylvania