**Federal Defenders OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

January 6, 2020

**By ECF**
Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
United States Courthouse
40 Centre Street
New York, NY 10007

Re:   <u>United States v. Sayfullo Saipov</u>
       (S1) 17 Cr. 0722 (VSB)

Dear Judge Broderick,

The parties submitted a joint proposed juror questionnaire to the Court today. *See* Dkt. No. 247-1. Within the questionnaire, questions and remarks in *italics* indicate defense-requested questions and remarks to which the government objects. We write in support of the inclusion of the defense-requested material.

"[T]he guarantee of a defendant's right to an impartial jury" necessarily includes "an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). While courts have broad discretion in conducting *voir dire*, the Supreme Court has "not hesitated … to find that certain inquiries must be made to effectuate constitutional protections." *Id.* at 730. Indeed, courts must be particularly careful to ensure that *voir dire* satisfies the Sixth Amendment in capital cases, *see id.*, given the enormity of the stakes for the defendant. Any restrictions on the defense's request for particular inquiries must comport with "the essential demands of fairness." *Id.* (quoting *Aldridge v. United States*, 283 U.S. 308, 310 (1931)).

As we have previously set out in detail, *see* Dkt. Nos. 226, 237, in a capital case, the court must determine if a juror's views about the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 420 (1985) (internal citations omitted). The government may challenge for cause prospective jurors who are "substantially impaired" in their ability to consider imposing a death sentence, and the defense may challenge for cause jurors who are "substantially impaired" in their ability to consider and give effect to the relevant mitigation factors in this case. *See Morgan*, 504 U.S. at 729-734. *Voir dire* as to these topics is thus necessary. *See id.* In particular, courts have repeatedly noted that the jury's ability to give consideration and effect to mitigation evidence is constitutionally required. *See, e.g.*, *Abdul-

*Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."); *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (internal citations and quotations omitted) (noting that the Constitution "requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence"); *Penry v. Johnson*, 532 U.S. 782, 797 (2001) ("[A] sentencer [must] be allowed to give full consideration and full effect to mitigating circumstances.") (internal citations omitted) (alterations in original).

In this case, a juror will be mitigation-impaired if he or she cannot consider mitigating evidence for a defendant who, as alleged here, planned and premeditated a terrorist attack, intentionally killed 8 people, and did so in an effort to join a foreign terrorist organization. The only way to find out if a juror is mitigation-impaired or not is to ask her. General questioning will not suffice. Only case-specific questions that explicitly address whether the juror can consider relevant facts will provide the court and the parties the necessary information to ensure an impartial jury. *See United States v. Johnson*, 366 F. Supp. 2d 822, 847-8 (N.D. Iowa 2005) (ruling in favor of case-specific punishment questions because the Court previously found that "there were numerous examples of the phenomenon of jurors who agreed that they could 'fairly consider' both life and death sentences in the abstract, but quickly acknowledged that they could only consider one penalty in a case involving certain facts"); *United States v. Fell*, 372 F. Supp. 2d 766, 771 (May 25, 2005 D. Vt.) (permitting case-specific punishment questions after acknowledging that a juror would have to be excused for cause if he or she could not consider mitigation under specific facts). Such questions are distinct from impermissible "stake out" questions, which ask a juror to commit in advance to how he or she would ultimately vote. *See id.*; *Johnson*, 366 F. Supp. 2d at 845 (asking juror if she "could fairly consider either a death or life sentence, notwithstanding proof of certain facts, commits a juror to no other position than fair consideration of the appropriate penalty in light of all of the facts and the court's instructions").

Social science research reveals that, in the absence of case-specific information, jurors may answer questions during *voir dire* based on circumstances that are wholly inapplicable to the case at bar. When jurors answer affirmatively to whether they could vote against the death penalty under certain circumstances, researchers have found that, "time and time again … many of these potential jurors are not contemplating circumstances attendant to the intentional killing of another human being with malice aforethought. Instead, all too often the potential jurors are thinking of 'circumstances' that would make the act or incident a killing in self-defense, an accident, an act in the 'heat of passion,' a product of insanity; that is, they are thinking of circumstances that would make the crime not a murder at all, let alone a capital murder." John H. Blume et. al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1244–45 (2001). Even among jurors who do have in mind intentional murder, some may only be able to vote against the death penalty in the absence of aggravating circumstances. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1542 (1998) ("[M]any jurors wrongly think they *must* return a death sentence if they find the defendant's crime was especially heinous.") (emphasis added). Thus, it is essential to present the particular case circumstances during *voir dire*.

Indeed, case-specific questions have been included in numerous death-penalty case questionnaires. *See Exhibit B*, Declaration Regarding Excerpts from Juror Questionnaires in Recent Federal Capital Cases by Matthew Rubenstein, Esq. ("Rubenstein Declaration II").[1] Aggravating factors are routinely included in penalty-section questions, to ensure that a juror can be fair in the particular case at bar notwithstanding the (often gruesome or extraordinarily prejudicial) facts. For example, in *Candelario-Santana*, potential jurors were asked about "a case where there were many murder victims, one of whom was an unborn child, and the defendant had spent time in prison in the past for prior convictions of murder"; in *Savage*, about "a person who deliberately and intentionally uses arson fire to murder family members of a government witness, including children"; in *Basciano*, about "a defendant [who] sought the murder of a federal prosecutor," "a defendant [who] sought the murder of a cooperating witness," "a defendant [who] is already serving a sentence of life imprisonment," and "a defendant [who] was previously convicted of intentional murder"; in *Duong*, about "a person who committed eight intentional murders"; and in *Moussaoui*, about "someone convicted of conspiracy to commit acts of terrorism, conspiracy to commit air piracy, conspiracy to murder U.S. citizens, or conspiracy to use weapons of mass destruction, resulting in the deaths of thousands of people, as in the September 11th attacks on the United States." *See id.*, at Excerpts: Set E & F (p. 10-13). Particular categories of mitigating factors are also regularly included in questionnaires: In *Con-Ui*, *Watland*, *Ritz Williams*, and *Lujan*, for example, jurors were asked about their ability to consider a defendant's childhood and background and personal circumstances, as well as and their ability to evaluate psychological and psychiatric testimony. *See id*. at Excerpts: Set I & J (p. 16-18). And courts have recognized the importance of asking jurors about their ability to consider the particular categories of mitigation evidence to be presented. *See, e.g.*, *United States v. Fell*, 372 F. Supp. 2d 786, 789 (June 9, 2005 D. Vt.) ("[T]he FDPA requires jurors to make an individual finding regarding each mitigating factor proposed by the defense. Thus, it is important for the court to ensure that every prospective juror is able to fairly and impartially consider the categories of mitigating evidence that the defendant would introduce at a penalty phase.").

### Defense Proposals

The defense proposals in the instant questionnaire are necessary to satisfy the demands of the Sixth and Eighth Amendments and the applicable case law. The questions and remarks seek information from the prospective jurors that will reveal any substantial impairment in their ability to impose the death penalty or consider mitigation. As detailed herein, each of our proposals is supported by prior capital cases: Other district courts have used the same questions and remarks to conduct an inquiry that meets the requirements of the Constitution.

### Punishment Section: Defense Introduction

The defense-proposed introduction to the punishment section is consistent with similar – and in some cases, taken verbatim from – instructions in multiple other cases. *See Exhibit A*, Declaration Regarding Language Providing a Brief Overview of the Sentencing Hearing Process

---

[1] Upon request, full versions of the questionnaires from which these excerpts were taken are available for the Court's review.

in Juror Questionnaires from Recent Federal Capital Cases by Matthew Rubenstein, Esq. ("Rubenstein Declaration I").

In the examples provided, district courts around the country included instructions that define aggravating and mitigating factors, and describe how they must be evaluated at a penalty phase. *See id*. Doing so enables the courts to root out substantial impairment among those in the venire. Because the Supreme Court requires that jurors be open to considering mitigating factors, and requires that the court determine a juror's openness to mitigating factors during *voir dire*, the Court should start by defining the terms aggravating and mitigating factors and explaining to the jurors how they may be called upon to consider such factors at the second phase of the trial. Our introduction does so.

By contrast, the government-proposed introduction is inadequate. It makes no mention of aggravating or mitigating factors nor any information about how the penalty process works. As a result, the government version creates a risk that a juror could read the introduction and answer the questions, be sworn in as a juror, and only learn during the penalty phase that she will be called upon to make a determination about the death penalty by considering and weighing aggravating and mitigating factors. If, upon hearing that, the juror thinks to herself that she cannot comply with the law, the court will have inadvertently allowed a mitigation-impaired juror to sit in judgment of Mr. Saipov in violation of his constitutional rights. The solution is simple: provide the juror with the brief explanation of aggravating and mitigating factors in the defense-proposed instruction in the questionnaire.

The defense introduction also provides additional, factual information regarding the penalty phase: that life imprisonment means life with no release, that the jury selects the sentence and the sentence is final, that each juror must make an individual moral decision about the sentence, and that 12 votes are required for a death verdict. As noted in our attachment, questionnaires given by other courts provide these facts. *See id*.

There is no reason to hide these principles of law from the jurors until after they are sworn in. To share them up front will ensure that the jurors are not answering the subsequent questions based on false assumptions or inaccurate premises. For example, jointly-proposed Question #124 asks, "In a case where an accused has been found guilty of intentionally murdering other people, I would vote to impose the death penalty, regardless of the circumstances?" Without the information offered in the defense introduction, a prospective juror might respond "no," because that juror might think – erroneously – that her vote was not determinative or that the judge would make the final sentencing decision. If that same juror is told the basic principles of law that we lay out in the introduction, that "no" might well become a "yes." Without giving the jurors the basic information the defense proposes, the parties and the Court will be left to wonder about the assumptions or misinformation the potential jurors may be relying upon. Again, the solution is simple: include the defense-proposed introduction in the questionnaire.

**Punishment Section: Defense Questions**

The proposed defense questions in this section are designed to root out substantial impairment, by further probing jurors' views on the death penalty and life imprisonment, asking if jurors can consider mitigation in the context of a defendant who premeditates a terrorist attack and kills multiple people, and seeking jurors' feedback regarding various categories of mitigation. Unlike improper "stake-out" questions, these questions do not commit jurors to any particular position; they merely assure that the jurors are open to following the Court's instructions in light of the particularly inflammatory facts of this case. Jurors' expressed views about the death penalty divorced from the general facts of this case – a premeditated terrorist attack involving the deaths of multiple people – will not provide the necessary assurance for a reliable death penalty proceeding. Precisely for this reason, other courts have routinely asked case-specific questions when probing jurors' views of the death penalty.

**Question #122(c)**: The government agrees that the questionnaire should ask about the evolution of the jurors' views on the death penalty (*see* Question #122(a), (b)). The defense believes that asking if terrorist attacks have influenced that evolution is relevant and probative.

**Question #127(a)**: Included in other capital case questionnaires. *See Exhibit B*, Rubenstein Declaration II, at Excerpts: Set A (p. 6).

**Question #132**: Included in other capital case questionnaires. *See id*. at Excerpts: Set B (p. 7).

**Question #133**: Included in other capital case questionnaires. *See id*. at Excerpts: Set C (p. 8).

**Question #134**: Included in other capital case questionnaires. *See id*. at Excerpts: Set D (p. 9).

**Question #135**: Included in other capital case questionnaires. *See id*. at Excerpts: Set E (p. 10). Some of the cited questions use very similar wording, while others vary, but all ask about the death penalty in light of case-specific aggravating facts. *See id.*

**Question #136**: Included in other capital case questionnaires. *See id*. at Excerpts: Set F (p. 13). All of the cited questions ask about life imprisonment in light of case-specific aggravating facts. *See id.*

**Question #137**: Included in other capital case questionnaires. *See id*. at Excerpts: Set G (p. 14).

**Question #138**: Included in other capital case questionnaires. *See id*. at Excerpts: Set H (p. 15).

**Question #139**: Included in other capital case questionnaires. *See id*. at Excerpts: Set I (p. 16).

**Question #140**: The defense only seeks to use this question if it decides to introduce mental health as a mitigating factor.
**Question #141**: Included in other capital case questionnaires. *See id*. at Excerpts: Set J (p. 18).

**Question #142**: Included in other capital case questionnaires. *See id*. at Excerpts: Set K (p. 19).

**Question #143**: Included in other capital case questionnaires. *See id*. at Excerpts: Set L (p. 20).

**Question #144**: Included in other capital case questionnaires. *See id*. at Excerpts: Set M (p. 21).

**Question #145**: Included in other capital case questionnaires. *See id*. at Excerpts: Set N (p. 22).

**Question #146**: Included in other capital case questionnaires. *See id*. at Excerpts: Set O (p. 28).

### Other Sections: Defense Questions

**Question #63**: This question has been used in another capital terrorism case. *See United States v. Moussaoui*, 01 Cr. 455 (LMB) (E.D. Va.), Question #76:

> Do you believe that Islam endorses violence to a greater or lesser extent than other major religions? Yes___ No___ Unsure___ Please explain: ___.

It has also been used in a non-capital terrorism case. *See United States v. Defreitas*, 07 Cr. 543 (DLI) (E.D.N.Y.), ECF No. 252, Question #21:

> Do you believe Islam endorses violence to a greater, lesser, or to the same extent than other major religions? [ ] Greater extent [ ] Less extent [ ] Same extent. Please explain:___.

> Can you set aside your views and assess this case based solely on the evidence and the law? [ ] Yes [ ] No. If 'no,' please explain:___.

**Question #70**: This question is similar to a question asked in another capital case involving terrorism. *See United States v. Moussaoui*, 01 Cr. 455 (LMB) (E.D. Va.), Question #93:

> Have you or any family member or close personal friend refused to fly in an airplane or been very reluctant to fly in an airplane as a result of the September 11th attacks? Yes___ No___.

**Questions #94 & 95**: These questions ask whether the juror can follow a particular principle of law. Such questions are both permitted and used elsewhere in this questionnaire on the consent of the government. *See*, *e.g.*, Question # 88, Question # 96, Question # 150.

**Questions #147 & 149 (1st #149, on p. 50)** [2]: The word "moral" comes from Supreme Court jurisprudence; therefore, we believe it should be included here. *See*, *e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 254 (1988) ("The capital sentencing jury is asked to make a *moral* decision about whether a particular individual should live or die") (emphasis added); *Abdul-Kabir*, 550 U.S. at

---

[2] The number 149 was mistakenly assigned to two consecutive questions in the joint questionnaire. We address them here by "1st" and "2nd" and using the page number on which they each appear.

6

252 (noting "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J. concurring)) (emphasis in original); *Penry*, 492 U.S. at 318-319 (reversing death sentence because the Court could not "be sure that the jury's answer to the first special issue reflected a 'reasoned *moral* response' to [the defendant's] mitigating evidence") (emphasis added).

**Question #149 (2nd #149, on p. 51)**: Whether a juror has formed an opinion about the outcome of the case is always relevant to person's ability to serve as a juror. If that opinion was formed based on specific impressions of Mr. Saipov, the answer is relevant to determine whether the juror can be fair and impartial in this case.

## Defense Objections

**Question #125**: We object to the inclusion of this question. The question that follows – Question #126 – is more balanced and open-ended and should be used in its place.

## Conclusion

For the reasons laid out herein, the defense proposals further the constitutional mandate to seat an impartial jury and are consistent with the inquiries made in other capital cases. They should be included in the questionnaire.

Respectfully submitted,

_____/s/_____
David Patton
Counsel for Sayfullo Saipov