**Federal Defenders**
**OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
Executive Director
and Attorney-in-Chief

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

September 24, 2020

*VIA EMAIL (UNREDACTED)*
*VIA ECF (REDACTED)*
Honorable Vernon S. Broderick
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

**Re:** *United States v. Saipov,*
  **(S1) 17 Cr. 722 (VSB)**

Dear Judge Broderick:

For over two years, the government assured this Court and the defense that it had complied with all of its discovery obligations. It did so in the face of repeated requests by the defense for specific material, including detailed demands for wiretapped recordings of Sayfullo Saipov's communications. Despite the government's assurances, near the end of July 2020—more than three months after trial was supposed to begin—the government produced 46 previously undisclosed recordings of Mr. Saipov's telephone calls. These calls were primarily with ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄, a target of national security-related, surreptitious government surveillance, and the subject of a separate terrorism investigation by one of the lead detectives in this case, Richard Paugh.

The government did not make these disclosures on its own initiative. While preparing for trial, the defense found reason to believe that the government had failed to disclose all of Mr. Saipov's recorded phone calls with ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄. On April 19 and 23, 2020 the defense sent the government two pointed demands for discovery, which followed up on numerous, previous demands for all of Mr. Saipov's recorded statements in the government's possession, custody, or control under Fed. R. Crim. P. 16(a)(1)(B)(i). On July 15 and 24, 2020 the government responded with 46 additional recordings of Mr. Saipov's phone calls, the bulk of which were with ▄

███████—a disclosure that still does not account for all of the discrepancies we identified for the government in our demand letters.

"Federal prosecutors have constitutional and statutory duties to disclose many types of evidence to defendants. This principle of disclosure is central to our criminal-justice system." *United States v. Sadr*, 18 Cr. 224 (AJN), Dkt. No. 379 (S.D.N.Y. Sept. 16, 2020) ("*Sadr* Order"). The July 2020 revelation that the government possessed and failed to disclose numerous communications between Mr. Saipov and ███████ belies its repeated previous representations that it complied with Rule 16 and produced all written or recorded communications attributable to Mr. Saipov in its possession or control. This Rule 16 violation, and the likelihood that the government is still withholding additional recordings of Mr. Saipov's communications, have wide-ranging implications for several aspects of this capital case. *See infra* Part III. Now, the Court must take action.

The government first disclosed years' worth of recorded communications between Mr. Saipov and ███████ in November 2018. Since then, their relationship, what the government knew about it, and how the government used that knowledge in interrogating Mr. Saipov has been a focal point for the defense. Not only did the wiretaps feature prominently in Mr. Saipov's motion to suppress his post-arrest statements and motion to compel notice and discovery of classified government surveillance, but the defense also relied upon the recordings in our investigation into several critical aspects of this case, including insight into Mr. Saipov's exposure to ISIS and relationships with ISIS sympathizers who could have influenced his behavior. Given the wiretaps' importance, on several occasions the defense sought the government's confirmation that there were no additional recordings to disclose. Each time, the government assured defense counsel that it understood its Rule 16 obligations and that there were no additional recordings to produce. The defense relied on the accuracy of these representations as we crafted strategies for sensitive interviews of potential witnesses and litigated various, complex legal issues, including the motion to suppress Mr. Saipov's post-arrest statements and our cross examination of the agents who interrogated Mr. Saipov.

Against this backdrop, the untimely July 2020 production of additional recordings requires revisiting (and additional briefing on) various pre-trial matters, including Mr. Saipov's motions to compel and suppress, his challenge to specific aspects of the government's Notice of Intent to Seek the Death Penalty, and the government's ability to seek the death penalty altogether. Before this can happen, Mr. Saipov respectfully submits that the Court should hold an evidentiary hearing to determine whether the untimely production was intentional; assess the accuracy and

thoroughness of the government's search of its files for discoverable materials; and obtain a more reliable assurance that the government has complied with Rule 16 and produced all of Mr. Saipov's written or recorded communications in its possession, custody, or control.

Following the evidentiary hearing, the defense may seek to file motions to: 1) reopen and reconsider the Court's Order and Opinion denying Mr. Saipov's motion to compel; 2) reopen the factual hearing regarding Mr. Saipov's motion to suppress his post-arrest statements; and 3) pursue appropriate remedies related to any Rule 16 violations and governmental misconduct claims arising from the July 2020 disclosures. This includes the disclosures' effect on Mr. Saipov's mitigation investigation and on the propriety of the government's Death Notice, including its ability to proceed with specific aggravating factors.

These measures are the minimum necessary to ensure the heightened reliability of Mr. Saipov's capital prosecution as required by the Fifth, Sixth, and Eighth Amendments. For more than two years, the government made false claims to the Court and the defense that it had complied with its discovery obligations. Had the trial not been delayed, the withholding of the evidence may never have come to light. Now that it has, we ask the Court to take appropriate steps to attempt to remedy the error.

## I. The July 2020 wiretap disclosures contradict the government's prior representations to Mr. Saipov and to the Court that it complied with its discovery obligations and disclosed all written or recorded statements attributable to Mr. Saipov.

During a status conference on June 22, 2018, the Court asked the government to confirm whether there was "additional discovery [] yet to be produced." Hrg. Tr. at 4. The government responded that "there is no pending Rule 16 discovery" and further stated that "we certainly don't anticipate any substantial CIPA motion practice here." *Id.* (referring to litigation under the Classified Information Procedures Act). Three months later, on September 21, 2018, the defense wrote the government and sought "all evidence of Mr. Saipov's alleged interactions, contacts, associations, or affiliations with ISIS." In pertinent part, the defense requested all of Mr. Saipov's written or recorded statements in the government's possession, custody or control under Fed. R. Crim. P. 16(a)(1)(B)(i).

On November 20, 2018, in its 17th discovery production, the government disclosed additional Rule 16 materials, including (for the first time ever) voluminous

3

recordings and translated summaries of telephonic conversations between Mr. Saipov and two targets of classified foreign-intelligence surveillance, one of which was ███ ████████.[1] On November 29, 2018 the defense sent the government another letter requesting more information about the wiretaps, including the factual basis for them and the surveillance authorities the government relied upon. The government declined to provide the requested information.

On January 14, 2019 the Court set a deadline of January 28, 2019 for any defense motion to compel related to the wiretaps. *See* Dkt. No. 107. Four days later, on January 18, 2019, the defense wrote the government and asked for additional discovery, including confirmation that there were no other written or recorded statements attributable to Mr. Saipov in the government's possession, custody, or control. The government responded that it intended to provide additional discovery and asked for our consent to move the deadline for the motion to compel to February 8, 2019, which the defense provided and the Court later granted.

On March 1, 2019, the government responded to our January 18 discovery demand and provided limited insight into why ████████████████ was a target of government surveillance. The government also stated that:

> [A]fter exercising due diligence and coordinating with other agencies, [it] is not aware of any additional written or recorded statements of Saipov. As part of this diligence, the Federal Bureau of Investigation ("FBI") conducted a comprehensive and exhaustive search for any communications from or to Saipov's known facilities [footnote omitted]. This included reviewing (i) all electronic accounts searched in connection with this investigation, (ii) the contents of phones or other communications facilities searched in connection with investigations of ████████████████████ and ██ associates, and (iii) any available intercepted communications of Saipov's associates. Further, and as you are aware from the FBI reports produced to date, several individuals consented to searches of their phones during the FBI's investigation of Saipov. Accordingly, the FBI also searched those phones for any communications with Saipov. Finally the Government has, throughout this case, coordinated with other parts of the U.S. Government to ensure

---

[1] The November 2018 disclosure contained 683 telephone calls, 135 text messages, and two emails (including one attachment) in which Mr. Saipov was a participant, that the FBI collected through its investigation of ████████████████ and of at least one other person.

that it has reviewed any other materials potentially subject to the Government's disclosure obligations.

Following the government's March 1, 2019 letter, the defense obtained an extension of time to file its motion to compel to March 15, 2019. The government later supplemented its March 1, 2019 letter with more information responsive to our January 18, 2019 demand, but did not disclose any additional recorded communications. Relying on the government's representation that the defense had received all written or recorded communications attributable to Mr. Saipov in its possession, custody or control, the defense filed its motion to compel notice and discovery of all surreptitious electronic surveillance (intentional or not) of Mr. Saipov's electronic communications.[2]

On July 12 and September 25, 2019 the defense requested additional discovery from the government, this time arising from our review of numerous FD-302s that the government had previously produced. In both demands, the defense sought any outstanding written or recorded communications between Mr. Saipov and various witnesses. With respect to ███████████, the defense explicitly requested "any outstanding written or recorded communications between ███████████ and Mr. Saipov, including communications over group chats on any social media platforms…."

The government answered the defense's July and September 2019 letters on September 25 and October 7, 2019, respectively. In the government's September 2019 response, it stated:

> Your July 12, 2019 letter further requests the defendant's telephonic or text-message communications, as well as any written or recorded communications between the defendant and certain

---

[2] The government responded to Mr. Saipov's motion to compel on July 19, 2019 and relied exclusively on an *ex parte* submission it had filed with the Court that same day under CIPA § 4. The government's response and CIPA § 4 application were preceded by two *ex parte* conferences with the Court under CIPA § 2 and another discovery production on July 16, 2019. On August 9, 2019 Mr. Saipov replied to the government's response and challenged the *ex parte* nature of the government's arguments against further discovery of the wiretap disclosures. The Court denied Mr. Saipov's motion to compel on October 29, 2019.

individuals.  We remain in compliance with our Rule 16 obligations and have no such additional materials to produce.

And in its October response, the government reiterated:

With respect to the remaining requests [concerning Mr. Saipov's written or recorded communications], we are in compliance with our disclosure obligations, including our obligation to produce any of Saipov's written or recorded statements.[3]

Relying on the accuracy of the government's representations that there were no outstanding written or recorded communications attributable to Mr. Saipov in the government's possession, the defense prepared for the suppression hearing, which was held at the end of January 2020 (*see infra*), and continued to interview witnesses, investigate various leads, and prepare defenses specific to the trial and penalty phases of this capital case.  Unfortunately, the government's numerous assertions that it had complied with Rule 16, and fully disclosed all of Mr. Saipov's recorded communications with ███████████ in particular, were false and only came to light after the defense confronted the government with discrepancies between the disclosures, Mr. Saipov's call detail records, and cell phone forensic reports.

## II. The government disclosed nearly four dozen additional recorded communications between Mr. Saipov and ███████████ in July 2020 only after pointed defense demands for the materials on April 16 and 23, 2020.

Following the January 2020 hearing regarding Mr. Saipov's motion to suppress his post-arrest statements, including post-hearing briefing, the parties pivoted to trial preparation, filing various motions *in limine* and responses and replies thereto.  When New York City became the national epicenter for the COVID-19 pandemic in mid-March, however, the Court adjourned Mr. Saipov's trial *sine die* and the parties remain in agreement that setting a new trial date is premature.  *See* Dkt. No. 343.

---

[3] Also on October 7, 2019, the defense sent the government a follow-up demand related to its September 25, 2019 letter.  In the defense's October 7 demand, we again requested "any written or recorded statements attributable to Mr. Saipov that have not yet been disclosed (Rule 16(a)(1)(B))."  The government responded on November 4, 2019 and stated that it remains "in compliance with its disclosure obligations, including its obligation to produce *Brady* material."

6

Although COVID-19 has disrupted and put on hold much of the defense's trial preparation, members of the defense team have continued to scrutinize the discovery materials and the government's trial exhibits, including the returns of a forensic search of Mr. Saipov's cellular phone. In doing so, the defense discovered numerous discrepancies between Mr. Saipov's cell phone metadata and the government's wiretap production from November 2018. Specifically, the defense discovered telephone calls between Mr. Saipov and ▬▬▬▬▬▬ from March through October 2017 that were either unaccounted for in the government's November 2018 wiretap production or that had lasted longer than what the corresponding wiretap returns for the calls suggested. Both of these revelations strongly suggested the existence of additional recordings between Mr. Saipov and ▬▬▬▬▬▬ that the government failed to disclose.

On April 19, 2020 the defense wrote to the government and flagged in general terms these discrepancies. When asked to clarify, the defense responded by letter on April 23, 2020 with a spreadsheet reflecting two types of data from our review of Mr. Saipov's call-log details with ▬▬▬▬▬▬ between March and October 2017:

1. 60 call-log items, totaling over three hours, for which no audio had been produced, and
2. 83 call-log items for which the produced wiretapped audio is shorter than that indicated in the call-detail logs. (Notably, one of the "shortened" recordings is a phone call between Mr. Saipov and ▬▬▬▬▬▬ ▬▬▬▬▬▬

On July 15, 2020 the government responded to our letter and stated that "upon a further review of the FBI's holdings" it had "identified 46 additional calls for production." The government claimed that "[t]hese calls were not produced previously because of inadvertent errors in the review and discovery process." The government attached seven recordings to its July 15 correspondence and produced the remaining 39 on July 24, 2020, noting that it would continue to work with the FBI to exhaustively search for any outstanding recordings. On September 18, 2020 we asked the government for an update and were informed that the government has not identified additional recordings to produce.

The government's July 2020 disclosures paint a troubling picture. In our April 2020 demand letters, the defense identified discrepancies between the government's November 2018 wiretap disclosure and Mr. Saipov's call-log records from March through October 2017. But the 46 additional recordings date back to May 15, 2015, which suggests that the problem is far more extensive than the defense realized.

7

Further, the July 2020 disclosures still do not account for all of the discrepancies we highlighted for the government. For example, it still appears that the defense is missing entire recordings of more than 30 phone calls between Mr. Saipov and ▇ ▇ throughout March 2017, and another dozen calls between April and October 2017. The defense also still has not received full recordings for many of the apparently incomplete recordings we identified for the government in April. It is unclear whether these recordings still exist or why they remain undisclosed.

The government's explanation that its failure to disclose these calls was the result of "inadvertent errors in the review and discovery process" is unacceptable, particularly given the government's repeated insistence that it had conducted a thorough search for Mr. Saipov's recorded statements and produced all of them in response to pointed, detailed defense requests. The explanation is also unacceptable because the government's false assurances to the Court and the defense are coming to light just as discovery violations have been exposed in other national security-related prosecutions. *See, e.g., United States v. Sadr, supra,* Dkt. No. 350 (S.D.N.Y. June 9, 2020) (order compelling the government to account for, in writing, various discovery violations and other disclosure issues, including the government's failure to timely disclose to the defense Rule 16 and *Brady* material); *Sadr* Order at 32 (ordering "each AUSA on the trial team, the two Unit Chiefs, and the SAUSA to submit individual declarations, under penalty of perjury, regarding [certain enumerated] issues" and requiring that "[t]hese declarations … at a minimum, respond to the following questions with specificity" and listing six multi-part questions).

While the defense is still scrutinizing the previously undisclosed recordings, there are several indications that this discovery violation affects various aspects of our defense, pre-trial investigation, and the merits of our motions to compel and suppress. *See infra; Ex Parte* Supplement, Attachment A.[4] At a minimum, the July 2020 productions, which include recordings between Mr. Saipov and ▇ on October 21, 2017, implicate the testimony of the government's cell site data expert, who used phone calls between Mr. Saipov and ▇ to approximate Mr. Saipov's location on various dates, ▇
▇
▇ Given this context, the recent disclosures are clearly material to our defense, and their withholding jeopardizes Mr. Saipov's Fifth Amendment due

---

[4] The defense submits *ex parte* Attachment A to provide additional insight into the disclosures' impact on our trial and penalty-phase preparation based on sensitive defense work product and strategy.

process rights and Eighth Amendment right to the heightened reliability of these proceedings.

Accordingly, the Court should hold an evidentiary hearing to get to the bottom of this discovery violation. Afterwards, the Court should reopen the suppression hearing and permit the defense to cross examine Mr. Saipov's interrogating agents on their familiarity with these new recordings, particularly the ones that undermine Mr. Saipov's alleged English proficiency. The Court should also set a briefing schedule for reconsidering Mr. Saipov's motion to compel, and permit the defense to brief potential remedies for this discovery violation, including possible Rule 16 sanctions and striking particular aggravating factors from the government's Death Notice (if not the Notice altogether).

### III. The Court should demand an explanation from the government and hold an evidentiary hearing regarding the circumstances surrounding the July 2020 wiretap disclosures, and allow the defense to brief the disclosures' implications for various aspects of this case.

*First*, and as Judge Nathan demanded of the government in *Sadr*, the Court should compel the government to answer various questions in writing to explain why it failed to disclose all of Mr. Saipov's recorded statements despite its repeated assertions that its November 2018 disclosure was complete.

In *Sadr*, Judge Nathan found "several… suppression and disclosure-related issues that plagued the prosecution." *Sadr* Order. Of particular relevance here, Judge Nathan determined there were:

- "Breakdowns in communication between the FBI and line prosecutors, including regarding the FBI's investigation of this case";
- "Insufficient training for all participating AUSAs and the SAUSA on disclosure obligations";
- "Insufficient policies in place that ensure timely and complete compliance with disclosure obligations"; and
- "Insufficient supervision of disclosure obligations by the USAO's Unit Chiefs."

*Id.* at 13. Judge Nathan also (correctly) surmised that the issues she observed were not limited to the case at bar: "It is possible that the issues articulated above, as well as the precipitating factors the Court identifies, are not unique to this case." And these same problems "may well have gone undetected in countless others." *Id.*

9

Judge Nathan's concern that discovery violations may go undetected in many other cases is especially salient here. Had this trial not been delayed, the government's violations may never have been detected. Particularly in light of the severity of discovery violations in a death penalty case, we ask the Court to require the government to:

    a. Scour the returns of all classified monitoring of Mr. Saipov's communications with any target of foreign intelligence or national security-related surveillance (including, but not limited to, ▮ ▮▮▮▮▮▮▮▮) in the possession of any competent government agency;

    b. Produce all outstanding written or recorded communications attributable to Mr. Saipov in the government's possession or control, or that could be through due diligence; and

    c. Affirm, under penalty of perjury, that the defense has received all of Mr. Saipov's recorded communications.

We further request that the Court conduct an evidentiary hearing in order that it may:

    a. Determine which of the government's attorneys and federal agents were responsible for ensuring the government's compliance with Rule 16 and the production of all written or recorded communications attributable to Mr. Saipov in the government's possession or control;

    b. Assess whether the July 2020 disclosures cast doubt on any representations the government made to the Court about the scope of classified surveillance in this case; and

    c. Identify all known misstatements (in writing or orally) made to the Court about the disclosure of classified materials and the scope of classified surveillance in this case.

*Second*, after the evidentiary hearing, the Court should permit the defense to file a motion to reconsider its denial of Mr. Saipov's motion to compel based on this newly-discovered evidence. *See generally* Fed. R. Civ P. 60(b). In March 2019, Mr. Saipov moved for "notice and discovery of any surreptitious government surveillance that caused his communications with [redacted] to be recorded and that revealed information about his financial transactions, online activities, and personal contacts" pursuant to "the Fourth, Fifth, Sixth, and Eighth Amendments to the U.S.

10

Constitution; Federal Rule of Criminal Procedure 16; 18 U.S.C. § 3504; and 50 U.S.C. §§ 1806 and 1881e." Mot. to Compel, Dkt. No. 142. We argued that "the applications and orders underlying the wiretaps are central to countering the government's ISIS-related allegations at the guilt and penalty phases." *See Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The government opposed the motion and asserted that it was in compliance with its discovery obligations. Gov't Opp. to Mot. to Compel, Dkt. No. 191. That, of course, turned out not to be true—based on the disclosures it made a full year later. *See also Sadr* Order ("The Court turns finally to the Government's complete failure to produce certain classified material at any point—either before, during, or after trial. During its post-trial review, the Government discovered additional classified material subject to Rule 16 disclosure that was never declassified and disclosed to Mr. Sadr.").

*Third*, following an evidentiary hearing regarding the discovery violation, the Court should reopen the January 2020 hearing regarding Mr. Saipov's motion to suppress his post-arrest statements, and allow the defense the opportunity to further cross examine FBI Agents Joanna Maroudas and Amber Tyree, and Task Force Detective Richard Paugh, about the wiretaps and the extent to which they were relied upon during Mr. Saipov's custodial interrogation.

Central to Mr. Saipov's pending suppression motion is the question of what information the FBI possessed prior to questioning Mr. Saipov. *See* Dkt. Nos. 102, 121, 133 (initial briefing); Dkt. Nos. 268, 278, 292 (post-hearing briefing). The defense repeatedly and consistently asserted its belief that additional, relevant wiretaps exist—and repeatedly and consistently argued that such wiretaps were relevant to the question of suppression.

Mr. Saipov made this clear from his initial suppression motion—more than 18 months ago, in December 2018: "We are still waiting for more information from the government about the nature and basis of the wiretaps, and expect that this November 2018 revelation may lead to additional Rule 16 discovery and Rule 12 motion practice, particularly because there is a colorable basis to believe the agents derived their questions from information the FBI obtained through this monitoring." Saipov Mot. to Suppress, Dkt. No. 102.

That statement clearly and unequivocally put the government on notice that the wiretaps would likely directly impact the litigation regarding the suppression of Mr. Saipov's post-arrest statements; still, the government failed to disclose 46 additional recordings for another year and a half—and long after the suppression hearing was over. Given the untimely July 2020 disclosures, the Court must now allow the

11

suppression hearing to be re-opened so that these issues can be addressed through cross examination.

The defense has consistently argued that the trove of information available to Detective Richard Paugh and the other interrogating agents about Mr. Saipov included years' worth of wiretapped conversations between him and ███ ██████████, and that the content of these wiretaps overlaps with some of the information reflected in Mr. Saipov's post-arrest FD-302. Saipov's Post-Hearing Memo, Dkt. No. 268. Specifically, we argued that Detective Paugh's familiarity with Mr. Saipov and his contacts through his investigation of ███████████, which necessarily includes the electronic intercepts, "raises the specter that Mr. Saipov may not have provided as much detail as the government contends" in his answers to the interrogators' questions—"i.e., that the government asked leading or detailed open-ended questions to confirm information or suspicions they had about Mr. Saipov from other sources." *Id.*

Indeed, at the suppression hearing, Detective Paugh admitted to entering the Saipov interrogation with facts from the wiretaps and the investigation of ███ ██████████ in his mind: "Whatever I knew about the investigation was in my head, yes." *Id.* at 157. Detective Paugh agreed that he "want[ed] to have enough details in [his] head to make sure that [his] interrogation of Mr. Saipov [was] fruitful." *Id.* And he believed he was specifically selected for the assignment given his pre-existing familiarity with ███████████ and his immediate recognition of Mr. Saipov's name: "[o]therwise what was the point in having [him] go and conduct the interrogation." *Id.* at 158. Detective Paugh also admitted that his previous investigation into ███████████ and others who supported ISIS under the "███ ██" moniker involved many of the same names and topics that Mr. Saipov purportedly divulged during his interrogation. *See id.* at 183-206. And even after the hearing, Mr. Saipov maintained that there "is a strong likelihood" some aspects of the interrogators' questions were "derived from surreptitious electronic surveillance under various foreign intelligence-related authorities, which demands additional discovery, further Fourth Amendment scrutiny, and an adversarial fruit-of-the-poisonous-tree analysis." *Id.*

Again and again, the government attempted to thwart our efforts to meaningfully address these arguments by claiming that the wiretap issue was dealt with by the Court's denial of Mr. Saipov's motion to compel (*see* Gov't Post-Hearing Memo, Dkt. No. 278 (claiming that "no further discovery is necessary regarding the defendant's claims concerning other surveillance, which have already been litigated and decided by the Court") and by repeating Detective Paugh's assertion that his

questioning "was not based on information…he had learned from [the surveillance]" (internal citations omitted)). The government repeatedly made these conclusory statements without providing the defense all of the evidence in its possession that would enable us to meaningfully challenge them. Such withholding directly contravenes due process and the obligations of the U.S. Attorney's Office. We must have an opportunity to challenge—and the Court must have the opportunity to evaluate—the newly-disclosed evidence before the suppression motion is decided.

*Fourth*, following the evidentiary hearing, the defense may seek to file additional motions triggered by the government's discovery violations. Those motions could address remedies for any governmental misconduct and any resulting irrevocable impact of the disclosures on Mr. Saipov's mitigation investigation and trial and penalty-phase defenses. In particular, following the resolution of factual questions related to the government's failure to disclose Mr. Saipov's recorded statements, we may request that the Court strike certain aggravating factors, dismiss the Death Notice entirely, or employ additional remedies to ensure that Mr. Saipov faces a fair trial and penalty proceeding that comports with the Eighth Amendment. *Cf. United States v. Tsarnaev*, 968 F.3d 24, 74-75 (1st Cir. 2020) (vacating death sentence in part because of the government's failure to disclose information relating to Mr. Tsarnaev's brother, which may have supported a defense theory relating to his relative culpability in the charged offenses). Because these motions necessarily involve an examination of the reasons why the government failed to disclose the additional recordings, and whether the government (including the agencies investigating this case) acted in an outrageous manner so as to deprive Mr. Saipov of due process in violation of the Fifth Amendment, the Court should first hold an evidentiary hearing as described above. *Cf. United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) ("[A] claim that the government has acted outrageously is taken seriously because ensuring that the government does not trample in an unconscionable manner on individual dignity is a bed-rock duty of judicial officers.").

Three months after Mr. Saipov's capital trial was scheduled to begin, the government disclosed improperly-withheld discovery that had been the subject of extensive demands and litigation. We request that the Court hold a hearing to investigate this discovery violation and, after considering the parties' briefing on various issues, take all necessary steps to remedy this error and ensure the fairness and heightened reliability of these capital proceedings.

Respectfully Submitted,

/s/
David E. Patton
Andrew J. Dalack
Sylvie J. Levine
Annalisa Mirón
David A. Ruhnke
David Stern

Counsel for Sayfullo Saipov

cc:   Government Counsel