# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

August 25, 2022

By Email (Unredacted)
By ECF (Redacted)
The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: <u>United States v. Saipov</u>,
 (S1) 17 Cr. 722 (VSB)

Dear Judge Broderick:

Over the past week, the Government has produced <u>Brady</u> material to us that has been in the FBI's possession for years. The material, which implicates the core of the defense's mitigation investigation, comes after years of detailed defense requests and repeated assurances from the Government that all had been produced. Among the nearly 50 documents produced is a FBI 302 report containing ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ And just last night, the Government produced a statement that has been in the FBI's possession since August 2018 from a source ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ nd the Government has informed us that additional material is forthcoming.

The significance of the disclosures is extraordinary. The reports strongly support two critical aspects of Mr. Saipov's mitigation case: (1) that he was influenced by others who share culpability, yet they are not being prosecuted, much less facing the death penalty and (2) ████████████████████████████████████ ███████ The information is also exactly of the type that the defense has repeatedly

sought for years.

Apparently, the attorneys for the Government only recently received the material from the FBI, which compounds the problem: although the Government has consistently maintained that it is complying with its obligations under Brady it is clear that the FBI, DHS, and other law enforcement entities are failing to adequately review their holdings for discoverable materials. See, e.g., Dkt. Nos. 344 and 354 (defense's letter motion and reply in support addressing the Government's belated disclosure of 46 recorded communications between Mr. Saipov and two targets of surreptitious electronic Government surveillance). See also Govt Ltr., Aug. 24, 2022 (attached under seal as Exhibit A). Notably, at least one of the reports was already in the FBI NY case file "at the time [the Government] received [Saipov's] October 7, 2019 discovery letter." Id.

The Government's Brady obligations—serious as they are in any case—are of special importance in capital cases, when the Government's goal is not just imprisonment, but execution. Given the importance of these issues and the defense's outstanding request for an evidentiary hearing into the sufficiency of the FBI's review and disclosure of the recorded communications, we renew our request for a hearing, which should now also determine the facts and circumstances of these Brady violations, to be followed by briefing to address the merits of the issue and potential remedies.

We are also submitting an ex parte supplement to this letter detailing the impact of these disclosures on the defense mitigation investigation.

**The Defense Has Repeatedly Sought Precisely This Type of Brady Material**

The Government's Brady obligation to timely produce information in its possession that is favorable to a defendant and material to guilt or punishment is not dependent on defense requests. United States v. Agurs, 427 U.S. 97, 107 (1976). Nevertheless, we have made many such requests throughout the pendency of this case, including specific requests about associates of Mr. Saipov who may have influenced him, exposed him to ISIS propaganda, and/or even played a role in the events of October 31, 2017. In response to our requests, the Government has consistently responded that it was aware of its obligations under Brady and that it "continues to coordinate with law enforcement and intelligence agencies to determine whether there are any materials in their holdings" that qualify as Brady or are otherwise discoverable. Govt. Ltr., Nov. 20, 2018.

The Government also promised to provide FBI 302 reports of interviews on a "rolling basis" of, among others, "individuals believed to be associated with the defendant" in order to assist the defense in its "trial preparation and mitigation

investigation." Govt Ltr., Jan. 8, 2019. We responded that we appreciated that commitment as we were "relying on [the 302 reports] in our preparation for a potential penalty phase as they are necessary to our understanding of Mr. Saipov's character, record, and the circumstances of his alleged offense, the consideration of which is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" Def. Ltr., Feb. 22, 2019 (citations omitted).

By separate letter, we reiterated that "any information the Government possesses (or could reasonably possess through due diligence) concerning any of Mr. Saipov's contacts who exposed him to ISIS propaganda or any other form of Islamic extremism is material to our defense preparation and is an aspect of his offense conduct that may be highly mitigating at a potential penalty phase." Def. Ltr., Jan. 18, 2019.

In further correspondence, the Government listed people that it considered "possible contacts and/or associates and who are (or have been suspected of being) sympathetic to ISIS or other foreign terrorist organizations and/or sharing propaganda" and that it was providing any FBI interview reports on those individuals and would "supplement this list with any additional names as its investigation continues." Govt. Ltr., Mar. 1, 2019.

In March of 2019, the defense filed a motion to compel specifics about the Government's surveillance of Mr. Saipov's communication with two individuals, including details on the authorities and factual bases for the wiretaps. Dkt. No. 142. In response, the Government filed an ex parte application pursuant to Section 4 of the Classified Information Procedures Act and, by separate cover letter, assured the Court that "there is no additional discovery responsive to the Discovery Motion and [that] the Government believes it is in compliance with its disclosure obligations." Dkt. No. 191 at 2. However, in the Spring of 2020, following an adjournment sine die of the trial date due to COVID-19, the defense alerted the Government to the substantial likelihood that it had failed to disclose recordings of at least 60 phone calls between Mr. Saipov and ████████████ ████████████ despite the Government's numerous reassurances that it had produced all of the recordings. See Dkt. No. 344 at 7. As a result of this exchange, the Government produced an additional 46 recorded communications and blamed the severely belated disclosure on "inadvertent errors in the review and discovery process." Id.

More recently, and in reaction to the Government's July 2022 disclosure of an old Homeland Security Investigations report about Mr. Saipov, which was created in July 2016 and updated immediately after his arrest, we filed a supplemental motion in limine regarding the Government's compliance with Rule 16 and Brady. Dkt. No. 473. Like our prior discovery demands, this motion made clear that our

3

Brady requests sought material that goes not just to the liability phase of the trial, but also to the potential penalty phase. Indeed, for Brady purposes, material evidence includes information that "play[s] a mitigating, though not exculpating, role." Cone v. Bell, 556 U.S. 449, 475 (2009). And in the penalty phase context of a death penalty trial, even a relatively small amount of undisclosed mitigation evidence can be material if its disclosure may bolster the defendant's mitigation case. Id.

**The Belated Disclosures Address Crucial Mitigation Factors**

On Tuesday, August 16, 2022, the Government provided us with three FBI 302 Reports, relating to FBI interviews of a confidential source ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ The disclosures were heavily redacted but included unredacted portions that revealed their obvious significance.



The first source told the FBI of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

The second source stated that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Upon disclosing the reports, the Government informed us that it was working to provide less redacted versions and planning to reach out to at least one of the sources and would provide us notes on that communication. On August 17, 2022, the Government did so. Those notes reflect the source stating to the Government tha▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

On August 18, 2022, the Government provided the less-redacted reports and additional materials, including the identity of the Confidential Human Source who provided the information in S78 and S96.

On August 24, 2022, the Government provided more than 10 documents relating ▬▬▬▬▬▬, as well as more than 30 new law enforcement reports ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

4

[REDACTED] our third-party culpability mitigation investigation since the outset of our representation nearly five years ago.

The Brady material produced this past week is unquestionably relevant and helpful to our relative culpability and [REDACTED] related mitigators.[1]  Relative culpability is the basis for both statutory and non-statutory mitigation factors. First, Congress explicitly listed "equally culpable defendants" as a statutory mitigating factor where "another defendant or defendants, equally culpable in the crime, will not be punished by death."  18 U.S.C. § 3592(a)(4).  Courts "uniformly interpret 'defendants' within the meaning of § 3592(a)(4) to include co-conspirators and accomplices."  United States v. Karake, 281 F. Supp. 2d 302 (D.D.C. 2003) (citing several cases).

Second, courts have construed both the statutory and non-statutory factors related to relative culpability broadly.  See, e.g., United States v. Bin Laden, 156 F. Supp. 2d 359 (S.D.N.Y. 2001) ("Congress' deliberate inclusion of this factor in the legislative scheme calls for a … broad interpretation…" because "the circumstance that others who are equally culpable will not be subject to the death penalty is a comparative factor which reflects a determination by Congress that it is appropriate for jurors to consider questions of proportionality and equity when they are evaluating whether a death sentence is appropriate.").

A few examples from federal capital trials suffice to show that such mitigating evidence—culpability relative to other actors who bear blame for their roles in recruiting or influencing the defendant's acts—matters, even in highly aggravated cases and those involving acts of terrorism.  See, e.g., United States v. Khalfan Mohamed, Case No. 98 Cr. 1023 (LBS) (S.D.N.Y. July 10, 2001) (10 jurors found that "Khalfan Mohamed was recruited by others as someone who was an expendable member of the conspiracy"); United States v. Mohamed Rashed Daoud al-'Owhal, Case No. 98 Cr. 1023 (LBS) (S.D.N.Y. June 12, 2001) (8 jurors found "[t]hat other members of the conspiracy, previously arrested or presently cooperating with the United States, guilty of or charged with planning and facilitating the bombing of the United States Embassies and the killing of United

---

[1] Indeed, Brady itself involved the failure to disclose evidence relating to relative culpability for purposes of the penalty phase of a death penalty trial.  Brady v. Maryland, 373 U.S. 83 (1963).

5

States nationals will not be punished by death"); United States v. Wilson, Case No. 04 Cr. 01016 (NGG), Dkt. No. 1437 (E.D.N.Y. July 24, 2013) (12 jurors found that "Ronell Wilson was susceptible to negative peer influence" and seven found that "but for" other named persons "Ronell Wilson would not have been involved in the murders").

And in addition to the relative culpability mitigation, the belated Brady disclosures from this week also bear directly on Mr. Saipov's Rule 12.2 notice. Indeed, portions of the reports provide corroboration of Mr. Saipov's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**The Court Should Order a Hearing to Determine the Scope of the Violation**

Against this backdrop, a hearing is necessary. On their face, the disclosures are classic Brady material of key import to our mitigation case. The most significant have been in the possession of the FBI for years. The material is precisely of the sort that the defense has specifically requested and that the Government has long assured was being produced. And unfortunately, this is not the first time the Government has been wrong. See Dkt. Nos. 344 and 354.

"Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine Brady by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it…." United States v. Blanco, 392 F.3d 382, 388 (9th Cir. 2004) (quoting United States v. Zuno-Arce, 44 F.3d 1420, 1427 (9th Cir. 1995).

When the prosecution fails to disclose exculpatory information that was specifically requested by the defense, it "impair[s] the adversary process." United States v. Bagley, 473 U.S. 667, 682-83 (1985). In such an instance, it is "more reasonable…for the defense to assume from the [Government's] nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption." Id. And indeed, for at least two years, while the material was withheld, we did just that—assumed that the evidence did not exist and made pretrial decisions accordingly. Now that it is apparent that material evidence *did* exist but was withheld, an evidentiary hearing is required to make a full record of the circumstances underlying the Government's delayed disclosure as well as the appropriate remedies.

---

[2] As noted above, the defense also submits an ex parte supplement to this letter, in which we intend to address in more detail the prejudice of these disclosures to our Rule 12.2 investigation.

6

Specifically, additional facts are required (1) to determine the scope of the violation and appropriate remedies, and (2) to satisfy the Court and the defense that there are no additional discoverable materials that are in the possession of law enforcement agents that have not been (or are in the process of being) disclosed. Such a hearing is squarely within this Court's "inherent authority to further explore the potential prejudice created by the Government's alleged violation of its broad duty of disclosure." United States v. Sutton, CR 21-0598-01 (PLF), 2022 WL 2383974, at *10, n.11 (D.D.C. July 1, 2022). See also, e.g., Rule 5(f) Order, United States v. Najibullah, (S2) 14 Cr. 401 (KPF), Dkt. No. 10 (S.D.N.Y. Oct 29, 2020) (explaining that if the Government fails to comply with Brady, the Court may enter any order that is just under the circumstances, including imposing evidentiary sanctions, dismissing charges, and/or granting a continuance).

Indeed, just two years ago, Judge Nathan engaged in extensive fact-finding to determine the extent of highly publicized Brady violations and how they occurred. See United States v. Nejad, 487 F. Supp. 3d 206 (S.D.N.Y. 2020). Through its fact-finding, Judge Nathan identified a series of common themes that warranted "systemic solutions" regarding the United States Attorney's Office for the Southern District of New York's (USAO-SDNY) disclosure procedures. Id. at 213. Among the many causes of the Brady violations in Nejad were "breakdowns in communication between the FBI and line prosecutors, including regarding the FBI's investigation of this case" and "[i]nsufficient policies in place that ensure timely and complete compliance with disclosure obligations." Id. at 213-14. Despite Judge Nathan's observations, the discovery failures and breakdowns in communications persist.

Other district courts have ordered evidentiary hearings to probe the extent of Brady violations in whatever context they were discovered—before trial, during trial, after trial, and in post-trial habeas proceedings. See, e.g., United States v. Newland, 17-CR-623 JLS, 2022 WL 2718614 (S.D. Cal. July 13, 2022) (District Court held a three-day evidentiary hearing on an alleged Brady violation (among other issues) while pausing a jury trial); United States v. Driscoll, 984 F.3d 103, 106 (D.C. Cir. 2021) (District Court "interrupted the trial and held an evidentiary hearing" regarding Brady claims); United States v. Lang, CR 2015-0018, 2019 WL 1673317, at *1 (D.V.I. Apr. 17, 2019) (District Court held a two-day evidentiary hearing after a guilty verdict on the defendant's Brady motion); United States v. Borda, 848 F.3d 1044, 1068 (D.C. Cir. 2017) (District Court conducted a post-trial evidentiary hearing to hear testimony regarding alleged violations of Brady); United States v. Mejia-Mesa, 153 F.3d 925, 929 (9th Cir. 1998), as amended (Sept. 4, 1998) (holding an evidentiary hearing on a Brady claim in a § 2255 petition was "required").

In a recent case in the District of Columbia, the Court determined that the "potential harm stemming from the Government's delayed disclosure of the witness's statements [could] not be fully ascertained" without a hearing. Sutton, supra. Therefore, the Court "conduct[ed] an evidentiary hearing to find facts…and to determine whether any potential prejudiced caused to [the defendant] by the Government's delay must be mitigated by imposing appropriate sanctions." Id. (ordering the testimony of two Special Agents regarding their interviews with a particular witness, "and their discussions and internal communications with prosecutors").

The same must be true in this case. The Government seeks to execute Mr. Saipov—the ultimate punishment. These stakes compel the Court's thorough inquiry and its imposition of appropriate remedies, regardless of whether it determines that the Government's errors were unintentional.

Specfically, the Court should hold a hearing to determine the scope of the violation and appropriate remedies. In advance of the hearing, the Government should produce and make available for questioning the confidential sources who provided the statements to the FBI and the FBI agents who were present for the interviews and took the statements. At the hearing, the Government should produce and make available for questioning the FBI handlers of the confidential sources and any other Government witness with knowledge of the mechanisms in place to ensure that the Government's continuing obligation to disclose material relevant to mitigation was and is met across law enforcement and intelligence agencies. In particular, the Government should be compelled to:

a. Call witnesses who can competently describe which law enforcement and intelligence agencies were aware of the Government's discovery obligations in this case, what law enforcement/intelligence databases were searched, how were they searched, and how often they were searched;
b. Explain what procedures were in place to make sure that information responsive to Mr. Saipov's discovery demands was collected and produced in a timely fashion;
c. Describe who was responsible for overseeing the collection of discoverable material;
d. Explain how these procedures and mechanisms failed to earlier capture the material that was produced in July 2020, July 2022, and August 2022;
e. Explain whether the case/investigating agents were aware of these disclosures, when they first became aware, and whether they were aware of the defense discovery demands and the Government's prior representations that discovery was complete.

8

Following any hearing, the defense requests leave to make additional arguments for more fact-finding and/or other remedies. The defense also requests leave to file the un-redacted version of this letter under seal because it discloses sensitive discovery information covered by the protective order.

Respectfully Submitted,

/s/
David E. Patton, Esq.
Andrew J. Dalack, Esq.
Sylvie J. Levine, Esq.
Annalisa Mirón, Esq.
David A. Ruhnke, Esq.
David Stern, Esq.

Counsel for Sayfullo Saipov

Cc: Government Counsel