UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

SAYFULLO HABIBULLAEVIC SAIPOV,

Defendant.

S1 17 Cr. 722 (VSB)

**THE GOVERNMENT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS SUPPLEMENTAL MOTIONS *IN LIMINE***

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States of America*

Andrew Dember
Amanda Houle
Alexander Li
Jason A. Richman
*Assistant United States Attorneys*
        *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

DISCUSSION ................................................................................................................. 2

████████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

Point 3:   The Court Should Deny the Defendant's *Brady* Motion, Request for a Hearing, and Request for an Adjournment of the Trial............................................................... 23

    A.   Applicable Law ................................................................................................. 24

    B.   Relevant Facts .................................................................................................. 26

    C.   The Defendant's *Brady* Claim Should Be Rejected .................................................. 36

    D.   The Recent Productions Do Not Warrant a Trial Adjournment ............................... 43

CONCLUSION ............................................................................................................. 45

## TABLE OF AUTHORITIES







## PRELIMINARY STATEMENT

The Government submits this memorandum of law in further support of its supplemental motions *in limine* ("Gov. Supp. MIL," Dkt. 472) and in response to the defendant's opposition to the Government's supplemental motions *in limine* ("Def. Supp. Opp.," Dkt. 493). ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

In addition, the Government provides the Court with an update on the recent productions made to the defense following additional searches of the FBI's electronic casefile system previewed in its August 19, 2022 Opposition Brief (Dkt. 492), and responds to the defendant's August 25, 2022 motion claiming *Brady* violations and requesting an evidentiary hearing ("Def Mot.," Dkt. 503) and August 29, 2022 motion requesting an adjournment of the trial date (Dkt. 510). As set out below, the defendant's *Brady* violation claim should be rejected. The newly produced reports are inculpatory (not exculpatory) and have limited relevance to the defendant's mitigation arguments. Moreover, most of the reports were not in the possession of the prosecution team in this matter until August 2022, when they were promptly produced to the defense. Additionally, the reports principally relate to individuals and topics of which the defense was previously on notice and about which the defendant has personal knowledge. For all of these reasons, too, the defendant's request to adjourn the trial should be denied. To the extent the materials have relevance to the defendant's anticipated evidence at any penalty phase, such a phase is at least three months away.

## DISCUSSION

[REDACTED]

### A. Applicable Law

#### 1. Rule 901 and Authenticity of Documents

As a general matter, "an item of evidence must 'be authenticated through introduction of evidence sufficient to warrant a finding that the item is what the proponent says it is.'" *United States v. Corley*, 679 F. App'x 1, 4 (2d Cir. 2017) (quoting *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126 (2d Cir. 2016)). "Under Rule 901 of the Federal Rules of Evidence, '[t]he requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *United*

---

[1] The defendant previously made an application to the Court for the Government's discussion of (*i*) [REDACTED] and (*ii*) [REDACTED] to be filed in redacted form. The Government continues to take no position on this request but has filed its brief in redacted form pending further instruction from this Court. The Government has further redacted the names of certain individuals, and certain information from sensitive witness reporting, that was produced to the defense under the standing Protective Order.

*States v. Jackson*, 345 F.3d 59, 65 (2d Cir. 2003) (quoting Fed. R. Evid. 901(a)); *see also United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001), *cert. denied*, 534 U.S. 897 (2001). This bar for authentication "is 'not particularly high.'" *United States v. Bout*, 651 F. App'x 62, 63–64 (2d Cir. 2016) (quoting *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007)). "Indeed, as long as a reasonable juror could find that evidence was authentic we permit that evidence to be introduced." *United States v. Ganias*, 824 F.3d 199, 234 (2d Cir. 2016). To meet this *prima facie* burden of admissibility, the Government need only introduce "sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification." *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) (internal quotation marks omitted). Proving a chain of custody will suffice to authenticate physical evidence, and the chain of custody need not be free of defects. *See United States v. Gelzer*, 50 F.3d 1133, 1140–41 (2d Cir. 1995). Alleged breaks in the chain typically "do not bear upon the admissibility of evidence, only the weight of the evidence." *Jackson*, 345 F.3d at 65 (internal quotation marks omitted).

Evidence of authenticity "may be direct or circumstantial, and the latter category may include distinctive characteristics of the document itself." *United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990). Indeed, Rule 901 itself contemplates multiple avenues through which a proponent may authenticate evidence. For example, the proponent may offer "[t]estimony that an item is what it is claimed to be," or may offer evidence of "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(1) and (4). "With respect to a document attributed to the defendant, the prosecution need only provide a rational basis from which the jury could infer that the document did, in fact, belong to him." *Maldonado-Rivera*, 922 F.2d at 957.

## 2. Admissibility of Relevant Evidence

Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial except as otherwise provided by the Constitution, federal statute, or Rules of Evidence. *See* Fed. R. Evid. 401, 402; *United States v. Abel*, 469 U.S. 45, 51 (1984). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). Rather, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401; *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency.").

Evidence is often admissible "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91–92 (2d Cir. 2006) (internal quotation marks omitted); *see also United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017) (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012)). "Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F. 2d 1553, 1561 (2d Cir. 1991) (internal quotation marks omitted); *see United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (articulating well-established principle that evidence is direct evidence (and not other act evidence under Rule 404(b)) if it is inextricably intertwined with the evidence of the charged offense or necessary to complete the story of the charged offense (citing *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997))); *see also* Weinstein's Federal Evidence § 404.20[2][c] (observing that evidence the absence of which "would leave a

chronological or conceptual void in the story of the crime" is "intrinsic evidence"). As the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

### 3. Unfair Prejudice and Rule 403

Rule 403 requires the Court to evaluate whether the probative value of otherwise relevant evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Since any evidence that is probative of guilt is, by definition, prejudicial, Rule 403 is designed to reach only unfair or undue prejudice—that which "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *Gelzer*, 50 F.3d at 1139 (internal quotation marks omitted). The Second Circuit has long held that evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *See, e.g.*, *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000).

The Federal Rules of Evidence do not apply at the penalty phase, with the only limitation being that "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c).

### 4. First Amendment Protections

"The First Amendment protects against government regulation and suppression of speech on account of its content." *United States v. Caronia*, 703 F.3d 149, 162–63 (2d Cir. 2012). It does not, however, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see also Dawson v. Delaware*, 503 U.S. 159, 165 (1992) (the "Constitution does not erect a *per se* barrier to the

admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment"). Thus, political beliefs may be "introduced to prove the *mens rea* element of the charged crimes." *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014); *see also United States v. Kourani*, 6 F.4th 345, 355–56 (2d Cir. 2021).

### 5. Cumulative Evidence

Finally, Rule 403 bars the introduction of otherwise relevant evidence if its probative value is "substantially outweighed" by a danger of "needlessly presenting cumulative evidence." Fed. R. Evid. 403. In evaluating whether evidence is needlessly cumulative, district courts consider whether other evidence in the record "so firmly" establishes a fact as to render additional evidence unnecessary. *See United States v. Wong*, 40 F.3d 1347, 1378–79 (2d Cir. 1994).

█████████

███████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



















---

















### Point 3:  The Court Should Deny the Defendant's *Brady* Motion, Request for a Hearing, and Request for an Adjournment of the Trial

For reasons described further below, the Government (referred to more specifically in this section as the Prosecution Team) recently produced supplemental materials to the defense.[4]  In response, the defense filed an August 25, 2022 letter claiming that the Prosecution Team had committed *Brady* violations for which the defense requests an evidentiary hearing.  (Dkt. 503).  On August 29, 2022, the defense filed a letter seeking an adjournment of the trial date based on the recent productions.  (Dkt. 510).  For the reasons set out below, the defendant's *Brady* claims are meritless.  None of the materials are exculpatory.  While some of the materials contain commentary on who may have radicalized Saipov, the defense has largely been on notice of the nature of the recently produced reports and, moreover, the defendant is otherwise already in possession of the pertinent information because he knows who (if anyone) radicalized him.  Moreover, the bulk of the materials were not in the Prosecution Team's possession until August 2022 (precluding any claim that they were suppressed), and the remainder of the materials (many

---

[4] As explained further below, the Prosecution Team consists of the undersigned and predecessor prosecutors from the U.S. Attorney's Office for the Southern District of New York and particular FBI counterterrorism agents from the New York Field Office of the FBI who are charged with the investigation and prosecution of Saipov.

of which have limited, if any, relevance and are being produced in excess of the Prosecution Team's disclosure obligations) were identified during a supplemental check of the Prosecution Team's files and produced to the defense well in advance of trial. While the defense argues that all of the FBI's holdings—along with the holdings of an untold number of other U.S. law enforcement components—are in the possession of the Prosecution Team, that is inaccurate and inconsistent with controlling Second Circuit precedent defining the scope of the Prosecution Team. Moreover, the defense arguments that the recently produced materials require a trial adjournment in favor of further investigation to prepare for any penalty phase overstate the mitigating value of the reports and ignore that such a penalty phase is still at least three months away, and that the defense was previously on notice of many of the individuals referenced in the recently produced reports. For all of these reasons, the defendant's *Brady* claims (and corresponding request for a hearing to investigate those claims) and adjournment request should be denied.

## A. Applicable Law

Federal Rule of Criminal Procedure 16(a)(1)(E) provides in relevant part that the Government must, upon the defendant's request, permit the defendant to inspect or copy documents and data "if the item is within the government's possession, custody, or control" and "material to preparing the defense" or "the government intends to use the item in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(E). To determine a defendant's right to disclosure of particular materials, "it is necessary to decide whether those items are 'material to preparing the defense' and, if so, whether they are within the possession, custody, or control of 'the government' as that term is used in the rule." *United States v. Ghailani*, 687 F. Supp. 2d 365, 368 (S.D.N.Y. 2010).

The prosecution team's disclosure obligations extend to material that is in the possession of an individual or entity that has acted as "an 'arm of the prosecutor'" in a given case. *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018) (quoting *United States v. Morell*,

524 F.2d 550, 555 (2d Cir. 1975)). In the analogous context of determining whether the prosecution conducted a "joint investigation" with another agency, courts assess a number of factors, including "whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018).

In addition, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, the Government has an affirmative duty to provide to the defense evidence that is favorable to the accused, known to the Government or other members of the prosecution team, and material to guilt or punishment. *See Strickler v. Greene*, 527 U.S. 263, 280–81 (1999); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted). "*Brady* is not a rule of discovery—it is a remedial rule." *United States v. Meregildo*, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013). Thus, "determination of a *Brady* violation is inherently a retrospective review made after a conviction or plea, and therefore, a trial court's role prior to trial is limited." *United States v. Rodriguez*, No. 19 Cr. 779 (AKH), 2020 WL 5819503, at *10 (S.D.N.Y. Sept. 30, 2020). Regardless, it is well settled in this Circuit that "there is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant." *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990). "Evidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Id.* (internal citations omitted); *see also United States v. Barcelo*,

628 F. App'x 36, 39 (2d Cir. 2015) (no *Brady* violation where the defendant "knew that [the witness] was present during the traffic stop and might have useful evidence"); *United States v. Torres*, 129 F.3d 710, 717 (2d Cir. 1997) (no *Brady* violation with respect to certain recordings because "even if the tapes might have led counsel to discover additional witnesses, [the defendant], as a participant in the conversations, would have already known of such witnesses").[5]

## B. Relevant Facts

### 1. Overview

Throughout the five-year pendency of this case, the Prosecution Team has undertaken significant and diligent efforts to meet and exceed its discovery and disclosure obligations. The Prosecution Team has taken a broad view of relevance in producing evidence and witness statements collected through its investigation of Saipov and his attack, producing materials far beyond the bounds of Rule 16, the Jencks Act, and *Brady* and its progeny. The Prosecution Team has also made extensive efforts to identify materials outside of its own holdings relating to Saipov, and to produce those materials to the defense. The processes undertaken in furtherance of those efforts have largely already been described to the Court. (*See, e.g.*, Dkt. 350 (describing the Prosecution Team's searches of the FBI's platforms housing intercepted communications to

---

[5] Throughout its briefing, the defense references the Government's obligation to disclose "*Woodson* materials." (*See, e.g.*, Def. Supp. MIL at 3–6). In *Woodson v. North Carolina*, 428 U.S. 280 (1976), the Supreme Court held, among other things, that a statute imposing a mandatory death penalty was unconstitutional because it failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Id.* at 303. While the opinion notes that a capital jury must be allowed to consider both the "offender and the offense" in coming to a decision on sentence, *id.* at 304, the opinion does not establish any separate disclosure obligation for the Government, nor is the Government aware of any opinion construing *Woodson* in that manner. *See, e.g.*, *United States v. James*, No. 02 Cr. 778 (SJ), 2007 WL 914242, at *4 (E.D.N.Y. Mar. 21, 2007) (in a capital case, holding that *Woodson* and other cases establishing the right to a mitigation case do *not* address "the prosecution's obligation to provide discovery of certain material not generally subject to production under the Federal Rules of Criminal Procedure").

identify communications with or concerning Saipov), Dkt. 207 (noting filing made pursuant to the Classified Information Procedures Act ("CIPA")).

Recently, in preparing for trial and reviewing its files, the Prosecution Team identified in its file a report from the Department of Homeland Security, Homeland Security Investigations ("HSI"), in which an individual named ██████████ is described. The substance of the report (which is described in the Government's brief of August 19, 2022, Dkt. 492) was duplicative of other reporting previously provided to the defense. Nonetheless, upon noting that the HSI report had not been previously produced to the defense, the Prosecution Team produced it on July 22, 2022, and undertook a supplemental review of the FBI's Saipov investigation electronic casefile (the "FBI Saipov Casefile").[6] Consistent with the Prosecution Team's historical approach to disclosures in this matter, this supplemental review was undertaken to ensure that the Prosecution Team has met, and exceeded, its discovery and disclosure obligations.

Additionally, and partially in consideration of the arguments raised by defense counsel in its August 5, 2022 filing (Def. Supp. Opp. at 4–6), the Prosecution Team requested a search of the FBI's agency-wide electronic casefile system for any reports mentioning "Saipov," and the Prosecution Team reviewed all of the results. This search returned interview reports generated by FBI personnel across the United States. The majority of these reports had previously been provided to the New York FBI case agents investigating Saipov, and, accordingly, had already been produced to the defense. There were some reports from other FBI offices, however, that had not previously been provided to the Prosecution Team.

---

[6] This supplemental review involved AUSAs from the Prosecution Team reviewing every report in the FBI Saipov Casefile, comparing (in coordination with paralegal assistance) those reports against the Prosecution Team's prior productions to the defense, and re-reviewing any reports that were not previously produced for potentially discoverable information.

Following these two reviews—of the FBI Saipov Casefile and the search results from the FBI's agency-wide electronic casefile system—the Prosecution Team identified a total of 71 reports for production to the defense. Twenty-eight of these reports had previously been in the possession of the Prosecution Team and the remaining 43 had not. These reports—which, with any attachments, generally numbered only a few pages each—were produced between August 16, 2022 and September 2, 2022. Those materials are described further below.

One report identified through this supplemental review, that had not previously been in the Prosecution Team's possession, reflected comments to the FBI by an individual ("Individual-1") opining that Saipov may have been radicalized by someone named ███████████████ , and that ██████████ had a mission to groom Saipov to commit an attack. Upon receiving the report of Individual-1's opinion, the Prosecution Team promptly provided the report to defense counsel. The Prosecution Team also promptly conducted a phone interview of Individual-1, who stated that his prior statements to the FBI were based on his assumptions because ██████████ and Saipov knew each other and because ██████████ is someone who Individual-1 believed to be affiliated with a fundamentalist sect of Islam. Individual-1 confirmed that he had never spoken to ██████████ about grooming Saipov for an attack, or otherwise radicalizing Saipov, and no one else had told him that. The Prosecution Team produced the notes from this interview of Individual-1 on the day of the interview.

While Individual-1's opinion that ██████████ may have wanted to groom Saipov for an attack in the United States was new information, the Prosecution Team had previously collected (and produced to the defense in 2019) information regarding ██████████ including, among other things, reporting that ███████████████████████████████████████████ ████████████████████████████████ that Saipov may have been close to ██████████ and that

██████ is purportedly jihadi and calls others to jihad. ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

Although the Prosecution Team had previously provided information to the defense concerning ████████ (including that he reportedly espoused jihad and was an associate of Saipov), and although Individual-1 in a subsequent interview with the Prosecution Team indicated that his opinion was not based on any particularized facts, given the nature of Individual-1's report, the Prosecution Team then requested a search of the FBI's agency-wide electronic casefile system for reports concerning ████████ Following that review, the Prosecution Team produced 17 reports bearing on ████████ potential links to radical extremists and potential radicalization of others. The reports were not previously in the possession of the Prosecution Team and are described further below.

Ultimately, then, and as set out in detail below, the Prosecution Team's recent diligence has included (*i*) a supplemental review of the entire FBI Saipov Casefile; (*ii*) a review of reports mentioning Saipov from across the FBI's electronic casefile system; and (*iii*) a review of reports pertaining to ████████ In connection with these reviews, the Prosecution Team has produced 71 reports pertaining to Saipov and his associates, 28 of which were previously in the possession of the Prosecution Team and the remainder of which were not; and 17 reports relating specifically to ████████ none of which were previously in the possession of the Prosecution Team. With few exceptions, these reports number only a few pages. None of these reports are exculpatory. Moreover, most of the reports have very limited relevance to Saipov—and often pertain to witness

statements describing passing interactions with Saipov. While some of the reports refence Saipov's radicalization, they largely contain the unsubstantiated opinions of others and ultimately, if Saipov was radicalized by any of the individuals mentioned in the reports, he knows that based on his personal discussions and interactions with them.[7]

2. The ▉▉▉▉▉ Materials and Other Interview Reports Outside the Prosecution Team's Possession

As described above, after searching the FBI's agency-wide electronic casefile system for any references to Saipov, the Prosecution Team identified 43 reports for production to the defense that were not previously in the possession of the Prosecution Team.[8] Additionally, after conducting searches of the FBI's agency-wide electronic casefile system relating to ▉▉▉▉ the Prosecution Team identified 17 reports for production to the defense bearing on ▉▉▉▉▉'s potential extremists connections and radicalization of others that were not previously in the possession of the Prosecution Team.

The 43 interview reports identified for production that were previously outside the possession of the Prosecution Team relate, to varying degrees, to Saipov and certain of his associates. The overwhelming majority of these reports pertain to witness interviews in which the witness indicated that the witness had limited prior interactions with Saipov, sometimes just a

_____

[7] The Prosecution Team's production of materials to the defense based on the above-described searches is substantially complete as of the filing of this brief. While the Prosecution Team may produce a few additional reports following approval from the relevant equity-holders, the Government does not view these additional materials as materially different in kind from the materials described herein.

[8] The Prosecution Team has not identified these reports in the FBI Saipov Casefile; in the emails of the Prosecution Team case agents; or the shared folders for the Prosecution Team AUSAs. The FBI case agents are in the process of searching an additional archive platform to confirm the reports also do not appear there. To the extent any reports described in this section do appear in that archive system, or are otherwise identified by the FBI case agents, we will update the Court and defense counsel promptly.

passing interaction. Moreover, approximately 12 of the witnesses interviewed in connection with the 43 reports had otherwise been interviewed in connection with the Saipov investigation, and reports of those interviews were previously produced to defense counsel (thus putting defense counsel on notice of the individuals).

Contained within the 43 interview reports are reports of Individual-1's opinion that ███████ may have radicalized Saipov and groomed him for an attack, as well as two other reports reflecting statements by individuals noting Saipov's relationship to ███████ Separate from the ███████ related reporting, within the 43 reports there are a few reports that contain opinions and commentary (including from FBI sources) regarding Saipov's radicalization, including, one subject opining that Saipov was likely radicalized by Russian propaganda; one subject stating that the subject heard from someone else that Saipov exhibited extremist behavior; one subject identifying an individual associated with Saipov who may have supported ISIS; and one subject ("Individual-2") claiming to have received reporting ███████████████████████████ ████████████████████████ that Saipov was linked to three individuals in the United States who had been watchlisted by ██████.[9]

Finally, as noted above, following the supplemental search relating to ███████ the Prosecution Team produced 17 reports to the defense that do not mention or concern Saipov but bear on ███████'s potential links to radical extremists and the radicalization of others. These reports indicate that ███████ may have been linked to a radical Islamic figure associated with

---

the Islamic Movement of Uzbekistan.  The reports further indicate that ███████ may have been involved in radicalizing, or facilitating the radicalization of, others, including in support of ISIS.[10]

### 3. Additional Reporting in the Prosecution Team's FBI Casefile

As noted above, in addition to requesting searches of the FBI's agency-wide electronic casefile system for reports mentioning Saipov and reports relating to ███████ the Prosecution Team also undertook a check of the FBI Saipov Casefile.  Through these reviews, the Prosecution Team identified 28 reports—many reports from FBI confidential sources—for production to the defense that were previously in the possession of the Prosecution Team and are described below.[11]

Most of these reports pertain to potential contacts of Saipov.  In one report, an individual reports seeing Saipov at a mosque and describes an apparent associate; in another report, an individual identifies a potential prior roommate of Saipov;[12] in another report, an individual reports passing contact with Saipov and provides information about a Saipov associate; in another

---

[10] One of the 17 reports is a June 2022 interview of a source conducted by a NY FBI counterterrorism agent who worked on the same squad as the Saipov case agents.  The source states that the source did not know if ███████ was associated with any radical clerics in Turkey but that the source believed, based on ████████████████, that ███████ held radical views.  The source report was generated more than 5 years after Saipov's attack and does not reference Saipov, and accordingly was not shared with the Saipov case agents or anyone else on the Prosecution Team.

[11] As noted throughout this submission, over the last five years, the Prosecution Team has produced materials far in excess of its Rule 16, *Brady*, and Jencks Act obligations.  The Prosecution Team's disclosures have involved the review and production of hundreds of reports.  Of the 28 reports identified for recent production, many were source reports that were inadvertently not previously reviewed for production.  The Prosecution Team's recent diligence, however, has involved a re-review of the entire FBI Saipov Casefile, including all source reports.  Ultimately, none of the 28 reports recently identified for production are exculpatory, none are voluminous, many have limited relevance, and all have been provided to the defense sufficiently in advance of trial.

[12] The individual who was identified as a potential roommate was subsequently interviewed.  The report of that interview was not in the possession of the Prosecution Team until the recent searches described above, and it was promptly provided to the defense.

report, a source identifies a potential close associate of Saipov; in another report, a source identifies a truck driver who may have known Saipov; in two reports, separate individuals describe truck driving companies at which Saipov worked; in one report, an individual recalls seeing Saipov at a mosque; in another report, an individual reports passing interactions with Saipov; in another report, an individual reports passing interactions with Saipov and is confronted about an apparent search for Saipov on the individual's phone in August 2017; in another report an individual denies knowing Saipov but admits to knowing other associates; and in another report, a tipster claims to have seen Saipov and two others in the vicinity of the World Trade Center on October 25, 2017. Additionally, one report notes that, in or about 2019, ██████████████████████████ ████████████.

In addition, two of the reports that were in the FBI Saipov Casefile relate to ████████ and Individual-1. Specifically, in one report, a source notes that ████████████████████████ ██████████████ and in another report Individual-1 (the individual who later opined that Saipov may have been radicalized by ████████ states that he never heard of Saipov prior to the attack.[13]

Four of the reports reference Saipov's radicalization. In one report, an individual states that he knew Saipov in Uzbekistan, that Saipov was not radical then, and that Saipov's behavior in the United States changed after he got married, when Saipov began wearing a beard, and became lazy and isolated; in another report, an individual states that he knew Saipov in Uzbekistan, that Saipov was not radical then, and that Saipov was not radical as of the time he got married in 2012 in the United States; in another report, an individual opines that Saipov could not have been radicalized in Uzbekistan because of the strict laws and security practices there; and in another

---

[13] This statement by Individual-1 appears inconsistent with Individual-1's later statements to the FBI, reflected above, concerning Saipov. Additionally, in this interview report, Individual-1 identifies potential extremists in the United States but does not mention ████████

33

report, Individual-2 states that a ███████████████ source told Individual-2 that Saipov was affiliated with extremists in Uzbekistan, including a particular individual, and that Saipov had been radicalized in Uzbekistan. Additionally, one of the reports is an FBI source report in which the source states that the source believes that, on three occasions, the source observed Saipov at an Islamic Cultural Center and that Saipov appeared to exhibit, in the source's opinion, insular and/or paranoid behavior because Saipov and his associates were not engaging socially with others and Saipov was frequently looking around the room.

The FBI Saipov Casefile additionally contained three reports (from two interview subjects) pertaining to an associate of Saipov—████████.[14] In one of these reports, an individual ("Individual-3") notes that ██████ was of interest to Uzbek law enforcement, and in another report Individual-3 states that ██████ wore a beard and his pants in the way that individuals do in Afghanistan and that Individual-3 blamed ██████ for Saipov's extremist views because Saipov became extremist after moving from ████████, where Saipov and ██████ would see each other and were in constant contact. These reports are consistent with prior interview reports previously produced to defense counsel in 2019 of interviews of Individual-3 in which Individual-3 stated that Saipov's behavior changed after he moved to ████ and that Individual-3 believed ████ whom Saipov associated with in ████—influenced Saipov to believe in extremism. Finally, the third report pertaining to ████ was from an FBI source, who states that Saipov and ██████ were associates in ████ that Saipov was not religious in Uzbekistan and became more religious upon moving to the United States, that ██████ may have influenced

---

[14] ██████ was noticed by the defense as a potential defense witness at the 2020 suppression hearing.

Saipov to become more involved in his faith, and that ███████ was devout but not radical or extremist.[15]

    Additionally within the Prosecution Team's possession were three reports concerning interviews of a man and woman ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████

    Finally, and separate from these interview reports, the Prosecution Team identified a contact list and tolls for a messaging application on the defendant's cellphone that was received

---

[15] As noted above, in 2019, the Prosecution Team produced information to the defense that it was Individual-3's opinion that ████████ was to blame for Saipov's extremism. The defense responded by asking questions relating to ██████ including requesting additional information regarding whether ██████ radicalized Saipov. Two of the three reports noted above are consistent with prior reporting produced to the defense concerning Individual-3's opinion of ██████ and the third report does not indicate that ██████ radicalized Saipov. Nonetheless, all three reports were in the possession of the Prosecution Team at the time of the defense request, and it appears they were inadvertently not produced.

Through the Prosecution Team's recent review of the FBI's agency-wide casefile search regarding Saipov, the Prosecution Team identified additional reporting concerning ██████ that was not previously in the possession of the Prosecution Team but has since been produced within the 43 reports described above. Those reports (which were not in the FBI Saipov Casefile) reflect comments that ██████ is not radical, is calm and non-violent, became more devout upon moving to the United States from Uzbekistan, and was associated closely with Saipov's brother-in-law ██████████████████████

by the Prosecution Team in response to an emergency disclosure request following the attack; a set of text messages between Saipov and Individual-3 that were provided by Individual-3 to the FBI in approximately March 2018; and two agent reports describing, in part, the post-attack search of the defendant's residence in New Jersey.[16] These materials have now been produced to the defense.

## C. The Defendant's *Brady* Claim Should Be Rejected

As detailed above, most of the recently produced materials—including the reports relating to ██████—were promptly produced to defense counsel once the reports came into the possession of the Prosecution Team. Because those materials were not previously in the possession of the Prosecution Team, they could not have been suppressed. The defendant's *Brady* claim, and corresponding request for an evidentiary hearing, should be dismissed on that basis standing alone. Moreover, to the extent these materials bear on how the defendant was radicalized, that information is inculpatory (not exculpatory), is already known by the defendant, and has limited relevance at a penalty phase given that the Government will not present evidence of who radicalized the defendant at the penalty phase and, moreover, anyone referenced in the recently produced reporting who may have played a role in radicalizing Saipov is hardly "equally culpable"

---

[16] These materials overlap with, but do not appear identical to, materials already produced in discovery. The Prosecution Team previously provided extractions of the defendant's cellphone, and its embedded contact lists and tolls, including a phone containing the messaging application; the Prosecution Team previously produced the contents of the defendant's cellphone, which appears to have contained all but eight of the text messages with Individual-3; and the Prosecution Team previously produced photos, videos, and paperwork associated with the search of the defendant's New Jersey residence (along with the search warrant). In preparing the two above-referenced agent reports regarding the residence search for production this week, the Prosecution Team noted that one of the search reports describes "a bottle of an unidentified drug like substance." Photos of the bottle, which were produced to the defense in December 2017, show a foreign label, which the Prosecution Team had translated this week and provided the translation to the defense. The draft translation reflects that the bottle contained a medication ████████ ████████

in his murderous attack. *See* 18 U.S.C. § 3592(a)(4) (defining mitigating factors). Finally, because the recent productions bear on issues of which the defense was largely on notice and which are already within the defendant's knowledge, and because any penalty phase is unlikely to begin for at least three months, the defendant's request to adjourn the trial should be denied.

1. The ████████ Materials Were Not in the Prosecution Team's Possession

The defense's argument that the Prosecution Team's recent disclosure of the ████-related materials constitutes a *Brady* violation is premised on an incorrect conception of the scope of the Prosecution Team. "[I]n the Second Circuit, a prosecutor's constructive knowledge [for the purposes of *Brady* disclosures] only extends to those individuals who [or entities that] are 'an arm of the prosecutor' or part of the 'prosecution team.'" *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 WL 457315, at *9 (S.D.N.Y. Feb. 15, 2022) (second alteration in original). Here, the Prosecution Team consists of the undersigned and predecessor prosecutors from the U.S. Attorney's Office for the Southern District of New York and particular FBI counterterrorism agents from the New York Field Office of the FBI who are charged with the investigation and prosecution of Saipov. The ████████ materials were principally generated by FBI offices in Philadelphia; Washington, D.C.; Kansas City; St. Louis; Chicago; Cleveland; and San Francisco, and all were generated without *any* involvement or direction from any of the prosecutors on this case. The FBI agents and field offices that generated the ████████ materials did not make any presentations to the grand jury in connection with this case, play any role in the development of prosecutorial strategy, or accompany the prosecution team to court proceedings. *See Middendorf*, 2018 WL 3956494, at *4; *see also United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (refusing, for *Brady* purposes, to impute to AUSAs prosecuting that action with the assistance of certain FBI agents knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants"); *United States v. Pelullo*, 399 F.3d 197, 218 (3d Cir. 2005)

("[T]hat other agents in the [Department of Labor ("DOL")] participated in this investigation does not mean that the entire DOL is properly considered part of the prosecution team."). While certain of those FBI offices outside of New York assisted with conducting interviews in the immediate aftermath of Saipov's attack, engaging in the limited task of conducting post-attack interviews (notably without any participation by any of the prosecutors) cannot transform every one of those offices (with their thousands of assigned FBI agents) into members of the Prosecution Team. *See generally Avenatti*, 2022 WL 457315, at *10 ("Importantly, although an investigation may be joint for some purposes, it may be independent for others. Thus, where two prosecution teams jointly conduct a limited number of investigative activities, those activities, without more, do not necessarily create an obligation under *Brady* for either team to search the entirety of the other team's file. Instead, each prosecution team will have an obligation to review the documents *arising from the joint efforts* to determine whether there is *Brady* material that must be disclosed." (emphasis in original)); *see also Meregildo*, 920 F. Supp. 2d at 441–42 ("Interacting with the prosecution team, without more, does not make someone a team member.").

Of note, the defense's argument extends far beyond even the FBI in construing the scope of the Prosecution Team, apparently encompassing the Department of Homeland Security and "other law enforcement entities." (Dkt. 503 at 2). But, again, this is incorrect. While the Prosecution Team has prudentially requested that certain law enforcement and intelligence agencies search their holdings for materials relating to Saipov (resulting, in part, in productions to defense, and, in part, in CIPA litigation before this Court), that does not expand the scope of the Prosecution Team to include all of those various agencies. [17] *See generally United States v.*

---

[17] In its August 25, 2022 submission, the defense cites a November 20, 2018 letter from the Prosecution Team, in response to a defense discovery request, in which the Prosecution Team stated that it did not currently have any materials to produce from other components of the U.S.

*Merced*, No. 19 Cr. 0832 (ER), 2021 WL 5826286, at *4 (S.D.N.Y. Dec. 8, 2021) (denying pretrial motion to compel production of information relating to the defendants from agencies outside the prosecution team and noting that the Government's "duty to learn of favorable evidence is not limitless," and that imposing such an "unlimited duty" on the Government would require the court to "adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis" (internal quotation marks omitted)). Under the defense argument, the entire U.S. government's holdings would be attributable to the Prosecution Team. As the Second Circuit recently emphasized, however, requiring prosecutors to "search the 'whole-of-government' for possibly material information in myriad cases and controversies . . . . would clearly be an unworkable encumbrance on the system of justice." *United States v. Hunter*, 32 F.4th 22, 36–37 (2d Cir. 2022) ("We have long rejected the notion that knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor." (internal quotation marks omitted)). For this reason, too, the defense construction of the scope of the Prosecution Team and its disclosure obligations should be rejected.

Moreover, beyond overstating the scope of the Prosecution Team's holdings, the defense overstates the bounds of relevant material concerning Saipov's associates. In its submission regarding ▮▮▮▮▮▮▮▮, for example, the defense requests that the Court compel the Prosecution Team to produce all information in its possession, custody, or control about ▮▮▮▮▮'s activities as a terrorist facilitator. (Dkt. 473 at 6). As described in our prior submission in opposition to the

government illustrating Saipov's relationship to ISIS, but that it was continuing to coordinate with other agencies to determine whether they had such materials in their possession. The Court is aware of the searches and reviews that the Prosecution Team conducted in and around that time, which were subsequently described in CIPA filings. Again, however, those prudential requests to other components do not transform those components into members of the Prosecution Team and, moreover, the Prosecution Team does not have ongoing access to those holdings.

defendant's motion, the Prosecution Team has already produced considerable information regarding ███████'s suspected terrorist affiliations. More broadly, through the course of this investigation, the Prosecution Team has also endeavored to identify for defense counsel the names of other individuals believed to have been associated with Saipov who are suspected of being supporters of ISIS or other terrorist organizations and/or sharing related propaganda. As it prepares for trial, the Prosecution Team will supplement that list with any additional individuals that come to its attention, particularly with respect to any such individuals suspected of radicalizing others. Ultimately, however, the Prosecution Team cannot be expected to exhaustively locate and produce information indicating only that an associate or potential associate of Saipov may be connected to terrorist organizations. The Prosecution Team's disclosure obligations do not extend that far (and any such requirement would be impractical). *See Avenatti*, 2022 WL 457315, at *12 ("*Brady* does not obligate the Government to seek out information like a private investigator and valet gathering evidence and delivering it to opposing counsel." (internal quotation marks and alterations omitted)). To be sure, the Prosecution Team has been and remains committed to producing any information in its holdings evidencing any radicalization of Saipov, but that is distinct from producing all derogatory information concerning Saipov's potential associates.

2. The Recent Productions Do Not Constitute a *Brady* Violation

Even if the ████████ materials had been in the possession of the Prosecution Team (which they were not), their recent production cannot constitute a *Brady* violation. Evidence is not suppressed under *Brady* "if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Diaz*, 922 F.2d at 1007. If in fact ████████ radicalized Saipov, Saipov already knows the essential facts (such as his personal interactions with ████████ permitting the defense to make use of that information including by conducting investigation relating to ████████ *See United States v. Corey*, 566 F.2d 429, 431 n.5

(2d Cir. 1977) (holding that a prosecutor has no obligation to bring to the defendant's attention matters which he already knows). While the Prosecution Team will continue to produce to the defense any information relating to Saipov's radicalization that it identifies through its investigation of Saipov and trial preparations, Saipov is, nonetheless, already in possession of the essential facts regarding his radicalization because they are within his own knowledge (such as, for example, who if anyone sent him propaganda or exposed him to ISIS's extremist ideology). Moreover, defense counsel has been in possession of information indicating ███████ may have supported jihad and had substantial contact with Saipov for years. ████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ While the recently produced ███████ reports (which, again, were not previously in the possession of the Prosecution Team and are not voluminous) provide further details and context regarding ███████ potential extremist views and contacts, the defense has long been in the possession of essential facts regarding ███████

Additionally, while the Court cannot actually assess the materiality of purported *Brady* evidence in the absence of a conviction or sentence, the defense here nonetheless overstates the potential relevance of the ███████ materials. *See Rodriguez*, 2020 WL 5819503, at *10 (noting that determination of a *Brady* violation is necessarily a "retrospective review made after a conviction"); *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (holding that a *Brady* analysis is fundamentally retrospective, requiring an assessment of actual prejudice). The ███████ materials are not exculpatory. While the defense argues that the ███████ materials are relevant to any penalty phase, the materials, in fact, have limited value. The Government will not be presenting evidence concerning who radicalized Saipov, and contrary to the defense arguments, individuals referenced in the reporting who may have "influenced" or radicalized Saipov are not

"defendants equally culpable in the crime" under Section 3592(a)(4). The cases relied upon by the defense concern instances in which co-conspirators were involved in the planning or facilitation of a capital crime (Dkt. 503 at 5–6)—such accomplices are plainly entirely distinguishable from the class of individuals addressed in the defense motion: individuals who may have exposed Saipov to ISIS propaganda or extremist views. Someone who shares propaganda is not equally culpable in the crime of murdering eight innocent victims and, indeed, may not be guilty of *any* crime, let alone the capital offenses charged here.

For similar reasons, the recent production of the limited set of reports that were in the Prosecution Team's possession do not violate *Brady*. Most of these reports concern individuals who had passing, or no, interaction with Saipov and are reporting on Saipov's potential contacts. The Prosecution Team has historically produced reports of this nature in an effort to assist the defense's investigation into associates of Saipov who may have information on his character, but, ultimately, Saipov already knows who his contacts are, and such reports contain no exculpatory or mitigating evidence. While four of the reports reference Saipov's radicalization, they are not voluminous, they pertain to an issue within Saipov's own knowledge (who, if anyone, radicalized him), and, again, despite the defense's claims, individuals who may have radicalized Saipov or exposed him to propaganda are hardly *equally* culpable in his murderous crimes as is relevant to any penalty phase. Moreover, the reports, on their face, have limited significance. Two reports concern witness opinions about the timing of Saipov's radicalization without any indication of who may have been involved in radicalizing him. The third report is an individual's broad opinion about whether Saipov, or anyone else, could hypothetically become radicalized in Uzbekistan. And the fourth report appears unreliable on its face given its inconsistency with scores of other witness reports about Saipov's radicalization in the United States (and to the extent Saipov was in

fact radicalized in Uzbekistan, he knows that). *See generally Tate v. Wood*, 963 F.2d 20, 25 (2d Cir. 1992) ("Thus, *Brady* requires the prosecutor neither to deliver his entire file to defense counsel, nor to make a disclosure if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." (internal citations and quotation marks omitted)); *see also generally United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) ("The government has no *Brady* obligation to "'communicate preliminary, challenged, or speculative information.'" (quoting *Diaz*, 922 F.2d at 1006 and *United States v. Agurs*, 427 U.S. 97, 109 n.16 (1976))).

For all of these reasons, the defendant's *Brady* arguments should be rejected, and his request for a hearing should be denied.[18]

### D. The Recent Productions Do Not Warrant a Trial Adjournment

The recent production of materials to the defense does not warrant a trial adjournment. First, as to the ██████ materials, the defense, since at least 2019, has been on notice that ████████ may have been a close associate of Saipov who espoused jihad. Moreover, to the extent Saipov was actually radicalized by ████████ or any other individual, that information was already in his possession. Second, the Prosecution Team is making efforts to confer with defense counsel and the FBI about what steps the Prosecution Team can take to facilitate the defense investigation into the recently produced materials, including by making individuals available to the defense. Third, the recently produced materials are not exculpatory, and to the extent they are relevant to any penalty phase, such a phase is not expected to begin until late this year. The parties and Court

---

[18] For all of the reasons set out above, there has been no *Brady* violation, and an evidentiary hearing to investigate such a violation is unwarranted. That said, the Prosecution Team has endeavored herein and in its prior submissions to describe for the Court the steps it has taken to identify materials for production to the defense, and always remains available to answer any questions the Court may have about that process through written submission or by way of a Court conference.

are planning for at least several weeks of individual *voir dire* to begin October 11; the Government's case-in-chief at the guilt phase will take at least two weeks to be followed by the defense's anticipated case of approximately one week; and there will then be a break of at least one week. Given this schedule, as well as the Thanksgiving holiday in November, any penalty phase is not expected to begin for another three months, at least. This is sufficient time to investigate the recently produced materials, particularly given how long the defense has been on notice of ███████ potential relevance and given that the defendant can guide the defense in any such investigation because he knows whether ███████ or anyone else, radicalized him.

## **CONCLUSION**

For the reasons above and in the Government's opening brief, the Court should ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████ (iii) deny the defendant's *Brady* claim and request for

an evidentiary hearing; and (iv) deny the defendant's motion to adjourn the trial.

Dated: New York, New York
       September 2, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:            /s/
       Andrew Dember
       Amanda Houle
       Alexander Li
       Jason A. Richman
       Assistant United States Attorneys
       (212) 637-2563/2194/2265/2589

Cc:    Defense Counsel (via ECF and email)