# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

September 6, 2022

**By Email & Ex Parte (Unredacted)**
**By Email (Partially Redacted Government Version)**
**By ECF (Fully Redacted Public Version)**

The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Centre Street
New York, NY 10007

     Re:    **United States v. Sayfullo Saipov**
             **(S1) 17 Cr. 722 (VSB)**

Dear Judge Broderick,

From the beginning of this case nearly five years ago, the defense has sought the sort of material the Government is only now disclosing. When the defense repeatedly requested information about anyone who recruited or influenced Mr. Saipov, or otherwise played a role in the truck attack of 2017, the Government responded that it was well aware of its obligations, that it continued "to coordinate with law enforcement and intelligence agencies to determine whether there are any materials in their holdings," and that it would provide information about "possible contacts and/or associates and who are (or have been suspected of being) sympathetic to ISIS or other foreign terrorist organizations and/or sharing propaganda" on a "rolling basis." The Government never questioned the relevance of the information. Nor did it question the importance of disclosing the information expeditiously.

Now, however, with the recent disclosures revealing that the Government failed in its obligations, it strikes a very different tone. Rather than acknowledge its error, the Government takes the stunning positions that: (1) the FBI, the investigating agency in this case, is not part of the prosecution team when field offices outside of New York compile evidence; (2) whether others recruited, directed or assisted Mr. Saipov in committing the offense is not relevant to the issue of shared culpability for purposes of determining whether Mr. Saipov should be sentenced to death; and 3) even if the first two points are incorrect, three months is plenty of time for the defense to track down witnesses and evidence in Ohio,

Florida, New Jersey, Turkey, and Uzbekistan; after all, only two of those three months will be spent in the courtroom full time.

The Government's response is not only wrong as a matter of law but also concerning: The FBI is not part of the prosecution team? Shared culpability is not material to the death penalty? If those are truly the Government's positions, the defense has no confidence that it is receiving all of the information to which it is entitled to defend this capital case. Nor should the Court.

In its response, the Government touts its "significant and diligent efforts to meet and exceed its discovery and disclosure obligations." Govt Rep. 26. But that description is belied by the method the Government used to find the recently disclosed documents, which did not require extraordinary measures: it typed "Saipov" into an FBI database.

At the very least, the Court should grant a continuance of the trial date to allow the defense to adequately investigate leads arising from the August 2022 disclosures and prepare for trial. Following further development of the record through an evidentiary hearing, the defense will pursue remedies beyond a continuance, including, but not limited to the Court's: striking of the Government's notice of intent to seek the death penalty; dismissal of discrete aggravating factors from the death notice; instruction to the jury that it must find certain mitigators; admission of certain reports and/or FD-302s at the penalty phase; and instruction to the jury that it can consider the Government's untimely disclosure of mitigation materials.

## I.     The August 2022 Disclosures are Plainly Relevant and Helpful to the Defense at a Death Penalty Sentencing Phase.

In its response, the Government downplays the significance of its August 2022 disclosures through a blanket and conclusory description of the items as "inculpatory" rather than exculpatory. The Government misapprehends the significance of the materials and its <u>Brady</u> obligations in a capital case.

### A. In capital cases, the Government's <u>Brady</u> obligation requires the disclosure of information material to the defendant's presentation of factors mitigating against a death sentence.

Under <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the prosecution has a duty to disclose all evidence favorable to the defendant which is "material either to guilt <u>or punishment</u>." In the sentencing phase of a death penalty prosecution, the defendant is entitled to present evidence regarding certain factors set forth in 18 U.S.C. § 3592(a). These factors include aspects of the defendant's background or character or any other circumstance of the offense that mitigates against a death

sentence. 18 U.S.C. § 3592(a)(8); see also § 3592(a)(4) ("In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following: … (4) Another defendant or defendants, equally culpable in the crime, will not be punished by death."). "Brady therefore mandates discovery concerning such mitigating factors." United States v. Storey, 956 F. Supp. 934, 939-40 (D. Kan. 1997). Indeed, for Brady purposes, material evidence includes information that "play[s] a mitigating, though not exculpating, role" in a capital case. Cone v. Bell, 556 U.S. 449, 475 (2009). In Cone for example, the Supreme Court granted habeas relief with respect to a state death sentence where the mitigation theory was that the defendant was suffering from acute methamphetamine psychosis when he killed the two victims, and the state had suppressed witness statements supporting this theory—even though they were incriminating as to guilt. Id.

Accordingly, in dismissing the August 2022 disclosures as "inculpatory," the Government takes an erroneous view of what is "favorable" to Mr. Saipov, particularly at the sentencing phase. Bell, 556 U.S. 449 at 473 ("Evidence that is material to guilt will often be material for sentencing purposes as well; the converse is not always true, however, as Brady itself demonstrates.").

Importantly, in determining the materiality of undisclosed information, a court may consider "any adverse effect" that the nondisclosure (or delayed disclosure) "might have had on the preparation or presentation of the defense's case." United States v. Bagley, 473 U.S. 667, 683 (1985). With this standard in mind, evidence must be disclosed, e.g., if it "could be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it." Ellsworth v. Warden, 333 F.3d 1, 54 (1st Cir. 2007) (en banc) (citing Wood v. Bartholomew, 516 U.S. 1, 6-8 (1995)).

## B. The recently disclosed information is material to Mr. Saipov's presentation of factors mitigating against a death sentence.

Among other things, the August 2022 disclosures are material and helpful to the defense against the Government's proof (in support of its aggravating factors) that Mr. Saipov's independent, "lone-wolf" planning and action justify a death sentence because they provide investigative leads and circumstantial evidence of others' support and/or involvement in the truck attack. Similarly, these same materials also bear directly on our argument that, under 18 U.S.C. § 3592(a)(4), a jury should spare Mr. Saipov's life because others who share culpability for the truck attack do not face a death sentence. Lastly, the disclosures are also relevant and helpful to Mr. Saipov's Rule 12.2 notice, in that they contain ███████████
███████████████████████████████████

3

The defense has never hidden the ball about what we consider relevant and vital to Mr. Saipov's mitigation case. We engaged with the Government for years in good faith and requested materials bearing on Mr. Saipov's exposure to ISIS propaganda by third parties, and the prospect of shared culpability for the truck attack. At every turn, the Government did not rebuff the defense requests or claim that the information sought was irrelevant or undiscoverable. Rather, the Government made several disclosures about Mr. Saipov's third-party contacts and reassured the defense that it was conducting a thorough review of materials in the possession of the FBI and other competent law enforcement and intelligence agencies for any other responsive materials. The defense relied on this information—including the Government's representations about the exhaustiveness of its searches—and have been blindsided by the August 2022 disclosures.

1. **The Government's prior representations about what it was disclosing on a "rolling basis" in response to pointed defense demands.**

On September 21, 2018, less than a year into the case, the defense wrote the Government requesting, <u>inter alia</u> and pursuant to <u>Brady</u>, all evidence of Mr. Saipov's alleged interactions, contacts, associations, or affiliations with ISIS, including, Mr. Saipov's efforts to communicate with ISIS agents, representatives, or sympathizers; Mr. Saipov's efforts to coordinate with or seek advice from ISIS or anyone associated with ISIS in advance of October 31, 2017; and any evidence that ISIS or anyone believed to be associated with ISIS possessed information about Mr. Saipov before or after October 31, 2017. The defense also specifically requested information in the possession of the National Security Agency, Department of Homeland Security, and the Department of Defense.

The Government responded on November 20, 2018, with records of Mr. Saipov's recorded communications with ███████████ and ███████ ████████. In pertinent part, the Government also wrote that it "continues to coordinate with law enforcement and intelligence agencies to determine whether there are any materials in their holdings that qualify as Rule 16, <u>Brady</u>, or <u>Giglio</u> materials in this matter. At this time, we have no additional materials to produce."

On January 18, 2019, we wrote the Government again and sought additional details about the ████ and ██████████ wiretaps. In doing so, we reiterated our position that "<u>any</u> information the government possesses (or could reasonably possess through due diligence) concerning any of Mr. Saipov's contacts who exposed him to ISIS propaganda or any other form of Islamic extremism is material to our defense preparation and is an aspect of his offense conduct that may be highly mitigating at a potential penalty phase."

4

As a result of that letter, the Government made three disclosures on



W]hen the prosecution represents that all such material has been disclosed[,]' it is reasonable for defense counsel to rely on the prosecution's representation." <u>United States v. Nelson</u>, 979 F. Supp. 2d 123, 133-34 (D.D.C. 2013) (quoting <u>Banks</u>

### 2. The August 2022 disclosures provide additional support for third-party involvement in Mr. Saipov's radicalization and the truck attack itself.

Third-party culpability has been a focus of the defense mitigation investigation for years because of its importance to two aspects of Mr. Saipov's penalty-phase presentation.

First, whether others contributed to Mr. Saipov's radicalization or participated in the planning of the truck attack is clearly relevant to rebutting the Government's allegation that Mr. Saipov—alone and without others' assistance— substantially planned and premeditated a terrorist attack in the backyard of the 9/11 attacks, and that he did so pursuant to an ISIS playbook that he obtained through his one-way consumption of ISIS propaganda. Second, third-party involvement in the truck attack is plainly relevant to a jury's consideration of whether it should spare Mr. Saipov's life because other (direct or indirect) participants in the truck attack or Mr. Saipov's radicalization are not facing prosecution, let alone a death sentence.

The Government's attempt to downplay the significance of the August 2022 disclosures to Mr. Saipov's defense is belied by the direction and scope of its investigation in the aftermath of the truck attack. Indeed, the prospect of third-party culpability has also been of significant interest to the Government. For example, some of the first FD-302s produced in discovery demonstrate that immediately following the truck attack, the FBI swiftly identified and questioned (and in at least one instance detained)



v. Dretke, 540 U.S. 668, 695 (2004). That is "defendants [do not have to] scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed." Banks, 540 U.S. at 695.



---

[2] ██████████████████████ is attached as Exhibit A.



In addition to implicating ████████████, the recent disclosures suggest a connection between Mr. Saipov's attack and a ████████████████████ For example, the August 24, 2022, production also contained typewritten notes from an August 2018 interview of ████████████████████████████[4] ████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[3] ████████████████████████████ is attached as Exhibit B.

[4] ████████████████████████████ is attached as Exhibit C.

Against this backdrop, the Government's attempt to discount or dismiss outright the significance of these recent disclosures on the defense's third-party culpability mitigation investigation should be rejected.  The belated disclosure of the reports, some of which were in the possession of the prosecution team and its FBI/Joint Terrorism Task Force partners for years (see infra) is inexcusable and at least warrants an evidentiary hearing.

### 3.  The August 2022 disclosures also provide additional support for, and grounds to investigate, Rule 12.2-related mitigation

The August 2022 disclosures are not only relevant and helpful to the defense's third-party culpability investigation, but they also concern the adequacy and scope of our mental health-related investigation and Rule 12.2 notice.

In Cone v. Bell, the Supreme Court vacated a death sentence when it determined that the suppressed evidence—police reports and eyewitness accounts

that Bell was acting "real weird," and was a serious drug user when he shot and killed a police officer and a bystander—"may well have been material to the jury's assessment of the proper punishment in this case."  556 U.S. at 475.  Here, too,



accumulation of traumatic brain injuries, evidence of cognitive impairments should have been disclosed immediately.

## II.   The Government Has an Obligation to Find and Disclose Discoverable Information in the FBI's Possession.

In opposing an evidentiary hearing and resisting further fact-finding into its belated, August 2022 disclosure of 71 FBI reports material to the defense's mitigation investigation, the Government makes other arguments, including that the disclosures overlap with previous discovery or that their disclosure was not required. These arguments all fall flat.

### A.   All of the reports disclosed this month appear to have been in the possession of the FBI, the investigating agency in this case, and were therefore subject to mandatory discovery under <u>Brady</u>.

The Government endeavors to cabin its <u>Brady</u> obligations to "the undersigned and predecessor prosecutors from the U.S. Attorney's Office for the Southern District of New York and particular FBI counterterrorism agents from the New York Field Office of the FBI who are charged with the investigation and prosecution of Saipov." Govt Rep. 37. But such a narrow view is contrary to well-established law and the facts of this case.

The Government "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995). Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned. <u>Id.</u> Accordingly, <u>Brady</u> applies to documents not only in the physical possession of the prosecutors, but also in the hands of the "investigating agency." <u>United States v. Blanco</u>, 392 F.3d 382, 388 (9th Cir. 2004).

"In the words of Judge Weinfeld, any argument that the Government's duty does not extend so far merely because another agency, not the USAO, is in actual possession of the documents created or obtained as part of the joint investigation is both 'hypertechnical and unrealistic.'" <u>United States v. Gupta</u>, 848 F. Supp. 491, 493 (S.D.N.Y. 2012) (quoting <u>United States v. Shakur</u>, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982)). Indeed, "[w]here the USAO conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for <u>Brady</u> evidence." <u>Gupta</u>, 848 F. Supp. 2d at 493; <u>see also United States v. Brooks</u>, 966 F.2d 1500, 1502 (D.C. Cir. 1992) (prosecution's <u>Brady</u> obligations include not only a duty to disclose exculpatory information, but also a duty to search possible sources for such information, including in the possession of agencies other than the prosecutor's office).

11

To determine the scope of the agency or agencies involved in a particular case, courts engage in a fact-intensive determination as to whether "an investigation is a joint investigation for purposes of triggering an extension of the Government's <u>Brady</u> search obligation." <u>United States v. Collins</u>, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019) (internal citations omitted). It is the <u>investigation</u>, not the prosecution that controls; the latter has "no bearing on joint collection of exculpatory information that <u>Brady</u> compels the prosecutor to disclose." <u>Gupta</u>, 848 F. Supp. 2d at 494.

In this case, the "investigating agency" is (and has been since the inception of this case) the FBI. And in arguing that some documents in the possession of the FBI were outside the reach of <u>Brady</u>, the Government makes a novel and peculiar claim: that the FBI is actually multiple separate agencies based on the location of its field offices. That argument is without any basis in the law.

The Government does not—because it cannot—cite to a single case that recognizes separate field offices of a single agency (like the FBI) to be separate, distinct agencies for the purposes of a <u>Brady</u> inquiry.[7]

Instead, and applying the test in <u>Middendorf</u> for determining whether separate agencies engaged in a joint investigation, the FBI clearly operated as one, unitary agency in this case. <u>See</u> <u>United States v. Middendorf</u>, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (finding that the USAO did not engage in a joint investigation with the Securities and Exchange Commission (SEC) or the Public Company Accounting Oversight Board (PCAOB)); Govt Rep. 25.

---

[7] Indeed, no such case exists. The Government cites only to <u>United States v. Avenatti</u>, No. 19 Cr. 374 (JMF), 2022 WL 457315, at *1 (S.D.N.Y. Feb. 15, 2022), in which Judge Furman determined that the United States Attorney's Office for the Central District of California, which was engaged in a separate prosecution of Avenatti for discrete crimes, was distinct from the Southern District of New York United States Attorney's Office. In making this factual finding, Judge Furman still adhered to the well-established rule: "An individual prosecutor is presumed ... to have knowledge of all information gathered in connection with his office's investigation of the case and ... has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." <u>Id.</u> at *9 (quoting <u>United States v. Avellino</u>, 136 F.3d 249, 255-56 (2d Cir. 1998)). Most importantly, Judge Furman relied heavily on the fact that Avenatti's SDNY case and his CDCA case were two separate prosecutions, each investigated by "<u>separate agency</u> partners—the FBI-NY for the USAO-SDNY and the IRS-CI for the USAO-CDC." <u>Id.</u> at *10 (emphasis added). Thus, <u>Avenatti</u> simply does not stand for the principle that the FBI can be divided into more than one agency for the purposes of <u>Brady</u>.

Under the test, courts consider "whether the other agency (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." Id. In this case, FBI agents participated in the prosecution's witness interviews, were involved in presenting the case to the grand jury, reviewed and shared documents with the prosecution, and accompanied the prosecution to court proceedings. Indeed, FBI agents have been working with the USAO on every aspect of this case; they have witnessed and participated in interviews with third parties, testified at hearings, and coordinated Rule 15 depositions.

For example, during the suppression hearing held in January 2020, ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████ And in its response, the Government even acknowledges that some of the same offices that possessed the August 2022 materials "assisted with conducting interviews in the immediate aftermath of Saipov's attack." Govt Rep. 38. Many of those offices also transmitted their reports to the prosecution team and/or made them available electronically shortly after the attack. For example, many of the FBI's 302s say they were "entered"—ostensibly into an FBI database—as early as November 4, 2017, five days after the attack. Lastly, the prosecution team has been producing to use other reports and 302s from those same offices for years.

The Government argues that despite its awareness of, and reliance on, the cross-country investigation into Mr. Saipov, every single FBI agent in the country is not a "member" of the prosecution team. Govt Rep. 38. But this is a red herring because any particular agent's so-called "membership" in the team is not the determinative factor; instead, the question is: did the prosecution team have reason to believe that various FBI field offices might have discoverable material in their possession? See Gupta, 848 F. Supp. 2d at 495 (citing Brooks, 966 F.2d at 1503 (D.C. Cir. 1992). In this case, the answer is clearly yes.[8]

The Government also contends that it should not face any sanction for the belated disclosure of at least 43 of the 71 documents produced this month because

---

[8] Nevertheless, even if out-of-state, non-NY FBI offices could somehow be deemed "separate agencies" for purposes of a Brady inquiry, the Government's Brady obligations do not suddenly end at the state line. "[I]nformation 'in the possession of the government' under Rule 16(a)(1)(C) may sometimes include out-of-district documents of which the prosecutor has knowledge and to which the prosecutor has access." United State v. Bryan, 868 F.2d 1032, 1036 (9th Cir. 1989).

the items were hidden in agency files across the country.  This argument lacks
merit.  The documents at issue were uncovered after the Government made a single
straightforward request of the agency that has been investigating this case all
along: "the Prosecution team requested a search of the FBI's agency-wide electronic
casefile system for any reports mentioning 'Saipov' and the search turned up "some
reports from other FBI offices… that had not previously been provided to the
Prosecution team."  Govt Rep. 27.  Worse, the Government does not offer any
explanation why the prosecution team waited until August 2022 to query the FBI's
agency-wide electronic casefile system for any reports mentioning "Saipov."  The
Court must obtain an explanation before it can be satisfied that the Government is
adhering to its obligations now and before it can determine the full scope of
appropriate remedies.  See Sutton, supra.  The prosecution team asks the Court to
credit its "recent diligence," Govt Rep. 29, but the Court should decline the
invitation as "too little, too late," and hold an evidentiary hearing.

It also bears emphasizing that the Government's efforts to disclaim control,
knowledge, or access to the holdings of non-NY FBI agencies and other
governmental entities is directly contradicted by their actions and representations
in this case—representations upon which the defense relied.  See supra.  The
Government acknowledges that it "has prudentially requested that certain law
enforcement and intelligence agencies search their holdings for materials relating to
Saipov."  Govt Rep. 38.  Indeed, since 2018, the Government has claimed to
"continu[ously] [] coordinate with law enforcement and intelligence agencies to
determine whether there are any materials in their holdings" that qualify as Brady
or are otherwise discoverable.  Govt Ltr., Nov. 20, 2018.[9]

If, instead, the Government had meant to disclaim any such disclosure
obligations, it could have done so.  The Government could have told the Court and
counsel that our repeated requests were for information outside of their purview, as
they have done in other cases.  See, e.g., United States v. Merced, 19 Cr. 832 (ER),
2021 WL 5826286, at *2 (S.D.N.Y. Dec. 8, 2021) ("the government wrote that
defendants were not entitled to the broad discovery materials requested …
[because] … defendants' requests 'inappropriately treat the federal government

---

[9] Indeed, even in the midst of disclaiming any responsibility to do so, the
Government offers the same assurances again in its response: "through the course
of this investigation, the Prosecution team has also endeavored to identify for
defense counsel the names of other individuals believed to have been associated
with Saipov who are suspected of being supporters of ISIS or other terrorist
organizations and/or sharing related propaganda…"  Govt Rep. 40.  The prosecution
team also "has been and remains committed to producing any information in its
holdings evidencing any radicalization of Saipov."  Id.  The Government clearly
recognizes the importance of this material, and even acknowledges that it might
have more in its possession.

(and state prosecutors in Brooklyn) as a monolithic whole'"). But it did not. As a result, the Government left the Court and the defense with the clear impression that it was conducting an exhaustive search for the requested materials—at the very least, of the documents in the possession of the FBI, its main investigating agency.

Finally, the defense has always been clear that we have a specific interest in others who may have influenced Mr. Saipov regarding ISIS and/or the truck attack. It is not—and has never been—our position that the prosecution team needed to "search the 'whole-of-government.'" Govt Rep. 39 (quoting United States v. Hunter, 32 F.4th 22, 37 (2d Cir. 2022)). In Hunter, the Brady claim concerned materials in the possession of a government agency that had gone to the District Court for a protective order specifically prohibiting the prosecution team from accessing it. To the contrary, here, we have been asking for specific topical materials that were in the possession of the very agency tasked with investigating this case.

## B. The prosecution concedes that more than a third of the 71 newly-disclosed reports were in its possession, but withheld from the defense.

Notwithstanding the Government's arguments regarding the documents it disclosed this past month from FBI offices around the country, 28 of the 71 reports it disclosed were plainly in the possession of the prosecution team well before August 2022.[10]  In fact, the reports were in the "FBI Saipov Casefile," the central repository for this investigation, by the main investigating body for this case.  Govt Rep. 28.

The Government attempts to downplay this failure as "inadvertent," Govt Rep. 32, n. 11, but it offers no facts to support that conclusion.  For example, how were the reports withheld despite pointed and detailed defense demands for the information?  Was it a technical or human oversight?  If technical, what search parameters or protocols were in place and were they followed?  Did someone on the prosecution team, including members of the FBI, make a judgment call to withhold certain reports?  And if so, why?

_____

[10]

The Court must hold a hearing to determine how these 28 reports sat in the prosecution team's possession and remained undisclosed, despite years of discovery disclosures and specific demands made by the defense. See United States v. Sutton, CR 21-0598-01 (PLF), 2022 WL 2383974, at *10, n.11 (D.D.C. July 1, 2022) (finding that the "potential harm stemming from the government's delayed disclosure of the witness's statements [could] not be fully ascertained" without a hearing).

The Government claims that an evidentiary hearing is "unwarranted," because it has "describe[d] for the Court the steps it has taken to identify materials for production to the defense." Govt Rep. 43, n. 18. But the Government has not explained at all how the mistakes were made, which is what a hearing is for. See Sutton, supra (ordering the testimony of two Special Agents regarding the disclosure violations).

### C. The August 2022 disclosures contain information that is not coextensive with previous discovery productions.

In general, the Government's principal position that these new disclosures largely overlap with materials previously produced is misleading. Indeed, as discussed above, the disclosures contain revelations about ▮▮▮▮▮▮ and the likelihood that others had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that have reshaped the defense mitigation investigation a mere five weeks before individual voir dire. And while some of the disclosures concern individuals and topics previously known to the defense, the August 2022 productions provide new details and insight crucial to illustrating Mr. Saipov's record and character.

For example, before August 2022, the Government produced 302s summarizing interviews of a witness named ▮▮▮▮▮▮▮▮▮▮▮. These 302s captured the bare minimum of the information discussed during the nearly 4-hour-long interview, as illustrated by the Government's August 2022 disclosure of the transcript.

16



The recency of the ▮▮▮▮▮▮▮▮ disclosure leaves little doubt that the agents conducting these interviews (who may have been acting at the behest of the FBI-NY) were unconcerned with ensuring that the defense received the materials.[11]



### III.    Nothing That May or May Not Be in Mr. Saipov's mind or in His Possession Relieves the Government of Its <u>Brady</u> Obligations.

The Government further argues that information regarding who radicalized Mr. Saipov would have been "known" to him, and therefore, could not have been suppressed by the government.  Govt Rep. 25, 40.  But that position, again, misapprehends the law and the facts.

To be sure, some courts have held that <u>Brady</u> does not require disclosure of specific exculpatory information that the defendant knows is in the Government's possession.  <u>See, e.g.</u>, <u>United States v. Clarke</u>, 767 F. Supp. 2d 12, 52 (D.D.C. 2011).  But that principle is of little use to the Government on this record.  In assessing whether the Government has a <u>Brady</u> disclosure obligation in light of a defendant's knowledge, the Court must focus on the defendant's "knowledge of the government's possession of possibly exculpatory information, in contrast to [his] independent knowledge of how the offense transpired."  <u>Id.</u>  Here, assuming <u>arguendo</u> Mr. Saipov

---

11

is aware of who radicalized him or had advanced knowledge of the truck attack, there is absolutely no way for him to know that the Government had evidence that would tend to support third-party culpability mitigation. Because the Government cannot prove that Mr. Saipov had knowledge of the contents of the Government's recent disclosures, whatever may or may not be in Mr. Saipov's mind "does not excuse the government's failure to disclose the evidence earlier." Id.

Moreover, by claiming that Saipov knows who radicalized him, the Government appears to be perpetuating a rather simplistic and inaccurate view of how radicalization works. The Government avers that "if Saipov was radicalized by any of the individuals mentioned in the reports, he knows that based on his personal discussions and interactions with them," Govt Rep. 30, as if the process of radicalization is straightforward and always apparent to the listener. To the contrary, the thoughts, ideas, and motivations of radicalizers—which they may keep hidden from the people around them—may not have been known to Mr. Saipov and yet must be investigated by the defense team. And lastly, facts known to Mr. Saipov are not necessarily admissible at trial. The defense has an obligation to review and discover what can be proven at trial through other means. If witnesses are saying things to the FBI that are favorable to Mr. Saipov's mitigation case or that could reasonably lead to favorable information, it is discoverable, regardless of what Mr. Saipov knows. A defendant's subjective impressions and memories can be wrong, and it is defense counsel's obligation to not take it for granted.

## IV.   Conclusion

The Government's new disclosures have triggered numerous avenues of mitigation investigation that we must conduct to meet our obligations under the Fifth, Sixth, and Eighth Amendments. We have been investigating this case for years and we (many months ago) traveled to various states and countries to conduct interviews. We made strategic decisions based on the information we had at the time. Now that we have new information, the Government has—through its recent, 11th hour disclosure of Brady materials—pushed our investigation backwards in time. At a minimum, a continuance of the trial date is warranted.

The defense team cannot spend the next five weeks focused on a mitigation investigation that we thought was nearly complete long ago. The trial team is—as it should be—working around the clock to prepare for both phases of the trial, in addition to engaging in the rigorous process of reviewing 947 juror questionnaires that were completed as a central part of the jury selection process.

In this regard, the Government offers a misleading timeline. It avers that the new disclosures have not resulted in any prejudice because "any penalty phase is not expected to begin for another three months, at least." Govt Rep. 44. It argues that three months is "sufficient time to investigate the recently produced materials." Id. That argument might hold water if during those three months, the

18

defense team was not going to be <u>engaged in a capital trial</u>.  The defense team must be fully focused on <u>voir dire</u> and the liability phase during those months, not distracted by last-minute curveballs thrown by the Government.

      Accordingly, the Court should grant a continuance of the trial date and adjourn by at least 90 days.  The Court should also hold an evidentiary hearing and, following additional fact-finding, allow the parties to brief the propriety of additional remedies.

                        Respectfully Submitted,

                        /s/
                        David Patton
                        Andrew J. Dalack
                        Sylvie J. Levine
                        Annalisa Mirón
                        David Stern
                        David A. Ruhnke

                        Counsel for Sayfullo Saipov

Cc:    Government Counsel