

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 3, 2022

<u>Via ECF</u>
The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 518
New York, New York 10007

      Re:    *United States v. Sayfullo Habibullaevic Saipov*, S1 17 Cr. 722 (VSB)

Dear Judge Broderick:

      The Government's September 2, 2022 brief detailed the reasons why the defendant's motion claiming a *Brady* violation and requesting an evidentiary hearing following the recent production of certain reports is meritless and should be denied. (Dkt. 521 (the "Opposition Brief")). The enclosed declarations from AUSA Amanda Houle (Exhibit A, which includes a summary chart (the "Summary Chart") requested by the Court) and FBI Special Agent Amber Tyree (Exhibit B) (collectively, the "Declarations") further support that conclusion.[1]

      In sum, the Declarations demonstrate that the scope of the Prosecution Team in this case (as defined in the Declarations and Opposition Brief, and supported by governing Second Circuit precedent) does not include the entirety of the FBI as the defense claims, and thus the majority of the recently produced reports were not in the possession of the Prosecution Team until August 2022, after which they were promptly produced to the defense. The Declarations also demonstrate that the Prosecution Team has conducted appropriate and good faith diligence in meeting—and often exceeding—its disclosure obligations. Importantly, however, even if the Court accepted the defense arguments concerning the definition of the Prosecution Team (which it should not, as they are contrary to governing precedent), the Court can and should deny the defendant's motion based on the contents of the reports and the fact that they have been produced well in advance of any penalty phase. None of the reports are exculpatory. Most of the reports have limited relevance to Saipov (sometimes just a witness's recollection of a passing interaction with Saipov). And to the extent any report is arguably relevant to any penalty phase, the defense has (and has had) sufficient time to investigate, given, among other things, that any penalty phase is not anticipated to begin until late this year at the earliest.

      No less importantly, the recent production of reports cannot constitute a *Brady* violation because *Brady* is a retrospective analysis concerning actual prejudice after a conviction, and here

---

[1] Defined terms in the Declarations are incorporated here and used throughout this letter.

The Honorable Vernon S. Broderick, U.S.D.J.
October 3, 2022
Page 2

there has been no conviction, let alone a sentencing. And, in any event, as stated, the defense has sufficient time to investigate.

Accordingly, for all of the reasons set out below, in the Declarations, and in the Opposition Brief, and in light of the content of the reports and the timing of their production months before any penalty phase, the Court should deny the defendant's motion without a hearing.

### *Background: The Recently Produced Reports*

As the Court is aware, following supplemental reviews of the FBI Saipov Casefile and additional searches of the FBI's agency-wide casefile-management system (Sentinel), the Government produced, between August 16 and September 2, 2022, additional reports to the defense. Those reports were summarized in the Opposition Brief (Dkt. 521 at 31, 33-34), were provided in hardcopy to the Court on September 20, 2022, and were further described in the Government's letter filed on that date (Dkt. 571). Most of the reports pertain to individuals who had limited (sometimes only passing) interaction with Saipov. A subset of the reports (Index Nos. 72-88) do not reference Saipov at all, and instead pertain to an individual named ▮▮▮▮▮▮ ▮▮▮▮▮▮. In 2019, the Government produced to the defense reports stating that ▮▮▮▮▮▮ was closely linked to Saipov and that ▮▮▮▮▮▮ is purportedly jihadi and calls others to jihad. ▮▮▮▮▮▮ has also made significant public statements about his relationship with Saipov and his opinion on Saipov's radicalization. (Dkt. 521 at 41). In August 2022, upon receiving additional information linking ▮▮▮▮▮▮ to Saipov, the Government promptly produced the material to the defense and conducted the supplemental search that resulted in the production of 17 additional reports pertaining to ▮▮▮▮▮▮ (*See* Dkt. 521 at 28-29; Ex. A ¶ 8).

Additionally, and in connection with its response to the Court's Order (Dkt. 563 (the "Order")), the FBI retrieved a backup file from a system used by FBI personnel during the emergency response to the defendant's attack (the ORION File—described in the Declarations (Ex. A ¶ 10, Ex. B ¶ 15(c))). The AUSAs reviewed the ORION File and identified 21 reports for production to the defense. Because the ORION File review was recently conducted, and the materials were not described in the Government's prior briefing, we provide additional details here, and have delivered hard copies of the materials to the Court today. Like the reports described above and in the Opposition Brief, the ORION File materials are not exculpatory and have limited relevance.

Six of the reports (Index Nos. 90, 92, 94, 99, 100, 103) pertain to "tips" from various individuals who were subsequently interviewed. Those reports of later interviews were produced to the defense long ago, but owing to the differences between the content of the tip and the later interview report, and the nature of the information provided in the report, the Government has produced these six tip reports as well. The tips at Index Nos. 90, 92, and 94 contain information and opinions relating to Saipov's radicalization that is duplicative of information in the interview reports previously produced to the defense.

Four of the reports pertain to tips from individuals who described some interaction with Saipov (even in passing). (Index Nos. 93, 106, 108, 109). These reports, for example, include a

The Honorable Vernon S. Broderick, U.S.D.J.
October 3, 2022
Page 3

report of a single conversation with Saipov in which the individual calling in the tip reported "nothing remarkable" about the conversation (Index No. 108) and a tip from someone who claimed to have "small talk" with someone they believed to be Saipov at a restaurant in Florida (Index No. 109). The remaining eleven reports were produced because they contain reporting that could arguably bear on Saipov's association with others potentially linked to terrorism. Several of those reports are implausible on their face—including a tipster purporting to see Saipov at an IHOP in Las Vegas with Stephen Paddock (who committed an October 1, 2017 mass shooting in Las Vegas) (Index No. 98), and a tipster claiming that Saipov owned a diamond exchange funding terrorism (Index No. 101)—or were otherwise determined to be not credible by law enforcement after following up with the tipster (*see, e.g.*, Index No. 107 (inmate report of unidentified Egyptian purportedly being involved in Saipov's attack deemed not credible)). In any event, the reports do not concern the guilt phase of the trial, do not have any discernible bearing on the penalty phase, and to the extent they have any conceivable relevance for a penalty phase, the Government has produced them well in advance of any penalty proceeding.

### *There Is No Brady Violation Because of the Limited Relevance of the Reports and their Production Months Before Any Penalty Phase*

The Court should deny the defendant's motion because the reports have limited relevance, and even those reports that have arguable relevance to any penalty phase have been produced months in advance of any such proceeding.

As summarized above, in the Opposition Brief, and as is clear from the binder provided to the Court, most of the reports are interviews of individuals who described minimal, even sometimes passing, interaction with Saipov. None of the reports are exculpatory. The few reports that reference Saipov's radicalization—to the extent (if at all) they are relevant to any penalty phase—have been provided to the defense with sufficient time to investigate these reports. This is particularly so since, if Saipov was radicalized by someone, or had discussions with someone about jihad, or was provided ISIS propaganda by anyone, Saipov already knows that. *See United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) (holding that "there is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant" and that "[e]vidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence").

Moreover, with respect to the reporting regarding ▮▮▮▮ in particular, and the suggestion that ▮▮▮▮ may have prepared Saipov for the attack, the defense has been on notice for years that ▮▮▮▮ reportedly encouraged others toward jihad and was close to Saipov. There is no doubt that the defense has had ample time to investigate this allegation.

Finally, *Brady* is a retrospective analysis of actual prejudice following a conviction. *See United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (holding that a *Brady* analysis is fundamentally retrospective, requiring an assessment of whether the result of the proceeding would have been different). Here, where there has not yet been a trial or sentencing (and, in any event,

The Honorable Vernon S. Broderick, U.S.D.J.
October 3, 2022
Page 4

the materials have been produced with sufficient time for investigation), there was no *Brady* violation and cannot be a finding of one.

For all of these reasons, the defense motion should be denied.

### *The Declarations Confirm the Appropriate Scope of the Prosecution Team and the Comprehensive Review of the FBI Saipov Casefile*

As set out below, the Declarations further support denial of the defendant's motion, including by demonstrating that the FBI field offices outside of New York that generated the majority of the recently produced reports were not acting at the direction of the Prosecution Team when they conducted the underlying interviews, and that the Prosecution Team has engaged in substantial and appropriate diligence to meet, and exceed, its disclosure obligations.

First, the Declarations establish that the majority of the recently produced reports were not in the possession of the Prosecution Team until August 2022—and then promptly produced to the defense. The ▮▮▮▮-related reports (Summary Chart, Index Nos. 72-88) had no connection to the FBI Case Team investigating Saipov, and most of the ▮▮▮▮▮ related reports predate the FBI's investigation into Saipov by years. (Ex. B ¶ 17). Of the remaining reports that have not been designated as within the possession of the Prosecution Team in the Summary Chart, nearly all pertained to investigative activity by field offices outside of New York that was independent from the FBI Case Team, and thus those field offices and their holdings cannot be attributed to the Prosecution Team. (Ex. B ¶¶ 14-17; Summary Chart Index Nos. 29-32, 37-43, 45-53, 55-65, 67-71). The defendant's argument to the contrary—that every FBI field office in the country is part of the Prosecution Team—is unsupported by the law or the facts.[2]

The fact that the FBI Case Team, in the immediate aftermath of the defendant's attack, made particular requests for interviews to other FBI field offices (that otherwise had no involvement in the investigation) does not transform those other field offices into members of the

---

[2] Contrary to the defendant's claim, other courts have defined the scope of the prosecution team with regard to particular field offices or divisions of federal agencies in line with the Government's articulated scope of the Prosecution Team here. *See, e.g.*, *United States v. Maxwell*, No. 05 Cr. 20571, 2006 WL 8439796, at *4 (S.D. Fla. July 14, 2006) (denying defense *Brady* demands and defining the prosecution team to include, among other entities, the Miami Field Office of the Criminal Investigations Division of the Internal Revenue Service); *United States v. Ryan*, No. 20 Cr. 65, 2022 WL 3139132, at *2 (E.D. La. Aug. 5, 2022) (noting the court's prior denial of a motion to compel and definition of the prosecution team as including particular field offices for certain federal agencies, including the FBI). Moreover, the Second Circuit implicitly concurred with these principles when it held that a report by FBI agents who had been uninvolved in the investigation or trial of defendants could not be attributed to a prosecution team that included other FBI agents. *See United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) ("Even assuming the reports' materiality, there is no evidence that the prosecution team in the instant case was aware of the reports that have subsequently come to light. We will not infer the prosecutors' knowledge simply because some other government agents knew about the report.").

The Honorable Vernon S. Broderick, U.S.D.J.
October 3, 2022
Page 5

Prosecution Team. (Dkt. 521 at 25); *see United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018).[3] Moreover, most of the recently produced reports generated by other FBI field offices were created months, and in most cases years, after the attack (Summary Chart), and divorced from any FBI Case Team request (Ex. B ¶¶ 16-17). These facts distinguish those other offices' independent investigatory activities from any coordinated actions that took place in the minutes and days following the defendant's attack, and further demonstrate that they are not properly considered part of the Prosecution Team. Moreover, those other field offices did not engage in the types of case-related activities that courts have found relevant in assessing whether an entity is a member of the prosecution team. They did not, for example, make any presentations to the grand jury in this case, play any role in the development of prosecutorial strategy, or accompany the prosecution team to court proceedings. The same is true for the various other state and federal law enforcement components that provided discrete assistance to the Prosecution Team. (Ex. B ¶ 19).

Second, the Declarations confirm that through the recent reviews and those conducted over the course of the preceding five years, the Prosecution Team has conducted a thorough review of the FBI Saipov Casefile for materials for production to the defense, including any *Brady* or *Giglio* material. (Ex. A ¶¶ 5-14; Ex. B ¶¶ 22-24). The Prosecution Team has taken a broad view of disclosure, including providing to the defense reports stating that the interview subject had interaction with Saipov, or provided information (even if just an opinion) about Saipov's potential radicalization or mental health. These efforts across the last five years have all been part of the Prosecution Team's demonstrated efforts to not just meet, but exceed, its disclosure obligations. *See United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) ("The government has no *Brady* obligation to communicate preliminary, challenged, or speculative information." (internal quotation marks omitted)).

For all of these reasons, and those set out in the Opposition Brief, the Court should deny the defendant's motion and request for a hearing.

### *The Court Need Not Conduct Further Fact-Finding*

The record developed by the Court to date amply supports denial of the defendant's *Brady* motion. Even putting aside that there cannot, under the law, be a *Brady* violation in advance of a conviction or sentence, the contents of the recently produced reports demonstrate that they are not exculpatory; generally have limited if any relevance; and, to the extent they have any relevance to a penalty phase, the defense has sufficient time to investigate (particularly since Saipov already knows whether the reports have any merit because he knows who, if anyone, radicalized him).

---

[3] As set out in the Opposition Brief, in the analogous context of determining whether the prosecution conducted a "joint investigation" with another agency, courts assess a number of factors, including "whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *Middendorf*, 2018 WL 3956494, at *4.

The Honorable Vernon S. Broderick, U.S.D.J.
October 3, 2022
Page 6

The Declarations address the central questions posed by the Court, and the Government respectfully submits that additional fact-finding is not necessary. As set out below, in the instances where the Declarations make clear that an exhaustive response is not feasible at this stage based on the records identified to date, the Government respectfully submits that its submissions have answered the thrust of the Court's inquiry. Moreover, additional fact-finding is not necessary to decide (and deny) the defendant's motion on the merits, in light of the content of the reports and the timing of their production well in advance of any penalty proceeding.

As explained in the FBI Declaration, the FBI did not keep an exhaustive record of the requests made to field offices outside of New York in the immediate aftermath of the defendant's attack on October 31, 2017. (Ex. B ¶ 15(b)); Order, 1(c)). The exigent circumstances created by the defendant's attack, and the need for the FBI to determine whether other attacks were imminent during its aftermath, necessitated real-time coordination that was not (and could not reasonably have been) exhaustively logged in the FBI Saipov Casefile or elsewhere. (Ex. B ¶ 15(b)). Importantly, however, this limitation on available records is relevant only to reports that were generated by other field offices in the immediate aftermath of the attack. (Ex. B. ¶ 16; Summary Chart Index Nos. 33-36, 54, 66). Most of the recently produced reports generated by other field offices, however, were generated in December 2017 or later, when requests made to other field offices generally would have been logged in the FBI Saipov Casefile or otherwise reflected in formal communications, and no such requests or communications have been identified by the FBI Case Team, confirming that those reports were not generated at the direction of the FBI Case Team. (Ex. B ¶ 16). Accordingly, the current record amply supports the conclusion that other field offices outside of New York that generated many of the recently produced reports acted independently and therefore are not members of the Prosecution Team, regardless of whether those field offices may have provided discrete support to the FBI Case Team in the immediate aftermath of the attack. *See United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 WL 457315, at *9 (S.D.N.Y. Feb. 15, 2022) (noting that even where "where two prosecution teams jointly conduct a limited number of investigative activities, those activities, without more, do not necessarily create an obligation under *Brady* for either team to search the entirety of the other team's file").

The Government also respectfully submits that additional fact-finding regarding the specifics of whether and to what extent the Prosecution Team reviewed the reports previously in its possession is not in any way required to decide the defendant's motion, and that the information provided by the Government to date sufficiently addresses the issue before the Court. (Order, 4). Because the Court inquired about whether the Government reviewed and decided not to produce any of the reports that were previously in the Prosecution Team's possession, we have included information in the Summary Chart indicating which of the reports we have identified as having been received by any AUSA and the date of that receipt. In this regard, seven of the 108 recently produced reports were previously received, at least in part, by AUSAs. (Ex. A ¶¶ 4(g), 12(a), 13(a)(i); Summary Chart, Index Nos. 18, 19, 23, 26, 27, 44, 109 (pg. 1)). We note, however, that as described in the Declarations, there are limitations on the Government's ability at this stage to exhaustively determine which of the reports previously in the possession of the Prosecution Team were specifically reviewed by an AUSA, including because, by way of example, there would not be a record of whether (if ever) an AUSA reviewed one of the Sentinel reports on an FBI computer as part of the prior diligence described in the Declarations. (Ex. A ¶¶ 4(f)(vii)(4), 4(g)). As to the

The Honorable Vernon S. Broderick, U.S.D.J.
October 3, 2022
Page 7

seven reports that we have identified as having been received by AUSAs, we have not identified a comprehensive record of why (to the extent they were even discoverable) these reports were not produced. Regardless, because the Government has already attributed to its own possession reports that were possessed by *any* member of the Prosecution Team (irrespective of whether an AUSA appears to have possessed the report), and because, for all of the reasons set forth above, the content of those reports and the timing of their production compel the conclusion that there is no *Brady* violation, the Government respectfully submits that the Court should decline to conduct further fact-finding on this point.

For similar reasons, the Government respectfully submits that the record sufficiently addresses the Court's questions regarding review of the FBI Saipov Casefile, and no further fact-finding is necessary. AUSA Houle's Declaration describes in detail the steps taken during the recent supplemental review of the FBI Saipov Casefile, the additional searches run of the FBI's agency-wide casefile-management system (Sentinel), and the review of the ORION File. (Ex. A ¶¶ 5-10). AUSA Houle's Declaration further describes prior reviews conducted as part of the Prosecution Team's discovery and disclosure diligence. (Ex. A ¶¶ 11-13). While the Prosecution Team did not maintain exhaustive records of, for example, its efforts to respond to each defense discovery demand, we respectfully submit that the information provided (including the detailed description of the recent reviews) is sufficient to address any defense argument regarding the Prosecution Team's compliance with its disclosure obligations. At bottom, any underlying infirmities in the processes employed early in the investigation to search for disclosure material have been amply addressed by the recent reviews, as detailed in the Declarations.

Finally, but no less importantly, the Government respectfully emphasizes that all of the undertakings described above, in the Declarations, and in the Opposition Brief have been aimed at ensuring that the Prosecution Team meets and exceeds its disclosure obligations. This has included endeavoring to identify and broadly produce information regarding who (if anyone) radicalized Saipov and who (if anyone) participated in Saipov's attack. As the Government has previously made clear, however, the Prosecution Team has not exhaustively searched for or produced all information generally bearing on all of Saipov's contacts. (*See, e.g.*, Dkt. 521 at 39-40). In denying the defendant's motion, the Court should reject the defendant's continued suggestion that such information falls within the Prosecution Team's disclosure obligations. An obligation of that breadth is entirely unsupported by the law and is not practical as it would involve, for example, the Prosecution Team essentially conducting comprehensive investigations of each one of Saipov's potential associates. And, while the Prosecution Team has provided certain information about some of Saipov's potential associates to the defense, including contacts who may have affiliations with terrorist organizations, provision of such information in excess of the Prosecution Team's obligations does not create any basis for arguing that the defense is entitled to all such information. Moreover, contrary to the defendant's claims, the Government never represented that it has exhaustively provided information to the defense about Saipov's contacts, even as it relates to terrorist organizations, and its representations that it was in compliance with its *Brady* obligations cannot reasonably be understood as such.

The Honorable Vernon S. Broderick, U.S.D.J.
October 3, 2022
Page 8

## *Conclusion*

      The Court should deny the defendant's motion because the contents of the recently produced reports and the timing of their production months before any penalty phase make clear that there is no *Brady* violation. The Declarations further show that the majority of the recently produced reports were not in the possession of the Prosecution Team until August 2022, that the Prosecution Team does not include the entirety of the FBI, and that the Prosecution Team has acted in good faith and with diligence to meet and exceed its *Brady* obligations, including through the recent supplemental reviews detailed in the Declarations. The Government respectfully submits that no further fact-finding is necessary, the defendant's motion should be denied without a hearing, and that it is appropriate for the trial to proceed as scheduled.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s/
      Andrew Dember
      Amanda Houle
      Jason A. Richman
      Alexander Li
      Assistant United States Attorneys
      (212) 637-2563/2194/2589/2265

cc:    Defense counsel (via ECF)