**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

                                                 :

**UNITED STATES OF AMERICA**       :

                                                 :     **Case No. 17-CR-722 (VSB)**

                            - v. -           :

**SAYFULLO HABIBULLAEVIC SAIPOV,** :

                                                   :

                              **Defendant.** :

-------------------------------------------------X

**BRIEF OF AMICI CURIAE**
**AMERICAN CIVIL LIBERTIES UNION, NEW YORK CIVIL**
**LIBERTIES UNION, AND ADVANCING REAL CHANGE, INC.**

Yasmin Cader
Mariana Kovel
Rachel Meeropol
American Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004

Brian W. Stull
Claudia VanWyk
American Civil Liberties
Union Foundation
201 W. Main Street, Suite 402
Durham, NC 27701
(919) 682-5659

Molly K. Biklen
Daniel R. Lambright
Guadalupe V. Aguirre
Christopher Dunn
New York Civil Liberties Union
Foundation
125 Broad Street, 19th Floor
New York, NY 10004

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................. iii

PRELIMINARY STATEMENT .........................................................................1

INTEREST OF AMICI CURIAE .......................................................................2

ARGUMENT.....................................................................................................3

I.   Before trial may begin, the defense team is constitutionally entitled to
     complete its mitigation investigation, delayed by the government's years-
     long suppression of *Brady* evidence. ...............................................................3

     A.   Constitutionally adequate mitigation investigation requires counsel
          to review the new information and to follow all generated leads to
          their conclusion. .............................................................................4

     B.   With mitigation still under investigation, due to the government's
          suppression, defense counsel can neither make needed strategic
          decisions, nor effectively represent Mr. Saipov in capital jury
          selection next week, nor present an integrated defense at the
          culpability phase. ............................................................................11

II.  Despite its claims that the "prosecution team" did not possess the
     materials, the U.S. government did possess, but for years suppressed,
     mitigating evidence in violation of *Brady v. Maryland*. ...............................15

III. The government errs to claim *Brady* does not apply pre-trial. ....................18

CONCLUSION ..................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baldwin v. Maggio*, 704 F.2d 1325 (5th Cir. 1983)...................................................6

*Banks v. Dretke*, 540 U.S. 668 (2004) ......................................................................19

*Brady v. Maryland*, 373 U.S. 83 (1963)...........................................................*passim*

*Gardner v. Florida*, 430 U.S. 349 (1977) ................................................................19

*Gilmore v. Taylor*, 508 U.S. 333 (1993) ..................................................................19

*Hopt v. Utah*, 110 U.S. 574 (1884)...........................................................................12

*Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991) ...............................................6

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...............................................................16-18

*Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003)...........................................................6

*Lockett v. Ohio*, 438 U.S. 586 (1978)........................................................................4

*Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987) ......................................................6

*Porter v. McCollum*, 558 U.S. 30 (2009) ...................................................................5

*Rompilla v. Beard*, 545 U.S. 374 (2005) ..........................................................*passim*

*Strickland v. Washington*, 466 U.S. 668 (1984) ...................................................5, 11

*Strickler v. Green*, 527 U.S. 263 (1999) ..................................................................16

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998)............................................16

*United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008).............................................18

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) ...............................................16

*Wiggins v. Smith*, 539 U.S. 510 (2003).............................................................*passim*

iii

*Williams v. Taylor*, 529 U.S. 362 (2000)..................................................................5

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ....................................................4

## Constitution

Fifth Amendment ........................................................................................................3

Sixth Amendment ...............................................................................................4, 5, 8

Eighth Amendment ....................................................................................................4

## Rules

Fed. R. Crim. Proc. 12.2 (b)........................................................................................14

## Other Authorities

*Am. Bar Ass'n Guidelines For the Appointment and Performance of Defense Counsel in Death Penalty Cases and Commentary*, 31 Hofstra L. Rev. 913 (2003) ............................................................*passim*

*Am. Bar Ass'n Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev.  677 (2008) ....................................................................*passim*

Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 Mercer L. Rev. 695 (1990)..................................14

Lee Norton, *Capital Cases: Mitigation Investigations*, The Champion, May 1992, at 45 .........................................................7, 10

Mary Ann Tally, *Integrating Theories for Capital Trials: Developing the Theory of Life*, The Champion, Nov. 1998, at 34 ........................14

Russell Stetler, *Capital Cases*, The Champion, Jan./Feb. 1999, at 38 ..................7

Sean O'Brien, *When Life Depends On it: Supplementary Guidelines for the Mitigation Function*, 36 Hofstra L. Rev. 693 (2008)..............................6

Stephen B. Bright, *Developing Themes in Closing Argument and Elsewhere: Lessons from Capital Cases*, Litig., Fall 2000, at 40 .....................14

## PRELIMINARY STATEMENT

As described further below, *amici* are dedicated to ensuring the protection of civil liberties, including the constitutional rights to effective assistance of counsel (inclusive of adequate investigation and mitigation investigation) as well as due process. Amici fully endorse Mr. Saipov's arguments and authority showing that: 1) the government's excuse that it did not "possess" the mitigating sentencing evidence obtained by FBI field offices outside the boundaries of New York City, but contained for years on a centralized FBI database accessible to any FBI agent, flatly contradicts settled Supreme Court precedent; and 2) the flagrant suppression of this evidence until the eve of trial, based on the contrivance of separate FBI field offices, warrants severe sanctions that will ensure *Brady*'s protections receive due respect going forward. *See* Dkt. No. 594.

Based on extensive experience with capital cases, amici write to explain in particular why significant time will be necessary for the effective investigation of these eleventh-hour disclosures. A mitigation investigation is cyclical. Each new piece of evidence discloses additional witnesses and records to pursue. Effective defense teams must pursue all of these leads, following each new one until the output of the investigation yields nothing new. This takes time, but not only that. Contrary to the government's position, this investigation cannot take place simultaneously with jury selection and the culpability phase of the trial. The defense team cannot make effective strategic decisions about jury selection and its culpability-phase presentation before completion of the new investigation

necessitated by the government's years-long suppression. For these reasons, at a minimum, this Court should grant Mr. Saipov's requested continuance of his capital trial.

## INTEREST OF AMICI CURIAE

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution. The ACLU has long been committed to due process and fundamentally fair procedures for defendants in all criminal cases, and, as relevant here, has supported the right of capital defendants to present mitigating evidence in order to urge the jury to choose life over death, and to ensure that the jury has the fullest picture possible in making such a life-or-death decision.

The ACLU's Capital Punishment Project defends persons facing the death penalty, primarily in the state courts, and has since 2006 been involved in training fellow capital defenders on the practices needed to meet the Sixth Amendment obligation of effective counsel. The ACLU's Racial Justice Program is dedicated to upholding racial equality and combating racism in all forms through litigation, community organizing and training, legislative initiatives, and public education to address the broad spectrum of issues that disproportionately and negatively impact people of color. The ACLU's Criminal Law Reform Project engages in litigation and advocacy throughout the country to protect the constitutional and civil rights of criminal defendants and to end

excessively harsh crime policies that result in mass incarceration and criminalization. The New York Civil Liberties Union is the New York state affiliate of the ACLU.

Advancing Real Change, Inc. (ARC, Inc.) is a nationwide not-for-profit that promotes justice by ensuring that the life histories of people charged with crimes are at the forefront of their cases. In addition to carrying out mitigation investigation in capital cases, ARC, Inc. annually provides training and education to thousands of criminal defense practitioners regarding the standard of care for the collection and presentation of mitigation evidence.

## ARGUMENT

### I.     Before trial may begin, the defense team is constitutionally entitled to complete its mitigation investigation, delayed by the government's years-long suppression of *Brady* evidence.

Having waited until the eve of Mr. Saipov's capital trial to disclose mitigating sentencing evidence in its possession for years, the government refuses to acknowledge its constitutional obligations. *See* U.S. Const. amend. V; *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Even as it continues to trickle out *Brady* materials, as recently as October 4, Dkt. No. 594, at 2, the government opposes any relief for its egregious violations, objecting even to a continuance for Mr. Saipov's lawyers to conduct the necessary follow-up investigation of this newly-disclosed information.

The government quickly dismisses the defense's need for more time, casually asserting that "any penalty phase is not anticipated to begin until late this year at the earliest." Dkt. No. 586, at 1. The government's position represents a fundamental misunderstanding of the role of mitigating evidence and the constitutional obligation of defense counsel to investigate it, to prepare not only for the penalty phase but also for jury selection and the culpability phase with an integrated defense. Developing the new evidence will take considerable time, and that investigation is necessary not *only* for the penalty phase, but also for effective voir dire and the culpability phase of the trial where counsel's failure to present an integrated defense would compromise credibility with the sentencer, risk Mr. Saipov's life, and ensure later claims of ineffectiveness.

### A. Constitutionally adequate mitigation investigation requires counsel to review the new information and to follow all generated leads to their conclusion.

As the Supreme Court stated in *Woodson v. North Carolina*, "the fundamental respect for humanity underlying the Eighth Amendment … requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." 428 U.S. 280, 304 (1976). Thus, the accused's right to present mitigating evidence in support of a sentence less than death is fundamental. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

This Eighth Amendment guarantee depends in turn on the Sixth Amendment promise of effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). As the Supreme Court has repeatedly held, the Sixth Amendment right includes the guarantee of an "adequate investigation" by the defense team "in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005); *Wiggins v. Smith*, 539 U.S. 510, 538 (2003) (reversing death sentence due to failure to meet this obligation); *Williams v. Taylor*, 529 U.S. 362, 398 (2000) (same); *Porter v. McCollum*, 558 U.S. 30, 44 (2009) (same).

The first ingredient of an adequate capital investigation is a comprehensive mitigation study – unearthing any circumstances of the crime, the defendant, or the defendant's history that could be used to argue for a sentence less than death. *See Am. Bar Ass'n Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. Ed. 2003) (hereafter ABA Guidelines), *reprinted in* 31 Hofstra L. Rev. 913, 1021-26 (2003) (Guideline 10.7 & Commentary, setting out duty to investigate and detailing the many elements of the required life-history and mitigation investigation); *see also Am. Bar Ass'n Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases* (2008), *reprinted in* 36 Hofstra L. Rev. 677-692 (2008). The second is a full-scale inquiry into the government's aggravating evidence. ABA Guideline 10.7, 31 Hofstra L. Rev. at 1026. Both investigations

must comply with the ABA Capital Guidelines. The Supreme Court has long referred to the ABA guidelines as guides to determining what constitutes reasonable performance by defense counsel. *Rompilla*, 545 U.S. at 387 (quoting *Wiggins*, 539 U.S. at 524).

These duties to investigate comprise "[o]ne of the primary duties [capital] defense counsel owe[] to [a] client." *Magill v. Dugger*, 824 F.2d 879, 886 (11th Cir. 1987). Unless counsel undertakes "a reasonably substantial, independent investigation into the circumstances and the law from which potential defenses may be derived," they cannot provide effective assistance. *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983). *See also Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) ("It is axiomatic—particularly since *Wiggins*—that [the decision not to present mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose."); *Kenley v. Armontrout*, 937 F.2d 1298, 1309 (8th Cir. 1991) (finding counsel ineffective for not producing non-statutory mitigation "[g]iven the sympathetic light in which Kenley's past behavior could have been presented, in the context of his family…background").

Experienced capital defenders know that effective mitigation investigations can take years. *See* Sean O'Brien, *When Life Depends On it: Supplementary Guidelines for the Mitigation Function*, 36 Hofstra L. Rev. 693, 695 (2008) (describing the "labor-intensive, time-consuming," and "exhaustive"

efforts required in mitigation in capital cases). Once this investigation begins, the collected evidence cyclically drives the investigation forward. *Id*. at 761 ("Seeking evidence from a broad set of sources will generate additional leads which must be followed, sometimes raising new questions for witnesses who have already been interviewed."). By suggesting that Mr. Saipov now has all he needs with the government's recent disclosures, the government completely mischaracterizes this process. Obtaining the relevant new information that has now been disclosed was vital, but that receipt marks the *beginning,* not the end of a competent mitigation investigation. One new record will invariably lead to one or more new witnesses, who in turn report on other new witnesses, with new information either about the crime or client's life history, which lead to new records, which mentions yet further new witnesses.

The defense team must continually integrate the new information and follow leads that emerge. *See* Lee Norton, *Capital Cases: Mitigation Investigations*, The Champion, May 1992, at 45. "The investigation is not complete until the information uncovered becomes redundant and provides no new insight." *Id.*; *see also* Russell Stetler, *Capital Cases*, The Champion, Jan./Feb. 1999, at 38 ("Investigating the capital client's biography is a sensitive, complex, and cyclical process. It is cyclical, rather than linear, because witnesses will need to be re-interviewed when new information has been discovered."). This is both common sense and basic investigative practice.

*Rompilla* exemplifies how this type of cyclical investigation should unfold. The state of Pennsylvania was seeking Rompilla's death sentence and had placed his counsel on notice of prior crimes the state would rely on in aggravation. 545 U.S. at 383-84. Rompilla's prior-conviction file was a public record defense counsel could easily have accessed, but ineffective counsel failed to do so. *Id.* at 384. The Court held that defense counsel failed to meet their constitutional obligations by not reviewing the file and stressed that obtaining the file itself was only the first step in a multi-step investigation that, the Court held, effective counsel would have conducted. *Id.* at 390-92.

As step one, counsel did obtain the file holding prior history about Rompilla's upbringing and mental capacity that conflicted with the rosier initial "impression given by [] five family members." *Id.* at 391. With this new information, the Court found, effective trial "counsel *would have* become skeptical of the impression" initially given and "would unquestionably have gone further to build a mitigation case." *Id. (*emphasis added*).* That further investigation, in turn, would have led to the same material that postconviction counsel, investigating thoroughly and effectively, later found, "including testimony from several members of Rompilla's family, whom trial counsel did not interview." *Id.* These family members would have shared information about the alcohol abuse of Rompilla's parents, including his mother who "drank during her pregnancy with [him]." *Id.* at 392. These new reporters would also have described the abuse Rompilla endured at the hands of his father, including his

8

being locked in a dog pen with his brother. *Id.* They would have explained that the family home had no indoor plumbing, or heat where Rompilla slept, before he left for school each day in rags. All of these findings led the post-conviction team, which the Court uplifted as a contrasting model of effectiveness, to still other "red flags" in school, medical, and prison records, pointing to a need for further testing. *Id.*

Now several steps from the initial discovery of the convictions file, the Court continued, "[t]hese findings in turn would probably have prompted a look at school and juvenile records, all of them easy to get, showing, for example, that when Rompilla was 16 his mother '"was missing from home frequently for a period of one or several weeks at a time."' *Id.* at 393.

In other words, Supreme Court precedent enforcing the Sixth Amendment requires capital defense teams to follow up on records and leads received until all leads are reasonably run down. *Wiggins* makes the same point. 539 U.S. at 525. There, defense counsel had obtained department of social services records. *Id.* But defense counsel treated those records as the end of their investigation, instead of the start. As the Court described,

> [t]he records revealed several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food. . . . As the Federal District Court emphasized, any reasonably competent attorney would have realized that pursuing these leads was necessary

>to making an informed choice among possible defenses,
>particularly given the apparent absence of any
>aggravating factors in petitioner's background.

*Wiggins*, 539 U.S. at 525. Here, again, the Court focused on the need for effective counsel to pursue the leads "necessary to making an informed choice among possible defenses[.]" *Id.*

These precedents thus teaches that Mr. Saipov's defense team cannot forge an effective strategy to save his life in this gravely-challenging capital case without continuing their investigation, running down the leads generated by the evidence the government has suppressed for years, and following each lead until "the information uncovered becomes redundant and provides no new insight." Norton, *Capital Cases: Mitigation Investigations*, at 45.

The government's suppression of exculpatory sentencing evidence has hamstrung defense trial preparation for years. The government's revelation of possible witnesses and records in various states, and countries as far flung as Uzbekistan, triggers massive investigation obligations. The defense team must plan to travel internationally, and is limited in the personnel it can send by language, cultural competence, and sufficient familiarity with the case to make the travel and investigation fruitful. A defense team in the midst of the many tasks of capital trial presentation, with work that must be done in court each day, and with witnesses and a client who will need time in between court sessions, is not a team positioned to undertake the type of

travel and full-scale investigation the government's late disclosures require. The many tasks needed to prepare competently for Mr. Saipov's capital trial cannot be accomplished in the mere weeks that will have elapsed between the government's belated disclosures and the start of this trial.

**B. With mitigation still under investigation, due to the government's suppression, defense counsel can neither make needed strategic decisions, nor effectively represent Mr. Saipov in capital jury selection next week, nor present an integrated defense at the culpability phase.**

While effective defense teams, like other professionals in the modern world, must multitask to some degree, they must undertake certain steps of trial preparation sequentially. Such is the case with adequate investigation and everything else that follows in a capital trial. Whether it be jury selection, the culpability phase of a capital trial, or capital sentencing, effective representation is impossible without complete investigation. A complete investigation is required *before* counsel may properly make any of the many strategic choices inherent in these integral phases of a capital trial. As the Supreme Court has repeatedly explained, "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 528 (quoting *Strickland*, 466 U.S. at 690-691).

In a matter of only days, the trial for Mr. Saipov's life starts with jury selection. But that puts the cart before the horse. While counsel should be

preparing for that critical stage of this trial, *see, e.g.*, *Hopt v. Utah*, 110 U.S. 574, 578 (1884), their team and resources will be divided, without a continuance, between that time-consuming process in court and the need in the field to conduct a foundational investigation that should have been completed long ago. Moreover, this incomplete investigation will inform everything that happens at Mr. Saipov's capital trial. To begin, as pertinent to jury selection, information gleaned from the new investigation made necessary by the government's late disclosure could shape counsel's strategic decisions about what questions to ask potential jurors and which jurors to challenge or accept.

The ABA Guidelines, again the governing standard of effective practice, emphasize the importance of "case-specific" voir dire. *ABA Guideline* 10.10.2 and Commentary, 31 Hofstra L. Rev. at 1051. Effective counsel must plan a strategy for voir dire for selecting the jurors "most favorable to the theories of mitigation that will be presented." *Id.* Without access to all of the relevant mitigating evidence, due here to the government's suppression of exculpatory sentencing evidence, Mr. Saipov's defense team cannot meet this obligation unless afforded more time. In sum, preparation for this crucial part of Mr. Saipov's trial cannot be completed until the necessary investigation is completed.

Likewise, Mr. Saipov's defense team cannot defend him in the culpability phase of the trial while the mitigation investigation remains incomplete. Doing so would necessarily mean that counsel were making uninformed strategic

12

choices about which defense evidence to present and which government evidence to attack.

One of the cardinal teachings of effective capital practice is the presentation of an integrated defense. As ABA Guideline 10.10.1 explains, "the investigations mandated by Guideline 10.7 [Investigation]" inform the "defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." The commentary to Guideline 10.10.1 explains why: "if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced." *ABA Guideline* 10.10.1 and Commentary, 31 Hofstra L. Rev. at 1047. The guidelines, their commentary, and experienced capital defenders emphasize this point again, again, and again.[1] A defense lawyer who presents a non-integrated

---

[1] *See* ABA Guideline 1.1, and Commentary, 31 Hofstra L. Rev. at 926 ("Moreover, trial counsel must coordinate and integrate the presentation during the guilt phase of the trial with the projected strategy for seeking a non-death sentence at the penalty phase."); *Id.* at Guideline 4.1, and Commentary, 31 Hofstra L. Rev. at 959 ("Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict."); *Id.* at Guideline 10.11, and Commentary, 31 Hofstra L. Rev. at 1059 ("The Importance of an Integrated Defense – During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation. Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks

defense risks her client's life, and virtually ensures a post-conviction claim of ineffective assistance of counsel.

Thus, although a capital trial is bifurcated, it remains *one* trial with the phases complementing each other. Without a continuance, Mr. Saipov's team will stumble through the culpability phase, making decisions on cross examination of government witnesses and presentation of its own witnesses in ignorance of mitigation still being unearthed, followed through, and integrated. For example, if the new evidence supports questions about his level of culpability because he was substantially dominated or under the influence of ISIS, that may affect his culpability at the guilt phase and the mental health witnesses his counsel may decide to call or defer calling (disclosure of whom is typically required long before trial, Fed. R. Crim. Proc. 12.2 (b)).

The new investigation triggered by the government's recent disclosure of mitigating evidence it has held for years could send this case into any number of directions. There remain countless ways in which this new evidence can impact the entire trajectory of Mr. Saipov's trial because capital cases hinge on the

---

losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime.") (internal quotation marks and footnotes omitted). *See* Mary Ann Tally, *Integrating Theories for Capital Trials: Developing the Theory of Life*, The Champion, Nov. 1998, at 34 (experienced practitioner explaining importance of integrated defense); Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 Mercer L. Rev. 695, 708-11 (1990) (same);  Stephen B. Bright, *Developing Themes in Closing Argument and Elsewhere: Lessons from Capital Cases,* Litig., Fall 2000, at 40 (same).

specific details which here remain unknown. The government has already introduced error into this case. At a minimum, this Court should seek to cure the prejudice flowing from this error by granting a continuance until the defense has had adequate time to complete its investigation and integrate the new evidence into its defense of Mr. Saipov's life.

## II. Despite its claims that the "prosecution team" did not possess the materials, the U.S. government did possess, but for years suppressed, mitigating evidence in violation of *Brady v. Maryland*.

As early as August of 2018 the government possessed mitigating sentencing evidence but failed to disclose it, until beginning in August of this year, 2022. Since then, the government has continued to slow walk disclosure through its latest disclosures on October 3, 2022.

In defense of this flagrant failure to disclose, the government has described the evidence as outside "the possession of the Prosecution Team." Dkt. No. 585, at 1; 571, 521. That is because, so this argument goes, the FBI field offices that collected this evidence in other states constitute separate entities from the New York field office of the FBI.

In no way, shape, or form does *Brady* or any other decision or authority limit the government's obligation to disclosing evidence about its criminal investigation to that held within what the government narrowly describes as "the prosecution team." Rather, the government maintains a "duty to learn of

15

any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting this passage from *Kyles*).

Following the 2017 truck attack, our government went on high alert, disbursing an army of FBI agents to investigate Mr. Saipov, his connections, and any possible connection to terrorism. Dkt. 525, at 13 (recounting testimony of FBI agents). The FBI thus began amassing evidence in this case. Where, as here, the United States government prosecuting a criminal matter draws on its nationwide resources to prosecute a single investigation leading to a single prosecution, it still remains obligated to disclose exculpatory information to the defense. *See*, *e.g.*, *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation."). That is true whether the FBI obtains the *Brady* evidence in the first instance in Ohio, New Jersey, Florida, New York, or some other state or country. Such suppression dishonors "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Green*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935) (internal quotation marks omitted)).

Already unfounded in law, the government's position also ignores reality that information stored electronically by one FBI field office is hardly separate and distinct from that held by another in the same investigation and

16

prosecution. After all, the government identified the suppressed information here simply by typing Saipov into "a search [engine] of the FBI's agency-wide electronic casefile system for any reports[.]" Dkt. 521, at 27. Absolutely no excuse exists for FBI records saved and accessible in such a system-wide database to be withheld by the United States government from a criminally accused person who wholly lacks such access. Presumably, any authorized person with a keyboard, a computer, and the correct spelling of Mr. Saipov's name could have uncovered the reports and evidence. Anyone following the rules could have made this material available to Mr. Saipov's lawyers years ago. No one did. The government's failure means it was either acting in bad faith, or incompetent.

If this court were to hold that the basic name search of an FBI database falls outside of the prosecutor's ""duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police[,]" *Kyles*, 514 U.S. at 437, it could greenlight a destruction of *Brady*'s promises of government fair play and due process across federal and state courts. This is a high profile death-penalty case, the first pursued by Attorney General Merrick Garland, and prosecuted by a United States Attorney's Office reputed for professionalism and excellence. Amici are greatly concerned that, unless this Court grants the requested relief, this case will set a negative precedent and encourage similar prosecutorial behavior in the future.

## III.   The government errs to claim *Brady* does not apply pre-trial.

Finally, amici are further concerned with the government's most recent assertion that *Brady* does not even apply pre-trial, because the reasonable-probability prejudice standard is inapt. Dkt. 586 at 1-2. This is not only non-sensical, but raises further concerns about the seriousness with which the government is taking its constitutional obligations. Contrary to the government's argument, *Brady* and subsequent precedent make clear that the constitutional requirement of disclosure applies *at trial*. *Brady*, 374 U.S. at 87-88 ("A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant."); *Kyles*, 514 U.S. at 439 (noting "a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence"). Of course, *if* that requirement is not met, then the prejudice standard may come into play on post-conviction review of conviction or sentence to determine whether relief is warranted. This case's pretrial posture, however, does not mean that the government's suppression of exculpatory sentencing evidence for years, up until days before a capital trial, cannot constitute a *Brady* violation. *See, e.g.*, *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) ("*Brady* material that is not disclosed in sufficient time to afford the defense an opportunity for use may be deemed suppressed within the meaning of the *Brady* doctrine.") (internal quotation marks omitted). *Brady* thus applies at trial, may be violated through late disclosures, and has been violated here.

18

### CONCLUSION

Mr. Saipov faces the death penalty, a punishment "different in both its severity and finality." *Gardner v. Florida*, 430 U.S. 349, 357 (1977). As a result, the Constitution demands "a greater degree of accuracy…than would be true in a noncapital case." *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).

The *Brady* rule constitutes one of the government's most significant obligations in a criminal trial. Despite the severity of this proceeding, the importance of this rule, and the specificity of Mr. Saipov's repeated prior requests for *Brady* evidence, Dkt. 586-2, at ¶ 22 (declaration of FBI agent acknowledging understanding of defense's requested *Brady* material), the government in 2018 suppressed exculpatory sentencing evidence in its possession. It did so again in 2019. And in 2020. And 2021. And on through October 4, 2022, when it was still slow walking disclosure of *Brady* material. The *Brady* rule would mean nothing if prosecutors can thwart it with impunity. It would mean nothing if the "prosecutor may hide, [but] defendant must seek[.]" *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

The government's flagrant *Brady* violation would be concerning in any case, but should warrant sanctions when a defendant's life is at stake and the government still cannot be bothered to undertake basic searches of its files. The Court should strike the death notice, order other sanctions, or at a minimum order this capital trial continued. *See* Dkt. No. 594, at 10 (requesting appropriate remedies).

19

Respectfully submitted,


<u>/s/ Brian W. Stull</u>
Brian W. Stull
Claudia VanWyk
American Civil Liberties Union
Foundation
201 W. Main Street, Suite 402 Durham,
NC 27701
(919) 682-5659

Yasmin Cader
Mariana Kovel
Rachel Meeropol
American Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004

Molly K. Biklen
Daniel R. Lambright
Guadalupe V. Aguirre
Christopher Dunn
New York Civil Liberties Union
Foundation
125 Broad Street, 19th Floor
New York, NY 10004