UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                       :
UNITED STATES OF AMERICA                               :
                                                       :
                                                       :          S1 17-CR-722 (VSB)
              -against-                                :
                                                       :          **OPINION & ORDER**
                                                       :
SAYFULLO HABIBULLAEVIC SAIPOV,                         :
                                                       :
              Defendant.                               :
-------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

        Defendant Sayfullo Habibullaevic Saipov has been charged in a twenty-eight count

superseding indictment with, among other offenses, eight counts of murder in aid of racketeering

and eighteen counts of attempted murder, arising out of an attack in New York City on October

31, 2017, in which Defendant Saipov—purportedly acting on behalf of the Islamic State of Iraq

and al-Sham ("ISIS")—is alleged to have driven a flatbed truck onto a cycling and pedestrian

pathway on the west side of lower Manhattan, killing eight civilians and injuring at least eighteen

others.  (Doc. 61.)  Many of the charges against Saipov carry a possible sentence of death.  On

September 28, 2018, pursuant to the Federal Death Penalty Act, 18 U.S.C. §§ 3591–3598

("FDPA"), the Government filed a Notice of Intent to Seek the Death Penalty (the "Notice").

(Doc. 80 ("Not.").)

        Currently before me are three motions of Defendant Saipov, all filed on December 17,

2018, seeking to limit or prevent the Government from seeking the death penalty against Saipov.

The first seeks to strike certain aggravating factors from the Notice (the "Factors Motion").

(Doc. 97.)  The second argues that the FDPA is unconstitutional because it gives the Court too

much discretion in choosing the method and location of execution should the jury convict Saipov

and return a sentence of death (the "Discretion Motion").  (Doc. 99.)  The third seeks to strike

the Notice on the ground that the death penalty itself, as well as the FDPA, are unconstitutional

for reasons not raised in the first two motions (the "Constitutionality Motion," and together with

the Factors Motion and the Discretion Motion, the "Motions").  (Doc. 103.)

For the reasons that follow, the Constitutionality Motion and the Discretion Motion are

DENIED, and the Factors Motion is GRANTED IN PART and DENIED IN PART.

## I.   <u>Background and Procedural History</u>

On June 19, 2018, the Government returned a superseding indictment against Defendant

Saipov, arising out of the October 31, 2017 truck attack.  (Doc. 61.)  The superseding indictment

charges Saipov with eight counts of murder in aid of racketeering, in violation of 18 U.S.C.

§ 1959(a)(1); eight counts of assault with a dangerous weapon and attempted murder in aid of

racketeering, in violation of 18 U.S.C. §§ 1959(a)(3) and 1959(a)(5); ten additional counts of

attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); one count of

providing material support and resources to a designated Foreign Terrorist Organization, in

violation of 18 U.S.C. § 2339B; and one count of violence and destruction of a motor vehicle

resulting in death, in violation of 18 U.S.C. §§ 33(a) and 34.  (*Id.*)  The murder in aid of

racketeering charges, as well as the charge for violence and destruction of a motor vehicle

resulting in death, carry a possible sentence of death.  *See* 18 U.S.C. §§ 33(a), 34, 1959(a)(1).

The superseding indictment also contains special findings that cite to various sections of the

FDPA that require, if the matters charged in these findings are proven "beyond a reasonable

doubt," that a defendant "be sentenced to death."  § 3591(a)(2).  The special findings also

reference the FDPA's statutory aggravating factors relevant to homicide cases.  *See* § 3592(c).

On September 28, 2018, the Government filed the Notice, (Doc. 80), which is required by the FDPA in cases in which the Government pursues a sentence of death.  *See* § 3593(a).  The Notice lists five statutory aggravating factors from the FDPA, § 3592(c), as well as six non-statutory aggravating factors, *see* § 3593(a)(2) ("The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family . . . and any other relevant information.").

On December 17, 2018, Defendant Saipov filed the Motions with supporting briefing.  (Docs. 97–100, 103.)  On February 15, 2019, the Government filed an omnibus opposition brief in response to the Motions.  (Doc. 121.)[1]  On March 8, 2019, Defendant Saipov filed an omnibus reply brief in support of the Motions.  (Doc. 133.)[2]

## II.   Discussion

I will assess Saipov's most general motion first, and then proceed to the more specific motions.  Accordingly, I begin with the Constitutionality Motion, then turn to the Discretion Motion, and conclude with the Factors Motion.

### A.   *The Constitutionality Motion*

In the Constitutionality Motion, Defendant Saipov makes four main arguments.  First, he challenges the death penalty facially, on the grounds that it is inherently applied in an arbitrary and capricious manner, (Const. Mem. 1–38),[3] and that an "evolving standards of decency" analysis requires finding the death penalty cruel and unusual under the Eighth Amendment, (*id.*

---

[1] Part I of the Government's omnibus opposition brief is not at issue in this Opinion & Order and has already been addressed in my Opinion & Order issued, under seal, on October 7, 2022.

[2] As with the Government's opposition, Saipov's reply brief also contains arguments already addressed in my Opinion & Orders issued on July 11, 2019, (Doc. 189), and October 7, 2022.

[3] "Const Mem." refers to Defendant Saipov's Motion to Strike the Notice of Intent to Seek the Death Penalty Because the Death Penalty and the Federal Death Penalty Act Are Unconstitutional.  (Doc. 103.)

at 38–45).  Second, he argues that, under *Ring v. Arizona*, 536 U.S. 584 (2002), the FDPA's

congressionally authorized method for charging the death penalty is unconstitutional, and that

the Government's "fix" for charging the death penalty in this case violates separation of powers

principles.  (*Id.* at 45–67.)  Third, he argues that the indictment in this case "does not comport

with the Grand Jury Clause of the Fifth Amendment."  (*Id.* at 67.)  Fourth, he argues that a jury

trying to follow the FDPA's structure would "likely" find it "incomprehensible," which "creates

an unreasonable risk that jurors will misunderstand their role" and thus the FDPA "violates the

Eighth Amendment and the Due Process Clause."  (*Id.* at 72–73.)  I address each of these

arguments in turn below.

### 1.    General Unconstitutionality of the Death Penalty

After Defendant Saipov filed his Constitutionality Motion, the Second Circuit decided

*United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018).  The Government says that *Aquart* rejected

the following three arguments underlying Defendant Saipov's general challenge to the

constitutionality of the death penalty – (1) that the FDPA operates in an unconstitutionally

arbitrary and capricious manner; (2) that the alleged inability to discern a "principled basis" for

distinguishing cases in which federal capital juries have imposed death renders the FDPA

unconstitutional; and (3) that evolving standards of decency render the FDPA unconstitutional.

(Mot. Opp. 63–69.)[4]

In reply, Defendant Saipov concedes "that *Aquart* forecloses these three claims for now,

[but] Mr. Saipov nevertheless preserves them for appellate review."  (Mot. Reply 14.)[5]  With this

concession, Defendant Saipov's only remaining facial challenge to the death penalty is whether it

---

[4] "Mot. Opp." refers to the Government's Omnibus Response to the Defendant's Motions.  (Doc. 121.)

[5] "Mot. Reply" refers to Saipov's Reply to the Government's Omnibus Opposition to His Motions.  (Doc. 133.)

transgresses either the Eighth Amendment or the Due Process Clause because it is discriminatorily applied, and that the discriminatory application can be seen by examining the race of death penalty defendants and the region of the country in which the death penalty is sought. (*Id.* at 15; *see also id.* at 17 ("Virtually every court that has considered the issue has" concluded "intent to discriminate was a necessary element only of an Equal Protection Clause claim, not an Eighth Amendment claim.").)

Under controlling precedent, death penalty "sentencing procedures" must be "[]adequate to ensure that death sentences [a]re not being arbitrarily and capriciously imposed in individual cases." *Aquart*, 912 F.3d at 54 (assessing Fifth Amendment and Eighth Amendment arguments). "[U]nless the death penalty is categorically disproportionate to the crime at issue . . . the proper constitutional focus is on providing the jury with adequate information and guidance to safeguard against arbitrary or capricious capital sentences." *Id.* at 57. As such, an attack on the death penalty as arbitrarily applied based on "statistics" or data about its application in other cases will fail where governing law "satisfactorily provide[s] th[e] constitutionally mandated safeguards" to limit the risk that improper considerations will infect a death penalty determination. *See id.* at 54–55, 57; *see also McCleskey v. Kemp*, 481 U.S. 279, 308 (1987) (rejecting an Eighth Amendment argument that the death penalty was arbitrarily imposed based on a statistical report where the "sentencing procedures" were sufficiently protective to allow the Court to "presume that McCleskey's death sentence was not 'wantonly and freakishly' imposed") (citation omitted). Courts recognize that "discrepancies in capital sentencing are inevitable given that the responsibility for 'express[ing] the conscience of the community on the ultimate question of life or death' is committed to the discretion of jurors who bring diverse aspects of 'human nature and varieties of human experience' to the task." *Aquart*, 912 F.3d at 56

(quoting *McCleskey*, 481 U.S. at 310–11).  The Supreme Court has "specifically 'decline[d] to assume that what is unexplained is invidious.'"  *Id.* (quoting *McCleskey*, 481 U.S. at 313).

Here, the procedures governing the death penalty are set forth in the FDPA.  The Second Circuit held that "the FDPA satisfies the[] criteria" necessary to provide the proper "safeguards" to protect against the sort of arbitrariness that Saipov purports to identify in his constitutional arguments.  *See Aquart*, 912 F.3d at 55.  Therefore, pursuant to binding precedent, Saipov's argument that any arbitrariness suggested by statistics about disparate applications of the death penalty render it unconstitutional must be rejected.

### 2.  The FDPA and the *Ring* Case

To understand Saipov's argument that under *Ring v. Arizona*, 536 U.S. 584 (2002) the FDPA's congressionally authorized method for charging the death penalty is unconstitutional, first requires an analysis of the FDPA and the contours of the *Ring* decision.

### a.  Applicable Law

"The FDPA defines the circumstances under which defendants who commit certain federal crimes may be eligible for the death penalty."  *United States v. Sampson*, 486 F.3d 13, 20 (1st Cir. 2007).  "It restricts the death penalty to an enumerated list of eligible crimes, *see* 18 U.S.C. § 3591, and requires a bifurcated trial, first to determine guilt, and only then to determine punishment*, see id.* § 3593(b)."  *Aquart*, 912 F.3d at 52.  Once guilt is determined, the defendant becomes "death eligible," and "the jury proceeds to make a 'selection decision,' in which it weighs all aggravating and mitigating factors to determine whether the defendant should be sentenced to death or life imprisonment."  *United States v. Fell*, 531 F.3d 197, 237–38 (2d Cir. 2008) (citation omitted).

If the government elects to seek the death penalty, it must notify the defendant through a written "notice," filed on a court's docket within "a reasonable time before the trial."  18 U.S.C.

§ 3593(a).  The notice must, among other things, "set[] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death."  *Id.* at § 3593(a)(2).

"The FDPA makes no mention of [a] grand jury."  *Sampson*, 486 F.3d at 20.  The reason for this make sense since in 1994, when the FDPA was enacted, then-governing Supreme Court precedent held that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."  *Walton v. Arizona*, 497 U.S. 639, 648 (1990) (citation omitted).  "Essentially, the *Walton* Court held that the facts necessary to render a defendant eligible for the death penalty were not elements of the offense itself, making inapplicable the Fifth Amendment requirement that the elements of an offense be charged by a grand jury in an indictment."  *Sampson*, 486 F.3d at 20.  In a case decided after *Walton* but before *Ring*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).  The Court in *Ring* found that "*Apprendi*'s reasoning is irreconcilable with *Walton*'s holding" and therefore, overruled *Walton* in relevant part, holding that "[c]apital defendants, no less than noncapital defendants. . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  *Ring v. Arizona*, 536 U.S. 584, 589 (2002).

"In the wake of *Ring*, Supreme Court precedent now firmly establishes that the mental culpability and aggravating factors required by the FDPA must—in addition to being included in the government's notice to seek the death penalty—be presented to a grand jury, charged in the indictment, and proved beyond a reasonable doubt."  *Sampson*, 486 F.3d at 21.  "Accordingly,

several circuits, including [the Second Circuit], require the government to charge statutory

aggravating factors under the FDPA in the indictment." *Fell*, 531 F.3d at 237; *United States v.*

*Quinones*, 313 F.3d 49, 53 n.1 (2d Cir. 2002) (explaining that, under *Ring*, "the statutory

aggravating factors . . . must now be alleged in the indictment and found by a jury in capital

cases.").

> b.    Application

Here, the Government concedes that its "practice" is to "submit[] the statutory

aggravating factors to a grand jury to ensure compliance with *Ring* and its progeny." (Mot. Opp.

79.) Saipov attacks both the FDPA and this practice. In essence, Saipov contends that *Ring*

renders the FDPA unconstitutional because the FDPA's "congressionally-approved method of

alleging aggravating factors is reserved to the government's attorneys and no one else, not grand

juries, not the court, and not any other individual or entity." (Const. Mem. 52.) Essentially,

Saipov argues that the Government's practice of submitting the aggravating factors to the grand

jury is itself unconstitutional, because the FDPA's silence around grand juries means that "the

FDPA *precluded* the government from including aggravating factors in a grand jury indictment

and [i]s thus facially unconstitutional," regardless of the procedure the Government employed to

comply with *Ring*. *Fell*, 531 F.3d at 236 n.27 (explaining that district court addressed this

argument and "held that [the FDPA] suffered from no such constitutional infirmity."). Although

the Second Circuit has not considered the precise constitutional arguments Saipov raises, it has

noted that "[a]ll courts of appeals to have considered th[is] argument have likewise rejected it."

*Id.*; *Sampson*, 486 F.3d at 21 (collecting cases). These courts have rejected the same argument

Saipov makes here because "[n]o provision of the FDPA prohibits a grand jury from considering

those factors necessary for imposition of a death sentence. The statute simply is silent with

respect to the function of the grand jury." *Sampson*, 486 F.3d at 21.

I agree with "the line of cases" finding "no irredeemable conflict between the FDPA and *Ring*." *Id.* "Nothing prohibits the government from presenting aggravating factors to a grand jury and then, if appropriate, charging those aggravating factors in the indictment." *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006). In particular, Saipov offers no principled argument as to why the FDPA's silence on grand juries means that the Government is prohibited from presenting the aggravating factors to a grand jury.

Moreover, Saipov agrees that the FDPA's aggravating factors "constitute elements of an offense" that are "require[d]" to be "include[ed] . . . in the indictment" and thus that they must be presented to the grand jury under *Ring*. (Const. Mem. 49.) The Federal Rules of Criminal Procedure require a grand jury to "return the indictment," Fed. R. Crim. P. 6(f), as well as that death penalty cases be "prosecuted by an indictment," Fed. R. Crim. P. 7(a), and that this "indictment," which must be approved by a grand jury, "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," *see* Fed. R. Crim. P. 7(a), (c).[6] Given that the aggravating factors are "essential facts constituting the offense charged" against Saipov, I reject Saipov's argument that the FDPA somehow disables the Government from presenting aggravating factors to a grand jury, especially where the Federal Rules of Criminal Procedure allow for the grand jury's involvement in this way.[7]

Furthermore, even if the Federal Rules of Criminal Procedure did not allow the Government to present the aggravating factors to a grand jury—which they most certainly do, *supra*—Saipov offers no persuasive argument as to why any separation of powers principle, or

---

[6] Indeed, Saipov even cites Rule 7(a) in support of his argument about the importance of the grand jury's role in charging a capital offense. (Const. Mem. 67–68.)

[7] Based on the above finding, I also reject Saipov's argument that the grand jury was somehow not allowed to make special findings. (Const. Mem. 60.)

similar concern he raises, would make it unconstitutional for the Government to present the aggravating factors as it did here.  "[T]he application of *Ring* is a matter of procedure, not of substantive definition regarding death-penalty eligibility," and as such "the rule against massive judicial rewriting of statutes simply is not implicated here."  *Sampson*, 486 F.3d at 21–22 (collecting cases).  Because of this, it is clear that presenting aggravating factors to a grand jury does not violate the prohibition on having courts, instead of a legislature, define the substance of a crime.  (*Contra* Const. Mem. 53.)  The FDPA itself provides the substantive criminal law here. *See* § 3591(a).

Saipov contends that, under *United States v. Jackson*, 390 U.S. 570 (1968), the Government cannot "rescue, through ersatz construction, a constitutionally flawed federal death penalty."  (Const Mem. 54.)  In *Jackson*, the Supreme Court struck down the death penalty component of the Federal Kidnapping Act because the Act only allowed "the jury . . . to return a verdict of death," which "impose[d] an impermissible burden upon the exercise of" the right to a jury trial by clearing the threat of a death sentence for those defendants who pleaded guilty.  *See* 390 U.S. at 571–72.  The government sought to have the Court save the death penalty portion of the Act by reading it as having "authorize[d] a procedure unique in the federal system—that of convening a special jury, without the defendant's consent, for the sole purpose of deciding whether he should be put to death."  *Id.* at 576–77.  The Court rejected this argument, because it found no textual support for the special jury procedure.  *Id.* at 577–78.  The Court further opined that "[i]t is one thing to fill a minor gap in a statute—to extrapolate from its general design details that were inadvertently omitted.  It is quite another thing to create from whole cloth a complex and completely novel procedure and to thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality."  *Id.* at 580.

As other courts have held in rejecting the *Jackson*-based part of Saipov's argument, "[t]his case . . . does not require" the fashioning of some complex and novel procedure, as "the role of the grand jury in charging the elements of an offense has long been established." *Sampson*, 486 F.3d at 22 (citations omitted); *see also United States v. Barnes*, 532 F. Supp. 2d 625, 641 (S.D.N.Y. 2008) ("Here, in contrast, by allowing a grand jury to include aggravating factors in an indictment, this Court does not create from whole cloth a complex and completely novel procedure.") (internal quotation marks omitted).  In fact, it is Saipov who asks that I fill in the FDPA's silence to find that it prohibits the Government from presenting the aggravating factors to a grand jury.  Therefore, I find that there is no violation of the separation of powers principles and *Ring* does not render the FDPA's congressionally authorized method for charging the death penalty unconstitutional.

### 3.      Saipov's Indictment Clause Arguments

Saipov argues that the Government failed to obtain an indictment consistent with the Indictment Clause of the Fifth Amendment for two reasons.[8]  First, Saipov argues that the grand jury had to be informed that the indictment it returned would authorize the Government to seek the penalty of death.  (Const. Mem. 67–71.)  Second, he says that the Government had to present the grand jury with "all relevant factors," including the non-statutory aggravating factors from the Notice and information to allow the grand jury to "deci[de] . . . whether Mr. Saipov should be subject to the death penalty" under the FDPA scheme by balancing "aggravating factors" against "mitigating factors."  (Const. Mem. 71.)

As to the first, "an indictment is sufficient if it, first, contains the elements of the offense

---

[8] He also makes a third argument that the grand jury is not authorized to make special findings, but I have already rejected this argument.  *See supra* note 7.

charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).  The role of the grand jury is "to investigate possible crimes . . . so that it can make a judgment whether a trial on specific charges is necessary." *United States v. Suleiman*, 208 F.3d 32, 39 (2d Cir. 2000) (citation omitted). There is no source of law that I could find—and Saipov cites none—suggesting that a grand jury must be presented with the potential of a death sentence for an indictment to be valid.  To the contrary, "[g]rand juries do not make findings or recommendations concerning punishment or sentencing and such considerations should not influence their decision.  It is for the petit jury to make that determination." *United States v. Matthews*, 246 F. Supp. 2d 137, 147 (N.D.N.Y. 2002); *see also United States v. Aquart*, No. 3:06CR160 JBA, 2010 WL 4363414, at *1 (D. Conn. Oct. 26, 2010) ("Because the Grand Jury was able to fulfill its constitutional role in determining whether there was probable cause to charge [defendants] for the crimes in the Indictment without considering potential sentences, the Indictment is not deficient even if the Grand Jury was not informed Defendants could face the death penalty as a result.")

As to the second, the Second Circuit has already held that "non-statutory aggravating factors" included in a notice of intent to seek the death penalty under the FDPA need not be included in an indictment for the indictment to be valid.  *Fell*, 531 F.3d at 238 ("The Supreme Court's distinction between eligibility and selection has led lower courts to conclude that only those factors which comprise death eligibility—intent and statutory aggravation—must be included in the indictment because those factors must be found before imposition of the maximum authorized penalty.").  There is no support for Saipov's contention that the balancing of various factors under the FDPA is a matter for the grand jury, or that the Constitution

somehow compels the grand jury to engage in this calculation.  Rather,

> [u]nder FDPA § 3591(a)(2), a defendant is not death eligible unless the sentencing jury finds that the Government has proved beyond a reasonable doubt at least one of the statutory aggravating factors set forth at § 3592.  Once a defendant becomes death eligible, the jury proceeds to make a selection decision, in which it weighs all aggravating and mitigating factors to determine whether the defendant should be sentenced to death or life imprisonment.

*Fell*, 531 F.3d at 237–38 (internal citations and internal quotation marks omitted).  This is a weighing to be conducted by "the jury," meaning the one impaneled for trial, as part of its selection decision, *see* § 3593(e), not an element of a charge that would have to be presented to a grand jury.  *See Fell*, 531 F.3d at 238 ("Whether or not Fell *should* be sentenced to death was a calculation made by the jury based on a variety of statutory and non-statutory considerations.") (emphasis in original).  Accordingly, the indictment comports with the requirements of the Fifth Amendment.

### 4.        Potential Jury Confusion

Saipov's final argument is that the structure by which the jury determines a death sentence under the FDPA is unconstitutional because it creates a "substantial risk of confusion" amongst jurors such that "[i]t is unreasonable to expect even . . . reasonably intelligent jurors to parse" the FDPA penalty phase requirements.  (Const. Mem. 73.)  However, courts must "presume that juries follow their instructions" unless "the record . . . suggest[s] that the jurors were either confused or prejudiced . . . in determining the counts of conviction."  *United States v. Stewart*, 433 F.3d 273, 310 (2d Cir. 2006).  This is thus a standard where a record is to be assessed for actual confusion, not where the law is struck down because of speculative, potential confusion.  *See id.* at 302–03.  At best, Saipov's position on confusion is pure speculation, based on the conclusory assertion that "[i]t is unreasonable to expect . . . jurors to parse [the FDPA's] complex mélange of concepts and come out with an understanding of the process or a principled

verdict." (Const. Mem. 73.)  Moreover, I disagree with Saipov's supposition.  Like other judges, I "remain[] confident that the jury can be instructed in such a way that it will understand and correctly apply the provisions of the FDPA." *United States v. Kee*, No. S1 98 CR 778 (DLC), 2000 WL 863119, at *3 (S.D.N.Y. June 27, 2000); *see also United States v. Mikos*, No. 02 CR 137-1, 2003 WL 22110948, at *19 (N.D. Ill. Sept. 11, 2003) ("While the statutory aggravating factors drafted by Congress are reasonably clear, the use of jury instructions helps diminish any confusion over any less precise provisions of § 3592 that may exist.").  Jurors are asked to parse through complex concepts all the time in cases brought in federal court, and there is no reason to believe that jurors would be incapable of following my instructions.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (rejecting capital defendant's argument that the jury did not understand its role following a question and instruction regarding mitigation, finding that "[a] jury is presumed to follow its instructions [and to] understand a judge's answer to its question.") (internal citation omitted).  Because I find that the jury is capable of following the FDPA's structure, I find that the FDPA does not violate the Eighth Amendment or the Due Process Clause.

### B.     *The Discretion Motion*

The FDPA provides that, if a defendant in a federal prosecution is sentenced to death, the defendant's "sentence" will be "implement[ed] . . . in the manner prescribed by the law of the State in which the sentenced is imposed."  18 U.S.C. § 3596(a).  However, recognizing that not all States have law allowing for the death penalty, the statute provides that, "[i]f the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law."  *Id.* However, the death sentence is not set in motion at sentencing.  Rather, "[a] person who has been

14

sentenced to death" shall be kept in "the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence." *Id.* It is only after this that the sentence is carried out. *See id.*

Saipov argues that, "[b]ecause the FDPA confers unbridled discretion on sentencing judges to choose the state whose laws will govern an execution[] in capital cases brought in states without the death penalty, it denies due process and violates the Eighth Amendment." (Discretion Mem. 13.)[9]  Saipov is thus challenging the FDPA's constitutionality in any case in which it is invoked against a defendant in a State that, like New York,[10] does not have the death penalty.  This is tantamount to a facial challenge, which means Saipov must "establish that no set of circumstances exists under which the [FDPA] would be valid" when invoked against a defendant in a State that does not have the death penalty.  *See United States v. Quinones*, 313 F.3d 49, 60 n.8 (2d Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

However, Saipov does not articulate any principle suggesting that the FDPA's procedure for death sentences in non-death penalty States is unconstitutional.  He says that "the Constitution requires objective and uniform standards affecting how to execute a human being." (Discretion Mem. 13.)  However, under the FDPA, if the jury returns a death sentence, I would "designate [a] State" other than New York in which to carry out the sentence.  18 U.S.C. § 3596(a).  Thus, to succeed on his argument, Saipov would have to show that there is no state I could select that has "objective and uniform standards affecting how to execute a human being." (Discretion Mem. 13.)  *Cf. Quinones*, 313 F.3d at 60 n.8.  Saipov does not analyze the laws of

---

[9] "Discretion Mem." refers to Saipov's Memorandum in Support of the Motion to Declare the FDPA Unconstitutional for Failure to Guide Courts' Discretion in Choosing the Manner and Location of Execution for a Defendant Sentenced to Death in a Non-Death Penalty State.  (Doc. 100.)

[10] New York's death penalty statute was struck down by the New York State Court of Appeals in *People v. LaValle*, 3 N.Y.3d 88, 131 (2004), and to date there is no death penalty in New York.

any State and thus fails to carry his burden.  Furthermore, to the extent Saipov is arguing that the

choosing of a State in which to carry out a FDPA sentence must be constrained so that any

discretion is not "unbridled," courts selecting states in which to carry out FDPA sentences have

fashioned methods of analysis to ensure that their "decision[s] . . . would not be unbounded or

arbitrary."  *United States v. Fell*, No. 5:01-CR-12-01, 2016 WL 1572894, at *4 (D. Vt. Apr. 18,

2016) ("The court would be guided by factors including: whether the selected state is within the

Second Circuit, which state has the closest connection to [defendant]'s alleged crimes, and

convenience for counsel and others.")

Saipov also argues that the Notice "should be stricken because DOJ apparently has failed

to establish procedures to ensure compliance with the state law chosen by the sentencing court

pursuant to § 3596."  (Discretion Mot. 14.)  However, as the Government correctly explains, the

FDPA provides a procedure:  a defendant sentenced to death in a non-death penalty state is

"release[ed] . . . to the custody of a United States marshal, who shall supervise implementation of

the sentence in the manner prescribed" by the law of the State ultimately selected.  (Mot. Opp. 96

(quoting § 3596(a)).  Saipov's reply brief offers no argument as to why the procedure set by the

FDPA is insufficient.  Accordingly, I reject his argument.

### C.    *The Factors Motion*

#### 1.    **Applicable Law**

As a constitutional matter, "a capital sentencing scheme must genuinely narrow the class

of persons eligible for the death penalty and must reasonably justify the imposition of" a death

sentence "on the defendant [as] compared to others found guilty of murder."  *United States v. Bin

Laden*, 126 F. Supp. 2d 290, 297 (S.D.N.Y. 2001), *aff'd sub nom. In re Terrorist Bombings of

U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008) (quoting *Lowenfield v. Phelps*, 484 U.S.

231, 244 (1988)).  Thus, in a homicide case, to return a valid death sentence, a finder of fact

"must convict the defendant of murder and find one 'aggravating circumstance' (or its

equivalent) at either the guilt or penalty phase."  *United States v. Fell*, 217 F. Supp. 2d 469, 476

(D. Vt. 2002), *vacated on other grounds*, 360 F.3d 135 (2d Cir. 2004) (quoting *Tuilaepa v.*

*California*, 512 U.S. 967, 971–72 (1994).

The "FDPA satisfies the[] criteria" for being "constitutional" as a death sentencing

framework, because it allows federal juries to "rationally narrow the class of death-eligible

defendants" and to "render a reasoned, individualized sentencing determination based on a

death-eligible defendant's record, personal characteristics, and the circumstances of his crime."

*Aquart*, 912 F.3d at 54–55 (quoting *Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006)) (internal

quotation marks omitted).  To accomplish these ends, as discussed *supra*, the FDPA "requires a

bifurcated trial."  *Id.* at 52.  In the "first" phase, the jury determines whether the defendant is

guilty of at least one "enumerated list of eligible crimes."  *Id.* (citing 18 U.S.C. § 3591).  In the

second phase, "[i]f a jury [has found] a defendant guilty of a death-eligible crime," the jury must

"unanimously f[i]nd beyond a reasonable doubt" that the defendant "acted . . . with specific

culpable intent . . . and under circumstances specified in at least one statutory aggravating

factor."  *Id.* (citations omitted).  "If a jury finds both these statutory requirements satisfied, it

must consider non-statutory aggravating factors that it finds proved beyond a reasonable doubt as

well any mitigating factors established by a preponderance of the evidence to the satisfaction of

even a single juror."  *Id.* (citing § 3593(c),(d)).  The jury then performs a holistic "weigh[ing]" of

all "aggravating and mitigating factors," and it may "return a death verdict" "only if it

unanimously concludes" that the aggravating factors sufficiently outweigh the mitigating factors.

*Id.*  A "capital jury . . . is never required to return a death sentence."  *Id.*  The FDPA makes this

clear:  even "in the absence of a mitigating factor," the jury must determine "whether the aggravating factor or factors alone are sufficient to justify a sentence of death."  18 U.S.C. § 3593(e).

Courts have a duty to ensure that the aggravating factors presented actually aid the jury in making a "principled distinction between those who deserve the death penalty and those who do not," *see Lewis v. Jeffers*, 497 U.S. 764, 776 (1990), as "not every consequence of a defendant's actions will support the imposition of capital punishment," *Bin Laden*, 126 F. Supp. 2d at 302. There are four main reasons why an aggravating factor may be stricken.

The first is insufficient relevance.  "Aggravating factors in death penalty cases must be 'particularly relevant to the sentencing decision,' not merely relevant, in some generalized sense, to whether the defendant might be considered a bad person."  *United States v. Fell*, 372 F. Supp. 2d 753, 763 (D. Vt. 2005) (quoting *Gregg v. Georgia*, 428 U.S. 153, 192 (1976)); *see also Bin Laden*, 125 F. Supp. 2d at 298 (aggravating factors must be "sufficiently relevant to the question of who should live and who should die.") (internal quotation marks omitted).  An aggravating factor does this if it "provide[s] a principled basis" "to distinguish those who deserve capital punishment from those who do not."  *Arave v. Creech*, 507 U.S. 463, 474 (1993).

The second is vagueness.  A factor will be sufficiently clear, and thus not vague, when it has a "core meaning that criminal juries should be capable of understanding."  *Jones v. United States*, 527 U.S. 373, 400 (1999).  "[T]he proper degree of definition . . . is not susceptible of mathematical precision."  *Tuilaepa*, 512 U.S. at 973 (internal quotation marks omitted).  The Supreme Court "ha[s] found only a few factors vague"—these are factors that ask a jury whether a defendant's conduct was highly contemptible in generalized and highly-colorful language.  *See id.* (collecting cases with vague factors including "whether murder was especially heinous,

18

atrocious, or cruel;" "whether murder was outrageously or wantonly vile, horrible and inhuman;" and factors involving "pejorative adjectives that describe the crime as a whole") (internal quotation marks omitted).[11]   However, an otherwise vague factor "may pass constitutional muster if it is given a constitutional limiting instruction." *United States v. Frank*, 8 F. Supp. 2d 253, 277–78 (S.D.N.Y. 1998) ("For example, in *Maynard* [*v. Cartwright*], the Court held that a limiting instruction" for the factor of whether a crime was committed in an "especially heinous, atrocious, or cruel" manner was proper because it explained that a finding that "the murder involved 'some kind of torture or serious physical abuse,' would be sufficient." (quoting 485 U.S. 356, 365 (1988))).

The third is overbreadth.  A factor that would "apply to every defendant convicted of murder" is overbroad, because valid factors "must apply only to a subclass of defendants convicted of murder." *Tuilaepa*, 512 U.S. at 972; *see also Frank*, 8 F. Supp. 2d at 274–75 ("The Eighth Amendment does not require that Frank be compared to all other defendants found guilty of a kidnapping in which death results, but rather that he be compared to all other persons who have committed murder.").

The fourth is duplicity.  "[A]ggravating factors are duplicative when one necessarily subsumes the other," which is the case "when a jury would necessarily have to find one in order to find the other." *Fell*, 531 F.3d at 236 (internal quotation marks omitted); *see id.* (explaining that, although a factor "address[ed] the same carjacking conduct as [in] the other two factors," a factor at issue "focus[ed] on premeditation rather than motive.  These are similar but nonetheless distinct concepts, justifying separate consideration and separate findings."). "Two factors are *not*

---

[11] These cases may also stand for the proposition that factors presented with overly-colorful language should be excluded for "plac[ing] an unwarranted thumb on death's scale."  *See Bin Laden*, 126 F. Supp. 2d at 299.

duplicative merely because they are supported by the same evidence." *Id.* (citing *Jones*, 527 U.S. at 399) (emphasis in original).

"Generally, more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors in the penalty phase of a capital case," and "district courts" are to use their "discretion to exclude any type of unreliable or prejudicial evidence." *United States v. Jacques*, 684 F.3d 324, 327 (2d Cir. 2012) (internal quotation marks omitted).

### 2.    Application

As an initial matter, all of Saipov's arguments for striking factors based on whether they are sufficiently supported by evidence, (*see* Factors Mem. 2, 13, 30)[12], must be denied as premature since evidence has yet to be presented to the jury.  In the event that Saipov is found guilty at trial, he will have the opportunity to challenge whether there is evidentiary support for presenting an aggravating factor to the jury.  The sufficiency of the evidence, if allowed, will then be a question for the jury.  § 3593(c) ("At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592.").[13]

#### a.    The "Death During Commission of Another Crime" Statutory Factor

Saipov argues that the aggravating factor of "death during the commission and attempted offense of 18 U.S.C. § 33, destruction of motor vehicles," is invalid because the Government seeks both to use this as an aggravating factor and to charge § 33 as a "substantive offense." (Factors Mem. 9–10 (internal quotation marks omitted).)  By using § 33 as a substantive charge

---

[12] "Factors Mem." refers to the Defendant's Memorandum of Law in support of Motion to Strike Aggravating Factors from the Government's Death Notice.  (Doc. 98.)

[13] The Government stated in a footnote in its supplemental motions *in limine*, "that it no longer intends to rely on. . . the heinous, cruel, and depraved manner of the offense. 18 U.S.C. § 3592(c)(6).  (Doc. 472, at 9 n.6; *see also id.* at 32 n.14; Doc. 627.)  As such, Saipov's arguments as to § 3592(c)(6) are moot.

and as part of an aggravating factor, Saipov says, "the government seeks to guarantee, as an automatic consequence of his conviction, Mr. Saipov's death-penalty eligibility," which he argues is improper.  (*Id.* at 10 (emphases omitted).)  This argument is based on one found to be persuasive in *United States v. Kaczynski*, where the court reasoned that, "[s]ince the [FDPA] requires the jury to find only one statutory aggravating factor, the narrowing function of these aggravating factors would be completely undermined if the mere commission of the charged offense could suffice."  No. CR S–96–259 GEB GGH, 1997 WL 34626785, at *21 (E.D. Cal. Nov. 7, 1997).

At least two courts in this district have rejected *Kaczynski*'s reasoning.  One explained that "there is nothing wrong with permitting the jury during sentencing to consider crimes for which the defendant has been found guilty beyond a reasonable doubt."  *Bin Laden*, 126 F. Supp. 2d at 301 (citation omitted).  The other reasoned that, under the FDPA, "[o]nce the penalty phase has begun, the jury is asked to consider *only once* the fact that the murder occurred in the course of commission of another crime," and given that the FDPA directs the jury to "focus on the circumstances of the crime" in total and never compels the jury to return a death sentence, *see* § 3593(c), Congress having allowed for this consideration "represents a constitutional exercise of Congress's legislative power."  *Frank*, 8 F. Supp. 2d at 276.

I agree with the reasoning in *Bin Laden* and *Frank*.  Saipov is likely correct that "anyone convicted of . . . § 33 would be automatically eligible for the death penalty," (Factors Mem. 10), at least where the person convicted is also found to have caused "death, or injury resulting in death, . . . during the commission or attempted commission" of the offense, § 3592(c)(1).  However, this is permissible.  Under Supreme Court precedent, there is "no reason why th[e] narrowing function may not be performed by jury findings at either the sentencing phase of the

trial or the guilt phase." *Lowenfield v. Phelps*, 484 U.S. 231, 244–45 (1988).[14]  Accordingly, even assuming that a conviction under § 33 would necessarily establish one relevant aggravating factor during the penalty phase, that would be acceptable under binding precedent.  *Id.* Moreover, as observed by other courts in this district, a conviction that establishes the existence of one aggravating factor does not in itself mean Saipov will be put to death.  *See Frank*, 8 F. Supp. 2d at 276; *see also* § 3593(c).  The FDPA provides a clear framework in which, after conviction, the jury would only consider a § 33 offense that resulted in death as but one factor that may, or may not, warrant the death penalty.  Indeed, the FDPA is written to allow the government to use the fact of death caused during the commission of a § 33 offense as an aggravating factor in the penalty phase once it is established in the guilt phase.  § 3592(c)(1). Thus, I reject Saipov's contention that allowing this factor "essentially re-write[s] the FDPA." (Mot. Reply 30).  *See also Frank*, 8 F. Supp. 2d at 276.

> b.        The "Injury to Surviving Victims" Non-statutory Factor

Under § 3593(a), the Government is allowed to include non-statutory factors in the notice of intent to seek the death penalty.  Specifically, that section provides that

> [t]he factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

§ 3593(a).  This is the last paragraph of section (a) of the statute.  The first paragraph states that

---

[14] Saipov argues that, under *Lowenfield*, "a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty," and establishing a factor in "the guilt stage" would somehow treat "all persons convicted of a designated offense as members of a faceless, undifferentiated mass."  (Factors Mem. 10–11.) However, as discussed, it is permissible to perform the narrowing function at the guilt phase.  484 U.S. at 245.  As in the *Frank* case, Saipov's argument on this point erroneously "suggests that the jury must be asked to compare him to all other defendants found guilty of" the offense of which he is convicted, whereas "[t]he Eighth Amendment" only requires that Saipov "be compared to all other persons who have committed murder."  *See* 8 F. Supp. 2d at 274–75.

the notice of intent is applicable "in a case involving an offense described in section 3591." *Id.*

In turn, § 3591 provides, in relevant part, that a sentence of death may be imposed on a

defendant for "any . . . offense" where defendant "intentionally killed the victim;" "intentionally

inflicted serious bodily injury that resulted in the death of the victim;" "intentionally participated

in an act, contemplating that the life of a person would be taken or intending that lethal force

would be used in connection with a person . . . and the victim died as a direct result of the act" or

"intentionally and specifically engaged in an act of violence, knowing that the act created a grave

risk of death to a person . . . such that participation in the act constituted a reckless disregard for

human life and the victim died as a direct result of the act."[15]  § 3591(a)(2).

In *United States v. Whitten*, a defendant argued on appeal that a non-statutory factor of

how "the victims' deaths impacted survivors . . . should have been limited to family."  610 F.3d

168, 176 (2d Cir. 2010).  In rejecting the defendant's argument, the Second Circuit said that

§ 3593(a) "speaks to what 'may be included,'" and that "the final phrase ('any other relevant

information') . . . is read most naturally as a catch-all for what may be deemed 'relevant' by the

court."  *Id.* at 188 (internal citations omitted).

Saipov argues that, as a matter of statutory construction, the FDPA uses the term "victim"

to mean homicide victim and therefore precludes the Government from raising "penalty-phase

testimony on the impact of injuries suffered by survivors."  (Factors Mem. 14–15.)  As a textual

matter, this argument has some superficial appeal, as the word "victim" in § 3591(a)(2) is used to

mean someone who died.  However, this argument cannot be squared with the plain language at

---

[15] The Government in its Opposition to Defendant's Omnibus Challenge to the Government's Informative Outline
stated that it was prepared to proceed without relying on the Grave Risk of Death factor.  (Govt. Opp. to Omnibus,
filed under seal, November 8, 2022, at 3.)  I am reading this concession to mean that the Government does not
intend to proceed with its presentation of the statutory aggravating factor "Grave Risk of Death to Additional
Persons" under 18 U.S.C. § 3592(c).

the end of § 3593(a), the definition of "victim" within §§ 3593(c) and 3510, and *Whitten*'s reading of that language—"any other relevant information"—as a "a catch-all for what may be deemed relevant by the court."  610 F.3d at 188 (internal quotation marks omitted).

Section 3593(c) refers to the logistics of a victim's attendance at trial, which makes Saipov's limited reading of "victim" as only applied to a deceased individual impossible.  Section 3593(c) states

> [i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. For the purposes of the preceding sentence, the fact that a victim, as defined in section 3510, attended or observed the trial shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c).  Section 3510 states that in a capital case

> [n]otwithstanding any statute, rule, or other provision of law, a United States district court shall not order any victim of an offense excluded from the trial of a defendant accused of that offense because such victim may, during the sentencing hearing, testify as to the effect of the offense on the victim and the victim's family or as to any other factor for which notice is required under section 3593(a).

18 U.S.C. § 3510.  By discussing the logistics of a victim's attendance and testimony at trial, the plain language of the statute makes clear that "victim" is not limited to the deceased.

Separate and apart from the plain language of the statute, given the plain meaning of the phrase "any other relevant information" in § 3593, it is hard to imagine why Congress would have intended the phrase to be read as narrowly as Saipov urges without explicitly limiting it. Saipov's narrow reading also does not make sense in the context of the framework of the statute. In the FDPA, Congress set forth a procedure where particular enumerated offenses render one eligible for death, § 3591, and where a jury must find "at least one [of a few specifically enumerated] statutory aggravating factor" is in play, *Aquart*, 912 F.3d at 52 (citations omitted).

24

However, after saying that in the statute, Congress provided that a jury may consider non-statutory factors that "may include . . . any other relevant information."  § 3593(a).  Clearly, Congress knew how to confine the sweep of the language of the FDPA when it wanted to do so. It did so in § 3591, but then used "a catch-all" in § 3593.  *Whitten*, 610 F.3d at 188.  Thus, Saipov's argument—that the FDPA's language cabins non-statutory aggravating factors—is defeated by the fact that "Congress allowed for the admission of non-statutory factors precisely because it could not foresee every criminal circumstance that might arise."  *Bin Laden*, 125 F. Supp. 2d at 302.

Furthermore, when Congress enacted the FDPA in 1994, it was well aware of the 1993 bombing of the World Trade Center—only "[s]ix people were killed" in this attack, but "more than a thousand [were] hurt in some way, some badly, with crushed limbs."  FBI, *1993 Trade Center Bombing*, https://archives.fbi.gov/archives/news/stories/2008/february/tradebom_022608 (last accessed July 8, 2022).  In other words, the Congress that passed the FDPA well knew through experience that there were mass acts of violence that killed few but devasted many, many survivors.  With this knowledge, Congress provided a law under which "factors . . . may include . . . . any other relevant information."  § 3593(a).[16]  In light of this, I cannot agree with Saipov that the Government is prohibited from alleging as an aggravating factor the harm Saipov allegedly caused to individuals who did not die in the truck attack.

     c.    <u>The "Engaged in Acts of Violence to Support a Terrorist Organization" Non-statutory Factor</u>

Saipov argues that "it would . . . be unconstitutional to base a death sentence on [his]

---

[16] For the sake of argument, assuming that Saipov's assertion is correct, the testimony of the injured survivors during any penalty phase would still be admissible, not as victim impact statements, but as relevant to "any properly alleged statutory or non-statutory aggravating factor relating to the capital charges."  *United States v. Tsarnaev,* 968 F.3d 24, 80 n.56 (1st Cir. 2020), *cert. granted*, 209 L. Ed. 2d 463, 141 S. Ct. 1683 (2021), *and rev'd*, 212 L. Ed. 2d 140, 142 S. Ct. 1024 (2022).

personal beliefs approving of ISIS's ideological goals," and thus that "[t]he First Amendment"

requires this factor be stricken.  (Factors Mem. 17.)  This argument is specious.  Saipov will

stand trial for, and if convicted, be subjected to the FDPA's penalty phase for, alleged acts of

violence.  As contemplated by this factor, Saipov would "not [be] penalize[d]" for "mere

association with a foreign terrorist organization" or for his beliefs, but for committing particular

acts of violence in furtherance of those beliefs as a part of an act of terror against the United

States.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 39–40 (2010) (holding that the

material-support statute, 18 U.S.C. § 2339B, does not "violate[]" a right to "freedom of

association under the First Amendment.").  In dicta, the Supreme Court has explained that there

are "many cases" in which

> associational evidence might serve a legitimate purpose in showing that a defendant
> represents a future danger to society.  A defendant's membership in an organization
> that endorses the killing of any identifiable group, for example, might be relevant
> to a jury's inquiry into whether the defendant will be dangerous in the future.  Other
> evidence concerning a defendant's associations might be relevant in proving other
> aggravating circumstances.

*Dawson v. Delaware*, 503 U.S. 159, 166 (1992).  Therefore, I reject Saipov's First Amendment

argument that this factor impermissibly accounts for Saipov's association with ISIS.

Separately, Saipov argues that this factor is "subsumed by the 'Substantial Planning and

Premeditation' statutory aggravator," which he does not challenge, because it accuses him of

"committing the offense after substantial planning and premeditation to cause the death of a

person and commit an act of terrorism."  (Factors Mem. 16–17 (internal quotation marks

omitted)).  I agree that there is some overlap between the factors here.  However, the Substantial

Planning factor in the Notice tracks the text of the FDPA.  *See* § 3592(c)(9) (stating that

"Substantial planning and premeditation" is when "[t]he defendant committed the offense after

substantial planning and premeditation to cause the death of a person or commit an act of

terrorism.").  The factor of whether Saipov "engaged in acts of violence to support a terrorist

organization" is not "necessarily subsum[ed]" within the Substantial Planning factor.  *Fell*, 531

F.3d at 235.  Even if Saipov "committed the offense after substantial planning . . . to . . . commit

an act of terrorism," that is distinct from whether he did it to lend support to a terrorist

organization.  This distinction is material.  Substantial planning captures what may have

happened in the past—the extent to which a defendant plotted to cause carnage.  Therefore, I

reject this argument and decline to strike this factor.[17]

    d.  The "Future Dangerousness" Non-statutory Factor

  In this factor, the Notice provides that Saipov

> is likely to commit criminal acts of violence in the future such that he poses a
> continuing and serious threat to the lives and safety of others as demonstrated by,
> among other things, his commission of the acts of violence charged in the
> Indictment, his stated intent to continue his attack in New York City had his truck
> not been rendered inoperable, and his continued support for the radical terrorist
> activities and goals of ISIS, which include the killing of U.S. nationals.

(Not. 4.)  Among other things,[18] Saipov argues that this factor duplicates other factors, including

"Multiple Killings" and "Engaged in Acts of Violence to Support a Terrorist Organization."

(Factors Mem. 18–20.)  Since the filing of these Motions, the Government in its Omnibus

briefing agreed to limit its argument and evidence of future dangerousness to what Saipov can do

---

[17] With regard to this factor and all the others in the Notice, the parties should meet and confer about proposed limiting instructions to ensure that the jury understands each factor.  With this factor in particular, a limiting instruction may be useful to ensure that the jury understands the distinction between it and other factors.  *See Fell*, 531 F.3d at 235 (explaining "that 'any risk that the weighing process would be skewed was eliminated by the District Court's instruction' to the jury" on how it should evaluate the factors) (quoting *Jones v. United States*, 527 U.S. 373, 399–400)).

[18] Saipov also argues future dangerousness is a facially unconstitutional consideration.  (Factors Mem. 20.)  This argument is foreclosed in light of the plethora of precedent.  *See, e.g., Dawson*, 503 U.S. at 166; *Jurek v. Texas*, 428 U.S. 262, 274–75 (1976) ("It is, of course, not easy to predict future behavior.  The fact that such a determination is difficult, however, does not mean that it cannot be made.  Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.").  To the extent Saipov argues that these holdings should be reevaluated in light of "lessons of subsequent experience," (Mot. Reply 39), that is a matter for a higher court to consider.

in prison and not society at large. (Govt. Opp. to Omnibus at 48.)

Although this factor may not be wholly subsumed within the others, *Fell*, 513 F.3d at 236, prior to the Government's agreement to limit Saipov's future dangerousness to prison, it did arguably overlap in such a way that it could be argued it does not provide for a "principled distinction between those who deserve the death penalty and those who do not" given the other factors in play, *see Jeffers*, 497 U.S. at 776.  However, this possible overlap has been largely eliminated by the Government's agreement to limit this factor to Saipov's future dangerousness in prison.  I agree with the Government that it would be relevant in any penalty stage to consider Saipov's future dangerousness as demonstrated by, for example, his "belie[f] that he is justified in killing *kuffar* (*i.e.*, non-believers or non-Muslims) wherever they are located."  (Mot. Opp. 116.)  A reasonable factfinder could conclude, in the penalty phase, that the extent of this belief renders it so likely that Saipov would engage in indiscriminate future killings while in prison that death is a warranted sentence.[19]

Accordingly, as explained further in the Conclusion, the parties are directed to meet and confer about how to proceed on this factor.  Either the Government will be granted leave to file an amended notice reflecting the more narrowly tailored version of the Future Dangerousness factor as limited to what Saipov can do in prison, or, the parties will inform me that the Future Dangerousness factor will be retained and propose a limiting instruction to the jury.  *See Fell*, 531 F.3d at 235.

e.    The "Selection of Site for Acts of Terrorism" Non-statutory Factor

Under this non-statutory factor, the Government alleges that Saipov "targeted the bike

---

[19] Once again, I reject Saipov's argument that his being under Special Administrative Measures ("SAMs") prevents him "from developing mitigation evidence generally or from developing evidence specifically related to his adaptation to prison life" that would speak to his potential future dangerousness.  (Doc. 108, at 21–22.)

path on the West Side Highway on Halloween because he intended to maximize the devastation

to civilians and in an attempt to instill fear in New Yorkers and tourists who use the bike path."

(Not. 5.)

Saipov argues that this factor is "completely subsumed by three statutory aggravating

factors: 'Grave Risk of Death to Additional Persons,'[20] 'Substantial Planning and

Premeditation,' and 'Multiple Killings.'" (Factors Mem. 28.)  He also argues that this factor is

too "arbitrary" because "[t]here is no way to prove by any standard that Mr. Saipov's conduct

was more deadly or devastating simply because it occurred" where it allegedly did, "as opposed

to" if it had occurred at "another . . . site in New York City." (*Id.* at 29.)  I reject both arguments.

As to the first, Saipov's argument fails to acknowledge that this factor is not duplicative

because it raises matters that only can be considered by their overlap:  that Saipov allegedly

targeted a site popular with "New Yorkers and tourists" on a popular holiday precisely so he

could "maximize" carnage and "instill fear" and terror.  (Not. 5.)  In other words, the factor is

intersectional and is not "necessarily and wholly subsumed by a different aggravator within the"

Notice.  *Bin Laden*, 126 F. Supp. 2d at 299.[21]  A jury could find that intersection in this factor—

maximizing carnage and death at a popular location to instill terror—is more than the sum of its

parts, and as such that this factor is unique in why Saipov may deserve the death penalty.  *Cf.*

*United States v. Roof*, 225 F. Supp. 3d 413, 417–18 (D.S.C. 2016) (denying motion to strike

---

[20] As previously stated, the Government has represented that it is prepared to proceed without relying upon this factor.  (*See* Govt. Opp. to Omnibus at 3.)

[21] In *Bin Laden*, Judge Sand struck a non-statutory factor of "Disruption to Important Governmental Functions" on the grounds that, because the "statutory aggravating factors for homicide . . . focus . . . on the crime's lethal effects," the non-statutory factor at issue there, which focused on "the disruption of a government's embassy-centered functions . . . is simply not sufficiently indicative of a defendant's disdain for human life as to warrant submission as an aggravating factor for the jury's consideration." 126 F. Supp. 2d at 302–03.  Here, the factor asks the jury to consider whether Saipov so disdained human life that he was willing to target a popular location to maximize the terror that would result from his actions.

factor that defendant "targeted men and women participating in Bible-study group at the Emanuel AME church in order to magnify the societal impact of the offenses charged in the Indictment"), *aff'd*, 10 F.4th 314 (4th Cir. 2021).[22]

Furthermore, Saipov's argument about arbitrariness erroneously assumes that Saipov's conduct, in allegedly choosing the highly trafficked West Side Highway pedestrian and bike path to cause carnage and terror, (Not. 5), needs to be compared to the possibility of whether Saipov had chosen other "communal sites in New York City" or that "he could have selected any crowded space and killed just as many, if not more, people." (Factors Mem. 29.) Here, however, the jury's task in considering whether Saipov should be put to death is not to compare Saipov "to all other defendants found guilty" of the crimes Saipov committed, "but rather" to "compare[]" him "to all other persons who have committed murder." *Frank*, 8 F. Supp. 2d at 274–75. Similarly, the jury's task on this factor would be to determine whether Saipov is more worthy of death than other people convicted of murder because he allegedly chose a popular pedestrian and bike path for a murderous act of terrorism, not because he might have chosen some other site for the act. A reasonable juror could well conclude that Saipov should be put to death because his alleged choice makes him more culpable than others convicted of intentional killings.

f.      The "Lack of Remorse" Non-statutory Factor

Saipov argues that the Notice's statement of his "demonstrat[ing] a lack of remorse in the

---

[22] Saipov attempts to distinguish the *Roof* case on the grounds that Saipov did not "target[] a specific racial group." (Mot. Reply 41.) There are at least two problems with this argument. First, Saipov cites nothing to support the notion that this type of non-statutory aggravating factor must require the targeting of a specific racial group to be viable. Second, Saipov is alleged to have committed his actions against a specific group of people on American soil, *i.e.*, New Yorkers and tourists using a location popular with New Yorkers and tourists on a popular holiday. I see no reason why this sort of targeting would be, as a matter of law, materially less contemptible or terroristic act as to make the non-statutory factor at issue here insufficient to support the death penalty.

days and months following his crime" is "so barebones and general that it does not provide [him] with enough information to refute, explain, or deny the allegation." (Factors Mem. 29.) In response, the Government clarifies that it intends to use affirmative statements and actions from "Saipov's confession" obtained "mere hours after" the alleged killings to show that he "is without any remorse whatsoever for his horrific crime" and is "proud of his terrorist attack and the hateful ideology that inspired it." (Mot. Opp. 125.) Saipov's only response in his reply is that he "challenges the government's characterization of his post-arrest and in-court statements," and requests that I "hold a hearing to determine the accuracy and reliability of the government's claims." (Mot. Reply 42.) However, in his omnibus challenge, Saipov notes that "he does not object to the government introducing or relying on [his post-arrest statements] to try to support its lack-of-remorse aggravating factor," but instead challenges the use of his comments in court and his telephone calls from prison. (Doc. 622 at 75–79.) Saipov's challenge is based on the assertion that his statements do not explicitly discuss the truck attack and "simply expressed generalized Muslim religious faith or beliefs . . . or political ideas that, while provocative to some, are not violent or terroristic on their face" and the only reference to ISIS "was that it was fighting for sharia (Islamic law) on earth." (*Id.* at 76–78.)[23] I find this evidence could speak to Saipov's lack of remorse; therefore, his challenge goes to the weight of these statements rather than their admissibility. I was present for Saipov's in-court statements and find that the statements are sufficiently accurate and reliable to be presented to the jury. As for his statements made over the telephone in prison, I find that his discussions do not need to include any specific

---

[23] I reject Saipov's argument that these statements must be excluded based on the wording of the Notice that Saipov showed a lack of remorse in "the days and months" following the crime. (Doc. 622 at 79.) As explained above, these statements are clearly relevant to the lack-of-remorse factor and I decline to define "months" as limited to October 2017 to October 2018, especially given the delay in the commencement of trial due to the COVID-19 pandemic.

reference to the truck attack in order for the Government to present them in support of a lack of remorse factor. The jury will be responsible for deciding which statements simply highlight Saipov's religious convictions and which more aptly illustrate any lack of remorse.

Furthermore, Saipov's reply here appears to abandon his opening argument that asking a jury to consider Saipov's "lack of remorse" is "a clear violation of his Fifth Amendment right against self-incrimination and Sixth Amendment trial right." (Factors Mem. 30.) This is likely because the Government represents that "unless Saipov opens the door," the only evidence of lack of remorse it will introduce is Saipov's "conduct and his affirmative statements," rather than evidence about what Saipov is not saying. (Mot. Opp. 127.)

In any case, precedent requires me to reject Saipov's constitutional arguments on this factor. "[A] defendant's conduct can result in a limited waiver of his Fifth Amendment rights against self-incrimination and against the drawing of an adverse inference from his invocation of that right." *Whitten*, 610 F.3d at 199. For example, "an unsworn, uncrossed allocution constitutes a limited Fifth Amendment waiver that allows the prosecution to argue for an adverse inference from a defendant's failure to *testify* as to that which he has *allocuted*." *Id.* at 199 (emphasis in original). Thus, to the extent that the Government seeks to introduce Saipov's affirmative statements and actions from his post-arrest statements and from court proceedings, there is no reason that using those statements and actions—which Saipov offered freely—would impinge on any of Saipov's constitutional rights.

### III.   <u>Conclusion</u>

For the foregoing reasons, the Constitutionality Motion and the Discretion Motion are

DENIED, and the Factors Motion is GRANTED IN PART AND DENIED IN PART pending

further clarification from the parties.  Within 7 days of entry of this Opinion & Order, the parties

shall notify me how they wish to proceed on the Future Dangerousness factor contained in the

Notice, and in particular whether the Government will file an amended notice of intent

narrowing this factor or whether the parties believe it can be appropriately dealt with using a

limiting instruction.

SO ORDERED.

Dated: January 24, 2023
        New York, New York

                                                            _____
                                                            Vernon S. Broderick
                                                            United States District Judge