

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 30, 2023

<u>Via ECF</u>
The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 518
New York, New York 10007

      Re:    *United States v. Sayfullo Habibullaevic Saipov*, S1 17 Cr. 722 (VSB)

Dear Judge Broderick:

      As discussed at the January 27, 2023 conference,[1] the Government writes to inform the Court of the expected contours of its rebuttal evidence, should the defendant argue (as he has indicated) that he poses no future danger due to the combined effect of two prison restrictions: (1) Special Administrative Measures ("SAMs"); and (2) the Special Security Unit of the United States Penitentiary Florence Administrative Maximum Facility ("ADX").[2] The Government anticipates presenting its rebuttal proof through: (i) the testimony of a Bureau of Prisons ("BOP") officer, who recovered a note that the defendant attempted to pass to another inmate in violation of his SAMs; (ii) the actual note that the defendant attempted to pass, along with a translation; and (iii) the testimony of a BOP expert, Scott Dodrill.[3]

---

[1] This letter supplements the Government's opposition to the defendant's omnibus challenge to the Government's informative outline, filed under seal on November 8, 2022. "Opp." refers to the Government's opposition, and "Reply" refers to the defendant's reply brief filed under seal on November 21, 2022. This letter is intended to outline the rebuttal proof that the Government presently intends to offer. For brevity, the Government summarizes or references its legal arguments as to admissibility, which are fully set forth in the briefing.

[2] In his briefing, the defendant described his anticipated placement at ADX as "H-Unit," which is where inmates in Phase One and Two (described below) are held. Phase Three inmates are held in the J/B unit. At the January 27 conference, the defense clarified that "[w]hen we refer to H Unit, we are talking about the special security unit at ADX Florence, which encompasses three locations, two H units and half of J Unit." (Tr. 1751).

[3] Mr. Dodrill is a former BOP warden and senior executive who oversaw the BOP's counterterrorism program before retiring in 2011. The defendant has challenged Mr. Dodrill's qualifications primarily on the ground that it is "too dated" specifically as to H-Unit (Reply at 28),

The Honorable Vernon S. Broderick, U.S.D.J.
January 30, 2023
Page 2

### I. Evidence of the Defendant's Efforts to Circumvent His SAMs

The Government anticipates that the BOP officer will testify that on February 6, 2022, the defendant asked the officer to give a bag of candy to another SAMs inmate.[4] (Opp. at 58). The officer inspected the bag and seized a note that stated, among other things, "God willing, very soon [we] will go to Hilafat [(Caliphate)]." (Opp. at 58).

The officer's testimony and the seized note are proper rebuttal to the defendant's anticipated argument that SAMs will help contain the danger that he poses, because the evidence shows the defendant's willingness to circumvent the SAMs that are already in place. The defendant argues that this evidence should be precluded because it was not contained in the informative outline (Reply at 26–27), but this is rebuttal proof that the Government anticipates offering in response to the arguments that the defendant outlined for the first time in his informative outline motion. Moreover, the Government's informative outline was intended to assist the defense in preparing for the penalty phase and raising motions in advance of trial, but should not be construed as controlling the Government's proof to the extent the Government amends it. The defendant also argues that this proof is not probative because the act was "trivial" and the defendant was not disciplined (Reply at 27–28), but the weight is for the jury to decide. Finally, the defendant argues that the evidence is unduly prejudicial due to the disclosure of the recipient's name and the fact that he is also under SAMs, but the Government will not elicit the recipient's name, and his SAMs status is necessary to show *why* the defendant's conduct is serious. The defendant did not attempt to pass an innocuous note to a random inmate, but a note specifically referencing the Caliphate to another SAMs inmate.

### II. Evidence of the Ability of SAMs and ADX to Forestall Danger

The Government anticipates that Mr. Dodrill will testify as to the following topics:

(1) A description of the purpose and implementation of SAMs, including that: (a) SAMs are designed to restrict an inmate's communications; (b) SAMs are not intended to be permanent, and they expire if not renewed annually; (c) SAMs are subject to administrative and judicial appeal; and (d) SAMs have in fact been permitted to expire, including for inmates designated to the Special Security Unit at ADX. (Opp. at 47–52).

---

but Mr. Dodrill last visited ADX, including H-Unit, in November 2022 in connection with this case. Moreover, the defendant relies on Mr. Dodrill for factual assertions in both his opening and reply briefs (Opp. at 60, Reply at 17–19), implicitly acknowledging his qualifications.

[4] The other inmate, Ruslan Maratovich Asainov, is charged in the Eastern District of New York with, among other things, providing material support to ISIS. The Government does not presently intend to elicit testimony regarding Asainov's ISIS affiliation.

The Honorable Vernon S. Broderick, U.S.D.J.
January 30, 2023
Page 3

(2) Mr. Dodrill's opinion that SAMs can be breached. To explain the basis for his opinion, Mr. Dodrill will cite two examples where SAMs inmates were able to pass messages in violation of their SAMs: (a) in 2000, a SAMs inmate (Sheikh Omar Ahmad Ali Abdel Rahman) passed messages to a foreign militant group; and (b) in 2012, another SAMs inmate (Kaboni Savage) had phone calls with unapproved associates, directed them to send him packages in prison, and successfully received at least one package. Although neither Rahman nor Savage was housed at ADX at the time of their SAMs violations, the vulnerabilities they exploited — unmonitored legal communications — exist at ADX. The Government will not elicit that Rahman or Savage's attorneys facilitated their security breaches, or otherwise suggest that the defendant's attorneys may help him violate the SAMs. (Opp. at 46, 53–54).

(3) A description of the BOP's designation system, including that: (a) the BOP presently assigns all post-conviction SAMs inmates to the Special Security Unit at ADX; and (b) SAMs inmates may be temporarily transferred to a different facility due to, for example, a court appearance or a medical issue. (Opp. at 43, 45).

(4) A description of the Special Security Unit for SAMs inmates at ADX, including: (a) that ADX has a phasing program for Special Security Unit inmates, whose phase progression is reviewed every six months; (b) the different privileges and housing locations of inmates in each of the three phases of the Special Security Unit; (c) the approximate number of inmates in each of the three phases;[5] and (d) the physical cell configuration and security protocols of each phase. (Opp. at 46–47).

(5) Mr. Dodrill's opinion that the security features at the Special Security Unit can be breached. To explain the basis for his opinion, Mr. Dodrill will cite two examples involving inmates within H-Unit: (a) in 2003, an inmate (Wadih El Hage) hid a razor blade in the fire sprinkler head in his cell; and (b) in 2018, a different inmate (Dzhokhar Tsarnaev) hid a razor blade attached to a toothbrush inside his cell.[6] Mr. Dodrill will also cite two examples involving an ADX inmate who was not in the Special Security Unit (Ismael Petty): (a) in 2013, Petty ambushed three correctional officers by suspending his body in the ceiling of the sally port to his suite, and then leaping down when the officers opened the door; and (b) in 2017, Petty broke into the pipe chase in his cell, crafted three weapons, a gas mask, and body armor, and set a fire in his cell. Although Petty was not housed within the Special Security Unit at the time of these incidents, the cells he occupied are identically configured to cells in the Special Security Unit. Specifically, Mr. Dodrill

---

[5] At the conference, the Court inquired regarding the phase placement of SAMs inmates Dzhokhar Tsarnaev and Ramzi Ahmed Yousef. Tsarnaev is presently in Phase 2 and Yousef is presently in Phase 3.

[6] Mr. Dodrill identified these examples upon reviewing disciplinary reports of Special Security Unit inmates recently produced by the BOP in response to a defense subpoena.

The Honorable Vernon S. Broderick, U.S.D.J.
January 30, 2023
Page 4

>will explain that based on his extensive experience with ADX, including site visits both before and after his retirement as a senior BOP official, the facility has only two types of cells: regular cells, which have solid metal doors and no built-in showers, and highest-security suites, which have sally ports and built-in showers to minimize inmate movement. With very few exceptions (*e.g.*, cells modified to accommodate disabilities), all regular cells at ADX are identical, and the same is true for suites. H-Unit has both types of cells. (Opp. at 45–46, 49).

(6) A description of the step-down program for non-SAMs inmates at ADX, including: (a) that ADX is not intended to be a permanent assignment for inmates; (b) if an inmate's SAMs are removed, then the inmate can earn his way into ADX's general population and, eventually, out of ADX altogether and into the BOP's regular penitentiary system; and (c) inmates previously designated to the Special Security Unit have in fact been able to work their way out of ADX.[7] (Opp. at 47).

At bottom, Mr. Dodrill will respond to the defense argument that SAMs and the Special Security Unit of ADX can forestall all danger — by truthfully explaining the limitations of both.[8] This is consonant with the Government's obligation to provide the jury with "accurate information for its deliberation in selecting an appropriate sentence," *California v. Ramos*, 463 U.S. 992, 1009 (1983), so that "the jury is not misled about a defendant's future incarceration status when assessing evidence of his future dangerousness," *United States v. Fields*, 516 F.3d 923, 942 (10th Cir. 2008). It is necessary for Mr. Dodrill to refer to examples because if he "were not permitted to use generalized examples or refer to limited number of anecdotes and statements that informed [his] expert opinion, it could be very difficult for [him] to convey her expert opinion in a manner that the jury will understand." *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 558146, at *22 (S.D.N.Y. Feb. 24, 2022). Put differently, it would be hard for Mr. Dodrill to explain how he knows that the security precautions of SAMs or the Special Security Unit could be breached without describing any breaches in the real world.

The defendant argues that the examples identified by Mr. Dodrill are irrelevant to the extent that they occurred outside of the Special Security Unit of ADX. (Reply at 23). But that does not mean the examples are not instructive. The vulnerabilities that Rahman and Savage exploited to violate their SAMs exist everywhere, including at ADX; and the ADX cells in which Petty crafted weapons and assaulted staff are identical to cells found within the Special Security Unit. The

---

[7] For example, Mohammad Salameh, Oussama Kassir, and Mohamed Saddiq Odeh, who were each convicted in this District for terrorism offenses and spent time in the Special Security Unit of ADX, are no longer at ADX.

[8] Contrary to the defense suggestion, there is no burden shifting. (Reply at 21–23.) The Government will meet its burden of proving future dangerousness by offering evidence of the defendant's own conduct. The Government will not call Mr. Dodrill unless the defendant argues that his SAMs and/or anticipated prison conditions can forestall his danger.

The Honorable Vernon S. Broderick, U.S.D.J.
January 30, 2023
Page 5

defendant argues that Petty's 2013 attack is unimportant because ADX learned from its mistakes, (Reply at 24 ("officials at ADX . . . adopted significant new remedial measures and re-training of staff aimed, successfully, at preventing such breaches"), but Petty's continued exploits at ADX, including in 2017, when he crafted weapons and armor within his cell, demonstrate the continued potential for inmates (including the defendant) to circumvent existing security procedures, even when those procedures are enhanced to account for recent violations.  Ultimately, Mr. Dodrill will cite these examples as illustrations for his opinion that neither SAMs nor the Special Security Unit of ADX can forestall all danger.  In evaluating what weight to give that opinion, it is important for the jury to understand the real-life examples on which Mr. Dodrill's opinion is based.  This information provides important context to the defendant's argument and helps the jury "have as much information before it as possible when it makes the sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 204 (1976).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/
Andrew Dember
Amanda Houle
Jason A. Richman
Alexander Li
Assistant United States Attorneys
(212) 637-2563/2194/2589/2265

cc: Defense counsel (via ECF)