UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                                              :

UNITED STATES OF AMERICA       :

                                                        :                    17-CR-722 (VSB)

                -against-                 :

                                                       :                          **ORDER**

SAYFULLO HABIBULLAEVIC SAIPOV,  :

                Defendant.              :
------------------------------------------------------------X

<u>VERNON S. BRODERICK</u>, United States District Judge:

        On February 1, 2023, I directed the Government Wall Team and Defense counsel to appear for a conference in courtroom 24B on February 2, 2023. (Doc. 702.) In open-court, I found that it was necessary at that juncture to conduct the meeting *in camera* in the jury room of Courtroom 24B because I felt that the information may implicate an anticipated defense by Mr. Saipov, thereby implicating his defense and right to a fair trial. I made clear that I intended to make the transcript public after consulting with the parties concerning their views and possible redactions.

        Following my disclosure to the parties regarding my involvement in an investigation related to an inmate at ADX Florence, the parties agreed that the information should be disclosed to the Prosecution Team and the transcript of the conference should be made public. I disclosed the information to the Prosecution Team, in open court, during the February 3, 2023 status conference. The transcript of the conference held on February 2, 2023 is attached hereto as Exhibit A.

SO ORDERED.

Dated: February 10, 2023
New York, New York

                                                              Vernon S. Broderick
                                                              United States District Judge

# EXHIBIT A

N228SAIF

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                          17 Cr. 722 (VSB)

SAYFULLO HABIBULLAEVIC SAIPOV,

            Defendant.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        February 2, 2023
                                        11:00 a.m.

Before:

                HON. VERNON S. BRODERICK,

                                        District Judge
                                        -and a Jury-

                          APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  LISA P. KOROLOGOS
     Wall Attorney

DAVID E. PATTON
     Federal Defenders of New York, Inc.
     Attorney for Defendant
BY:  DAVID E. PATTON
     SYLVIE J. LEVINE
     ANDREW J. DALACK
```

1     (Trial resumed)

2     THE COURT:  First, I would like to apologize for

3  unnecessary anxiety I might have caused anyone in getting the

4  e-mail.  I think once we get into the details, I think it will

5  hopefully alleviate any anxiety.

6     So yesterday my law clerk sent an e-mail at my

7  direction that read as follows:

8     "Counsel:  Judge Broderick would like to schedule a

9  meeting for tomorrow at 11 a.m. in the jury room of courtroom

10 24B with the government's wall team and the defense team.  The

11 meeting relates to ADX Florence and the inmate discussed in the

12 article linked below."  And then we provided the link to that

13 article.

14    "Please let us know if Mr. Saipov plans on joining the

15 conference.  If Mr. Saipov does not intend to waive his

16 appearance for this meeting, we will move the meeting to Friday

17 in order to make the necessary arrangements with the

18 interpreters."

19    So, first, let me just confirm that Mr. Saipov waives

20 his appearance at this matter.

21    MR. PATTON:  He does, your Honor.

22    THE COURT:  All right.

23    So, first, let me just say, and repeat, yesterday my

24 staff sent an e-mail to the defense and the Wall Team related

25 to an inmate at ADX Florence.  I sent the e-mail to the Wall

Team instead of the trial team because the discussion implicates what I understand to be a potential defense that might be raised during the penalty phase related to the conditions of Mr. Saipov's incarceration in the future at ADX Florence.

The public has a First Amendment right of access to criminal proceedings. I am citing *Press-Enterprise* there, which is at 464 U.S. 501, at 508. Judicial proceedings may be closed only upon a showing that closure is necessary to protect higher values and that the closure is narrowly tailored to the individual circumstances.

The presumption of openness in a criminal trial may be overcome only by the overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered. And there again I am citing *Press-Enterprise*, at 510.

The Second Circuit has adopted this standard. And among other cases, I am citing now *Matter of New York Times*, 828 F.2d 110, at 116.

Therefore, because the right of access to a criminal proceeding is not absolute, it "must give way in certain cases to other rights or interests, such as the defendant's right to

1  a fair trial or the government's interest in inhibiting
2  disclosure of sensitive information."  In *United States v.*
3  *Suarez*, 880 F.2d 626, the Second Circuit, noting that the
4  public right of access to a criminal proceeding is not
5  absolute, considered the risk of prejudice to the litigants in
6  a criminal proceeding, including, among other things, the risk
7  of improperly disclosing trial strategy or violating
8  work-product protection.
9        Here, I find that the discussion of the inmate at ADX
10 Florence and his conditions of confinement implicate an
11 anticipated defense of Mr. Saipov.  As such, the discussion
12 might result in discussions of the anticipated defense and its
13 contours; thereby implicating Saipov's defense and right to a
14 fair trial.  I therefore find holding that discussion in camera
15 to be the appropriate course of action at this juncture.
16 However, to be clear, if the discussion does not result in such
17 disclosures, or the discussion is limited such that the
18 transcript can be redacted, I intend to make the transcript
19 public after consulting with the parties concerning their views
20 and possible redactions.
21       I will also, after a discussion with the parties,
22 consider also making the disclosure to the trial team.
23 Obviously, if there are discussions of defense strategy and the
24 like, anything like that, we can talk about redacting the
25 transcript.

1    So with that, I think I would like to proceed to the
2    jury room, and I will provide details concerning why I decided
3    to have this conference.
4    MR. PATTON:  One thing for the Court.  Would the Court
5    be amenable to us allowing one resource counsel to join us,
6    Mr. Bolser, who works with the federal defender program?
7    THE COURT:  Sure.  That's fine.
8    I take it, let me just round that out, is he working
9    on issues relating to ADX Florence?
10   MR. PATTON:  He is, your Honor, and he is a federal
11   defender employee.
12   THE COURT:  Sure.
13   (Continued on next page)

1           (In camera; judge, prosecution wall attorney and
2    defense team present)
3           THE COURT:  So I asked for this conference and it's
4    fairly straightforward.  As part of the work I did at the U.S.
5    Attorney's Office, when Judge Martin imposed the conditions of
6    confinement on Luis Felipe, he retained jurisdiction over that;
7    and, therefore, if there were violations and the like, he -- he
8    basically at one point asked me to review -- asked the U.S.
9    Attorney's Office to review, and it became the responsibility
10   of me as violent gang chief to either assign it to somebody or
11   do it myself.  So I handled it with regard to Mr. Felipe.
12          I wanted to raise it just because I recognize -- this
13   is some 20 years ago that I engaged in this, and I went back
14   and I looked at the docket, and Judge Martin must have had all
15   of the proceedings, they must be sealed, because I do recall
16   having several court appearances related to the issue.  And the
17   issue basically was that Luis Felipe -- it wasn't his main
18   lawyer, who I believe on the docket was Larry Feitell; it was
19   another attorney who became involved, and, quite frankly, I am
20   not sure who it was.  I think I might know.
21          So that attorney I think may have communicated with
22   others information that Mr. Felipe had provided, and also
23   provided Mr. Felipe with, I don't remember if it was articles
24   or some form of communication.  Basically, it was in violation
25   of what Judge Martin had imposed, and Judge Martin asked me to

1   look into it, not with regard to Mr. Felipe -- and I have no
2   idea what happened, or at least I don't remember if there was
3   anything that happened with regard to the BOP and Mr. Felipe --
4   but really with regard to the attorney.
5           So in connection with that, I spoke with that
6   attorney, I spoke with Mr. Feitell, and I may have spoken with
7   some other people, reviewed whatever materials that the BOP
8   had.  And then there may have been some limited testimony in
9   front of Judge Martin.  My recollection is he was just trying
10  to figure out whether there should be any repercussions for the
11  attorney.  In the end there were not.  In the end, I reported
12  that it was ill-advised, not nefarious, and that, my
13  recollection again, is that the substance of the
14  communications -- well, they weren't on their face things that
15  could cause issues.  They weren't similar to the trial
16  testimony and the like concerning Mr. Felipe ordering things
17  from prison.
18          I just don't know the contours of the defense.  I
19  doubt you're going to be reaching back 20-some-odd years, but I
20  wanted to just disclose that.  I don't think it's a conflict in
21  any way, but I wanted to make sure the parties were aware of
22  it.  And it occurred to me, just recently actually, that I had
23  done this work, and unfortunately I didn't see anything on the
24  docket.  Again, I didn't scour it.
25          So that's the nature of it.  So I apologize for

everybody sort of, for however many hours, wondering what the heck was going on.

            MR. PATTON:  Got it.

            THE COURT:  Yes, Mr. Patton.

            MR. PATTON:  I appreciate your Honor raising it.  Of course, we were trying to guess what this might involve, and we thought perhaps it had to do with some of the litigation over the scope of the future danger arguments and whether or not the Court in this case could impose sort of parallel conditions to the SAMs, which I think would resolve some of the issues about whether things can be modified, because it could be in the hands of the Court any potential for modification moving forward.  So to the extent that is something that could help, we are certainly willing to explore that.

            THE COURT:  I guess what I would say is, and I hadn't really thought about it until I went back and started to read the Second Circuit's case, which is *United States v. Felipe*, 148 F.3d 101.  I hadn't really thought about it.  That's, quite frankly, a ways away because that is the sentencing.  I have no problem raising it tomorrow.  Times have changed.  I don't know and I don't really remember what the -- although there were clearly special administrative measures that could be imposed because there is a reference to special administrative measures.  I am not sure what iteration that is, and I haven't looked at anything other than *Felipe* to know whether or not the

scope of a judge's discretion under the RICO statute -- and I didn't actually specifically look at whether it -- I assume it applies to VICAR charges, but I am not entirely sure about that because it generally refers to RICO.

So I haven't really thought about it, quite frankly. Even if, and this is just off the top of my head, even if that were the case, I would still -- a couple of things. Number one, I do have life tenure, but it would mean that it would probably -- and again, I don't know what is going to happen in the penalty phase. But I know that, just by way of example, I think there is another judge who now has Felipe because over the years various things have come up. So that would probably occur or need to occur.

First, let me ask, would there be any objection to me making the same disclosure and making this transcript public? And the second part is -- and again, I haven't thought about that issue -- you should feel free to, if you haven't already, raise it with the trial team, but we can also talk about it tomorrow.

MR. PATTON: Nothing occurs to me off the top of my head about the sealing issue. Could we have just 20 seconds to --

THE COURT: You could also wait and get the transcript to review it.

MR. PATTON: Why don't we do that.

                THE COURT:  And let me know if there are any
redactions.  I am sure that the press is going to be
interested.  There may be certain things in there that you feel
should be redacted, but take a look at the transcript and just
let me know.
                On the issue of -- again, I just don't know what the
contours are.  I am not sure if the SAM is already imposed.  I
don't know what authority I have to -- it could be sort of in
parallel and then the BOP may decide to drop it.  I don't know.
I just have no idea.
                MS. KOROLOGOS:  Your Honor, AUSA Korologos, wall
attorney.
                My position is going to be, once you look at this,
that the case team should be aware of the issue.  It is
something that is in the public realm.  We certainly don't want
anything with regard to sentencing not be, both with respect to
having the prosecution team aware, and then the public is a
different issue, I will leave to you.  But this is something
that I think, at least at the highest level, your involvement
in that case and your conclusion that it's not going to affect
the sentencing and all that, it is something I would go back
and tell my chief about, which of course I can't.  So I just
think it is important that the case team at least know.  And
this is public information I think that you were involved in
this, although if Judge Martin sealed it, maybe not.

1            I do think also, to the extent it comes into the
2    information on the contours of what actually can and cannot
3    happen, reading the article, I think what was described in the
4    article that was novel was the fact that it wasn't the BOP
5    driving the ship, it was Judge Martin.  So it could be
6    something that can become relevant, and if litigated, I think
7    it has to be the prosecution team, unless there is a really
8    strong reason not to be.
9            THE COURT:  I think in the end there will be some
10   disclosure as to the contours of it.  There really hasn't been
11   anything discussed; I haven't really got into exactly what the
12   defense is going to be.  We should be able to do that.  And
13   maybe disclosing it tomorrow, even if the transcript isn't
14   available.
15           MR. PATTON:  I don't imagine it will be an issue.
16           THE COURT:  Again, I have no idea -- I mean, I have a
17   better idea of the rebuttal, what they are proposing, but just
18   in case.  And I raised it in the context of, I will say
19   conflict, but I don't think there is anything there, but in an
20   abundance of caution just so that the parties are aware.
21           Ms. Korologos, I think I will do that.  Although the
22   only person who will remember probably is Mr. Dember.
23           MS. KOROLOGOS:  I was in the office at the time.
24           So even with the appearance of a conflict, I think the
25   prosecution team and the supervisors need to know.  And then as

1 long as defense is not concerned that there is some defense
2 strategy disclosure, I would be in favor of disclosing.
3         THE COURT:  Is there anything else?  Obviously we have
4 the conference tomorrow.  There is going to be a lot of ground
5 to cover.  Is there anything else that we should discuss?  If
6 we do, we should probably do it out in public.
7         MR. PATTON:  No, your Honor.
8         THE COURT:  All right.  Well, thank you very much.  I
9 hope no one lost sleep over it.
10         MR. PATTON:  There are plenty of other things to lose
11 sleep over.
12         THE COURT:  Well, you may be losing sleep just
13 generally, and I get that.
14         Thank you very much.
15         We will stand adjourned.
16         (Adjourned to February 3, 2023, at 2:00 p.m.)