## MEMORANDUM OF LAW REGARDING
## SPECIFIED TYPES OF PROSECUTORIAL
## <u>MISCONDUCT IN PENALTY-PHASE SUMMATION</u>

On behalf of Mr. Saipov, counsel submits this memorandum of law addressing the appropriate bounds of capital penalty-phase arguments. It identifies and discusses specific arguments that have been condemned by courts, but nevertheless have been and continue to be advanced by prosecutors in a number of federal capital cases — borrowed and repeated, sometimes almost verbatim, from one to the next. It is intended to facilitate addressing any objections that may be raised concerning the government's summations and to preserve the record on appeal.

# MEMORANDUM OF LAW

## TABLE OF CONTENTS

A.   INTRODUCTION  ........................................................................1

B.   SPECIFIC KINDS OF ARGUMENTS THE COURT SHOULD
     PROHIBIT  ...............................................................................7

     1.   Urging the Jury to Ignore or Disregard Legitimate Mitigating
          Evidence  ........................................................................7

     2.   Suggesting that Mitigating Evidence Requires a Nexus to the
          Crime or to the Defendant's Culpability for the Offense  .................11

     3.   Adverting to the Victim's Family's Desire for a Death Sentence  .....14

     4.   Inviting a Death Verdict on Behalf of the Victim or the Victim's
          Family  ...........................................................................17

     5.   Invoking Comparative Justice in a Victim-Impact Argument  ..........19

     6.   Invoking Comparative Worth in a Victim-Impact Argument  ...........25

     7.   Inviting the Jurors to Experience the Crime Vicariously  .................27

     8.   Inflaming the Jurors' Fears for Their Own Safety or That of
          Others Close to Them  .......................................................34

     9.   Suggesting Jurors Will Bear Responsibility for Future Acts
          of Violence  .....................................................................37

     10.  Portraying Jurors as an Arm of Law Enforcement  ...........................40

     11.  Suggesting Jurors Must Impose Death to Prevent Incompetence
          or Mistakes of Other Actors  .............................................45

i

12.   Asking the Jurors to Send a Message .................................................47

13.   Asking the Jury to Vote for Death to Satisfy the Expectations
       of the Community .................................................................................53

14.   Suggesting that the Jurors Have a Civic Duty to Return a
       Sentence of Death .................................................................................55

15.   Commenting on the Costs or Comforts of Life Imprisonment .........62

16.   Vouching or Bolstering .........................................................................65

17.   Suggesting Additional Evidence Beyond that Adduced at Trial .......72

18.   Asking the Jury to Infer Lack of Remorse, or Other Aggravating
       Factors, from Defendant's Silence or Refusal to Testify ..................74

19.   Inviting the Jury to Consider Defendant's Decision to Plead
       Not Guilty or His Exercise of Trial Rights ........................................82

20.   Commenting on the Defendant's Failure to Have Discussed or
       Apologized for the Crime Before Trial ..............................................86

21.   Denigrating Defense Counsel or the Defense ...................................87

22.   Demonizing the Defendant .................................................................93

23.   Misleading the Jurors on the Consequences of Non-Unanimity .......95

24.   Arguing that Mercy is Never Appropriate ..........................................99

25.   Misstating the Evidence ......................................................................101

## MEMORANDUM OF LAW

On behalf of Mr. Saipov, counsel respectfully submits this memorandum of law in support regarding specified types of prosecutorial misconduct in penalty-phase summation.

### A. INTRODUCTION

It is axiomatic that the government is constrained by ethical and legal duties not to use summation arguments at trial to inflame jurors, mislead them, inject personal opinions, divert jurors from the issue of guilt or innocence, or otherwise employ "improper methods calculated to produce a wrongful conviction." *United States v. Young*, 470 U.S. 1, 7 (1985) (*quoting Berger v. United States*, 295 U.S. 78, 88 (1935)).

Given the heightened reliability required in death-penalty cases, similar if not stricter principles, discussed below, govern a prosecutor's summation at a capital penalty phase.

The Second Circuit has demonstrated that it will enforce these principles strictly. In the two most recent FDPA appeals to reach the court, it concluded that the government had engaged in misconduct in its penalty summations and reversed the death sentences imposed below and remanded for new sentencing proceedings:

- *United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018). Second Circuit found

1

that the government's attempt to elicit testimony that a defense witness—Efrain Johnson—who participated in the homicides but was not tried as a capital defendant, did not receive a cooperation agreement from the government because the government "determined that he was lying" was "a single, but significant error." When considered together with the prosecution's denigration of the inconsistent theories advanced by the defense in the guilt and penalty phases of the trial, the error was serious and prejudicial and warranted reversal. Specifically, the government urged the jury to reject Aquart's first mitigating factor—that Efrain Johnson and co-defendant John Taylor would not face the death penalty—because assigning an aggravating role in the murders to Taylor in the sentencing phase was inconsistent with the guilt phase theory that Taylor was not even present for the murders. Consequently, "the government violated Aquart's Sixth Amendment right when it urged the jury to draw an adverse inference from the fact that the defense had advanced different theories as to confederate Taylor's role at the guilt and penalty phases of trial." In other words, the suggestion that the defense did not believe Efrain Johnson, coupled with the government's cross-examination of the FBI agent left the jury with the impression that neither side believed Efrain Johnson to be credible, thus "erecting an especially high hurdle for a jury to make its own credibility assessment." Accordingly, a remand for a new penalty phase trial was necessary.

- *United States v. Whitten*, 610 F.3d 168, 194-200 (2d Cir. 2010). Court holds that government's penalty-phase closing arguments required vacating defendant's death sentences and remanding for a new sentencing hearing. (1) Prosecutor improperly argued in summation that while defendant (who had allocuted before the sentencing jury, expressing remorse) had right to trial, he "can't have it both ways. He can't do that, then say I accept responsibility. And say 'I'm sorry, only after you prove I did it.'" Court holds that the argument penalized defendant for exercising Sixth Amendment right to jury trial. (2) Prosecutor also improperly argued, as to defendant's allocution: "He chose to do it from there (indicating defense table). The path for that witness stand has never been blocked for Mr. Wilson, had that opportunity too. He chose, like many other things in this case, to do it that way." Court holds that prosecutor's argument, together with court's denial of a modified no-adverse-inference instruction, created

risk that jurors improperly held defendant's failure to testify at sentencing or guilt against him in violation of his Fifth Amendment right not to testify.

And, in a number of other federal death-penalty appeals across the country, the Courts of Appeal have found or suggested that AUSAs engaged in misconduct in closing argument:

- *United States v. Umana*, 750 F.3d 320, 351 (4th Cir. 2014). In sentencing summation, the prosecutor argued that Umaña, who had attempted to smuggle a shank into court, had done so in order to "to fight off rivals" and then urged the jurors that the marshals, the judge, the prosecutor, and even the jurors themselves were his rivals. "The prosecutor's statement portraying the jurors as Umaña's rivals was improper."

- *United States v. Runyon*, 707 F.3d 475, 514-15 (4th Cir. 2013). The prosecution concluded its main summation with: "On behalf of the United States of America, in memory of [the victim], we ask that you do your duty and impose a sentence of death on the defendant for the murder of Cory Allen Voss." Earlier in its summation, the prosecution had urged the jury to "send a message to the community, send a message with your verdict." On appeal, the court concluded that both statements were "improper."

- *United States v. Montgomery*, 635 F.3d 1074, 1098 (8th Cir. 2011). Court holds that the prosecutor's remarks criticizing the decision to have the defendant's children testify were improper. "The prosecution cannot use the defendant's exercise of specific fundamental constitutional guarantees against [her] at trial. Montgomery had the right to have her children testify at her trial. It was thus improper for the prosecutor to argue that Montgomery forced her children to testify and 'victimized them again in front of the whole world.'"

- *United States v. Lighty*, 616 F.3d 321, 360-61 (4th Cir. 2010). During penalty-phase closing arguments, the AUSA twice informed the jurors that the victim's family was asking for a sentence of death: (1) "And let there be no doubt what the United States is asking you to do in this case, on behalf of

[the victim's] family . . . to impose a sentence of death." (2) "[Y]ou will do what the victim's family asks you to do . . . and that is to impose [the death sentence]." Court holds that "there is little doubt that the statements were improper," both because the statements were without support in the evidence and because they were based upon inadmissible victim-impact evidence. *Id.*

- *United States v. Sinisterra*, 600 F.3d 900, 910-11 (8th Cir. 2010). Court condemns "the prosecutor's remarks that the jury could act as the conscience of the community and 'send a message to all other drug dealers that this community will not tolerate [crimes like Sinisterra's]' . . . . The prosecutor's arguments linking Sinisterra to the broader drug problems of the United States, telling the jury to act as the conscience of the community, and asking the jury to send a message with its verdict were improper. Such arguments impinge upon the jury's duty to make an individualized determination that death is the appropriate punishment for the defendant."

- *United States v. Caro*, 597 F.3d 608, 625-28 (4th Cir. 2010). Court finds "troubling" the prosecutor's summation argument that the BOP, judge, and prosecutor were powerless to control defendant, and only the jury could by imposing a death sentence. Capital sentencing should involve an individualized determination, but "[t]he suggestion that the BOP would not secure Caro adequately to prevent future violence implicates policy and resource considerations that are quite different . . . . Moreover, calling upon the jury to 'control' Caro gives them a role more akin to law enforcement than to impartial arbitration between the defendant and the government." It also "might have been improper" for government to argue in summation that a life sentence would send bad message to defendant's prison gang, to prison staff and inmates victimized by the gang, and to parents of the victim.

- *United States v. Rodriguez*, 581 F.3d 775, 803 (8th Cir. 2009). It was improper for prosecutor to refer to "fear" victim felt (since there was no evidence about this) and to label expert testimony as "what defense experts are trying to sell you in this case."

- *United States v. Bolden*, 545 F.3d 609, 630 (8th Cir. 2008). Prosecutor "did improperly ask for the jury to impose the death penalty on behalf of the [victim's] family."

4

- *United States v. Mitchell*, 502 F.3d 931, 994 (9th Cir. 2007). Argument that defendant "has sentenced himself to death" was "improvident." Other arguments — that Attorney General had information jurors did not have when he decided to seek death, calling mitigating factors "excuses," and asking jury what defendant had done to earn a life sentence — were not fair comments on the evidence.

- *United States v. Johnson*, 495 F.3d 951, 979 (8th Cir. 2007). Court condemns as "over the line," government noting that ten, twenty, thirty years from now the child victims will still be dead and arguing "No matter how small [the defendant's] cell may be, it's going to be larger than the coffin that [the victims] are laying [sic] in now." "Although the government was entitled to respond to Johnson's portrait of a miserable thirty years behind bars, it should not have used the victims' plights to do so."

- *United States v. Higgs*, 353 F.3d 281, 331 (4th Cir. 2003). Argument that "mercy is not in the instructions" and "not something you do in this case" "arguably crossed into" improper argument.

- *United States v. Allen*, 247 F.3d 741, 776 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002). Prosecutor's reference to defendant as "murderous dog" in summation was improper. [1]

---

[1] In *United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020), the First Circuit also addressed three instances of alleged prosecutorial misconduct by the government. (1) at the guilt-innocence trial, the government's expert on Islamic terrorism was allowed (over defense objection) to include ISIS in his discussion of the "global jihad movement," even though the defendant had no connection to ISIS and, indeed, the group had hardly existed at the time of the bombings. (2) in the guilt-innocence summation (again over objection) as the prosecutor displayed a PowerPoint that included photos of victims severely wounded by the bombings, he played audio of an Islamic song (a "nasheed") found on the defendant's computer in his dorm room. (There was also evidence that, after carjacking a motorist in their attempted escape from the Boston area, the defendant and his brother had gone back to their own car to retrieve a CD containing such Islamic songs). (3) during the government's opening statement at the sentencing hearing, another prosecutor displayed giant easels with photos of the deceased victims, along with another easel in the middle with a black cloth covering it. During her statement, she told jurors that, soon after the defendant's arrest, he "had one more message to send" about the bombings. "The prosecutor then pulled the black cloth off the middle easel, revealing a 3-foot by 4-foot photo of Dzhokhar in his cell thrusting his middle finger at a surveillance camera." The First Circuit found that the admission of the ISIS testimony was error, and it assumed each of the other two actions by the prosecutors during addresses to the jury was also improper. But the appeals court found all of this to be harmless, given the other evidence of the defendant's "devotion to radical jihadist ideology" and his "disdain for the victims." Still, the court concluded, "we suggest that prosecutors not repeat these tactics on remand."

The Second Circuit's reversal of the death sentences in *Whitten* and *Aquart* and remand for a new sentencing hearing underscore the significant costs that may follow government misconduct during penalty-phase summations. To be sure, the other decisions listed above did not go so far. But they do not suggest that the Courts of Appeal will tolerate the same or similar improper arguments continuing to be made in case after case. Moreover, most of those decisions declined to reverse only because defense counsel never protested the misconduct below, and thus the claim was reviewed on appeal only under the stricter "plain error" standard (or, in post-conviction, under the even stricter standard for ineffective assistance of counsel). That will not happen here. Defendant is intent on challenging any and all improper arguments by the prosecutor, and this motion reflects the first effort toward that end.

Further, to the extent the Court of Appeals in any of these cases, or other ones, have declined to reverse because it considered the record as a whole and determined that an improper argument was not, in the end, prejudicial, that obviously cannot justify the government making or this Court tolerating such improper arguments in the first place.

## B. SPECIFIC KINDS OF ARGUMENTS THE COURT SHOULD PROHIBIT

### 1. Urging the Jury to Ignore or Disregard Legitimate Mitigating Evidence

Jurors must be able to consider and give effect to any and all relevant mitigating evidence offered in support of a sentence less than death, *see, e.g., Penry v. Johnson*, 532 U.S. 782, 797 (2001); *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), and they must be aware of their obligation to do so. As the Supreme Court stated in *Boyde v. California*, the "[p]resentation of mitigating evidence alone . . . does not guarantee that a jury will feel entitled to consider that evidence." 494 U.S. 370, 384 (1990). Jurors may believe themselves precluded from considering relevant mitigation evidence not only as a result of the judge's instructions, "but also as a result of prosecutorial argument dictating that such consideration is forbidden." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n.21 (2007).

Accordingly, "[a] prosecutor errs by directing the jury to ignore a proposed mitigating factor." *United States v. Rodriguez*, 581 F.3d 775, 800-801 (8th Cir. 2009) (direct review of federal death sentence) (citations omitted); *see also*

7

*Sinisterra v. United States*, 600 F.3d 900, 909 (8th Cir. 2010) ("To ensure the reliability of the determination that death was the appropriate punishment, a prosecutor may not argue that [meaningful] consideration [of potentially relevant mitigating evidence] is forbidden.") (citation omitted); *DePew v. Anderson*, 311 F.3d 742, 749 (6th Cir. 2002) (granting habeas relief and ordering resentencing from state death sentence, where prosecution's inadmissible, inflammatory, and misleading comments "were designed to keep the jury from properly considering and weighing the mitigating evidence offered by the defendant"); *Le v. Mullin*, 311 F.3d 1002, 1018 (10th Cir. 2002) (prosecutor may not imply that "the jury had the ability to ignore the legal requirement that it must consider mitigating evidence").[2]

Examples of such improper argument include:

- This is the time for punishment. Punishment. And let me caution you respectfully, and I mean this respectfully, the issue of punishment for the Defendant is not an issue of how it affects his family, not under the law.

---

[2]Although the government may argue that the jurors, in considering the defense evidence, should give the mitigating factors slight weight, *see, e.g.*, *United States v. Whitten (Wilson)*, 610 F.3d 168, 184 n.6 (2d Cir. 2010); *United States v. Bolden*, 545 F.3d 609, 630 (8th Cir. 2008); *United States v. Johnson*, 495 F.3d 951, 978 (8th Cir. 2007), as the Supreme Court explained in *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982): "[T]he sentencer *may not give it no weight* by excluding such evidence from . . . consideration." *Id.* (emphasis added); *see also Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (death sentence reversed where instructions failed to provide jury a vehicle for fully considering mitigating evidence of abuse defendant suffered as a child), *abrogated in part on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Hitchcock v. Dugger*, 481 U.S. 393, 394, 397-99 (1987) (death sentence reversed where sentencing judge refused as a matter of law to consider defendant's troubled family history); *Eddings*, 455 U.S. at 113-114 (same, noting also that such evidence is "particularly relevant" when defendant committed the capital crime as a teenager, not far in time from his difficult upbringing); *Wilson*, 610 F.3d at 184 n.6 ("On review, we ask whether there is a 'reasonable likelihood that the jurors believed themselves to be precluded from considering [the] mitigating evidence.'") (*quoting United States v. Fell*, 531 F.3d 197, 223 (2d Cir.2008)).
.

*Rodriguez*, 581 F.3d at 800 (direct review of federal death sentence). The Eighth

Circuit concluded that, standing alone, this argument would have improperly

directed the jury that family-impact mitigating factors are irrelevant "under the

law." *Id.*; *see also Simmons v. Bowersox*, 235 F.3d 1124, 1136 n.6, 1137 (8th Cir.

2001) ("Show some mercy to his family, give him death. Look at his family. Look

at his little brother. [His little brother] said it all. Someday I want to grow up to be

just like him. To be just like him. Spare those kids of that."; such comments have

"no place in an American courtroom") (citation omitted); *Antwine v. Delo*, 54 F.3d

1357, 1362-64 (8th Cir. 1995) (same, regarding "[I]sn't it much more humane to

sentence this man to death so that his brother can get on with his life, and so that

the two children can get on with their lives, instead of having to think, every day

for the next 50 years, they have a brother or a father locked up in the

penitentiary?").

- As I told you yesterday, he used his age in committing this offense because he didn't believe that you would think that he was capable of it. Well, you do, and you have found it. Don't let him use his age to protect himself now, because then he wins.

*Simmons*, 235 F.3d at 1136 n.6; *see also id.* at 1137 (argument "improper": "[W]e

condemn the prosecution for teetering on the edge of misstating the law with

regard to the significance of Simmons' age as a mitigating factor.").

9

- I told you it was coming, and there, there we heard it. It's everybody's fault but the defendant's. I mean, if he had stayed in the middle of the bed, he would still be alive. If these guys had come up from south Florida a day and a half earlier, he'd still be alive. Come on. Everybody's fault but his. I mean, he snapped? Is that a defense? He snapped?

*Jordan v. State*, 2019 WL 8161276, at *6 (Fla. Dec. 5, 2019) (Court finds that "tone of [prosecution] argument is denigrating"); *Simpson v. Carpenter*, 912 F.3d 542, 587 (10th Cir. 2018) (Prosecutor's characterization of defendant's PTSD diagnoses as "'insult to all legitimate people with PTSD' and 'legitimate veterans' stray[ed] into inappropriate personal opinion. Similarly, the prosecutor's comments suggesting the defense should be ashamed for relying on [defendant's] family support and mental health improperly denigrated [defendant's] mitigating evidence); *Pierce v. Thaler*, 604 F.3d 197, 211 (5th Cir. 2010) ("By essentially instructing the venire members that 'youth isn't relevant,' the [prosecutor's] comments may have undermined the jury's ability to give mitigating effect to evidence of [defendant's] youth . . . ."); *Ferrell v. State*, 29 So. 3d 959, 987 (Fla. 2010) (affirming reversal of death sentence based, in part, upon conclusion that prosecutor erroneously and, therefore, improperly argued that age mitigating factor could only apply to someone younger than defendant).

2.   Suggesting that Mitigating Evidence Requires a Nexus to
the Crime or to the Defendant's Culpability for the Offense

A particular kind of forbidden appeal to ignore or disregard mitigating

evidence, discussed generally above, is any suggestion that mitigating factors must

demonstrate a nexus to the crime.   The Supreme Court has recognized that

mitigating factors need not relate to the defendant's "culpability for the crime."

*Tennard v. Dretke*, 542 U.S. 274, 285 (2004); *Smith v. Texas*, 543 U.S. 37, 45

(2004); *see also*, *e.g.*, *United States v. Fell*, 531 F.3d 197, 222 (2d Cir. 2008) ("A

capital defendant's mitigating evidence need not have a nexus to the murder for

which he has been convicted, but need only allow 'the sentencer to reasonably find

that it warrants a sentence less than death.'") (*quoting Tennard*, 542 U.S. at 285),

*cert. denied*, 130 S. Ct. 1880 (2010); *Small v. State*, 51 A.3d 452, 459-63 (Del.

2012) (on plain error review, reversing death sentence because of prosecutorial

misconduct in repeatedly characterizing mitigating circumstances as "excuses" or

"attempts to shift the blame": "the prosecutorial misconduct in this case

jeopardized the fairness and integrity of the penalty hearing"); *State v. Kleypas*, 40

P.3d 139, 281-82 (Kan. 2001) (arguments that certain circumstances should not be

considered mitigating because they were not causally related to the crime

"constituted prosecutorial misconduct"), *overruled in part on other grounds*, *State*

11

*v. Marsh*, 102 P.3d 445, 450 (Kan. 2004).[3]  "The question is not whether evidence in mitigation makes the defendant any less guilty, or the crime any less horrible, but whether it provides a reason why, despite those things, the defendant should not die." *United States v. Johnson*, 495 F.3d 951, 978 n.26 (8th Cir. 2007) (direct appeal from federal death sentence) (quotation marks and citation omitted).[4]

Examples of such improper argument include:

- The intentional murder of children is an unspeakable evil. It's an evil that cannot be mitigated by any evidence.   None of the defendant's mitigators can take away what she did and her involvement in killing those children.   Somebody involved in the murder of children deserves the death penalty.

*Johnson*, 495 F.3d at 978. The *Johnson* court cautioned that the government's "infelicitous" wording, standing alone, might have suggested that the defendant's mitigating evidence was only intended to diminish the horror of the killings or of the defendant's involvement therein, when, in fact, some of the mitigating factors

---

[3] The United States Supreme Court reversed and remanded *Marsh* on other grounds, 548 U.S. 163 (2006), after which the Supreme Court of Kansas vacated its opinion in part on other grounds, 144 P.3d 48 (Kan. 2006).

[4] In *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008), two judges suggested, while expressly reserving the issue, that it might not be improper for "a prosecutor to argue that, because such a nexus is absent, the mitigating evidence should be given little or no weight." *Id.* at 222 n.14.   The third judge concluded that the government's arguments "impermissibly suggested that the juror should disregard the mitigating evidence because it did not 'connect' to the charged crimes." *Id.*   In any event, because all three judges agreed that the defendant had not been prejudiced, under the specific facts of that case, the panel expressly declined to resolve their differences.   *Id.*   None of the judges, even in dicta, suggested that it would be permissible for the government to argue that the jurors could exclude from consideration any mitigating evidence unconnected to the crime.

"were intended to provide reasons for mercy despite the gravity of the offense,

rather than to 'take away' [the defendant's] involvement in the crime or portray the

murders as any less evil."  *Id.* at 978 n.26.

- We have a whole list of things that have been submitted as mitigating circumstances.   The Court instructs you that mitigating circumstances are those which in fairness and mercy -- get this -- may be considered as extenuating or reducing the moral culpability or blame.   It doesn't say anything about whether you've been a good guy in the past or anything like that.   Do these circumstances extenuate or reduce the degree of moral culpability of responsibility for what he did?   It's up to you to decide what are mitigating circumstances.
  [D]oes that in any way officiate (sic) or mitigate or relieve or make any less horrible what he did . . . ?   I submit to you they do not. . . .   Does it make it all right to go out and murder?   Does it make you less guilty when you go out and commit this kind of a crime?
  . . .

  I don't want to go run through all of these.   I submit to you, ladies and gentlemen, there is nothing in here, nothing in that list in any way mitigates or officiates (sic) or alleviates or makes any less horrible what this man did . . . .

*Le v. Mullin*, 311 F.3d 1002, 1016-17 (10th Cir. 2002).

- Does the defendant's age outweigh what he did?   It doesn't matter if he was seventeen, twenty-seven, or seventy, the crime is still the same, and it's just as vicious.

*Simmons v. Bowersox*, 235 F.3d 1124, 1136 n.6, 1137 (8th Cir. 2001) (argument

13

"improper"; "we condemn the prosecution for teetering on the edge of misstating the law with regard to the significance of Simmons' age as a mitigating factor").

### 3. Adverting to the Victim's Family's Desire for a Death Sentence

The jury may not weigh either the survivors' investment in the trial or their wishes as to its outcome. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court made plain that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." *Id.* at 830 n.2 (*citing Booth v. Maryland*, 482 U.S. 496 (1987)); *accord id.* at 832 (O'Connor, White, & Kennedy, JJ., concurring); *id.* at 835 n.1 (Souter and Kennedy, JJ., concurring). So, too, then, does argument by the government adverting to the opinions of the victim's family violate the Eighth Amendment. *See Middlebrooks v. Bell*, 619 F.3d 526, 543 (6th Cir. 2010) (Telling the sentencing jury that the victim's family "asks you to impose the death penalty" was "completely out of bounds, textbook examples of what a prosecutor should *not* be permitted to say during closing argument"), *vacated on other grounds*, *Middlebrooks v. Colson*, 132 S. Ct. 1791 (2012)

For example, in *United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010), a federal capital prosecution, "[t]wice during closing argument at the sentencing

14

phase, the AUSA informed the jury that [the victim's] family was asking the jury

to impose the death penalty," *id.* at 360:

- "And let there be no doubt what the United States is asking
  you to do in this case, on behalf of the [the victim's] family
  and with the law in support, to impose the only justifiable
  sentence in this case and that is a sentence of death."; and

  > "And with that evidence to guide you and with the law to
  > guide you, you will do what the [victim's] family asks
  > you to do, what the Government tells you to do, in
  > connection with the facts and the law of this case, and
  > that is to impose the only sentence, the only sentence that
  > is justified for these facts for the execution of this young
  > man. And that is the death sentence."

*Id.* at 360-61. On appeal, the Fourth Circuit held that "there is little doubt that the

statements were improper." *Id.* at 361. First, the court noted that there was no

evidence in the record concerning whether the victim's family was, in fact, asking

for the death penalty, and "[t]hus, the AUSA was not at liberty to comment on

facts not in evidence. *Id.* "By going outside the evidence, the AUSA 'violated the

fundamental rule, known to every lawyer, that argument is limited to the facts in

evidence.'" *Id.* (quoting *United States ex rel. Shaw v. De Robertis*, 755 F.2d 1279,

1281 (7th Cir.1985)). Second, the court held that the sentencing desires of the

victim's family constitute inadmissible victim-impact evidence under *Payne* and

*Booth*. *Id.* (citing *Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir.2005) (en

banc)). The court concluded that, under the Eighth Amendment, "the AUSA was

not permitted to advance an argument based on inadmissible victim impact

evidence." *Id*.[5]

In another federal capital prosecution, the government twice requested a

death verdict "on behalf of" the victim's family and urged:

- "Don't tell the [victim's] family that their son died because [the defendant] had some childhood issues."

*United States v. Bolden*, No. S1402CR557(CEJ), Tr. 3933, 3983, 3990 (E.D. Mo.).

On direct appeal, the Eighth Circuit held the comments to be "improper" argument,

"for which there was no supporting evidence." *United States v. Bolden*, 545 F.3d

609, 630 (8th Cir. 2008).[6]

- [Y]ou know what [the victim's family's] presence here is asking you to do. I think you should consider their wishes.

*Miller v. Lockhart*, 65 F.3d 676, 682, 685 (8th Cir. 1995) (argument improper

because no evidence introduced regarding the family's wishes); *see also Baer v.*

*Neal*, 879 F.3d 769, 785 (7th Cir. 2018), cert. denied, No. 18-287, 2018 WL

---

[5] The court declined to reverse, however, noting that: the improper statements were isolated; the jury was not likely mislead; the government's case was overwhelming; appellant had not demonstrated that the government's remarks were intentional; and, upon request of the defense, the district court instructed the jurors that it was the government that sought the death penalty and that the desires of the victim's family should not be considered. *Id.* at 362.

[6] The court declined to reverse, however, on plain-error review (where the defense had not timely objected). It noted that, upon defense request, the district court had instructed the jury not to speculate about the family's wishes, and concluded that the isolated comment had not substantially affected the defendant's rights. *Id.*

4257853 (U.S. Dec. 3, 2018) (In reversing district court's denial of habeas writ, Seventh Circuit noted that the prosecutor's statements regarding what the victim's family believed was the appropriate punishment for "justice" violated the law. The "comments were made without any admissible evidence and were made well before the penalty phase. His assertions that the [victim's] family wanted the death penalty were highly objectionable and could not be considered properly admitted evidence." *Id.* "While these comments alone might not have rendered [defendant's] trial fundamentally unfair, they constituted a piece of a broader pattern of problematic prosecutorial comments.")

4.  Inviting a Death Verdict on Behalf of the Victim or the Victim's Family

Similarly, the prosecution may not ask the jury to base a sentence of death on sympathy for the victim or the victim's family. The Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 827 & 830 n.2 (1991), permitted only a "glimpse" of the impact of a crime on the victims and their families. It did not permit jurors to consider the impact of the sentencing decision on the family or allow sympathy for the family to influence deliberations. This Court may not "condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision." *Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999); *see also United States v.*

17

*Rodriguez*, 581 F.3d 775, 803 (8th Cir. 2009) (direct review of federal death sentence; "improper" to appeal excessively to jurors' emotions through claim to "speak for" the victim). "The jury should make decisions based on the strength of the evidence, and not on raw emotion, though we recognize that some emotional influence is inevitable." *Wilson v. Sirmons*, 536 F.3d 1064, 1120 (10th Cir. 2008). "The State should not encourage the jury to impose the death penalty out of sympathy for the victims." *Le v. State*, 947 P.2d 535, 554 (Okla. Crim. App. 1997).

Examples of such improper argument include:

- "[B]ring back a death verdict out of love for the [victims and parents] of the world and the future and the past victims of [petitioner]."

*Moore*, 195 F.3d at 1172 & n.11.

- "I'm sorry that [defendant's] mother has to wait 20 minutes to see him in jail. But you know what? Ms. Dorn right over there, guess how long she gets to wait to see her son [the victim] . . . [t]he rest of her life, she gets to wait to see Richard."

*Wilson*, 536 F.3d at 1119.

- During penalty-phase closing argument, prosecutor asked the jury to return the death penalty on behalf of "[the victims] and myself."

*Nevius v. State*, 699 P.2d 1053, 1059 (Nev. 1985) (warning that "[w]ere the evidence of guilt and of the appropriateness of the death penalty in this case of a lesser order of magnitude, we may have had to reverse this judgment and sentence

18

on the ground of the serious and wholly unnecessary misconduct of the prosecutor"); *see also Cardona v. State*, 185 So. 3d 514, 522 (Fla. 2016) (vacated convictions and death sentence and remanded for a new trial because "[t]he prosecutor's use of 'justice for Lazaro' as the theme of the closing argument unquestionably crossed the line. The argument that the case is about 'justice' for the victim or the victim's family has been uniformly condemned."); *Williams v. State*, 188 P.3d 208, 230 (Okl. Crim. App. 2008) (condemning as "troubling" prosecution argument that "the jury would be devaluing and discrediting [the victim's] life if they did not assess the ultimate punishment"); *cf. United States v. Caro*, 597 F.3d 608, 625 n.17 (4th Cir. 2010) (in direct appeal of federal death sentence, suggesting, without deciding, that government's argument that a life sentence would tell the victim's parents that "their son's life was meaningless" might have been improper: "Because the decision whether to impose the death penalty should involve an individualized determination on the basis of the character of the individual and the circumstances of the crime, the government's comments about messages sent to anyone other than Caro might have been improper.") (citation and internal quotation marks omitted).

     5.  Invoking Comparative Justice in a Victim-Impact Argument

Comparative justice arguments regarding the victim have no place in a

courtroom. It is improper to say the victim had no rights or that a verdict vindicates a victim's rights, or to compare the victim's rights to the defendant's. *See, e.g., Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir. 1985) (*en banc*) ("[I]t is wrong to imply that the system coddles criminals by providing them with more procedural protections than their victims. A capital sentencing jury's important deliberation should not be colored by such considerations."), *vacated on other grounds*, 478 U.S. 1016 (1986). Such arguments impermissibly appeal to sympathy and burden the defendant's exercise of constitutional rights. *See Kemp*, 762 F.2d at 1411 (*citing Griffin v. California*, 380 U.S. 609 (1965)); *State v. Cockerham*, 365 S.E.2d 22, 23 (S.C. 1988).

- [Defendant] conducted a trial, much like the trial we are having here, in some ways, and in some ways, very far from it, because [the victim's] Constitutional Rights, and the rights to a trial by jury didn't do much for her that night, because on that night, he was her judge, he was her jury, and he was her executioner. And she didn't have the right to . . . be represented by a lawyer. She didn't have the right to have independent people on her jury. [The defendant] took care of all that.

*Cockerham*, 365 S.E.2d at 23.

Similarly it is "prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison." *Bland v. Sirmons*, 459 F.3d 999, 1028 (10th Cir. 2006). Such appeals improperly "make light of the

penalty of life in prison," *id.*, and constitute an impermissible appeal to sympathy for the victim, encouraging the jury to fail to consider mitigating evidence, *Le v. Mullins*, 311 F.3d 1002, 1015-16 (10th Cir. 2002). *See also Simpson v. Carpenter*, 2018 WL 6802636 at *26 (10th Cir. 2018) (Court wrote that "it is prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison [and the] statement here was an improper comment designed to stir the jurors' emotions and elicit sympathy for the victims." However, it did not reverse because of the "extensive aggravating evidence" presented to the jury); *Middleton v. McDaniel*, 386 P.3d 995 (Nev. 2016) ("While two of the challenged arguments were not improper, the third argument, which implied that Middleton deserved the same sympathy he showed the victims, was improper.")

In a federal capital prosecution under the FDPA, the Eighth Circuit held that the government transgressed this prohibition in its penalty-phase closing arguments. In that case, the government argued, *inter alia*,

- Those victims have been dead for 12 years. This defendant has lived for 12 years after being involved in the murder of 5 people. Ten years passes from now, and [the victims] will still be dead. Twenty years will pass while [the defendant is] living in prison, and [the victim] will still be dead. Thirty years from now, [one victim] will still be ten years old, and [the second victim] will still be six years old.

21

. . .

> No matter how small [defendant's] cell may be, it's going to be
> larger than the coffin that [the victims] are laying [sic] in now.

*United States v. Johnson*, 495 F.3d 951, 979 (8th Cir. 2007). On appeal, the Eighth

Circuit concluded that "[t]he prosecutor's comments in this case . . . went beyond

the bounds of permissible argument.": "Although the government was entitled to

respond to [the defense] portrait of a miserable thirty years behind bars, it should

not have used the victims' plights to do so." *Id.*

In another recent federal capital prosecution, the government argued:

- He [defense counsel] essentially asks you to send him
  [Johnson] to his room where he gets privileges, three
  squares, and the ability to have visitors. The only visitors
  that [the victim] will have come to his gravesite.

*United States v. Johnson*, 713 F. Supp. 2d 595, 631 (E.D. La. 2010). The district

court granted defendant's motion for a new sentencing hearing in part based on this

"inappropriate emotional appeal to impose the death penalty out of sympathy for

the victim." *Id.* at 27, 34.


Other examples condemned by courts include:

- "Maybe the Defendant will be in prison, maybe he will be
  behind that concrete and those jail bars with his T.V. and his
  cable and good food. But one thing . . . is for sure, [the

22

victim] won't be here and his family won't be able to be
with him, they won't be able to share holidays with him."

*Bland*, 459 F.3d at 1027.

- "Next year [defendant] will be a year older and [the victim]
  will be 34 years old from now to eternity.

      . . .

      "[D]o you really think that justice would be done if this
      man goes to prison, gets three meals a day and a clean
      bed every night and regular visits from his family while
      [the victim] lays [sic] cold in his grave[?]"

*Le,* 311 F.3d at 1014-16.

- Improper to ask whether it would be "justice [to] send this
  man down to prison, let him have clean sheets to sleep on
  every night, three good meals a day, visits by his friends and
  family, while [the victim] lies cold in his grave?"

*Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002).

- "[I]t is prosecutorial misconduct for the prosecution to
  compare the plight of the victim with the life of the
  defendant in prison [by stating]….[o]f course, [defendant's
  family] go to the penitentiary to see him. Of course they
  would. You know, they're good people. These victims can't.
  They can go to the cemetery.

23

*Simpson v. Carpenter*, 912 F.3d 542, 2018 WL 6802636 at * 26 (10th Cir. 2018).

It is also "blatantly impermissible" to ask the jury to "'show [a capital defendant] the same amount of mercy . . . that he showed'" the victim. *Urbin v. State*, 714 So. 2d 411, 421 (Fla. 1998) (reversing death sentence for such "'unnecessary appeal to the sympathies of the jurors,'" among other misconduct) (citation omitted). As the Third Circuit has observed, by "imploring the jury to make its death penalty determination in the cruel and malevolent manner shown by the defendants," the prosecutor improperly "directed" the jury "to passion and prejudice rather than to an understanding of the facts and of the law." *Lesko v. Lehman*, 925 F.2d 1527, 1545 (3d Cir. 1991) (citation omitted). Such an argument is a "thinly veiled appeal to vengeance" that "encourage[s] the jury to make a retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence." *State v. Bigbee*, 885 S.W.2d 797, 812 (Tenn. 1994)[7]; *see also*, *e.g.*, *Ferrell v. State*, 29 So. 2d 959, 997-98 (Fla. 2010) (affirming grant of new sentencing hearing, in part, because improper to argue "I'll leave you with one final thought, I'm going to ask you to show this Defendant the same sympathy, the same mercy he showed [the victim] and that was none."); *Rhodes v. State*, 547 So.

---

[7] *Superseded by statute on other grounds as stated in State v. Stout*, 46 S.W.3d 689 (Tenn.2001).

2d 1201, 1206 (Fla. 1989) (prosecutor improperly concluded his argument by urging the jury to show the defendant the same mercy shown to the victim on the day of her death).[8]

### 6. Invoking Comparative Worth in a Victim-Impact Argument

Nor may the prosecution compare the value of the victim's life with the life of the defendant. In *Hall v. Catoe*, 601 S.E.2d 335 (S.C. 2004), the Supreme Court of South Carolina granted post-conviction relief because trial counsel failed to object to the following argument from the prosecution's penalty-phase closing:

- I am talking about values, because a jury verdict is a statement of values. And I am not talking about dollars and cents as far as what the [lives of the two victims were] worth, but nevertheless it is a question of values. What are the lives of these two girls worth? Are they worth the life of this man, the psychopath, this killer who stabs and stabs and kills, and rapes and kidnaps.

*Id.* at 339. The court held that such argument violated *Payne* and granted the defendant a new sentencing hearing, concluding that the prosecutor's comparison

---

[8] In two recent cases, on plain error review, the Fourth Circuit found no error in government arguments comparing the defendant's rights to the victim's rights and asking the jurors to show the defendant the same measure of mercy that he had shown the victim. *United States v. Umana*, 750 F.3d 320, 353 (4th Cir. 2014); *United States v. Runyon*, 707 F.3d 475, 513 (4th Cir. 2013). The decisions are outliers, however. Neither addresses the cases from other courts that have universally condemned such arguments. More importantly, in neither did the Fourth Circuit recognize or address the burden such arguments impose on the defendant's exercise of his constitutional rights. "When specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristofor*, 416 U.S. 637, 643 (1974).

(1) was "so emotionally inflammatory that it became a material part of the jury's deliberation process"; (2) "unquestionably" directed the jurors to conduct an arbitrary balancing of worth, "which required that Hall be sentenced to death if the jury found Hall's life was worth less than the lives of his victims"; (3) was "totally unrelated to the circumstances of the crime"; and (4) was "distinguishable from traditional impact evidence in that it was not actually offered to show the impact of the crime on the victims or the victims' family." *Id.* at 340. *See also Humphries v. Ozmint*, 397 F.3d 206, 222-23 (4th Cir. 2005) (*en banc*) (agreeing that, in *Hall*, "a direct 'value' comparison between the defendant and the victim . . . rendered his trial fundamentally unfair in violation of due process," but finding no comparable comments in Humphries' case).

In a federal capital prosecution, the government argued that

- Failure to impose a sentence of death is a statement that his [Johnson's] life is worth more than the victim he annihilated – in fact, the two victims he annihilated.

*United States v. Johnson*, 713 F. Supp. 2d 595, 630 (E.D. La. 2010). The district court granted the defendant's motion for a new sentencing hearing based in part on the government's inappropriate "call for the death penalty in order to affirm that the victim's life was worthier than that of the 'evil' defendant was error, and an improper and inflammatory appeal to juror passion and emotion." *Id*. at *27, 34;

26

*see also*, *e.g.*, *Wheeler v. State*, 4 So. 3d 599, 610-11 (Fla. 2009) ("To the extent that the prosecutor's argument urged the jury to compare the worth of the life of the victim against that of Jason Wheeler, the argument is erroneous"); *State v. Rizzo*, 833 A.2d 363, 419-20 (Conn. 2003) (reversing where prosecutor's argument might have been understood as an appeal to weigh the victim's life against the defendant's, which would have been inflammatory and improper); *State v. Koskovich*, 776 A.2d 144, 182 (N.J. 2001) (urging jurors to "balance the victim's background against [the defendant's] was akin to asking the jury to compare the worth of each person," which is "inherently prejudicial" and "might prompt jurors to impose the death penalty arbitrarily"); *State v. Muhammad*, 678 A.2d 164, 179 (N.J. 1996) ("[v]ictim impact testimony may not be used . . . as a means of weighing the worth of the defendant against the worth of the victim"); *State v. Storey*, 901 S.W.2d 886, 902 (Mo. 1995) (prosecutor's argument, "Whose life has more value? The Defendant's or Jill Lynn Frey's?" was misleading and improper).

7. Inviting the Jurors to Experience the Crime Vicariously

Another form of improper victim-impact argument invites the jurors to step mentally into the place of the victim. This forensic device wields great emotional power. It is also wholly and universally disallowed. *See, e.g., Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008) (prosecution may not urge jurors to identify

individually with the victims with comments like "[i]t could have been you" the

defendant killed or "[i]t could have been your children"); *Wilson v. Sirmons*, 536

F.3d 1064, 1119-20 (10th Cir. 2008) (improper to ask the jury to put themselves

"in the victim's shoes"); *Hodge v. Hurley*, 426 F.3d 368, 384 (6th Cir. 2005)

("highly improper" for prosecutor to ask jury to try to "put [itself] in the place of

someone that might run into [defendant] at night"); *Boyle v. Million*, 201 F.3d 711,

715, 717 (6th Cir. 2000) (granting habeas relief based, in part, on numerous

statements urging jurors to identify with the victim and the victim's family and

neighbors); *Roberts v. Delo*, 205 F.3d 349, 351 (8th Cir. 2000) (condemning

"golden rule" argument: "This Court has held it is improper for a prosecutor to ask

jurors to put themselves in the place of the victim."); *Shurn v. Delo*, 177 F.3d 662,

665, 667 (8th Cir. 1999) (personalized analogy to the jurors' self-defense of their

own children); *Newlon v. Armontrout*, 885 F.2d 1328, 1336, 1342 (8th Cir. 1989)

(same); *United States v. Teslim*, 869 F.2d 316, 328 (7th Cir. 1989) (noting that so-

called "Golden Rule" argument is "universally" condemned); *Mathis v. Zant*, 744

F. Supp. 272, 275-76 (N.D. Ga. 1990) ("urging jurors if they looked at pre-autopsy

pictures of the murder victims they would see images of their own parents"),

*vacated in part on other grounds*, 975 F.2d 1493 (11th Cir. 1992); *Commonwealth*

*v. Rutherford*, 476 Mass. 639, 646 (2017) (holding, in an appeal of conviction for

first-degree murder, that the prosecutor "ask[ing] the jurors to imagine the victim crawling down into his basement to die" was "inappropriate and impermissible, exceeding the bounds of zealous argument" because it "drew an improper inference that unfairly invited the jury to decide the case based on sympathy for the victim" and "[t]he jury should not be asked to put themselves 'in the shoes' of the victim, or otherwise be asked to identify with the victim."); *People v. Seumanu*, 355 P.3d 384, 422 (Cal. 2015) ("As is apparent, the prosecutor's argument improperly asked the jury to view the crime through [victim's] eyes. We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt."); *Lawson v. State*, 886 A.2d 876, 890 (Md. 2005) ("When a jury is asked to place themselves in the shoes of the victim, the attorney improperly appeals to their prejudices, and asks them to abandon their neutral fact finding role."); *State v. Rhodes*, 988 S.W.2d 521, 528-29 (Mo. 1999) (*en banc*) (setting aside death sentence because prosecutor asked jurors "to imagine themselves in the place of the victim experiencing every detail of the crime"); *Urbin v. State*, 714 So. 2d 411, 419 (Fla. 1998) ("placing the jury in the position of the victim and having them imagine their pain"); *Wells v. State*, 698 So. 2d 497, 507 (Miss. 1997) (asking jurors to imagine their children as the victim);

29

*Witter v. State*, 921 P.2d 886, 899 (Nev. 1996), *abrogated in part on other grounds, Byford v. State*, 994 P.2d 700 (Nev. 2000); *State v. Storey*, 901 S.W.2d 886, 901 (Mo. 1995) ("Asking the jury to 'put themselves in [the victim's] place,' then graphically detailing the crime as if the jurors were the victims, could only arouse fear in the jury. This argument was grossly improper."); *Dean v. Commonwealth*, 777 S.W.2d 900, 904 (Ky. 1989) (prosecutors may not "sensationaliz[e] [a] victim's suffering," for instance by rhetorically asking: "Can you imagine the fear that went through the life of [the victim] on this day? . . . Can you imagine the fear and embarrassment . . . the terror . . . the humiliation?"), *overruled on other grounds*, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003); *Garron v. State*, 528 So. 2d 353, 358-59 (Fla. 1988) (reversing first-degree murder conviction and death sentence, in part, because the prosecutor invited the jurors to imagine themselves in the place of the victim); *People v. Spreitzer*, 525 N.E.2d 30, 45 (Ill. 1988) (asking jurors to put themselves "in the shoes" of the victim and imagine her feelings); *Bertolotti v. State*, 476 So. 2d 130, 133 (Fla. 1985) (prosecutor urged the jury to place themselves in the position of the victim and imagine the victim's "final pain, terror and defenselessness").

"Imagine you're the victim" arguments are improper for several reasons. First, putting thoughts and words "in the victim's mouth" tends to "unduly create,

30

arouse and inflame the sympathy, prejudice and passions of the jury." *Urbin*, 714 So. 2d at 421 (citation omitted). This induces jurors to improperly decide the case based on these overwhelming passions rather than on a "reasoned moral response" to the aggravating and mitigating factors. *Penry v. Johnson*, 532 U.S. 782, 788 (2001). *See Storey*, 901 S.W.2d at 901 (asking jurors to imagine themselves as the victim "could only arouse fear in the jury" and thus was "grossly improper").

Second, these arguments encourage jurors to experience the crime as the victim or a relative of the victim did. Thus, to the extent they encourage any view of the evidence, other than just an overwhelming emotional response, it is the biased view of a participant rather than the disinterested outsider that each juror should be. *See Fields v. Woodford*, 309 F.3d 1095, *as amended*, 315 F.3d 1062 (9th Cir. 2002) ("think of yourself as [the victim]" argument "inappropriately obscure[s] the fact that [the prosecutor's] role is to vindicate the public's interest in punishing crime, not to exact revenge on behalf of an individual victim") (*citing Drayden v. White*, 232 F.3d 704, 712-13 (9th Cir. 2000)). A prosecutor may not ask jurors to place themselves in the shoes of the victim because "a juror doing that would be no fairer judge of the case than the party or victim herself." *Rhodes*, 988 S.W.2d at 527 (citation omitted). *See also Mathis*, 744 F. Supp. at 275 n.4 (improper to ask jurors to imagine their parents as the victim, since such a juror

31

would have been disqualified); Keck v. State, 2015 WL 1880587 at *4 (Sup. Ct. Nev. Apr. 21, 2015) (Prosecutor's argument in summation entreating jurors to imagine the future wedding day of deceased victim's son was improper. Arguments "touching upon the absence of a murdered loved one on holidays or important life events such as a wedding serve only to appeal to jurors' emotions rather than guiding jurors to legitimate sentencing considerations."); *State v. White*, 144 S.E.2d 481, 483 (S.C. 1965) (asking jurors to imagine their loved ones as the victim removed "the necessary element of impartiality" from capital sentencing decision). Finally, arguments in which a prosecutor purports to recreate the deceased victim's thoughts and feelings as the crime unfolded are nothing more than "gross speculation." *Combs v. Coyle*, 205 F.3d 269, 292-293 (6th Cir. 2000). *See also Land v. Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009) (where no direct evidence of events at victim's home, improper for prosecution invite the jurors to speculate on interactions between defendant and victim; "The prosecutor exceeded the bounds of appropriate conduct by claiming to describe exactly what happened, and particularly what was said, with such specificity."); *United States v. Rodriguez*, 581 F.3d 775, 803 (8th Cir. 2009) (direct review of federal death sentence; government asking jurors to imagine the victim's "raw fear of what would be her fate as the Defendant drove her into the night" was impermissible because

government introduced no evidence of the victim's fear); *Urbin*, 714 So. 2d at 421

(prosecutor "went far beyond the evidence in emotionally creating an imaginary

script demonstrating that the victim was shot while 'pleading for his life'").

Speculating about matters not in evidence is a quintessential form of prosecutorial

misconduct. *See* Section 27, *post*.

Examples of forbidden golden-rule argument include:

- I have a very personal interest in this case and I suppose that is why I am here today. Little Bob Bell, twelve years old, started out in the first grade at Burton School with my twelve year old daughter. They started, they have gone through school together. Burton School, Stokes School, would have gone to John Trotwood Moore together this year. It could have been my little girl that was in that store, a witness eliminated. It could have been you. It could have been your children. It could have been any one of us, if we decided that we wanted to buy something from Bob Bell, at nine fifty-eight on July 5, 1980, we would have been dead.

*Johnson*, 525 F.3d at 484.

- [P]ut [yourselves] in the victim's shoes. Each and every day you get up, you put on your clothes, and you go to work. You tie your shoes, you get off-you get off to work, you kiss your wife and your kids, if you have any, goodbye. And you don't know what the day might bring. You only have hope. And he left that particular night, on the 25th, hoping it to be just like an ordinary day in terms of what he would do. He didn't have the chance to tell Angela goodbye. He didn't have the chance to tell his two sons goodbye. . . . And if you find this man guilty, I submit to you he'll have more than 2 minutes and 11 seconds to ponder his death, much more than

33

Richard Yost.

*Wilson*, 536 F.3d at 1119.

- Now, the most important single fact that you need to think about right now, and what I want to ask you to think about right now, is you're at home, any of these homes; you're at home at the Tidwells' house, the Millers' house, or the Pitmans' house. It's an ordinary night. Nothing different is going on. You're just at home. 'Cause these people were selected at random. These three people were selected at random by the defendant. They were selected the same way you all were; just like you were selected at random through the process; they knew not that they were going to be caught up in this huge conflict. They knew not that they were going to be drug [sic] into court some day and asked all these questions. They were selected at random by this man. Now, that makes them exactly like you, in a way.

*Boyle*, 201 F.3d at 715.

- Can you imagine the dread of knowing that your life is ending and you're feeling pain all over your body as it's bleeding internally from all of these injuries, the pain and suffering of feeling the penetration, feeling the tearing and ripping of sensitive tissue . . . . And that pain would have been exponentially greater for a little girl, a little, innocent girl.

*Ritchie v. State*, 344 So. 3d 369, 380 (Fla. 2022), *reh'g denied*, No. SC20-1422,

2022 WL 3593821 (Fla. Aug. 23, 2022).

        8.  Inflaming the Jurors' Fears for Their Own Safety or That of Others Close to Them

Similarly, it is improper for the government, in urging a death sentence, to

incite the jurors' fears for their own personal safety or that of their families or

neighborhoods. "[I]nvoking a jury's general fear of crime to encourage the

application of the death penalty in a particular case is unfairly inflammatory."

*Weaver v. Bowersox*, 438 F.3d 832, 841 (8th Cir. 2006), *cert. dismissed sub nom.*,

*Roper v. Weaver*, 550 U.S. 598 (2007).

Thus, courts have condemned as improper arguments such as the following:

- A lot of times you'll hear people talking about the horrible
  things that happen in the community—"When are they
  going to do something about that?" Well, ladies and
  gentlemen, you are now they. When it comes to Rejon
  Taylor, you are the ones that have to do something about it.
  You are the ones who have the obligation to be the sheep
  dog that protects the sheep, and even sometimes the wolves,
  from the wolf.

*United States v. Taylor*, 814 F.3d 340, 389 (6th Cir. 2016). Judge White,

concurring in part and dissenting in part, noted that "[a]lthough [defendant] did not

object to this part of the prosecutor's argument and does not raise an issue on

appeal, the prosecutor's argument was improper and should not be repeated." *Id.*

- [O]n January the 8th, 1987, the evil one appeared at the door
  of 351 Hampshire Drive, a home not unlike yours in a
  neighborhood not unlike yours . . . . Yes, whether you like it
  or not—whether you volunteered or not, you are engaged in
  the ultimate battle in everyday combat with the evil one, and
  he's not going to go away. . . . You have got to destroy and
  destroy, or he and his benefactors will destroy you. He'll
  destroy us. He'll destroy our children. . . . [S]end a message

35

that we stand ready—armed, and ready to fight for all in the world, for everything that you believe in, for the sanctity of your home, the blessing of seeing your children reach adulthood and have your grandchildren, and you will take a step and leave a legacy to your children that they someday will not have to grapple with what the Smiths had to deal with and what Karen Rivetna and her mother have to deal with.

*Cauthern v. Colson*, 736 F.3d 465, 475, 477 (6th Cir. 2013) (granting habeas relief because of misconduct in prosecution's sentencing rebuttal argument, including encouraging "the jury to personally identify with the victims, and to feel as though failing to return sentence of death would endanger the families of the jury").

- The prosecutor began his closing at the penalty phase by referring to a "television news report . . . about gangs in Los Angeles" and stating that "members of the street gangs were murdering each other" in a violent fight for turf. The prosecutor then went on to state that the gang shootings made his "blood boil," and that this case made him want to "weep and cry" because it was "the same thing, right here in our backyards."

*Copeland v. Washington*, 232 F.3d 969, 972-73 (8th Cir. 2000) (affirming grant of habeas relief based, in part, on prosecutorial misconduct: "This was the sort of argument that would result in 'mob justice' rather than result in a reasoned deliberation.").

- The prosecutor argued that jury would be taking "terrible risk" if it sentenced defendant "to life imprisonment with him having escaped once already."

36

*Miller v. Lockhart*, 65 F.3d 676, 682 (8th Cir. 1995) (affirming grant of habeas

relief based on prosecutorial misconduct).

- "You live in this community. Your family goes to school in this community. Your wife attends the grocery store in this community. Your children attend the baseball games and the football games in this community. Your daughter is a cheerleader in this community. In your hands lies the safety of not only your family but the family of every other member of [this county] from the hands, the violent hands of the defendant in this case."

*Mathis v. Zant*, 744 F. Supp. 272, 275-76 (N.D. Ga. 1990) (granting habeas relief

in part based on prosecution's improper penalty-phase closing argument),

*judgment vacated in part on other grounds*, 975 F.2d 1493 (11th Cir. 1992).

9. Suggesting Jurors Will Bear Responsibility for Future Acts of Violence

It is one thing to ask jurors to make a reasoned determination about the

likelihood that a defendant will commit serious acts of violence in the future. It is

quite another to suggest that a vote for life will make them personally complicit in

such an act: To quote one AUSA's argument, "if you, the jurors," make the

mistake of being "willing to assume" the "risk" of letting the defendant live, the

result will be "another victim in the future that didn't have to die."[9]  Such an

---

[9] *See United States v. Wilson*, No. 1:04-cr-01016-NGG, Tr.1641 (E.D.N.Y. Jan. 29, 2007). On appeal, the Second Circuit, which reversed defendant's death sentences and remanded for a new sentencing hearing because of other

argument cannot help but galvanize the jurors' fears, and encourage a future-danger finding — and a resulting death verdict — on impermissibly emotional grounds.

A prosecutor may argue that the defendant poses a future danger: "What are prohibited are arguments which directly or by implication, place responsibility on the jury for the deaths of unknown future victims." *State v. Schoels*, 966 P.2d 735, 749 (Nev. 1998); *see also id.* at 739-40 (in future danger argument, prosecutor improperly "suggested, at least by strong implication, that the jury would be responsible for the deaths of future innocent victims if a death penalty verdict was not returned").

Thus, such arguments have been condemned:

- By permitting this man to live, we in essence become an accomplice. We have assisted him in his criminal undertaking. If you, based on the law and the facts of this case, choose not to execute the defendant, you have passively issued a warrant of execution for someone else. We don't know who it is. We don't know when it will take place; but ladies and gentlemen, I think you can see from the proof in this case that the only thing that will be left out of that warrant of execution that someone else is to receive, if this man lives, is the name of the victim and the date that it takes place. . . . *Where is fundamental fairness in that, to let this man live and, in essence, to sentence someone else to*

---

instances of prosecutorial misconduct during penalty-phase summations, did not address the AUSA's statements set out above.

> *die? If he goes to the state penitentiary under a life sentence
> and he is permitted to be among the general population in
> the facility where he is going to be housed, by your actions
> of voting for life for him, you are voting for death for
> someone else.* Where is the fairness? Where is the justice in
> permitting him to go down and execute some individual who
> is in the penitentiary for grand larceny? Grand larceny never
> has been and never will be a capital crime in this state. Sure,
> the men in the penitentiary are criminals, and some of them
> have committed the act of grand larceny or some other
> felony offense. Sure, he has an obligation to serve a
> sentence. He must be punished, but he doesn't deserve the
> death penalty. Don't let Bates be his executioner.
>
> . . .
>
> There are other people in the penitentiary system that
> deserve our protection: the administrative staff there, the
> guards. . . . *Please don't vote for life for [the defendant]
> and death for them.*

*Bates v. Bell*, 402 F.3d 635, 642 (6th Cir. 2005) (emphasis in original); *see also id.*

at 644, 648-49 (granting habeas relief based, in part, on this prosecutorial

misconduct, which the court deemed an improper "appeal to the fears of individual

jurors and to emotion").

- Can we be guaranteed that for the next 30 or 40 years, a
person who is sitting in prison the rest of his life is not going
to flare up and get angry at a guard, like he did [when
housed at prior detention facility]. . . . So the question is
simply this: Do we execute a person who has killed not
once, but two times, or do we risk the execution of some
very innocent people?

*Sherman v. State*, 965 P.2d 903, 914-15 (Nev. 1998).

39

- And let's say you fall for that fraud [the defense] and you say well, gee, I just can't bring myself to do what I should do, and I am going to impose life without parole. You don't die in prison of old age. People get out. Now, are you prepared to risk the life of some other person or child by giving him the opportunity to get out? That will be your risk. That will be your burden.

*Sechrest v. Ignacio*, 549 F.3d 789, 808, 811 (9th Cir. 2008) (argument improperly

inflamed the passions of the jury).

- [Y]ou are the only people in the entire world that can stop [the defendant] from killing. . . . The next victim . . . will be on your conscience.

*Tucker v. Kemp*, 762 F.2d 1496, 1508, 1509 (11th Cir. 1985) (*en banc*)

(condemning "inflammatory" remarks).

- There is a plaque outside of the holocaust museum in Washington, D.C., [which] says the following, "thou shalt not be a victim"

*State v. Schierman*, 438 P.3d 1063, 1134 (Wash. 2018) (finding improper

prosecutor's references to the Holocaust, analogizing the victims' murders to

Holocaust victims and implying that anything less than a death sentence would

make jurors complicit bystanders).

10. Portraying Jurors as an Arm of Law Enforcement

Relatedly, the jury is not "an arm of the prosecution." *Williams v. State*, 522

So. 2d 201, 209 (Miss. 1988). The function of the jurors is "impartial arbitration

40

between the defendant and the government," not "law enforcement." *United States v. Caro*, 597 F.3d 608, 626 (4th Cir. 2010) (direct appeal of federal death sentence); *see also Cargle v. Mullin*, 317 F.3d 1196, 1222-23 (10th Cir. 2003) ("extremely improper" for prosecutor to suggest to jurors they "are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant"); *Weaver v. Bowersox*, 438 F.3d 832, 840-41 (8th Cir. 2002) (argument that the death penalty was "necessary to sustain a societal effort as part of the 'war on drugs'" is improper as it "prevents an individual determination of the appropriateness of capital punishment," and is "unfairly inflammatory" because it "invok[es] a jury's general fear of crime to encourage the application of the death penalty in a particular case") (citations omitted); *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky. 2005) ("[T]he Commonwealth . . . is not at liberty to place upon the jury the burden of doing what is necessary to protect the community.") (citation omitted); *State v. Smith*, 554 So. 2d 676, 684 (La. 1989) ("[I]t is highly improper and prejudicial for a prosecutor to turn his argument to the jury into a plebiscite on crime or to refer to the consequences to society of the jury's verdict."), *overruled in part on other grounds*, *State v. Taylor*, 669 So. 2d 364 (La. 1996).

In *Caro*, the government, during its penalty-phase closing, had stressed that

41

only a death sentence could "control" the defendant. Particularly, the government

indicated that a death sentence should be imposed because the BOP would not

secure the defendant adequately to prevent future violence. After urging that the

BOP system is not "fail-safe," the government urged, "There is one thing that we

can do." 597 F.3d at 625. It continued, "[W]hat is the way that we can deter Carlos

Caro? When I say we, this is something I can't do, the judge can't do it, because

the question of the death penalty, ladies and gentlemen, is left exclusively to you,

the jury. It's your decision." *Id.* The government concluded:

- So, ladies and gentlemen, we now come to you. You're it.
  I'm the United States Attorney, powerless to control Caro.
  United States District Judge, federal judge, powerless to do
  it. The law allows one last option, and that is you. And only
  you. Judge Jones will do what you say. You go back there
  and find a unanimous verdict for life, that's what he will
  impose. You find death, that's what he'll do. The authority
  and the responsibility for the control of Carlos David Caro is
  in your hands. We have done all we can do. And so we come
  to you.

*Id.*


On appeal, the Fourth Circuit held that the government's arguments were

"troubling," in part because "calling upon the jury to 'control' Caro gives them a

role more akin to law enforcement than to impartial arbitration between the

defendant and government," *id.* at 626 (*citing United States v. Young*, 470 U.S. 1, 18 (1985)), but declined to reverse, concluding that the government's remarks had been isolated, were counterbalanced by court's instructions, and that the evidence of future danger was strong, *id.* at 626-27.

In *United States v. Umana*, 750 F.3d 320 (4th Cir. 2014), a federal capital prosecution, the defendant had attempted to smuggle a shank into the courtroom. In sentencing summation, the government argued that he had done so "to fight off his rivals." The prosecutor continued,

> You know who the rivals were? They're the Marshals. Those are his rivals. The judge is his rival. I'm his rival. Anybody in this courtroom is a rival. You're his rival. He brought it on the first day of jury selection.

*Id.* at 351. On appeal, the Fourth Circuit agreed that the "you're his rival" comment was improper because "it encouraged the jurors to abandoned their role as 'neutral adjudicators' and become 'interested parties.'" *Id.* (citing *United States v. Manning*, 23 F.3d 570, 574 (1st Cir. 1994) and *Caro*, 597 F.3d at 626). The court affirmed, notwithstanding the misconduct, concluding that the isolated comment was not likely material to the death verdict. *Id.*

Other examples of such improper argument include:

- Ladies and gentlemen, you the jury, [assistant district attorney] Mrs. Smith and me, and the police, all fulfilled

> their roles in this case because that's our duty. . . . [T]his
> defendant . . . committed a crime so vile, so vicious, so
> despicable, so unnecessary that the death penalty is the only
> answer. Sure your job is hard, but you can do it. Only you
> can do it. The police department has done all that it can do.
> When I sit down, Mrs. Smith and I will have done all that
> we can do. Only the 12 of you can finish the job by going up
> in that jury room and bringing back a verdict of death.
> Unless you do that, the efforts of the police department and
> my office have all been in vain.

*Cargle*, 317 F.3d at 1122-23 (condemning "this extremely improper argument,

suggesting that the "improper jury argument may very well have been so

prejudicial in itself as to render the penalty-phase proceedings fundamentally," and

granting habeas relief because, when considered with the other errors at the

sentencing stage, the court had "no difficulty finding cumulative error").

- Ladies and gentlemen, opposing counsel has tried to make
  this appear as the Great State of Mississippi against the
  Defendant. Sure, this case is styled, State of Mississippi
  versus Fulgham, but who is the State of Mississippi? It's the
  people, and you represent the people. And, you apply the
  laws. In essence, you become law enforcement personnel
  today.

  > You are law enforcers from the standpoint that you are
  > the final decision makers and you apply the laws that the
  > Court has instructed you on. Now, I'd like to compare
  > our criminal justice system to a chain. Now, we've all
  > heard the expression that a chain is no stronger than its
  > weakest link. There are several chains here. You have the
  > first link, law enforcement. Law enforcement has done its
  > job. The next link, although it means nothing here, is the

44

grand jury. The grand jury has indicted him. You will not consider that fact, but that link is in the chain. It's strong. The prosecution is another link. We have to prosecute. Then, we get to the final link and that's the jury. And, I emphasize that the chain is no stronger than its weakest link.

*Fulgham v. State*, 386 So. 2d 1099, 1101 (Miss. 1980) (argument "went too far" and should be omitted on retrial).

11. Suggesting Jurors Must Impose Death to Prevent Incompetence or Mistakes of Other Actors

The government may not ask the jury to impose death in order to forestall the possibility that courts or prison officials, at some date in the future, may err. "Neither the future diligence of an appellate court nor the possibility of future incompetence of corrections and parole personnel should be invoked to alter the jury's perception of its role at capital sentencing." *Tucker v. Kemp*, 762 F.2d 1496, 1508 (11th Cir.1985) (*en banc*); *cf. Darden v. Wainwright*, 477 U.S. 168 (1986) (holding that prosecution acted improperly in arguing, in a case where defendant committed the murder while out on weekend furlough, "I will ask you to advise the Court to give him death. That's the only way that I know that he is not going to get out on the public. It's the only way I know. It's the only way I can be sure of it. It's the only way that anybody can be sure of it now, because the people that turned him loose.").

45

In *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010), a federal capital prosecution, the government, during its penalty-phase closing, had stressed that only a death sentence could "control" the defendant. Particularly, the government indicated that a death sentence should be imposed because the BOP would not secure Caro adequately to prevent future violence: "[C]an he be controlled in the Bureau of Prisons? I suspect the answer to that question is no. . . . The reason he can't be controlled is because the system is not failsafe." 597 F.3d at 625. Responding to a defense expert's testimony that during a life sentence the defendant would be incapacitated at Florence ADMAX until the BOP found him no longer dangerous, the government remarked: "[W]hat about this classification system that the BOP has? The question is can we rely on the BOP to send Caro to a place where he won't kill? . . . [W]e know that the system for classification is not failsafe." *Id.*

On appeal, the Fourth Circuit held that the government's arguments were "troubling." Noting that the defendant is entitled to "an individualized determination on the basis of the character of the individual and the circumstances of the crime," *id.* at 626 (quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983), the court explained that, by contrast, "[t]he suggestion that the BOP would not secure Caro adequately to prevent future violence implicates policy and resource

46

considerations that are quite different," *id.* (*citing Tucker*, 762 F.2d at 1508).

12. Asking the Jurors to Send a Message

At sentencing, the jurors must undertake "an individualized determination on the basis of the character of the individual and the circumstances of the crime," *United States v. Caro*, 597 F.3d 608, 625 n.17 (4th Cir. 2010) (direct appeal of federal death sentence) (*quoting Zant v. Stephens*, 462 U.S. 862, 879 (1983)).[10] Appeals to the jurors to impose a sentence of death in order to "send a message" "impinge on upon the jury's duty to make an individualized determination that death is the appropriate punishment for the defendant" and, thus, are improper. *Sinisterra v. United States*, 600 F.3d 900, 910 (8th Cir. 2010) (post-conviction challenge to federal death sentence); *see also United States v. Runyon* 707 F.3d 475, 514-15 (4th Cir. 2013) (direct appeal of federal death sentence, "send a message" argument improper because it "invites [the jury] to play to an audience beyond the defendant—to use its decision not simply to punish the defendant, but

---

[10] *See also*, *e.g.*, *Jones v. United States*, 527 U.S. 373, 381 (1999) ("In order for a capital sentencing scheme to pass constitutional muster, it must perform a narrowing function with respect to the class of persons eligible for the death penalty and must also ensure that capital sentencing decisions rest upon an individualized inquiry."); *Buchanan v. Angelone*, 522 U.S. 269, 274-75 (1998) (referring to "the Eighth Amendment requirement of individualized sentencing in capital cases"); *Romano v. Oklahoma*, 512 U.S. 1, 7 (1994) ("States must ensure that 'capital sentencing decisions rest on [an] individualized inquiry,' under which the 'character and record of the individual offender and the circumstances of the particular offense' are considered.") (*quoting McCleskey v. Kemp*, 481 U.S. 279 (1987)); *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) ("We have held that a capital sentence is cruel and unusual under the Eighth Amendment if it is imposed without an individualized determination that that punishment is 'appropriate [.]' ") (*citing Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)).

47

to serve some larger social objective or to seek some broader social approval as well"); *Weaver v. Bowersox*, 438 F.3d 832, 841 (8th Cir. 2006) ("send a message" argument puts an "improper burden on the defendant because it prevents an individual determination of the appropriateness of capital punishment"), *cert. dismissed sub nom., Roper v. Weaver*, 550 U.S. 598 (2007); *Commonwealth v. De Jesus*, 860 A.2d 102, 116 (Pa. 2004) (same, reversing death sentence; such arguments "invite[] jurors to ignore their sworn duty to decide the matter exclusively upon the facts presented concerning the weighing of specific statutory aggravating and mitigating circumstances"); *cf. Caro*, 597 F.3d at 625 n.17 (direct appeal of federal death sentence; suggesting, without deciding, that, "the government's comments about messages sent to anyone other than Caro might have been improper" in violation of defendant's right to an individualized sentencing determination).

"Send a message" arguments also improperly "encumber an individual defendant with the responsibility for the nation's . . . problems, in addition to the defendant's personal crimes and misdeeds." *Sinisterra*, 600 F.3d at 910; *see United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992) (same).[11]  Similarly, the

---

[11] *See also*, *e.g.*, *United States v. Solivan*, 937 F.2d 1146, 1153-54 (6th Cir. 1991) ("[G]overnment prosecutors are not at liberty to urge jurors to convict defendants . . . to send messages to all drug dealers. Such appeals are extremely prejudicial and harmful to the constitutional right to a fair trial."); *United States v. Reliford*, 58 F.3d 247, 251 (6th Cir. 1995) ("The jury may not convict the accused in order to send a message to the public or the

48

prosecution "puts too significant a burden on a single defendant" when it "instructs the jury to . . . send a message from one case to another." *Sinisterra*, 600 F.3d at 910; *see also Weaver*, 438 F.3d at 841.[12]  Moreover, "send a message" constitutes an improper "emotional appeal calculated to persuade the jury to decide the case on other than the facts before it." *United States v. Lee*, 743 F.2d 1240, 1253 (8th Cir. 1984).

Courts have, accordingly, condemned "send a message" in penalty-phase summations:

- [I]f you make it loud and clear that the community will not tolerate this conduct, the community will not tolerate a man dying because of money, will not tolerate people entering banks with firearms and killing people trying to protect us, if you make that crystal clear, it may save the next Bryan Hurst.

---

community at large; they may not hold the defendant responsible for the crimes of others.").

[12] *See also, e.g.*, *People v. Johnson*, 803 N.E.2d 405, 420 (Ill. 2003) (denouncing "send a message" arguments because such arguments inject matters that have no real bearing on the case and "incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation"); *Hunter v. State*, 684 So.2d 625, 637 (Miss. 1996) (court has "repeatedly" cautioned jurors not to use "send a message" argument: "The function of the jury is to weigh the evidence and determine the facts. . . . [J]urors are not [messengers]."); *State v. Rose*, 548 A.2d 1058, 1093 (1988) ("By urging the jury to sentence defendant to death in order to deter him from future acts of violence and to 'send a message' to society that conduct such as defendant's will result in the death penalty, the prosecutor's arguments focused the jury's attention on matters extraneous to the aggravating and mitigating factors established by the Legislature to channel the jury's deliberations in the penalty phase of a capital case. Neither the likelihood that defendant would commit future crimes nor the benefit to society from sentencing to death persons convicted of capital murders is among the aggravating factors set forth in the Act. The emotional force of the prosecutor's arguments posed a significant risk that the jury would be diverted from its duty to determine defendant's punishment based on the evidence and in accordance with the trial court's charge. We conclude that these statements were improper and prejudiced defendant's penalty-phase proceeding.")

*United States v. Lawrence*, 735 F.3d 385, 432 (6th Cir. 2013). On direct appeal of a

federal capital conviction, the Sixth Circuit observed that the government's

remarks "may have skirted the line of impropriety": "[B]y invoking the need to

protect community values and deter criminal conduct by others and by asking the

jury to communicate messages to [the victim's] family, the police community and

the community in general, the prosecutor invited the jurors to consider arguably

irrelevant factors." *Id.* at 433.[13]

- It is time to turn the tables on drug traffickers like this
  defendant. Finish the message that you began with your
  verdict of guilt in this case. Tell this defendant and those
  like him that murder will not be tolerated especially murder
  committed to further drug trafficking schemes.

  …

  German Sinisterra believes by his actions that murdering
  couriers over a drug debt is just part of doing business.
  Tell him he's wrong and tell the other drug traffickers of
  the world if they come to Kansas City they are going to
  be dealt with in the most severe way, they are going to
  receive a sentence of death.

*Sinisterra*, 600 F.3d at 910.

- It strikes right at the heart of our system. You've got to look
  beyond William Weaver. This isn't personal. This is
  business. . . . You have to tell the Williams Weavers and the

---

[13] The Court, however, declined to reverse, finding the comments did not amount to flagrant misconduct and did not render Lawrence's sentencing fundamentally unfair. *Id.*

Daryl Shurns of the world, and you have to be willing to look them right in the eye when you do it, that there's a point at which we won't allow you to go. And when you do, prison's too good. It's the death penalty.

. . .

And I'm going to beg you for the entire community and for society not to spare his life. I'm going to beg you for the right message instead of the wrong message. The right message is life? For an execution? That's the right message? That's the message you want to send to the drug dealers, the dope peddlers and the hit men they hire to do their dirty deeds: Life in prison is what you get when we catch you and convict you. Life in prison? That's the message you want to send to the scum of the world? That when we catch you and we're convinced you're guilty, we're going to give you life in prison? That's not the right message.

. . .

The message has to be death for these types of people. That's the only message they are going to understand.

The one thing you've got to get into your head, this is far more important than William Weaver. This case goes far beyond William Weaver. This touches all the dope peddlers and the murderers in the world. That's the message you have to send. It doesn't just pertain to William Weaver. It pertains to all of us, the community. They are our streets, our neighborhoods, our family. The message is death, not life. And you've just got to geer [sic] yourself to that.

*Weaver*, 438 F.3d at 836-37, 840.

- He has shown you again and again that he hurts people because he likes to and he wants to, and he has earned the

right to be on death row. *When you think of the death penalty, there are messages to be sent. There's a message on the street saying, look at that, he got death, you see that, honey, that's why you live by the rules, so you don't end up like that. Because they're in these bad neighborhoods. . . . You also send a message in prisons.* When you peep in that bus and talk and whisper, you can say, death penalty. Maybe you've got just one inmate sitting there going, well, he got death, this is serious, I don't want to end up like that. Maybe your penalty you'll save one guy, to scare him straight.

*DeJesus*, 860 A.2d at 113, 117-19 (emphasis in original).[14]

- Anything less [than a death sentence] in this case would only confirm what we see running around on the bumper stickers of these cars, and that is that only the victim gets the death penalty.

*Bertolotti v. State*, 476 So. 2d 130, 133 (Fla. 1985) (improper to urge the jury to consider the message that its verdict would send to the community). *See also Floyd v. Filson*, 949 F.3d 1128, 1151 (9th Cir. 2022) (prosecution argument during penalty phase that the death penalty "sends a message to others in our community, not just that there is a punishment for a certain crime, but that there is justice…inappropriately implies that the jury could sentence Floyd to death to send a message, rather than making "an individualized determination.").

---

[14] *Cf. Caro*, 597 F.3d at 625 n.17 (during penalty-phase summation, government argued that a life sentence (a) would tell the Texas Syndicate, "[Y]ou can kill and it's okay"; (b) would tell prison staff and inmates, "It's open season because in this community there's no punishment for murder"; and (c) would tell the victim's parents "that their son's life was meaningless"; on direct appeal court suggests, without deciding, that the arguments "might have been improper").

13. Asking the Jury to Vote for Death to Satisfy the
Expectations of the Community

The government may not suggest that the jury should return a sentence of

death to satisfy community expectations. *See Bryan v. Bobby*, 114 F. Supp. 3d 467,

519 (N.D. Ohio 2015) (During penalty phase closing arguments, prosecutor argued

that by failing to return a death sentence, the jury would be: "telling the ladies and

gentlemen of this community, when this is published in the paper, or when you get

a chance to read this, about what your verdict is * * * that it's okay to shoot a

policeman now . . . ." On habeas review, district court held that such a statement

"improperly suggested that the jury could consider the response of public opinion

when voting on the sentence")[15]; *Trillo v. Biter*, 769 F.3d 995, 1000-01 (9th Cir.

2014) (on habeas review, concluding that it was improper to urge jurors to convict

simply because they would feel "uncomfortable" discussing a not guilty verdict

with their neighbors); *Whittington v. Estelle*, 704 F.2d 1418, 1423 (5th Cir. 1983)

(condemning such arguments, which "inject[ed] a new and harmful fact into

evidence" by urging "that the wishes of the community mandated a particular

result"); *see also*, *e.g.*, *Ward v. Dretke*, 420 F.3d 479, 498 (5th Cir. 2005) (noting

---

[15] On appeal, the Sixth Circuit did not disagree that these statements were improper, but held that "any harm was cured when the Ohio Supreme Court independently reweighed aggravation and mitigation." *Bryan v. Bobby*, 843 F.3d 1099, 1114 (6th Cir. 2016).

impropriety of prosecutorial argument urging jurors to sentence on the basis of

community expectations); *Ordway v. Commonwealth of Kentucky*, 391 S.W.3d

762, 797 (Ky. 2013) (reversing death penalty in part because "the prosecutor called

the jury's attention to the effect that the whole community expected them to do

'something' and he left no doubt that what he meant by 'something' was to return a

guilty verdict. This argument impermissibly urged the jury to consider public

opinion, and it correspondingly applied pressure on the jury to satisfy the

community expectation."); *State v. Allen*, 994 P.2d 728, 764 (N.M. 1999)

(prosecutor engaged in misconduct in arguing in penalty phase rebuttal that jury

should return verdict based on considerations such as "community outrage,"

society's right to grieve, the fact that "this is the stuff that we, as parents, fear for

our children," and the need for "a stern message from you that this conduct won't

be tolerated"); *State v. Bryan*, 804 N.E.2d 433, 464 (Ohio 2004) ("'A prosecutor

may not call for the jury to convict in response to public demand.' . . . Such

argument improperly suggest[s] that the jury could consider the response of public

opinion when voting on the sentence.") (citation omitted); *State v. Reed*, 362

S.E.2d 13, 15 (S.C. 1987) (condemning argument that "attempted to pressure the

jury into rejecting appellant's evidence in mitigation by referring to public

opinion").[16]

    14. <u>Suggesting that the Jurors Have a Civic Duty to Return a Sentence of Death</u>

       The government may not argue or imply that the jurors have a "duty" to return a sentence of death. In *Viereck v. United States*, the Supreme Court found that a prosecutor's contention that the American people were relying on jurors to do their wartime duty in convicting the defendant was "an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." 318 U.S. 236, 247 (1943). The Court noted that such argument was "highly prejudicial, and . . . offensive to the dignity and good order with which all proceedings in court should be conducted." *Id.* at 248; *see also United States v. Young*, 470 U.S. 1, 18 (1985) (holding that prosecutor engaged in misconduct in exhorting a jury to "do its job" by convicting the defendant and observing that "that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice") (citing ABA Standards for Criminal Justice 3-5.8(c) and 4-7.8(c)); *United States v. Sanchez*, 176 F.3d 1214, 1224-25 (9th Cir. 1999) (government committed

---

[16] *Overruled in part on other grounds by State v. Torrence*, 406 S.E.2d 315 (S.C. 1991) and *Franklin v. Catoe*, 552 S.E.2d 718 (S.C. 2001).

misconduct in urging "after the marshal's service has done their duty and the court
has done its duty and lawyers on both sides have done their duty, that you as jurors
do your duty and well consider this matter and find these defendants guilty");
*United States v. Mandelbaum*, 803 F.2d 42, 44 (1st Cir. 1986) ("Cases are to be
decided by a dispassionate review of the evidence admitted in court. There should
be no suggestion that a jury has a duty to decide one way or the other; such an
appeal is designed to stir passion and can only distract a jury from its actual duty:
impartiality."); *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986)
(improper for prosecutor to tell jury it had any obligation other than weighing
evidence).

In the capital-sentencing context, such arguments are "calculated to remove
reason and responsibility from the sentencing process" and "diametrically opposed
to the requirement that capital sentencing be at the jury's discretion." *Weaver v.
Bowersox*, 438 F.3d 832, 840 (8th Cir. 2006) (citations omitted); *Le v. Mullin*, 311
F.3d 1002, 1022 (10th Cir. 2002) (error to exhort a jury to impose a death sentence
on grounds of civic duty); *Brooks v. Kemp*, 762 F.2d 1383, 1412, 1413 (11th Cir.
1985) (*en banc*) (characterizing juror as soldier ordered to kill the enemy
"misrepresents the task the jury is charged by law to carry out" and undermines the
individualized consideration of the capital defendant), *vacated on other grounds*,

478 U.S. 1016 (1986); *Hance v. Zant*, 696 F.2d 940, 952 (11th Cir. 1983) (granting

habeas relief, where prosecutor, *inter alia*, urged a sentence of death by likening

jurors to soldiers at war and asking them join the war on crime through a death

verdict), *overruled in part on other grounds*, *Brooks*, 762 F.2d at 1399; *see also*,

*e.g.*, *Evans v. State*, 28 P.3d 498, 515 (Nev. 2001) ("highly improper" to ask the

jury "if it had the 'intestinal fortitude' to do its 'legal duty'"; such arguments

designed to stir a passion that can "only distract a jury from its actual duty:

impartiality")[17]; *State v. Rousan*, 961 S.W.2d 831, 851 (Mo.1998) ("Prosecutors

should avoid . . . any suggestion that the jury is weak if it fails to return a certain

verdict.").

        Following this well-settle case law, the Fourth Circuit, in *United States v.

Runyon*, 707 F.3d 475 (2013), on plain-error review in a direct appeal of a federal

death sentence, held "improper" the government's exhortation, "On behalf of the

United States of America, in memory of Cory Voss, we ask that you do your duty

and impose a sentence of death on the defendant for the murder of Cory Allen

Voss." *Id.* at 514-15.[18]

        Other examples of arguments that courts have condemned as improperly

---

[17] Overruled on other grounds, *Lisle v. State*, 351 P.3d 725, 732 n.5 (2015)
[18] The Court, however, declined to reverse Runyon's death sentence, noting that the improper statement was brief and isolated. *Id.* at 515.

urging that the jurors have a duty to return a sentence of death include:

- Do your duty. When you open that paper and you find that the State has carried out your instruction, you will have scaled the ramparts at least one time, and you will have been a part of bringing back peace and tranquility in your community and in our community . . . .

    Horrible chaos has been reaped and racked on this family. I'm asking you to do your duty. Stand tall. Thank you.

*Cauthern v. Colson*, 736 F.3d 465, 475, 477 (6th Cir. 2013) (granting habeas relief because of misconduct in prosecution's sentencing rebuttal argument, including "an appeal to the duty of the jury, which is a form of argument that the Supreme Court has expressly criticized").

In a recent federal capital prosecution, the government argued, *inter alia*,

- Today, today, justice demands a sentence of death.
    . . .

    Don't feel guilty about doing your duty in a death penalty case.
    . . .

    Don't be the water that washes the blood from his hands. For every drop of blood that spilled on the floor of the Iberia Bank, sentence him to death. For every bullet that tore into the bodies of the victims, sentence him to death. And for every gurgle and every gasp of Joe Gennaro on that tile floor on May the 3rd, sentence him to death.

    Do not confuse mercy with weakness. You have an

obligation to uphold the law, and it takes courage to do
that. The Government is confident, absolutely confident,
that you have that courage.
. . .

When a career criminal kills a police officer, he deserves
the death penalty. When a convict kills a second time,
commits a second felony murder, it always deserves the
death penalty, without exception. You don't get to
commit two murders. Enough is enough.

You must not capitulate. You must be vigilant. Anything
less than a sentence of death in this case is a failure of
will and a wholly inadequate response to the senseless
murder of a man who dedicated his life to protecting us.
Don't have a tepid or timid response. Respond in kind
and make sure your response is certain. Express your
outrage and our outrage and our unyielding commitment
to protect those who protect us.

*United States v. Johnson*, 713 F. Supp. 2d 595, 634 (E.D. La. 2010). The district

court granted defendant's motion for a new sentencing hearing in part based on this

argument: "The Court finds that the prosecutor rebuttal charging the jury with

capitulation, a failure of will and washing the blood from the defendant's hands if

they returned a verdict other than death was a highly improper emotional appeal to

stir the jurors passions and distract them from their actual duty, which was to

decide the case impartially." *Id.* at 32 (citation omitted).

- I know there's a movie, Patton, and in the movie, George
  Patton was talking to his troops because the next day they
  were going to go out in battle and they were scared as young

soldiers. And he's explaining to them that I know that some
of you are going to get killed and some of you are going to
do some killing tomorrow morning. And they all knew that.
And he was going to try to encourage them that sometimes
you've got to kill and sometimes you've got to risk death
because it's right. He said: But tomorrow when you reach
over and put your hand in the pile of goo that a moment
before was your best friend's face, you'll know what to do.
. . .

Sometimes killing is not only fair and justified; it's right.
Sometimes it's your duty. There are times when you have
to kill in this life and it's the right thing to do. If [the
victim] had been able to get his gun out that day, would
you have said it was right for him to kill [the defendant]?
Of course, you would. It would have been self-defense.
Well, it was right to kill then and it's right to kill him
now.

*Weaver*, 438 F.3d at 836; *see also*, *id.* at 840 (concluding that describing jurors as

soldiers with a duty "eviscerates the concept of discretion afforded to a jury as

required by the Eighth Amendment").

- Some of you may be tempted to take the easy way out, and
  by that, I mean, you may be tempted not to weigh all of
  these aggravating circumstances and to consider the
  mitigating circumstances. That you may not want to carry
  out your full responsibility under the law and just decide to
  take the easy way out and to vote for death. I'm sorry, vote
  for life. . . . I ask you not to be tempted to do that, I ask you
  to follow the law, to carefully weigh the aggravating
  circumstances, to consider the mitigating circumstances, and
  you will see these aggravating circumstances clearly
  outweigh any mitigating circumstances if there are any. And
  then under the law and the facts death is a proper

recommendation.

*Ferrell v. State*, 29 So. 3d 959, 987 (Fla. 2010); *see also State v. Brooks*, 762 So. 2d 879, 903-04 (Fla. 2000) (error to argue "I'm concerned . . . that you may want to . . . take the easy way out and just quickly vote for life. I submit to you, don't do that: follow the law, do your duty."); *Urbin v. State*, 714 So. 2d 411, 421 (Fla.1998) (condemning prosecution's penalty-phase closing argument: "[M]y concern is that some of you may be tempted to take the easy way out, to not weigh the aggravating circumstances and the mitigating circumstances and not want to fully carry out your responsibility and just vote for life.").

- I'm going to ask you to return the verdict that's called for by your oath, by the law, by the evidence, that the aggravating factors here, shotgun murder, robbery, here far outweigh those minuscule excuses that he has proffered.
    . . .

    I will thank you now one last time for your courage not to flinch in applying the law. Courage and weigh well.

*State v. Pennington*, 575 A.2d 816, 831 (N.J. 1990), *overruled in part on other grounds*, *State v. Brunson*, 625 A.2d 1085 (N.J. 1993).

- I'm asking you to do your duty. Stand tall.

*State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998).

15. [Commenting on the Costs or Comforts of Life Imprisonment](#)

The government may not argue to the jury that it should impose a sentence of death to avoid the costs inherent in a sentence of life imprisonment without parole. As the Eighth Circuit has explained, "[t]here is simply no legal or ethical justification for imposing the death penalty on [the basis of cost] and it is not a proper factor to be considered by the jury, for it does not reflect the properly considered circumstances of the crime or the character of the individual." *Blair v. Armontrout*, 916 F.2d 1310, 1323 (8th Cir. 1990); *see also Miller v. Lockhart*, 65 F.3d 676, 682, 685 (8th Cir. 1995) (same; improper to refer to "tremendous burden" that life imprisonment would "put on the taxpayers" and to ask the jury to consider "[t]he cost of food, clothing, shelter, and guards"); *Brooks v. Kemp*, 762 F.2d 1383, 1412 (11th Cir.1985) (*en banc*) ("clearly improper" to argue that death should be imposed because it is cheaper than life imprisonment; "cost is not accepted as a legitimate justification for the death penalty"), *vacated on other grounds*, 478 U.S. 1016 (1986).[19]

Examples of argument that improperly urges the cost of life imprisonment as

---

[19] In noncapital federal sentencing too, courts may not consider costs of imprisonment. *See, e.g., United States v. Pepper*, 570 F.3d 958, 965-66 (8th Cir. 2009), vacated in part on other grounds, 562 U.S. 476 (2011).

a factor weighing in favor of a death sentence include:

- Why should you and I, as lawful, working citizens of this community, work the rest of our natural lives just so [defendant] can live in the penitentiary for the rest of his natural life . . . ?

*Antwine v. Delo*, 54 F.3d 1357, 1364 (8th Cir. 1995) (condemning argument as "improper, unsupported, and inaccurate").

- What's the other reason for not giving this defendant the death penalty? That, if he gets a life sentence for murder, why he'll be up there at Parchman and won't see daylight for ten years. Do you believe that? Do you believe they're going to put him in some hole and he isn't gonna see daylight for ten years? Or do you believe he's gonna go up there and watch television and live off the taxpayers' money for ten years? And get fed and housed and given all the conveniences of life. For what. For killing him ([prosecutor] holding up exhibit [of victim]).

*Edwards v. Scroggy*, 849 F.2d 204, 210 (5th Cir. 1988) (government's argument "improper").

A variation on argument that improperly focuses the jurors on the irrelevant consideration of the costs of life imprisonment was discussed above, under the heading "Comparative Justice," *ante*: argument that compares the plight of the victim to the defendant's life in prison. *See, e.g., United States v. Johnson*, 495 F.3d 951, 979 (8th Cir. 2007) (direct appeal of federal judgment of death; government "strayed over the line" and "went beyond the bounds of permissible

argument," in government noting that ten, twenty, thirty years from now the child

victims will still be dead and arguing "No matter how small [the defendant's] cell

may be, it's going to be larger than the coffin that [the victims] are laying [sic] in

now."); *Bland v. Sirmons*, 459 F.3d 999, 1027 (10th Cir. 2006) (condemning

"Maybe the Defendant will be in prison, maybe he will be behind that concrete and

those jail bars with his T.V. and his cable and good food. But one thing . . . is for

sure, [the victim] won't be here and his family won't be able to be with him, they

won't be able to share holidays with him."); *Le v. Mullins*, 311 F.3d 1002, 1014-16

(10th Cir. 2002) (improper for prosecutor to argue, inter alia, "[D]o you really

think that justice would be done if this man goes to prison, gets three meals a day

and a clean bed every night and regular visits from his family while [the victim]

lays [sic] cold in his grave[?]"); *Duckett v. Mullin*, 306 F.3d 982, 992 (10th

Cir.2002) (improper to ask whether it would be "justice [to] send this man down to

prison, let him have clean sheets to sleep on every night, three good meals a day,

visits by his friends and family, while [the victim] lies cold in his grave?"); *United

States v. Johnson*, 713 F. Supp. 2d 595, 631 (E.D. La. May 18, 2010) (granting

motion for new sentencing hearing in federal capital prosecution in part based on

government's argument that "He [defense counsel] essentially asks you to send

him [Johnson] to his room where he gets privileges, three squares, and the ability

64

to have visitors. The only visitors that [the victim] will have come to his grave

site.")

Even without an express comparison to the victim, such appeals "make light

of the penalty of life in prison," *Bland*, 459 F.3d at 1028, and call to the juror's

minds the costs of imprisoning the defendant for life – a factor that cannot be

considered in deliberating between life and death.

16. Vouching or Bolstering

It is highly improper for any attorney for the government to intimate to the

jury his or her own personal beliefs or opinions. The Supreme Court has held that a

prosecutor's "vouching" poses twin dangers:

> Such comments can convey the impression that evidence not
> presented to the jury, but known to the prosecutor, supports the
> charges against the defendant and can thus jeopardize the defendant's
> right to be tried solely on the basis of the evidence presented to the
> jury; and the prosecutor's opinion carries with it the imprimatur of the
> Government and may induce the jury to trust the Government's
> judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18-19 (1985) (*citing Berger v. United States*,

295 U.S. 78, 88-89 (1935)).

Thus, courts have universally held that the government may not state an

opinion as to the veracity of witnesses. *See Young*, 470 U.S. at 18; *see also*, *e.g.*,

*Parker v. Allen*, 565 F.3d 1258, 1273 (11th Cir. 2009) (improper for prosecutor to

argue "I submit to you at least from the State's witnesses they were trying very hard to tell you the truth and the truth as they saw it . . . . [W]e vouch for the credibility of those witnesses by putting them on the stand and I submit to you that they've told the truth . . . ."); *Bates v. Bell*, 402 F.3d 635, 644-45 (2005) (finding a prosecutor's statements to be improper where he stated, when discussing the testimony of mitigation witnesses, "You don't believe that, and I don't believe it [either].").

There are no "magic words" to identify improper vouching. *See Hodge v. Hurley*, 426 F.3d 368, 379 n.21 (6th Cir. 2005) ("We have previously indicated that it is not necessary for the prosecutor actually to use the words 'I believe,' or any similar phrase, for a statement to constitute improper comment on the credibility of witnesses."). The government engages in misconduct merely by seeking to cloak a witness in the prestige of the government or suggesting that evidence outside the record supports the witness. In *Hodge*, for example, the Sixth Circuit found reversible misconduct in prosecution's assertion, without reference to the testimony or other evidence, that the government witness was "absolutely believable" and that defense witnesses were "lying," *id.* at 378: "[B]ecause these statements by the prosecutor were not coupled with a more detailed analysis of the evidence actually adduced at trial, they convey[ed] an impression to the jury that

they should simply trust the State's judgment that [the government witness] was a credible witness and that the defendant's witnesses were non-credible, if not perjurious," *id.* at 378-79; *see also*, *e.g.*, *Douglas v. Workman*, 560 F.3d 1156, 1179-80 (10th Cir. 2009) (prosecution's argument strayed beyond permissible commentary on witness's credibility and "raised the implication that his belief in the truthfulness of [the witness's] testimony is rooted in his knowledge of facts outside the evidence already presented"); *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (government improperly vouched for its witness by arguing that if its witness testified falsely, "the reputation of the [D]epartment of [J]ustice would be put on the line to solicit false testimony just to prove up a case against these two defendants").[20]

And recently, in *United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018), the Second Circuit held that the prosecutor's attempt in cross-examination to elicit testimony that another confederate of the defendant did not receive a cooperation agreement because the government "determined [the confederate] was lying" was

---

[20] *See also*, *e.g.*, *United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008) (reversal, on plain error review, based on prosecutor's repeated statements in rebuttal argument that he personally believed the agents' testimony); *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994) (reversal based on prosecutor's argument that government witness' plea agreement ensured that his testimony was credible); *United States v. Manning*, 23 F.3d 570 (1st Cir. 1994) (reversal where prosecutor vouched for key witness' credibility); *United States v. Kerr*, 981 F.2d 1050 (9th Cir. 1992) (same); *United States v. Garza*, 608 F.2d 659 (5th Cir. 1979) (reversing conviction where prosecutor vouched for the credibility of the police officers involved in that case).

error. As referenced previously, in *Aquart*, the defense called the investigating FBI agent as a witness during the penalty phase of the trial. On cross-examination, the agent testified that Efrain Johnson—who was present when the murders occurred—was not offered a cooperation agreement because the government "determined he was lying." On appeal, the Second Circuit found that this inquiry, "inquiry ran afoul of established law holding that cross-examination cannot be used to "direct[ ] the jury to trust the Government's judgment rather than its own view of the evidence. *Aquart*, 912 F.3d at 33.

Nor may the government state an opinion regarding its own case, the defense mitigation case, the defendant, or the defense counsel. *See, e.g.*, *Sechrest v. Ignacio*, 549 F.3d 789, 810-11 (9th Cir. 2008) (prosecutor committed "flagrant misconduct," in support of his own unfounded, inaccurate assertions of parole eligibility, by "representing" to the jury that "as a lawyer, as an attorney for the people of this county," "the pardons board has the authority to commute [a sentence of life without possibility of parole] tomorrow if they want to."); *Beuke v. Houk*, 537 F.3d 618, 649 (6th Cir. 2008) (improper for the prosecution to state that he was "scared to death of [defendant]"); *United States v. Galloway*, 316 F.3d 624, 632-33 (6th Cir.2003) (finding a prosecutor's statements to be improper where he stated, "I have tried several cases myself where we see the [defendant make this

argument].”); *Boyle v. Million*, 201 F.3d 711, 715, 717 (6th Cir. 2000) (granting

habeas relief based, in part, on prosecution's vouching for defendant's guilt,

including statement that "[W]hat I do know for sure is he's guilty."); *United States*

*v. Molina*, 934 F.2d 1440, 1444-45 (government's assertion there were as many as

nine other law enforcement officials who would support the testimony of the three

government witnesses who testified was "an improper reference to inculpatory

evidence not produced at trial"); *Miller v. Lockhart*, 65 F.3d 676, 682-84 (8th Cir.

1995) (prosecutor argued at capital sentencing that in his 20-year experience with

"a lot of criminals and a lot of people," he had "never seen me one that was as

tough" as defendant).[21]

Finally, the government may not opine on "the appropriateness of capital

punishment" in this case or as relative to other cases. *Bates v. Bell*, 402 F.3d 635,

646 (6th Cir. 2005). Such arguments are not supported by evidence adduced at

trial. Moreover, because the jury must exercise its discretion in determine

punishment, it is "wrong" for the prosecutor to "undermine that discretion" by

---

[21] *See also*, *e.g.*, *United States v. Hitt*, 473 F.3d 146 (5th Cir. 2006) (holding that it was improper for the prosecutor to bolster argument that defendant was not credible by arguing that the judge and defense counsel would have jumped on prosecutor for stating during cross-examination of a witness that the defendant had lied right here had the prosecutor not been right about that); *United States v. Smith*, 962 F.2d 923 (9th Cir. 1992) (reversing conviction based on prosecutor's argument that he was inherently credible as a government representative and that "if I did anything wrong in this trial, I wouldn't be here. The court wouldn't allow that to happen."); *United States v. Kerr*, 981 F.2d 1050 (9th Cir. 1992) (reversal based on prosecutor's rhetorical question of whether jurors believed that the prosecution witnesses were "hoodwinking me").

implying that he or she, or another high authority, has already made the careful

decision required: "This kind of abuse unfairly plays upon the jury's susceptibility

to credit the prosecutor's viewpoint." *Brooks v. Kemp*, 762 F.2d 1383, 1410 (11th

Cir. 1985) (*en banc*) ("[t]he discussion of the prosecutor's practice of seeking

death only in a few cases during the past years was improper"), *judgment vacated

on other grounds*, 478 U.S. 1016 (1986).

Courts have not hesitated to denounce as improper a prosecutor's reference

to his or her own opinion as to the death worthiness of a particular defendant:

- As I told you, I have never previously sought the death
  penalty in any murder case, but I tell you, I am seeking it
  now, and I am asking this jury to go back to that jury room
  and return a verdict, or a decision to send John Wayne
  Conner to the electric chair.

*Conner v. GDCP Warden*, 784 F.3d 752, 769-70 (11th Cir. 2015) (Eleventh Circuit

"agree[s] with the Georgia Supreme Court that the prosecutor's closing arguments

were improper").

- [I]nformation furnished in this case [to the Attorney
  General] as to this defendant, it rose to that level [to seek the
  death penalty]. . . . It was . . . rational, well-reasoned, based
  on information that you don't have before you that this case
  was different [from that of accomplice].

*United States v. Mitchell*, 502 F.3d 931, 995 (9th Cir. 2008) (direct appeal from a

70

federal capital prosecution; comment "should not have been made").

- I'm the top law enforcement officer in this county and I'm the one that decides in which cases to ask for the death penalty and which cases we won't. . . . I'm telling you there's no case that could be more obvious than [defendant's] was.

*Shurn v. Delo*, 177 F.3d 662, 665-66 (8th Cir. 1999).

- I've been a prosecutor for ten years and I've never asked a jury for a death penalty, but I can tell you in all candor, I've never seen a man who deserved it more than [defendant]. Today I'm talking to you as Prosecuting Attorney of this County -- the top law enforcement officer in St. Louis County.

*Newlon v. Armontrout*, 885 F.2d 1328, 1335 (8th Cir. 1989).

- There are not many times that I come before a trial jury and make the request that I will be making of you in this case. In effect, I think this is the seventh time in seven years that I've stood in the same position, so I do not take this lightly.

*Tucker v. Kemp*, 762 F.2d 1496, 1505 (11th Cir. 1985) (*en banc*) (argument

improperly invoked the expertise of the prosecutor to suggest the special

seriousness of the crime).

- I've been with the District Attorney's Office for a little over eight years now and it's my recollection that we've had no more than a dozen times, no more than twelve times in those eight years, to request [the death penalty] out of the thousands of cases . . . that pass through our office.

*Hance v. Zant*, 696 F.2d 940, 951-52 (11th Cir.1983), *overruled in part on other*

71

*grounds*, *Brooks*, 762 F.2d at 1399.[22]

17. Suggesting Additional Evidence Beyond that Adduced at Trial

Related to the issue of improper vouching described above, the government, of course, may not suggest to the jury the existence of additional evidence, not adduced at trial, in support of a sentence of death. The defendant is entitled to a jury verdict based solely on the trial evidence and, in addition, to test the government's evidence through cross-examination or to introduce evidence of his own in rebuttal. *See*, *e.g.*, *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996) (reversal on appeal where prosecutor told jurors that a government agent who did not testify would have given inculpatory testimony; violation of Confrontation Clause); *United States v. Blakely*, 14 F.3d 1557, 1560 (11th Cir. 1994) (reversal based on prosecutor's arguing facts not in evidence, namely, that the defendant was a career criminal); *Miller v. Lockhart*, 65 F.3d 676, 682, 684-85 (8th Cir. 1995) (granting habeas corpus relief in death penalty case where, among other things, the prosecutor argued that the defendant had a history of escape,

---

[22] *See also, e.g., Ferrell v. State*, 29 So. 3d 959, 987 (Fla. 2010) ("The State doesn't seek the death penalty in all first degree murders, it's not always proper to do that. . . . But where the facts, where there are facts surrounding the murder that demand the death penalty, the state has an obligation to come forward and seek the death penalty. This is one of those cases."); *Conner v. State*, 303 S.E.2d 266, 276 (Ga. 1983) ("The portion of the prosecutor's argument referring to his prior criminal experience and the frequency with which he had sought the death penalty was not supported by any evidence and, moreover, was irrelevant to any issue in the case. The argument was therefore improper.").

where no such evidence was introduced during the trial); *United States v. Molina*, 934 F.2d 1440, 1446 (9th Cir. 1991) ("The prosecutor's assertions that there were as many as nine other law enforcement officials who would support testimony is an improper reference to inculpatory evidence not produced at trial."); *United States v. Murrah*, 888 F.2d 24, 226-27 (5th Cir. 1989) (reversing conviction in case in which, among other things, the prosecutor told jurors that he could have called another prosecution witness to supply important facts about the crime but did not do so because it would have been "cumulative"); *United States v. Carroll*, 678 F.2d 1208, 1210 (5th Cir. 1982) (district attorney violated defendant's Confrontation Clause rights by suggesting in closing argument that the defendant had to have been at the scene of the crime because he knew more about pictures than his lawyer did); *United States v. Goodwin*, 492 F.2d 1141 (5th Cir. 1974) (reversing conviction in part based on prosecutor's closing argument to jury, in which he referred to the defendant as having been a "fugitive" during a portion of the time leading up to the indictment, when there was no evidence offered to support this claim); *Hall v. United States*, 419 F.2d 582, 585 (5th Cir. 1969) (reversing conviction in part based on prosecutor's closing argument that defendant had tampered with witnesses where no evidence supported that claim, directly or inferentially); *Ginsberg v. United States*, 257 F.2d 950, 954-55 (5th Cir.

73

1958) (reversing conviction where prosecutor argued that "I could probably have fifty people in here who would show that [the defendant] isn't a good character" – in response to defense counsel's argument that the prosecutor had not called any witnesses to contradict the defendant's character witnesses).

        18. Asking the Jury to Infer Lack of Remorse, or Other Aggravating Factors, from Defendant's Silence or Refusal to Testify

        The government may not ask a sentencing jury to find a lack of remorse, or any other aggravating factor, from the fact that the defendant elected to exercise his constitutional right to remain silent and not to testify. A prosecutor may not adversely comment on the defendant's exercise of his Fifth Amendment privilege not to testify. *Griffin v. California*, 380 U.S. 609, 614-15 (1965). In federal prosecutions, this rule also derives from a statutory command. *See* 18 U.S.C. § 3481 (defendant's failure to testify "shall not create any presumption against him"); *Bruno v. United States*, 308 U.S. 287, 292-93 (1939) (court's refusal to give no adverse-inference charge required reversal under Section 3481). The privilege against self-incrimination reflects, among other "fundamental values," the imperative of a "fair state-individual balance by requiring the government in its contest with the individual to shoulder the entire load." It also acknowledges that "[i]t is not everyone, however honest, who would . . . willingly be placed on the

witness stand." *Id.* at 300.

Adverse prosecutorial comment "cut[s] down on the privilege by making its assertion costly." *Griffin*, 380 U.S. at 614. Direct comment on a defendant's choice not to testify constitutes *Griffin* error. *See, e.g.*, *Gomes v. Brady*, 564 F.3d.532, 538 (1st Cir. 2009) (misconduct to argue that only defense counsel had "take[n] the stand" to urge that defendant did not shoot victim); *United States v. Johnston*, 127 F.3d 380, 398 (5th Cir. 1997) (misconduct for government, after referring to defendant's constitutional right not to testify, to argue: "But what you also can't do in a situation like this is go back into that jury room and make up a story for them. That is impermissible by law. You can't play 'what if.' You can't say, 'Well, if they testified, well, maybe they would have explained this. Maybe they would have said that.' That's not allowed and that's fair."); *United States v. Rodriguez*, 627 F.2d 110, 111-12 (7th Cir. 1980) (improper for government to argue that defendant "has been very quiet" during the trial); *Eberhardt v. Bordenkircher*, 605 F.2d 275, 278 (6th Cir. 1979) (error for prosecutor to ask jurors, "what other witnesses could [the defense] have put forward who were totally available?" and then pointed in the direction of the defendant); *Hicks v. State*, 525 S.W.2d 177, 179-80 (Tex. Crim. App. 1975) (prosecutor argued, while standing behind defendant and looking down at him, "But there is somebody that we haven't heard from in this case. And I think

75

you all know who it is.").[23]

So, too, does indirect comment. Examples of impermissible indirect comment on the defendant's choice not to testify include: arguing that the defendant is "still running and hiding today," *United States v. Hardy*, 37 F.3d 753, 757-58 (1st Cir. 1994); arguing that the government's evidence is "uncontradicted," "undenied," "unrebutted," or "undisputed," where it is apparent that only the defendant himself could refute such evidence, *see*, *e.g., United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996) (government committed misconduct when it repeatedly referred to its evidence as "uncontroverted," when it was apparent that only the defendant himself could have refuted such evidence); *Raper v. Mintzes*, 706 F.2d 161, 165-67 (6th Cir.1983) (misconduct to refer to witness's testimony as "uncontradicted" or "unrefuted" when defendant was the only person, other than the testifying witness, with knowledge of the events)[24]; and asking how

---

[23] *See also*, *e.g.*, *Girts v. Yanai*, 501 F.3d 743, 755-756 (6th Cir. 2007) (arguments that "Petitioner was the 'only one person" who could explain the crime to the jury" and that testimony of prosecution witnesses concerning statements made by defendant was "unrefuted" and "uncontradicted" were highly prejudicial); *Lincoln v. Sunn*, 807 F.2d 805, 810 (9th Cir. 1987) (improper for prosecutor to make repeated references to the failure to hear from the "only person" who could explain what happened); *Rachel v. Bordenkircher*, 590 F.2d 200, 202 (6th Cir. 1978) (prosecutor argued "We will never know [the exact circumstances leading to the death of the victim], these men [the defendants] won't tell us. The only other man who could tell us is dead and in his grave."); *Berryman v. Colbert*, 538 F.2d 1247, 1249 (6th Cir. 1976) ("Nobody was there when the robbery took place. Nobody that we can bring to testify. The defendants, here, yes, but we can't get them to testify.").

[24] *See also, e.g., Freeman v. Lane*, 962 F.2d 1252, 1261 (7th Cir.1992) (repeated remarks that evidence was "unrebutted and uncontradicted" violated Fifth Amendment); *Williams v. Lane*, 826 F.2d 654, 664 (7th Cir. 1987) (in rape prosecution, arguments that "She [victim] told it to you and nobody else told you anything different." and "Who got up on this witness stand and told you these two were dating?" were "clearly improper and violated the Fifth Amendment"); *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1302 (7th Cir.1985) (same for

defense counsel will explain events or evidence, *see United States v. Skandier*, 758 F.2d 43, 45 (1st Cir.1985) (prosecutor's question in summation as to how the defense counsel would explain certain events was improper in a case where the defendant had not taken the stand)[25]; *State v. Cockerham*, 365 S.E.2d 22, 23 (S.C. 1988).

The constitutional rule of *Griffin* applies in full to a capital sentencing hearing, at which a convicted defendant retains a Fifth Amendment privilege. *See Estelle v. Smith*, 451 U.S. 454, 462-63 (1981) ("We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."); *see also United States v. Whitten (Wilson)*, 610 F.3d 168, 199 (2d Cir. 2010) (citing *Estelle*); *Lesko v. Lehman*, 925 F.2d 1527, 1542 (3d Cir. 1991) ("*Griffin*'s protections apply equally to the guilt and penalty phases of a death penalty trial."). Indeed, a defendant retains a limited privilege even at a non-capital sentencing hearing. *Mitchell v. United States*, 526 U.S. 314, 316-17 (1999) (court violated

---

"uncontradicted and undenied"); *United States v. Buege*, 578 F.2d 187, 189 (7th Cir.) (same for "uncontradicted"); *United States v. Fearns*, 501 F.2d 486, 490 (7th Cir.1974) (same for "undisputed"); *United States v. Handman*, 447 F.2d 853, 855 (7th Cir.1971) (same for "unchallenged" and "uncontradicted").

[25] *See also*, *e.g.*, *United States v. Cox*, 752 F.2d 741, 745 (1st Cir. 1985) ("how-does-he-explain argument" a "fairly severe violation of *Griffin*"); *United States v. Wilkins*, 659 F.2d 769, 774 (7th Cir. 1981) (misconduct when government argued that its theory of the case was the "only explanation" put before the jury and that defense should explain why defendant was in the getaway car); *United States v. Barton*, 731 F.2d 669, 673-74 (10th Cir. 1984).

defendant's Fifth Amendment privilege by drawing adverse inference from her

failure to testify at sentencing hearing).

In *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010), the Fourth Circuit

acknowledged that, under *Estelle* and *Mitchell*, the Fifth Amendment prohibits

considering a federal capital defendant's silence in support of an aggravating factor

of lack of remorse. *Id.* at 630. Similarly, in *United States v. Davis*, 912 F. Supp.

938 (E.D. La. 1996), the district court said the government could use the

defendant's "exultation" at hearing the victim was dead, to support the

future-danger aggravator. But it found that the factor of lack of remorse was not

proper. Such a factor, said the court, is generally problematic, since it is difficult to

prove and risks treading on defendant's constitutional rights to silence and to rest

on the presumption of innocence. *Id.*; *see also United States v. Roman*, 371 F.

Supp. 2d 36, 50 (D.P.R. 2005) (holding that during a capital sentencing lack of

remorse may not be proved using "information that has a substantial possibility of

encroaching on the defendants' constitutional right to remain silent"); *United*

*States v. Cooper*, 91 F. Supp. 2d 90, 112-13 (D.D.C. 2000) (barring the inference

of lack of remorse from a defendant's "unwillingness to acknowledge in his

post-arrest statements that he is blameworthy for the crimes to which he admitted")

(internal quotations omitted).[26]

Thus, in the penalty phase of a capital trial, the government may not seek to punish the defendant for exercising his right not to testify, may not ask the jury to draw adverse inferences from his failure to testify, and may not ask the jury to find any aggravating factor, including lack of remorse or future dangerousness, from defendant's exercise of his rights not to incriminate himself.

In *Wilson*, a federal capital prosecution, in which the defendant was permitted to read from the defense table (as opposed to the witness stand) an unsworn statement of remorse, not subject to cross-examination, the AUSA argued during penalty-phase summations:

> I want to talk to you a minute about the statement itself. You may have noticed that when he made that statement, Ronell Wilson wasn't sitting up there on the witness stand under oath, subject to cross-examination. *He chose to do it from there (indicating). The path for that witness stand has never been blocked for Mr. Wilson, had that opportunity too. He chose, like many other things in this case, to do it that way.*
>
> *You may ask yourselves well, what more would we have if he took that*

---

[26] *But see United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008). In a split decision (2-1; Posner, J., dissenting), the Seventh Circuit rejected the defendant's arguments that the evidence did not support this aggravating factor and that, in addressing it in summation, the prosecutor had improperly commented on his silence and failure to plead guilty. Since it is appropriate to take confessions, guilty pleas, etc., into consideration as mitigation at sentencing, said Judge Easterbrook, it is equally proper for a prosecutor to point out when none of these events have occurred. Moreover, the primary theme of the prosecutor's lack of remorse argument was the defendant's affirmative conduct after arrest (e.g., contacting potential witnesses to persuade them not to testify), rather than his silence. In *Caro*, the Fourth Circuit expressly rejected the Seventh Circuit's reasoning, 597 F.3d at 629 n.19, and, more recently in *Wilson*, the Second Circuit noted that it was "unpersuaded" by *Mikos*, 610 F.3d at 196. The Supreme Court has not addressed this apparent split in the circuits.

*stand, what would be the difference?* Well, we might have been able
to ask him when did you come up with this? How did you come up
with it? Why did you come up with it? Why now? Why now of all
times are you sorry? We might be able to test the credibility of the
statement, the veracity of it. You might have information that could
help you decide if you need to believe it. Ronell Wilson didn't want
that. He wanted to say it from there, ["]take my word for it now after
all this, I'm sorry["].

610 F.3d at 197-98 (emphasis in original). The Second Circuit held that, although

the defendant's allocution resulted in a limited waiver of his Fifth Amendment

rights, which would have permitted the government to "argue for an adverse

inference from a defendant's failure to *testify* as to that to which he has *allocuted*,"

*id.* at 200, nevertheless, the statements set out above, combined with the district

court's failure to give modified no-adverse-inference instruction, pursuant to

*Carter v. Kentucky*, 450 U.S. 288 (1981), created a risk that jurors considered

Wilson's failure to testify at sentencing or guilt for other, more expansive

purposes, *id*. And, holding that this burdening of his Fifth Amendment right not to

testify, combined with other government misconduct during the penalty-phase

summations, *see* Section 21, *post*, could not be deemed harmless, the Second

Circuit vacated the death sentences and remanded for a new sentencing hearing, *id.*

at 201-02.

Additional examples of penalty-phase arguments that have been condemned

for burdening the defendant's Fifth Amendment rights include:

- Good character and record. All of the character witnesses
  limited their testimony to a certain period of time. . . . We
  heard about John Lesko up to a certain point. And I want
  you to consider that. John Lesko took the witness stand, and
  you've got to consider his arrogance. He told you how rough
  it was, how he lived in hell, and he didn't even have the
  common decency to say I'm sorry for what I did. I don't
  want you to put me to death, but I'm not even going to say
  that I'm sorry.

*Lesko*, 925 F.2d at 1540; *see also id.* at 1545 ("prosecutor's criticism of Lesko's

failure to express remorse penalized the assertion of his fifth amendment privilege

against self-incrimination, in violation of the rule in *Griffin*"; error, combined with

additional prosecutorial misconduct at penalty-phase closings, required granting

habeas relief).[27]

- Has he expressed any regrets to you, any remorse for putting
  to death execution style this 51-year-old man? Has he even
  said to you I am sorry I did it? No. I think that you have got
  to assume that he is not sorry, that he did it. If he was sorry
  that he did it, he would tell you that he is sorry he did it. He
  hasn't even said I am sorry. He said I didn't do it when the
  evidence was so overwhelming that no reasonable person
  could make any argument as to whether or not the man was

---

[27]  In *United States v. Gabrion*, 648 F.3d 307, 349-50 (6th Cir. 2011), the Sixth Circuit concluded that, where the
defendant had both testified at trial and delivered an allocution, the government's limited, and factually accurate,
argument concerning defendant's failure to express remorse during those two appearances did not improperly
attempt to penalize the defendant for exercising his constitutional rights. The panel opinion was subsequently
vacated. The Sixth Circuit *en banc* Court overturned the original panel's grant of relief on unrelated grounds, and
then declined to address explicitly any of the remaining points rejected by the three-judge panel: "It is enough for
our purposes to state that we reject all of Gabrion's remaining arguments." 719 F.3d 511, 535 (6th Cir. 2013) (en
banc).

guilty. He just simply said I didn't do it.

*Miller v. Lockhart*, 861 F. Supp. 1425, 1430 (E.D. Ark. 1994). On appeal, the

Eighth Circuit affirmed granting habeas relief, concluding that the prosecution's

*Griffin* error, without more, prejudiced petitioner. 65 F.3d 676, 684 (8th Cir. 1995)

(prosecutor improperly argued that defendant's failure to take the stand during the

penalty phase and ask for mercy showed that defendant was tough, uncaring, and

undeserving of mercy).

      19. **Inviting the Jury to Consider Defendant's Decision to Plead Not Guilty or His Exercise of Trial Rights**

      Similarly, a defendant's decision to proceed to trial rather than plead guilty

simply may not be treated as a factor triggering or supporting capital punishment.

In *United States v. Jackson*, 390 U.S. 570 (1968), the Supreme Court vacated a

death sentence imposed under a scheme that exposed only defendants convicted at

trial to the death penalty while exempting those who pled guilty. "The inevitable

effect of any such provision" is to "penaliz[e] those who choose to exercise" their

"Sixth Amendment right to demand a jury trial." *Id.* at 581. *See also Zant v.*

*Stephens*, 462 U.S. 862, 885 (1983) (capital-sentencing scheme may not

"authorize[] a jury to draw adverse inferences from conduct that is constitutionally

protected," such as, "for example . . . the request for trial by jury") (*citing*

*Jackson*).

The lower courts, too, have since recognized that

> a capital-sentencing scheme cannot allow the jury to
> draw an adverse inference from constitutionally protected
> conduct such as a request for trial by jury; if the
> government invites the jury to find the existence of an
> aggravating factor based on inferences from conduct that
> is constitutionally protected . . . for example . . . the
> request for trial by jury . . . due process of law would
> require that the jury's decision to impose death be set
> aside.

*United States v. Whitten*, 610 F.3d 168, 194-95 (2d Cir. 2010) (direct appeal from

federal judgment of death) (internal citation and quotation marks omitted); *see also*

*Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (granting habeas relief based

on prosecutorial argument that urged jury to "consider the fact that Burns, by

exercising his right to a jury trial and to confront witnesses," caused stress to

victim); *State v. Brown*, 347 S.E.2d 882, 886-87 (S.C. 1986) (reversible error for

prosecutor to ask testifying defendant at capital sentencing hearing: "You weren't

sorry then?," referring to when defense put state to its proof at trial).

In *Wilson*, a federal capital prosecution under the FDPA, the government

argued, concerning the defendant's unsworn statement of remorse read to the jury

during sentencing proceedings:

> Ronell Wilson up until the very moment that he

addressed you last week has done everything he could to escape responsibility for his crimes. *He has an absolute right to go to trial, put the government to its burden of proof, to prove he committed these crimes, but he can't have it both ways. He can't do that, then say I accept responsibility. . . . And [say "]I'm sorry, only after you prove I did it.["]* That's not acceptance of responsibility. That is a manipulative criminal saying what he has to, saying what he knows you want to hear when it's in his interest to say it.

610 F.3d at 194 (emphasis in original). The Second Circuit held that the government's arguments – urging that the defendant's demand for a jury trial demonstrated a lack of remorse and refusal to accept responsibility[28] – impermissibly burdened his Sixth Amendment right to a jury trial, *id.* This, in combination with other government misconduct during the penalty-phase summations, *see* Section 19, *ante*, could not be deemed harmless, and required reversal of his death sentences, *id.* at 201-02.[29]

---

[28] On appeal, the government argued that the challenged statements, which it contended aimed only at rebutting the defendant's mitigating factors, fell on the permissible side of the line that courts have drawn between "increasing the severity of a sentence for a defendant's failure to cooperate and refusing to grant leniency." *Wilson*, 610 F.3d at 195 (quoting *United States v. Stratton*, 820 F.2d 562, 564 (2d Cir.1987)). The Second Circuit rejected the government's characterization of the challenged statements, holding that the statements aimed both at establishing an aggravating factor and at rebutting the defendant's mitigating factors: "In purpose and effect, the government used Wilson's demand for trial to evidence lack of remorse and refusal to accept responsibility, characteristics offered to undermine Wilson's defenses to a sentence of death. The government also emphasized Wilson's lack of remorse as support for the aggravating factor of future dangerousness." But, in any event, the court held that the government's proposed distinction immaterial in the context of a sentencing hearing under the FDPA: "There is no doubt that the baseline sentence in this case [under the FDPA] is life without parole, and that a verdict of death is an increase in severity. . . . Wilson's constitutionally protected decision to go to trial was cited as a reason to sentence him to death, and thus to 'enhance' what would otherwise be a life sentence." *Id.*

[29] In *United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013), the defendant sought but was denied a plea that would have precluded the death penalty. At sentencing, the government challenged the defense mitigating factor of

A further example of such improper argument is:

- [I]t's offensive to me to sit here and I don't say this for any personal reason, but to be in this courtroom having asked for recesses to get my body in shape to try a case for several days, when a man sits up here and tries to mislead you first of all, into believing he's not guilty. That's offensive, to me. That's trifling with the processes of this court. I personally dislike that, and I don't mind publicly saying it, and I will say it the next time I feel it. This system we have is too precious. It took too many lives to bring it here, to let somebody come in here and take his chances on killing a man, robbing a man, trying to escape and then beg and ask the jury, not him himself, but through cross-examination and casting reflections and dispersions on witnesses. . . . The case here, Ladies and Gentlemen of the Jury, is, "Find me guilty first, and then I'll take the stand and beg you to save my life."

    . . .

    He's had a trial of people in Lincoln County, some of whom, I believe, knew him before this, he's had the right to have witnesses face. He's had the right to cross-examination. He's had the right to have His Honor charge the jury correctly. He's had every right afforded a human being, although sometimes I wonder if they're really entitled to it.

*Cunningham v. Zant*, 928 F.2d 1006, 1019 & n.21 & n.22 (11th Cir. 1991); *see*

---

acceptance of responsibility, noting that the defendant had contested the charges at trial and had denied all the elements of the offense. *Id.* at 433. The Sixth Circuit observed that the suggestion that the defendant's exercise of his right to trial, to avoid death, refuted evidence of his acceptance of responsibility "carries little weight" and, thus, had a slight tendency to mislead the jurors. *Id.* at 434. Assuming impropriety, however, the Court declined to reverse, where the remark was isolated and not unduly emphasized and in light of the fact that eight jurors found the acceptance of responsibility mitigating factor established. *Id.*

*also id.* at 1019-20 (describing prosecutor's penalty-phase arguments as "outrageous"; "[The prosecutor] sought to inflame the jury and to misinform them as to the role that certain fundamental rights guaranteed by the Sixth Amendment play in our legal system and to suggest that [the defendant] was somehow not entitled to those rights.").

20. Commenting on the Defendant's Failure to Have Discussed or Apologized for the Crime Before Trial

A prosecutor is equally forbidden from presenting evidence or argument that the defendant declined to speak about the crime out of court after he was arrested and advised of his Fifth Amendment privilege. *See Doyle v. Ohio*, 426 U.S. 610, 617-18 (1976). Because such advice carries an implicit assurance "that silence will carry no penalty," *id.*, adverse use of that silence "violate[s] the Due Process Clause" and "fundamental fairness." *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993).

Thus, just as a prosecutor may not argue that a capital defendant lacks remorse because he did not testify, so the prosecutor may not base such an argument on the defendant's failure to speak about the crime prior to trial. *See State v. Call*, 508 S.E.2d 496, 522-23 (N.C. 1998) (death sentence reversed under *Doyle* because state elicited testimony that defendant "had not . . . expressed

remorse to his jailers, in violation of his right to due process and privilege against self-incrimination"); *see also Gholson v. Estelle*, 675 F.2d 734, 736-37, 741 (5th Cir. 1982) (competency psychiatrists' testimony that defendants did not demonstrate remorse "necessarily violated their fifth amendment rights . . . . Defendants . . . maintained silence regarding their guilt or innocence in response to questions about crimes for which they had been charged . . . . The defendants in this case, as in every criminal case, were under no duty to confess guilt").

21. Denigrating Defense Counsel or the Defense

The United States Constitution guarantees a capital defendant the rights to counsel and to introduce relevant mitigating evidence for the jury's consideration in determining the appropriate sentence. The government, then, may not urge the jury to impose a sentence of death because a defendant has exercised those rights. Accordingly, attacks on defense counsel or on a legitimate defense constitute grave prosecutorial misconduct. *See United States v. Young*, 470 U.S. 1, 9 (1985) (counsel "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate"); *United States v. Kallen-Zury*, 629 Fed. App'x 894 (11th Cir. 2015) (government improperly accused defendant's counsel of perpetrating fraud on the jury when it called defense counsel's charts a "sham"); *United States v. Montgomery*, 635 F.3d 1074, 1098 (8th Cir. 2011) (federal capital 2255 appeal;

noting that the Sixth Amendment "right to present a defense" includes the right to offer testimony and compel witness attendance and holding that "the prosecution cannot use the defendant's exercise of specific fundamental constitutional guarantees against him at trial."); *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) ("And in all events the prosecutor may not simply belittle the defense's witnesses or deride legitimate defenses.") (citations omitted); *Broom v. Mitchell*, 441 F.3d 392, 412-13 (6th Cir. 2006) ("It is improper to personally attack defense counsel or argue that counsel is attempting to mislead the jury."); *Gall v. Parker*, 231 F.3d 265, 314-16 (6th Cir. 2000) (condemning prosecution's strategy of improperly criticizing "the very use of the [insanity] defense, "rather than addressing its evidentiary merits head on"), *abrogated on other grounds as recognized in Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003); *United States v. Diaz-Carreon*, 915 F.2d 951, 958 n.13 (5th Cir. 1990) ("A prosecutor may not challenge the integrity or impugn the character of defense counsel.").

Courts have universally condemned such improper argument. *See*, *e.g.*, *Hughes v. Quarterman*, 530 F.3d 336, 346-47 (5th Cir. 2008) (error to argue that defense acted improperly in cross examining child witness); *United States v. Lopez*, 414 F.3d 954, 960 (8th Cir. 2005) (prosecutor's reference to defense counsel's "slick tactics" was improper); *United States v. Holmes*, 413 F.3d 770,

88

775 (8th Cir. 2005) (reversing conviction on the grounds of prosecutorial

misconduct because the prosecutor suggested to the jury that defense counsel was

distracting it with red herrings and insinuated the defense had been fabricated);

*United States v. Sanchez*, 176 F.3d 1214, 1224-25 (9th Cir.1999) (prosecutor

argued "[T]he defense in this case read the records and then told a story to match

the records. And, ladies and gentlemen, I'm going to ask you not to credit that

scam that has been perpetrated on you here"; court holds that prosecutor

committed misconduct "denigrating the defense as a sham"); *United States v.*

*Bennett*, 75 F.3d 40, 46 (1st Cir. 1996) ("The prosecutor is expected to refrain from

impugning, directly or through implication, the integrity or institutional role of

defense counsel."); *United States v. Procopio*, 88 F.3d 21, 32 (1st Cir. 1996)

(prosecutor told the jury that defense arguments were "illusions . . . a smoke screen

aimed at creating . . . an illusion"); *United States v. Friedman*, 909 F.2d 705, 709

(2d Cir. 1990) (improper for prosecutor to "malign defense counsel by accusing

him of willingness to make unfounded arguments" and to denigrate "defense

counsel's entirely legitimate role as an advocate"); *United States v. Resto*, 824 F.2d

210, 212 (2d Cir. 1987) (stating that references to defense tactics as "slick bits,"

"slyness" or "sleight-of-hand" were improper and warranted reprimand); *United*

*States v. Biasucci*, 786 F.2d 504, 514 (2d Cir. 1986) (stating that characterization

of defense questions as "nonsense" was "improper and ha[s] no place in any
court"); *United States v. Burse*, 531 F.2d 1151, 1154 (2d Cir. 1976) (reversing
conviction where prosecutor's misconduct included, among other things,
derogatory comments about defense counsel); *State v. Hulsey*, 243 Ariz. 367, 390,
408 P.3d 408, 431 (2018) ("The prosecutor's comments equating defense counsel
to Don Quixote were different from those discussing defense theories. The
prosecution impugned defense counsel's integrity by suggesting he was purposely
leading the jury on a make-believe expedition."); *Cardona v. State*, 185 So. 3d
514, 524-25 (Fla. 2016) (prosecutor denigrated the defense "by repeatedly
accusing the defense of using 'diversionary tactics.' In the same vein, the
prosecutor also warned the 'jurors that the defense would 'cloud' and 'muddle' the
issues, mocked the defense closing argument as a 'magnificent display ... a real
show' and suggested that defense counsel was being dishonest.")[30]

Examples of denigration argument in penalty-phase summations condemned
by the courts include:

- Deception, manipulation is a way of life and they want you
  to give her credit and say she's a good wife, a good mother.

---

[30] In *United States v. Whitten (Wilson)*, 610 F.3d 168, (2d Cir. Jun. 30, 2010), the Second Circuit rejected
appellant's contention that the government's arguments, castigating defense counsel for (1) presenting the mitigating
evidence, and (2) allegedly shifting the blame for the murders to the victims and others, required reversal. The Court
did not hold that the government's arguments were proper, but concluded, instead, only that the misconduct, if any,
could not be deemed severe and did not substantially prejudice appellant.

She never apologized for her actions.[31]

> And then after all of that she drags those kids into court
> here to testify in this high profile case in front of all these
> people and puts them through this again and victimizes
> them again in front of the whole world.
>
> . . . .
>
> She drug these kids in here to testify on her behalf. Don't
> you think that's painful for them. She's a good mom?
> Most of us, if we had children [and] we were involved in
> a situation we would want them a thousand miles away
> from this. We wouldn't make them come to court and
> testify.

*Montgomery*, 635 F.3d at 1096, 1098 ("The prosecution cannot use the defendant's

exercise of specific fundamental constitutional guarantees against [her] at trial.

Montgomery had the right to have her children testify at her trial It was thus

improper for the prosecutor to argue that Montgomery forced her children to testify

and 'victimized them again in front of the whole world.'")

- Regardless of what defense experts are trying to sell you in
  this case, we also each know that we are surrounded by
  people, people who have made more of their lives than their
  troubled beginnings might have supposed.

*United States v. Rodriguez*, 581 F.3d 775, 802 (8th Cir. 2009) (direct appeal of

---

[31]  The Eighth Circuit upheld, on appeal, the government's remarks about the defendant's failure to apologize to her children as proper rebuttal to the defense offer, as a mitigating circumstance, evidence that the defendant was a good mother. *Montgomery*, 635 F.3d at 1097.

federal death sentence; "Defense counsel was not 'selling' a case, but was instead

providing constitutionally required assistance as counsel.")

- What I like to call mitigating factors are excuses for murder because we have free will.

*United States v. Mitchell*, 502 F.3d 931, 995-96 (9th Cir. 2007) (in direct appeal of

federal judgment of death, comment "should not have been made").

- And he's going to do everything he can, through his attorneys, to take advantage of your caring, and your softness, and that softness which creates an inability to do something difficult like, you should be sentenced to death. He's not soft, he's what he is, however he got there, but he's not soft, but he depends on your soft underbelly, your lack of courage, your lack of commitment to get out of what he's into.

*State v. Cockerham*, 365 S.E.2d 22, 23 (S.C. 1988).

- [L]et's say you fall-I am going to talk about his defense. It was a fraud. And let's say you fall for that fraud and you say well, gee, I just can't bring myself to do what I should do, and I am going to impose life without parole. You don't die in prison of old age. People get out. Now, are you prepared to risk the life of some other person or child by giving him the opportunity to get out? That will be your risk. That will be your burden.

*Sechrest v. Ignacio*, 549 F.3d 789, 809 (9th Cir. 2008); *see also id.* at 812 (calling

the defense a "fraud" improperly inflamed the passions of the jury).

22. Demonizing the Defendant

The government may not use epithets or otherwise attempt to dehumanize or demonize the defendant through rank name-calling. Such comments not only amount to an improper personal expression of the prosecutor's own views, but also risk distracting the jury from a reasoned determination of the appropriate sentence. *See Kellogg v. Skon*, 176 F.3d 447, 451-52 (8th Cir. 1999); *see also*, *e.g.*, *United States v. Cannon*, 88 F.3d 1495, 1522 (8th Cir. 1996) (name calling "simply does not further the aims of justice or aid in the search for truth, and is likely to inflame bias in the jury and to result in a verdict based on something other than the evidence"), *abrogated in part on other grounds*, *Watson v. United States*, 552 U.S. 74 (2007).

In *United States v. Allen*, on direct appeal from a federal capital prosecution under the FDPA, the Eigth Circuit condemned as improper the prosecutor's reference, during penalty-phase closing argument, to the defendant as a "murderous dog." 247 F.3d 741 (8th Cir. 2001), *judgment vacated on other grounds*, 536 U.S. 953 (2002).

*Allen* is far from alone in finding prosecution name-calling and efforts to dehumanize the defendant outside the bounds of proper argument. *See*, *e.g.*,

*Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986) (prosecutor referring to defendant as an animal was "undoubtedly . . . improper"); *United States v. Klemis*, 859 F.3d 436, 442 (7th Cir. 2017) (prosecutor's references to the nine circles of hell depicted in Dante's Inferno and placing defendant in "the innermost circle reserved for the worst of the damned were "improper" because it was "a naked appeal to passion rather than reason and evidence and as such falls outside the bounds of proper closing argument."); *Wilson v. Sirmons*, 536 F.3d 1064, 1118 (10th Cir. 2008) ("As to the prosecutor's use of the terms 'animal' and 'unadulterated evil' to describe Mr. Wilson, we find the pejoratives unprofessional, inappropriate, and unworthy of an officer of the court."); *Fahy v. Horn*, 516 F.3d 169, 201 (3d Cir. 2008) ("We do not condone the characterization of [defendant] as demonic, nor consider it a proper form of argument."); *Bland v. Sirmons*, 459 F.3d 999, 1025 (10th Cir. 2006) (improper for prosecution to refer to defendant as "sniffling . . . coward," "heartless and vicious killer," and "violent and evil man"); *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000) (referring to defendant as a "predator" was improper "gratuitous insult[]"); *Kellogg*, 176 F.3d at 451-52 (prosecutor's references to defendant as "monster," "sexual deviant," and "a liar," were improper and "had no place in the court room"); *Preston v. Delo*, 100 F.3d 596, 602 (8th Cir. 1996) ("strongly" disapproving of referring to defendant as

"garbage"); *Miller v. Lockhart*, 65 F.3d 676, 684-85 (8th Cir. 1995) (prosecutor

described defendant as a "mad dog," and argued that "[y]ou don't do but one thing

with a mad dog. You put him to death.").[32]

### 23. Misleading the Jurors on the Consequences of Non-Unanimity

The government may not mislead the jurors regarding the consequences that

would follow in the event that the jurors are unable to render a unanimous

sentencing verdict. Under the FDPA, in the event of non-unanimity, the district

court will impose a sentence authorized by law. *See Jones v. United States*, 527

U.S. 373, 381 (1999); *see also* 18 U.S.C. § 3594. Retrial on the question of

punishment is not permitted in the event of jury deadlock. *Id.*

Regarding any potential verdict, whether death, life, or non-unanimity, "the

---

[32] *See also, e.g.*, *Martin v. Parker*, 11 F.3d 613, 616 (6th Cir. 1993) (granting habeas relief in part based on prosecution's comparing defendant to Hitler); *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (prosecutor's reference to the defendant as a liar was inflammatory and excessive); *Newlon v. Armontrout*, 885 F.2d 1328, 1337 (8th Cir. 1989) (cumulative impact of the prosecutor's misconduct, which included attempting to link petitioner with several well-known mass murderers such as Charles Manson, violated petitioner's due process rights); *United States v. Steinkoetter*, 633 F.2d 719, 720-21 (6th Cir.1980) (prosecutor's comparison of defendant to Pontius Pilate and Judas Iscariot mandates reversal); *People v. Johnson*, 803 N.E.2d 403, 421 (Ill. 2004) ("It is improper to characterize a defendant as 'evil' or to cast the decision of the jury as a choice between 'good and evil.'"); *People v. Arredondo*, 21 Cal. App. 5th 493, 502-06, 230 Cal. Rptr. 3d 380, 388 (Ct. App. 2018), as modified on denial of reh'g (Apr. 5, 2018), review denied (June 27, 2018) (Prosecutor's repeated references to defendants as "cockroaches…plainly denigrated and dehumanized the defendants….A fleeting characterization of  the defendants as cockroaches would not rise to the level of misconduct. However, the use here was not fleeting but relentless….The [] epithet became, by virtue of both its repetition and its power, the major theme of the prosecutor's argument. That theme was highly improper."); *Furnish v. Commonwealth*, 267 S.W.3d 656, (Ky. 2007) ("In closing argument, the Commonwealth called Appellant 'evil,' an 'animal' and a 'wolf.' We reiterate our previous condemnation of such improper attacks. There is no place in a courtroom for such personal vilification of a defendant, no matter how vile the charges against him."); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998) (frequent references to the defendant as "the evil one" and urging jury to "combat and destroy" the "evil one" improper).

jury must not be misled regarding the role it plays in the sentencing decision."
*Romano v. Oklahoma*, 512 U.S. 1, 8 (1994); *see Caldwell v. Mississippi*, 472 U.S.
320, 329-30 (1985).

Misleading information concerning the consequence of non-unanimity -- for
example, erroneously suggesting that a non-unanimous verdict would violate the
jurors' oaths or the law or that, in the event of jury deadlock, a retrial will be
required or that the defendant will receive a parole-eligible sentence -- risks
coercing jurors to abandon their conscientiously held views as to the appropriate
punishment in order to achieve unanimity and, thus, avoid the stated consequences.
"Any criminal defendant, and especially any capital defendant, being tried by a
jury is entitled to the uncoerced verdict of that body." *Lowenfeld v. Phelps*, 484
U.S. 231, 241 (1988); *see also Smalls v. Batista*, 191 F.3d 272, 279 (2d Cir. 1999)
("[c]oercion may be found when" juror is "encouraged to abandon, without any
principled reason," opinion that "juror conscientiously holds" about the appropriate
verdict, for the sake of achieving unanimity).

For example, in *Morris v. Woodford*, 273 F.3d 826, 841-43 (9th Cir. 2001),
the Ninth Circuit found constitutional error when a state trial court misinformed a
capital jury about what a not-unanimous verdict would mean. The trial court had
mistakenly told jurors that such a verdict would result in a sentence of life with

96

parole, when in fact state law mandated a sentence of life without parole if the jurors could not agree. *Id.* at 841. In reversing the death sentence on this ground, the Ninth Circuit noted that the "coercive potential" of such an instruction was "obvious." The jurors, who had sent a note asking what would happen if they could not reach agreement, would have understood the instruction as a way of "forcing a choice between two alternatives by threatening an unpleasant third alternative." If the jury was divided between death and life without parole, "'dissenting jurors'" would be "'effectively coerced into unanimity'" if they "'could not countenance allowing'" the defendant "'the prospect of parole.'" *Id.* (citation omitted).

Similarly, in *Hooks v. Workman*, 606 F.3d 715 (10th Cir. 2010), the Tenth Circuit concluded that the prosecutors engaged "engaged in wholesale and repeated attempts to mislead the jury as to its sentencing role under [state law]" and thereby, had "invaded [petitioner's] Eighth Amendment rights." *Id.* at 744. In that case, Oklahoma law, like the Federal Death Penalty Act, provided that, if the jury came back not unanimous, the defendant would receive a life sentence. The Tenth Circuit found that the prosecutors had improperly mislead the jury as to its role in sentencing by informing them, contrary to state law, that "(1) the jury's work would be wasted if it failed to reach a unanimous verdict, (2) defense counsel's argument that it took the vote of only one juror to prevent imposition of

97

the death penalty constituted a request for 'jury nullification,' and (3) failure to

deliberate in a manner leading to a unanimous verdict would amount to operating

outside the law." *Id.* at 742-43.

Specifically, the prosecutors argued, inter alia:

- It [sic] is certainly nothing easy about asking 12 strangers that don't know each other to come into the room here and listen to all of this and end up with unanimity going in the same direction. It's a tremendously difficult process and we know that.

    But again, it's the best system in the world. And it requires, though, these 12 people, these 12 strangers to come together and collaborate, discuss, make a decision. The system would actually grind to a halt. Think about it. It would grind to a screeching halt if juries didn't come together and do that.

    If we couldn't depend on 12 citizens to come together and go in the same direction, then we would never have a verdict. There would never be a disposition. Defendant[s] would go back to jail and wait for the next trial and they'd go back to jail and wait for the next trial and no one would ever be acquitted and no one would ever be sent on to the penitentiary.
    . . .
    Now I suggest that [defense counsel] will probably say something to the affect [sic] that someone on this jury could hold up a decision. He will likely tell you that it just takes one person to stop all this. That is such a common argument down here that it's got a name. It's called jury nullification.

    Nullification means an action impeding or attempting to

prevent the operation or enforcement of the law. Websters. Nullification means an action impeding or attempting to prevent the operation of the law.

In other words, to nullify a jury, a jury's job, a jury's efforts really requires only convincing one or two people to cripple it, to stop it. And while I don't want to beat this down I have got to tell you one more time that that's not what we're about. This system, and I remind you, is about deliberation. To do otherwise eviscerates the system. It cuts it up literally. It cuts it up. The very law that we live by. The 12 of you must resolve this case, all 12, I suggest.

And in rebuttal, the prosecutors continued:

[Defense counsel] mentioned that any one of you can control the result in this trial and you can do that legally. But ladies and gentlemen, there is not one chair up there. There's [sic] 12. Twelve chairs. And there's [sic] 12 chairs for that purpose. The Constitution of the United States guarantees a person a trial by a jury of his peers, not by one person, by a jury of his peers.

There's been far too much work go into this case. It's far too important in this case for someone to play martyr and try to hang it up.

*Id.* at 734-35; *see also id.* at 743 ("There is no doubt the intentional misconduct on the part of [the prosecutors] violated [petitioner's] constitutional rights.").

24. Arguing that Mercy Is Never Appropriate

It is improper for prosecutors to argue, directly or implicitly, that jurors may not consider mercy in deliberating between the sentences of life and death. *Wilson*

99

*v. Kemp*, 777 F.2d 621, 626 (11th Cir.1985) (granting penalty-phase habeas relief based on prosecution argument that mercy was not an appropriate consideration under the law). Argument that mercy is unavailable under the law "strikes at the core of the jury's role in capital sentencing" and withdraws "from the jury one of the most central sentencing considerations, the one most likely to tilt the decision in favor of life." *Drake v. Kemp*, 762 F.2d 1449, 1460 (11th Cir. 1985) (granting penalty-phase habeas relief based on prosecution's closing arguments). *See also Romine v. Head*, 253 F.3d 1349, 1367-68 (11th Cir. 2001) ("a prosecutor misleads a capital sentencing jury when he quotes scripture as higher authority for the proposition that death should be mandatory for anyone who murders his parents"; habeas relief granted).

In a federal capital prosecution, the government, during its penalty-phase closing statements, argued that that "mercy is not in the instructions" and "not something you do in this case." *United States v. Higgs*, 353 F.3d 281, 331 (4th Cir. 2003). On appeal, the Fourth Circuit observed that the statements arguably "crossed into argument in contradiction of the district court's instructions": "[T]he jury is empowered to show mercy to reject a death sentence." *Id.* The court, however, declined to reverse, concluding that the isolated comments did not prejudice the defendant.

100

### 25. Misstating the Evidence

"It is unprofessional conduct for the prosecutor intentionally to . . . mislead the jury as to the inferences it may draw." *United States v. Young*, 470 U.S. 1, 8 n.5 (1985) (citation and internal quotation marks omitted); *see also United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008); *United States v. George*, 201 F.3d 370, 373-74 (5th Cir. 2000).

> Misrepresenting facts in evidence can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." . . . This is particularly true in the case of prosecutorial misrepresentation because a jury generally has confidence that the prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty, whose interest "in a criminal prosecution is not that it shall win a case, but that justice will be done."

> *Gall v. Parker*, 231 F.3d 265, 313 (6th Cir. 2000) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974), and *Berger v. United States*, 295 U.S. 78, 88 (1935)).

Thus, courts have condemned as improper, government closing statements that are not reasonably supported by the evidence. *See, e.g., Land v. Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009) (where no direct evidence of events at victim's home, improper for prosecution to invite the jurors to speculate on interactions between defendant and victim; "The prosecutor exceeded the bounds

101

of appropriate conduct by claiming to describe exactly what happened, and particularly what was said, with such specificity."); *Bland v. Sirmons*, 459 F.3d 999, 1028-29 (10th Cir. 2006) (because jury did not convict defendant of felony-murder charged, predicated on robbery, improper for the prosecution to argue that the homicide was committed in the course of a robbery during penalty-phase summations); *Le v. Mullin*, 311 F.3d 1002, 1020 (10th Cir. 2002) (prosecution improperly misstated the evidence, arguing that defendant laughed after the homicide; "The Assistant District Attorney's comment was erroneous in that it mischaracterized trial testimony in order to show that [defendant] was either remorseless or actually made light of the tragic events of that day. No evidence supports this characterization of the . . . testimony."); *Miller v. Lockhart*, 65 F.3d 676, 682 (8th Cir. 1995) (prosecutor suggests without support in evidence that defendant escaped from jail before); *Tucker v. Kemp*, 762 F.2d 1496, 1507 (11th Cir. 1985) (*en banc*) (although prosecution may argue reasonable inferences from the evidence, prosecution's closing argument that defendant forced the victim to engage in oral sex was a "gratuitous and unsupported charge" and, therefore, "serious professional impropriety").[33]

---

[33] *See also*, *e.g.*, *Berger v. United States*, 295 U.S. 78, 88 (1935) (in reversing the defendant's conviction, the Supreme Court held that: "[T]he United States prosecuting attorney overstepped the bounds of that propriety and fairness . . . by misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him

Dated:       New York, New York
             March 6, 2023

                              Respectfully Submitted,


                              _____/s/_____

                              David E. Patton, Esq.
                              Andrew J. Dalack, Esq.
                              Sylvie J. Levine, Esq.
                              Annalisa Mirón, Esq.
                              David Stern, Esq.

                              Counsel for Sayfullo Saipov

---

personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner."); *United States v. Wilson*, 135 F.3d 291 (4th Cir. 1998) (reversal based on prosecutor's repeated argument that the defendant had committed a murder when no evidence supported that argument); *United States v. Donato*, 99 F.3d 426 (D.C. Cir. 1996) (reversal based on prosecutor's inaccurate statement concerning evidence of defendant's motive).