UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                                          :
UNITED STATES OF AMERICA                                  :
                                                          :
                                                          :        S1 17-CR-722 (VSB)
                    -against-                              :
                                                          :        **OPINION & ORDER**
                                                          :
SAYFULLO HABIBULLAEVIC SAIPOV,                            :
                                                          :
                    Defendant.                            :
----------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

      Defendant Sayfullo Habibullaevic Saipov ("Defendant" or "Saipov") was charged in a

twenty-eight count superseding indictment, filed on June 19, 2018 ("Superseding Indictment").

Saipov was convicted on all twenty-eight counts in the indictment when the jury returned its

verdict on January 26, 2023.  The Government's penalty phase presentation began on February

13, 2023, and concluded on February 22, 2023 when the Government rested its case.[1]  During

trial on February 16, 2023, Saipov orally moved for a mistrial principally based on the testimony

of Lieve Wyseur.  I held any decision on the application for a mistrial in abeyance, and stated

that I wanted to give the parties the opportunity to make written submissions.  By letter dated

February 17, 2023, Saipov submitted his written motion for a mistrial.  (Doc. 731.)  On February

20, 2023, the Government filed its opposition to Saipov's motion for a mistrial, (Doc. 737), and

on February 22, 2023, Saipov filed his reply, (Doc. 747).

---

[1] On March 13, 2023, the jury rendered its penalty phase decision by indicating that they were unable to reach a
unanimous decision on any of the capital counts.

On February 22, 2023, I issued an oral decision denying Saipov's motion for a mistrial but indicated that I would issue a written opinion with additional details concerning my legal and factual reasoning.  I now issue that decision.  Because testimony of the victim-impact witnesses (1) was appropriate, (2) was well within the bounds of the law, and (3) did not create unfair prejudice, Saipov's motion for a mistrial is DENIED.  In addition, because Saipov's request for an order directing the court reporters to retain their tape recordings has no support in the law, Saipov's motion for an order directing the retention of such tapes is also DENIED.

### I.    Background and Procedural History

Defendant Sayfullo Habibullaevic Saipov was charged in a twenty-eight count indictment with, among other offenses, eight counts of murder in aid of racketeering and eighteen counts of attempted murder, arising out of an attack in New York City on October 31, 2017, in which Defendant Saipov—acting on behalf of the Islamic State of Iraq and al-Sham ("ISIS")—drove a flatbed truck onto a cycling and pedestrian pathway on the west side of lower Manhattan, killing eight people and injuring at least eighteen others.

Jury selection began in this death penalty case on October 11, 2022 and concluded on January 5, 2023.  The trial phase began on January 9, 2023 and concluded on January 26, 2023 when the jury returned guilty verdicts on all twenty-eight counts in the Superseding Indictment.

The penalty phase of the case began on February 13, 2023.  The Government concluded its penalty phase presentation on February 22, 2023, and the defense ("Defense") concluded its penalty phase presentation on March 1, 2023.  During its presentation, the Government called thirty-one witnesses.  Of these witnesses, sixteen were either family members or friends of the eight murdered victims.

During trial on February 16, 2023, Saipov moved for a mistrial principally based on the testimony of Lieve Wyseur, the mother of deceased victim Ann-Laure Decadt, arguing that "[s]he was extremely emotional" was "uncontrollably weeping throughout portions of her testimony" and that she became "very angry" when describing the 14 days it took to take her daughter's body home.  (Tr. 2549:3-10.)[2]  Counsel also argued that Ms. Wyseur's comment that she "regretted that [her surviving daughters] could not" describe the impact that Ann-Laure's death had on them suggested that "the defense is preventing that or there is some objection we've made to them not being able to testify."  (Tr. 2549:11-16.)[3]  Finally, counsel argued that Ms. Wyseur's testimony about the impact on her older grandson was too attenuated to Saipov's attack and the death of his mother.  (Tr. 2549:17-25.)

I held any decision on the application for a mistrial in abeyance because I anticipated that—as the Defense has done repeatedly throughout the trial—the Defense would file a letter motion after making their oral motion, and I stated I wanted to give the Defense that opportunity and the Government an opportunity to file an opposition so I would not need to rule piecemeal. However, I did mention that I thought that a curative instruction could be issued concerning the 14-day delay in transporting Ms. Decadt's body back to Belgium.

By letter dated February 17, 2023, Saipov submitted his second written motion for a mistrial arguing that "[t]he government's victim-impact presentation has deprived Mr. Saipov of his right to a fair and reliable penalty phase under the Fifth and Eighth Amendments," and

---

[2] "Tr." refers to the trial transcript.

[3] Despite moving for a mistrial based upon these two portions of Ms. Wyseur's testimony, among other things, the Defense declined my offer to give curative instructions related to this testimony.  (Tr. 3285:24-3286:7.)

requesting that I "declare a mistrial and direct the court reporters to preserve the audio recordings of the penalty phase for the record." (Doc. 731 at 1.)

In his February 17 letter, Saipov referenced the testimony of Alexander Naessens, Ann-Laure Decadt's widower, and Ms. Wyseur. However, Saipov mainly focuses on Ms. Wyseur's testimony. Saipov claims that Ms. Wyseur "wept and sobbed through most of her testimony," was angry at times, which Saipov claims was a "quintessential appeal to passion and emotion." (*Id.* at 1.) Saipov also claims that Ms. Wyseur referenced "painful circumstances and situations following Ms. Decadt's death that are indisputably attenuated" from his attack. (*Id.* at 1-2.) Finally, Saipov argues that because "it is not possible to cure the unfair prejudice from the accumulated testimony, a mistrial is warranted." (*Id.* at 2.)

On February 20, 2023, the Government filed its opposition to Saipov's motion for a mistrial. (Doc. 737.) The Government argues that Saipov essentially "seeks relief because the witnesses—the mother and husband of Ann-Laure Decadt, one of the defendant's murder victims—expressed emotion while testifying and because they described the consuming impact of Ms. Decadt's death on themselves and on Ms. Decadt's children," but that such "testimony was well within the bounds of the law". (*Id.* at 1.) On February 22, 2023, Saipov filed his reply, claiming that the Government's comment that I "carefully noted the non-verbal aspects of the witnesses' testimony throughout the penalty phase when the defense has raised these issues" is "neither accurate nor complete." (Doc. 747 at 1.) Saipov claims that I had "not endeavored to make anything resembling a complete and detailed record on audible or visible displays of reaction or emotion from the government's two dozen impact witnesses—or any record on such displays from members of the gallery or some jurors in reaction to such testimony, though defense counsel has also cited those displays during sidebars and in filed papers." (*Id.*) Saipov

then asserts that, because of the disputes between the parties during the penalty phase concerning the displays of emotion by certain of the victim witnesses, he was including in his reply "observations of some of the government's victim-impact witnesses' non-verbal conduct" which included "observations" with "input from the defense team who were present in court for the government's victim-impact presentation."[4]  (*Id.*)

## II.    <u>Applicable Law</u>

"The Eighth Amendment does not erect a per se bar to the admission of victim-impact evidence in a death penalty case."  *United States v. Whitten*, 610 F.3d 168, 187 (2d Cir. 2010), citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).  Evidence concerning the personal characteristics of a victim and the effect of a murder on survivors "[i]s simply another form or method of informing the sentencing authority about the specific harm caused" by the defendant's crime in a capital case.  *Id*. (citing *Payne*, 501 U.S. at 825).  Victim-impact evidence is designed to show "each victim's uniqueness as an individual human being, whatever the jury might think the loss to the community resulting from his death might be."  *Payne*, 501 U.S. at 823 (internal quotation marks omitted).  Therefore, it is appropriate for a "jury to assess meaningfully the defendant's moral culpability and blameworthiness" by having "before it at the sentencing phase evidence of the specific harm caused by the defendant."  *Id*. at 825.  However, "[d]ue process is violated when victim-impact evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair."  *Whitten*, 610 F.3d at 190 (internal quotation marks omitted).

---

[4] In reply Saipov raises new facts and arguments that he did not make in his opening letter; thereby depriving the Government of the opportunity to specifically address the new facts and arguments.  Although this could be viewed as impermissible, (*see United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003) ("We will not consider an argument raised for the first time in a reply brief.")), I will address these new facts and arguments in this Opinion & Order.

"It cannot be expected that victim-impact testimony will be cool and dispassionate. Some deaths cause more suffering than others.  The only way to ensure against victim-impacts caused by one's murder of a well-loved human being is to take care to murder no one at all."  *Id.* at 191.  Moreover, in assessing victim-impact testimony, "[t]he magnitude of the crime cannot be ignored," because "[i]t would be fundamentally unfair to shield a defendant from testimony describing the full effects of his deeds simply because he committed such an outrageous crime," and "[t]he sheer number of actual victims and the horrific things done to them necessarily allows for the introduction of a greater amount of victim-impact testimony in order for the government to show the harm caused by the crime."  *United States v. McVeigh*, 153 F.3d 1166, 1221 (10th Cir. 1998).

The Second Circuit and other courts of appeals have approved "emotionally charged" victim-impact testimony.  For example, in *Whitten* the Second Circuit found that

> The family members of Detectives Andrews and Nemorin delivered emotionally charged testimony. The anguished testimony of Detective Nemorin's widow described how her children visit the cemetery on Father's Day and other occasions, write letters to their father, and embrace his headstone.  Even such testimony does not appear to exceed (or approach) the margins of what has been allowed.

610 F.3d at 190.

In *United States v. Savage*, the Third Circuit noted that "courts have held victim-impact statements directly asking the jury for a death sentence violate the Eighth Amendment."  970 F.3d 217, 299 (3d Cir. 2020).  However, "abstract pleas for justice, accountability or closure do not by themselves violate the Eighth Amendment," "nor does 'emotionally charged testimony inviting the jury to infer a desire for execution, as long as no evidence as to the witnesses' preferred sentence is actually admitted."  *Id*. at 300 (quoting *Whitten*, 610 F.3d at 190–92).  Accordingly, the Third Circuit held that the following statements did not cross the line:

"I can't understand how or why a person would do such a heinous act.  Then to say such hurtful words after you have did this to our family. . . .  I feel that everyone involved should get the same sentence as if they all threw the gasoline and match. How do they sleep at night? My family didn't deserve this at all [ ] . . . I'm afraid of courtrooms due to you don't know who is who and not living in a safe environment because of pollution of murderers who saw fit to kill children. . . .  My prayer is full justice for all."

"My son and his paternal family were brutally murdered for no reason. . . .  This was the worst crime in the history of Philadelphia in 2004. . . .  How do you live with yourself and the decisions you've made? . . .  How do we go on in our daily lives knowing you could care less that you inflicted so much pain and grief to so many people?"

"Every year on October 9th I'm reminded how the evil actions of one man cost my family a tremendous loss."

*Id*. at 301–02.

Other courts of appeals have found no abuse of discretion denying mistrial motions where witnesses gave emotional testimony specifically directed at the defendant.  *See e.g., United States v. Roof*, 10 F.4th 314, 374, 376 (4th Cir. 2021), *cert. denied*, 143 S. Ct. 303 (2022) ("He's evil.  There's no place on earth for him except the pit of hell. . . . Send himself back to the pit of hell, I say."); *United States v. Barnette*, 390 F.3d 775, 798–801, n.7 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005) ("I didn't get to tell her good-bye.  She was the joy of my life.  Marc [the defendant] knew she was the joy of my life.  The only little girl I had.  The only little girl I had.  You knew that, Marc.  You took her life.  Took away her future.  You know how much she meant to me. . . . How can you kill my baby?  Why you kill my baby, Marc?  She loved you, you know that.  She never mistreated you, Marc.").

The Tenth Circuit held in *United States v. Chanthadara*, that the victim witness testimony at trial was not "so prejudicial as to render the proceeding fundamentally unfair."  230 F.3d 1237, 1274 (10th Cir. 2000).  That testimony included testimony by deceased victim's "husband and two children, ages seven and ten," which was "amplified with numerous colored

photographs of Mrs. Sun while she was alive," "[b]oth children ended their testimony in tears," and the jury was permitted to "take into the jury room physical evidence of the impact of Ms. Sun's death on her children," including "letters the children had written to their dead mother and a daily journal which described one child's loss." *Id*.

In *United States v. McVeigh*, McVeigh argued that the Government's victim-impact witnesses "allowed witnesses to eulogize their loved ones." Those witnesses testified to, among other things, "Westberry's description of her grandson's uncontrollable crying on hearing of her husband's death; Whicher's recollection of 'screaming out that I wanted to die' and frightening her children; and Treanor's recounting of the recovery and return of her deceased daughter's hand six months after the explosion. . . . Gregory Sohn's testimony about breaking down upon learning of his wife's death and Sharon McCullough's account of her son's cries of 'I don't want my dad to be dead' as he saw pictures of the remains of the Murrah Building on television and the prayer he offered later when he calmed down." 153 F.3d 1166, 1219 (10th Circ. 1998). The Tenth Circuit disagreed with the defendant's characterization stating that "the unique qualities of a murdered individual and his or her life accomplishments constitute the core impact evidence describing a victim's 'uniqueness as an individual human being' allowed by [the Supreme Court in] *Payne*." *Id*. (quoting *Payne*, 501 U.S. at 823).

### III.   Discussion

On January 26, 2023, I denied Saipov's motion for a mistrial based on the victim-impact testimony elicited during trial. (Tr. 2783:24-2790:24.) At that time, I held that "because the request for a mistrial and the testimony upon which it is based does not exceed the bounds of the law and did not create unfair prejudice, Saipov's motion for a mistrial is denied," (Tr. 2787:7-10), and indicated that I would issue a more detailed written decision, (Tr. 2786:21-23; 2790:19-

24).

Before addressing some of Saipov's specific complaints and assertions related to the substantive testimony of the victims, I address some of his generalized and conclusory statements.  In his reply, Saipov argues that "because of the extensive number of witnesses and the lengthy questioning overlayed with photos, letters, demonstratives, and videos that triggered highly emotional reactions, the cumulative effect of five days' worth of victim-impact testimony is so much so that it has deprived Mr. Saipov of his right to a fair and reliable penalty phase under the Fifth and Eighth Amendments."  (Doc. 747 at 3).  Saipov is wrong to the extent he means that sixteen witnesses for the eight deceased victims is an excessive number of witnesses. The Government did not call an excessive number of victim witnesses, nor could the questioning of the witnesses it did call be appropriately described as "lengthy".  I addressed this issue in my oral ruling stating:

> . . . I previously ruled, the number of victim witnesses here is not what I would describe as extensive.  There were two victim witnesses for each deceased victim. And then there were victims -- the victims who were injured who also testified. That is well within the bounds of victim testimony in death penalty cases in terms of number.  In addition, I would not characterize the questioning as lengthy questioning.  As I recall it, with regard to each of the victim's testimony, I don't recall any exceeding approximately 45 minutes and many were shorter than that. The simple fact is that that testimony was limited, focused, and direct and, therefore, not something that I would describe as extensive where we spent an hour or more on any one particular witness in that regard.  I just wanted to note that to the record.  And also, as I have previously noted, with regard to the photos and other things that have been used, they too have been limited when you're talking about, A, the limited nature of their testimony, 30 to 40, 45 minutes, and the number of exhibits have in fact been limited again, from my perspective, and also pointed.

Tr. 2789:24–2790:18.

Two witnesses for each deceased victim is not an excessive number, and is fewer than the number of victim witnesses who testified in the penalty phases of other death penalty cases.  *See*, *e.g.*, *Whitten*, 610 F.3d at 176 (Government's victim-impact evidence consisted of 10 witnesses;

5 for each of the deceased victims.); *Roof*, 10 F.4th at 366 (Roof killed nine individuals and during trial "the government presented victim-impact testimony from twenty-three witnesses."); *United States v. Lawrence*, 735 F.3d 385, 405–06 (6th Cir. 2013) (holding that "victim-impact evidence from [seven of] Hurst's family members and fellow police officer was neither improper nor excessive."); *United States v. Nelson*, 347 F.3d 701, 713 (8th Cir. 2003) (finding that six victim-impact witnesses testifying about a deceased victim was not cumulative or unduly prejudicial).[5]

The witnesses called by the Government to describe the unique lives of the deceased victims were family members and friends of the victims.[6]  However, each of the victims had professional lives and were also involved in various aspects of their respective communities, but the Government did not call witnesses from these areas of the victims' lives—although they certainly could have—to provide a more detailed picture of each victim's uniqueness, and the impact their deaths had on others.  Saipov's suggestion that the number of witnesses was excessive is simply not accurate.

Saipov also complains about the substance of the victims' testimony and the level of emotion certain witnesses exhibited while testifying.  Such complaints are without merit.  The victim-impact testimony was not unduly prejudicial such that it rendered the trial fundamentally unfair.  Indeed, I find the testimony of the Government's victim-impact witnesses does not even come close to the line and is well within the bounds of victim-impact testimony described in and

_____

[5] The number of Government exhibits, less than 130 exhibits admitted throughout the entirety of the penalty phase as related to both victim-impact witnesses and the testimony of Bureau of Prison personnel, which included only 51 photos and/or video excerpts of the deceased victims as they were in life (just 18 more family photos than the Defense used in its own penalty phase presentation), was also reasonable.  *See Whitten*, 610 F.3d at 176 (finding it appropriate to admit forty-one photographs of two deceased victims as they were in life).

[6] Some of the friends who testified also worked with certain of the deceased victims.

approved of by the Second Circuit and other courts of appeals.

I will address some of Saipov's specific complaints concerning the substantive testimony of certain of the victim-impact witnesses below. However, I more generally address his arguments here. Saipov indiscriminately killed mothers, fathers, sons, and daughters. Any complaints concerning testimony that described these characteristics of the victims and the loss felt by those who loved them are unfounded. The fact that children are left without their mothers and mothers and fathers, and parents are left without their sons and daughters is the direct result of Saipov's crime. The death of certain victims meant that parents were left without children, the death of others meant that young children were left without their mother or father, and all of their deaths meant that their friends and colleagues also suffered a loss. That is just the reality of Saipov's attack, and, as a general matter, I find his complaints related to testimony that described the unique nature of the deceased victims to be baseless and without merit. *See Whitten*, 610 F.3d at 191 ("Some deaths cause more suffering than others. The only way to ensure against victim-impacts caused by one's murder of a well-loved human being is to take care to murder no one at all."). "The magnitude of the crime cannot be ignored," and Saipov's efforts to sanitize the victim-impact witnesses' testimony at various points throughout the trial was not warranted under the case law as "[i]t would [have been] fundamentally unfair to shield [Saipov] from testimony describing the full effects of his deeds simply because he committed such an outrageous crime." *McVeigh*, 153 F.3d at 1221.

In Saipov's opening letter seeking a mistrial he focused on the testimony of Alexander Naessens, Ann-Laure Decadt's widower, and Lieve Wyseur, Ms. Decadt's mother.[7] However, in

_____

[7] Saipov claims that his letter motion was necessitated by my denial of his renewed "motion to compel the

reply Saipov included summaries of purported "observations of some of the government's victim-impact witnesses' non-verbal conduct." (Doc. 747 at 1.) He claims this was necessary because of "the government's repeated, sharp disagreements with defense counsel's representations about such displays, and given the importance of an accurate record of them for any appellate court that might need to review the denial of Mr. Saipov's mistrial motion or any of the Court's series of adverse rulings about victim- and survivor-impact testimony". (*Id.*) According to Saipov, "[t]he observations include[d] input from the defense team who were present in court for the government's victim-impact presentation, which began on February 13, 2023, and ended yesterday, February 21, 2023".[8] (*Id.*)

Saipov also claims that the Government's statement that I "carefully noted the non-verbal aspects of the witnesses' testimony throughout the penalty phase when the defense ha[d] raised these issues" was "neither accurate nor complete." (*Id.*) I will not characterize whether my efforts to document my observations on the record—often in response to mischaracterizations by

---

government to produce scripts of the remaining victims' testimony" purportedly "so that the defense and the Court could better assess the propriety of the rest of the victims' testimony and avoid more unfair prejudice to Mr. Saipov." (Doc. 731 at 1.) Saipov failed to identify anything in the Federal Death Penalty Act or case law that such scripts are required or even advisable where the parties have not agreed to such a process. Here I note that (1) the Government began producing 3500 material for its penalty phase witness in March 2019 and continued to supplement that material as witnesses were interviewed, (Doc. 713), and (2) Saipov has been in possession of an informative outline since September 13, 2022 and a detailed supplement to that outline with highlighted passages from the 3500 material of the portions of the witnesses' 3500 material that related to their penalty phase testimony since the end of January 2023. I also note that trial in this case was scheduled to begin in April 2020 (*see* Doc. 320) —in fact the jury selection process had already begun in February 2020—that there are 7 defense attorneys listed on the docket, and there have been at least 5 defense attorneys at counsel table or in the courtroom throughout the trial. These are just the attorneys of which I am aware; however, there have no doubt been many more legal professionals who have worked on this case since 2019. Therefore, Saipov had the material in his possession to make specific objections in advance of a witness's testimony to subject matters or issues he believed to be prejudicial (but he rarely if ever did so), had the personnel to completely review, summarize and digest that material, and had more than enough time to do so. In fact, the Defense did not object to any victim-impact testimony in real time—before or as a witness was answering a question—instead opting to request side bars most often at the conclusion of a witness's testimony to voice objection to the substance of the testimony or the emotion displayed by the witness or both.

[8] I note that Saipov did not raise many of these issues with me in real time when they were purportedly occurring.

the Defense of the non-verbal aspects of certain of the victim-impact witnesses—were complete; however, I describe below the specific comments I made related to the non-verbal aspects of certain of the victim-impact witnesses.

### A.  *Mr. Naessens's Testimony*

With respect to the testimony of Mr. Naessens, Ann-Laure Decadt's widower, Saipov claims that testimony related to "Ms. Decadt's commitment to 'the less fortunate people in life'", her "musings about their future together", and "the pain and anguish" suffered by his wife, children, and himself was improper.  (Doc. 731 at 3–4.)  I previously ruled that testimony concerning a "deceased victims' professional business, business, and community contributions" was admissible.[9]  (Tr. 1902:3-1903:5.)  Indeed, when I asked defense counsel "whether this type of testimony would be admissible if it was related to what a witness loved or missed . . . the most about the deceased, the defense acknowledged that it would be".  (Tr. 1902:13-17.)   Despite this concession and my prior ruling, Saipov again claims that Mr. Naessens's testimony about his wife's charitable acts "readily invited jurors to compare the value of Ms. Decadt's life to Mr. Saipov's in a way that is incompatible with the Fifth and Eighth Amendments."  (Doc. 731 at 3.)  Saipov is wrong; that is simply not the case.  Mr. Naessens did not mention or suggest any comparison during his testimony.  Instead, he described how his wife cared for others and he provided an example.  Such testimony is clearly permissible to provide the jury with information so that they can understand Ms. Decadt's "uniqueness as an individual human being."  *Payne*, 501 U.S. at 823.

---

[9] I note that the Government represented during the conference on February 3, 2023, and again in a letter on February 6, 2023 "that it [would] not elicit testimony . . . suggesting that the defendant is more deserving of punishment because his victims were assets to the community."  (Tr. 1902:10-13.)

Mr. Naessens's testimony concerning the box his wife left for him when they first started dating as she was leaving on a trip served as an example to the jury of Ms. Decadt's creative, funny, and romantic nature.  (Tr. 2502:6-8 ("Yes, I think it was typical of her because it was very creative, also very funny and very romantic.  I think that is typical of her traits.").)  Ms. Decadt took a simple object—a cardboard shoe box—and made it into a symbol of her love and her hopes for a future with Mr. Naessens.  (*See* Tr. 2500:1-2502:8.)  Here again, Mr. Naessens was describing his wife and did not either directly or indirectly suggest a comparison to Saipov.  This testimony falls squarely within permissible victim-impact testimony to demonstrate the uniqueness of the victim and the loss to those who loved her.  *See Payne*, 501 U.S. at 823 (Victim-impact evidence is designed to show "each victim's uniqueness as an individual human being, whatever the jury might think the loss to the community resulting from his death might be.") (internal quotation marks omitted); *McVeigh*, 153 F.3d at 1219 (". . . the unique qualities of a murdered individual and his or her life accomplishments constitute the core impact evidence describing a victim's uniqueness as an individual human being allowed by [the Supreme Court in] *Payne*.") (internal quotation marks omitted).  Saipov's suggestion that this "testimony transcended a 'brief glimpse' into Ms. Decadt's life, and instead readily invited sympathy from the jurors and anger at Mr. Saipov for having deprived Mr. Naessens and Ms. Decadt of their fantasies and life together" is inaccurate and meritless.  (Doc. 731 at 4.)  The testimony provided only one example of Ms. Decadt's creative, funny, and romantic nature, and spanned only two pages of trial transcript.

Finally, Saipov claims that Mr. Naessens's testimony about the impact of his wife's death on his sons, and description of "the pain and anguish he felt in delivering the news of his wife's passing to his oldest son and the pain his son continues to feel and display for not being able to

have her in his life" was improper.  (Doc. 731 at 4.)  Specifically, Saipov quoted the following

testimony by Mr. Naessens in response to how his wife's death was impacting him

> First of all, I—of all people, she is the worst off.  She can never
> enjoy life any more.  She can never see her own kids grow up.  And
> second place I think my children are worst because they will never
> have their mother, never have the most important person in their life,
> never.  And as for me, you know, my life is ruined.

(Tr. 2513:24–2514:4.)  Saipov claims that this testimony "transcended a mere description of pain

and loss and all but urged jurors to end Mr. Saipov's life because he had ended Ms. Decadt's and

'ruined' the lives of her husband and children."  (Doc. 731 at 4.)  Saipov is making connections

that were not made by the witness either directly or indirectly.  Rather, Mr. Naessens's testimony

concerning the consequences on his family of Saipov murdering his wife is unquestionably

appropriate victim-impact testimony.  *See Whitten*, 610 F.3d at 191 ("It cannot be expected that

victim-impact testimony will be cool and dispassionate.  Some deaths cause more suffering than

others."); *McVeigh*, 153 F.3d at 1221 ("The magnitude of the crime cannot be ignored," by a court

assessing victim-impact testimony, because "[i]t would be fundamentally unfair to shield a

defendant from testimony describing the full effects of his deeds simply because he committed

such an outrageous crime").

For all of these reasons, I again reject Saipov's complaints regarding Mr. Naessens's

testimony, find his testimony permissible victim-impact testimony, and find that the testimony

does not support Saipov's motion for a mistrial.

## B.  *Ms. Wyseur's Testimony*

With respect to Ms. Wyseur, Ann-Laure Decadt's mother, Saipov's characterization that

"[t]hroughout her testimony, Ms. Wyseur wept and became visibly angry, and at various times,"

commented on "impacts completely attenuated from the offense", (Doc. 731 at 5), inaccurately

describes Ms. Wyseur's testimony.  Although Ms. Wyseur cried at times during her testimony, she completed her testimony without interruption, the interpreters never asked Ms. Wyseur to repeat an answer because they could not understand her, she never asked for a break, and I did not believe that her level of emotion warranted my intervention to call for a break.  In other words, I do not find that Ms. Wyseur's displays of emotion—which were natural given the circumstances and not prohibited by the law—unduly prejudiced Saipov.  *See Whitten*, 610 F.3d at 191 ("It cannot be expected that victim-impact testimony will be cool and dispassionate.").

Saipov argues that:  (1) Ms. Wyseur's having to return to Belgium the day after the attack without her daughter's body was "completely attenuated from the offense"; (2) Ms. Decadt's son's reaction to a minor cut while possibly related to his mother's death was "just as likely" unrelated to her death; and (3) Ms. Wyseur's "survivor's guilt" and sorrow at her daughter's lost "opportunity to experience motherhood" were improper "appeal[s] to passion and emotion." (Doc. 731 at 1, 5–6).  These arguments ignore the reality of the impact on Ms. Wyseur, her daughters, and her grandson.  The Government correctly points out that (1) "the defendant strategically decided not to cross-examine Ms. Wyseur about these topics, [(2)] did not object to her testimony at the time it was delivered, and [(3)] did not object to these aspects of her testimony despite each of these categories being noticed in the highlighted 3500 material attached to the revised informative outline."  (Doc. 737 at 5.)

Saipov claims that Ms. Wyseur's testimony about having to leave behind her daughter's body when she returned to Belgium was "indisputably attenuated from the truck attack."  (Doc. 731 at 1–2.)  As an initial matter, Saipov does not cite any cases where a court found the testimony of a victim-impact witness to be too attenuated from the underlying crime to be properly considered, let alone a case that found such testimony to be unduly prejudicial so as to

support a mistrial motion. Although Saipov repeatedly uses the word "attenuated" to describe this impact he never states how or why the impact described by Ms. Wyseur relating to the return of her daughter's body to Belgium was attenuated from the truck attack. The reason for this failure is simple. The return of Ms. Decadt's body to Belgium is directly related to the truck attack. Saipov admitted that he targeted the bike path—a location frequented by New Yorkers and tourists—as a location where he could kill as many people as possible. To further this goal, he committed his terrorist attack in the middle of the afternoon on Halloween. The fact that the bodies of deceased victims would require transport to their homelands, and the corresponding pain and anguish to family members and friends—whether they had to leave their loved ones behind or not—was a direct result of Saipov's truck attack. In other words, there was nothing attenuated about Ms. Wyseur having to deal with the logistics of the transport of her daughter's body back to Belgium in the immediate aftermath of the truck attack. As the Government notes, "[t]here is nothing unfair about the defendant being held accountable for that impact and that harm he has caused to his victims". (Doc. 737 at 5.)

Ms. Wyseur's testimony concerning the impact she observed on her grandchildren following Saipov's murder of their mother is also proper victim-impact testimony. Saipov's argument to the contrary is specious. Ms. Wyseur observed that Ann-Laure Decadt's older son—Raphael—developed a significant fear of death following his mother's sudden death, for which she provided two examples. First, she described her grandson's reaction to a minor cut, stating "he was in total panic, and he was screaming and he thought he was going to die." (Tr. 2539:16-17.) She was so concerned that she contacted his father so that he could come and calm his son down. (Tr. 2539:20-21.) Second, while putting together a puzzle, he became afraid that a child depicted in a puzzle who was standing in front of a tractor was about to be run over by

the tractor and killed.   (Tr. 2539:22-2540:9.)  Saipov suggests that these two incidents could be unrelated to the impact of Ms. Decadt's murder.  However, Saipov ignores the fact that Ms. Wyseur, as the child's grandmother, would be in an ideal position to detect dramatic changes in her grandson's behavior, and that Ms. Wyseur's observations are consistent with the testimony of Mr. Naessens concerning the emotional impact on his older son.[10]  Even if I were to assume that Ms. Wyseur is wrong about her grandson's behavior—although there is no reason to make such an assumption—her interpretation of those incidents would be additional evidence of the impact of her daughter's murder on her; either way it is appropriate victim-impact testimony.

Finally, Ms. Wyseur's testimony expressing her desire to "trade places with her [daughter]" and the sorrow she felt that her daughter lost the "opportunity to experience motherhood" is plainly appropriate evidence of victim-impact testimony.  (Tr. 2543:11-16.)  Ms. Wyseur's expression of her desire to "trade places" with her daughter is indicative of the psychological impact of her daughter's murder at Saipov's hands.[11]  Similarly, Ms. Wyseur's sorrow at what Ms. Decadt will miss out on in life not only speaks to the impact on her but also "goes squarely to one of Ms. Decadt's defining characteristics as an individual human being:  her motherhood."  (Doc. 737 at 6.)

---

[10] It is also relevant to Ms. Wyseur's testimony to point out that she lives close to Mr. Naessens and her grandchildren, and Raphael is "very often in [her] home."  (Tr. 2539:12-13.)  In fact, during both of the incidents discussed above—the minor cut and the tractor puzzle piece—Raphael was in Ms. Wyseur's house.  (Tr. 2539:13-17; 22-25.)

[11] As the Government notes, "Ms. Wyseur struggles with feelings of survivor's guilt because the defendant murdered her daughter in front of her, and in a manner that was indiscriminate such that Ms. Wyseur is understandably left with the feelings that she described."  (Doc. 737 at 6.)

For all of these reasons, I again reject Saipov's complaints regarding Ms. Wyseur's testimony, find her testimony permissible victim-impact testimony, and find that the testimony does not support Saipov's motion for a mistrial.

### C.  *The Victim-Impact Witnesses Referenced in Saipov's Reply and Comments I Made During Trial*

In his February 22, 2023 reply, Saipov stated that "[g]iven the government's repeated, sharp disagreements with defense counsel's representations about such displays, and given the importance of an accurate record of them for any appellate court that might need to review the denial of Mr. Saipov's mistrial motion or any of the Court's series of adverse rulings about victim- and survivor-impact testimony, the defense avers the following observations of some of the government's victim-impact witnesses' non-verbal conduct."  (Doc. 747 at 1.)  Because I agree with Saipov's assertion regarding the importance of an accurate record, I address each characterization contained in bullet points in Saipov's reply.  For ease of reference, I have copied Saipov's bullet points prior to my findings.[12]

- On February 13, 2023, during her testimony, Ana Evans (wife of Hernan Case Mendoza) was tearful and frequently cried.  For example, when asked how she learned of her husband's death, and how she told her children, Ms. Evans cried more visibly and audibly.  Several members of the audience also cried and could be heard sniffling.

On February 14, 2023, even though the jury was not in the jury box, Saipov requested a sidebar and objected to two aspects of Ms. Evans' testimony, but notably did not object to Ms. Evans crying during her testimony.  Saipov objected to (1) the gallery laughing at Ms. Evans' lighthearted stories about her husband and general "engagement from the gallery with this

---

[12] As noted, Saipov provided these "observations" for the first time in his reply, as opposed to in his original mistrial motion, thereby depriving the Government of its opportunity to respond.

witness," (Tr. 2095:5-10), and (2) Ms. Evans' comment that her daughter thought it was unfair that she did not have a father because of "this man," which Saipov argued violated the instruction to the witnesses not to comment on Mr. Saipov or the offense.  (Tr. 2094:16-23.)  I found that the comment regarding her daughter was tangential to Ms. Evans' testimony about her experience having to tell each of her three children individually that their father had passed.  (Tr. 2098:17-23.)  I also note that the comment made by Ms. Evans' daughter was indicative of the immediate impact of her father's death on her.  As for Ms. Evans demeanor during her testimony, she was understandably emotional but never once required a break or paused her testimony as a result of her emotions.  Her testimony was clear, and the interpreter was able to translate everything that she said without requesting that Ms. Evans repeat herself.  Any reactions by the gallery were also muted, and I addressed this point during Saipov's sidebar objection.  Although some people in the gallery may have had minor reactions such as a soft laugh or "sniffling" as the Defense puts it, there were absolutely no outbursts and nothing that even came close to causing a disruption that could possibly have been prejudicial to Saipov.[13]  I

---

[13] Unfortunately, the same cannot be said for the Defense witnesses.  A disruption occurred on February 23, 2023, immediately following the testimony of Habibulloh Saipov, Saipov's father, involving his father and uncle, Narullo Saipov.  Saipov's father began testifying in the morning and continued into the afternoon.  Following the lunch break, Saipov's father was "uncontrollably sobbing" through nearly the entirety of his testimony.  (Tr. 2977: 4.)  He was crying so hard he needed to pause his testimony several times while seated in the witness box in order to regain his composure.  By way of comparison, I find that the emotion displayed by Habibulloh Saipov—both the intensity of his crying and the fact that he needed to pause his testimony to regain his composure—went well beyond what any of the Government witnesses exhibited.  At the conclusion of his testimony, Habibulloh Saipov was sobbing uncontrollably.  After the Government indicated that it did not wish to cross examine, Habibulloh Saipov appeared to regain composure and left the witness box.  However, as noted on the record, he began uncontrollably sobbing again as he walked past the jury box.  (Tr. 2977:4-5.)  Once he was next to the defense table, he let out a sob and cried out something in Uzbek.  Following this outburst, another member of Saipov's family, a man later identified as Saipov's uncle, Narullo Saipov, who had been audibly sobbing at various points during his brother's testimony, cried out and yelled something.  He was ushered out of his seat by members of his family and members of the defense team, but stood in place for several moments sobbing.  While walking out of the courtroom, he yelled out several phrases in Uzbek and pounded his fist on the courtroom door two times, and possibly on the adjacent wall.  In reaction to this outburst, one of the victim witnesses in the gallery appeared to be experiencing a panic attack and

also note that, as a general matter, the jurors' attention was on the witness in the witness box which is in the opposite direction of the gallery.  Saipov's objection here amounts to a request that I force the gallery to remain emotionless and unresponsive throughout the entirety of the victim-impact testimony, and there is simply no legal basis for this request.[14]

- On February 14, 2023, there were soft, but audible, gasps from the gallery when the photograph of deceased victim Hernan Mendoza was published.

Just as the gallery acted completely appropriately throughout Ms. Evans' testimony, there was absolutely nothing disruptive about any gallery reactions in response to the photograph of the deceased victim Mr. Mendoza.  I would also note that the characterization of these gallery reactions as "audible" is inaccurate and misleading since the Defense is basing these assertions,

---

I directed that the courthouse nurse be summoned to the courtroom.  The jury was present for Saipov's uncle's outburst but had left the courtroom before the victim witness began to show extreme symptoms of a panic attack and before I directed that the courthouse nurse be summoned.  (*See* Tr. 2975:1-5.)  I am not making a finding that Saipov's father's testimony was overly emotional, but his outburst upon leaving the witness box and Saipov's uncle's outburst clearly crossed the line and required me to excuse the jury.  Immediately following the outburst, I instructed the defense to "do what you need to do to make sure that does not happen again.  I can't say it any clearer.  It cannot happen."  (Tr. 2976:6-8.)  Defense counsel confirmed that they understood the inappropriate nature of the outburst stating "I hear the Court loud and clear on that.  It was not our intention."  (Tr. 2976:12-13.)  To be clear, I do not believe and do not suggest that counsel intended for the outburst to occur, but I made clear that the Defense should redouble their efforts when preparing their witnesses to make sure such outbursts would not happen in the future.  (Tr. 2976:14-17.)  I also directly addressed Saipov's family witnesses, including Habibulloh Saipov and Narullo Saipov, concerning their deportment as witnesses.  Specifically, I said "You are scheduled to testify today, or at some point thereafter, and I anticipate that the testimony may be understandably emotional for you.  I'm speaking to you now to let you know that if you feel like you are going to be too emotional to continue your testimony, please let me know by asking to take a break.  I will then take a break and send the jury back to the jury room.  We will continue your testimony once you feel that you are able to continue.  There is no issue with taking such a break, and all the parties want to make sure that the jury is able to understand your testimony.  Please also remember that during [your] testimony, you may not address the victims or their families or share your thoughts or feelings about the victims, their families, the appropriate punishment, or what you want the jury to do in this case." (Tr. 2807:7-2808:5.)

[14] I also note that I specifically addressed the issue of emotional reactions by people sitting in the gallery by providing the following instruction to the gallery:  "While a certain amount of emotion is to be expected during this type of testimony, if you feel you will be overwrought, such that you would cause a disturbance to the proceedings, you should exit the courtroom until you can regain your composure, and you should consider going to the designated overflow room if you feel unable to regain your composure."  (Tr. 2012:7-16.)

at least in part, on the observations of members of the Defense team in the gallery.[15]  There is a difference between a reaction that is audible to someone in the gallery who may be sitting directly in front of or behind someone and something that is audible in other parts of the courtroom, including the jury box.  Any reactions from the gallery that may have occurred did not cause a disturbance and did not prejudice the jury in any way.

- Also on February 14, 2023, Marie Rose Charles delivered especially powerful testimony, including about the pain she experienced from just sitting in the witness stand (nine out of ten, Tr. at 2240) which was evident on her face.  Numerous people in the gallery cried during her testimony, and Ms. Charles was also tearful at various points as she described the challenges she faces because of the truck attack.

Again, there is absolutely no basis for Saipov's apparent argument that victim-impact testimony be given without emotion.  As Saipov points out, Ms. Charles is to this day in an exceptional amount of pain, which is a direct result of Saipov's attack.[16]  In order to prevent against any prejudice, the jury was taken out of the courtroom while Ms. Charles both entered and exited the witness box, because she now requires assistance to stand up from a seated position and it takes her a significant amount of time and effort to walk with her cane.  The emotion that Ms. Charles showed during her testimony was nowhere close to the line of what is acceptable during victim-impact testimony.  As with every other Government victim-impact

---

[15] The Defense does not identify where the members of the Defense team were sitting.  I also note that the monitor that displayed the evidence to people sitting in the gallery was on the far left of the gallery as viewed from the bench where members of the press were typically sitting—except when members of Saipov's family were in the courtroom—throughout most of the penalty phase.  In other words, people seated on the right side of the gallery—where victims and their family members and friends were seated throughout most of the penalty phase—were furthest from this monitor making it more difficult for them to see anything depicted on the screen.

[16] As a result of her injuries, Ms. Charles had to have eight screws permanently inserted into her ribs, (Tr. 2237:13-15), her liver was lacerated, her spine was cracked, and her head was slashed with glass shards from the bus window.  (Tr. 2234:12-17.)  She spent nine days in the intensive care unit, during which she was "suffering" and could not raise her head.  (Tr. 2238:18-24.)  As the Defense acknowledged, during her testimony, five years after the truck attack, Ms. Charles rated her current level of pain as a nine on a scale of one to ten.  (Tr. 2240:16-20.)  She is not able to walk without the assistance of a cane, she cannot sit for long periods of time, carry her own groceries, drive, or work.  (Tr. 2241:3-13; 2245:2-6.)

witness, there was never a single time when the interpreter needed to ask Ms. Charles to repeat

herself.  Even in moments when Ms. Charles became tearful discussing the horrific pain that she

endured and endures, she maintained her composure.

- On February 15, 2023, Vera Dargoltz (wife of Hernan Ferruchi) held back tears from the moment she entered the witness box.  Soon into her testimony, she began to cry, and then continued to cry audibly and visibly throughout the remainder of her testimony.  *See also* Tr. at 2310.

On February 15, 2023, at a sidebar requested by the Defense following Mr. Richman's

proposed introduction of Government Exhibit 1500-56, the Defense renewed its objection

against the exhibit and "state[d] for the record I'm not complaining about these things, but during

Ms. Dargoltz's testimony . . . She was very emotional.  She cried throughout her testimony.  She

provided significant detail about the role that her husband played in her life, the financial impacts

that his absence has had on her, the emotional impact that it has had on her children and on her.

She provided anecdotes and details about trips they took together and the things that she misses

most about her husband."  (Tr. 2310:2-16.)  The Defense's reference to Ms. Dargoltz as "very

emotional" mischaracterizes her demeanor.  As the Defense admitted during the sidebar, there is

absolutely nothing to complain about in relation to Ms. Dargoltz testimony.  Although she was

visibly upset during her testimony with tears in her eyes, she was able to continue her testimony

without any breaks and without any disruption to the interpretation.

- That same day [February 15, 2023], Lina Ferruchi cried audibly and visibly when she testified about not hugging her father goodbye at the airport before he left for New York. And during a sidebar to discuss a defense objection to an exhibit (GX 1500-56), Aristedes Melissas (a surviving victim) half stood up and shrugged as if to say, "Why are you doing this?" with his arms.  Others in the audience shook their heads in disapproval, and members of the jury observed these reactions.

During the same sidebar in which the Defense characterized Ms. Dargoltz's testimony,

the Defense went on to characterize her daughter's testimony by stating that she "provided

details about the things that she misses most about her father, what she misses most.  She has cried throughout her testimony.  I would note too that at least two of the jurors have been emotional and displayed emotion and cried both during Ms. Ferruchi's testimony and Ms. Dargoltz's testimony and there has been crying in the gallery as well."  (Tr. 2310:17-24.)  In response, the Government clarified that Ms. Ferruchi maintained her composure, breaking for "maybe three seconds at one point."  (Tr. 2311:17-18.)  I corrected the mischaracterization by the Defense that the witnesses "cried throughout" and stated "[t]hat was not my observation of their testimony."  (Tr. 2312:6-9.)  I stand by my finding at sidebar and note that Ms. Ferruchi's testimony was not overly emotional.  She maintained composure and was able to proceed with her testimony after a brief few seconds' pause.  With regard to the assertion by the Defense that Mr. Melissas half stood up and shrugged, I first note that I did not see this purported action and the first time it was mentioned was in Saipov's reply.  Moreover, there is absolutely no reason to assume that this gesture was done as a way to question Saipov's request for a sidebar.  This assertion is nothing more than the Defense's characterizations of Mr. Melissas' alleged movement, which I did not see and was not brought to my attention at the time.

As a general matter, unlike Defense counsel, I was able to see—although perhaps not all at once—the witness, the jury, the Government, Defense counsel, Saipov, and the gallery.  I did not observe any gallery interactions that were overly emotional or that—even if seen by the jury—might cause unfair prejudice.[17]

- Also on February 15, 2023, Monica Missio (mother of Nicholas Cleves) delivered particularly powerful testimony, breaking down into tears when she recounted that she was unable to read her deceased son's journals.  Later, when Ms. Missio testified about

---

[17] As noted in footnote 13, the one exception were the outbursts by Saipov's father, Habibulloh Saipov, and uncle, Narullo Saipov.

learning about her son's death from law enforcement, she cried again and required a long pause to complete her answer.  Following Ms. Missio's testimony, after she had left the courtroom, the government published a photograph of her son's body on the bike path. Several members of the audience audibly gasped.

Defense requested a sidebar following the Government's request to introduce a photo of the deceased victim, Nicolas Cleves.  The purpose of the sidebar was to "preserve and say for the record that the testimony that we heard from Mr. Cleves' mother and from his best friend was extremely poignant and emotional at various points in which Ms. Cleves' mother became emotional on the stand and began crying, understandably so, especially when she was asked to recount the interaction she had with law enforcement and they informed her that her son had been killed.  She began to cry and there was silence in the courtroom. You could hear a pin drop at that point."  (Tr. 2370:6-14.)  The Government objected to this characterization and took "issue with the description of it as her reaction being overly emotional in any way.  She teared up a few times and it was brief.  Throughout most of the testimony she spoke really without much emotion."  (Tr. 2372:2-6.)  Defense clarified that they did not consider Ms. Missio's testimony to be overly emotional and explained that the emotion provided context as to why the introduction of the photograph of Mr. Cleves would be inappropriate.  (*See* Tr. 2372:19-2373:5.)  During sidebar, I made the following finding,

> [W]ith regard to Ms. Missio's testimony and her demeanor.  Like the other witnesses who testified today, and actually throughout the penalty phase, their level of emotion throughout their -- their composure I found to be remarkable throughout their testimony and her in particular.  Yes, there were times when she became emotional and when she cried, as we might expect from a mother losing her only child.  However, she was able to regain her composure to continue her testimony.  Not saying that you used the term, but in my view, the testimony was the appropriate level of emotion and didn't exceed the bounds that we might expect.
>
> With regard to -- this is generally with regard to the argument that things are cumulative with these witnesses.  The government's

25

> burden is beyond a reasonable doubt with regard to each of the
> aggravators that they have alleged.  Therefore, having more than one
> witness, Ms. Missio, Mr. Li testify where some of the things they
> say overlap and perhaps corroborative with one another, that's
> entirely permissible and I would suggest in order to -- and the
> government is entitled to do that."

(Tr. 2373:6-2374:6.)  I stand by my findings at sidebar and affirm that nothing in Ms. Missio's

testimony could fairly be characterized as overly emotional or even close to crossing the line of

appropriate victim-impact testimony.

There was one additional objection that the Defense raised following Ms. Missio's

testimony that I feel the need to address here, even though it was not included in Saipov's reply.

During sidebar, the Defense stated "we noticed that several jurors were also crying.  Folks were

crying in the gallery.  Again, these are the kinds of observations that I think are important for the

record because it's clear at this juncture, everybody understands that Mr. Cleves was killed,

everybody understands that Mr. Saipov killed Mr. Cleves, and everybody understands that Mr.

Cleves' death had an extremely profound and devastating impact on his mother and on his friend

[Jie Li]."  (Tr. 2371:15-22.)  Although certain jurors and members of the gallery cried at certain

points during the testimony of certain victim-impact witnesses, I only observed a few jurors

occasionally dabbing their eyes with tissues during some victim-impact witnesses' testimony.

Any suggestion that a majority or even many of the jurors were crying during the victim-impact

testimony is not accurate.  Throughout the entirety of the Government's case-in-chief, every

member of the jury and the gallery maintained their composure.  There were no disruptions from

the jury box or the gallery during the victim-impact testimony.[18]  To the extent the Defense is

---

[18] Again, the only disruption occurred following the testimony of Saipov's father.  *See supra* n.13.

trying to suggest that jurors and people sitting in the gallery were sobbing or weeping uncontrollably during the trial, any such suggestion is simply not accurate.  In addition, the fact that it had been established that Saipov murdered Mr. Cleves does not preclude his mother from providing victim-impact testimony that provides the jury with insight into his uniqueness, and the impact of his death on his mother.  *See Whitten*, 610 F.3d at 191 ("The only way to ensure against victim-impacts caused by one's murder of a well-loved human being is to take care to murder no one at all.")

- Luciana Martinez (wife of Diego Angelini), who also testified on February 15, 2023, cried visibly and audibly through most of her testimony, particularly when discussing her four children and her husband's role as a father.  Ms. Martinez repeatedly struggled to complete her answers:  She raced to finish answering questions, with her voice rising in pitch and breaking, before she would start crying again, which further impaired her ability to answer questions.  Much of her testimony was delivered with a wavering voice and through tears.

Ms. Martinez was understandably emotional, but she was not "impaired [in] her ability to answer questions."  I also would not characterize Ms. Martinez as "rac[ing] to finish answering questions. . . before she would start crying again."  Ms. Martinez was able to provide answers to every single one of the Government's questions without pause and without the need for the interpreter to ask for clarification.  Once again, despite Saipov's efforts to remove any emotion from the victim-impact testimony, emotionless victim-impact testimony is not a requirement, or an expectation.  *See Whitten*, 610 F.3d at 191 ("It cannot be expected that victim-impact testimony will be cool and dispassionate.").

- On February 16, 2023, Maria Sosa (wife of Alejandro Pagnucco) cried repeatedly throughout her testimony, including when she discussed the meaning behind her daughters' names; photographs of her daughters dancing with her husband; and telling her daughters that their father had died.  When Ms. [S]osa described her new place of employment, the Rosario International Airport, as the last place she saw her husband, she cried even harder and struggled to finish her answer.  And when Ms. [S]osa testified about her fear of dying and orphaning her children, she cried harder still.

It is misleading to say that Ms. Sosa "struggled" to finish her answer, because—like every other Government witness who used an interpreter when testifying—there was never any testimony that the interpreter was unable to hear or understand. Saipov failed to define what "struggled" means in this context and does not state which questions Ms. Sosa "struggled" to answer. Ms. Sosa successfully answered every single one of the Government's questions, and Saipov has not identified a specific question that she did not answer.

- Also on February 16, 2023, Lieve Wyseur (Ann-Laure Decadt's mother) cried, often intensely, throughout her testimony. Ms. Wyseur often struggled to answer through the crying. Her face was red, and she sobbed loudly when she described the circumstances surrounding the return of her daughter's body to Belgium. Numerous spectators in the gallery cried audibly and visibly during Ms. Wyseur's testimony. After her testimony, as jurors watched her leave the stand and walk to the back of the courtroom, Mr. Naessens hugged Ann-Laure Decadt's sisters, and stood to accompany Ms. Wyseur out of the courtroom. Mr. Melissas grabbed Mr. Naessens's hand and held it for several moments. Several jurors observed this exchange.

I addressed the substance of Ms. Wyseur's testimony above and I will not repeat my findings here. Even if I accept Saipov's characterization of the reaction of people in the gallery to Ms. Wyseur's testimony it did not disrupt the proceedings. Saipov claims for the first time in his reply that "[a]fter [Ms. Wyseur's] testimony, as jurors watched her leave the stand and walk to the back of the courtroom, Mr. Naessens hugged Ann-Laure Decadt's sisters, and stood to accompany Ms. Wyseur out of the courtroom. Mr. Melissas grabbed Mr. Naessens's hand and held it for several moments. Several jurors observed this exchange." (Doc. 747 at 3.) To the extent that Saipov describes these interactions to support a claim of unfair prejudice, I find that the exchanges did not create unfair prejudice. These victims from Belgium did not know one another prior to Saipov's truck attack, and their presence on the bicycle path was pure happenstance. (*See* Tr. 312:22–313:6.) Tragically what has drawn them together is the fact that Saipov killed or injured members of their families. These silent expressions of support and

28

solidarity were not disruptive or excessive, and certainly were not unduly prejudicial.

Second, Ms. Wyseur, like every other Government witness who utilized the services of an interpreter during their testimony, did not have an issue expressing herself in a clear manner to the interpreter.  Just as I stated at sidebar on February 16, 2023, "I don't think as a general matter that, either individually or collectively, the testimony has been overly emotional, as I have ruled at different times after different witnesses.  As a general matter, although some of the witnesses have cried at various points in time, none of them have -- in particular, the witnesses that utilize the interpreters, there was never a point in time where a[n] interpreter would have to stop and asked them to repeat it.  They couldn't understand it or anything like that.  It never reached a point in time where I felt that there was a need for me to basically say, I think we should take a break and give the witness time to compose themself.  That was because they were able to continue the testimony and, yes, they cried, but then they came back."  (Tr. 2445:4-17.)

- On February 21, 2023, Pabla Pereyra (wife of Ariel Erlij) cried when she read a letter her husband had written her, and she cried even harder when reading the end of the letter. Ms. Pereyra also visibly and audibly cried when she was asked to describe Mr. Erlij as a person, and when she testified about the effect of her husband's death on her sons.

Saipov's description of Ms. Pereyra as "visibly and audibly" crying is not particularly helpful to making an assessment whether or not there has been unfair prejudice and misrepresents the level of composure that the Government's witnesses were able to maintain throughout their testimony.  Yes, Ms. Pereyra cried during what was understandably emotional testimony, but she never needed to ask for a break, and her testimony was clear enough for the interpreter to provide the translation for the jury.

### D. *Victim-Impact Witnesses Not Referenced by the Defense*

Notably, Saipov did not comment on the testimony of Marion Van Reeth and Barbara Drake.  To be clear, I find that none of the testimony of the Government witnesses referenced in

Saipov's reply crossed the line in terms of permissible victim-impact testimony.  However, for the sake of developing an accurate and complete record, I will discuss the testimony of the witnesses that Saipov chose not to comment on.  As I stated at sidebar on February 16, 2023, "I would also say, in the context of, for example, Ms. Van Reeth, and this may, quite frankly, be a consequence of the impact it had on her, was unbelievably composed and I would even say almost stoic."  (Tr. 2445:18-21.)  Ms. Van Reeth did not cry during her testimony in which she discussed the extent of her injuries, including double amputations on her legs, partial paralysis and the impacts those injuries have had, not only on her, but on her entire family.

Similarly, Barbara Drake, the mother of deceased victim Darren Drake testified without crying as she described the dread that she and her husband felt searching for their son in the New York City Hospitals, trying to find out whether he was still alive.  Again, these examples are not meant to serve as any sort of benchmark, but I think that it is important to include them for the sake of an accurate record.

### E.  *Court Reporter Tapes*

Saipov also requests that I order the court reporters who worked on the trial to preserve any audio tapes from the penalty phase they may have made during the trial, arguing that "because the government has repeatedly challenged the defense's characterizations of the victim-impact testimony at various sidebars and conferences, the Court should direct the court reporters to preserve their recordings of the penalty phase for the record."  (Doc. 731 at 1, 6.)  I denied this request in my oral ruling.  (Tr. 2787:11-15.)  Saipov does not cite to any legal support for this request.  The lack of legal support is undoubtedly because—as the Government points out— "[b]ackup recordings made by court reporters for their own convenience and not otherwise required by 28 U.S.C. § 753 are the personal property of the court reporter."  6 Guide to

Judiciary Policy § 510.40.10(c)(1).  "There is no public entitlement to these recordings, or to backup recordings made for the convenience of the court, with the exception of recordings of arraignments, changes of plea, and sentencings filed with the clerk of court."  *Id*. at § 510.40.10(c)(2).  "In other words, the court reporter must file either a transcript or an electronic recording.  A litigant is not automatically entitled to both."  *United States v. Austin*, 954 F.3d 877, 879 (6th Cir. 2020) (per curiam); *accord Smith v. U.S. Dist. Ct. Officers*, 203 F.3d 440, 442 (7th Cir. 2000.)  Therefore, based on the applicable regulations and statutes, courts routinely deny access to the court reporter's backup tapes.  *See Austin*, 954 F.3d at 879; *Moreno v. United States*, 834 F. App'x 474, 475 (10th Cir. 2021); *United States v. Benchick*, No. 13-20453, 2017 WL 4161106, at *2 (E.D. Mich. Sept. 20, 2017); *Choy v. Comcast Cable Commc'ns, Inc.*, No. 08 Civ. 4092, 2015 WL 12835103, at *1–2 (D.N.J. Mar. 31, 2015); *Rosenfeld v. Linn-Benton Hous. Auth.*, No. 07-6209-HO, 2012 WL 12903896, at *1 (D. Or. Feb. 12, 2012); *United States v. Lee*, No. 07 Cr. 121, 2008 WL 2401188, at *1 (E.D. Tenn. June 11, 2008); *United States v. Kopp*, No. 00 Cr. 189A, 2007 WL 1461326, at *1 (W.D.N.Y. May 16, 2007).

Here, the court reporters have created and filed transcripts.  Saipov has not provided a legal reason for me to deviate from these prior decisions; therefore, his request for an order directing the court reporters to retain their tapes is denied.

## IV.   <u>**Conclusion**</u>

For the reasons stated on the record on February 22, 2023 and above, Saipov's motion for

a mistrial and his request for an order directing court reporters to retain their audiotapes are

DENIED.

Dated:  March 22, 2023
New York, New York

Vernon S. Broderick
United States District Judge