UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | S1 17 Cr. 722 (VSB) |
| SAYFULLO HABIBULLAEVIC SAIPOV, | |
| Defendant. | |

# THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States of America*

Andrew Dember
Amanda Houle
Alexander Li
Jason A. Richman
*Assistant United States Attorneys*
    *Of Counsel*

## I. Preliminary Statement

The Government respectfully submits this memorandum in advance of the sentencing of defendant Sayfullo Habibullaevic Saipov, which is scheduled for May 17, 2023.  On January 26, 2023, Saipov was convicted following a jury trial of all twenty-eight counts in Indictment S1 17 Cr. 722 (VSB) (the "Indictment").  These charges arose from the defendant's terrorist attack in New York City on October 31, 2017, resulting in the murder of eight innocent people and attempted murder of eighteen others for the Islamic State of Iraq and al-Sham ("ISIS").  The defendant's conduct before, during, and after his attack warrants a sentence that reflects the extraordinary depravity of his crimes.  The Government respectfully requests that the Court impose the maximum statutory penalty on each count of conviction, and that the Court order that the defendant's sentences on the murder and attempted murder counts run consecutively, resulting in a sentence of eight consecutive life sentences on Counts One through Eight, 260 years' imprisonment to run consecutively on Counts Nine through Twenty-Six, and two additional life sentences on Counts Twenty-Seven and Twenty-Eight to run concurrently with all other sentences imposed.  Such a sentence is necessary to provide just punishment, to reflect the seriousness of the defendant's offense, to promote adequate deterrence, and to account for the defendant's history and characteristics.

## II. Factual Background

### A.  The Defendant's Terrorist Attack and Brutal Murder of Eight Innocent People

On October 31, 2017, the defendant intentionally murdered eight innocent people and attempted to murder eighteen others during an attack on New York City that terrorized his victims and countless others.  The details of the defendant's attack are harrowing.  The morning of his

attack, the defendant calmly rented a Home Depot truck weighing more than 5,000 pounds. (May 5, 2023 Final Presentence Investigation Report ("PSR") ¶ 34). The defendant drove the truck from New Jersey into Manhattan and turned onto the Hudson River bike path near the entrance of Pier 40. (PSR ¶ 35). At the time the defendant charged onto the bike path, he was traveling approximately 31 miles per hour. (PSR ¶ 35).

Within moments, the defendant struck his first victim—Ann-Laure Decadt, a mother of two visiting from Belgium. Ann-Laure was riding with her mother and two sisters, who frantically tried to save her life and instead were forced to watch her die. (PSR ¶ 36). After murdering Ann-Laure—causing extensive injuries to her head, lungs, spleen, and ribs (PSR ¶ 36)—the defendant did not stop or slow down. Instead, he sped up and charged toward his next set of victims—another family visiting from Belgium, including two teenage boys. (PSR ¶ 37). Saipov very nearly killed the Melissas-Van Reeth family. (PSR ¶ 37). Among other injuries, Marion Van Reeth was unconscious for over a week, lost both of her legs, and suffered paralysis below her waist. (PSR ¶ 37). Her husband, Aristide Melissas, suffered an open-skull fracture requiring brain surgery as well as broken vertebrae, ribs, and a wrist injury. (PSR ¶ 37). Their son, Darryl Melissas, who was just 16 years old, was knocked unconscious and suffered a brain hemorrhage and scarring to his face, arm, and back. (PSR ¶ 37). Leaving the Melissas-Van Reeth family in his bloody trail, the defendant again did not stop or slow down. Instead, he charged toward his next set of victims: Carolea Goldfarb, a New Yorker who was riding home from work, and then Sandra Hagen, a German physician visiting New York. (PSR ¶ 38). Saipov missed Carolea by just an inch, and he struck Sandra and left her clinging to life. Sandra spent approximately 23 days in the hospital in the United States, including approximately two weeks in the intensive care unit where she was

2

induced into a coma, and was then transferred directly to a medical care facility in Germany. (PSR ¶ 38).

Continuing his mass carnage, Saipov sped down the bike path toward his next set of victims—a group of 10 friends from Argentina who were celebrating the 30th anniversary of their high school graduation. (PSR ¶ 39). Saipov killed five of the friends: Hernan Mendoza, Alejandro Pagnucco, Hernan Ferruchi, Diego Angelini, and Ariel Erlij. (PSR ¶ 39). Their injuries included severe brain injuries—in some instances causing visible brain matter and hemorrhaging of the brain—as well as crushing injuries to their spines, ribs, legs, and chests. (PSR ¶¶ 41-44). The five friends from Argentina who survived—Martin Marro, Ivan Brajkovic, Juan Pablo Trevisan, Ariel Benvenuto, and Guillermo Banchini—suffered not only the torture of watching a terrorist murder their best friends and the agony of trying and failing to save their friends' lives, but also suffered physical injuries. Martin, for example, suffered a brain hemorrhage and injuries to his head, eye, spine, and ribs (PSR ¶ 45), and Juan Pablo suffered injuries to his elbow and hand (Tr. 448).

Just ahead of the Argentinian friends on the bike path was a young woman, Rachel Pharn, who was riding alone northbound. Rachel saw Saipov murder the Argentinian friends and then watched Saipov swerve toward her. (PSR ¶ 46). Rachel narrowly escaped death by riding out of Saipov's path, but not before Saipov hit her with his truck. (PSR ¶ 46). The force of the impact broke Rachel's foot and ankle, scraped off part of her ankle, and injured her shoulder, causing her what she described as excruciating pain. (PSR ¶ 46).

Saipov accelerated down the path—now traveling approximately 57 miles per hour. (PSR ¶ 47). Saipov's next murder victim was a 32-year old New Jersey native—Darren Drake—who was enjoying a bike ride on a break from work. (PSR ¶ 48). Darren suffered unimaginable

3

injuries—including crush injuries to his chest and abdomen.  (PSR ¶ 48).  Many of Darren's organs, including his heart, spleen, bladder, and lungs, were crushed, pulpified, and almost liquified.  (PSR ¶ 48).

Moments after hitting and killing Darren, Saipov barreled toward Yanjun Zhang, a New Yorker who was riding home from his job at Stuyvesant High School.  (PSR ¶ 49).  Video of the attack shows Yanjun getting launched into the air.  (GX 403).  Fortunately, Yanjun survived, though he suffered injuries to the right side of his body.  (PSR ¶ 49).

Just ahead of Darren and Yanjun on the bike path was Nicholas Cleves, a 23-year-old New Yorker who was riding back to his family business after running errands.  (PSR ¶ 50).  Saipov crashed into Nicholas and sent his body flying into the air.  (PSR ¶ 50).  Nicholas died of massive injuries including fractures of the skull, hemorrhaging in the spinal column, a laceration of the thoracic aorta, and fractures of his left leg.  (PSR ¶ 50).

Despite having murdered eight people and injured many more, Saipov still was not done. Speeding down the bike path at 66 miles per hour towards an intersection on Chambers Street, Saipov crashed into a bus carrying two adults (Marie Rose Charles and Mezac Chosson) and two special needs children (Kristen Lin and Noah Salz).  (PSR ¶¶ 52-53).  Marie Rose suffered severe injuries to her ribs, spine, liver, and head.  (PSR ¶ 53).  Marie Rose's injuries required surgery and have inhibited her from, for example, walking without assistance.  (PSR ¶ 54).  Kristen's injuries were also severe.  Kristen suffered a traumatic brain injury, collapsed lung, fractures to her ribs and spine, internal bleeding, and a lacerated liver.  (PSR ¶ 53).  Kristen spent approximately one month in the intensive care unit in the hospital and then several weeks in a rehabilitation facility. (PSR ¶ 53).  Kristen's brain injuries caused severe cognitive harm, including loss of speech for a

month, and the inability to recognize family members or even remember her own name.  (PSR ¶ 53).

The defendant's terrorist attack also had a devastating psychological impact on his victims and their families.  The Court heard tragic testimony from many of the attempted murder victims who testified about their difficulty dealing with what had happened to them and their loved ones.  For example, Aristide Melissas testified about having the darkest moments of his life in the years after the attack, and about how he had considered suicide on multiple occasions.  (Tr. 2141).  Rachel Pharn testified that it has been hard for her to find the will to live in the five years since the attack and that she relives the attack on a daily basis.  (Tr. 2068).  Juan Pablo Trevisan testified about how he has trouble sleeping at night and stays up thinking about what happened to him and his closest friends.  (Tr. 2276-77).   Many family members of the murder victims also testified about the depression and anguish they suffer, and they will address the Court again at sentencing to describe that pain.  Monica Missio, mother of murder victim Nicholas Cleves, testified, for example, about how she no longer recognizes her own life since losing her only child, and about how the anguish and pain she feels is indescribable.  (Tr. 2354-55).  Vera Dargoltz testified about how she tries to go on with her life, but the sadness the defendant has wrought "burns" her family.  (Tr. 2301-02).  These are just a few examples of the dramatic and permanent psychological toll of the defendant and his rampage on October 31, 2017.

### B.  The Defendant Remains a Proud ISIS Terrorist

When the defendant crashed into the school bus, his truck became inoperable.  (PSR ¶ 55).  Unable to retrieve three knives that had rolled away from him in the truck, Saipov emerged from the truck carrying two fake guns that appeared real.  (PSR ¶ 55).  Standing in the middle of

5

Chambers Street, with a bloody trail of death and destruction behind him, Saipov proudly proclaimed "Allahu Akbar," a phrase meaning "God is great" that is used by ISIS members as a celebratory cheer. (PSR ¶ 55). Saipov was carrying with him in the truck a note with drawings of the ISIS flag and a phrase translating to "the Islamic State Shall Endure" written six times, which is an ISIS rallying cry. (PSR ¶ 56).

As Saipov ran around Chambers Street and the West Side Highway carrying his fake firearms, he caused panic. Children ran in terror from Saipov, and a schoolyard full of children celebrating Halloween screamed with fear as they ran for their lives back into their school. (GX 404). Saipov's attack finally came to an end when he was shot by a New York City police officer and taken into custody. (PSR ¶ 56).

After being shot, Saipov was treated for his injuries at a hospital and then voluntarily participated in an interview with law enforcement agents. (PSR ¶ 58). Saipov was eager to talk to law enforcement about his attack and told the interviewing agents that he committed the attack in response to a video by Abu Bakr Al-Baghdadi, the then-leader of ISIS. (PSR ¶ 58). Saipov admitted that his goal was to kill as many people as possible, and that he was happy with what he had done. (PSR ¶ 58). Saipov smiled and asked to hang an ISIS flag in his hospital room. (PSR ¶ 58). Saipov admitted that he had decided to commit an attack a full year before he executed it, and that he had spent two months planning his truck attack. (Tr. 253). In the days after the attack, ISIS issued an announcement proclaiming Saipov as an "Islamic State soldier" and describing Saipov's attack as "one of the most prominent attacks targeting Crusaders in America." (PSR ¶ 59).

### C.   The Defendant Is Violent and Undeterred

Saipov expressed no remorse in the immediate aftermath of the attack and has expressed none since.  Instead, he has remained committed to ISIS and its hateful ideology.  For example, a notebook seized from Saipov's prison cell in 2022 (GX 1220) is full of references to jihad and ISIS, and contains violent imagery.  (PSR ¶ 59).  The notebook includes a drawing of a truck bearing an ISIS flag, with a mounted gun shooting bullets, and charging toward a bicycle.  These writings in Saipov's cell reflect his continued pride in his attack and his devotion to ISIS as a Soldier of the Caliphate.  Saipov's communications with his family also confirm that he does not regret his murderous attack.  Saipov, for example, during an October 7, 2020 phone call with his family told them, "I am here [in prison] not because I stole someone's stuff or hurt some innocent people."  (PSR ¶ 60).  Far from contrite, he remains proud of what he has done.

Saipov has also exhibited violent and aggressive behavior in prison.  He has repeatedly threatened to behead corrections officers.  (PSR ¶ 60).  During one of those threats, Saipov banged and kicked his prison cell door so hard that Saipov cracked the cell window, something the corrections officer had never seen before.  (PSR ¶ 60).

### D.   The Jury Verdict

On January 26, 2023, following a three-week liability phase, the jury unanimously convicted Saipov of twenty-eight counts:  eight counts of murder for the purpose of joining a racketeering enterprise (ISIS), in violation of 18 U.S.C. § 1959(a)(1); eight counts of assault with a dangerous weapon and attempted murder for the purpose of joining ISIS, in violation of 18 U.S.C. §§ 1959(a)(3) and (a)(5); ten counts of attempted murder for the purpose of joining ISIS, in violation of 18 U.S.C. § 1959(a)(5); one count of material support of a foreign terrorist

organization resulting in death, in violation of 18 U.S.C. § 2339B; and one count of damage and destruction of a motor vehicle resulting in death, in violation of 18 U.S.C. §§ 33 and 34. On March 13, 2023, after a four-week penalty phase concerning the nine capital counts (One through Eight and Twenty-Eight), the jury was unable to reach a unanimous verdict as to whether to sentence Saipov to death, meaning that the Court must impose a life sentence on each of those nine counts.

### E. The Presentence Investigation Report

On May 5, 2023, the Probation Office submitted its final PSR in this case. The Probation Office calculated a combined adjusted offense level of 60. Because, however, the total offense level exceeds 43, the offense level will be treated as level 43—the maximum offense level under the Guidelines. (PSR ¶¶ 91-261). The Probation Office further found the applicable Criminal History Category to be VI, pursuant to U.S.S.G. § 3A1.4(b), because the offense involved, or was intended to promote, a federal crime of terrorism. (PSR ¶ 265). The Government agrees with the Probation Office's calculation, and as of this filing the defense has not filed any objection.[1]

Accordingly, the Guidelines recommend a sentence of life imprisonment—the highest recommended sentence provided for under the sentencing table. (PSR ¶ 295). The defendant's murder convictions on Counts One through Eight each carry a mandatory sentence of life imprisonment. 18 U.S.C. § 1959(a)(1). The defendant's assault and attempted murder convictions on Counts Nine through Sixteen carry a maximum sentence of 20 years' imprisonment per count (for a total of 160 years' imprisonment). 18 U.S.C. §§ 1959(a)(3), (a)(5). The defendant's attempted murder convictions on Counts Seventeen through Twenty-Six carry a maximum

---

[1] To the extent the defendant files any objections in advance of sentencing, the Government will submit a response.

sentence of 10 years' imprisonment per count (for a total of 100 years' imprisonment).  18 U.S.C. § 1959(a)(5).  The defendant's conviction on Count Twenty-Seven for provision of material support to ISIS resulting in death carries a maximum sentence of life imprisonment.  18 U.S.C. § 2339B(a)(1).  Finally, the defendant's conviction on Count Twenty-Eight for damage and destruction of a motor vehicle resulting in death carries a mandatory sentence of life imprisonment. 18 U.S.C. §§ 33, 34.

### III. THE COURT SHOULD IMPOSE EIGHT CONSECUTIVE LIFE SENTENCES PLUS A CONSECUTIVE 260 YEARS' IMPRISONMENT

While certain of the defendant's counts of conviction require a mandatory life sentence (Counts One through Eight and Count Twenty-Eight), the Court's discretion at sentencing is two-fold.  First, the Court will determine whether to impose the maximum statutory penalties for Counts Nine through Twenty-Seven.  Second, the Court will determine which, if any, of Saipov's sentences on his twenty-eight counts of conviction should run consecutively.  Because Saipov deliberately committed the most abhorrent crime imaginable for which he has expressed no remorse, he deserves no leniency.  Only the maximum punishment on each count of conviction will reflect the unimaginable harm inflicted and send the appropriate message that terrorist attacks on innocent civilians will be punished as harshly as the law allows.  Moreover, because each of Saipov's murders and attempted murders is sufficiently serious to warrant individually the maximum possible sentence, and because each murder and attempted murder has wreaked individual and particularized harm, the Court should order the defendant's sentences on the murder and attempted murder counts to run consecutively.  An exercise of such discretion to hold the defendant fully accountable for his crimes, and to send the appropriate message to the defendant, the public, and any others who might contemplate an attack on U.S. soil, would result in imposition

of eight consecutive life sentences, a consecutive term of 260 years' imprisonment, and two concurrent life sentences.

## A.  Applicable Law

Title 18, United States Code, Section 3584 vests district courts with discretion to run terms of incarceration concurrently or consecutively.  *See generally United States v. Lucas*, 745 F.3d 626, 628 (2d Cir. 2014) (noting that Section 3584 "makes clear that a court retains the discretion to run terms consecutively when it sees fit").  Section 3584 provides that, in determining whether to impose consecutive or concurrent terms of imprisonment, the Court shall "consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)."  18 U.S.C. § 3584(b).  Consecutive sentences may be imposed for multiple violations of a statute where the underlying predicate offense is a factually unique crime of violence (here, eight distinct murders and eighteen distinct attempted murders).  *See generally United States v. Mejia*, 545 F.3d 179, 205-06 (2d Cir. 2008) (affirming imposition of consecutive sentences for multiple violations of 18 U.S.C. § 924(c); relying on precedent that "the appropriate unit of prosecution under § 924(c)(1) is the predicate offense (i.e., the 'crime of violence')"; and noting that "[a]lthough [the defendants'] separate shootings are clustered in time and space, that clustering does not somehow merge them into one predicate crime"); *see also generally United States v. Jenkins*, No. 19 Cr. 2778, 2022 WL 3138879, at *7 (2d Cir. Aug. 5, 2022), *cert. denied*, 143 S. Ct. 533 (2022) (rejecting multiplicity challenge and holding that, "Here, Counts 5 and 6 are predicated on separate offenses—namely, the murders of two victims, charged as separate offenses in Counts 3 and 4.  Although [the defendant] emphasizes that the murders happened 'within seconds' of each other, such temporal proximity does not collapse the two murders into a single crime.").  Indeed,

the Second Circuit has routinely affirmed the imposition of consecutive life sentences in murder cases. *United States v. Polanco*, 145 F.3d 536, 543 (2d Cir. 1998) (affirming three of defendant's five consecutive life sentences); *United States v. Aquart*, 912 F.3d 1, 16 (2d Cir. 2018) (affirming defendant's consecutive life sentences on three counts and vacating death sentence on other counts); *see also generally United States v. Basciano*, 634 F. App'x 832, 835 (2d Cir. 2015) (noting that the defendant, the leader of an organized crime family, was serving two consecutive life sentences).

Section 3553(a), in relevant part, directs that courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant"; the "kinds of sentences available"; and the need for the sentence imposed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a).

## B. Discussion

Saipov is an unabashed terrorist—a proud murderer who deserves no leniency and should be punished to the fullest extent of the law. After months of planning a viscous terrorist attack, Saipov got what he wanted: brutal carnage of innocent people, lives and families destroyed, and terror in New York City. Indeed, the only thing Saipov was denied was even more death and destruction because he crashed into a school bus before he made it to the Brooklyn Bridge. Saipov's depraved crimes are extraordinary in the harm they have caused, for which he has expressed no remorse in over five years since his attack. While the Government appreciates that it is a significant request to seek maximum terms of imprisonment on all counts of conviction and consecutive terms for each of the murder and attempted murder counts in Counts One through

Twenty-Six, we respectfully submit that this is not a close question. Saipov committed *eight murders and eighteen attempted murders*—each, in its own right, a serious crime, against a unique victim, reflecting a unique harm, and justifying an independent and consecutive maximum sentence. Further justifying consecutive sentences on the murder and attempted murder counts, and maximum sentences on the remaining two counts, is the need to promote general deterrence to others who may contemplate similar crimes, as well as the need to account for the defendant's characteristics, which include his unrelenting commitment to ISIS, his disdain for his victims and their sorrow, and his decision to choose a path of hatred and violence despite having a family that loved him and supported him. For all of these reasons, the Court should impose the maximum punishment on each count of conviction and should order that the defendant's sentences on the murder and attempted murder counts of conviction run consecutively.[2]

### 1. Just Punishment Requires Eight Consecutive Life Sentences for the Murder Counts of Conviction

The defendant's convictions on Counts One through Eight—each of which accounted for his murder of a particular victim—necessitate a consecutive sentence of life imprisonment for each of these counts. The defendant—inspired by hatred—purposefully and brutally murdered eight completely innocent victims. The murder of each one of those victims, and the pain suffered by

---

[2] The Government proposes consecutive sentences for Counts One through Twenty-Six, and concurrent sentences for Counts Twenty-Seven and Twenty-Eight for reasons similar to those set out in the PSR concerning the grouping analysis. (PSR ¶¶ 92-94 (explaining that Counts Twenty-Seven and Twenty-Eight group with Count One because they involve a common victim and common acts or transactions constituting a common plan)). For the reasons explained above, the distinct victims, harm, and conduct underlying Counts One through Twenty-Six warrant consecutive sentences.

those who love them and those who watched them die, warrants a distinct and consecutive sentence of life imprisonment.

Through the penalty phase of the trial, the Court gained a glimpse into the eight unique lives that the defendant stole. The Court heard powerful testimony at the penalty phase from the victims' family members, and will hear from those families again during the sentencing hearing.[3] The Court heard, for example, about how Nicholas Cleves and Darren Drake were young men just starting their adult lives with promising futures ahead, and who, as only children, were the light of their parents' lives—a light that, in going out, has left their parents searching for purpose and tortured by their grief. (Tr. 2332-68, 2713-41). The Court also learned about how Hernan Mendoza, Hernan Ferruchi, Diego Angelini, Alejandro Pagnucco, and Ariel Erlij were friends with generous hearts that were full of love for each other, their careers, and their families—families consisting of wives, parents, siblings, and young children who are haunted by answerable questions about why their loved ones were suddenly murdered and how they are going to survive without them. (Tr. 2038-58, 2070-76, 2102-08, 2288-2315, 2390-2415, 2461-77, 2485-91, 2666-75, 2678-96). The Court also learned about Ann-Laure Decadt, who was murdered right in front of her mother and two sisters, and who never returned home to her devoted husband and two infant children—an absence that pains the children daily and will never be made whole. (Tr. 2527-43, 2496-2515). Finally, the Court learned about the depraved manner in which the defendant

---

[3] By May 16, 2023, the Government will also submit written submissions from victims who are unable to travel to attend the sentencing due to family and work obligations.

murdered his victims, after premeditation and calculated planning, and in a manner that gave the victims and their families no warning and no time to say goodbye.

Ultimately, the testimony at the penalty phase emphasized the unique value of each life the defendant stole and his own depravity in the way he committed his brutal attack. Concurrent life sentences on Counts One through Eight would be insufficient to provide just punishment and to reflect the seriousness of the defendant's evil murders and the harm to each of his eight distinct murder victims and their families. Indeed, concurrent sentences are the *minimum* penalty the Court may impose. More than the minimum is required here. The only appropriate sentence on Counts One through Eight is eight consecutive life sentences.

### 2. Just Punishment Requires a Consecutive Sentence of 260 Months' Imprisonment for the Attempted Murder Counts of Conviction

The defendant's convictions on Counts Nine through Twenty-Six also warrant maximum consecutive sentences. These counts reflect separate crimes against unique individuals who have each experienced distinct pain and suffering. The Court heard evidence at both phases of the trial regarding the circumstances of these attempted murders and the impact on the individual victims. (PSR ¶¶ 36-39, 45-47, 49, 53-54, 70-88). Many of the victims will also address the Court at sentencing.

The Court heard, for example, about how the defendant swerved to try and murder several of these victims, but the victims managed to narrowly escape death. (PSR ¶¶ 36-50). The Court heard about the severe injuries suffered by the victims, such as, for example, Marion Van Reeth, who lost both of her legs (PSR ¶ 77); Marion's husband, Aristide Melissas, who suffered a skull fracture and required brain surgery (PSR ¶ 73); Marie Rose Charles, who suffered spinal cord injuries, cannot walk without assistance, and is still in immense pain (PSR ¶ 70); and Kristen Lin,

who was in the hospital for months after the attack without the ability to walk, speak, or breathe on her own, and who continues to suffer from the cognitive setbacks of her brain injury (PSR ¶ 72).  The Court also heard about the psychological trauma suffered by the attempted murder victims—many of whom suffered from depression and despair following the attack.  Victims like Rachel Pharn, who testified that she sometimes struggled to get out of bed and suffers from daily flashbacks of the attack (PSR ¶ 76), and victims like Juan Pablo Trevisan and Martin Marro, who described suffering from anxiety and paranoia following the attack (PSR ¶ 75, 85).  Compounding the traumatic experience for these attempted murder victims is that the defendant committed his attack in a way that caused these victims to not just suffer the harm of enduring an attack on their lives but also suffered the trauma of watching others die—in many instances, watching those they loved dearly die, and after desperately trying to save their lives.

While for the reasons described above, each of the defendant's attempted murder convictions undoubtedly warrants a consecutive maximum sentence, the defendant's crimes with respect to Counts Eleven, Thirteen, Eighteen, and Twenty-Three are particularly heinous in that the defendant attempted to murder children.  Two of those children were riding on the bike path and two were riding in the school bus.  While the defendant claimed in his post-arrest statement that he was not aiming for the school bus, that fact, even if true, is irrelevant.  The defendant chose to commit a terrorist attack on Halloween just at the time that children are released from school, and along an area of Manhattan that is filled with children and families.  The defendant also admitted in his post-arrest statement that he specifically targeted Halloween because it would be crowded; there is no denying that he knew this crowd would include children, particularly at 3 p.m. in the afternoon.  This feature of the defendant's attack is pure evil, and it underscores the

necessity of consecutive sentences to account for the seriousness of the defendant's abhorrent crimes.

All of this evidence demonstrates the overwhelmingly serious nature of the defendant's attempted murder crimes and the unimaginable harm he caused to each of his attempted murder victims.  That is why the defendant should receive maximum and consecutive sentences on each of Counts Nine through Twenty-Six.  Accordingly, the Court should impose consecutive sentences of 20 years' imprisonment for each of Counts Nine through Sixteen (assault and attempted murder) and consecutive sentences of 10 years' imprisonment for each of Counts Seventeen through Twenty-Six (attempted murder), for a total term of years of 260 months' imprisonment to run consecutively to each other and to the defendant's sentences of life imprisonment on Counts One through Eight.

### 3.  Consecutive Sentences for the Murder and Attempted Murder Convictions Are Necessary to Promote Respect for the Law and Afford Adequate Deterrence

"[T]here is no danger to society greater than that of terrorism, no danger greater than that posed by those that think they can impose their will on others through senseless and incomprehensible violence."  *United States v. Raishani*, 17 Cr. 421 (RA), Dkt. No. 62 at 25-26.  In imposing sentence in this case, and in exercising the discretion available to the Court to impose maximum and consecutive sentences, the Court has the opportunity to send a message regarding how the U.S. justice system will treat those who attack innocent people in the name of brutal terrorist organizations or causes.  Imposing consecutive sentences for each of the murder and attempted murder convictions will make clear that terrorist attacks on U.S. soil will be met with maximum punishment and no leniency.  Those considering a terrorist attack will know that, to the extent they survive their attack (which has been the outcome in every terrorist attack in New York

City since 9/11), they will face the maximum punishment the law allows—to include multiple life sentences and the assurance that they will spend the rest of their days under the most restrictive conditions of confinement.

### 4. The History and Characteristics of the Defendant Warrant a Harsh Penalty

Finally, the history and characteristics of the defendant warrant maximum sentences on each count of conviction and consecutive sentences for his convictions on the murder and attempted murder counts. The evidence at the penalty phase established that the defendant is committed to violence and hatred; that in the years after his vile attack he has expressed no apology or remorse; and that he dedicated himself to this path of violence despite having a stable childhood, a large family that loved him, and sufficient means to live a comfortable life in the United States.

Foremost in the Court's consideration of the defendant's characteristics must be his continued support for ISIS years after his attack. Other than the evidence in this case which he had access to under limited conditions, the defendant has not been permitted to view a single piece of ISIS propaganda since 2017 (as enforced by his special administrative measures). Nonetheless, he remains a devoted soldier of the Caliphate—writing notes in his prison cell about jihad, violence, and the purported supremacy of the Islamic State, and communicating with his family about how proud and happy they should be about what he has done. The defendant is (and remains) an ISIS solider because he chooses to be, even today. The defendant is an adult who has had more than five years to reflect on his actions. He continues to actively choose hate and violence, and should be punished accordingly.

In considering the defendant's characteristics, the Court should also weigh that the defendant has repeatedly spoken publicly and with his family about his crimes over the last five

years, but has never expressed even a modicum of remorse—just the opposite. The defendant's selfishness and lack of any remorse define his character and militate strongly in favor of a harsh penalty.

Finally, in reflecting on the defendant's history, it is notable that he came from a background of love, support, and opportunity. The defendant was raised by a family who loves him. He was granted the privilege of coming to this country, where he was further privileged to build another family that loves him. From all of that love and opportunity, he chose hate. While the defense repeatedly emphasized the defendant's family life throughout the penalty phase as mitigating, the Government submits that it is, if anything, an aggravating circumstance, and counsels against any leniency here.

## IV. CONCLUSION

It is impossible to fully put into words the pain and suffering that the defendant has caused. He attacked and killed innocent, loving, human beings, and destroyed their families. He left 17 children missing a parent for the rest of their lives. And from the night of the attack forward, he has expressed nothing but happiness for the pain and suffering he has caused. For these reasons, the Government respectfully submits that the Court should exercise its discretion to impose the maximum penalty on each count of conviction and should impose consecutive sentences on Counts One through Twenty-Six. Imposition of concurrent sentences in this case is insufficient. At base, such concurrent sentences would fail to reflect the unique harm of each of the defendant's murder and attempted murder crimes on each of his victims, and would afford the defendant a degree of leniency that he does not deserve. While the law ensures that the defendant will receive at least a life sentence, the Court has the opportunity to make clear that the defendant's despicable crimes

18

for ISIS deserve more punishment than the mandatory minimum sentence. The Court should impose instead the maximum penalty on each count and should order that the defendant's sentences on his murder and attempted murder convictions shall run consecutively.

Dated:  New York, New York
        May 15, 2023

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York

                            By:     ___/s/_____
                                        Andrew Dember
                                        Amanda Houle
                                        Alexander Li
                                        Jason A. Richman
                                        Assistant United States Attorneys

Cc:    Defense Counsel
       (Via ECF)

19