RECEIVED
JUN 27, 2023
S.D.N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA                :
                                        :
                                        :
                  -against-             :                17-CR-722 (VSB)
                                        :
                                        :        **SEALED OPINION & ORDER**
                                        :
SAYFULLO HABIBULLAEVIC SAIPOV,          :
                                        :
                  Defendant.            :
--------------------------------------------------------X

<u>VERNON S. BRODERICK, United States District Judge</u>:

Defendant Sayfullo Habibullaevic Saipov has been charged in a twenty-eight count

indictment with, among other offenses, eight counts of murder in aid of racketeering and

eighteen counts of attempted murder, arising out of an attack in New York City on October 31,

2017, in which Defendant Saipov—purportedly acting on behalf of the Islamic State of Iraq and

al-Sham ("ISIS")—is alleged to have driven a flatbed truck onto a cycling and pedestrian

pathway on the west side of lower Manhattan, killing eight people and injuring at least eighteen

others.  (Doc. 61 ("Superseding Indictment").)

In anticipation of trial, the parties have filed numerous motions *in limine*, some of which

are overlapping.  Below are my rulings on the parties' motions *in limine*.

(1)     The Government's motion to deem terrorist propaganda materials admissible is

        GRANTED.

(2)     The Government's motion to deem proof of other violent acts undertaken by ISIS

        admissible is GRANTED.

(3)     The Government's motion to deem expert testimony of Dr. Zelin admissible is

        GRANTED.

(4)     The Government's motion to deem crime scene photographs admissible is GRANTED, as to the agreed upon 32 photographs attached as Exhibit B to the Government's reply memorandum in further support of its motions *in limine*.

(5)     The Government's motion to deem Saipov's prior in-court statements admissible is GRANTED.

(6)     The Government's motion to preclude the Defense from offering mitigating evidence during the trial phase is DENIED, without prejudice to specific objections at trial.

(7)     The Government's motion to preclude the Defense from cross-examining law enforcement agents about the Justice Department policy on recording post-arrest statements is DENIED, but will be subject to a limiting instruction.

(8)     The Government's motion for the Court to take judicial notice of ISIS as a foreign terrorist organization is GRANTED.

(9)     The Defense's motion to preclude all parties and the Court from referring to the first phase of trial as the "guilt phase" is GRANTED, insofar as the Government does not object.

(10)    The Defense's motion to exclude opinion testimony about Saipov's alleged lack of remorse is GRANTED.

(11)    The Defense's motion to preclude evidence regarding ISIS is DENIED.

(12)    The Government's motion to preclude the Defense from arguing that the beyond-a-reasonable-doubt standard applies to the penalty phase weighing process is GRANTED.

(13)   The Government's motion to preclude the Defense from making any argument concerning the unavailability of the death penalty under New York law is GRANTED.

(14)   The Government's motion to deem evidence of Saipov's threats in custody admissible is GRANTED.

(15)   The Government's motion to preclude the Defense from offering evidence about the impact that Saipov's execution would have on his family is GRANTED, except the Defense will be permitted to offer impact evidence that speaks to Saipov's background, record, or character.

(16)   The Government's motion to preclude the Defense from comparing this case to other capital cases is GRANTED.

(17)   The Government's motion to compel Saipov to produce Rule 16 discovery to a firewalled Assistant United States Attorney ("AUSA") relating to his Rule 12.2 notice is GRANTED.  The Defense is directed to make Rule 16 disclosure to a firewalled AUSA by Friday, October 21, 2022.

(18)   The Defense's motion for a written proffer of victim impact evidence is sub judice and will be decided in conjunction with the pending death penalty motions.

(19)   The Defense's motion to exclude crime scene and autopsy photographs of the deceased victims during the penalty phase is sub judice and will be decided following additional briefing from the Government.

(20)   The Government's motion to deem evidence of Saipov's prison writings, communications, and threats to prison personnel admissible is GRANTED.

3

(21)   The Defense's motion for supplemental expert notices and *Daubert* hearings is DENIED, except with regard to Dr. David King for whom the motion is sub judice.

(22)   The Defense's motion to exclude photographs of homicide victims while they were alive is GRANTED as to the trial phase, insofar as the Defense stipulates to the identity of the victims, and DENIED as to the penalty phase without prejudice to the Defense making specific objections to individual photographs at trial.

(23)   The Defense's motion to preclude the introduction of Saipov's statements in custody is DENIED.

(24)   The Defense's motion requesting that parties remain seated when the jury enters and exits the courtroom is GRANTED, insofar as the Government does not object. Specifically, consistent with their agreement, Saipov, the Defense team, and the prosecution team will remain seated when the jury enters and leaves the courtroom, but others in the courtroom will not be required to remain seated.

## I.   **Procedural History**

This case was initially scheduled to go to trial in April 2020 but was delayed due to the COVID-19 pandemic. (Doc. 324.) On February 18, 2020, ahead of the original trial date, the Government filed its motions *in limine*. (Doc. 285.) On February 19, 2020, the Defense filed its motions *in limine*. (Doc. 287.) On March 2, 2020, the Government filed its opposition to the Defense's motions, (Doc. 300), and on March 4, 2020, the Defense filed its opposition to the Government's motions, (Doc. 305.) On March 9, 2020, both sides filed replies. (Doc. 312; Doc. 313.) On March 18, 2020, the trial was adjourned *sine die*. (Doc. 324.)

4

In 2021, I rescheduled this trial for 2022, with individual *voir dire* beginning October 11, 2022.  (Doc. 426.)  On August 5, 2022, both sides filed supplemental motions *in limine*.  (Doc. 472; Doc. 473.)  On August 19, 2022, both sides filed supplemental oppositions.  (Doc. 492; Doc. 493.)  On September 2, and September 3, 2022, the Defense and Government filed supplemental replies, respectively.  (Doc. 520; Doc. 521.)

## II.    Legal Standards

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial. . . . Evidence should not be excluded on a motion *in limine* unless such evidence is clearly inadmissible on all potential grounds."  *Doe v. Lima*, No. 14 CIV. 2953 (PAE), 2020 WL 4731418, at *3 (S.D.N.Y. Aug. 14, 2020) (citation omitted).  A court's ruling "is 'subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in a party's proffer.'"  *Id.* (quoting *Luce v. United States*, 469 U.S. 38, 41 (1984)).

Pursuant to Federal Rule of Evidence 401, evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action."  Fed. R. Evid. 401.  Rule 403 authorizes a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

Federal Rule of Evidence 702 permits the admission of expert testimony as long as:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the

principles and methods to the facts of the case.

Fed. R. Evid. 702. "The fundamental requirements are thus that such evidence be relevant and reliable." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587–92 (1993) ("*Daubert*"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999). In *Daubert*, the Supreme Court held that the trial judge is responsible for "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. Thus, "[w]hile the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . . the district court is the ultimate gatekeeper." *Jones*, 965 F.3d at 161 (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted)).

As the Second Circuit has recognized, however, the inquiry under *Daubert* is limited, and "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Rather, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* at 266–67 (citation omitted) (Rule 702 and *Daubert* mandate exclusion where "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached"). "This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.* at 267. "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

6

evidence." *Id.* (citation omitted).  At bottom, the *Daubert* analysis is intended to give the district court the discretion "needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Id.*

Federal Rule of Evidence 404(b) prevents the introduction of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  However, the same evidence may be introduced for other purposes, including to demonstrate "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  Evidence of prior bad acts is admissible where "the prior acts evidence [i]s offered for a proper purpose" under Rule 404(b), the evidence [i]s "relevant to a disputed issue," and the probative value of the prior acts evidence is not substantially outweighed by the danger of unfair prejudice. *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009); *see also United States v. Scott*, 677 F.3d 72, 83 (2d Cir. 2012) ("[E]vidence admitted under Rule 404(b) must not have its probative value substantially outweighed by its prejudicial effect.").

## III.   Discussion

### A. *Trial Phase*

#### 1.   Government's Motions *in Limine*

##### a.   Terrorist Propaganda Materials

The Government requests that "terrorist propaganda materials" be deemed "admissible as direct evidence and pursuant to Rule 404(b)."  (Doc. 285, at 1.)  The Government's request applies to two categories of terrorist propaganda materials:  "(1) publicly-available statements released by ISIS on its various public communications channels," and "(2) ISIS recordings, photographs, and videos found on" Saipov's cellphones.  (*Id.* at 13.)  Within the first category,

the Government intends to present "(1) statements from ISIS leaders" released through ISIS-operated media outlets, and "(2) ISIS's claims of responsibility for terrorist attacks," also released through ISIS-operated media outlets. (*Id.* at 14.)

Evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence," Fed. R. Evid. 401, and relevant evidence should only be excluded if it is unduly prejudicial, *see* Fed. R. Evid. 403. Although the Defense argues that it "anticipates stipulating to the fact that ISIS is a foreign terrorist organization and an enterprise that engages in racketeering activity, including murder, kidnapping, and extortion," rendering the terrorist propaganda material "not relevant," (Doc. 287, at 12–13), I have not been informed that the parties have agreed to such a stipulation. The Government says that even if the parties reach a stipulation, it will still seek to introduce a narrower set of these materials. (*See* Doc. 312, at 3–4.) I agree with the Government that, regardless of any stipulation,

> [T]he Terrorist Propaganda Materials help to demonstrate that ISIS is an enterprise within the meaning of the RICO statute; that ISIS has engaged in a pattern of racketeering activity; that a method of gaining membership into ISIS was to commit a lone wolf attack; that ISIS promoted lone wolf attacks that include indiscriminately killing others using automobiles like the defendant's truck, which is relevant to establishing the defendant's motive; and that Saipov conducted the attack for the purpose of gaining membership into ISIS, pursuant to the guidance in the Terrorist Propaganda, because he was well aware of ISIS's structure and brutal terrorist tactics.

(Doc. 285, at 31–32.) Specifically, the claims of responsibility and leadership messages are highly relevant as proof of the enterprise, and to demonstrate Saipov's intent, motive, and purpose behind committing the charged crimes in Counts One through Count Twenty-Six. (*See* Superseding Indictment ¶¶ 1–13.) The terrorist propaganda material is also relevant to show Saipov's knowledge of ISIS, which is necessary for Count Twenty-Seven to show Saipov was providing material support to a terrorist organization. (*See id.* ¶ 15.) The propaganda on

8

Saipov's phones is admissible for all of the above reasons.[1]  Although the terrorist propaganda material may be upsetting or disturbing, that does not negate its probative value or make it unfairly prejudicial.  "Probative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact." *United States v. Salameh*, 152 F.3d 88, 123 (2d Cir. 1998).

The Defense is wrong when it argues that the responsibility and leadership messages are inadmissible because they are hearsay.  (*See* Doc. 305, at 3–4.)  These statements are admissible as co-conspirator statements, Fed. R. Evid. 801(d)(2)(E), and statements against penal interest, Fed. R. Evid. 804(a)(4) and 804(b)(3).  Indeed, co-conspirator statements are admissible against Saipov even if they were made before he joined the enterprise.  *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986) ("It is reasonable to expect that a new recruit can be thought to have joined with an implied adoption of what had gone on before to enhance the enterprise of which he is taking advantage, where, as here, there is sound reason to believe that he joined when he was generally aware of what his new partners had been doing and saying on behalf of the enterprise."  (internal quotation marks omitted)).

The propaganda is also admissible under Federal Rule of Evidence 404(b) to show Saipov's motive, intent, plan, preparation, and his knowledge of ISIS.  "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal

---

[1] Notably, the Government is only offering a small subset of the propaganda contained on Saipov's phone. "Specifically, (i) of the more than 6,000 images of jihadist propaganda, the Government seeks to offer 16; (ii) of the approximately 252 audio recordings involving jihadist propaganda, the Government seeks to introduce 23; (iii) of the approximately 90 videos involving jihadist propaganda, the Government seeks to offer eight; and (iv) of a 479-page chat containing jihadist propaganda, the Government seeks to introduce seven pages of excerpts." (Doc. 312, at 14.)

quotation marks omitted). "Rule 403 does not bar evidence of other bad acts that 'did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged.'" *United States v. Lights*, No. 15 Cr. 721 (RWS), 2016 WL 7098633, at \*2 (S.D.N.Y. Dec. 5, 2016) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)). I find that the propaganda is no more violent and no more sensational than the charged crimes, and that any prejudice can be dealt with through the use of limiting instructions.

Therefore, the Government's motion is GRANTED, and the Government may introduce the terrorist propaganda material.

b.      Proof of Other Violent Acts Undertaken by ISIS Members

The Government requests that I order that "[e]vidence of other violent acts undertaken by ISIS members is admissible to prove that ISIS is a racketeering enterprise engaged in racketeering activities." (Doc. 285, at 1.) Specifically, the Government intends to introduce testimony and evidence about (1) the "June 12, 2016 fatal shooting at the Pulse nightclub in Orlando, Florida;" (2) the "December 2, 2015 fatal shooting in San Bernardino, California;" (3) the "July 14, 2016 deadly truck attack in Nice, France;" (4) the "November 28, 2016 vehicular and stabbing attack in Columbus, Ohio;" and (5) the "March 22, 2017 deadly vehicular and stabbing attack in London, England." (*Id.* at 47–48.)

I find that evidence of other violent acts undertaken by ISIS members is relevant under Rule 401 and not overly prejudicial under Rule 403. This evidence tends to show the existence of the racketeering enterprise—ISIS—and that the enterprise engaged in a pattern of racketeering activity. (*See* Superseding Indictment ¶¶ 1–13.) Again, although Defendant claims to be "willing[]to stipulate that ISIS is a racketeering enterprise," (Doc. 305, at 6), and although the Government says that a stipulation would "obviate the need for a significant amount of this

10

testimony," (Doc. 285, at 47 n.12), I have not been informed that the parties have reached

agreement on a stipulation.  In any event, even if there is a stipulation, "a criminal defendant may

not stipulate or admit his way out of the full evidentiary force of the case as the government

chooses to present it." *United States v. Salameh*, 152 F.3d 88, 122 (2d Cir. 1998) (internal

quotation marks omitted); *see also United States v. Pepin*, 514 F.3d 193, 208 (2d Cir. 2008).  To

the extent that there is any risk of "confusing the jury by implying that Mr. Saipov is responsible

for acts of violence that the government cannot prove he knew about or participated in," (Doc.

305, at 6), I will give a limiting instruction.

Accordingly, the Government's motion is GRANTED.

c.      Expert Testimony of Dr. Aaron Y. Zelin

The Government requests that Dr. Aaron Y. Zelin's testimony regarding the ISIS

leadership messages and claims of responsibility be deemed admissible expert testimony under

Federal Rule of Evidence 702.  (Doc. 312, at 3.)  Dr. Zelin will explain the means and method of

ISIS, including the use of the internet and social media to disseminate its message, radicalize

individuals, and communicate with individuals about committing acts of terror wherever

necessary.  (*See id.* at 10–12.)  He will also explain the words and phrases used by ISIS,

including those used to entice individuals to become "lone wolves" and provide a guide for those

individuals to commit violent acts on behalf of ISIS to gain entry into ISIS.  (*See id.* at 7–9.)

This testimony will assist the jury in understanding "ISIS's enterprise status, the defendant's

motive for committing his attack, and whether he provided material support to ISIS."  (*Id.* at 7.)

Courts in this Circuit have repeatedly permitted Dr. Zelin to testify on similar topics.  *See*

*generally United States v. Ullah*, 18 Cr. 16 (RJS) (S.D.N.Y. 2018) (expert testimony from Dr.

Zelin on ISIS); *United States v. Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y. 2017) (expert testimony

11

from Dr. Zelin on al Qaeda, Al-Qa'ida in the Arabian Peninsula, ISIS, and their use of lone wolf attacks); *United States v. El Gammal*, 15 Cr. 588 (ER) (S.D.N.Y. 2017) (expert testimony from Dr. Zelin on ISIS); *United States v. Pugh*, 15 Cr. 116 (NGG) (E.D.N.Y. 2016) (expert testimony from Dr. Zelin on ISIS). The Defense has not identified a court, in this District or elsewhere, that precluded Dr. Zelin from testifying. (*See* Doc. 305, at 2–3.) Therefore, the Government's motion is GRANTED.

d.   <u>Photographs from the Scene of the Truck Attack</u>

The Government requests that I deem photographs from the crime scene admissible. (*See* Doc. 285, at 49–54.) The Defense objects and requests that I limit the number of crime scene photographs to ten. (*See* Doc. 305, at 6–8.) The Government in its reply represents that it narrowed the collection of crime scene photographs, and attaches copies of the 32 photographs it seeks to admit during the trial phase as Exhibit B. (*See* Doc. 312, at 17–20.) As a general matter, crime scene photographs are routinely admitted into evidence. *See, e.g.*, *United States v. Fell*, No. 5:01-CR-12-01, 2018 WL 7247414, at *1 (D. Vt. Apr. 4, 2018) ("Federal courts have commonly admitted evidence of crime scenes despite the upsetting nature of the photographs. Such photographs are held to be relevant because they provide information about the nature of the crime, the identity of the victim, and may corroborate the testimony of witnesses."). I find that, to the extent that the crime scene photographs are those attached as Exhibit B to the Government's reply, (Doc. 312), the photographs are not unduly inflammatory or cumulative. *See* Fed. R. Evid. 403. The photographs "are relevant to prove, among other things, the force of the defendant's attack (as they show bicycles that were broken or crumpled) and the number of targets he hit (as multiple bicycles are depicted) and, thus, the defendant's intent in carrying out

the attack." (Doc. 285, at 50–51.)  The Government's motion for admission of the photographs

is GRANTED, and the Defense's request to limit the number of photographs to ten is DENIED.

e.    <u>Defendant's Prior In-Court Statements</u>

The Government requests that I deem admissible statements Saipov made in open court

at two court conferences, one on June 22, 2018 and another on November 18, 2019.  (Doc. 285,

at 54–58; *see also* Doc. 71 ("June Tr."); Doc. 228 ("Nov. Tr.").)  On both occasions, I advised

Saipov of his right to remain silent, Saipov indicated that he understood his rights, but Saipov

chose to speak anyway.  (*See* June Tr. 33:8-17; Nov. Tr. 18:24-19:4.)  Saipov said, among other

things, that ISIS is "fighting to impose sharia on earth" and that he did not recognize the

authority of the Court because he follows Allah.  (Doc. 285, at 55 (citing June Tr. 31:14-36:1;

Nov. Tr. 18:22-20:14).)  The Government argues that the in-court statements "evidence

[Saipov's] familiarity with (i) ISIS's goals—including that the Islamic State was imposing

'sharia [law] on earth' and 'is leading a war'—and (ii) ISIS's terminology, including use of the

term 'taghut,' which Dr. Zelin will explain is a term used by ISIS to refer to illegitimate leaders."

(Doc. 312, at 20.)

In opposition, the Defense argues that "to the extent Mr. Saipov's statements express

association, support, or purported membership in ISIS, they are inadmissible" under the First

Amendment.  (Doc. 305, at 9.)  The Defense is incorrect.  The First Amendment does not

preclude the Government's use of Saipov's in-court statements.  "The First Amendment protects

against government regulation and suppression of speech on account of its content.  It does not,

however, prohibit the evidentiary use of speech to establish the elements of a crime or to prove

motive or intent." *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014) (internal quotation

marks omitted).

13

Therefore, the Government's motion is GRANTED, and Saipov's prior in-court statements are admissible, as he was explicitly warned they would be.

        f.     <u>Mitigating Evidence During the Trial Phase</u>

The Government requests that the Defense "be precluded during the [trial] phase from mentioning mitigating factors during its addresses to the jury, and from asking questions eliciting evidence about any mitigating factors through cross-examination or otherwise." (Doc. 285, at 58–60.) The Defense objects. (*See* Doc. 305, at 9–10.) On reply, "the Government reserves its objection until the time when such evidence is offered." (Doc. 312, at 22.) At this stage of the case and in light of the relative positions of the parties, it is difficult to make a definitive ruling on such a broad motion to preclude. *See, e.g.*, *United States v. Tsarnaev*, 13 Cr. 10200 (GAO) (D. Mass. March 4, 2015), Doc. 1528, at 11:10-14 ("The government's motion is directed rather at a general category, mitigation evidence, the contents of which cannot be precisely defined and about which the parties are likely to have different views."). Accordingly, the Government's motion is DENIED without prejudice to specific objections to evidence offered by the Defense at trial.

        g.     <u>Cross-Examination Concerning DOJ Policy Regarding the Recording of Post-Arrest Statements</u>

The Government requests that the Defense be precluded from cross-examining two law enforcement agents about the Department of Justice policy in place at the time of Saipov's arrest concerning the electronic recording of custodial statements. (Doc. 285, at 60–64.) The Defense argues that Saipov has a Sixth Amendment right to explore this line of questioning. (Doc. 305, at 10–12.) I agree with the Defense that this questioning could bear on the witnesses' credibility. Therefore, the Government's motion is DENIED, and the Defense may cross-examine the law enforcement agents on this topic, subject to a limiting instruction. I intend to instruct the jury

that the jury may only consider the Department of Justice policy for purposes of impeachment, that the Department of Justice policy is not a statute or regulation, and that the Department of Justice policy does not create any legally enforceable rights.  Furthermore, I will allow the Government to identify other portions of the policy for the jury.

        h.      <u>Judicial Notice of ISIS as a Foreign Terrorist Organization</u>

The Government requests that I take judicial notice of the fact that ISIS has been designated a foreign terrorist organization, as indicated in the Federal Register. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed.").  The Defense does not appear to object.  Accordingly, the Government's motion is GRANTED.

        **2.**      **Defense's Motions *in Limine***

        a.      <u>Referring to the First Phase of Trial as the "Trial Phase"</u>

The Defense requests that I issue "an order precluding any reference to the first phase of the trial as the 'guilt phase' in the jury's presence." (Doc. 287, at 17–18.)  The Government does not object.  (Doc. 300, at 35.)  Therefore, the Defense's motion is GRANTED, and the parties and the court will refer to the initial phase as the "trial phase," consistent with the Defense's suggestion.  However, my granting of the request should not be taken as agreement with the Defense's argument that Saipov is somehow prejudiced by the use of the term "guilt phase."  The phrase simply reflects that the jury is being asked in the first part of the trial to determine whether the Government has proven Saipov guilty beyond a reasonable doubt of the charges contained in the Superseding Indictment.

        b.      <u>Testimony Regarding Saipov's Alleged Lack of Remorse</u>

The Defense requests that I exclude "any opinions, comments, or observations by law enforcement officers, first responders, or civilians during the trial phase about Mr. Saipov's

demeanor, emotions, characterizations of emotions, lack of reaction, lack of remorse, or lack of emotion during his post arrest medical treatment, interviews and/or interrogations." (Doc. 287, at 9.) The Government "agrees not to elicit any opinion testimony during the trial phase regarding the defendant's lack of remorse," but "does seek to offer limited testimony from the FBI agents who took the defendant's post-arrest statement regarding their observations of the defendant's lucidity, eagerness to speak with them, and enthusiasm regarding ISIS's mission." (Doc. 300, at 1; *see also id.* at 10–12.) The Defense's motion as to opinion testimony about Saipov's lack of remorse is GRANTED; however, the Government can elicit lay testimony from the interviewing agents concerning Saipov's demeanor based upon their observations of Saipov.

c.     <u>Evidence Regarding ISIS</u>

The Defense requests that "the government should be precluded from introducing specific ISIS-related evidence and testimony during the trial phase." (Doc. 287, at 12.) For the reasons stated in granting the Government's motions in Sections A(I)(a)–(c), *supra*, the Defense's request is DENIED.

**B.  *Penalty Phase***

**1.    Government's Motions *in Limine***

a.     <u>Beyond-a-Reasonable-Doubt Standard</u>

The Government requests that the Defense be precluded from arguing or suggesting to the jury that the beyond-a-reasonable-doubt standard applies when determining what sentence is justified under the circumstances. (Doc. 285, at 67–70.) During the penalty phase, once a jury decides unanimously beyond a reasonable doubt that at least one statutory aggravating factor enumerated in 18 U.S.C. § 3592(c) is present, the Federal Death Penalty Act of 1994 ("FDPA") provides that the jury must

16

> consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.

18 U.S.C. § 3593(e)(3). All courts of appeals that have considered what is meant by justified have determined that the beyond-a-reasonable-doubt standard is inapplicable to the FDPA weighing process. *See, e.g., United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013) (finding the jury instructions as to the weighing process "perfectly proper" where the District Court "recited the governing standard from the FDPA virtually verbatim"). I see no reason to reach a contrary conclusion. As articulated in *United States v. Sampson*, at the stage of weighing a sentence under § 3593(e), the jury "already ha[s] found beyond a reasonable doubt the facts needed to support a sentence of death." 486 F.3d 13, 32 (1st Cir. 2007). "[During the penalty phase], the judgment is moral—for the root of 'justify' is 'just.' What § 3593(e) requires, therefore, is not a finding of fact, but a moral judgment." *United States v. Gabrion,* 719 F.3d 511, 533 (6th Cir. 2013). Therefore, the Government's motion is GRANTED.

###### b.   Unavailability of the Death Penalty Under New York Law

The Government requests that I preclude the Defense from making any argument concerning the status of the death penalty under New York state law. (Doc. 285, at 71–72.) Because the Defense has not objected to the Government's motion, and New York's position on the death penalty is not a mitigating factor under the Eighth Amendment or the FDPA, the Government's motion is GRANTED.

###### c.   Evidence of the Defendant's Threats at Metropolitan Correctional Center as Proof of Future Dangerousness

The Government requests that I allow evidence of Saipov's threats to a correctional officer at the Metropolitan Correctional Center ("MCC") as proof of the aggravating factor of

17

"future dangerousness" pursuant to 18 U.S.C. § 3593(a)(2). (Doc. 285, at 72–75.) In response, the Defense asks that if the Government is permitted to present evidence of the aggravating factor, I hold an evidentiary hearing to test the reliability and credibility of the Government's proposed testimony. (Doc. 305, at 22.) Because I find that testimony regarding this incident speaks to future dangerousness, and Saipov admitted to the MCC's disciplinary committee that he made these threats, (*see* Doc. 285, at 73), the Government's motion is GRANTED, and the Defense's request for an evidentiary hearing is DENIED.

d.      Impact That the Defendant's Execution Would Have on the Defendant's Family

The Government initially requested that I "preclude any testimony or evidence about the impact that the Defendant's execution would have on the Defendant's family." (Doc. 285, at 75–78.) However, in its reply in further support of its motions *in limine*, the Government stated that it "will not object to [the] admission of execution impact testimony to the limited extent such testimony bears on the defendant's background, record, or character." (Doc. 312, at 29.) The Government's motion is GRANTED; however, the Defense is still permitted to present testimony that is relevant to the Defendant's background, record, or character in accordance with 18 U.S.C. § 3592(a)(8).

e.      Other Capital Cases

The Government requests that I preclude the Defense "from introducing any evidence or argument comparing the defendant to other capital defendants." (Doc. 285, at 78.) As the Defense does not object to this request, the Government's motion is GRANTED.

18

f.    Rule 16 Discovery Relating to Defendant's Rule 12.2
Notice

The Government requests that I "order the defendant to provide Rule 16 discovery

regarding his intended mental health evidence to a firewalled AUSA."[2]  (Doc. 472, at 28

(redacted); *see also* Doc. 521, at 18–19 (redacted).)  The Defense objects to the request, arguing

that the "notice went well beyond the plain language of Rule 12.2 and detailed both the kinds of

experts Mr. Saipov intends to call, the specific mental condition they will discuss, and the

sources of information on which they will rely," and that the request is a violation of Rule

12.2(c)'s timed-disclosure provisions.  (Doc. 493, at 11–20 (redacted).)  In light of the Defense's

objection, the Government is not requesting that I order a rebuttal examination at this time.

(Doc. 521, at 18–19 (redacted).)

Rule 12.2(c) is meant to protect against premature disclosures of mental health

examinations and related evidence, but in the death penalty context, "courts have consistently

authorized mental examination of the defendant by the Government experts pre-trial, i.e. before

the guilty verdict comes in, in order to avoid delay between the guilt and penalty phases of the

trial."  *United States v. Wilson*, 493 F. Supp. 2d 348, 359 (E.D.N.Y. 2006) (authorizing the

government's examination pre-trial because the risk to defendant of premature disclosure was

outweighed by the risks associated with a delay between the trial and penalty phase).  Here, as

noted, the Government is not seeking such an examination.

With regard to Rule 16 disclosures,

> Rule 16 does not mandate the timing of disclosure, but the Advisory
> Committee Notes to the 1993 Amendment declare: 'Although no
> specific timing requirements are included, it is expected that the

---

[2] The Government asked that this information be provided by September 2, 2022.

19

> parties will make their requests and disclosures in a timely fashion.'
> Courts in this district typically interpret the 'timely fashion' in
> which expert disclosure should be made to be anywhere from fifteen
> to thirty days before trial.

*Id.* at 356 (ordering the Defense to turn over Rule 16(b) discovery and additional related

discovery to the firewalled AUSA team one month before the start of jury selection).

    The Government's request that Rule 16 discovery regarding Saipov's intended mental

health evidence be provided to a firewalled AUSA is GRANTED.  I find that the Defense should

make Rule 16 disclosure to a firewalled AUSA by Friday, October 21, 2022.

### 2.    Defense's Motions *in Limine*

#### a.    <u>Written Proffer of Victim Impact Evidence</u>

    The Defense requests "a ruling that the government be required to offer a written proffer

in advance of victim impact testimony so that the Court can ensure that the evidence is within

constitutional bounds and is not unduly prejudicial under § 3593,"[3]  (Doc. 287, at 3), for "every

witness who will testify to her injuries or the impact that the death of her loved one has had,"

(Doc. 313, at 8).  The Government agreed to supplement its Death Penalty Notice with an outline

of anticipated aggravating-factor proof, but argues that the Defendant is in possession of the

material necessary to file motions related to these witnesses.  (Doc. 300, at 3–4.)  The Defense's

request is sub judice and will be decided in conjunction with the outstanding death penalty

motions.

---

[3] This request is related to the Defense's pending motion to dismiss specific aggravating factors from the Government's notice of intent to seek the death penalty.  (Doc. 98.)  This motion and related death penalty motions, Docs. 99, 103), will be addressed in a separate Opinion & Order.

    b.  Use of Gruesome, Repetitive Photographs, Videos, or
        Recorded Phone Calls

   The Defense requests that I make a "preliminary ruling . . . under Fed. R. Evid. 104(a) to

limit the government's admission of photographs of homicide victims, the crime scene, videos,

and 911 calls concerning the attack." (Doc. 287, at 10.) As it pertains to the penalty phase, the

Government opposed this request, and sought to admit "five crime scene photographs and five

autopsy photographs of each deceased victim during any penalty phase as evidence of the

defendant's heinous, cruel, and depraved manner of committing the offense . . . and to

demonstrate the serious bodily injury suffered by the victims." (Doc. 300, at 13–14 (citing Ex.

B, (filed under seal)).) The Government indicated that these photographs would be "offered

through the expert testimony of Dr. King, who will testify to each of the deceased victims'

suffering and pain." (*Id.* at 14.) The Defense objected to the use of these photographs during

both the trial phase and penalty phase in its opposition to the Government's motions *in limine*.

(Doc. 305, at 6–8.) The Government then stated in a footnote in its supplemental motions *in

limine*,

> The Government also now provides notice that it no longer intends
> to rely on one statutory aggravating factor—the heinous, cruel, and
> depraved manner of the offense. 18 U.S.C. § 3592(c)(6). This factor
> was not relevant to any of the Government's pending motions *in
> limine*, but the defendant moved *in limine* to preclude the testimony
> of Dr. David King, whose testimony would be relevant in part to
> proving this aggravating factor. (*See* Dkt. No. 287, at 8-9). In
> addition, one of the defendant's pending pretrial motions is to strike
> this aggravating factor, among others. (*See* Dkt. Nos. 97, 98 at 12-
> 14).

(Doc. 472, at 9 n.6; *see also id.* at 32 n.14 ("As noted above, the Government no longer seeks to

prove the aggravating factor of the heinous, cruel, and depraved manner of committing the

offense.").) Therefore, the Defense's motion is sub judice and will be decided following

additional briefing from the Government as to (1) whether it still intends to admit five autopsy photographs and five crime scene photographs of each deceased victim during the penalty phase, and under what basis; and (2) what Dr. King will be testifying to now that the Government no longer intends to rely on 18 U.S.C. § 3592(c)(6).

### C. *Both Phases*

#### 1. Government's Motions *in Limine*

##### a. Defendant's Prison Writings, Communications, and Threats to BOP Personnel

The Government requests that I deem "evidence of the Defendant's prison writings, communications, and threats to BOP Personnel" admissible during the trial phase, (Doc. 472, at 11–18 (redacted)), and also during the penalty phase as evidence of aggravating factors, (*id.* at 18–25 (redacted)). The Government's request to permit evidence of statements made by Saipov while incarcerated, both to prison officials and in the writings found as a result of the search of Saipov's cell on August 19, 2021, is GRANTED. The Government's request to allow admission of translated transcripts of recordings of Saipov while he has been incarcerated, which are contained in Exhibits A–F of the Government's memorandum of law in support of its supplemental motions *in limine*, filed under seal, is GRANTED.

#### 2. Defense's Motions *in Limine*

##### a. Expert Notice and for a *Daubert* Hearing

In response to the Government's notice for various trial and penalty phase experts, the Defense requests that I order the Government to supplement its expert notice and "preclude certain opinion testimony, and/or hold [*Daubert*] evidentiary hearings." (Doc. 287, at 5.) The Government objects to both the request for supplementation and a *Daubert* hearing. (*See* Doc. 300, at 4–10.)

Based on the Government's original expert notice and subsequent disclosures, there is no need for a *Daubert* hearing with respect to the testimony of Reginald Donaldson. (*See id.* at 5–6.) A *Daubert* hearing is also unnecessary as to the testimony from individuals involved in the forensic searches of Saipov's electronic device because these individuals are not providing expert testimony. (*See id.* at 6–7.) These individuals will be testifying to what was found on Saipov's phone and will not be expressing their opinion. *See United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) (summary order) (finding no error in allowing lay, non-expert testimony relating to search of electronic device where witness simply "explained his training," "described" his search, and "testified to the contents of the messages retrieved from the phone"). There is no need for a *Daubert* hearing related to the expert testimony of Jon Northrup. (*See* Doc. 300, at 7–8.) In testifying to the speed that Saipov was driving approximately five seconds before crashing the truck into the school bus, Northrup is relying on "maps, pictures, and videos of the crime scene, and the Bosch Crash Data report," all of which have been provided to the Defense. (*Id.*) In light of the Government's indication that it no longer intends to rely on one statutory aggravating factor—the heinous, cruel, and depraved manner of the offense, 18 U.S.C. § 3592(c)(6), the Defense's motion with regard to the testimony of Dr. King is sub judice until I receive additional briefing from the Government concerning what Dr. King will be testifying to now that the Government no longer intends to rely on 18 U.S.C. § 3592(c)(6).[4]

───────────────

[4] I note that the Defense is not challenging Dr. King's medical expertise or experience. Prior to the Government's decision to no longer rely on 18 U.S.C. § 3592(c)(6), Dr. King's testimony was to be based on his medical expertise and experience concerning the impact of trauma and injuries on the human body and the resultant pain. He provided similar testimony in *United States v. Tsarnaev* after the Court deemed such testimony admissible, only limiting Dr. King's remarks as to his personal experiences on the day of the attack. No. 13 Cr. 10200 (GAO) (D. Mass.), Doc. No. 1306, March 17, 2015 Tr. at 5. The Defense has not identified any cases in which Dr. King's testimony has been precluded.

In light of the initial and supplemental disclosures made by the Government, the

Defense's motion for additional expert notice is DENIED.  (*See* Doc. 300, at 5–6.)  The

Defense's motion for *Daubert* hearings is DENIED.

                b.      <u>Photographs of Homicide Victims While They Were Alive</u>

The Defense requests that I preclude the introduction of photographs of the homicide

victims while they were alive.  (Doc. 287, at 11–12.)  Since the Government has conditionally

agreed to this point, (Doc. 300, at 16), the Defense's motion as to the trial phase is GRANTED,

on the condition that the Defense stipulates to the identity of the homicide victims during the trial

phase.  The Defense's motion as to the penalty phase is DENIED, and the Government may

introduce up to five photographs of the homicide victims while they were alive, without

prejudice to the Defense making specific objections to individual photographs.

                c.      <u>Request For the Parties to Remain Seated When the Jury<br>Enters and Exits the Courtroom</u>

The Defense requests that I "enter an order instructing all parties to remain seated when

the jury enters or leaves the courtroom" because Saipov "believes that his religion prohibits him

from acknowledging any secular authority as a form of idolatry and a public denunciation of

God's supremacy." (Doc. 287, at 15.)  While "not conced[ing] that the defendant's twisted

conception of Islam qualifies for the protections he claims under the First Amendment and the

Religious Freedom Restoration Act," nor agreeing "that the jury would necessarily draw an

adverse inference against the defendant for remaining seated, as opposed to assuming that

defendants are not required to stand," the Government does not object to the Defense's request

that the parties remain seated.  (Doc. 300, at 32–33.)  The Defense's request is GRANTED,

insofar as Saipov, all Defense counsel, and all members of the Prosecution team agree to remain

seated.  In granting this request, I do not find or reach the issue of whether Defendant's

conception of Islam qualifies for the protections he claims under the First Amendment and/or the Religious Freedom Restoration Act; my decision to allow the Defense and Prosecution teams to remain seated is based on the parties' agreement. As such, I will not require, or instruct, other individuals in the courtroom to remain seated, and will leave it to their discretion whether or not to stand.

d.     <u>Saipov's Statements in Custody at the MCC</u>

The Defense argues that Saipov's statements at a disciplinary hearing while in custody at the MCC are inadmissible under *Miranda v. Arizona*, 384 U.S. 436 (1966) and the Fifth Amendment. (*See* Doc. 287, at 16–17.) As the Defense appears to concede, *Miranda* warnings are not necessary where the statements are not made in response to questioning. (*See* Doc. 300, at 33–35.) Saipov was advised at the start of the disciplinary hearing that he was not required to make any statements during the proceeding. (*Id.* at 34 ("Here, the defendant was advised at the start of the disciplinary proceeding that he was not required to make any statements.").) As reflected in the report, Saipov replied, "I don't care" and instructed the hearing officer to "write down" what he said. (*Id.*) Even though the purpose of the disciplinary hearing was to investigate whether Saipov had covered a security camera, Saipov proceeded to make statements regarding his threats to an officer. (*Id.*) The disciplinary committee advised Saipov that he was free to remain silent, and therefore, even though he "'was not free to leave MCC, he was free to cut off [the] conversation' with the Committee." *United States v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988). The Defense has not raised a material factual dispute to warrant a hearing. Because Saipov's statements to the officers at MCC were not made in response to questioning, (*see* Doc. 300, at 33–34), the Defense's request to preclude these statements is DENIED.

25

### D. *Other Motions*

#### 1.     Informative Outline of the Government's Aggravating Factors

The Defense requested that I require the Government "to provide an outline of the evidence underlying its proposed aggravating factors, and hold a hearing before any penalty phase to test whether the evidence is reliable or creates too great a risk of unfair prejudice if admitted." (Doc. 287, at 1.)  After this initial request, the Defense filed a letter motion on August 1, 2022 asking that I require the Government to turn over its informative outline by August 11, 2022.  (Doc. 462.)  Following a conference held on August 10, 2022, I issued an order directing the Government to produce its informative outline by September 13, 2022 and directing the Defense to file any objections by October 11, 2022.  (Doc. 482.)

#### 2.     *Brady*, Rule 16, and *Woodson* Materials

The Defense requested that I order the Government to "disclose all outstanding *Brady*, Rule 16, and *Woodson* Materials, particularly relating to Mr. Saipov's third-party contacts." (Doc. 473, at 4.)  In response, the Government claims that (1) none of the materials are exculpatory, (2) the Defense has "largely been on notice of the nature of the recently produced reports," (3) Saipov is already in possession of the information because he is aware of who radicalized him, and (4) "the bulk of the materials were not in the Prosecution Team's possession until August 2022." (Doc. 521, at 23.)

On October 6, 2022, six weeks after the Defense filed a Letter Motion raising *Brady* allegations based on recent disclosures by the Government, (Doc. 503), I received a letter to my Chambers inbox from the American Civil Liberties Union, through its Capital Punishment and Criminal Law Reform Projects, Advancing Real Change, Inc., and the New York Civil Liberties Union, ("Amici"), seeking leave to file a proposed amicus curiae brief, ("Amicus Brief".)  By

separate order, I granted the Amici leave to file the Amicus Brief.  To the extent the Government wishes to do so, the Government has until October 14, 2022 to file a response to the Amicus Brief.

The Defense's request under *Brady*, Rule 16, and *Woodson* will be addressed in a separate Opinion & Order following the review of the supplemental materials received this week from both the Government and the Defense, as well as the Amicus Brief and any Government response.

a.    <u>Masking Policy</u>

The Defense requested that I "require the parties, Mr. Saipov, and prospective jurors to remain mask-less during individual *voir dire*." (Doc. 473, at 6.)  On September 12, 2022, following additional briefing, (Doc. 518), I issued an order requiring a vaccinated jury and masking in the courtroom, (Doc. 559.)

## IV.    **Conclusion**

The foregoing rulings shall govern the admission of evidence at trial that were the subject of the motions *in limine*.  The parties shall inform the Court at the final pre-trial conference scheduled for October 7, 2022, or soon thereafter, and in any event no later than October 14, 2022, of any outstanding motions *in limine* that require the Court's attention, and any redactions[5] the parties wish to make to this Opinion & Order.[6]

---

[5] I am making this Opinion & Order available to the parties and filing a copy under seal until I receive proposed redactions, if any, from the parties.

[6] I note that Saipov reserves the right to seek additional remedies under the Fifth, Sixth, and Eighth Amendments should the Government ultimately not allow his overseas witnesses to testify in person. (*See* Doc. 473, at 4.)

SO ORDERED.

Dated: October 7, 2022
      New York, New York

Vernon S. Broderick
United States District Judge