```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA                                    :
                                                            :
            -against-                                       :   S1 17-CR-722 (VSB)
                                                            :
SAYFULLO HABIBULLAEVIC SAIPOV,                              :   OPINION & ORDER
                                                            :
            Defendant.                                      :
                                                            :
------------------------------------------------------------X
```

VERNON S. BRODERICK, United States District Judge:

Defendant Sayfullo Habibullaevic Saipov ("Defendant" or "Saipov") was charged in a twenty-eight count superseding indictment, filed on June 19, 2018 (the "Indictment" (Doc. 61.).) Saipov was convicted on all twenty-eight counts in the Indictment when the jury returned its verdict on January 26, 2023. On March 13, 2023, the jury rendered its penalty phase decision indicating that they were unable to reach a unanimous decision on any of the capital counts.

Currently before me is the Government's proposed restitution order, (Doc. 846-1), and Defendant's objection to a portion of the restitution amount, (Doc. 856). Because the testimony of Rachael Pharn during the trial and penalty phases, the nature and circumstances of Defendant's crimes, and Ms. Pharn's declaration more than establish by a preponderance the amount of restitution, the Government's order of restitution is APPROVED, and the restitution order will be filed simultaneously with this Opinion & Order.

I.   **Background and Procedural History**

Jury selection began in this death penalty case on October 11, 2022 and concluded on January 5, 2023. The trial phase began on January 9, 2023 and concluded on January 26, 2023 when the jury returned guilty verdicts on all twenty-eight counts of the Indictment. Rachel

Pharn, one of the surviving victims of Saipov's attack, testified during the trial phase on January 11, 2023.

The penalty phase of the case began on February 13, 2023, and Ms. Pharn testified on the first day of the penalty phase. The Government concluded its penalty phase presentation on February 22, 2023, and the defense ("Defense") concluded its penalty phase presentation on March 1, 2023. During its presentation, the Government called thirty-one witnesses. The Defense called nine witnesses during its penalty phase presentation. The penalty phase concluded on March 13, 2023, when the jury rendered its penalty phase decision stating that they were unable to reach a unanimous decision on any of the capital counts.

Ms. Pharn's testimony during the trial and penalty phases of the trial described in detail Saipov murdering two victims in front of her and his attempt to kill her with the 6,000-pound truck. (Doc. 858 at 2.) Specifically, Ms. Pharn testified that after having lunch with her best friend in midtown Manhattan, she received a call from Chase Bank indicating that someone had turned in the wallet she lost the week before. She rented a Citi Bike and rode down the bike path along the westside of Manhattan to the Chase branch located in the vicinity of South End and Liberty Street. After retrieving her wallet, Ms. Pharn rented another Citi Bike and headed north along the westside bike path. As she travelled north, she saw a white truck driving down the bike path, which she initially thought was a construction worker. However, she soon noticed that the truck was not slowing down and was heading towards two bicyclists riding south towards her on the bike path, who were approximately 15 feet in front of her. The truck "drove straight through the bike path into [the two bicyclists] and ran them over" causing their "bodies [to fly] into the air and f[a]ll to the ground" and scattering parts of their bikes in the bike path. (Tr. at

481.)[1]  The truck continued towards her and she "tried to move over to the right to avoid it" but it hit the left side of her body causing her to fall into the bushes along the bike path.  (*Id*. at 481–482.)  As she lay on the ground in excruciating pain and screaming "at the top of [her] lungs," Ms. Pharn "noticed that the two bikers in front of [her] weren't moving."  (*Id*. 482–483.)

When help arrived, Ms. Pharn asked "them to check the bikers that were in front of [her] first because [she] was worried about their well-being."  (*Id*. 483.)  When she arrived at the hospital, Ms. Pharn learned that her "left shoulder was injured," she had "a broken foot and ankle," and part of her left ankle was "scraped off."  (*Id* . 483–84.)  Ms. Pharn's shoulder was "severely bruised, and [she] also suffered from nerve damage."  (*Id*. 2063.)  Because of her physical injuries, Ms. Pharn attended physical therapy, saw a chiropractor, and wore a leg cast for months.  (*Id*. 2063.)  Ms. Pharn also developed "arthritis in [her] right knee," because she had to rely on the right side of her body to get around.  (*Id*. 2067–68).  Ms. Pharn experienced severe psychological trauma, including flashbacks, insomnia, and a "spectrum of extreme emotions ranging from peace and joy to despair, grief, and fear."  (*Id*. 2068.)  Ms. Pharn summarized her emotions over the five years between the attack and trial stating:

> The last five years just feel like an endless stream of thoughts.  I don't even feel like I have a sense of time.  And while the last few years have been the most transformative and positive growth I have ever experienced, at many times it has been hard to find the will to live.

(*Id*.)  Ms. Pharn continues to receive mental health treatment.  (Doc. 858-1 ¶ 4.)

On May 17, 2023, I sentenced Saipov to life imprisonment on each of Counts One through Eight; 20 years on each of Counts Nine through Sixteen; and 10 years on each of Counts Seventeen through Twenty-Six, to run consecutively with one another for a total of 260 years'

---

[1] "Tr." refers to the transcript from the trial.

imprisonment; and life imprisonment on Counts Twenty-Seven and Twenty-Eight, to run concurrently.  (Doc. 841 at 101.)  I also imposed a period of supervised release of five years of supervised release on Counts One through Eight and Counts Twenty-Eight and Twenty-Seven to run currently to all other terms of supervised release, and three years of supervised release on Counts Nine through Twenty-Six to run concurrently with all other terms of supervised release.  (*Id*. at 101-02.)  I did not impose a fine or forfeiture, but imposed a $100 special assessment on each of the twenty eight counts for a total of $2,800.  (*Id*. at 102.)

With regard to restitution, I granted the Government ninety days within which to submit a restitution order.  (Doc. 841 at 102.)  On August 11, 2023, the Government filed a proposed restitution order which provides for restitution from Defendant in the amount of $156,418.  (Doc. 846-1.)  After obtaining several extensions, (Docs. 848, 850, 852, 854), on October 17, 2023, Defendant filed a letter ("October 17 Letter") objecting to the Government's restitution request as "speculative and unsubstantiated."  (Doc. 856 at 1.)  Specifically, in the October 17 Letter, Defendant agreed to restitution of:  (1) $2,678 for transportation to medical appointments, and (2) $3,740 for out-of-pocket medical expenses.  (*Id*. at 2.)  However, with regard to the amount in lost income sought by the Government on behalf of Ms. Pharn, the Defense asserted that (1) the "Government has not met its burden to establish causation between Mr. Saipov's crime of conviction and the victim's subsequent work schedule", (2) that any amount over $20,000 in lost wages "does not have 'a sufficiently close connection to the [offense] conduct'," and (3) the lost wages are not supported by any documents.  (*Id*.)

In its October 27, 2023 response, (Doc. 858), the Government pointed out that the Defense mistakenly used $1,000 per month as Ms. Pharn's income for the months preceding the attack instead of $3,000 per month to calculate her lost income for the 20 months after the attack.

The Government argued that $3,000 per month was "not a reasonable baseline because Ms. Pharn had shifted to part-time work to study for business school." (*Id*. at 3, n.4.)  Instead, the Government states that Ms. Pharn's "but-for income should be at least $4,500 per month, representing the midpoint of the approximately "$4,000 to $5,000 per month" she earned during her last period of full-time employment before the attack." (*Id*. at 3.)  However, rather than rely on these figures, the Government asked Ms. Pharn to estimate her lost income.

Ms. Pharn estimated her lost income for the five-year period after the attack by considering her "job history and income before and after the attack." (Doc. 858-1 ¶ 6.)  Specifically, Ms. Pharn took into account that she (1) had "shifted to part-time work" while she was preparing to apply to business school, and (2) "worked sporadically and at reduced rates" after the attack. (*Id*.)  She described how the physical, mental, and emotional injuries impacted her ability to work for the period immediately following the attack until right before trial. (*Id*. ¶¶ 6 c.–g.)  Ms. Pharn estimated her lost income for each of the five years after the attack to be $30,000. (*Id*. ¶ 6.)

In its reply, the Defense conceded that it should have used the $3,000 figure and calculated Ms. Pharn's "lost income for the first 20 months [to be] $51,000." (Doc. 859 at 1.)  However, with regard to the remaining 40 months after the attack, the defense maintained that "the Government has not met its burden to establish causation between Mr. Saipov's crime of conviction and the victim's subsequent work schedule." (*Id*. at 2.)

II. **Legal Standard**

With regard to restitution, the "term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).  "[T]he requirements of direct and proximate causation, . . ., are necessary

conditions for restitution under the [Mandatory Victim Restitution Act]—not sufficient ones. As the statute makes clear, the harm must also come within one of the categories enumerated in § 3663A(b)." *United States v. Maynard*, 743 F.3d 374, 379 (2d Cir. 2014) (internal citations omitted). "Although restitution calculations cannot be hypothetical or speculative, a 'reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable.'" *United States v. Morante*, 631 F. App'x 72, 73 (2d Cir. 2016) (quoting *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013)).

The Government bears the burden of proving the victim's loss amount by a preponderance of the evidence. 18 U.S.C. § 3664(e). In determining restitution, a court may rely on any proof, including testimony at trial, *United States v. Pickett*, 387 F. App'x 32, 36 (2d Cir. 2010) (affirming restitution order based on trial testimony and summary chart), and affidavits, *United States v. Rivera*, 152 F.3d 921, at *1 (2d Cir. 1998) (summary order) (affirming restitution order based on victim affidavit). No evidentiary hearing is required even if parties dispute the loss amount. *See United States v. Sabhnani*, 599 F.3d 215, 257–58 (2d Cir. 2010) ("We have noted, in the context of contested issues regarding the propriety of a restitution award, that the sentencing procedures employed to resolve such disputes are within the district court's discretion so long as the defendant is given an adequate opportunity to present his position[.]").

The Mandatory Victim Restitution Act (the "MVRA") provides restitution for bodily injury that includes: (1) "an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;" (2) "an amount equal to the cost of necessary

physical and occupational therapy and rehabilitation;" and (3) "reimburse[ment to] the victim for income lost by such victim as a result of such offense." 18 U.S.C. § 3663A(b)(2). In any case, the MVRA also provides for "reimburse[ment to] the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Id*. § 3663A(b)(4). "[T]he MVRA's lost income provision applies to future income lost as a result of the offense of conviction." *United States v. Messina*, 806 F.3d 55, 67 (2d Cir. 2015). "[L]ost income is [ ] understood to encompass future income lost from death or injury[.]" *Id*. at 69.

### III. Discussion

The parties are in agreement that Ms. Pharn is a victim under the MVRA entitled to restitution in amount of (1) $2,678 for transportation to medical appointments, and (2) $3,740 for out-of-pocket medical expenses. (Doc. 858 at 2, n.2.) However, with regard to Ms. Pharn's lost income, the parties do not agree. Despite using $3,000 a month to calculate Ms. Pharn's lost wages for the first 20 months following the attack, the Defense argues that the Government has "not met its burden to establish causation between Mr. Saipov's crime of conviction and the victim's subsequent work schedule." (Doc. 859 at 2.) The Defense is wrong; Ms. Pharn's testimony, her declaration, and the circumstances of the attack more than amply establish by a preponderance of the evidence that Saipov's crimes caused Ms. Pharn's lost income for the five-years after the attack.

In her declaration, Ms. Pharn describes her reasonable, good-faith effort to calculate her lost income for the five-year period after the attack. (858-1 ¶ 6.) There is no question that she is in the best position to calculate her lost income since she can assess the impact of the attack on her ability to work and provide details concerning how much she was able to work after the

attack. There is also no question that I can consider her declaration to assist me in determining the amount of restitution. *See United States v. Hall*, 467 F. App'x 47, 49 (2d Cir. 2012) (finding that the district court, after ordering the Government to obtain affidavits from each of the victims detailing the amount of loss they had incurred and how they had been victimized, committed no procedural error); *United States v. Romano*, No. 09-Cr-170, 2022 WL 2666914, at *6 (E.D.N.Y. July 11, 2022), *aff'd*, No. 15-992, 2022 WL 17097587 (2d Cir. Nov. 22, 2022) (citing *Hall*, 467 F. App'x at 49) ("The use of victim loss affidavits in calculating restitution is widely accepted, even though the production of such affidavits is not required under the statute") (internal quotation marks omitted).

It is also clear that Ms. Pharn suffered physical, mental, and emotional injuries as a result of Saipov's attack. Saipov murdered eight people, and murdered two people in front of Ms. Pharn after hitting them with a 6,000-pound truck travelling at approximately 60 miles per hour. After witnessing these horrific events from a distance of approximately 15 feet, Ms. Pharn had mere seconds to avoid being killed herself as Saipov aimed the truck at her. After narrowly escaping with her life, she lay on the ground in agony waiting for help to arrive, and saw the two victims she saw hit by the truck were not moving. It is, therefore, not surprising that even after her physical injuries had largely healed, the mental and emotional scars have yet to heal and will undoubtedly be with her for the rest of her life. After the attack, Ms. Pharn experienced severe psychological trauma, including flashbacks, insomnia, and a "spectrum of extreme emotions ranging from peace and joy to despair, grief, and fear." (*Id*. 2068). She summarized her emotions over the five years between the attack and trial stating:

> The last five years just feel like an endless stream of thoughts. I don't even feel like I have a sense of time. And while the last few years have been the most transformative and positive growth I have ever experienced, at many times it has been hard to find the will to live.

(*Id*. 2068.)  Ms. Pharn continues to receive mental health treatment.  (Doc. 858-1 ¶ 4.)

With regard to the attack's impact on her ability to work, Ms. Pharn specifically describes the impact of her physical, mental, and emotional injuries from the attack on her ability to work by breaking down the impact by time periods following the attack.  She stated that:  (1) for approximately six months (from the date of the attack until mid-2018), she could not work at all due to her injuries, (Doc. 858-1 ¶ 6 c.); (2) from approximately mid-2018 to early 2019, she was "only able to work part-time owing to the effects of the defendant's attack and [her] physical, mental, and emotional injuries" and earned approximately $1,000 per month, (*id*. ¶6 d.); (3) from early 2019 until mid-2019, she moved to another state and "had to restart therapy and again could not work for several months owing to the effects of the attack", (*id*. ¶ 6 e.); (4) from approximately mid-2019 until mid-2022, she worked part-time (10 to 20 hours per week) at various temporary jobs, earning between $18 and $44 per hour, but was "unable to return to full-time work due to the physical, emotional, and mental impact of the attack", (*id*. ¶ 6 f.); and (5) in mid-2022, Ms. Pharn had to "again stop working, in substantial part because of the trauma of preparing for, testifying at, and attending the Saipov trial", (*id*. ¶ 6 g.).  "Taking all this information into account," Ms. Pharn estimated her lost income for each of the five years after the attack to be $30,000 a year, for a total of approximately $150,000.  (Doc. 858-1 ¶ 6.)  Ms. Pharn's estimation is a "'reasonable approximation'" of her lost income resulting from her physical, mental, and emotional injuries from the attack.  *See Morante*, 631 F. App'x at 73.  Defendant's argument that there is insufficient evidence of a causal connection between Saipov's crimes and Ms. Pharn's work history after the attack simply ignores the nature of Saipov's crimes and Ms. Pharn's physical and psychological injuries.  The attack upended Ms. Pharn's life, resulting in her not being able to work immediately after the attack and her inability

9

thereafter to work full-time. With regard to Ms. Pharn's inability to work full-time after she had recovered from the most severe of her physical injuries, the record amply supports the causal connection between ability to work and her psychological injuries. As noted above, Ms. Pharn witnessed two innocent people brutally murdered in approximately 15 feet in front of her by Saipov. She then had mere seconds to avoid being killed herself because Saipov then aimed the truck at her. The psychological impact of witnessing such horrific events caused her to have flashbacks, insomnia, and a "spectrum of extreme emotions ranging from peace and joy to despair, grief, and fear." (Tr. 2068). As a result of the attack, Ms. Pharn received and continues to receive mental health treatment. (Doc. 858-1 ¶ 4.)

It is also not surprising that the investigation, preparation for the trial, and the trial itself impacted Ms. Pharn's ability to work, since she met with law enforcement officers and prosecutors on numerous occasions and essentially relived the attack multiple times as part of the investigation and preparation to testify at trial. The MVRA specifically recognizes costs associated with investigation and prosecution, including testimony and attendance at proceedings, to be recoverable. *See* 18 U.S.C. § 3663A(b)(4) (allowing for "reimburse[ment to] the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.").

In addition, Defendant's argument that the lost income portion of the restitution needs to be supported by documents is not supported by the case law. Indeed, Defendant does not cite any legal basis for his assertion. The law only requires that restitution calculations be a reasonable approximation that can be based on any proof, including testimony at trial, *Pickett*, 387 F. App'x at 36, and affidavits, *Rivera*, 152 F.3d 921, at *1; *Hall*, 467 F. App'x at 49;

*Romano*, 2022 WL 2666914, at *6.

### IV.  Conclusion

For the foregoing reasons, the Government's request restitution to Ms. Pharn in the amount of $156,418 is GRANTED.  The order of restitution will be filed simultaneously with this Opinion & Order.

SO ORDERED.

Dated: January 22, 2024
      New York, New York

*[signature]*
Vernon S. Broderick
United States District Judge